JPL:MBM
F.#2006R00076

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -               04-CR-706 (S-6)(DGT)

DAMION HARDY,
    also known as "World,"

             Defendant.

- - - - - - - - - - - - - - - -X

GOVERNMENT'S SECOND MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO MEDICATE DAMION HARDY

                               LORETTA E. LYNCH
                               UNITED STATES ATTORNEY
                               Eastern District of New York
                               271 Cadman Plaza East
                               Brooklyn, New York 11201

JAMES P. LOONAM
MELISSA B. MARRUS
Assistant United States Attorneys
(Of Counsel)

<u>SUMMARY</u>

The government respectfully submits that the Court should order the involuntary medication of Damion Hardy on two grounds.  First, Hardy poses a danger to the safety of Bureau of Prisons ("BOP") staff members due to his mental illness, and he should be medicated to mitigate this danger.  Second, Hardy should be medicated to render him competent to stand trial for his role in serious crimes, including six murders.

With respect to the first basis, there can be little question that Hardy is dangerous even under the conditions of his incarceration.  As established at the hearing in this case:

- Hardy has been able to construct potentially deadly weapons, <u>even while he has been housed in the special housing units</u> ("SHU") at the BOP;

- Hardy has used these weapons in the past.  He cut BOP personnel on the hand while in SHU, repeatedly stabbed another inmate in the head, neck and arm while in general population, attempted to stab a BOP guard in the chest while in SHU, and hit a BOP staff member in the head with a sock full of batteries;

- Even while held in four-point restraints, Hardy has attempted to bite BOP personnel;

- Hardy throws urine and excrement in the faces of BOP personnel on a regular basis, exposing them to infection; and

- Hardy recently attempted to assault BOP personnel, thrusting his arm outside of the food slot while reaching for a toothbrush with his other hand.

The doctors who have actually examined Hardy have concluded that the only way to deal effectively with the danger he poses is to

treat him with one of the widely prescribed medications which are the universally accepted treatment for schizophrenia.  Medicating Hardy on this basis is permitted, and even mandated, by the controlling law and regulations.

With respect to the second basis, the government, the courts, the victims of Hardy's crimes, the witnesses to Hardy's crimes, and even Hardy himself, have an important interest in moving this case forward to trial.  To do so, there is no alternative to the administration of this same widely prescribed medication to treat Hardy's diagnosed schizophrenia.  The administration of this medication is the medically appropriate thing to do.  The only seriously contested point between the parties is whether the medication is substantially likely to work.  The doctors who have examined Hardy have concluded that it is, and have opined that the administration of medication is substantially likely to render Hardy competent to stand trial.  Their conclusions are supported by <u>all</u> of the available medical literature in the record, as set forth below.

A.   A Sample[1] of the Restoration Studies Relied Upon By <u>Government Experts</u>

1.   Involuntary Medication of Patients Who Are Incompetent to Stand Trial: A Descriptive Study of <u>the New York Experience with Judicial Review</u>

---

[1]  Dr. Sarrazin's psychiatric report cites to fourteen different psychiatric studies in support of his report.  <u>See</u> Sarrazazin, M.D., Psychiatric Report, Feb. 2, 2009 at 17-18.

In 1993, the Bulletin of the American Academy of Psychiatry and the Law published a study that considered the efficacy of involuntary administrations of antipsychotic medications to render defendants competent to stand trial.[2]  This study was recognized by the American Academy of Psychiatry and the Law with an award for best research by a fellow in forensic psychiatry in 1993.  Of the cases in which defendants were involuntarily medicated, <u>87 percent were restored to competence</u>.  <u>Id</u>. at 538-39.  "In the majority of such cases the response was described as rapid and robust and dramatic."  <u>Id</u>. at 538.  The defendants in this study were typically treated with first generation long-acting intramuscular antipsychotic medications such as haloperidol.  <u>Id</u>. at 535.

    B.    Restoration Study Cited By The First Defense
          <u>Expert, Dr. Richard Dudley</u>

        1.    Jackson's Indiana: State Hospital Competence
            <u>Restoration in Indiana</u>

In 2008, the Journal of American Academy of Psychiatry and the Law published a comprehensive study that considered the probability of success for restoration proceedings for criminal defendants.[3]  The study gathered data from 1,475 defendants

---

    [2]  Ladds, et. al., <u>Involuntary Medication of Patients Who Are Incompetent to Stand Trial: A Descriptive Study of the New York Experience with Judicial Review</u>, Bull. Amer. Acad. Psych. & Law, v.21:4, 1993.

    [3]  <u>See</u> Morris and Parker, <u>Jackson's Indiana: State Hospital Competence Restoration in Indiana</u>, J. American Academy of

4

admitted to Indiana hospitals for restoration to competence proceedings over an eighteen year period (1988 to 2005). The study found that <u>72.3 percent of the defendants were restored to competence within six months of admission and 83.9 percent were restored to competence within one year of admission</u>. <u>Id</u>. The success rate for defendants with psychotic disorders such as Hardy was similar, with 72.8 percent restored to competence within six months of admission and 83.8 percent restored to competence after one year of admission. <u>Id</u>. at 529, Table 4.

C.   Restoration Studies Relied Upon By the Second Defense Expert

The defense psychologist Xavier Amador, did not cite to a single restoration study in either his affidavit or his testimony. The one psychiatric study relied upon by Dr. Amador during his testimony was the "Kane study" which is titled "Clozapine for the Treatment Resistant Schizophrenia." (Tr. Amador Test. at 195, 205).[4] This study did not address restoration proceedings and therefore did not use restoration rates as a data point.

Amador testified that the Kane study would support his testimony that Hardy was only 35 percent likely to respond to

_____

Psychiatry and the Law, 2008, p. 524 (recognizing that "[t]he probability of successful RTC [(restoration to competency)] is both clinically and legally pertinent[.]"

[4] John Kane M.D., <u>et al</u>., <u>Clozapine for the Treatment Resistant Schizophrenia</u>, Arc. Gen. Psych., Vol 45 (Sept. 1988).

treatment because he suffered from delusions as a symptom of his schizophrenia.  (Tr. Amador Test. at 193-94).  However, the Kane study says no such thing.

The Kane study actually supports medicating Hardy.  It states that only 10-20 percent of schizophrenic patients will derive little benefit from the typical drugs (e.g. haloperidol) administered to treat schizophrenia.  See Kane at 789.  Therefore, 80-90 percent of schizophrenic patients will benefit from the typical drugs.  See Kane at 789.  The small percentage of unresponsive patients is known as the "refractory group."  See Kane at 789.

The focus of the Kane Study is not on predicting which schizophrenic patients will be part of this refractory group.  To the contrary, Kane explicitly states "there are no consistently replicated findings providing clues about why patients are refractory to treatment."  Kane at 789.  In other words, the doctors have no reliable data to assess why certain schizophrenic patients respond to the typical treatment and a small percentage of others do not.  This is the opposite of what Amador testified the study would say.

The Kane Study focused on the efficacy of a particular drug, clozapine, in treating this refractory group.  See Kane Study at 789-96.  The results of the Kane study found that "[t]he response to clozapine demonstrates that this sub-group [the

6

refractory group] of severely ill schizophrenic patients, previously considered by many to be beyond the reach of conventional therapy, does remain capable of experiencing substantial medication response." Kane Study at 795.

This positive result occurred regardless of the symptoms of the schizophrenic patients. The superiority of clozapine "was not confined to a particular aspect or dimension of psychopathological characteristics (e.g. hallucinations, delusions, or suspiciousness) but involved all the major psychotic signs and symptoms associated with this patient group, including such negative items as blunted affect, emotional withdrawal, apathy, and disorientation)." Kane at 796. In other words, the efficacy of clozapine was not affected by symptoms (and also noteworthy, delusions were listed with the other common symptoms of schizophrenia and were not listed as "negative items"). Again this is the opposite of what Amador testified to.

It is also noteworthy, that this point about clozapine was made in Dr. Sarrazin's original report to the Court. See Sarrazin Psychiatric Report, Feb. 2, 2009 at 11.

<u>Conclusion of Summary</u>

The government respectfully submits that the extensive record in this case supports medicating Hardy to both mitigate the danger he poses to BOP staff and render him competent to stand trial. Such an order is warranted by the law most

7

importantly, but also by standards of medical care and general notions of justice.

I.   <u>STATEMENT OF FACTS</u>

On January 24, 2008, a grand jury returned a twenty-six count superseding indictment that charged Hardy with crimes in connection with his leadership of the CMB.  Among other crimes, Hardy is charged with the murders of Michael Colon, Darryl Baum, James Hamilton, Ivery Davis, Johan Camitz, and Tyrone Baum.[5]

A.   <u>Competency Evaluations</u>

Hardy has been examined on multiple occasions to determine whether he is competent to stand trial.  The first examination was ordered on September 22, 2004 and was conducted by Cristina Liberati, Ph.D., at the Metropolitan Correction Center.  Dr. Liberati observed that Hardy was fully oriented as to time, place, person and circumstance.  <u>See</u> Liberati Report at 4.  She further found that Hardy "showed no signs of expressive or receptive speech difficulties and that his speech was logical and coherent but irrelevant to the topic by choice."  <u>Id</u>.

Regarding Hardy's ability to assist with his defense, Dr. Liberati noted that Francisco Celedonio, Esq., Hardy's defense counsel, stated that "Hardy was competent to stand trial

_____

[5]   The Attorney General has directed the Office to seek the death penalty against Hardy for the murder of Ivery Davis.  A defense request for the Attorney General to reconsider the decision to seek the death penalty is currently pending.

and was able to assist in his defense." Liberati Forensic Report at p. 5. Mr. Celedonio described Hardy as "very sharp" and further stated that Hardy was aware of "the charges, the background, specific events, legal arguments and the court process." Liberati at 6. Mr. Celedonio stated that Hardy "is responsive when he wants to be and chose not to participate in past court proceedings." Id. Dr. Liberati opined that Hardy was competent to stand trial, but noted that Hardy's lack of cooperation with the examination prevented the usual level of psychological certainty. Id.

Subsequent examiners have determined that Hardy is not competent to proceed to trial. William Ryan, Ph.D., examined Hardy from December 2007 to January 2008. In connection with this examination, defense counsel David Ruhnke, Esq., informed Dr. Ryan that defense counsel's interactions with Hardy "always included a mix of bizarre and relevant content, but over time the bizarre and delusional has almost wholly supplanted the relevant." Preston-Baecht Forensic Report at p. 7. Mr. Ruhnke further informed Dr. Ryan that Hardy "has been consistently unwilling or unable to discuss the facts and circumstances of the charges against him in any meaningful way." Id. Dr. Ryan concluded that "Hardy's delusional beliefs may manifest in serious issues regrading his competency, as [he] seems to put little effort into fighting his case as he believes he is the

Messiah and Allah will make things right." Id.

BOP conducted another competency evaluation in March 2008. Christine Scronce, Ph.D, conducted the evaluation and found that "there is no clear evidence that [Hardy] harbors current delusional beliefs that would hinder his relationship with counsel and his rational understanding of his legal circumstances, [however] Mr. Hardy does present signs of disordered thinking that could seriously impact his capacity to meaningfully participate in his defense." Id. at 8. Dr. Scronce diagnosed Hardy with schizophrenia, paranoid type and concluded that he was not competent to proceed to trial. Id.

Given the reports of Drs. Ryan and Scronce, the government consented to an order finding Hardy incompetent to stand trial pursuant to 18 U.S.C. § 4241(d).

B. Restoration Study

Pursuant to 18 U.S.C. § 4241(d)(1), Your Honor committed Hardy for further study to determine whether there was a substantial probability that he could be restored to competence in the foreseeable future. See Order Committing Defendant For Further Study, July 29, 2008 (docket entry no. 422). Two BOP doctors conducted this study: psychologist Lea Ann Preston-Baecht, Ph.D, and psychiatrist Robert Sarrazin, M.D.

1. Lea Ann Preston-Baecht, Ph.D

Dr. Preston-Baecht conducted a full review of Hardy's

10

psychiatric history as part of her evaluation.  See Preston-

Baecht Report at pp. 5-8.  Dr. Preston-Baecht also conducted her

own evaluation based on her observations and interactions with

Hardy.  Id. at 8-11.  Dr. Preston-Baecht diagnosed Hardy as

suffering from schizophrenia, paranoid type.  See Preston-Baecht

Report at p. 11.  Dr. Preston-Baecht noted that Hardy's "factual

understanding of the charges and proceedings against him is not

the problematic issue; rather it is his lack of rational

understanding of his legal situation and his ability to assist in

his defense."  Id. at 11.  Dr. Preston-Baecht noted Hardy's

insistence that there is no case against him and his repeated

references to "ethou law" and court cases from the 1800s as

evidence of his psychosis.  Id.  Dr. Preston-Baecht concluded as

follows:

> Although some of Mr. Hardy's uncooperative
> behavior has likely been willful, his
> delusional and at times, disorganized
> thinking, clearly impacts his ability to
> communicate meaningfully.  As described
> above, he often talks in a rambling fashion
> using circular reasoning.  In his present
> mental condition, he is unable to assist
> properly in his own defense.  His mental
> illness impairs his ability to communicate
> with counsel, testify in his own behalf, and
> make well-reasoned decisions.
>
> Based on the above information, it is my
> opinion Mr. Hardy remains incompetent to
> proceed in the absence of anti-psychotic
> medication.  At the present time, he suffers
> from a severe mental disease, paranoid
> schizophrenia, which negatively impacts his
> ability to understand the nature and

11

> potential consequences of the proceedings
> against him, or to assist properly in his
> defense.

Id. at 12.

Dr. Preston-Baecht opined that absent antipsychotic medications, Hardy was substantially unlikely to be restored to competency in the foreseeable future.  Id.   Dr. Preston-Baecht further opined that the administration of antipsychotic drugs on an involuntary basis "would likely reduce the intensity of Mr. Hardy's psychotic symptoms and improve his mental status to the level where he would be considered competent to stand trial." Id. at 13.  Dr. Preston-Baecht concluded that "with the proper prescription and monitoring of antipsychotic medication, it is substantially likely that Mr. Hardy will be restored to competency and that the proposed treatment would be substantially unlikely to have side effects that would interfere significantly with his ability to assist counsel in conducting a defense."   Id.

     2.   Robert Sarrazin, M.D.

Robert Sarrazin, M.D., the Chief of Psychiatry at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri, also evaluated Hardy.  Based on his own interactions with Hardy as well as a review of Hardy's past evaluations, Dr. Sarrazin concluded that Hardy "is very disorganized in his thought processes and difficult to follow in conversation.  He remains extremely delusional, particularly in light of the fact

12

that he states that there is no case against him, that there are
Supreme Court decisions that he has looked up that state he
should be 'free.'" See Sarrazin Psychiatric Report at p. 3.  Dr.
Sarrazin diagnosed Hardy as suffering from schizophrenia, with
antisocial personality disorder.

Dr. Sarrazin proposed a very specific treatment plan of
antipsychotic medications which he opined was "substantially
likely to render [Hardy] competent to proceed to stand trial and
substantially unlikely to have side effects that will interfere
significantly with his ability to assist counsel in conducting a
defense." Id. at 11.  Dr. Sarrazin recommended starting Hardy on
second generation antipsychotic medications such as Abilify,
Geodon, or Risperdal.  If Hardy is unwilling to cooperate with
oral medication, Dr. Sarrazin recommended treating Hardy with
injections of haloperidol, a long-used first generation
antipsychotic medication.  Id. at 3, 12-4.  Dr. Sarrazin noted
that "[t]he current professional psychiatric literature indicates
that first and second generation antipsychotics have
approximately equal efficacy against psychotic symptoms[.]" Id.
at 11.  Dr. Sarrazin's proposed treatment plan is very specific
and includes recommended dosage ranges for each medication as
well as procedures for administering the medication and
monitoring and treating potential side effects from the
medication.  Id. at 7-10, 12-4.

13

Dr. Sarrazin noted that general data from the American Psychiatric Association provides a wide range of predictions for Hardy's treatment outcome.  The most optimistic interpretation of the general data suggests that Hardy has a 90 percent likelihood of restoration to competency with treatment.  The most pessimistic interpretation of the data suggests that Hardy, at worst, has a 40 percent chance of restoration with treatment. Id. at 5-6.  These percentages are general and apply to all schizophrenic defendants who are candidates for involuntary medication orders.

Dr. Sarrazin opined that the likelihood for restoring Hardy to competence using antipsychotic medication was neither the most optimistic or most pessimistic view of the general data, but rather somewhere between the two extremes.  Dr. Sarrazin stated that "[t]he court should consider that Mr. Hardy has been able to maintain a relatively high level of social functioning despite his low level thought disorder. . . . His relatively high level of social functioning has some positive prognostic implications[.]"  Id. at 15.  Dr. Sarrazin also noted that "[t]he general outcome of competency restoration activities for groups of incompetent defendants has been described as quite positive." Id. at 3.  "More specifically related to Mr. Hardy's case, the available empirical data indicates that the majority of incompetent defendants suffering from schizophrenia and related

14

psychotic disorders who refused the recommended treatment with antipsychotic medication can be restored to competency to stand trial following a period of involuntary treatment." Id. at 4. Dr. Sarrazin pointed to a study conducted in New York State of incompetent defendants who were subjected to involuntary treatment with antipsychotic medications. Of these defendants, 87 percent were rendered competent to stand trial. Id. at 4.[6] Dr. Sarrazin estimated that Hardy was approximately 75 to 87 percent likely to be restored to competence with antipsychotic medications. See id. at 11 (citing studies with a range of response rates from 75 percent to 87 percent).

      C.    The First Sell Hearing

          1.    Pre-Hearing

      The Court held an evidentiary hearing pursuant to Sell on August 25, 2009. Prior to the hearing, the government informed the Court of two recent reports in the Federal Bureau of Prisons Psychological Data System. See Transcript of August 24, 2009.[7] The first report, dated August 18, 2009, was written by

---

[6] See also Ladds, Involuntary Medication of Patients who are Incompetent to Stand Trial: A Descriptive Study of the New York Experience with Judicial Review, 1993.

[7] The Sell hearing was originally scheduled for August 24, 2009. However Hardy refuse to come to court on that day. In Hardy's absence, the parties addressed two procedural issues on the record, (1) how to address the two recent psychological reports, and (2) the issuance of a force order. This proceeding does not appear on the docket.

Dr. Parry Hess, Psy.D. Dr. Hess reported as follows:

> Mr. Hardy exhibits significant improvement in
> interpersonal and cognitive function and did
> not exhibit psychotic symptoms during today's
> interview. Although mental health problems
> were evident in the past, he appeared
> psychologically stable during today's
> interview. However, he does continue to
> exhibit signs of non-delusional paranoia and
> anti-social behavior.

Hess Report at p. 2.

The second report, dated August 19, 2009, was drafted

by the Chief Psychologist at the Metropolitan Detention Center

and related a report from a duty officer who interacted with

Hardy. The report stated as follows:

> Inmate Hardy made a request for a copy of a
> specific forensic report which he needed for
> a hearing. The [duty officer] stated that
> Hardy communicated in a clear, coherent,
> logical and rational manner throughout the
> several conversations they held.

Guerrero-Cohen Report at p. 1.

In light of these reports, Your Honor allowed Drs.

Preston-Baecht and Sarrazin to meet with Hardy prior to the

hearing. After this meeting, Drs. Preston-Baecht and Sarrazin

confirmed that Hardy continued to suffer from schizophrenia.

    2.  Testimony

On August 25, 2009, the government called Drs. Preston-

Baecht and Sarrazin to testify at the Sell hearing. On November

24, 2009, the defense called Dr. Richard Dudley to testify. The

government provided the court with numerous exhibits during the

16

hearing including scientific psychiatric studies which support the conclusions reached by Drs. Preston-Baecht and Sarrazin.

a.   <u>Preston-Baecht, Ph.D.</u>

Dr. Preston-Baecht was the assigned primary clinician and evaluated Hardy over a four month period.  <u>See</u> Aug. 25, 2009 Tr. at 4-5.  Dr. Preston-Baecht described how she was able to observe Hardy during her rounds and interact with him on at least 13 or 14 occasions, oftentimes for close to an hour in duration. <u>Id</u>. at 5.  Dr. Preston-Baecht testified that Hardy would typically state that he needed to be released immediately and often giggled inappropriately during their interactions.  <u>See id</u>. Dr. Preston-Baecht reiterated the descriptions in her report concerning Hardy's statements about "ethou" law.  <u>Id</u>. at 6.  Dr. Preston-Baecht testified that in her opinion Hardy suffered from schizophrenia and was not competent to proceed to trial.  <u>Id</u>. at 7-8.  Dr. Preston-Baecht testified that the first evidence of Hardy's psychosis appeared in 2004 when he made odd statements on a radio program about freemasons and then traveled to the Middle East with the belief that he had authority to speak with leaders there.  <u>See id</u>. at 10, 33-6.  However, Dr. Preston-Baecht took note that in 2004 and 2005 Hardy's counsel, Mr. Celedonio, believed that Hardy understood the charges, legal arguments and court processes and was competent to proceed to trial.  <u>See id</u>. at 32-3.

Dr. Preston-Baecht testified that the administration of antipsychotic medication is the medically appropriate treatment for Hardy's schizophrenia.  See id. at 15.  Dr. Preston-Baecht testified that Hardy rejected all prior offers of antipsychotic medication, usually by laughing.  See id.  Dr. Preston-Baecht opined that the only way to render Hardy competent to stand trial is to administer antipsychotic medications.  See id. at 15.

On cross-examination Dr. Preston-Baecht confirmed that Hardy's condition was continuous, meaning it was unabated during the months of the evaluation.  See id. at 18.  Dr. Preston-Baecht disagreed with Mr. Celedonio's characterization of Hardy's illness as "deteriorating."  To the contrary, Dr. Preston-Baecht testified that Hardy "remained fairly constant in his presentation."  Id.  Dr. Preston-Baecht reiterated that Hardy "seems to have remained the same since the time that I met him in October of '08."  Id. at 20.  Dr. Preston-Baecht disagreed with defense counsel's description of Hardy's condition as "a major delusional disorder" and clarified that schizophrenia is a type of psychotic disorder not a delusional disorder.  See id. at 19.  Dr. Preston-Baecht again confirmed her opinion that Hardy lacked a rational understanding of his case and had a very impaired ability to assist in his own defense.  See id. at 21-2.  Dr. Preston-Baecht confirmed that there were no less intrusive methods to treat Hardy.  See id. at 24.  Dr. Preston-Baecht

18

testified that "in general the vast majority of [her] patients who have been involuntarily medicated have been restored to competency[,] . . . [m]ore than 75 percent have been restored." Id. at 26; see id. at 30-1.

      b.   Robert Sarrazin, M.D.

As the Chief of Psychiatry at Springfield Medical Center ("Springfield"), Dr. Sarrazin saw Hardy "many times" during his fourt month evaluation.  Id. at 40.  During these encounters, Hardy typically discussed "ethou law" and demonstrated an inappropriate affect, often laughing.  Id.  Dr. Sarrazin described how Hardy suffers from schizophrenia and opined that Hardy was not competent to proceed to trial.  See id. at 42.  Dr. Sarrazin recommended treating Hardy's illness with antipsychotic medications.  See id. at 44.  Without such medication, Hardy "would not attain competency to stand trial, and he would not be treating his mental illness." Id.  Dr. Sarrazin reiterated that with antipsychotic medications, he believed that there is "a substantial probability that [Hardy] would attain competency to stand trial[.]" Id.

Dr. Sarrazin described his treatment plan for Hardy, should the Court enter the requested order.  Dr. Sarrazin stated that he would provide Hardy with a copy of the involuntary medication order and try to elicit his cooperation with taking oral second generation antipsychotic medications.  Id. at 51.

Dr. Sarrazin also described how he would alter the dosing of the medication to resolve side effects, which can include sedation, dry mouth and dry eyes.  Dr. Sarrazin testified that these side effects typically resolve themselves within two or three days with dosage changes.  Id.  If Hardy refused to cooperate, Dr. Sarrazin would use an intramuscular injection of short-term haloperidol, a first generation antipsychotic medication.  Id. at 52-3.  Dr. Sarrazin testified that he would begin with the short-term haloperidol with the hope that it could make Hardy more cooperative and willing to begin oral second generation medication.  In addition, the short-term haloperidol remains in the body's system for 24 hours, allowing the doctors an opportunity to observe how Hardy reacts to the medication before administering a long acting dosage.  If Hardy continued to refuse oral medication after several days and showed no serious adverse reaction to the short acting haloperidol, Dr. Sarrazin would administer a long-acting intramuscular injection of the medication.  Id. at 52-3, 56-8.

Dr. Sarrazin testified that haloperidol is equally as effective in treating schizophrenia as the second generation medications.  Id.  However, the first generation medications have additional potential side effects including stiffness.  Dr. Sarrazin testified that there are multiple medications he uses to alleviate the stiffness that can be associated with a first

20

generation antipsychotic medication.  Id.  Dr. Sarrazin also
testified about the increased risk of rare side effects such as
tardive dyskinesia (involuntary movement of the tongue and mouth)
and neuroleptic malignant syndrome (loss of ability to regulate
the body's internal temperature).  Dr. Sarrazin explained that
the risk of tardive dyskinesia is usually associated with high
doses of first generation medications over a long period of time
and that "[i]n the time frames we are looking at for Mr. Hardy
and treating him for competency restoration, tardive dyskinesia
usually does not become a concern."  Id. at 54.  Dr. Sarrazin
described neuroleptic malignant syndrome as "extremely rare" and
explained how the medical staff monitors for this rare
complication and how they have the resources to identify and
treat it.  Id. at 55.  Dr. Sarrazin noted that these medications,
including long-acting intramuscular injections of haloperidol,
are used "in the outpatient settings of the United States and the
world all the time."  Id.

         Dr. Sarrazin testified that the potential side effects
of the first and second generation antipsychotic medications
would not interfere significantly with Hardy's ability to assist
his attorney in preparing his defense.  Id. at 58.  Dr. Sarrazin
explained that "[t]he use of these medications is to improve
someone's cognitive abilities, not make them worse, to improve
their ability to interact with their attorneys, with their

families, with the community, to improve their ability to work outside in the community." Id. at 58-9.  Dr. Sarrazin further explained that if a side effect interfered with a defendant's ability to assist counsel, that defendant would not be found competent to proceed to trial by his staff.  Id. at 59.  Finally, Dr. Sarrazin confirmed that the administration of antipsychotic medication is the medically appropriate treatment for schizophrenia.  Id. at 60.

On cross examination, Dr. Sarrazin confirmed his diagnoses of Hardy as schizophrenic.  Id. at 62.  Dr. Sarrazin also confirmed the information contained in his report about the most optimistic and pessimistic views of the general prognostic data for schizophrenics.  Id. at 65-6.  Dr. Sarrazin noted that this general data did not contemplate restoration proceedings and competence to proceed to trial.  Id. at 72-3, 99-100.  Moreover, there was no probability assigned to the optimistic view of the data versus the pessimistic view of the data.  Id.  Dr. Sarrazin testified that there is a high risk of relapse for patients if they stop taking their antipsychotic medication.  Id. 66.  Dr. Sarrazin testified that it is preferable to treat schizophrenia as early as possible to help potentially mitigate some of the collateral consequences caused by schizophrenia, including trouble maintaining employment and illegal drug use.  Id. at 69.

Dr. Sarrazin then walked through the positive

22

prognostic indicators set forth in the DSM-IV-TR for schizophrenia.  Based on his physical examination, Hardy demonstrated normal neurological functioning which is a positive prognostic indicator, however, Hardy has never had a specific neurological evaluation.  Id. at 79.  Hardy's age at the time of the onset of his illness may also qualify as a positive prognostic indicator, albeit not a definitive one.  Id. at 76.  Dr. Sarrazin did not agree with defense counsel's premise that Hardy's criminal conduct demonstrated the absence of "good premorbid adjustment," which is another positive prognostic indicator.  Id. at 75.  To the contrary, Dr. Sarrazin testified that Hardy's high level of social functioning both before and after the onset of his symptoms was a positive prognostic indicator.  Id. at 103-05.

There was insufficient information to determine whether other positive prognostic indicators applied to Hardy such as acute onset of his illness and family history.  Id. at 74-6, 78-9.  Dr. Sarrazin further testified that certain positive prognostic indicators did not apply to Hardy such as the absence of anosognosia (i.e. poor insight into his illness), treatment with antipsychotic medication shortly after the onset of symptoms, compliance with medication,[8] and brief duration of

---

[8]   However, this positive prognostic indicator would be present were the Court to enter an order to involuntarily medicate Hardy, as compliance with medication would be

active symptoms.  Id. at 77-8.  Dr. Sarrazin clarified that the absence of positive prognostic factors was not the same as the presence of negative prognostic factors.  Id. at 79.  Dr. Sarrazin agreed with defense counsel that Hardy did not present with many of the positive prognostic indicators set forth in the DSM.  Id.  Dr. Sarizzan also noted that Hardy's diagnosis as a paranoid schizophrenic was a positive prognostic indicator when compared to undifferentiated or disorganized schizophrenia.  Id. at 104.

Defense counsel then questioned Dr. Sarrazin about Jackson's Indiana: State Hospital Competence in Indiana, a study that was published in the Journal of the American Academy of Psychiatry and the Law in 2008.  Dr. Sarrazin explained that the study examined 988 patients who suffered from a psychotic disorder such as schizophrenia and who were found not competent to proceed to trial.  Id. at 84.  Of those patients, 72.8 percent were restored to competency after six months of treatment and 83.8 percent were restored after one year.  Id. at 83-4.[9]

_____

guaranteed.

[9]  Dr. Sarrazin previously testified about a study in New York with similar results.  The Ladds study examined restoration proceedings for incompetent defendants who were involuntarily medicated in New York from 1986 through 1990.  In that study the average age of the defendant was 40 years old.  96 percent of the defendants in the study had a psychotic disorder such as schizophrenia and 87 percent of the defendants were rendered competent after involuntary medication.  See id. at 45-7.

24

Defense counsel then questioned Dr. Sarrazin on the potential side effects of antipsychotic medications.  Dr. Sarrazin explained that "extrapyramidal side effects" such as stiffness and shakiness are more prevalent with first generation antipsychotic medications than second generation medications. Id. at 86.  Dr. Sarrazin further explained that these side effects can be treated by medications such as Cogentin and Artane.  Id. at 86.  Dr. Sarrazin explained that if Hardy experienced side effects of stiffness or shakiness, but refused to take medication to alleviate the side effects, Dr. Sarrazin could administer other injectable antipsychotic medications which may not cause Hardy to experience these side effects, including a long-acting first generation medication called Prolixin.  Id. at 88-9.  Dr. Sarrazin explained that there are injectable second generation antipsychotics such as short-term Zyprexa, short-term Geodon and long-term Risperidone that could be used to treat Hardy.  Dr. Sarrazin explained that before he used long-acting Risperidone he would want to first use a short-acting oral dose of Risperidal to ensure that Hardy does not have an adverse reaction to the medication.  Id. at 87-8.  Assuming Hardy refused the oral Risperidal, the oral dose would be administered through a nasal gastric tube which is a routine procedure for BOP personnel.  Id. 87-9.  However, Dr. Sarrazin recommended using haloperidol rather than the second generation injectable

medications because haloperidol is available in many different forms, has been used for many years and has a demonstrated safety profile.  <u>Id</u>. at 88.

Dr. Sarrazin then briefly discussed the other side effects he addressed in his report, including acute dystonic reaction (involuntary contractions of muscles), acathisia (sense of restlessness), and drug induced Parkinsonism (muscular rigidity, tremor, decreased spontaneous facial expression).  <u>Id</u>. at 91-2.  Dr. Sarrazin testified that these side effects could be managed by changing the dosage of the medications and/or administering a medication to relieve the side effects.  <u>Id</u>. at 92-3.  Dr. Sarrazin then explained how monitoring and treating potential side effects was an integral part of the restoration process.  <u>Id</u>. at 93-4.

In response to the Court's inquiry, Dr. Sarrazin explained that prior to the Supreme Court decinding <u>Sell</u>, the BOP conducted a statistical analysis of all involuntarily medicated defendants in the twelve months immediately prior to <u>Sell</u> and found that 75 percent of those defendants were rendered competent to proceed to trial.  <u>Id</u>. at 106.  Dr. Sarrazin opined that the vast majority of these defendants were on first generation antipsychotic medication.  <u>Id</u>. at 106-07.  Defense counsel pointed out that this was not a scientifically conducted study with a control group, but rather a statistical and anecdotal

26

study.  Id. at 109-10.

Finally, Dr. Sarrazin testified that he was not aware
of a single patient who was rendered competent, remained on
medication in BOP custody, and then deteriorated back to
incompetence during the pendency of a case.  Id. at 107-10.  Dr.
Sarrazin testified that as the chief of psychiatry at
Springfield, he would be aware of such a case if it existed.  Id.
at 108.

c.   Richard Dudley, M.D.

Dr. Dudley, a board certified psychiatrist, testified
that half of his practice was devoted to treating patients and
half was dedicated to forensic work.  He specifically denied that
the majority of his practice involved testifying as a forensic
psychiatrist.  See 2009 Tr. at 150.  When confronted, Dr. Dudley
admitted that 90 percent of his work was forensic, not 50 percent
as he had previously testified.  Id.  At the time of the hearing,
Dr. Dudley was treating two schizophrenic patients, both of whom
were taking antipsychotic medications prescribed by Dr. Dudley.
Id. at 142-43.  Dr. Dudley confirmed that the administration of
antipsychotic medication was the "treatment of choice" for
someone with Hardy's condition.  Id. at 122.

Dr. Dudley met with Hardy twice in 2007.  See Tr., Nov.
24, 2009 Hearing, at 145-46.  These were Dr. Dudley's only
meetings with Hardy.  Id.  Contrary to standard practice, Dr.

27

Dudley did not take any notes of his observations of Hardy during these meetings.  Id. at 146.  During the first meeting, Hardy did not interact at all with Dr. Dudley, and during the second meeting Dr. Dudley sat in a meeting with Hardy and his counsel. Id.  Dr. Dudley testified that he did not perform his own examination of Hardy and instead relied on the reports of Drs. Preston-Baecht, Sarrazin and other BOP personnel who had much more extensive contact with Hardy.  Id. at 146-47.  Dr. Dudley testified that he was retained to review and respond to the BOP expert reports rather than conduct his own forensic evaluation of Hardy.  Id. at 149.

In that limited capacity, Dr. Dudley spoke with Hardy's mother and brother,[10] reviewed the BOP reports and notes provided by the government, and spoke with Hardy's counsel.  Id. at 148-49, 153.  Based on this information, and in the absence of his own forensic evaluation, Dr. Dudley opined that there was not a substantial likelihood of restoring Hardy to competence using antipsychotic medications.  Id. at 121.  Again, in the absence of his own forensic evaluation, Dr. Dudley testified that Hardy demonstrated none of the positive prognostic indicators set forth in the DSM.  Id. at 129, 137.  Dr. Dudley also opined that Hardy was likely to experience side effects from the medication, but

---

[10]   Dr. Dudley did not take any notes of these meetings. These meetings occurred in the courthouse after status conferences in this case.  Id. at 153-54.

28

could not opine as to whether these side effects would interfere with his ability to assist counsel at trial.  Id. at 121, 138.

Dr. Dudley did not review much of the available information to form the basis of his opinion and testimony.  Id. at 149.  Dr. Dudley did not review any of the audio recordings made of Hardy while in BOP custody, or any of the prior trial transcripts from United States v. Sessoms and United States v. Raheem, which included testimony of Hardy's behavior up to 2004. Id. at 151-52.  Dr. Dudley was not aware that Hardy had attempted to start a legitimate business or that he was able to generate substantial start-up capital for that business.  Id. at 152.  Dr. Dudley testified that he was not aware that in January 2005, Mr. Celedonio informed the Court that, based on his interactions with Hardy, he did not believe Hardy was mentally ill.  Id.  Dr. Dudley agreed that this information could have been relevant to consideration of prognostic indicators, cognitive abilities and the age of onset of Hardy's symptoms.  Id.

In his letters and testimony, Dr. Dudley has offered several opinions with respect to the age of onset of Hardy's illness.  Ultimately, Dr. Dudley withdrew his opinion on this matter altogether.  First Dr. Dudley opined that Hardy's illness began in his early 20s.  See Dudley Letter dated August 15, 2009. During his direct testimony Dr. Dudley stated that he believed to "a reasonable degree of medical certainty" that Hardy became

29

psychotic at least five years ago, probably longer (which, contrary to his earlier letter, would be in his late 20s). Id. at 126-27. However, on cross-examination, Dr. Dudley stated that he was not offering any opinion with respect to the age of onset of Hardy's illness and was just raising questions about whether the age of onset predated 2004 based on information he received from Hardy's family members. Id. at 154-55. Dr. Dudley did not take any notes during his meetings with Hardy's family members or describe specific instances that formed the basis of the questions he raised. Id. 153-55.

Dr. Dudley also provided inconsistent information on whether Hardy experienced periods of remission. In his September 19, 2009 letter, Dr. Dudley suggested that Hardy previously experienced periods of remission. See Dudley Letter, Sept. 19, 2009 at 3. During his testimony, Dr. Dudley retracted this suggestion and testified that he was only speaking about schizophrenia generally and not Hardy specifically. See 2009 Tr. at 156-7. Dr. Dudley then agreed that there was at least some evidence in the record that Hardy experienced a recent remission of symptoms, which would be a positive prognostic indicator. Id. at 160. Dr. Dudley agreed that Hardy could exhibit symptoms of schizophrenia and yet still be competent to proceed to trial. Id. at 158.

D.   Circumstances that Led To The Emergency Medication of
Hardy

The parties submitted post-hearing briefs after the
first Sell hearing.  However, due to Judge Trager's tragic
passing, this issue was not resolved.

In response to concerns raised by defense counsel that
the reports of Drs. Sarrazin and Preston-Baecht had grown stale,
the Court directed the BOP to issue a new report to confirm
whether, at present, there continued to be a substantial
probability that with the proper treatment Hardy could be
rendered competent to stand trial.  To conduct this follow-up
study, Hardy was transferred to Springfield.

On November 7, 2011, while at Springfield, Hardy became
aggressive and attempted to assault a BOP staff member.  As a
result, Dr. Sarrazin determined that Hardy's condition qualified
as a "psychiatric emergency" as defined by 28 C.F.R. 549.46.  Dr.
James K. Wolfsohn, a psychiatrist who was uninvolved in the
defendant's care, was consulted in the matter.  He concurred with
Dr. Sarrazin's assessment.  On November 8, 2011, pursuant to the
applicable regulations, doctors administered an intramuscular
injection of a 5 milligram dose of the antipsychotic medication
haloperidol to Hardy.  On November 9, 2011, doctors administered
a 75 milligram long-acting dose of haloperidol to Hardy.  Hardy
exhibited no side effects as a result of the administration of
antipsychotic medication.  He has not been medicated since that

31

date.

By order dated November 23, 2011, the Court directed
the BOP to proceed with a previously scheduled administrative due
process hearing, pursuant to 28 C.F.R. § 549.46(a), to determine
whether Hardy should continue to be medicated under the
applicable regulations.  That hearing was held on November 29,
2011 (the "Due Process Hearing").  (See United States Medical
Center for Federal Prisoners, Springfield, Missouri, Involuntary
Medication Report ("Springfield Report") at p. 1).  Dr. Carlos
Tomelleri conducted the Due Process Hearing.  (Id.).  John
Getchell, a licensed clinical social worker, met with the
defendant prior to the hearing and advised him of his right to
have witnesses and to administratively appeal the decision.  (Id.
at 3).  As set forth in that report, Dr. Tomelleri determined
that Hardy met the criteria for the administration of involuntary
medication under the applicable regulations.  (Id. at 4).

More specifically, based on the defendant's history of
aggressive and violent acts while in custody, coupled with the
defendant's "grandiose delusions," and "the belief that he is not
responsible for any misconduct because he is invalidly
incarcerated," Dr. Tomelleri concluded that the defendant "is
dangerous to others due to his mental illness."  (Id. at 6).

Dr. Tomelleri explained that "[p]sychotropic medication
is universally accepted as treatment of choice for

schizophrenia," and that treatment other than psychotropic
medication would not be effective.  (Id.).  Specifically, he
determined that "[o]ther modalities of treatment, such as
psychotherapy, do not address the fundamental problem."
Similarly, tranquilizers, seclusion and restraints "have no
direct effect on mental illness" and do not "impact the core
manifestations of the illness."  (Id.).

On December 2, 2011, the defendant was served with a
copy of the Springfield Report.  He stated, "They gave no reason
why I should be medicated," and he directed a social worker to
file an appeal on his behalf.  (United States Medical Center for
Federal Prisoners, Springfield, Missouri, Appeal of Involuntary
Medical Decision, Staff Representative Comments).

That same day, on December 2, 2011, Paul Celestin, the
Associate Warden, Health Services, issued a report upholding Dr.
Tomelleri's decision that involuntary medication was necessary
because the defendant constituted a danger to himself or others.
(Due Process Hearing Appeal Response ("Appeal Response") at p.
1).  The Appeal Response explained that the defendant was
afforded due process because he had "24-hour advance notice of
the hearing, the right to select a staff representative, the
right to call witnesses, the right to present information on
[his] behalf, and the right to appeal any findings by the hearing
officer."  (Id.).  The Appeal Response detailed the defendant's

history of being combative and violent with prison staff, and noted that seclusion and soft restraints "are only temporary in nature" and fail to "relieve the symptoms of [the defendant's] mental illness." (Id. at 2). The Appeal Response concluded that medication "is the least intrusive treatment for [the defendant] at this time." (Id.).

On December 6, 2011, Dr. Tomelleri filed an amended report which amended the number of BOP incident reports the defendant had received, and the dates upon which the incidents occurred (the "Amended Report"). Specifically, the Amended Report referenced three specific incidents of dangerous behavior: attempting to stab an officer on October 15, 2010; attempting to bite an officer on October 16, 2010; and threatening to break an officer's neck on April 5, 2011. (See Amended Report at p. 4). Otherwise, the report was unchanged. (See Letter from Dr. Carlos Tomelleri dated December 8, 2011). On December 7, 2011, John Getchell delivered a copy of the Amended Report to the defendant. (Getchell Letter to the Court, dated December 8, 2011). The defendant again stated that he wished to appeal the decision. The following day, on December 8, 2011, Associate Warden Celestin issued a decision again upholding Dr. Tomelleri's decision to forcibly medicate the defendant based upon dangerousness. (Due Process Appeal Response, dated December 8, 2011 (the "Amended Appeal Response")).

34

E.   The First Judicial <u>Harper</u> Hearing and the Second <u>Sell</u>
     Hearing

1.   <u>Pre-Hearing</u>

The Court held an evidentiary hearing pursuant to <u>Sell</u>
and <u>Harper</u> on January 26, 2012.  Prior to the hearing, the
government submitted records pertaining to the defendant's acts
of violence while incarcerated.  (Gvt. Exs. A-Q).  Specifically,
the records pertained to the following incidents:

- While in SHU, on December 12, 2006, Hardy struck a BOP
  staff member in the "facial area" with a sock full of
  batteries during a forced cell move. (<u>See</u> Gvt. Ex. E).

- On February 25, 2008, during a brief period when Hardy
  was not housed in a SHU, he stabbed another inmate once
  in the head and once in the neck with a comb which had
  been sharpened at one end to a point.  (<u>See</u> Gvt. Ex. A,
  D).

- On April 5, 2010 Hardy threatened a BOP staff member
  and stated: "you gonna pay for that shit, when I catch
  you  going to break your fucking neck faggot." (Gvt.
  Ex. F).

- On June 8, 2010, the defendant was handcuffed behind
  his back during routine movements.  The defendant
  succeeded in moving his hands from his back to the
  front of his body, and he refused to allow staff to
  correct his restraints, which posed a danger to staff
  members.  (Gvt. Ex. G).

- On July 14, 2010, the defendant told staff members that
  he wanted to be transferred to the MDC.  He placed his
  arm in the food slot and refused to move it until he
  was transferred.  (Gvt. Ex. H).

- On September 14, 2010, the defendant threw an unknown
  liquid on the face of an MDC staffmember.  (Gvt. Ex.
  I).

- On October 15, 2010, Hardy attacked a BOP guard.  The
  incident began when Hardy placed an object into his

35

food slot and refused to move it.  Hardy also refused
to submit to hand restraints.  The Use of Force team
was sent into the defendant's cell, and the defendant
attempted to stab a staff member in the torso with a
sharpened object. (Gvt. Ex. C).

- On October 16, 2010, while in restraints as a result of
  the October 15, 2010 incident, the defendant tried to
  bite a medical staff member who was attempting to take
  the defendant's vital signs.  (Gvt. Ex. B).

- On November 15, 2010, the defendant threw an unknown
  liquid from a milk container at the torso of an MDC
  staffmember.  (Gvt. Ex. J).

- On November 22, 2010, the defendant again threw an
  unknown liquid from a milk container, which hit an MDC
  staffmember in the face and torso.  (Gvt. Ex. K).

- On November 25, 2010, the defendant refused to close
  his food slot and threw an unknown liquid at an MDC
  staffmember.  (Gvt. Ex. L).

- On December 6, 2010, the defendant opened the food slot
  and threw an unknown liquid onto an MDC staffmember's
  torso and arms.  (Gvt. Ex. M).

- On December 8, 2010, the defendant "threw an unknown
  liquid substance" at a staffmember's eyes.  The
  staffmember stated that the liquid "caused intense
  burning to my eyes."  (Gvt. Ex. N).

- On January 21, 2011, the defendant pressed the duress
  button continuously.  The defendant told a responding
  staff member, "Yo, I need a toothbrush."  The staff
  member stated that there were no toothbrushes available
  and that the defendant had received one two days prior.
  The defendant replied, "Find me one or else."  The
  staff member asked, "What do you mean by 'or else'?"
  The defendant responded, "I'll throw shit in your face
  like the last time, faggot."  (Gvt. Ex. O).

- On April 13, 2011, staff at MDC attempted to remove the
  Hardy's's handcuffs.  Hardy "became aggressive and
  combative," and, while struggling, he broke the key to
  the handcuffs.  The defendant then refused to remove
  his hand from the cell's food slot.  (Gvt. Ex. P).

36

2.  <u>Testimony</u>

On January 26 and 27, 2012, the government called nine prison guards, and Drs. Preston-Baecht and Sarrazin to testify at the <u>Harper</u>/<u>Sell</u> hearing.  On January 26, 2012, the defense called Dr. Xavier Amador to testify.  The government provided the court with numerous exhibits during the hearing including the actual weapon the defendant used to strike a prison guard in 2010, and photographs of a victim the defendant stabbed in 2006.

a.  <u>Officer Angelo Ferreira</u>

Officer Ferreira testified that on June 23, 2005, while attempting to move another inmate into the defendant's cell in the SHU at the MDC, the defendant managed to move his handcuffed hands from behind his back to in front of him.  The defendant, while handcuffed, then punched a prison guard in the face because "he didn't want to take a bunky."  (January 26, 2012 Hearing Transcript (hereinafter, "2012 Tr.") at 220-21, 223).

b.  <u>Special Investigative Agent Michael Drake</u>

Agent Drake stated that during a routine cell rotation on November 3, 2006 at the MDC, the defendant, who was housed in the SHU, refused to change cells.  Before officers opened his cell, the defendant made a weapon by putting batteries into a sock.  (<u>Id</u>. at 247-48).  Officers sprayed pepper spray into the cell, but the defendant covered himself with a shower curtain to protect himself from the spray.  (<u>Id</u>. at 248).  Officers then

37

entered the cell, and the defendant hit one of the officers in the face with the sock full of batteries.  The officer was wearing a shield over his face and was not injured.  (Id. at 249).

### c.   Officer Keith Hardy

Officer Hardy testified that on February 25, 2008, he was working in the Special Investigative Office at the MCC.  (Id. at 38).  He received a call that there was a stabbing in progress in one of the housing units.  (Id. at 38).  Officer Hardy went to the unit and found a comb with a sharpened handled in the defendant's sleeve.  (Id. at 38-39; Gvt. Ex. 27).

### d.   Officer John Rodriguez

Officer Rodriguez testified that on February 25, 2008, he was working in the Special Investigative Office at the MCC with Officer Hardy.  (2012 Tr. at 254).  On that day, he and Officer Hardy responded to a call from a housing unit that the defendant was stabbing another inmate.  (Id. at 255).  When they arrived at the unit, they stopped the defendant.  Officer Hardy searched the defendant and recovered from his sleeve a hair comb that had been sharpened to a point.  (Id. at 255-56; Gvt. Ex. 27).  Officer Rodriguez then took photographs the victim, who had stab wounds on his neck, head and forearm.  (2012 Tr. at 255-56; Gvt. Ex. 27).

38

e.   <u>Officer David Lorenzo</u>

Officer Lorenzo testified that on September 14, 2010, he had provided food and clean linens to the defendant, who was housed in the SHU at MDC.  The defendant became angry that his food was not warm enough and that he did not receive extra clothing.  (2012 Tr. at 230-32).  The defendant then put his arm through the food slot and threw urine into Officer Lorenzo's mouth and nose.  (<u>Id</u>. at 233).  Officer Lorenzo was told by the medical staff that he risked exposure to Hepatitis by having oral contact with urine.  (<u>Id</u>. at 234).

f.   <u>Lieutenant Patrick Henderson</u>

On October 15, 2010, Lieutenant Henderson was working working in the MDC SHU along with Officers Santiago and Matos. The defendant had been holding open his food slot, which was a security issue because "it's difficult for the officers to do their job for fear [] he might try to assault them as they are walking by." (<u>Id</u>. at 13).  Lieutenant Henderson was informed by another officer that the defendant had a weapon in his cell. (<u>Id</u>. at 14).  Based upon that information, Lieutenant Henderson obtained authorization to use OC spray, or "pepper spray," to enter the defendant's cell.  (<u>Id</u>. at 16).  Lieutenant Henderson returned to the defendant's cell.  The defendant was still standing by the door with his arm outside of his food slot; Lieutenant Henderson saw that the defendant was holding an

39

unknown object in his hand.  (Id.).  The defendant refused to be handcuffed, even after speaking with a member of the "confrontation avoidance team."  (Id. at 17).  Lieutenant Henderson then authorized the use of the OC spray.  Officer Matos put his hand into the food slot to spray pepper spray into the defendant's cell.  (Id. at 18).  The defendant cut Matos's hand with an unknown object.  (Id. at 18).  Lieutenant Henderson then authorized the use of force team to enter the defendant's cell. The defendant then "used an object and attempted to stab the first team member entering the cell" in the officer's "torso area."  (Id. at 18-19).  The officer was not injured, and the team then placed the defendant in ambulatory restraints.  (Id. at 19-20).

g.   Officer Ezequiel Santiago

On October 15, 2010, Officer Santiago was assigned to be a member of a use of force team supervised by Lieutenant Henderson.  (Id. at 238).  Lieutenant Henderson gave the defendant several orders to submit to hand restraints, but the defendant refused.  (Id. at 239).  The team then sprayed OC spray through the food slot and into the cell, in order to try to subdue the defendant.  (Id. at 239).  The defendant shielded himself from the effects of the spray by covering himself with a shower curtain and by pushing the spray canister out of the food slot.  (Id. at 239).  Officer Santiago then went into the

40

defendant's cell, and the defendant slashed at Santiago's chest and torso four times with a "shank." (Id. at 240; Gvt Ex. 44). The shank consisted of a sharp blade carved from a food tray, made of "hard plastic," and a "handle" fashioned out of a sock. (2012 Tr. at 242; Gvt. Ex. 44). Santiago was wearing a vest which did not protect the area below his armpits. (2012 Tr. at 241). The defendant hit Santiago approximately three to four inches from the exposed area. (Id. at 241).

h.   Officer Hubert Kosakowski

On October 16, 2010, while the defendant was still in restraints after stabbing Officer Santiago with a shank the previous day, Officer Kosakowski assisted a medical staffmember to take the defendant's vital signs. Routinely taking an inmate's vital signs is standard protocol for any inmate placed in ambulatory restraints to ensure that the restraints are not compromising the inmate's circulation. (Id. at 23, 31). The defendant "became belligerent" and "pulled away from [MDC staffmembers]." (Id. at 32). Officer Kosakowski tried to restrain the defendant to allow the medic an opportunity to take the defendant's vital signs. The defendant "started moving around violently," rolled over to his side and tried to bite Officer Kosakowski's arm, which was not covered by any protective material. (Id. at 32-33).

41

i.   Officer Joe Jamaica

Officer Jamaica testified that on December 8, 2010, he was responsible for exchanging inmates' bed linens in the MDC SHU.  He was "passing through" the area in which the defendant was located, when the defendant reached through his food slot and threw a liquid into Officer Jamaica's face.  The liquid burned his face.  (Id. at 9-11).

j.   Robert Sarrazin, M.D.

Dr. Sarrazin testified that his prior testimony during the first Sell hearing remains accurate.  (Id. at 56-57).  Dr. Sarrazin stated that the defendant remains incompetent to stand trial because he suffers from paranoid schizophrenia.  (Id. at 47, 49).  Dr. Sarrazin testified that the defendant should be treated with antipsychotic medication, which is the "gold standard" treatment for schizophrenia.  He explained that only antipsychotic medications "are going to treat the neurotransmitters in the brain chemistry that [are] causing some of the difficulties with the schizophrenia." (Id. at 81-82).

Dr. Sarrazin reiterated that the defendant does not suffer from delusional disorder, that he will not attain competency to stand trial without the administration of anti-psychotic medication, and that "there is a substantial likelihood that [the defendant] could be rendered competent if he was treated with anti-psychotic medications." (Id. at 52-54).

42

Dr. Sarrazin explained that in his experience, it generally takes four to six months to restore competency by administering antipsychotic medications. (Id. at 58). He further explained that the probability that Hardy would be rendered competent was higher than 75 percent. (Id. at 60-61). Dr. Sarrazin cited positive prognostic indicators for Hardy – such as his high level of social functioning, the fact that he suffers from paranoid schizophrenia and not disorganized schizophrenia, and the fact that he does not suffer from a cognitive disorder. (Id. at 59-61).

Since the initial Sell hearing, the defendant was returned to the Springfield in November 2011, and has been housed there until the present. (Id. at 46). Dr. Sarrazin has routinely seen the defendant two to three times per week. (Id. at 46). Based upon his interactions with the defendant, Dr. Sarrazin testified that the defendant is dangerous to staff members. (Id. at 63). In addition to his numerous violent outbursts in the MDC and the MCC, the defendant has continued his violent behavior while housed in Springfield.

On November 7, 2011, within a few days of arriving at Springfied, the defendant became "angry with the officers when they were leading him back to his cell. He became agitated and was fighting with them. He was in restraints." Upon being placed back into his cell, the officers tried to remove the

43

defendant's hand restrains but "Mr. Hardy then broke away from them, threw one of his arms out of the food slot in an attempt to grab one of the officers, and . . . it appeared he was reaching for something in the -- in his cell, at which point he had a tooth brush and jammed that into the food slot. He was extremely angry and agitated." (Id. at 64, 93). More recently, the defendant was found with "a toothpaste tube that had been emptied out" and which was "filled with feces and urine; and the only reason to have that would be that would be something that could be kind of shot out [at staff]." (Id. at 65).

Dr. Sarrazin explained that as a result of the defendant's first incident at Springfield, during which he fought with the guards and reached for a toothbrush, the defendant was medicated on an emergency basis, receiving one short-acting dose of haloperidol. The defendant exhibited no adverse reaction to the medication, so he was then administered one long-acting dose of haloperidol. Dr. Sarrazin further explained that although the defendant has had violent outbursts while housed in MDC and MCC, forcible administration of medication was never contemplated at those institutions because they "do not do due process[] [hearings]. That is not within their -- what they do." (Id. at 116). Based upon the Court's Order, the defendant received no further medication. (Id. at 66-74).

Dr. Sarrazin observed the defendant after having been
medicated, based upon which he concluded:

> Mr. Hardy did not have difficulty with that
> medication.  It was noted that he did not
> appear orally sedated. He did not have any
> abnormal motor movements that were noted. He
> did not have dystonia.  He did -- appeared to
> tolerate that medication without difficulty.

(Id. at 74-75).

Dr. Sarrazin explained that the defendant's paranoid
delusions are the underlying cause of the defendant's
dangerousness while in prison.  In particular, one of the
defendant's delusions is that "[t]here's already been an order
for him to be released" from prison."  (Id. at 77).  Because the
defendant believes that he is wrongfully incarcerated, he
believes that "anything he does, he's not responsible for."  (Id.
at 78).

According to Dr. Sarrazin, the administration of
antipsychotic medication is the only reasonable means by which
prison staffmembers may be protected from the defendant.  (See
id. at 79-81).  Dr. Sarrazin explained that using four-point
restraints on a long-term basis is dangerous and is not a
reasonable alternative to medication:

> If someone is in restraints for a long period
> of time, there's a concern of deep vein
> thrombosis.  They could get a clot in their
> leg.  They have problems with moving their
> bowels because they're not moving their arms
> and legs.  There could be times when they may

45

be develop abrasions on their arms or their
legs.

(Id. at 79).  Nor is seclusion a viable alternative, since the
defendant is "already in seclusion" and yet he remains a threat
to prison staff.  (Id. at 80).  Dr. Sarrazin explained that there
were "n[o] lesser intrusive medically acceptable means for
avoiding the use of antipsychotic medication," because there are
no other means which will "treat the illness."  (Id. at 82).

k.   Lea Ann Preston-Baecht, Ph.D.

Dr. Preston-Baecht testified that her prior testimony
during the first Sell hearing remains accurate.  (Id. at 135-38).
Dr. Preston-Baecht stated that the defendant remains incompetent
to stand trial because he suffers from paranoid schizophrenia.
(Id. at 137).  During the defendant's most recent stay at
Springfield, Dr. Preston-Baecht has been the defendant's primary
clinician.  She sees him at least once per week.  (Id. at 136).
In Dr. Preston-Baecht's opinion, it is "substantially unlikely"
that the defendant will be restored to competency to stand trial
without the administration of antipsychotic medication, but that
"it is substantially likely that he could be restored to
competency with [such] treatment."  (Id. at 138).

Dr. Preston-Baecht stated that the defendant currently
poses a danger to prison staffmembers.  (Id. at 138).  She
explained:

46

> Mr. Hardy, prior to his first admission to
> Springfield, had had a number of incidents of
> aggression towards staff and other inmates
> here in New York.
>
> When he arrived at Springfield in '08, we
> conducted a Harper-like hearing, an
> administrative hearing, where they looked at
> whether or not he was dangerous in the
> correctional environment. Psychiatrist staff
> at that time were very conservative and since
> he had not engaged in frequent aggression at
> our facility at that time, they did not think
> that he met the criteria for the involuntary
> administration of medication.
>
> Since his Sell hearing in August of 2009,
> however, he has received a number of incident
> reports here at Brooklyn.  Many of them were
> aggression towards staff and then, during his
> second admission at our facility, he's also
> engaged in aggression to the point where, at
> this time, I don't think we can manage him
> with typical correctional techniques.  I
> think our staff are in danger of being hurt
> by him.

(Id. at 138-39).

Dr. Preston-Baecht then noted that after the defendant

had been administered antipsychotic medication on an emergency

basis, and after the drugs' effects had likely worn off, the

defendant again displayed dangerous behavior:

> As recently as January 13th, he received
> another incident report.  At that time the
> correctional staff found a tube of toothpaste
> that was filled with urine and feces.  He
> also made insolent, aggressive-like
> statements to staff. So, I think that as soon
> as the medication wore off, he began
> displaying that behavior.

(<u>Id</u>. at 139).  With respect to the tube of toothpaste, Dr.
Preston-Baecht stated that it posed a danger to staff because,
"the defendant would have been able to squeeze it and shoot it
towards staff."  (<u>Id</u>. at 155).

Dr. Preston-Baecht explained that the etiology of the
defendant's dangerousness is his schizophrenia:

> Oftentimes, people can be dangerous even
> without a mental illness. I think that the
> most problematic symptom, psychotic symptom,
> that Mr. Hardy has is the delusional belief
> that because he's being held -- in his mind
> -- illegally, he cannot be held responsible
> for any aggressive or violent behavior that
> he engages in.
>
> He gave me an example of this. He said that
> if I were -- referring to me -- falsely
> imprisoned, if I decided to kill my cellmate,
> then I would be able to go free because I
> can't be held responsible for anything I do
> while I am wrongly incarcerated.  In his
> mind, he's being wrongly incarcerated;
> therefore, any action he takes he can't be
> responsible for.

(<u>Id</u>. at 143).

According to Dr. Preston-Baecht, medicating the
defendant with antipsychotic medications is the only likely means
of addressing the delusions which cause the defendant's
dangerousness.  (<u>See</u> <u>id</u>. at 143-44).  In her opinion, the long-
term use of physical restraints is impracticable because it is
not only dangerous to the inmate, but they are not likely to be
effective at protecting staffmembers:

48

> [I]t actually requires staff to have more
> physical contact with him because they have
> to give him food trays, they have to monitor
> his vitals every few hours, they have to
> somehow assist him with toileting -- whether
> or not they hand him a urinal or they change
> a diaper, it involves a lot more contact
> between the staff and an inmate -- they can
> still spit on staff, they can still try to
> bite staff.  So, not only is it, I think,
> inherently risky to the patient, it's also
> risky to the staff. . . . And it's not going
> to treat the underlying mental illness. He's
> still going to have that delusional belief
> that can result in someone being hurt.

(Id. at 143-44).  Dr. Preston-Baecht noted that although the

defendant is currently housed in "SHU-like conditions" at

Springfield, the defendant "has access to staff when they have to

take him out of his for shower, law library, recreation and

interviews," and that "staff are required to offer him" those

services.  (Id. at 154).

l.   Xavier Amador, Ph.D.

Dr. Amador is a licensed clinical psychologist, with an

expertise in psychotic disorders.  (Id. at 162-63).  As a

psychologist, Dr. Amador has never attended medical school and is

not able to prescribe medications.  (Id. at 181-82).   Dr. Amador

has conducted research on medications used to treat

schizophrenia, and he served as the co-chair of the

"schizophrenia and related psychotic disorders section" for the

DSM-IV, the diagnostic manual used to diagnose mental illnesses.

(Id. at 164).

According to Dr. Amador, approximately 70 percent of all schizophrenic patients treated with antipsychotic medication respond to medication, and approximately 25 percent of patients receive "no benefit" from treatment.  (<u>Id</u>. at 174, 184).  Dr. Amador confirmed that these statistics apply "regardless of what schizophrenia category [the patients fall into."  (<u>Id</u>. at 174).  Nevertheless, Dr. Amador opined that there is a 35 percent likelihood, at best, that the defendant would be restored to competency because of the defendant's long-standing delusions.  (<u>Id</u>. at 166).  Dr. Amador stated:

> Restoration of competency, if you look at the data, the research data, how well do delusions respond to anti-psychotic medications that are being proposed by the doctors that preceded me?  They don't respond well.  They particularly are poor at affecting delusions and improving delusions, anti-psychotic medications, if the person has been untreated for a year or longer.

(<u>Id</u>. at 169).  Dr. Amador explained that he premised his conclusion – that delusions do not respond to antipsychotic medication – upon the "John Kane" study to which he cited in his affidavit.  (<u>Id</u>. at 195-96).  Dr. Amador further opined that because the defendant did not acknowledge that he was ill, he suffered from "anasognosia," a "common symptom of schizophrenia and related to cognitive deficits."  (<u>Id</u>. at 171).  Dr. Amador explained that he did not conduct an examination of the

50

defendant, and that his opinions were based upon the examinations conducted by Drs. Sarrazin and Preston-Baecht.  (<u>Id</u>. at 190-91).

Dr. Amador confirmed that antipsychotic medication is the "[f]irst line" of treatment for schizophrenia, and that long-acting antipsychotic medication is "both effective and safe." (<u>Id</u>. at 176, 187).  Dr. Amador similarly confirmed that there is a "direct link between untreated schizophrenia and an increased risk for violence."  (<u>Id</u>. at 187).

3.  <u>Restoration Studies Cited By The Experts</u>

a.  A Sample[11] of the Restoration Studies Relied <u>Upon By Government Experts</u>

i.  Involuntary Medication of Patients Who Are Incompetent to Stand Trial: A Descriptive Study of the New York Experience with <u>Judicial Review</u>

In 1993, the Bulletin of the American Academy of Psychiatry and the Law published a study that considered the efficacy of involuntary administrations of antipsychotic medications to render defendants competent to stand trial.[12] This study was recognized by the American Academy of Psychiatry

_____

[11]  Dr. Sarrazin's psychiatric report cites to fourteen different psychiatric studies in support of his report.  <u>See</u> Sarrazazin, M.D., Psychiatric Report, Feb. 2, 2009 at 17-18. Only two are described herein as a representative sample.

[12]  Ladds, et. al., <u>Involuntary Medication of Patients Who Are Incompetent to Stand Trial: A Descriptive Study of the New York Experience with Judicial Review</u>, Bull. Amer. Acad. Psych. & Law, v.21:4, 1993.

and the Law with an award for best research by a fellow in forensic psychiatry in 1993.

The study gathered data over a four and a half year period (July 1986 through December 1990) for all defendants admitted to two New York States hospitals for involuntary restoration proceedings. These two hospitals treated over 95 percent of all felony defendants found not competent to proceed to trial in New York. See Ladds at 534. During this period there were 68 cases for 61 defendants (in seven cases the defendants refused medication twice). Id. at 535. Of these defendants, all but one were diagnosed with a psychotic disorder such as schizophrenia. Id. at 536. The average age of the defendants was 40 years old. Id.

Of the 45 cases in which defendants were involuntarily medicated, 87 percent were restored to competence. Id. at 538-39. "In the majority of such cases the response was described as rapid and robust and dramatic." Id. at 538. The defendants in this study were typically treated with first generation long-acting intramuscular antipsychotic medications such as haloperidol. Id. at 535.

ii. Predicting Restorability of Incompetent
    Criminal Defendants

In 2007, the Journal of American Academy of Psychiatry and the Law published a study that considered the probability of

52

restoring criminal defendants who were found not competent.[13]
The study looked at data from the Ohio state court system for
both felony and misdemeanor defendants from 1995 through 1999.
In Ohio, the restoration statute allowed a court to order
involuntary medication for felony defendants for up to 4 to 12
months and misdemeanor defendants for up to 30 to 60 days.  See
Mossman at 36.

As a result of the short treatment period, the success
rate for restoring misdemeanor defendants to competence was low;
only 48 percent of misdemeanor defendants were restored to
competence.  In contrast, felony defendants enjoyed a much higher
rate of successful restoration; 75 percent of felony defendants
were restored to competence due to the extended treatment period.
The median age for all restored defendants was 35.5 years
(comparable to Hardy).  All defendants diagnosed as schizophrenic
or schizoaffective, including both felony and misdemeanor
defendants, enjoyed a restoration rate of 62 percent.  Id. at 38.

The study does not break out data for defendants
charged with felonies who were diagnosed with schizophrenia from
those defendants who were charged with misdemeanors; however, the
overall data for felony versus misdemeanor restoration rates
discussed above suggests that the restoration rate for felony

---

[13]   See Mossman, Predicting Restorability of Incompetent
Criminal Defendants, J. American Academy of Psychiatry and the
Law, 35:34-43, 2007.

defendants with schizophrenia is significantly higher than 62 percent.

       b.    Restoration Study Cited By The First Defense
            Expert, Dr. Richard Dudley

           i.    Jackson's Indiana: State Hospital Competence
               Restoration in Indiana

In 2008, the Journal of American Academy of Psychiatry and the Law published a comprehensive study that considered the probability of success for restoration proceedings for criminal defendants.[14]  The study gathered data from 1,475 defendants admitted to Indiana hospitals for restoration to competence proceedings over an eighteen year period (1988 to 2005).  Of these defendants, 988 had a psychotic disorder such as schizophrenia.  See Morris and Parker at 527.  The remainder of the defendants were diagnosed with mood disorders, mental retardation and/or other disorders.  Id.  The average age of the defendants treated was 36.6 years old (comparable to Hardy's age).  The study found that 72.3 percent of the defendants were restored to competence within six months of admission and 83.9 percent were restored to competence within one year of admission.  Id.  The success rate for defendants with psychotic disorders such as Hardy was similar, with 72.8 percent restored to

_____

[14]  See Morris and Parker, Jackson's Indiana: State Hospital Competence Restoration in Indiana, J. American Academy of Psychiatry and the Law, 2008, p. 524 (recognizing that "[t]he probability of successful RTC [(restoration to competency)] is both clinically and legally pertinent[.]"

competence within six months of admission and 83.8 percent
restored to competence after one year of admission.  Id. at 529,
Table 4.

    c.    Restoration Studies Relied Upon By the Second
          Defense Expert

    The defense psychologist Xavier Amador, did not cite to
a single restoration study in either his report, (Docket entry #)
or his testimony.  The one psychiatric study relied upon by Dr.
Amador during his testimony was the "Kane study" which is titled
"Clozapine for the Treatment Resistant Schizophrenia."  (Tr.
Amador Test. at 195, 205).[15]  This study did not address
restoration proceedings and therefore did not use restoration
rates as a data point.

    Amador testified that the Kane study would support his
testimony that Hardy was only 35 percent likely to respond to
treatment because he suffered from delusions as a symptom of his
schizophrenia.  (Tr. Amador Test. at 193-94).  However, the Kane
study says no such thing.  In light of Amodor's cavalier
testimony concerning "musketeers" and "plastic swords" (Tr. at
205), the importance of this point is hard to overemphasize.

    The Kane study actually supports medicating Hardy.  It
states that only 10-20 percent of schizophrenic patients will
derive little benefit from the typical drugs (e.g. haloperidol)

_____

    [15] John Kane M.D., et al., Clozapine for the Treatment
Resistant Schizophrenia, Arc. Gen. Psych., Vol 45 (Sept. 1988).

administered to treat schizophrenia.  <u>See</u> Kane at 789.

Therefore, 80-90 percent of schizophrenic patients will benefit

from the typical drugs.  <u>See</u> Kane at 789.  The small percentage

of unresponsive patients is known as the "refractory group."  <u>See</u>

Kane at 789.

        The focus of the Kane Study is <u>not</u> on predicting which

schizophrenic patients will be part of this refractory group.  To

the contrary, Kane explicitly states "<u>there are no consistently</u>

<u>replicated findings providing clues about why patients are</u>

<u>refractory to treatment</u>."  Kane at 789.  In other words, the

doctors have no reliable data to assess why certain schizophrenic

patients respond to the typical treatment and others do not.

This is the opposite of what Amador testified the study would

say.[16]

        The Kane Study focused on the efficacy of a particular

drug, clozapine, in treating this refractory group.  <u>See</u> Kane

Study at 789-96.  The results of the Kane study found that "[t]he

response to clozapine demonstrates that this sub-group [the

---

        [16] In fact, every patient who had been part of the Kane
Study was "refractory" because they had already been medicated
with the typical drugs for at least three periods in the last
five years with at least two different typical antipsychotic
medications over a period of six weeks (for a total of 18 weeks
of treatment) without significant symptomatic relief.  To confirm
non-responsiveness, the subjects of the study underwent another
round of treatment with the typical medications for a period of
six weeks.  The refractory patients were defined by their non-
responsiveness, not by their symptoms.

refractory group] of severely ill schizophrenic patients, previously considered by many to be beyond the reach of conventional therapy, does remain capable of experiencing substantial medication response." Kane Study at 795.

This positive result occurred regardless of the symptoms of the schizophrenic patients. The superiority of clozapine "was not confined to a particular aspect or dimension of psychopathological characteristics (e.g. hallucinations, delusions, or suspiciousness) but involved all the major psychotic signs and symptoms associated with this patient group, including such negative items as blunted affect, emotional withdrawal, apathy, and disorientation)." Kane at 796. In other words, the efficacy of the medication that was the focus of this study was not affected by symptoms (and also noteworthy, delusions were listed with the other common symptoms of schizophrenia and were not listed as "negative items"). Again this is the opposite of what Amador testified to.

It is also noteworthy, that this point about clozapine was made in Dr. Sarrazin's original report to the Court. See Sarrazin Psychiatric Report, Feb. 2, 2009 at 11.

II. DISCUSSION

In Sell v. United States, 539 U.S. 166 (2003), the Supreme Court considered whether the Constitution permits the government to administer antipsychotic drugs involuntarily to a

57

mentally ill pre-trial criminal defendant, in order to render that defendant competent to stand trial for serious crimes.  <u>See</u> <u>id</u>. at 169.  The Court held that the government could forcibly medicate a defendant under certain circumstances set forth in detail below.

However, in <u>Sell</u> the Court also held that "a court need not consider whether to allow forced medication [to render a defendant competent to stand trial], if forced medication is warranted for a <u>different</u> purpose, such as the purposes set out in <u>Harper</u> related to the individual's dangerousness . . . ."  <u>Id</u>. at 181-82 (emphasis in original).  The Court noted "[t]here are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds before turning to the trial competence question."  <u>Id</u>. at 182 (emphasis in original).

> [T]he [Harper] inquiry into whether
> medication is permissible . . . to render an
> individual nondangerous is usually more
> "objective and manageable" than the inquiry
> into whether medication is permissible to
> render a defendant competent. The medical
> experts may find it easier to provide an
> informed opinion about whether, given the
> risk of side effects, particular drugs are
> medically appropriate and necessary to
> control a patient's potentially dangerous
> behavior (or to avoid serious harm to the
> patient himself) than to try to balance harms
> and benefits related to the more
> quintessentially legal questions of trial
> fairness and competence.

Id. (internal citations omitted).   The Court further explained
that "[e]ven if a court decides medication cannot be authorized
on [Harper] grounds, the findings underlying such a decision will
help to inform expert opinion and judicial decisionmaking in
respect to a request to administer drugs for trial competence
purposes."   Id. at 183.

        The Sell Court thus suggested that when asked to
approve forcible administration of antipsychotic medication, a
court should determine whether such medication is warranted for
pursuant to Harper before determining whether it is warranted to
render a defendant competent to stand trial.   See Coleman v.
State Supreme Court, 697 F.Supp.2d 493, 507 (S.D.N.Y. 2010)
("Significantly, the [Sell] Court suggested that before seeking
to justify forced medication on [trial competency] bases, a court
should determine whether it is warranted for a 'different
purpose, such as the purposes set out in Harper'") (quoting Sell,
539 U.S. at 181-82).   Accordingly, in United States v. Gomes, the
Second Circuit explained that before proceeding to a Sell
analysis, a court must first determine the "threshold inquiry
[of] whether the forced treatment is justified for other
reasons," such as those set forth in Harper.   Gomes, 387 F.3d at
160.

A.   <u>Harper and Riggins Standard</u>

In <u>Harper v. Washington</u>, the Supreme Court addressed the constitutionality of a state prison regulation that allowed the state to forcibly medicate an inmate who suffered from a mental disorder and who posed a likelihood of serious harm to himself, to others, or to their property.  After <u>Harper</u> was forcibly medicated pursuant to the regulation, he brought suit under 42 U.S.C.A. § 1983, claiming that due process required that the determination of whether to forcibly medicate him could only be made by a judge after an evidentiary hearing.

The Court upheld the regulation, finding first that the regulation constituted a rational means of furthering a legitimate interest.  Specifically, the Court recognized

> the legitimacy and the importance of the
> government's interest in controlling
> dangerous prison inmates.  <u>See</u> <u>id</u>. at 225.
> There are few cases in which the State's
> interest in combating the danger posed by a
> person to both himself and others is greater
> than in a prison environment, which, by
> definition, is made up of persons with a
> demonstrated proclivity for antisocial
> criminal, and often violent, conduct.

<u>Id</u>. (internal quotation marks omitted).  The Court thus concluded that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest."  <u>Id</u>. at 227.

60

The Court then conducted a detailed review of the
procedural safeguards contained in the regulation.  First, the
Court rejected the contention that due process required that the
decision to medicate be made by a judge.  "[A]n inmate's
interests are adequately protected, and perhaps better served, by
allowing the decision to medicate to be made by medical
professionals rather than a judge."  Id. at 231.  The Court
explained:

> The Due Process Clause has never been thought
> to require that the neutral and detached
> trier of fact be law trained or a judicial or
> administrative officer. . . . Particularly
> where the patient is mentally disturbed, his
> own intentions will be difficult to assess
> and will be changeable in any event. . . .
> We cannot make the facile assumption that the
> patient's intentions, or a substituted
> judgment approximating those intentions, can
> be determined in a single judicial hearing
> apart from the realities of frequent and
> ongoing clinical observation by medical
> professionals. . . . The mode and procedure
> of medical diagnostic procedures is not the
> business of judges. . . . Although we
> acknowledge the fallibility of medical and
> psychiatric diagnosis, we do not accept the
> notion that the shortcomings of specialists
> can always be avoided by shifting the
> decision from a trained specialist using the
> traditional tools of medical science to an
> untrained judge or administrative hearing
> officer after a judicial-type hearing. . . .
> Nor can we ignore the fact that requiring
> judicial hearings will divert scarce prison
> resources, both money and the staff's time,
> from the care and treatment of mentally ill
> inmates.

Id. at 231-32 (internal citations and quotations omitted).

The Harper Court then upheld the constitutionality of the administrative procedures, because the statute provided that: (1) the inmate had the right to 24-hour notice of intent to convene the hearing, during which time he could not be forcibly medicated; (2) the inmate had the right to attend the hearing, to present evidence, and to cross-examine adverse witnesses; (3) he had the right "to the assistance of a lay advisor who [had] not been involved in his case and who [understood] the psychiatric issues involved"; (4) if the committee rendered an adverse decision, the inmate had the right to submit an appeal within 24 hours to the superintendent of the institution, who was then obliged to decide the appeal within 24 hours of receipt; (5) if the superintendent made an adverse finding, the inmate could seek judicial review of an adverse decision by way of "a personal restraint petition or an extraordinary writ"; and (6) after the initial hearing, the inmate could be forcibly medicated only with periodic review. Id. at 216.

The Court explicitly rejected the "contention that the hearing must be conducted in accordance with the rules of evidence or that a 'clear, cogent, and convincing' standard of proof is necessary. This standard is neither required nor helpful when medical personnel are making the judgment required by the regulations here." Id. at 235 (citations omitted).

The Court further stated that unless there was "evidence of resulting bias, or evidence that the actual decision is made before the hearing," the mere fact of allowing an inmate to contest the staff's position at the hearing "satisfies the requirement that the opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'"  Id. at 235 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).

Finally, the Court rejected the argument that physical restraints and seclusion would constitute appropriate accommodations in lieu of involuntary medications, for the failure to show these methods to be medically effective at a de minimus cost to the institution.  Id. at 226-27.

After Harper, the Supreme Court decided Riggins v. Nevada, 504 U.S. 127 (1992) and Sell v. United States, 539 U.S. 169 (2003).  In Riggins, the Supreme Court addressed the constitutionality of a Nevada court's order to forcibly medicate an inmate during trial for the purpose of maintaining competency to proceed to trial.  Riggins did not address the dangerousness issues addressed in Harper.  However, the Riggins Court did use Harper as a comparison to strike down the Nevada court's order. The Court stated:

> Under Harper, forcing antipsychotic drugs on
> a convicted prisoner is impermissible absent
> a finding of overriding justification and a
> determination of medical appropriateness.
> The Fourteenth Amendment affords at least as
> much protection to persons the State detains

63

>           for trial.  See Bell v. Wolfish, 441 U.S.
>           520, 545 (1979) ("[P]retrial detainees, who
>           have not been convicted of any crimes, retain
>           at least those constitutional rights that we
>           have held are enjoyed by convicted
>           prisoners"); O'Lone v. Estate of Shabazz, 482
>           U.S. 342, 349 (1987) ("[P]rison regulations
>           ... are judged under a 'reasonableness' test
>           less restrictive than that ordinarily applied
>           to alleged infringements of fundamental
>           constitutional rights").  Thus, once Riggins
>           moved to terminate administration of
>           antipsychotic medication, the State became
>           obligated to establish the need for Mellaril
>           and the medical appropriateness of the drug.
>
>           Although we have not had occasion to develop
>           substantive standards for judging forced
>           administration of such drugs in the trial or
>           pretrial settings, Nevada certainly would
>           have satisfied due process if the prosecution
>           had demonstrated, and the District Court had
>           found, that treatment with antipsychotic
>           medication was medically appropriate and,
>           considering less intrusive alternatives,
>           essential for the sake of Riggins' own safety
>           or the safety of others.

Riggins, 504 U.S. at 135, 112 S.Ct. at 1815.

The Court also "set forth a standard of heightened, but not "strict," scrutiny for determining when the possible prejudice to a defendant's fair trial rights might be outweighed by the government's interest in prosecution: "administration of antipsychotic medication [that is] necessary to accomplish an essential state policy." Id. at 138; United States v. Gomes, 289 F.3d 71, 81-82 (2002) (citation omitted).

B.   <u>Regulatory Framework</u>

In response to <u>Washington v. Harper</u>, the Justice Department, Bureau of Prisons, established an administrative procedure for delivering involuntary psychiatric treatment and medication, which was codified at 28 CFR §§ 549.43 and 549.46. This regulation provides, <u>inter alia</u>:

(1) 24-hour notice of intent to convene the hearing, during which time the inmate cannot be forcibly medicated.  28 CFR § 549.46(a)(1), (2);

(2) the right of the inmate to attend the hearing, to present evidence, and to cross-examine adverse witnesses.  28 CFR § 549.46(a)(3);

(3) the right of the inmate to have a qualified staffmember present as a representative.  28 CFR § 549.46(a)(3);

(4) the hearing to be conducted by a "psychiatrist other than the attending psychiatrist, and who is not currently involved in the diagnosis or treatment of the inmate"; 28 CFR § 549.46(a)(4);

(5) the psychiatrist conducting the hearing to prepare a written report documenting whether involuntary administration of psychiatric medication is necessary because "as a result of the mental illness or disorder, the inmate is dangerous to self or others, poses a serious threat of damage to property affecting the security or orderly running of the institution, or is gravely

65

disabled (manifested by extreme deterioration in personal functioning)." 28 CFR § 549.46(a)(7), (8); and

(6) if the hearing results in an adverse decision, an appeal may be filed within 24 hours to the supervisor of the mental health division of the institution, who is obliged to decide the appeal within 24 hours of receipt. 28 CFR § 549.46(a)(8), (9).

   C.   BOP's Decision to Medicate Hardy Should Be Affirmed and the Court's Stay of BOP's Medication Order Should Be Lifted under the Harper and Riggins Standard

      1.   Standard of Review

As described below, courts have reviewed BOP's regulatory decision whether to medicate inmates on dangerousness grounds using a deferential standard applicable to the Administrative Procedure Act ("APA"). While the government believes that this standard does apply in this case, the government believes that the facts in the record support a finding to medicate Hardy under a de novo standard as well.

The administrative due process procedures set forth at 28 C.F.R. §§ 549.43 and 549.46 do not expressly provide for any form of judicial review of the mental health administrator's final decision. It is clear from Harper, however, that prisoners can judicially challenge such decisions. See Harper, 494 U.S. at 235 (upholding the constitutionality of the statute based upon, inter alia, the fact that "under state law an inmate may obtain

judicial review of the hearing committee's decision by way of a personal restraint petition or petition for an extraordinary writ"). Few courts have addressed the basis of a court's jurisdiction to review a medical facility's determination of dangerousness and the attendant standard of review to be applied. Those that have addressed the issue have determined that jurisdiction was proper pursuant to the APA, codified at 5 U.S.C. §§ 701-706. See United States v. Humphreys, 148 F. Supp.2d 949, 953-54 (D.S.D. 2001); United States v. McAllister, 969 F. Supp. 1200, 1211-12 (D.Minn. 1997); see also United States v. Morgan, 193 F.3d 252, 262-264 (4th Cir. 1999) (holding that administrative hearing was subject to judicial review for arbitrariness).

Under the APA, a reviewing court may not overturn an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E); see Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc. 467 U.S. 837 (1984). A court's review under the APA is narrow, and the court cannot substitute its judgment for that of the agency, see Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), which in this case is the Bureau of Prisons. See Harper, 494 U.S. at 231 ("[W]e conclude that an inmate's interests are adequately protected, and

67

perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge."); United States v. Charters, 863 F.2d 302, 309-310 (4th Cir. 1988) (A judicial rather than medical decision "reflects greater confidence in the ability of judges and adversarial adjudicative processes than in the capacity of medical professionals subject to judicial review to minimize the risk of error in such decision, it flies directly in the face of the Supreme Court's perception on that score."); Parham v. J.R., 442 U.S. 584, 609 (1979) ("[W]e do not accept the notion that the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist using the traditional tools of medical science to an untrained judge.").

In reviewing an agency's rationale for adopting a particular rule, the court "must be satisfied that the agency examined the relevant data and established a rational connection between the facts found and the choice made." Natural Resources Defense Council, Inc. v. U.S. Dept. of Agriculture, 613 F.3d 76, 83 (2d Cir. 2010) (citations and quotations omitted). "The agency's action should only be set aside if it relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be

ascribed to a difference in view or the products of expertise." Id. at 83-84 (citations and quotations omitted).

    2.   Hardy Should Be Medicated Pursuant to Harper and Riggins

As detailed above, the Supreme Court has stated that for the purposes of forcibly medicating a prisoner during trial, a trial court "certainly would have satisfied due process" by showing that "treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of [the inmate's] own safety or the safety of others." Riggins, 504 U.S. at 135. The government does not concede this formulation to be the threshold for upholding a forcible medication order based on dangerousness, however, the evidence in this case satisfies this criteria.

    a.   The Defendant is Dangerous to Prison Staff

The first factor under the Harper and Riggins test is to determine whether Hardy poses a danger to others, namely BOP staff. He clearly does. BOP's determination that Hardy is dangerous to others should be affirmed. (See Involuntary Medication Report, Dec. 6, 2011).

It is unavoidable that the defendant will interact with prison staff. As detailed at the 2012 hearing, prison staff members are responsible for providing food and clean clothes to the defendant, moving the defendant periodically pursuant to

69

security protocols, and monitoring the defendant's health and vital signs.

Moreover, the defendant has access to everyday items which may be converted into weapons, such as combs, batteries, food trays, and his own urine and feces.  As detailed above in the statement of facts, Officers Ferreira, Hardy, Rodriguez, Lorenzo, Henderson, Santiago, Kosakowski, Jamaica and Agent Drake all testified that the defendant has posed, and continues to pose, a danger to any individual who comes in contact with the defendant.

Based upon the defendant's numerous attacks on prison staff described above, as well as the information detailed in the defendant's incident reports (See Gvt. Ex. A-Q), the defendant is undoubtedly a threat to the safety of prison staff.  See United States v. Holman, 532 F.3d 284, 289 (4th Cir. 2008) (upholding district court's finding that unmedicated inmate posed danger to himself and others based upon "violent behavior" in prison, "threats" against prison staff, and threats to commit suicide).

This conclusion is bolstered by the defense expert Amador, who testified that non-medicated schizophrenic patients such as Hardy pose an increased risk for violent behavior. (2012 Tr. at 187)(Amador confirmed that he had previously written that untreated schizophrenics posed a risk of committing serious violence at a rate three times higher than the normal rate).

70

b.   Treatment with Medication is Medically
     Appropriate

Under Riggins, the next factor to consider is whether
the proposed medication is medically appropriate.  BOP's
determination that the administration of antipsychotic medication
is medically appropriate treatment for Hardy should be affirmed.
(See Involuntary Medication Report, Dec. 6, 2011).

In this case "there is little dispute in the
psychiatric profession that proper use of [antipsychotic] drugs
is one of the most effective means of treating and controlling a
mental illness likely to cause violent behavior."  See Harper,
494 U.S. at 226.  Dr. Sarrazin testified that "it is clinically
appropriate to treat Hardy with antipsychotic medications.  His
illness just from a standpoint of treating him, his illness
requires treatment."  (2009 Tr. at 59).  This is because the
administration of antipsychotic medication is the "gold standard"
treatment for schizophrenia, because only the antipsychotic
medications "are going to treat the neurotransmitters in the
brain chemistry that [are] causing some of the difficulties with
the schizophrenia."  (2012 Tr. at 81-82).

Dr. Dudley, the defense's first expert, agreed that the
administration of antipsychotic medications is "the treatment of
choice" for schizophrenic patients.  (2009 Tr. at 122).  He also
agreed that "[p]sychopharmacological intervention with anti-

71

psychotic medications" is "the treatment most likely to have an effect on Mr. Hardy's schizophrenia[.]" (2009 Tr. at 122).

Moreover, Dr. Amador agreed that long-acting antipsychotic medications are effective and safe to use to treat schizophrenia. (2012 Tr. at 187). In fact, Dr. Amador believes that the administration of long-acting injectable anti-psychotic medication, as opposed to oral second generation medication, should be "among the first-line treatments" to treat schizophrenic patients. (2012 Tr. at 186).

   c.   Medication is Essential for the Safety of
        Others

Under Riggins, the next factor to consider is whether the medication is essential to the safety of others after taking into account less intrusive means. This is true in Hardy's case. The forcible administration of antipsychotic medication is essential to prevent the defendant from harming prison staff, and less intrusive means are not viable.

The defendant's current dangerousness stems from his mental illness. (2012 Tr. at 64, 142). Dr. Sarrazin, the defendant's treating psychiatrist, explained that the defendant's dangerousness is caused by his paranoid delusions. In particular, one of the defendant's delusions is that "[t]here's already been an order for him to be released" from prison. (2012 Tr. at 77). Because the defendant believes that he is wrongfully incarcerated, he believes that "anything he does, he's not

72

responsible for." (Id.) Dr. Preston-Baecht elaborated on the

etiology of the defendant's dangerousness:

> Oftentimes, people can be dangerous even
> without a mental illness. I think that the
> most problematic symptom, psychotic symptom,
> that [the defendant] has is the delusional
> belief that because he's being held - in his
> mind - illegally, he cannot be held
> responsible for any aggressive or violent
> behavior that he engages in.
>
> He gave me an example of this. He said that
> if I were - referring to me - falsely
> imprisoned, if I decided to kill my cellmate,
> then I would be able to go free because I
> can't be held responsible for anything I do
> while I am wrongly incarcerated.
>
> In his mind, he's being wrongly incarcerated;
> therefore, any action he takes he can't be
> responsible for.

(2012 Tr. at 142). Even the defense expert, Dr. Amador, agreed

that untreated schizophrenics pose an increased risk for violent

behavior. (2012 Tr. at 187).

As Dr. Sarrazin explained, "only the antipsychotic

[medication]. . . treat[s] the underlying reason for the violence

and the paranoia." (2012 Tr. at 81). Therefore, the forcible

administration of antipsychotic medication is necessary to

protect prison staff. See Harper, 494 U.S. at 226 ("[T]here is

little dispute in the psychiatric profession that proper use of

[antipsychotic] drugs is one of the most effective means of

treating and controlling a mental illness likely to cause violent

behavior.")

>    d.    There are no less intrusive means available

Medication is the only appropriate and effective means
of protecting staff from the defendant.  First, complete
isolation is simply not possible.  For example, as Dr. Preston-
Baecht explained, the defendant is currently housed in "SHU-type
conditions" -- in a cell by himself with a "double food slot,"
which reduces the defendant's "chance that he can harm [staff]"
when they give him food and other necessities.  (2012 Tr. at
152-53).  Nevertheless, the defendant still "has access to staff
when they have to take him out of his [cell] for shower, law
library, recreation and interviews."  (2012 Tr. at 153-54).
Because the defendant is entitled to certain rights, such as the
ability to take a shower and have access to the law library and
the recreation area, it is simply not possible to completely
isolate the defendant from staff members.  Consequently, the
prison staff members are presently "in danger of being hurt by
[the defendant]."  (2012 Tr. at 139).

Indeed, most of the defendant's acts of violence,
outlined above, occurred while he was housed in almost complete
isolation.  (2012 Tr. at 9-11 (throwing liquid into guard's eyes
while housed in SHU); 18-19 (attacking guard with shiv while
housed in SHU); 31-33 (trying to bite staff while restrained
while housed in SHU); 65 (filling toothpaste with feces and urine
while housed in Springfield); 220-21 (punching guard while

74

handcuffed while housed in SHU); 230-34 (throwing urine into
guard's face while housed in SHU); 247-49 (attacking guard with
sock full of batteries while housed in SHU)).  Therefore, even by
isolating the defendant – to the extent isolation is possible in
the prison context – such measures have failed to protect prison
staff members from the defendant's violence.  This is especially
true because the defendant is not predictable with respect to his
violent outbursts.  As Dr. Sarrazin explained, "I cannot say that
there would be some sign that I would see that he was escalating
[to violence]."  (2012 Tr. at 80).

        Nor can physical restraints be considered a reasonable
alternative.  First, "[r]estraints are not really going to impact
[the defendant's] underlying illness and the dangerousness that
he has."  (2012 Tr. at 69).  Second, inmates in restraints
require staff assistance to perform basic tasks, such as eating
and diaper-changing, in addition to constant medical monitoring.
Therefore, restraints "involve[] a lot more contact between the
staff and an inmate – they can still spit on staff, they can
stiff try to bite staff."  (2012 Tr. at 143).   Indeed, the
defendant attempted to bite a staff member while he was
restrained.  (See 2012 Tr. at 32-33).  Third, the use of
long-term restraints bears its own risks.  "Being in that
position for a long period of time, obviously, you risk physical
problems such as blood clots," "problems with [inmates] moving

their bowels" and "abrasions on their arms or their legs." (2012
Tr. at 79, 143).  Unsurprisingly, the Supreme Court recognized
that "[p]hysical restraints are effective only in the short term,
and can have serious physical side effects when used on a
resisting inmate, as well as leaving the staff at risk of injury
while putting the restraints on or tending the inmate who is in
them." Harper, 494 U.S. at 226-27.

Finally, sedatives such as Valium and Ativan are not
reasonable alternatives to antipsychotic medication.  First, the
forcible administration of sedatives would not necessarily
alleviate the constitutional concerns set forth in Harper,
Riggins and Sell.  Second, although sedatives may "alleviate
agitations," they "do not affect the paranoia.  They do not treat
psychosis."  Therefore, such medications would not "have an
effect on the etiology of the dangerousness." (2012 Tr. at
80-81).  Indeed, sedatives would have no impact on the
defendant's delusion that he has the right to harm or kill
individuals in the prison because he is wrongfully detained.
(2012 Tr. at  77, 142).  Because the underlying cause of the
defendant's dangerousness would be unaffected by sedatives, there
is nothing to suggest that they would effectively protect prison
staff from the defendant, and they are not a viable alternative.

e.   <u>Conclusion of Harper, Riggins Discussion</u>

Treating the defendant with antipsychotic medication is medically appropriate and, considering less intrusive alternatives, essential for the sake of the safety of BOP staff. See <u>Riggins</u>, 504 U.S. at 135.  As such, due process has been satisfied.  The government therefore respectfully requests that the Court affirm the BOP's forcible medication order to mitigate the danger Hardy poses to BOP staff.

D.   <u>Hardy Should be Medicated Pursuant to Sell</u>

To medicate Hardy pursuant to <u>Sell</u>, the Court must find the following four factors proven by clear and convincing evidence: (1) that important governmental interests are at stake; (2) that involuntary medication will significantly further the government's important interests; (3) that involuntary medication is necessary to further the government's important interests; and (4) that administration of the drugs is medically appropriate. See <u>Sell</u> 539 U.S. at 180-82.

1.   <u>Important Government Interests Are At Stake</u>

The Court must first determine whether an important government interest is at stake.  In <u>Sell</u>, the Supreme Court stated that:

> The Government's interest in bringing to
> trial an individual accused of a serious
> crime is important.  That is so whether the
> offense is a serious crime against the person
> or a serious crime against property.  In both
> instances the Government seeks to protect

> through application of the criminal law the
> basic human need for security.

Sell, 539 U.S. at 180.  The government also has a concomitant interest in assuring that the defendant receives a fair trial. Id. at 180.  The Court must consider the individual circumstances of each case in determining whether there is an important government interest at stake.

In Gomes, the Second Circuit found that the government had an important interest in trying a defendant who was charged with illegal possession of a handgun as an armed career criminal pursuant to 18 U.S.C. § 924(e).  See Gomes, 387 F.3d at 160-61 (citing the risk of violence).  The Second Circuit found that the possibility of civilly committing the defendant was insufficient to overcome the government's interest in trying the defendant. See id. at 161.  See also United States v. Grape, 549 F.3d 591, 602-03 (3d Cir. 2008)(important government interest at stake in receipt of child pornography case).

This factor is clearly satisfied in this case.  Hardy was the leader of a ruthless drug gang and is charged in a superseding indictment with orchestrating six murders, two attempted murders, a kidnaping, an attempted robbery, and multiple firearms and narcotics offenses.  The circumstances of the six murder charges are briefly described below.

Hardy is charged with murdering Michael Colon on April 15, 1998.  Mr. Colon worked at a roller skating rink in Brooklyn,

New York.  Workers ejected Hardy from the rink on April 15th.
Hardy returned later that same night with gunmen who shot and
killed Mr. Colon.

Hardy is charged with murdering Darryl Baum on June 10,
2000.  Mr. Baum associated with Ivery Davis, a rival drug dealer
whom Hardy held responsible for the murder of his brother Myron
Hardy.  On Hardy's orders, Baum was shot and killed on a street
in Brooklyn, New York.

Hardy is charged with murdering James Hamilton on
August 1, 2000.  Mr. Hamilton also associated with Ivery Davis.
As described during the trial of United States v. Abubakr Raheem,
on Hardy's orders, Mr. Hamilton was shot and killed in a
restaurant he opened in Brooklyn.

Hardy is charged with murdering Ivery Davis and Johan
Camitz on August 10, 2000.  Hardy held Mr. Davis responsible for
the murder of Hardy's brother Myron Hardy.  The evidence will
show that Hardy and his gang hunted Mr. Davis while
systematically killing his associates.  On Hardy's order, Aaron
Granton shot and killed Mr. Davis outside of a nightclub in
Manhattan.  During the course of the murder, Johan Camitz, a
bystander, was also killed as Mr. Davis attempted to flee the
scene.  Mr. Camitz was a young film and commercial director who
had just moved to New York City from Sweden.  The Attorney

General has directed the Office to seek the death penalty against Hardy for the murder of Mr. Davis.

Finally, Hardy is charged with murdering Tyrone Baum on July 25, 2003.  Mr. Baum was the brother of Daryl Baum whom Hardy had killed in June 2000.  As described during the trial of United States v. Abubakr Raheem, on Hardy's orders, Mr. Baum was shot and killed as he worked at a construction site on a street in Brooklyn.

The government submits that there is an important government interest in proceeding to trial against Hardy and seeking justice for the six murders and other serious crimes he has committed.  "Power to bring an accused to trial is fundamental to a scheme of ordered liberty and prerequisite to social justice and peace."  Riggins v. Nevada, 504 U.S. 127, 135-136 (1992).  Accordingly, there can be no doubt that there are important government interests at stake in moving forward with a fair trial of Hardy.

> 2.   Involuntary Medication Will Significantly Further The Government'S Interests

The Court must next determine whether involuntary medication will significantly further the government's concomitant interests.  See Sell, 539 U.S. at 181.  The Court must find that administration of the drugs is substantially likely to render the defendant competent to stand trial.  At the same time, it must find that administration of the drugs is

substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair. Id. at 181.

The Second Circuit considered this issue in Gomes. In Gomes, the defendant was diagnosed as suffering from a delusional disorder of grandiose and persecutory type. See Gomes, 387 F.3d at 159. Two government experts, including Dr. Robert Sarrazin, testified that there was a "substantial probability" that antipsychotic medications would render the defendant competent to stand trial and that any side effects could be effectively managed. See Gomes, 387 F.3d at 161. Based on this evidence, the district court found that the government established that involuntary medication would significantly further the government interests without interfering with the defendant's ability to assist counsel. The Second Circuit affirmed this finding. See id. at 162.

Other Circuits have considered this prong of the Sell test as well. For example, in United States v. Fazio, 599 F.3d 835 (8th Cir. 2010), the defendant suffered from paranoid schizophrenia with cognitive deficits including memory loss. Id. at 837-38. During the Sell proceeding, Dr. Sarrazin recommended a treatment regimen of the following antipsychotic medication in order of preference: Abilify, Risperdal, Zyprexa, and Haldol.

81

_Id_. at 838-39.  Dr. Sarrazin testified that there was a 75 to 87 percent chance that these medications would render the defendant competent to stand trial.  _Id_. at 838.  The Court credited Dr. Sarrazin's testimony and ordered the defendant's involuntary medication.  The Eighth Circuit upheld the trial court's decision.  _Id_. at 840-41.

In _United States v. Grape_, 549 F.3d 591 (3d Cir. 2008), the defendant was diagnosed with paranoid schizophrenia and antisocial disorder.  Dr. Sarrazin outlined a treatment plan that included the potential use of second and first generation antipsychotic medications including haloperidol, for at least four to six months.  _Id_. at 595.  Dr. Sarrazin opined that there was a "substantial probability" that the defendant would be restored competent to proceed to trial with the antipsychotic medication.  _Id_. at 595.  Dr. Sarrazin further opined that the medication would not have side effects that would significantly inhibit the defendant's ability to interact with his attorney. _Id_. at 596.  The trial court credited Dr. Sarrazin's testimony and ordered the defendant forcibly medicated.  However, before his appeal was decided, the defendant attacked a BOP guard and was subsequently forcibly medicated with antipsychotics and rendered competent to proceed to trial pursuant to _Washington v. Harper_, 494 U.S. 210 (1990).  _See_ _Grape_, 549 F.3d at 597.  The

82

Third Circuit found that this was "tangible evidence" to support the district court's ruling.  Id.

In this case, Drs. Preston-Baecht and Sarrazin conducted their own evaluations of Hardy and concluded that it is substantially likely that, with the administration of antipsychotic medication, Hardy will be restored to competency and that the proposed treatment would be substantially unlikely to have side effects that would interfere significantly with his ability to assist counsel in conducting a defense.  See Sarrazin Psychiatric Report at 11; Preston-Baecht Report at pp. 5-8; 2009 Tr. at 42; 2012 Tr. at 51-54, 56-61, 138.  Even Dr. Amador agreed that antipsychotic medication is both safe and effective.  See 2012 Tr. at 187.

Dr. Sarrazin opined that the probability that Hardy would be rendered competent was higher than 75 percent.  See 2012 Tr. at 60.  Dr. Sarrazin cited to specific positive prognostic indicators applicable to Hardy that support this conclusion; namely, Hardy's high level of social functioning, the absence of a cognitive disorder, and the diagnosis of paranoid type schizophrenia, as opposed to other types of schizophrenia.  (2009 Tr. at 103-105; 2012 Tr. at 60-61).  In addition, as stated by defense expert Dr. Amador, the most important positive prognostic indicator for the treatment of any patient is compliance with the prescribed medication regimen.  2012 Tr. at 184-185.  In the

83

context of involuntary medication, this positive prognostic

indicator is guaranteed.  See id.

Drs. Sarrazin's and Preston-Baecht's conclusion is

supported by the applicable scientific data.  See e.g., Morris

and Parker, Jackson's Indiana: State Hospital Competence

Restoration in Indiana, J. American Academy of Psychiatry and the

Law, p. 524 (cited by the defense expert)(72.8 percent of

psychotic patients restored to competence within six months of

admission and 83.8 percent restored to competence after one

year); Ladds, et. al., Involuntary Medication of Patients Who Are

Incompetent to Stand Trial: A Descriptive Study of the New York

Experience with Judicial Review, Bull. Amer. Acad. Psych. & Law,

v.21:4, 1993 (87 percent of patients involuntarily medicated were

restored to competence).  Dr. Preston-Baecht's personal

experience is consistent with this data.  (2009 Tr. at 26, 30-1)

(patients under Dr. Preston-Baecht's care who have been

involuntarily medicated have been restored to competency more

than 75 percent of the time).

In contrast, the defense experts did not conduct their

own evaluations of Hardy and ignored information that could have

been relevant to their opinion with respect to Hardy's prognosis.

(2009 Tr. at 149-52; 2012 Tr. at 189-91).  In addition, Dr.

Amador's testimony was premised on a belief that the Kane study

said something it does not.  See supra at 7-9.  Dr. Amador,

84

citing the Kane study, testified that Hardy was unlikely to respond to treatment because he suffers from delusions.  This was the basis of Amador's sole objection to medicating Hardy.  Amador otherwise testified that antipsychotic medication is both safe and effective in treating schizophrenia.  (2012 Tr. at 176, 187).

However, contrary to Dr. Amador's testimony, the Kane study states that "there are no consistently replicated findings providing clues about why patients are refractory to treatment." Kane at 789.  Thus, according to the Kane study, Hardy's delusions are not an indication that he may be refractory to treatment.  Dr. Amador's premise is therefore false.  In addition, Dr. Amador did not seem to be familiar with the studies he criticized during his testimony and in his affidavit.  See 2012 Tr. at 196-200, 203-205.

Moreover, Dr. Amador's estimate that Hardy has a 35 percent chance for restoration is below the American Psychiatric Association's most pessimistic view of the available data.  See Psychiatric Report at 5-6.  Dr. Amador's estimate is simply not credible (this is especially true since there is absolutely no evidentiary support in the record for his position).

The government respectfully submits that under these circumstances, Dr. Dudley's and Dr. Amador's testimony concerning Hardy's prognosis deserve no weight.  In fact, Dr. Amador was second-guessing his conclusion with respect to Hardy's diagnoses

while he was on the stand.  (2012 Tr. at 182 ("[i]n light of the more recent progress notes that have read and the testimony have heard today, I am questioning the subtype of paranoia").

The government respectfully submits that the detailed testimony and reports of both Drs. Preston-Baecht and Sarrazin, which were based on a thorough review of Hardy's history and their _own_ observations and evaluations of Hardy, together with all of the medical authority in the record - including the studies relied upon by Amador - establishes the second prong of the _Sell_ test.   _See_ _Gomes_, 387 F.3d at 161-62; _Fazio_, 599 F.3d at 838, 841; _Grape_, 549 F.3d at 595-97; _United States  v. Thomas_, 2009 WL 2401178 (S.D. Ala. 2009); _United States v._ _Jaramillo-Ayala_, 526 F. Supp.2d 1094 (S.D. Cal. 2007); _United States v. Ballesteros_, 2006 WL 224437 (E.D. Cal. 2006); _United States v. Timmins_, 2005 WL 1231456 (D. Or. 2005).

>    3.   Involuntary Medication Is Necessary To Further The
>          Governments Interests

The Court must next determine whether involuntary medication is necessary to further the government's interests. _Sell_, 539 U.S. at 181.  With respect to this factor, the Supreme Court has stated:

> The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results.  And the court must consider less intrusive means for administering the drugs, _e.g._, a court order to the defendant backed by the contempt

power, before considering more intrusive
methods.

Id. at 181.

In the present case and as set forth more fully above,
Dr. Preston-Baecht stated in her report that "Mr. Hardy is
substantially unlikely to be restored to competency in the
foreseeable future in the absence of antipsychotic medication."
Preston-Baecht Report at p. 12.  Dr. Preston-Baecht further
stated that "less intrusive treatments (e.g. psychotherapy,
education, etc.) are unlikely to achieve substantially the same
results [as medication]." (Id. at 14).  Dr. Sarrazin testified
that there was no medically appropriate treatment for
schizophrenia which excluded antipsychotic medications.  See 2009
Tr. at 60.  Dr. Sarrazin testified that without medication, there
is no chance Hardy will be rendered competent to proceed to
trial.  2012 Tr. at 53.  The defense has not introduced any
evidence to the contrary.

The government respectfully submits that this factor
has been proven.

4.   Administration Of The Drugs Is Medically
     Appropriate

The Court must next determine whether administering
antipsychotic drugs is "medically appropriate, i.e., in the
patient's best medical interest in light of his medical
condition." Sell, 539 U.S. at 182.  In Gomes, the trial court

87

credited the testimony of the government experts who opined that the administration of drugs was medically appropriate.  <u>Gomes</u>, 387 F.3d at 163.  In this case, both the government and the defense experts agree that the only medically appropriate treatment for Hardy is the administration of antipsychotic medication.

As described above, Dr. Sarrazin testified that "it is clinically appropriate to treat Hardy with antipsychotic medications.  His illness just from a standpoint of treating him, his illness requires treatment." (2009 Tr. at 59).  This is because the administration of antipsychotic medication is the "gold standard" treatment for schizophrenia, because only the antipsychotic medications "are going to treat the neurotransmitters in the brain chemistry that [are] causing some of the difficulties with the schizophrenia." (2012 Tr. at 81-82).

This was not disputed by the defense.  Indeed, Dr. Dudley agreed that the administration of antipsychotic medications is "the treatment of choice" for schizophrenic patients. (2009 Tr. at 122).  Moreover, the defense's second expert, Dr. Amador, testified that long-acting antipsychotic medications are appropriate and safe to use to treat schizophrenia. (2012 Tr. at 187).  In fact, Amador believes that the administration of long-acting injectable antipsychotic

medication, as opposed to oral second generation medication, should be "among the first-line treatments" to treat schizophrenic patients.  (2012 Tr. at 186).

The government respectfully submits that this factor has been proven.

<u>CONCLUSION</u>

The government respectfully submits that it has established all of the factors set forth by <u>Harper</u>, <u>Riggins</u>, and <u>Sell</u> by clear and convincing evidence.  The testimony of the expert witnesses, the medical literature and the case law all support the conclusion that Hardy should be medicated, involuntarily if necessary, to mitigate the danger he poses to BOP staff and to render him competent to proceed to trial for his serious crimes in this District.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:    _____/s_____
James P. Loonam
Melissa B. Marrus
Assistant United States Attorneys
(718) 254-7000