UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------
x
UNITED STATES OF AMERICA,

      -against-                        **MEMORANDUM AND ORDER**
                                           Case No. 04-CR-706 (S-6)

DAMION HARDY, also known as
"World," AARON GRANTON, also
known as "E-Bay" and "Eric Moore," and
ABUBAKR RAHEEM, also known as
"Kim Crandall,"

                Defendants.
--------------------------------------------------------
x

*Appearances*:
*For the United States*:
LORETTA E. LYNCH, ESQ.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:    JAMES P. LOONAM, ESQ.
        MELISSA MARRUS, ESQ.
        Assistant United States Attorneys

*For Defendant Damion Hardy*:
FRANCISCO CELEDONIO, ESQ.
401 Broadway, Suite 2506
New York, New York 10013

DAVID A. RUHNKE, ESQ.
47 Park Street
Montclair, New Jersey 07042

**BLOCK, Senior District Judge:**

        Damion Hardy is charged with numerous crimes — including six murders

— in connection with his alleged role in the "Cash Money Brothers" gang.  Based on one

of the murders, the government has given notice that it intends to seek the death penalty.

        For the time being, however, Hardy cannot be tried because all agree that he

is incompetent to stand trial.  *See Dusky v. United States*, 362 U.S. 402, 402 (1960) ("The test

must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him.") (per curiam) (internal quotation marks omitted). Since he has refused all offers of mediation that might restore his competency, the government moves, pursuant to *Sell v. United States*, 539 U.S. 166 (2003), for an order authorizing the Bureau of Prisons ("BOP") to medicate him involuntarily. In addition, it moves, pursuant to *Washington v. Harper*, 494 U.S. 210 (1990), for an order authorizing involuntary medication on the ground that Hardy poses a danger to others.

## FACTUAL BACKGROUND

### A. Introduction

On August 15, 2004, Hardy was arrested and housed at the Metropolitan Correction Center ("MCC") to await trial. Initial observations by a BOP psychologist did not raise any red flags. Similarly, Hardy's counsel opined that his client was competent to stand trial.

By the end of 2007, matters had changed. Hardy's learned counsel reported that interactions with his client "always included a mix of bizarre and relevant conduct," and that "over time the bizarre and delusional ha[d] almost wholly supplanted the relevant." Report of Lea Ann Preston-Baecht, Ph.D., at 7. Another BOP psychologist confirmed that Hardy labored under the delusion that "he is the Messiah and Allah will make things right." *Id.* In March 2008, a third diagnosed Hardy with paranoid schizophrenia and concluded that he was not competent to stand trial. Based on these

reports, and with the consent of both the government and the defense, Judge Trager entered an order finding Hardy incompetent to stand trial on July 29, 2008.

## B. Restoration Study

Pursuant to Judge Trager's order, Hardy was remanded to the United States Medical Center for Federal Prisoners in Springfield, Missouri. There, Lea Ann Preston-Baecht, Ph.D., and Robert Sarrazin, M.D., studied whether Hardy could be restored to competency. Both reported their findings to Judge Trager in February 2009. Hardy was transferred from Springfield to the Metropolitan Detention Center ("MDC") shortly thereafter.

Dr. Preston-Baecht concluded that Hardy suffered from paranoid schizophrenia. According to the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), paranoid schizophrenia (or, more formally, "schizophrenia, paranoid type") involves preoccupation with "delusions or frequent auditory hallucinations," without "disorganized speech, disorganized or catatonic behavior, or flat or inappropriate affect." In lay terms, Hardy manifested a persistent, irrational belief that something he referred to as "Ethou law" entitled him to immediate release without facing the charges against him.

Dr. Preston-Baecht concluded that Hardy was likely able to understand the nature of the charges and the criminal proceedings against him, but that his "delusional and at times, disorganized thinking" negatively impacted his ability to assist in his defense. Preston-Baecht Report at 11. She opined that Hardy could not likely be restored to competency without antipsychotic medication, but that with such medication, it was "substantially likely that Mr. Hardy [would] be restored to competency" and "substantially

unlikely to have side effects that would interfere significantly with his ability to assist counsel in conducting a defense." *Id.* at 13.

Dr. Sarrazin, the Chief of Psychiatry at Springfield, confirmed the prior diagnoses of paranoid schizophrenia, noting that Hardy "remain[ed] extremely delusional, particularly in light of the fact that he states that there is no case against him." Report of Robert Sarrazin, M.D., at 3. To treat Hardy, Dr. Sarrazin proposed a regimen of antipsychotic medication. He recommended that Hardy first be asked to take a second-generation antipsychotic (such as Abilify, Geodon or Risperdal) orally. If Hardy refused, it would be necessary to administer injections of haloperidol (also know as haldol), a first-generation antipsychotic. Dr. Sarrazin noted that first- and second-generation antipsychotics have "approximately equal efficacy." *Id.* at 11.

Dr. Sarrazin's report relied, in part, on studies of defendants found incompetent to stand trial. Those studies found that antipsychotic medication was able to restore a sizeable majority — ranging from 75 to 87 percent — to competency. Dr. Sarrazin opined that Hardy's response would be "similar to the cohort described" in those studies. *Id.*

**C. First Hearing**

Judge Trager ordered an evidentiary hearing, which took place on August 25 and November 24, 2009. Drs. Preston-Baecht and Sarrazin testified on August 25th; Dr. Richard Dudley, a defense expert, testified on November 24, 2009.

**1. Dr. Preston-Baecht**

Dr. Preston-Baecht evaluated Hardy over a four month period during the restoration study. In addition to observing Hardy during her daily rounds, she conducted more than a dozen one-on-one interviews with him. Those observations and interviews formed the basis of her conclusions that Hardy suffers from paranoid schizophrenia, that he is not competent to stand trial, and that he is unlikely to be restored to competency without antipsychotic medication. She clarified that schizophrenia is a psychotic disorder, not a delusional disorder.

Dr. Preston-Baecht testified that Hardy's condition was continuous, but stable. *See* Tr. of Aug. 25, 2009, at 20 ("[Hardy] seems to have remained the same since the time that I met him in October of '08."). She testified that "in general the vast majority of [her] patients who have been involuntarily medicated have been restored to competency[,] . . . [m]ore than 75 percent have been restored." *Id*. at 26.

**2. Dr. Sarrazin**

Dr. Sarrazin saw Hardy "many times" during the restoration study. *Id*. at 40. He repeated his diagnosis of paranoid schizophrenia, as well as his opinion that with antipsychotic medication there is "a substantial probability that [Hardy] would attain competency to stand trial." *Id.* Without it, he opined, Hardy "would not attain competency to stand trial." *Id.*

Dr. Sarrazin then elaborated on the proposed treatment plan outlined in his February 2009 report. He stated that he would provide Hardy with a copy of the involuntary medication order and try to elicit his cooperation with taking second-

generation antipsychotics orally. If Hardy refused to cooperate, Dr. Sarrazin would use an intramuscular injection of short-term haloperidol in the hope that it could make Hardy more cooperative and willing to take second-generation antipsychotics. A short-term dose would also allow doctors an opportunity to observe how Hardy reacted to the medication before administering a long-acting dosage. If Hardy continued to refuse oral medication after several days and showed no serious adverse reaction to the short-acting haloperidol, Dr. Sarrazin would administer a long-acting intramuscular injection of the medication.

Dr. Sarrazin testified that haloperidol is equally as effective in treating schizophrenia as the second-generation medications, but has a different profile of possible side effects. He testified that there are multiple medications he can use to alleviate the stiffness that can be associated with haloperidol. He explained that a less common side effect, tardive dyskinesia (involuntary movement of the tongue and mouth), is associated with high doses of haloperidol over a long period of time, and that "[i]n the time frames we are looking at for Mr. Hardy and treating him for competency restoration, tardive dyskinesia usually does not become a concern." *Id*. at 54. He described a third possible side effect, neuroleptic malignant syndrome (loss of the body's ability to regulate temperature), as "extremely rare." *Id*. at 55.

Dr. Sarrazin then explained how his medical staff would monitor Hardy for side effects and treat them if they arose. He opined that none of the potential side effects would interfere with a defendant's ability to communicate with counsel and assist in his defense.

Concluding his direct examination, Dr. Sarrazin testified that antipsychotic medication, both first- and second-generation, is the medically appropriate treatment for schizophrenia. *See id.* at 58-59 ("The use of these medications is to improve someone's cognitive abilities, not make them worse, to improve their ability to interact with their attorneys, with their families, with the community, to improve their ability to work outside in the community."), 60 ("[I]t really has been the treatment of choice for many, many years."). Other therapies can be helpful, but without antipsychotic medication are unlikely to be successful.

On cross-examination, Dr. Sarrazin acknowledged that the relevant medical literature reflects a range of possible responses to antipsychotic medication. According to the American Psychiatry Association's ("APA's") "Practice Guideline for the Treatment of Patients with Schizophrenia," between 10 and 30 percent of patients will not respond at all to medication, while another 30 percent will have only a partial response. Dr. Sarrazin noted that a partial response may or may not be sufficient to restore competency to stand trial. *See id.* at 72 ("[T]he partial response my be enough for them to be competent. We do not have that particular aspect because [the practice guideline] doesn't use competency as an end point."). He accepted, however, that the most pessimistic view of the guideline is that only 40 percent of patients would respond to medication enough to be deemed competent to stand trial; the most optimistic interpretation is that 90 percent would.

Dr. Sarrazin further acknowledged that up to 30 percent of treated patients relapse within a year, even if they fully comply with their medication regimen.[1] He testified, however, that during his tenure as Springfield's Chief of Psychiatry, he was not aware of a single patient who was rendered competent, remained on medication while in the BOP's custody, and then deteriorated back to incompetence during the pendency of a case.

Dr. Sarrazin then walked through factors that, according to the DSM, increase the chances of a positive prognosis. He opined that Hardy had "good premorbid adjustment," meaning that, notwithstanding his antisocial behavior, he was "fairly doing well prior to the onset of symptons." *Id.* at 75. While acknowledging that there had not been a full neurological workup, Dr. Sarrazin further opined that Hardy "appears to be normal." *Id.* at 79. Later in his testimony, he stated that paranoid schizophrenia is a positive prognosis indicator "as compared to some of the others" such as disorganized and undifferentiated schizophrenia. *Id.* at 104.

Dr. Sarrazin acknowledged that some positive indicators — such as later-age onset, being female, good insight, treatment soon after onset and brief duration of active-phase symptoms — were not present in Hardy's case. Others — such as acute onset, good interepisode functioning, minimal residual symptoms, absence of brain abnormalities and family history — were either not applicable or unknown due to a lack of information.

Defense counsel questioned Dr. Sarrazin about a study of 1,475 defendants

---

[1]The odds are much worse for patients who stop taking medication, with 60 to 70 percent relapsing within a year, and 90 percent within two years.

found incompetent to stand trial due to a psychotic disorder, a mood disorder or mental retardation. Dr. Sarrazin agreed that those suffering from a psychotic disorder were less likely to have their competency restored through medication than those suffering from a mood disorder. He pointed out, however, that the success rates for psychotic defendants were still high, with 72.8 percent being restored to competency within six months and 83.3 percent within one year.

Near the end of his testimony, Dr. Sarrazin testified that the BOP had compiled statistics on incompetent defendants referred for restoration studies for a 12-month period. Seventy-five percent of those for who were involuntary medicated were restored to competency. Dr. Sarrazin opined that "the vast majority" were medicated with first-generation antipsychotics. *See id.* at 106.

### 3. Dr. Dudley

Dr. Dudley is a board-certified psychiatrist retained by the defense to review and respond to the BOP expert reports; he was not asked to conduct his own forensic evaluation of Hardy. He reviewed the BOP's medical file on Hardy (including the reports of Drs. Preston-Baecht and Sarrazin), interviewed Hardy's mother and brother, and met with Hardy on two occasions.

Dr. Dudley agreed that antipsychotic medication is the "treatment of choice" for paranoid schizophrenia. *Id.* at 122. He opined, however, that there was not a substantial likelihood that such medication would restore Hardy to competency, principally because of the absence of enough positive prognostic indicators. He further opined that Hardy was likely to experience side effects, but did not state whether those

side effects would interfere with his ability to communicate with counsel in the preparation of his defense.

### D. Post-Hearing Developments

Due to his untimely death, Judge Trager did not rule on whether Hardy could be involuntarily medicated. Instead, the case was transferred to the undersigned.

Because of the resulting delay, the Court directed the BOP to reassess Hardy's condition. After attempts to conduct the reassessment at MDC failed, Hardy was transferred back to Springfield. The Court's transfer order stated that Hardy was not to be involuntarily medicated without its authorization.

On November 7, 2011, Hardy attempted to assault a staff member at Springfield. Dr. Sarrazin determined that Hardy's condition qualified as a "psychiatric emergency" for which involuntary medication is authorized by regulations. The following day, Springfield doctors, apparently unaware of the Court's order, administered an injection of short-acting haloperidol. On November 9th, they administered an injection of long-acting haloperidol. Hardy exhibited no side effects.

After the emergency medication was brought to the Court's attention, it directed the BOP to proceed with an administrative due-process hearing to determine whether Hardy should continue to receive haloperidol injections on the ground that he posed a danger to others. That hearing was held on November 29, 2011, before Dr. Carlos Tomelleri, a Springfield psychiatrist. John Getchell, a clinical social worker, met with Hardy prior to the hearing and advised him of his right to have witnesses. Hardy did not call any witnesses.

After interviewing Hardy and reviewing other evidence, Dr. Tomelleri determined that Hardy met the criteria for the administration of involuntary medication. He found that Hardy had "thrust his arm at staff and reached with his left hand for a toothbrush in his cell" on November 7. Am. Involuntary Medication Report, at 5. Dr. Tomelleri also credited prior incident reports that, while at MDC, Hardy had (1) attempted to stab a staff member with a sharpened object, (2) attempted to bite an officer, and (3) threatened to break an officer's neck. Finally, Dr. Tomelleri noted that during his interview Hardy stated that "since his incarceration was invalid he could not be held responsible for any transgression or criminal act occurring during that period of time." *Id.* at 6.

Dr. Tomelleri concluded that because of his mental illness, Hardy was laboring under a "grandiose delusion[] . . . that he is not responsible for any misconduct because he is invalidly incarcerated," *id.*, and that the delusion rendered him dangerous to others. He observed that involuntary medication was "in the patient's best interest," *id.* at 4, and that other measures, including tranquilizers and physical restraints, would not address the core cause of the danger.

Hardy instructed Getchell to file an administrative appeal on his behalf. Springfield's Associate Warden ruled on the appeal on December 7, 2001. He found that Hardy had been given more than 24 hours' notice of the hearing, as required by regulation, and upheld Dr. Tomelleri's findings that Hardy posed a danger to others and that involuntary medication was in his best medical interest. Because of the Court's order, however, Hardy has not been involuntarily medicated since November 8, 2011.

**E. Second Hearing**

On January 26 and 27, 2012, the Court held an evidentiary hearing to determine whether Hardy should be involuntarily medicated *either* because he poses a danger to others *or* to restore him to competency.

**1. Evidence of Dangerousness**

At the beginning of the hearing, the government presented testimony and documentary evidence of numerous instances of misbehavior by Hardy during his confinement. Dr. Tomelleri, however, made his decision based on the circumstances of the November 7th incident and three others. The Court will similarly confine its consideration.

Patrick Henderson, a lieutenant at MDC, testified that on October 15, 2010, he was told by another officer that Hardy had a weapon in his cell. He then obtained authorization to use pepper spray to enter the cell, and assembled a team of officers to assist him.

Arriving at the cell, Henderson saw Hardy with his arm in the food slot of his cell door. Henderson could see an unknown object in Hardy's hard. When Hardy refused to cooperate, another officer put his hand into the food slot to deploy the pepper spray. Hardy cut the officer's hand with the unknown object.

Henderson then directed his team to enter the cell by force. Hardy attempted to stab the first officer to enter— Ezquiel Santiago.

Santiago testified that Hardy had shielded himself from the pepper spray with a shower curtain. He then lunged at Santiago's chest four times with a "shank" carved out of a hard plastic food tray. Santiago was not injured and Hardy was eventually

restrained.

The next day, Hardy was examined by medical staff to ensure that his restraints were not compromising his circulation. Officer Hubert Kosakowski assisted. He testified that Hardy "became belligerent" and "started moving around violently." Tr. of Jan. 26, 2012, at 32-33. When Kosakowski tried to subdue Hardy, Hardy tried to bite the officer's arm.

Approximately two months later, on December 8, 2010, Officer Joe Jamaica was changing inmates' bed linens in MDC's special housing unit ("SHU"). As Jamaica passed Hardy's cell, Hardy reached through his food slot and threw a liquid at Jamaica's face. The liquid "started burning" Jamaica's eyes." *Id.* at 10. Gov't Ex. N. The government offered documentary evidence of four other occasions when Hardy threw an unidentified liquid at MDC staff.

## 2. Psychiatric Testimony

Dr. Sarrazin testified that his testimony from the first *Sell* hearing remained accurate, repeating that the probability that his proposed medication regimen would restore Hardy to competency was higher than 75 percent. He noted that, in his experience, it generally takes at least four to six months for antipsychotic medications to restore competency.

Dr. Sarrazin confirmed the circumstances surrounding Hardy's emergency medication. While being placed in his cell at Springfield, Hardy "broke away from [the escorting officers,] threw one of his arms out of the food slot in an attempt to grab one of the officers." *Id.* at 64. Hardy then reached for a "toothbrush and jammed that into the

food slot." *Id.* Dr. Sarrazin also testified that shortly before the hearing, Hardy had been found with "a toothpaste tube that had been emptied out [and] filled with feces and urine." *Id.* at 65.

Reiterating his explanation of Hardy's condition from the first hearing, Dr. Sarrazin opined that Hardy's paranoid delusions were the underlying cause of his outbursts. In Hardy's mind, he is being held illegally because "[t]here's already been an order for him to be released from prison." *Id.* at 77. He therefore believes that "he can't be held responsible" for anything he does. *Id.* at 78.

According to Dr. Sarrazin, the administration of antipsychotic medication is the only reasonable means by which corrections staff can be protected from Hardy. He explained that using physical restraints on a long-term basis can cause abrasions on the inmate's arms and legs, difficulty with bowel movements and deep-vein thrombosis.

Like Dr. Sarrazin, Dr. Preston-Baecht testified that her testimony from the first *Sell* hearing remained accurate. Also like Dr. Sarrazin, she testified that Hardy poses a danger to corrections staff. She acknowledged that she did not believe Hardy to be dangerous when he first arrived at Springfield in 2008. As of the January 2012 hearing, however, she had observed Hardy "engage[] in aggression to the point where" she no longer believed he could be managed "with typical correctional techniques." *Id.* at 139.

Dr. Preston-Baecht confirmed Dr. Sarrazin's account of the incident report involving the tube of toothpaste filled with urine and feces. She also agreed with his opinion regarding the source of Hardy's behavior:

> I think that the most problematic symptom, psychotic symptom, that Mr. Hardy has is the delusional belief that

14

> because he's being held — in his mind — illegally, he cannot be held responsible for any aggressive or violent behavior that he engages in.

*Id.* at 142. She then elaborated on the dangers of controlling Hardy with physical restraints:

> [I]t actually requires staff to have more physical contact with him because they have to give him food trays, they have to monitor his vitals every few hours, they have to somehow assist him with toileting — whether or not they hand him a urinal or they change a diaper, it involves a lot more contact between the staff and an inmate — they can still spit on staff, they can still try to bite staff.

*Id.* at 143.

Dr. Dudley did not testify at the January 2012 hearing. Instead, the defense called Xavier Amador, Ph.D., a licensed clinical psychologist with an expertise in psychotic disorders. Dr. Amador testified that, as a general matter, approximately 70 percent of all schizophrenic patients respond to antipsychotic medication, while approximately 25 percent of patients receive "no benefit." *Id.* at 174. In Hardy's case, however, Dr. Amador opined that, at best, Hardy had a 35 percent of being restored to competency.

Dr. Amador's opinion was based principally on his assertion that, "if you look at the data, the research data, [you will find that antipsychotic medications] particularly are poor at affecting delusions and improving delusions[.]" *Id.* at 169. The prognosis is particularly poor, he opined, where "the person has been untreated for a year or longer." *Id.*

When, on cross-examination, Dr. Amador was asked to identify the data supporting his opinion, he cited a study (referred to at the hearing as the "Kane Study") entitled "Clozapine for the Treatment-Resistant Schizophrenic." That study found that a

group of patients who were unresponsive to other antipsychotics (the "refractory group") were responsive to clozapine. It noted, however, that the refractory group comprised only 10 to 20 percent of the patients studied, meaning that 80 to 90 percent responded, at least partially, to more traditional antipsychotics like haloperidol. In addition, the study expressly declined to address why certain patients fell into the refractory group. *See* Kane Study at 789 ("[T]here are no consistently replicated findings providing clues about why patients are refractory to treatment.").

## LEGAL BACKGROUND

A prison inmate possesses "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221-22 (1990). A pretrial detainee enjoys "at least as much protection." *Riggins v. Nevada*, 504 U.S. 127, 135 (1992). The liberty interest may be overcome, however, by an "overriding justification and a determination of medical appropriateness." *Id.*

### A. *Harper*

In *Harper*, the Supreme Court held that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." 494 U.S. at 227. It further held that administrative factfinding by an independent medical professional not involved with the inmate's diagnosis or treatment, with the right to seek judicial review of the decision, satisfied procedural due process. *See id.* at 231-35. Neither judicial factfinding nor the appointment of counsel is

required.  *See id.* at 231 ("[W]e conclude that an inmate's interests are adequately protected, and perhaps better serves, by allowing the decision to medicate to be made by medical professionals rather than a judge."), 236 ("Given the nature of the decision to be made, we conclude that the provision of an independent lay adviser who understands the psychiatric issues involved is sufficient protection.").

The BOP has enacted administrative procedures roughly equivalent to those approved in *Harper*.  The regulations contemplate a hearing before a "psychiatrist who is not currently involved in the diagnosis or treatment of the inmate."  28 C.F.R. § 549.43(a)(3).  The inmate is to be given at least 24 hours' notice of the hearing, *see id.* § 549.43(a)(1), and is to be advised "of  the right to appear at the hearing, to present evidence, to have a staff representative, to request witnesses, and to request that witnesses be questioned by the staff representative or by the person conducting the hearing."  *Id.* § 549.43(a)(2).

Following the hearing, the presiding psychiatrist determines whether treatment is necessary.  He or she must "prepare a written report regarding the decision."  *Id.* § 543.43(a)(5).  The inmate is to be given a copy of the report and advised of the right to appeal and to have the assistance of a staff representative in preparing the appeal.   *See id.* § 543.43(a)(6).  The appeal must be decided by the institution's mental-health administrator within 24 hours.  *See id.*  Absent emergency circumstances, no medication will be administered until the appeal is decided.  *See id.* § 543.43(a)(7).

**B.** *Sell*

In *Sell*, the Supreme Court concluded that

> the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

539 U.S. at 179. It then broke the newly-announced standard down into four parts.

"First, a court must find that *important* governmental interests are at stake. The Government's interest in bringing to trial an individual accused of a serious crime is important. . . . The potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution." *Id.* at 180.

"Second, the court must conclude that involuntary medication will significantly further those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.* at 181.

"Third, the court must conclude that involuntary medication is necessary to further th[e government's] interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. And the court must consider less intrusive means for administering the drugs, e.g., a court order to the

defendant backed by the contempt power, before considering more intrusive methods."
*Id.*

"Fourth . . . , the court must conclude that administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition. The specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." *Id.*

The Supreme Court did not in *Sell* address the burden of proof or the standard of review. The Second Circuit filled those gaps in *United States v. Gomes*, 387 F.3d 157 (2d Cir. 2004): "[T]he relevant findings must be supported by clear and convincing evidence." *Id.* at 160. "Whether the Government's asserted interest is important is a legal question that is subject to de novo review. The district court's findings with respect to the other *Sell* factors are factual in nature and are therefore subject to review for clear error." *Id.*

## ANALYSIS

In *Sell*, the Supreme Court noted that "[t]here are often strong reasons for a court to determine whether forced administration of drugs can be justified on alterative grounds [e.g., dangerousness to self or others] *before* turning to the trial competence question." 539 U.S. at 182. Mindful of this admonition, the Court will turn first to whether involuntary medication is warranted under *Harper*, and then to whether it is warranted under *Sell*.

**A. _Harper_**

The _Harper_ issue comes to the Court in an unusual procedural posture. In the normal course of events, Hardy would presumably seek judicial review of an administrative decision to involuntarily medicate him through the Administrative Procedures Act, which would limit both the Court's consideration of evidence outside the administrative record and the scope of its review.

In this case, though, the decision occurred after the Court had imposed a ban on involuntary medication pending its review of the _Sell_ issue. In addition, as defense counsel points out, the defendant in _Harper_ had not been declared incompetent. The procedures approved in that case may not adequately protect the due process rights of those, like Hardy, who are unable or unwilling to invoke them. Indeed, although Hardy was present at the hearing before Dr. Tomelleri, he did not call any witnesses or otherwise actively participate in the proceeding. One suspects that his delusional belief that he is being illegally detained is to blame.

It was for those reasons that the Court conducted the January 2012 hearing pursuant to both _Harper_ and _Sell_. It has no doubt that defense counsel adequately protected their client's interests through cross-examination of the government's witnesses, examination of their own witness, and presentation of argument to the Court. Accordingly, the Court will review the evidence adduced afresh and without deference to the administrative decision-makers**.**

**1. Dangerousness**

The incidents described at the January 2012 hearing are not themselves in

dispute. Defense counsel argues, however, that, given the circumstances, they do not support a finding that Hardy presents a continuing danger to others. The Court disagrees. The facts described at the hearing unequivocally show that Hardy's outbursts are not isolated incidents, but a pattern of violent behavior.

The common-sense of the opinions of Drs. Sarrazin and Preston-Baecht that Hardy's psychosis is at the root of his violent behavior is too powerful to dismiss. From Hardy's perspective, he is essentially a hostage or kidnapping victim. Though his premise is delusional, what follows from it — that he must act out against his captors at every opportunity, and regardless of the consequences — is to be expected. That Hardy has not, as far as the record reflects, had any incident reports since January does not assuage the Court's concern that addition aggressive behavior is possible — even likely — as long as the reason for it exists.

The Court has considered whether the BOP's interest in protecting the safety of its staff can be achieved through measures that do not impinge on Hardy's interest in refusing medication. But no such measures are apparent. As the Supreme Court noted in *Harper*, "[p]hysical restraints are effective only in the short term, and can have serious physical side effects when used on a resisting inmate . . . , as well as leaving the staff at risk of injury while putting the restraints on or tending to the inmate who is in them." 494 U.S. at 226-27. Physical isolation has also proven ineffective, inasmuch as some of the incidents described above occurred while Hardy was confined to the SHU.

**2. Medical Interest**

The evidence also convinces the Court that involuntary administration of

antipsychotic medication is in Hardy's medical interest. It is undisputed that such medication is the treatment of choice for Hardy's condition. Why that should be the case is clear. Without it, no treatment can demonstrate the fallacy of the patient's delusion. With medication, by contrast, there is at least the hope that Hardy can be made aware that he is being lawfully detained pending trial. While that awareness may not be pleasant, it might at least allow Hardy to cope in less antisocial ways. The Court has no doubt that attempting to make Hardy aware of his illness is in his medical interest. *See Harper*, 494 U.S. at 225-26 ("Where an inmate's mental disability is the root cause of the threat he poses to the inmate population, the State's interest in decreasing the danger to others necessarily encompasses an interest in providing him with medical treatment for his illness.").

Possible side effects also bear on what is in Hardy's medical interest. In that regard, the Court credits, without qualification, Dr. Sarrazin's testimony that the most likely side effects are easily treatable, and that the less likely side effects can be avoided through a combination of careful monitoring, dosage adjustment and — as a last resort — discontinuation of the medication.

**3. Conclusion**

Defense counsel have raised the sensible concern that declaring an inmate to be a danger to himself or others is a tempting end run around the more stringent standard of *Sell*, discussed below. But the evidence of Hardy's dangerousness is too concrete and persuasive to allow for the possibility that the BOP is manufacturing a reason to medicate Hardy. The Court is convinced that Hardy poses a danger to corrections staff, that that danger cannot reasonably be abated without antipsychotic medication, and that such

medication is in Hardy's medical interest.

**B.  *Sell***

Strictly speaking, the Court's findings that Hardy poses a danger to others and that antipsychotic medication is in his medical interest makes it unnecessary to decide whether he can be medicated to restore his competency to stand trial.  *See Sell*, 539 U.S. at 183 ("If a court authorizes medication on these alternative grounds, the need to consider authorization on trial competence grounds will likely disappear.").  To streamline proceedings here and on appeal, however, the Court will address that issue.

**1.  Important Governmental Interest**

In *Gomes*, the defendant faced a statutory minimum sentence of 15 years on a felon-in-possession charge.  *See* 387 F.3d at 160.  The Second Circuit held that the seriousness of the charge and the penalty created an important governmental interest in bringing the defendant to trial.  *See id.*  The charges against Hardy and the penalty he faces are both far more serious than those identified in *Gomes*.  Defense counsel wisely concedes that the government has an important interest in bringing Hardy to trial.

The possibility of civil commitment pending restoration of competency does not mitigate the government's interest.  It is extremely unlikely that Hardy will spontaneously regain competency.  Even if he does, the resulting delay in trial proceedings risks serious prejudice to the prosecution.  *See Sell*, 539 U.S. at 180 ("[I]t may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost.").  Finally, even assuming that civil commitment serves some of the same purposes as a prison term (such as protection of the

public), it cannot remotely vindicate the government's interest when it seeks — as it is authorized to do — the ultimate penalty of death.

## 2. Significantly Furthering Governmental Interest

The parties key dispute involves the second factor — whether the government has shown, by clear and convincing evidence, that long-acting haloperidol is "substantially likely to render the defendant competent to stand trial," and "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense[.]" *Sell*, 539 U.S. at 181.

The success range of 40 to 90 percent set forth in the APA's Practice Guideline supplies a helpful starting point. Beyond that, it is of limited use because, as noted, it does not measure success in terms of restoration of competency, and it is clear that a patient may continue to show symptoms of paranoid schizophrenia and still be competent to stand trial. In addition, the Guideline does not provide any insight into the likelihood that a patient will fall at a particular point within the range.

The studies of incompetent defendants in the medical literature, as well as the BOP's own statistical analysis, provides greater insight and supports the conclusion that antipsychotic medication has, in the aggregate, upwards of a seventy percent chance of restoring a defendant to competency. But the Court agrees with defense counsel that the studies are, by themselves, insufficient to show that Hardy's prognosis in particular is that optimistic.

That link was provided by Dr. Sarrazin, who rendered his opinion based on numerous observations of Hardy and awareness of his circumstances. In that regard, Dr.

Sarrazin acknowledged the various positive prognosis indicators set forth in the DSM, and conceded that many were absent in Hardy's case. Despite those concessions, however, he adhered to his opinion that his proposed medication regimen had a better than 75 percent change of restoring Hardy to competence. The DSM does not assign weights to the factors, and Court credits Dr. Sarrazin's assessment that Hardy had good premorbid adjustment, and that that factor greatly increases the chance of success. The Court also agrees with the government's observation that Hardy will necessarily continue taking the medication despite lack of awareness that he is mentally ill. This, the Court finds, further establishes a significant likelihood or restoring Hardy to competency.

With respect to possible side effects, none bears a direct link to Hardy's ability to assist in his defense. Nevertheless, the Court has considered side effects that might otherwise affect the fairness of the trial, such as an effect on his demeanor before a jury. Here, too, the Court credits Dr. Sarrazin's testimony that the most likely side effects can be minimized with other medications or, if necessary, by adjusting the dosage of haloperidol. The Court further finds that less likely — though more serious — side effects can be avoided through careful monitoring. The Court is confident that the BOP's medical staff will respond appropriately and with good medical judgment to any side effects that do arise. In an abundance of caution, the Court will make it explicit that they must consider stopping antipsychotic medication should the need arise, even if it means abandoning the attempt to restore Hardy's competency.[2]

---

[2]The Court notes that in assessing the likelihood of side effects, it has not considered evidence of Hardy's response to the medication administered in violation of its ban on involuntary medication.

### 3. Necessary to Further Interest

Defense counsel argue that the government has not established that antipsychotic medication is necessary to bring Hardy to trial because it has not established, under the second prong, that such medication is likely to restore Hardy's competency. That argument relies entirely on its premise, which the Court has rejected.

The only other possible argument with respect to the third prong is that there is some means of restoring Hardy's competency without medication. The evidence clearly and convincingly establishes that this is not the case, and defense counsel do not contend otherwise.

*Sell* instructs the Court to consider "less intrusive means for administering the drugs, e.g., a court order to the defendant backed by the contempt power, before considering more intrusive methods." *Id*. In that regard, Dr. Sarrazin has stated that he will present Hardy with a copy of the Court's order in a final attempt to secure his consent. Given the nature of Hardy's delusion, the Court considers it unnecessary to back the order with the threat of contempt. The very problem is that Hardy believes that he need not answer the serious charges against him. The prospect of being haled into court to account for his behavior has no chance of disabusing him of his belief.

### 4. Medically Appropriate

Finally, the government must prove that "administration of the drugs is medically appropriate." *Sell*, 539 U.S. at 180-81. Citing a Ninth Circuit decision that paraphrased this fourth prong as whether the medication is "in the patient's best medical interest in light of his medical condition," *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 703

(9th Cir. 2010), defense counsel argue that the Court must take Hardy's *long-term* medical interest into account.

The Court agrees that a defendant's medical interest contemplates something more than restoring his competency to stand trial. But medical interest, standing alone, cannot justify involuntary medication under *Sell*. Thus, while the Court must ensure that involuntary medication is medically appropriate for Hardy in the long term, it cannot require him to continue the medication beyond whatever time it takes to restore him to competency and to conclude the trial.

Antipsychotic medication is, by common consent, the medically appropriate treatment of choice for Hardy's condition. As the Court has found, possible side effects affecting Hardy's trial can be monitored and managed; the Court is convinced that the same is true for side effects that do not affect the fairness of the trial, but may impact Hardy's health.

In short, the government has proved to the Court, by clear and convincing evidence, that antipsychotic medication is medically appropriate for the period necessary to restore Hardy's competency and bring him to trial. Whether the medication continues past that point will be up to Hardy and his own assessment of the benefits and risks.

5. **Conclusion**

There is, of course, no guarantee that antipsychotic medication will render Hardy competent to stand trial. But in this area, as in many others, complete certainty is an unattainable goal. Thus, the government's burden, though high, is not impossible. In that regard, the evidence is clear and convincing that there is a substantial likelihood of

restoring Hardy to competency without causing side effects that would prejudice his ability to assist in his defense and receive a fair trial.

## CONCLUSION

The BOP is authorized to implement Dr. Tomelleri's decision to involuntarily medicate Hardy to reduce the danger he poses to staff. It is further authorized to involuntarily medicate Hardy in accordance with the treatment plan set out in Dr. Sarrazin's February 2009 report for the purpose of restoring Hardy's competency to stand trial. The Court's prior order prohibiting involuntary medication shall, however, remain in effect long enough to allow Hardy to file and expeditiously pursue an appeal.

**SO ORDERED.**


_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
July 19, 2012