

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SD/MSA/RTP

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 27, 2015

By ECF and Hand

The Honorable Frederic Block
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Damian Hardy and Aaron Granton
              Criminal Docket No. 04-706 (S-6) (FB)

Dear Judge Block:

      The defendants Damion Hardy, also known as "World," and Aaron Granton, also known as "E-Bay," are charged with, inter alia, violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO") and with violent crimes, including numerous murders in-aid-of racketeering, in violation of 18 U.S.C §§ 1956 and 1959.  Trial is scheduled to begin on March 23, 2015.  By this letter, the government provides notice of certain evidence of the charged racketeering enterprise and narcotics trafficking conspiracy that it will move to admit at trial.  As set forth more fully below, such evidence is admissible to prove the existence of, and the defendants' participation in, those offenses.

      I.    Background

      From 1991 until August 2004, Hardy, was the leader of a criminal enterprise known as the "Cash Money Brothers" ("CMB"), based in the Lafayette Gardens houses in Brooklyn, New York ("Lafayette Gardens").   Granton, was a member of CMB and one of its top enforcers.

      From the time the crack cocaine epidemic began in the late 1980s, Lafayette Gardens was a central and lucrative hub for the distribution of cocaine base.  At that time, the young men who would form CMB acted as low-level street dealers under the direction of senior drug dealers who controlled Lafayette Gardens.  In or around 1991, under the leadership of the

defendant Hardy and his brother, Myron Hardy, also known as "Wise," the CMB ousted the senior dealers and seized control of the Lafayette Gardens crack trade in their own right.

From 1991 until 2004, when federal authorities arrested most of the CMB's members in connection with the investigation underlying the instant indictment, the CMB controlled the narcotics trafficking in Lafayette Gardens. Also during the time period alleged in the indictment, certain CMB members left Brooklyn to distribute crack cocaine outside of Lafayette Gardens, including in Albany, Schenectady, Troy, and Utica, New York, and Virginia and Pennsylvania.

The CMB wrested and maintained control of Lafayette Gardens through acts of violence that included near daily gun battles with rival organizations. Those gun battles resulted in numerous murders and non-fatal shootings of associates of rival organizations and the CMB alike. Nearly every CMB associate participated in such shootings. Furthermore, for CMB associates, participation in shootings solidified their membership in the organization and raised their status as members.

A. Shootouts with Rival Drug Crews

1. Hamilton Crew

The CMB's efforts to seize control of Lafayette Gardens focused principally on the Hamilton family, which was led by Derrick Hamilton, also known as "Bush," James "JR" Hamilton and Ulysses Hamilton. After Derrick Hamilton was arrested on state charges and imprisoned, the defendant Hardy directed CMB associates to use violence, primarily shootings, to force the remaining members of the Hamilton organization to stop trafficking cocaine base in Lafayette Gardens. For example, after learning that a Hamilton organization drug dealer known as "Supreme" was selling crack cocaine base in Lafayette Gardens, packaged in similar sized vials as the CMB, Hardy ordered CMB member Allen Bryant, also known as "Boo," to shoot Supreme. Later the same day, Bryant orchestrated the shooting of Supreme that left Supreme paralyzed and wheelchair bound. As part of the same rivalry, defendant Granton shot a Hamilton crew member known as "Black Ant" and "Bozo" numerous times.

In addition, on December 22, 1992, at the direction of Hardy, Granton shot and killed Hamilton crew associate Troy Davis, also known as "Crazy Troy."[1] To lure Davis to a location where Granton planned to murder him, Hardy paged Davis to a phone booth in Lafayette Gardens. When Davis arrived at the phone booth, Granton approached and shot Davis in the head.

The evidence will also show that in the same time period, Hardy had a rivalry with a drug trafficker named "Knowledge." After "Knowledge" sent someone to shoot Hardy in

---

[1] CMB member Dwayne Myers was arrested for the murder after a witness identified him in a lineup, but the case against Myers was ultimately dismissed.

2

Lafayette Gardens, Hardy retaliated by sending CMB member Bryant to shoot "Baby D," the brother of "Knowledge."

As a result of the CMB's penchant for violence and aggressiveness in claiming drug-dealing territory, the Hamilton crew ceded control of Lafayette Gardens to CMB. Due to their willingness to commit acts of violence on behalf of the organization and act on Hardy's orders without questioning them, CMB members Granton and Bryant rose to prominence in the organization and occupied positions trust throughout the organization's existence.

2. Grand Avenue Rivalry

Throughout the CMB's existence, the organization engaged in violent disputes with drug dealing organizations that occupied the neighborhoods immediately surrounding Lafayette Gardens. The organizations warred over drug territory and the right to claim to be the dominant criminal organization in the area. One such rival organization, led by Lawrence Sumpter, also known as "Rab," who controlled an area a block away from Lafayette Gardens on Grand Avenue in Brooklyn ("the Grand Avenue Crew"). CMB and the Grand Avenue Crew engaged in shootouts for several years beginning in the early 1990s.

Among the numerous exchanges of gunfire, Granton attempted to shoot Sumpter and, Sumpter shot a CMB associate known as "Peter Rab," rendering him paralyzed. "Peter Rab" eventually died from complications from injuries suffered in the shooting. After the shooting of "Peter Rab," Hardy directed CMB members to fire upon Grand Avenue Crew members whenever they were encountered. Accordingly, Granton, along with other CMB members, shot at Grand Avenue Crew member "Lance." During the rivalry, CMB associate Lamont Johnson, also known as "Sambo," was shot on two separate occasions by Grand Avenue Crew members.

3. Bedford Avenue

In approximately 1993, Hardy declared war on another group based on Bedford Avenue ("the Bedford Avenue Crew"), which consisted of an individual known as "Sherrod" and others, and ordered CMB members to shoot Bedford Avenue Crew associates on sight. As a result of Hardy's order, on May 7, 1994, CMB member Alan Bryant shot Bedford Avenue crew member William Wells.[2]

4. Deuce Crew

In or about 1993, a rival group calling itself the "Deuce Crew" and "Cock and Squeeze," led by Hardy's brother, Julian Hardy, also known as "Highness," began selling cocaine base around 470 Dekalb Avenue in Lafayette Gardens. Hardy ordered CMB members to

---

[2] On March 6, 1995, Bryant pleaded guilty to the shooting and was sentenced to five years in state prison.

3

shoot the rival crew's members. Numerous shootings ensued, including Allen Bryant's shooting of a Deuce Crew member known as "Baby Eli."

### 5. The Razor Brothers Crew

In the early 1990s, Hardy feuded with a crew operating in or around Marcy Avenue, which included "Chaka" and others (the "Razor Brothers Crew"). This rivalry also led to shootings, including the shooting of Razor Brothers Crew associate "Gus" by CMB associate James Sessoms, also known as "Popsie."

### B. Firearms Possession by CMB

Throughout the organization's existence, the CMB maintained an arsenal of firearms for use in violent confrontations with rival organizations and to intimidate Lafayette Gardens residents. The defendant Hardy supplied the majority of those weapons and controlled the access of organization members to them. The government will introduce into evidence a number of firearms seized from apartments that CMB associates used to store weapons and narcotics and firearms seized during police intervention in criminal conduct by CMB associates.

### C. The 1998 shooting of uniformed police officers

On July 29, 1998, at approximately midnight, two New York Police Department officers heard gunshots while patrolling the area around Lafayette Gardens. When the officers turned on to Bedford Avenue, they observed Hardy with a gun in his hand pointed at an individual from a rival gang. One of the police officers exited his vehicle and attempted to run after Hardy. Hardy, who was on a bicycle, then fired at the officer and the officer fired back. Hardy then fled into 433 Lafayette. Hardy was arrested within days and pleaded guilty on June 2, 1999 to Attempted Assault in the 2nd degree and was sentenced to two to four years. CMB associates were aware the shooting, which furthered Hardy's reputation for ruthlessness and his authority in the organization. In addition, CMB cooperating witnesses will testify that as a result of this conviction, Hardy was incarcerated at the time of Myron Hardy's death in June 1999.

### D. The October 1999 Murder of Lamel Lawson

On October 23, 1999, several CMB members including Granton, attended a party at 272 Gates Avenue in Brooklyn, New York. Prior to the party, Hardy had ordered CMB members to kill "Griff," an individual who sold heroin at Lafayette Gardens without Hardy's authorization. CMB members attended the party carrying weapons. At the party, CMB member Tion Weller, also known as "Top," observed "Griff," and intended to shoot him. Another party attendee, Lamel Lawson, drew his weapon, a Mac 11 machine gun. As a result, Granton fired a .40 caliber weapon at Lawson, killing him. Ballistics evidence revealed that the same gun used by Granton at the Lawson murder matched the weapon used by Granton in the charged August 2000 Ivory Davis murder

II.     Legal Analysis

The evidence described above is offered as direct proof of and the existence of the enterprise and narcotics distribution conspiracy charged in the indictment and the defendants' connection to them. The evidence is therefore admissible under established law.

"It is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise." Baez, 349 F.3d at 93 (upholding district court's admission of sixteen uncharged robberies); see, e.g., United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999); United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997) (uncharged murders properly admitted to prove "the existence and nature of the enterprise and the conspiracy"); United States v. Wong, 40 F.3d 1347 (2d Cir. 1994); United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992) (evidence of uncharged murders admissible to prove relationship and continuity of RICO enterprise's illegal activities).

For example, in Diaz, at trial on charges that the defendants committed RICO violations based on their participation in the "Latin Kings" street gang, the government introduced evidence of numerous crimes not specifically named in the indictment but committed in furtherance of the charged enterprise, including drug trafficking, weapons possession, assaults in-aid-of racketeering, robbery and related acts of violence. 76 F.3d at 79. On appeal, the Second Circuit rejected the defendants' claim that evidence of such acts not specified was inadmissible, holding that it was properly admitted as proof of the charged RICO enterprise. See id.

Likewise, in Miller, the Second Circuit affirmed the admission of evidence of uncharged murders as proof of a charged RICO enterprise and conspiracy. 116 F.3d at 682 ("The district court concluded that the proof of these murders was relevant to show the existence and nature of the enterprise and the conspiracy and that the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice . . . we see no abuse of discretion here.").

Similarly, in Wong, the Second Circuit specifically approved the admission of evidence of a shootout between rival gangs to establish the existence of, and the defendants' membership in, the charged racketeering enterprise, affirming then-District Judge Raggi's conclusion that "this evidence was probative of the existence, organization and nature of the RICO enterprise, a central allegation in the indictment. Id. at 1378.

In the instant case, the government will present evidence that the acts described above were carried out by CMB associates in furtherance of the charged racketeering enterprise. The government will also present evidence that the acts were committed at Hardy's direction, ordered in his capacity as the enterprise's leader. The acts will therefore demonstrate the existence of the organization, its goal of obtaining and maintaining control of the narcotics trafficking in Lafayette Gardens and elsewhere, its structure and the roles of different associates

5

in the enterprise's activities. Such evidence is therefore essential proof of the existence of the charged organization and Hardy's leadership of it. Furthermore, because Granton participated extensively in the acts, the evidence constitutes critical proof of Granton's entry into the organization and his rise to a position of trust therein.

In short, all of the above-described evidence is crucial to the statutory elements that the government must prove to convict the defendants of the crimes charged. Moreover, for the bulk of the above described acts, each cooperating witness will testify that he committed the act of violence as a result of direct orders from Hardy. Without acknowledgment of Hardy at the helm of the enterprise, the jury will be left with the impression that the cooperating witnesses committed these acts independently.

Finally, it is likely that the defendants will cross-examine the government's cooperating witnesses about their participation in the acts described above pursuant to Giglio v. United States, 405 U.S. 150 (1972). If the government is not permitted to question the cooperating witnesses during direct examination about their own participation in events where Hardy ordered shootings and murders and in which Granton participated, the jury will be left with the misimpression that the government was attempting to conceal important and damaging information about these witnesses from the jury. Furthermore, to the extent that evidence of uncharged crimes includes inculpatory admissions by cooperating witnesses who participated in the uncharged crimes jointly with the defendants, such evidence is also admissible to corroborate those witnesses' testimony. See United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987); United States v. Mejia-Valez, 855 F. Supp. 607, 611 (E.D.N.Y. 1994).

III. Conclusion

The government thus provides notice that it will introduce evidence at trial of the acts described above. Because such evidence constitutes direct proof of the crimes charges in the indictment, the evidence should be admitted.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:      /s/
Soumya Dayananda
Mathew S. Amatruda
Rena Paul
Assistant U.S. Attorneys
718-254-6147/7012/7575

cc: Clerk of Court (FB)
All Defense Counsel (by ECF)