1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      :
                                :   04-CR-706
                                :   (FB)
                                :
     -against-                  :
                                :
                                :   United States Courthouse
                                :   Brooklyn, New York
                                :
DAMION HARDY,                   :
                                :
        DEFENDANT.              :   Tuesday, March 24, 2015
                                :   3:00 p.m.
                                :

- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR COMPETENCY HEARING
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S :

| For the Government: | LORETTA E. LYNCH, ESQ.<br>United States Attorney<br>BY: **JAMES PATRICK LOONAM, ESQ.**<br>   **RENA PAUL, ESQ.**<br>   **MATTHEW S. AMATRUDA, ESQ.**<br>   Assistant United States Attorneys |
|---|---|

| For the Defendant<br>Damion Hardy: | Ruhnke & Barrett<br>BY: **DAVID A. RUHNKE, ESQ.**<br>   **JEAN BARRETT, ESQ.** |
|---|---|

Courtroom Deputy: **Michael Innelli**

Court Reporter:   **Mary Agnes Drury, RPR**
                  Official Court Reporter
                  Telephone: (718) 613-2615
                  E-mail: Mad78910@yahoo.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

PROCEEDINGS                                 2

1              (In open court.)

2              COURTROOM DEPUTY: All rise, the United States

3    District Court for the Eastern District of New York is now

4    in session, the Honorable Frederic Block is now presiding.

5              (Honorable Frederic Block takes the bench.)

6              COURTROOM DEPUTY: Calling Criminal Cause for

7    Competency Hearing in Docket No. 04-CR-706, *United States of*

8    *America against Damion Hardy.*

9              While Mr. Hardy is being brought into the

10   courtroom, I'll ask the parties to state their appearances

11   for the record.

12             MR. LOONAM:  James Loonam for the United States,

13   together with Rena Paul and Matt Amatruda.  Good afternoon,

14   your Honor.

15             MR. RUHNKE:  And David Ruhnke for the defendant,

16   together with Jean Barrett.

17             THE COURT:  Good to see you here.

18             MS. BARRETT:  Good afternoon, your Honor.

19             (Defendant enters the courtroom.)

20             THE COURT:  Good afternoon.

21             All right.  The case has been called, and we're

22   here today to listen to the two psychiatrists.

23             But I just want to make some comments here.  It's

24   good to see Mr. Hardy here in court.

25             I spoke to the warden yesterday, as you may or may

PROCEEDINGS                                    3

1    not know.  And, you know, he's out of the SHU now.  He is

2    supposed to be out of the SHU.

3              MR. RUHNKE:  I just found that out.

4              THE COURT:  I just want Mr. Hardy and everyone to

5    know that I've been interactive here, because I didn't think

6    it was appropriate for him to be in the SHU.  And I've had a

7    lengthy conversation with the warden, I'll be speaking to

8    her consistently to make sure that Mr. Hardy is properly

9    taken care of while he's at the MCC.  And I just thought it

10   was counterproductive to have to impose that kind of harsh

11   treatment on him.

12             And I think after I spoke with the warden, she

13   understands, and she's going to be fully compliant and work

14   with me to make sure that Mr. Hardy is properly taken care

15   of while he's at the MCC.  I just wanted you to know that,

16   and the government to know that and Mr. Hardy to know that

17   as well.

18             THE DEFENDANT:  I appreciate it.  Thank you.

19             THE COURT:  All right.  You will continue to let

20   me know, preferably through your attorney, you have a very

21   good attorney, how you're being treated form day-to-day.  I

22   want to make sure you're properly being taken care of there,

23   okay?  And I just wanted you to know that I did interact on

24   your behalf here.

25             All right.  Having said that, let's hear from the

PROCEEDINGS                              4

1   two sides.  Who is going to go first?

2           MR. LOONAM:  That's the question, your Honor, but

3   -- and it's important that we make a record on this, not

4   only for your Honor's benefit, but for, I believe the Second

5   Circuit, in any event, we should have a full record here.

6           So the statute that provides for the competency

7   determination 18 USC 4241 does not allocate the burden of

8   proof.  And the Supreme Court and the Circuit have not

9   definitely decided this issue.  And -- so the Second Circuit

10  has recognized that it hasn't addressed this issue.

11          There is a split of authority between the

12  Circuits, the Fourth and the Eleventh Circuit come down one

13  way; the Ninth Circuit and some other circuits come down

14  another way.  And the Supreme Court of the United States has

15  stated in dicta that, "Congress has directed that the

16  accused in a federal prosecution must prove incompetence by

17  a preponderance of the evidence."  And that's *Cooper v*

18  *Oklahoma* at 517 US 348 at page 362.

19          Now, however, we don't believe that your Honor is

20  going to need to address the issue of who actually bears the

21  burden, because I think both parties agree that whoever

22  bears the burden, the burden is a preponderance of the

23  evidence.  And we believe that the government will be able

24  to meet a preponderance of the evidence in any event.

25          However, we want to reserve our right on appeal to

PROCEEDINGS                                    5

1    argue that it's the defendant who bears the burden, and we

2    believe that in this context, since this is a motion made by

3    the defendant and the defendant is in sole possession of the

4    facts, which give rise to this motion for incompetence, that

5    the defendant should go first.

6              THE COURT:  All right.  So I'm glad you made the

7    record and, you know, I suspect this was the first of a

8    number of situations we may be talking about over the

9    ensuing weeks that may be novel or things that we have to

10   scratch our chins about and figure out how to sort it out.

11             But I think that for the present purposes, I'm

12   just going to ask the government to go first without

13   assigning any burdens at all for anybody right now.

14   Somebody has to go first.  And we'll sort it out, it may be

15   academic, depending on what transpires here.

16             So you're tooled up and I think your person will

17   testify through the video, right?

18             MR. LOONAM:  That's correct, your Honor.

19             THE COURT:  So this is an accommodation with the

20   doctor that you'll go forward with your video presentation

21   now.  Mr. Ruhnke, anything you wish to say?

22             MR. RUHNKE:  Just this, your Honor:  I note for

23   the report that our expert, Dr. Richard Dudley, is in the

24   courtroom and will be observing the testimony, I want to be

25   sure that the government doesn't have an objection to that.

PROCEEDINGS                          6

1           MR. LOONAM:  We do object.

2           THE COURT:  And also your doctor, what's her name

3    again, Doctor?

4           MR. RUHNKE:  Preston Baecht.

5           MR. LOONAM:  It's Preston Baecht, your Honor.

6           THE COURT:  Dr. Preston Baecht.  How are you?  You

7    know, she can stay tuned, if she wants to, while the other

8    doctor testifies, if you'd like her to do that.

9           MR. LOONAM:  Actually, your Honor, the government

10   would seek to invoke sequestration in this instance.  When

11   Dr. Dudley testified at the last hearing, he was not

12   testifying with respect to his own examination of Mr. Hardy,

13   he was, instead, testifying on -- he was commenting on the

14   observations and opinions of the other doctors.

15          THE COURT:  Be that as it may, I'm going to let

16   her be privy to the proceedings, and we'll worry about how

17   that falls out if it needs to later, okay?

18          So let's go forward with the examination, and I

19   guess you should be sworn, right?

20          MR. LOONAM:  Yes, your Honor.

21          MR. RUHNKE:  Your Honor, there is just one more

22   issue I need to raise, and that is that I understand, and

23   I've just gotten a copy, of a motion filed by Mr. Hardy to

24   discharge me as counsel on the basis of ineffectiveness.

25   Obviously the Court has just gotten it as well, it was filed

PROCEEDINGS                                7

1   by mail, not on ECF.  And I'm assuming Mr. Innelli is about

2   to post it, but that will have to be dealt with at some

3   point.

4            THE COURT:  We'll deal with that, but since

5   everybody is ready to go here -- I haven't had a chance to

6   look at it again, it's just been recently filed.  Let's get

7   the testimony of the doctor in the first instance.

8            MR. LOONAM:  And, your Honor, I'm going to move on

9   to the doctor's testimony very quickly, but just in the

10  interest of speed, I've consulted with Mr. Ruhnke, and he

11  has no objection to the admission of the Government's

12  exhibits.

13           So at this time, the government moves Exhibits 1

14  through 8, and we've provided a copy to the Court.  We move

15  Government Exhibit 1 through 8 into evidence at this time.

16           THE COURT:  I take it I have all of those in these

17  black binders?

18           MR. LOONAM:  You do, sir.

19           MR. RUHNKE:  That's without objection.

20           THE COURT:  All right.  That's allowed in evidence

21  for purposes of this hearing.

22           (Government Exhibits 1 to 8 are admitted into

23  evidence.)

24           COURTROOM DEPUTY:  Good afternoon, Doctor.  Can

25  you hear me?

PRESTON BAECHT - DIRECT/MR. LOONAM                    8

1        THE WITNESS:  Yes, I can.

2

3   **LEA ANN PRESTON BAECHT**, PhD, called by the Government, having

4   been first duly sworn, was examined and testified as follows:

5

6        THE WITNESS:  I'm sorry, I'm not able to hear you

7   right now.  Can you speak a little louder?

8        COURTROOM DEPUTY:  Do you affirm the testimony you

9   are about to give will be the truth, the whole truth, and

10  nothing but the truth?

11       THE WITNESS:  It will be.

12       THE COURT:  Are you able to hear the Court now?

13  Can you hear me also?

14       COURTROOM DEPUTY:  She answered in the

15  affirmative.

16       THE COURT:  Yes, you answered in the affirmative,

17  but I want to know whether you can hear me also.

18       THE WITNESS:  I can hear you, your Honor.  I can

19  hear Mr. Loonam very well.  I could barely hear Mr. Ruhnke

20  when he was speaking.

21       THE COURT:  So it's important for us to know that

22  so we can make sure we have proper amplification as needs

23  be, so don't hesitate to interrupt, okay?

24       THE WITNESS:  Thank you, your Honor.

25       THE COURT:  Mr. Loonam, your witness.

PRESTON BAECHT - DIRECT/MR. LOONAM                    9

1        MR. LOONAM:  Yes, your Honor.  Thank you.

2   DIRECT EXAMINATION

3   BY MR. LOONAM:

4   Q    Good afternoon, Doctor.

5   A    Good afternoon.

6   Q    What is your current position?

7   A    I am currently a staff psychologist at the United

8   States Medical Center for federal prisoners in Springfield,

9   Missouri.

10  Q    And how long have you had that job?

11  A    I've been a full-time employee in that position since

12  January of 2000.

13  Q    And you were previously qualified as an expert witness

14  in this case, correct?

15  A    Yes, I was.

16  Q    And you were the primary clinical psychologist for

17  Damion Hardy, correct?

18  A    Yes, I have been.

19  Q    Over what time period were you Hardy's primary clinical

20  psychologist?

21  A    I believe I first met Mr. Hardy in October of 2008.  He

22  was here for four months at competence restoration

23  treatment.  He had to go back to New York for the court

24  proceeding following that period of treatment.  He then

25  returned in November of 2011, and he's been here at Spring

1  -- he was here at Springfield with me from November of 2011

2  until the end of 2014, I believe he left in the last week of

3  December.

4  Q    So the last stretch that you saw Damion Hardy was for

5  three years, and it ended -- when was that, in 2014?

6  A    Yes, in December of 2014.

7  Q    Okay.  And what were your job responsibilities as

8  Hardy's primary clinical psychologist?

9  A    When I conducted his initial competency restoration

10  evaluation, it was my opinion that he was mentally ill and

11  in need of treatment, and recommended antipsychotic

12  medication.

13         When he returned in November of 2011, he was here

14  for a significant period of time while we were waiting the

15  Court's decision as to whether or not medication would be

16  authorized.

17         During that time period he was in a holdover

18  status and my role was to simply monitor him, interact with

19  him on a weekly basis to make sure that he was coping

20  adequately at that time.

21         Once the Court authorized the administration of

22  medication, then we moved into a more appropriable

23  competency restoration where I was meeting with him

24  routinely to monitor his response to medication.  Also,

25  evaluating his educational needs and referred him for

1    competency restoration group.

2              And at the end of his stay, I conducted additional

3    interviews to reassess his competency to go forward with his

4    case.

5    Q    All right.  And you diagnosed Hardy with a mental

6    illness, correct?

7    A    That's correct.

8    Q    And which mental illness did you diagnosis him with?

9    A    When we were still utilizing the DSM IV, which is the

10   Diagnostic and Statistical Manual of Mental Disorders,

11   Fourth Edition, his diagnosis was paranoid type

12   schizophrenia.  The Fifth Edition of the DSM no longer has

13   specifiers for schizophrenia, and so at this point in time

14   his diagnosis would simply be schizophrenia.

15   Q    And in February of 2009, you opined at that time that

16   Hardy was not competent to proceed to trial, correct?

17   A    That's correct.

18   Q    Referring back to February 2009, you opined that Hardy

19   was able to understand the nature of the charges in this

20   case as well as the nature of the proceedings; is that

21   correct?

22   A    He had a factual understanding of the those things.  At

23   that time he had several delusions that prevented him from

24   having a rational understanding of his legal case and the

25   potential consequences.

1   Q    Pursuant to court order, Hardy was medicated with

2   antipsychotic medication to treat his mental illness,

3   correct?

4   A    Correct.

5   Q    Approximately when did this medication regiment begin?

6   A    I believe it was in December of 2013.

7   Q    And has Hardy been medicated continuously since that

8   date?

9   A    While he was at our facility, yes.  In looking over the

10  electronic medical records following his discharge from this

11  facility and his transfer back to New York, there appears

12  there were a handful of days where he was offered oral

13  antipsychotic medication as opposed to the injectable

14  medication every three weeks.  So he may have had one or two

15  days where he refused oral medicine.

16            However, in January, I think it was January 16th,

17  2015, they resumed to give him haldol decanoate, which is a

18  long-acting injectable antipsychotic medication, and he's

19  been receiving that 175 milligrams every three weeks since

20  that time.  That is the same medication he received while he

21  was at Springfield.

22  Q    So in your opinion, would those handful of days where

23  he was offered oral medication had a material impact on the,

24  I guess, the levels of medication in Hardy's body at the

25  time in January of 2015?

1  A    No, it's unlikely that it would have a significant

2  effect.  And if it had had some effect, it would have been

3  back in January.  And as I've indicated, all the records

4  that I've looked at, it appears he's been receiving his

5  Haldol decanoate injection every three weeks since that date

6  in January.

7  Q    Can you describe to the Court Hardy's response to the

8  medication that you observed?

9  A    He improved.  It was a gradual improvement, but it was

10 significant.  Early on he was out of touch with reality and

11 insisting that he was Essa, a profit.  He also alleged at

12 one point that he was Clifford Harris, that he was the

13 president of the United States.  It was nearly impossible to

14 have a conversation with him prior to the initiation of

15 medication.

16         However, with time he became much less preoccupied

17 with the belief that he was someone else.  He became much

18 more pleasant and rationale.

19         It's also notable that prior to the initiation of

20 medication he had multiple incidents where he was aggressive

21 towards others.  However, once the medication was started,

22 he no longer showed the aggressive and threatening behavior,

23 and I was able to get him to a semi unlocked unit where he

24 had more freedom to interact with others.

25         So in my opinion, he had a very good response to

1   the medication and it's now significant.

2   Q    In a report dated November 18th, 2014, which is in

3   evidence as Government Exhibit 7, your Honor, you found that

4   Hardy was competent to proceed to trial, correct?

5   A    That's correct.

6   Q    All right.  Please tell the Court why you found Hardy

7   competent to proceed to trial.

8   A    Well, there are three main issues when it comes to

9   competency.  One, do they have a rational and factual

10  understanding of the nature of the charges against him.  And

11  in my interviews with him, it was very clear that he did.

12  He was fully aware of the charges against him.  The

13  racketeering.  He was accused of ordering the murders of

14  various individuals and being involved in a large drug

15  enterprise.  He had a very good understanding of that.

16          The second piece is do they have a rational

17  understanding and factual understanding of the potential

18  consequences?  Again, Mr. Hardy was very much aware that

19  these charges were serious.  He indicated he was facing life

20  in prison.  He expressed an understanding that although

21  initially he was facing the death penalty, that that had

22  been taken off the table.

23          And then the third piece that's important to look

24  at is does he have the ability to assist in his own defense.

25  At that point in time we talked about what he intended to do

1   when he returned to court.  He expressed no paranoid or

2   delusional ideation regarding Mr. Ruhnke, his defense

3   counsel.  He offered a defense strategy to me at that point

4   that, although it may not have been realistic, it did not

5   sound to be delusional in nature at all.

6          He indicated to me that he was interested in

7   meeting with the prosecutors in this case and trying to

8   obtain a deal.

9          Again, his expectations were what kind of deal he

10  could have been offered may not have been reasonable, but he

11  did indicate to me that at the time that he would be willing

12  to accept a deal for 15 years.

13         So in my opinion, based upon what he was saying to

14  me as well as how he presented in our conversation, I

15  thought he demonstrated the ability to assist in his own

16  defense.

17  Q    In the course of making your competency determination

18  that's memorialized in your report of Government Exhibit 7,

19  which, for your benefit, is the November 18th, 2014, report,

20  did you review any material other than, you know, your

21  interactions with Hardy directly?

22  A    Yes, I believe I have it listed in the beginning of my

23  report.  But I also reviewed a motion that he had filed I

24  belive in March of 2014.  I had reviewed various

25  transcripts.  I had spoken to defense counsel, about their

Case 1:04-cr-00706-FB   Document 955   Filed 04/16/15   Page 16 of 121 PageID #: 7556

1   interactions with him.

2          I had also reviewed several phone calls that

3   Mr. Hardy made while he was at the facility.  He made a

4   large number of calls, and I wasn't able to review all of

5   them, but I did review a sample of those phone calls.

6   Q    Can you tell the Court what the phone calls revealed to

7   you?

8   A    It was very clear to me during those phone calls that

9   Mr. Hardy was fully aware of what was going on.  He was

10  aware again of the nature and the potential consequences of

11  his case.  He talked in those conversations about possible

12  defense strategies.  At one point he talked about something

13  he had learned from Mr. Ruhnke regarding the nature of the

14  charge against him; under what number it fell under, and so

15  he previously believed that they needed to have an overt act

16  in order to indict him.  But he was able to recall what

17  Mr. Ruhnke had told him.  And he indicated in the phone call

18  that he had looked it up in a computer and that Mr. Ruhnke

19  was correct, that actually they could charge him without

20  having an overt act.

21         So in my reading of those or in my listening of

22  those phone calls, it was apparent that he had, again, a

23  good and rational and factual understanding of what was

24  going on.  He may not always agree with others.  He may

25  think his perceptions were accurate, sometimes they may or

1   may not; however, it was fair that he did have the ability

2   to hear the information and retain it and understand it.

3   Q    All right.  In the phone calls you listened to, did

4   Hardy refer to himself as the President of the United

5   States?

6   A    No, he did not.  He never referred to himself as anyone

7   or a than Damion Hardy, a man who was being accused of some

8   very serious crimes that he asserted innocence of.

9   Q    Go ahead.  I apologize.  I didn't mean to interrupt

10  you.  I apologize.

11  A    I was going to say that he asserted he was innocent of.

12  Q    And do you recall whether the defendant made any

13  representations to you about, you know, whether he had, you

14  know, access to significant amounts of money and then what

15  you later found on the phone calls?

16  A    Yes.  I remember that Mr. Ruhnke had mentioned him

17  saying to him, Mr. Hardy told Mr. Ruhnke that he made $50.

18  And I ask did ask him about that, and he told me he had $5

19  million that he had won in a lawsuit.  But at the same time

20  -- around the same time period when he told me that, I

21  reviewed phone calls where he asked his mother, "we don't

22  got no millionaires in the family, huh?"

23          So I think what I took from that was although he

24  may have made statements saying that he believed himself to

25  have millions of dollars, I don't think that he genuinely

PRESTON BAECHT - DIRECT/MR. LOONAM          18

1   believed it, because when he spoke with his mother, he was

2   not asking about that money and being able to access it;

3   instead, he was asking, do you know of anybody who has the

4   money that he could potentially use.

5          So in my view he was not generally delusional

6   about that particular issue.

7   Q    Are you aware of other phone calls where the Defendant

8   Damion Hardy is asking people for money to pay for his new

9   lawyer?

10  A    I did not personally review that call, but I have been

11  informed by another staff member that they had reviewed

12  phone calls where he had asked another person for a large

13  sum of money to help him in obtaining a new lawyer, yes.

14  Q    Directing your attention to March 20th, 2015, you met

15  with the defendant on March 20th, 2015, correct?

16  A    Yes, I did.

17  Q    And you created a report as a result of your meeting

18  with the defendant, correct?

19  A    That's correct.

20          MR. LOONAM:  And, your Honor, that report is in

21  evidence as Government Exhibit 6.  And the date of the

22  report is March 23rd, 2015.

23  Q    What did you observe about the defendant's demeanor

24  during the course of your meeting with him on March 20th,

25  2015?

1  A    Mr. Hardy was calm, he was pleasant, he wasn't

2  argumentative with me.  I think what struck me the most is

3  that he appeared very dysphoric, that he appeared very upset

4  about his circumstances.

5  Q    And --

6            THE COURT:  Whose phone call was that?

7            THE WITNESS:  I believe it was --

8            THE COURT:  Was that from your end?  Was that from

9  your office?

10            THE WITNESS:  Yes.  It was the secretary's phone,

11  they have another one in here and it was ringing.

12            THE COURT:  All right.  Maybe can you tell her if

13  there is a possibility that we can sort of turn the phone

14  off while you're testifying?

15            THE WITNESS:  Yes.  I can get up and find that

16  out, certainly.

17            THE COURT:  Maybe we can do that.

18            THE WITNESS:  Certainly.

19            (Witness complies.)

20            THE WITNESS:  If I can figure out how to do this.

21  Excuse me one moment.  Let me double check with her.  I want

22  to make sure I can unplug it.

23            MR. RUHNKE:  It made me realize my phone was on,

24  your Honor, so...

25            THE COURT:  I didn't think it was your's.

PRESTON BAECHT - DIRECT/MR. LOONAM          20

1          MR. LOONAM:  Mine's off.

2          MR. RUHNKE:  No, it wasn't, but it could have

3     been.

4          THE COURT:  So thank you very much, Doctor.

5          Let me just clarify something.  You mentioned a

6     phone call between Mr. Hardy and his mother, I guess a

7     couple of months ago, did you listen to the phone call?

8          THE WITNESS:  All phone calls are recorded for a

9     period of time.  And as part of my evaluation, I'll often

10    review phone calls just to see if someone is --

11         THE COURT:  My question is whether you -- my

12    question is whether you listened to that particular phone

13    call?

14         THE WITNESS:  I did.  In my report I list which

15    phone calls I reviewed, and I did listen to that phone call.

16         THE COURT:  You mentioned that.  All right.  So

17    you heard him talk to his mother for some length of time,

18    correct?

19         THE WITNESS:  Yes.  I believe the phone call was

20    approximately 15 minutes.

21         THE COURT:  And you listened to the entire 15

22    minutes?

23         THE WITNESS:  Yes, I did.

24         THE COURT:  All right.  And based upon the

25    conversation that was transpiring between Mr. Hardy and his

1   mother, how would you characterize that conversation in

2   terms of whether it was one that was rapid?  Whether it was

3   controlled?  Whether it was normal, for lack of a better

4   word?  In your own professional words.

5            THE WITNESS:  He did not present with obvious

6   symptoms of mental illness in that conversation.  He was --

7   and actually, I reviewed a number of phone calls in all

8   of --

9            THE COURT:  I'm just talking about the one with

10  his mother.

11           THE WITNESS:  Well, most of them were with his

12  mother that I reviewed.  But he did not express any

13  delusional ideation.  He talked in one of the phone calls

14  about, like I said, leaving with Mr. Ruhnke, saying he was

15  not charged under 371, but under 846 and 841.  He said he

16  looked it up on the computer, and that it appears that he

17  could be arrested under those statutes without an overt act.

18           He also discussed the civil commitment statute and

19  explained it correctly to --

20           THE COURT:  All right.  So, you know, I know you

21  are referring now to your notes about that, right?  But I

22  just wanted to get the general tone; there were a number of

23  phone calls, you listened to all of them, and they were all

24  pretty consistent in terms of his communication skill and

25  the conversation that was transpiring between mother and

PRESTON BAECHT - DIRECT/MR. LOONAM          22

1   son?

2          THE WITNESS:  Yes.  I mean, he, at times, would

3   ask her to do something for him more than once, but it

4   didn't -- to me, that wasn't out of the ordinary.  Nothing

5   about those phone calls stood out to me as reflecting

6   psychosis or mental illness.

7          THE COURT:  When was the most recent phone

8   conversation you listened to between Mr. Hardy and his

9   mother?

10          THE WITNESS:  I was provided with two phone calls

11   that he made from MCC New York, and the dates of those calls

12   -- I believe one was in January, and one was in February of

13   this year, and I was -- and I listened to both of those.

14          THE COURT:  So the most recent one was perhaps a

15   month or so ago?

16          THE WITNESS:  Correct.

17          THE COURT:  All right.  I just wanted to clarify

18   that.  You can continue with your questioning, Mr. Loonam.

19          MR. LOONAM:  Thank you, sir.

20   BY MR. LOONAM:

21   Q   Actually, why don't you just tell the Court, and we'll

22   get into more specific questions, but about your

23   observations of Hardy when you saw him on March 20th, 2015,

24   as compared to what you observed as to him in Springfield

25   when you found him competent?

1  A    His mental state was not significantly changed in that

2  he -- if anything, he mentioned fewer potentially odd things

3  during my March 20th interview.  For example, he never

4  claimed to be anyone other than Damion Hardy when I met with

5  him on March 20th.  He answered all of my questions

6  relevantly.

7          He, at times refused to answer my questions;

8  however, again, he did not express any delusional strategies

9  he didn't express any paranoid ideation.

10          If anything, he came across as someone very much

11  in distress and worried about his current circumstances and

12  the fact that he, you know, could potentially be going to

13  trial in less than two weeks.

14  Q    And we'll discuss your observations concerning his

15  stress.  But with respect to your observations of Mr. Hardy

16  on March 20th, 2015, do you think he was basically the same

17  as you observed him in Springfield, better than you observed

18  him in Springfield, or worse than you had observed him in

19  Springfield?

20  A    In some respects he actually presented as better.  You

21  know, I noted in my November 18th report, you know, towards

22  the end of my interview with him he claimed to be the

23  President of the United States.  I don't think he believed

24  it, but he still made that claim.  During my March 20th

25  interview, he never made any of those claims at all.

1          At the very end of our interview, he did mention

2     the Supreme Court.  He did mention Ethou Law.  However, his

3     description of Ethou Law was that I said -- that he

4     overheard me saying at one point years ago that the law said

5     a person could not be forcibly medicated for competency

6     restoration unless the judge ordered it.

7          He did not say that Ethou Law was a basis for him

8     to be immediately released or for him to be out for his

9     trial.

10          And in terms of any mentioning the Supreme Court

11    in passing, he never made any statements to suggest that he

12    thought that the Supreme Court had based a ruling that was

13    going to prevent him from going to trial or result in his

14    immediate release.

15          So even though he made brief mention of those two

16    things, he did not perseverate or fixate on it in any way

17    being related to his case or saying that he was not facing a

18    trial in two weeks.

19    Q    And when he raised those instances that -- in a

20    different way than he had in the past of the Supreme Court

21    and Ethou Law, was that prompted by anything?

22    A    At the end of the interview I asked him if he believed

23    he was competent.  And at that he shrugged his shoulders and

24    told me that that was my decision to make, not his.  And

25    then he made a comment that he was certain I would find him

1   to be competent.  And then after that, he mentioned the

2   Supreme Court and the Ethou Law.

3   Q    And just going back to your evaluation of Hardy in

4   2014, did he express a view to you as to whether he wished

5   to be found competent or not competent or had he expressed

6   any feeling about that issue?

7   A    He asked me to find him to be incompetent.

8   Q    Now, in your report you wrote that Hardy expressed some

9   frustration with his counsel.  What did he tell you about

10  that?

11  A    There were two main issues.  The one is that he felt as

12  if Mr. Ruhnke was objecting to him sitting down with the

13  prosecution and proffering testimony.

14          He indicated that he did not believe he could win

15  at trial, and he thought that cooperating with the

16  prosecution was his best option at getting out of jail, and

17  so he was questioning why Mr. Ruhnke wouldn't allow him to

18  do that.

19          The other statement that he made was that he

20  believed that Mr. Ruhnke should have tried to get his case

21  dismissed on, quote, a technicality.

22          With questioning, it was clear that he understood

23  that no one else agreed with him, that the case should be

24  dismissed on a technicality; nevertheless, he indicated that

25  he thought Mr. Ruhnke should have tried harder.

1   Q    And with respect to Mr. Hardy's desire to meet with the

2   government to cooperate as being his best chance to get out

3   of jail, did Mr. Hardy describe for you in general terms

4   what type of information he wanted to provide to the

5   government?

6   A    Yes.  In general terms he indicated that he wanted to

7   provide the government with information about how some of

8   the cooperating witnesses were responsible for some of the

9   acts that he has been accused of committing.  He also

10  indicated that he had information on other individuals that

11  are not currently known to the government to have been

12  involved in this -- I guess you call it drug enterprise.

13  Q    And have you listened to any calls earlier where the

14  defendant expressed any view of what he might want to do

15  with respect to cooperating with the government?

16  A    I listened to one phone call where he proposed that he

17  would tell the government -- this is while he was at

18  Springfield -- he proposed that he would tell the government

19  that his codefendant was responsible for much of the events

20  that he had been accused of committing.

21  Q    And so during that call he suggested that he would

22  cooperate against the Codefendant Aaron Granton or E-bay?

23  A    Correct.

24  Q    Did he raise that same possibility with you during the

25  course of your meeting with him on March 20th, 2015?

1   A    No, he did not.  Rather, he said that -- he identified

2   one of the cooperating witnesses as being the true leader of

3   the organization.

4   Q    And who did he identify as the true leader of the

5   organization during your meeting with him on March 20th,

6   2015?

7   A    I'd have to look at my notes, because I didn't remember

8   the name, but I have it in here somewhere.  Edward Cook, I

9   think, I can't read my handwriting.

10  Q    With respect to the defendant's thoughts of coming in

11  and providing information to the government, have you

12  observed whether his thoughts are fixated in that respect or

13  have they changed and evolved over time?

14  A    I would say they evolved.  He certainly, back in

15  November of 2014, indicated he wanted to speak to the

16  government and he reiterated that during my interview of

17  March 20th.

18         However, it seems that the content of what he

19  thought would be helpful to share has changed.  And so, no,

20  it's not fixated.  It seems as if, like I said, it's evolved

21  over time; probably to reflect what he thinks will be the

22  most useful or helpful.

23  Q    Did the defendant ask you to do anything on his behalf

24  during the course of your meeting with him on the 20th of

25  March?

1  A    He did ask me on several occasions to let the

2  prosecuting -- prosecutors associated with the case know

3  that he wanted to sit down with him.  And I explained to him

4  again that that was my not role.  Nevertheless, he probably

5  asked me five or six times, as an estimate, to try to make

6  that happen, that meeting happen.

7  Q    And did the defendant express any understanding of what

8  it would take to obtain a cooperation agreement with the

9  government?

10  A    I had indicated to him that it was my understanding

11  that the defense counsel and others thought it was very

12  unrealistic to expect that he would be exonerated, because

13  apparently that's what he had repeatedly said; that if he

14  just had an opportunity to speak to the prosecutors, he

15  would be exonerated and let go.

16         And when I indicated that and I said most of the

17  time individuals are expected to at least admit to some

18  wrongdoing if they are going to want some sort of deal to be

19  worked out, he said he would be willing to cop to something,

20  but he did not indicate specifically what he would be

21  willing to say that he was guilty of.  However, he did

22  indicated that he would consider saying that he was guilty

23  of something, if necessary.

24  Q    And you mentioned that, you know, the defendant has

25  represented to others that he's, you know, he's innocent,

1    that he's not guilty of the charges, he wants to be

2    exonerated.

3            Did the defendant say anything to you about the

4    actions of the cooperating witness and why he believes that

5    he is not guilty for the acts that he committed?

6    A    I'm not sure if that this will answer your question

7    directly, but when we did speak about the cooperating

8    witnesses, he indicated to me that they were lying.  That

9    they lied to try to get themselves out of jail or out of

10   trouble.  He said the accusations they made were rather

11   vague saying that he was the leader, but that there wasn't a

12   great deal of detail than what they alleged he had done.

13           I did ask him, you know, have you reviewed the

14   transcripts of their testimony so that you can help

15   Mr. Ruhnke in cross-examination.  And he said that he

16   reviewed some of the transcripts, but that much of what they

17   were saying was just vague accusations that he was the

18   leader, that he ordered things as opposed to specific times

19   and dates of what he might have, you know, committed some

20   offense.

21   Q    And do you recall whether or not Hardy expressed any

22   view for who was responsible for the actions of the

23   cooperating witnesses?

24   A    He said that they're responsible for their own actions,

25   that each of those people and what they were saying, they

1    are responsible for their own behavior and their own

2    actions.

3    Q    Now, you also mentioned that Hardy expressed his view

4    to you that he didn't think he would win at trial, correct?

5    A    Correct.

6    Q    Has -- I guess you've already spoken to this, but has

7    Hardy described to you what his understanding is of the

8    nature of the Government's evidence against him?

9    A    He said that all the government had was cooperating

10   witnesses; I asked him how many, he said over ten.  And at

11   one point, you know, he said "it's my word against all of

12   their's."

13   Q    And has the defendant told you about anything he's done

14   to prepare for trial?

15   A    In my questioning he did say that he -- I asked him if

16   he thought of any witnesses that he could call on his own

17   behalf.  And he said he had thought about that, but that he

18   was not able to come up with any potential defense

19   witnesses.

20          And like I mentioned earlier, he did say he

21   reviewed some of the transcripts from some of the

22   cooperating witnesses' testimony.  And he -- his observation

23   was their accusations were rather vague in nature and that

24   they were all lies.

25   Q    So in your opinion, based on your interactions with

1   Hardy on, you know, March 20th, does Hardy continue to have

2   a factual understanding of the case against him?

3   A    Yes.

4   Q    Does he continue to have an accurate understanding of

5   roles of the prosecutors, defense counsel, the judge and

6   jury?

7   A    Yes.

8   Q    And in your opinion, does he have a rational

9   understanding of this case?

10  A    Yes.  I think he has a rational understanding of the

11  seriousness of what he's facing if he goes to trial.

12  Q    In your opinion, if Hardy chose to do so, could he

13  cooperate with his defense counsel?

14  A    Yes.  I think that at this point he is focused on an

15  option that he views as being his best option, which is

16  trying to cooperate with the government.  And as a result,

17  he doesn't think that there is a point in trying to assist

18  in preparing for trial.  However, I think that if he chose

19  to do so, he has the ability to do so.

20  Q    And in your opinion is the conflict between the

21  strategy of Mr. Hardy and the strategy of Mr. Ruhnke the

22  product of mental illness?

23  A    At this point, no.  I think his mental illness is

24  controlled with medication.  He's in touch with reality.  He

25  knows he's Damion Hardy.  He knows what's going on.  He

1    doesn't allege that he's a prophet or the President of the

2    United States.

3           I think that although it's probably very

4    frustrating for his defense counsel to try to work with him,

5    given his very stubborn fixation on this option, I don't

6    think it's a result of an illness.  I think it's more the

7    result of his own weighing in that that's his best option.

8           He may not be correct.  He may be unrealistic in

9    his expectations, but I don't think that it's a function of

10   psychosis.

11   Q    And in your opinion, is Hardy competent to proceed to

12   trial?

13   A    I believe he is, yes.

14          THE COURT:  Let me ask you this question:  When

15   was the last time or the first time he expressed any

16   displeasure with Mr. Ruhnke's representation?

17          THE WITNESS:  On March 20th was when I interviewed

18   him in MCC New York.  And like I said earlier, he said he

19   was frustrated that Mr. Ruhnke wouldn't facilitate him

20   meeting with the prosecutors.  And he also said he was

21   frustrated that he did not try harder to get the case

22   dismissed on a technicality.

23          THE COURT:  Did he ever express displeasure of

24   Mr. Ruhnke's services before that time?

25          THE WITNESS:  I can't think of a specific instance

1   where he said anything negative about Mr. Ruhnke while he

2   was at Springfield.

3          At the very end of his evaluation he was asking to

4   speak to the prosecutor at that time, but I can't recall off

5   the top of my head right now if he was upset with Mr. Ruhnke

6   about that.

7          THE COURT:  All right.  Mr. Ruhnke, do you wish to

8   inquire?

9          MR. RUHNKE:  Is Mr. Loonam finished?

10          MR. LOONAM:  I guess I am.  One moment.  Let me

11   just check with co-counsel.

12          (Pause.)

13          MR. LOONAM:  Nothing further at this time, your

14   Honor.

15          All right.  Dr. Preston Baecht, was the secretary

16   able to print out a copy of the 3500 for you?

17          THE WITNESS:  Well, she printed something.  It

18   appears to be a police report.  Is that what you guys sent?

19   It's not the medical record of Mr. Hardy.

20          MR. LOONAM:  Okay.  There should be another

21   package there, I'm told.  If you could check with her, that

22   should be in her inbox.

23          THE WITNESS:  Okay.  I will check with her right

24   now.  Did you guys mean to send police reports to me?

25          MR. LOONAM:  No, I think that was inadvertent.

1          THE WITNESS:  Okay.  Let me check really quickly.

2    I'll be right back.

3          MR. LOONAM:  I apologize, your Honor.  At least

4    she can print it and -- I mean, she has the reports, just

5    without the stamps.

6          THE WITNESS:  Ms. Dixon just checked her inbox and

7    saw the E-mail.  She'll start printing them now.

8          MR. LOONAM:  Okay.

9          THE WITNESS:  I'm not sure how many pages it is or

10   how long it will take.

11         MR. RUHNKE:  Probably about 75 pages.  We can

12   proceed, I think.  Dr. Preston, can you hear me okay?

13         THE WITNESS:  Yes, I can.  Thank you.

14   CROSS-EXAMINATION

15   BY MR. RUHNKE:

16   Q    Okay.  How are you?

17   A    I'm good.  Thank you.

18   Q    So I wanted to start with just basic principles.

19   Mr. Hardy has a lifelong mental health condition; is that

20   correct?

21   A    Yes, schizophrenia is a chronic mental illness.

22   Q    There is no cure for schizophrenia, correct?

23   A    Not at this time; although, there are good treatments

24   for schizophrenia.

25   Q    The symptoms can be put into abatement, but the

1   underlying illness is always there, correct?

2   A    I mean, yes.  What that essentially means is that if

3   you stop taking your medication, the symptoms will return.

4   So, yes, the illness is always there, but the treatments can

5   often eliminate the symptoms.

6   Q    And Mr. Hardy has been diagnosed with a serious mental

7   illness by several different mental health professionals

8   within the Bureau of Prisons itself, correct?

9   A    Correct.

10  Q    First at MCC, New York and then at FMC Devens, and then

11  really several times at Springfield, correct?

12  A    That's correct.

13  Q    And I want to take you through some of your reports,

14  and I want to know, do you have in front of you, your file

15  that is headed, "Forensic Examination Interview?"  There is

16  a category of reports called, "Forensic Examination

17  Interview."  Do you have that?

18  A    I printed some of them, but I didn't print everything,

19  because it was so voluminous.

20  Q    So take a look and see if you have a Forensic

21  Examination Interview dated October 3, 2014?

22  A    No.  I printed all from October 31st on.  I did not

23  print one that was that old.

24  Q    Let me ask you this question and see if you remember it

25  or not remember it.

1   A    Okay.

2   Q    Now, November 3rd, 2014 would be four or five weeks

3   before you found him competent, correct?

4   A    Yes.

5   Q    And do you remember a conversation you had with him,

6   and it's headed, "Forensic Examination Interview" where he

7   was getting ready to make a phone call, and you spoke with

8   him?

9   A    What was the date of the interaction?

10  Q    The date is October 3, 2014.

11  A    If you tell me, I might remember it, but off the top of

12  my head unfortunately, I don't have the note printed.

13  Q    So let me ask you whether or not -- and perhaps we can

14  stipulate to the language of the report with the government.

15  It says the first page of 3500 LAPB2, Mr. Loonam, do you see

16  it?

17            MR. LOONAM:  I've got it.

18            MR. RUHNKE:  I'm going to read the language to you

19  and I'm going to ask if you remember saying that in the

20  report.  I'm going to -- I'll just read it, it's just a

21  paragraph.  "Mr. Hardy was getting ready to make a phone

22  call before I spoke with him.  He reported that he was

23  coping adequately and asked if I would need to complete a

24  memo in order for him to move to open population.  When I

25  stated that I would, he expressed irritation and

1    frustration.  I informed him that I've been asked to provide

2    the Court with an updated competency opinion by November 3.

3    When asked if he believed he was competent to go to court

4    currently, he stated, quote, I never thought I wasn't,

5    closed quote.  However, he then stated there was no case

6    against him and directed me to read his criminal complaint.

7    When informed that he must be aware that he's been charged

8    with several serious charges, he stated, quote, you know

9    what the Supreme Court said, closed quote.  He then stated

10   he needed to make the phone call.  We will discuss his

11   current understanding of his legal situation next week.  No

12   signs of thought disorganization.  No signs of depression or

13   mania.  He specifically denied thoughts of self harm or

14   harming others.  Will continue to evaluate."

15            Do you recall that now?

16            THE WITNESS:  It sounds like a note I would write.

17   I don't have a clear recollection it was, but I guess that's

18   what happened if that's what I reported in my note on that

19   date.

20   Q    All right.  And the topic of Ethou Law has been a

21   constant theme of Mr. Hardy's; is that correct?

22   A    Yes.  He's started talking about it several years ago.

23   Q    And do you remember when you testified in 2009 at a

24   hearing in this courtroom on the issue of forced medication?

25   Do you remember that, the first time?

1   A    The first time, yes.

2   Q    Okay.  That was August of 2009?  Yes, 2009.  It was in

3   front of Judge Trager who has since passed away, but do you

4   recall discussing Ethou Law at the time?

5   A    In vague terms.  His definition of Ethou Law has

6   changed over the years.  But at that time I believe it may

7   have been he should be released, but I don't recall

8   specifically.

9   Q    Now, going back to your testimony in 2009 --

10  Mr. Loonam, is there a number on that?  Do we have a

11  transcript of her prior testimony that has a number on it?

12          MR. LOONAM:  I don't think I included the 2009

13  testimony here.

14          MR. RUHNKE:  We both have it, I'm sure.

15  Q    But in any event, he was found to be -- he had been

16  found to be incompetent by the evaluators at FMC Devens and

17  that's what led to his transfer to Springfield after Judge

18  Trager had signed an order declaring him incompetent.  Do

19  you recall that sequence of events?

20  A    Yes.

21  Q    And in terms of a rational understanding of the charges

22  against him, did you believe and did you express the opinion

23  at that time that Ethou Law was an example of his not having

24  a rational understanding of the charges against him?

25  A    At that point in time he was very fixated on the belief

1   that he should be immediately released, and that there was

2   no case against him, and he would cite the Supreme Court

3   cases from the 1800's, and he would cite Ethou Law.  That

4   was prior to being treated with medication for a significant

5   period of time.

6   Q    And in terms of what Ethou Law is, I'm going to read

7   for you actually two pages of your testimony in 2009, and

8   tell me if that accurately reflects how you viewed the

9   situation in 2009, okay?  It will take just a couple of

10  minutes.

11        "QUESTION:  Doctor, could you give us some insight

12  into the explanation of Ethou Law that Mr. Hardy gave you on

13  the various occasions that he referred to that?

14        ANSWER:  Certainly."

15        I'm reading from page 28 of the transcript.

16        "ANSWER:  In my report I note his description,

17  because it was kind of difficult to follow.  When I asked

18  him to explain, he said George Washington established it.

19  It comes from a saying that Jesus made to the apostles.  It

20  is a law that when someone is arrested and placed in jail

21  and that person does not have a case, when that is made

22  clear to the court, Ethou Law goes into effect.  Courts have

23  a certain time period to show that the person has a case.

24  It goes into effect for four years and two months and

25  17 days from when the court learns there is no case.  If

1    they don't do it, it's over, that's it.  If a person is not

2    released on the day of the time limit, then the President of

3    the United States signs an order for soldiers to go into the

4    jail and get that person.  It's an unusual law.  No one can

5    change it, not even the Supreme Court.  The person released

6    is to be provided a driver's license and passport when

7    released, and that person cannot be arrested, investigated

8    or prosecuted for crimes known or unknown at any time

9    period.  There also can be no strip search when released by

10   Ethou Law.  He wanted to stay more specifically that the

11   judge in his case stated in August of 2004, that he was to

12   be released on November 3rd, 2008.  And when he told me that

13   I need to look on the computer, he will be able to tell that

14   Ethou Law was in effect in his case.

15           QUESTION:  Of course, the whole notion of Ethou

16   Law demonstrates that he lacks a factual understanding and a

17   rational understanding of what's going on; is that right?

18           ANSWER:  It certainly demonstrates that he lacked

19   a rational understanding when I spoke to him about his case.

20           QUESTION:  Well, the notion that he could be

21   deported today demonstrates a lack of factual understanding;

22   is that right?

23           ANSWER:  It demonstrates a lack of rational

24   understanding.  The factual piece of it, when people have

25   been told the facts of what they're charged with, there may

1   be some part of him that he still knows exactly what charges

2   have been leveled against him.  I know he has a copy of his

3   criminal complaint in this case, because he showed it to me,

4   and I believe he has a copy of the indictment as well, so on

5   some level he may have some factual understanding.  The key

6   is rational understanding.  Does he understand the

7   implications of the things that he's reading?  And in his

8   case, no, he doesn't have a rational understanding of the

9   charges against him."

10          I'll just ask the government, have I read that

11  correctly?

12          MR. LOONAM:  No objection.

13          MR. RUHNKE:  Okay.  No objection.

14          THE COURT:  Go ahead.

15  Q    Do you remember that this is how you testified in 2009?

16  A    Yes.  He was very ill in 2009.

17  Q    But the subject of Ethou Law has not gone away, has it?

18  A    In the way he described it then, yes, it has gone away.

19  He rarely mentions Ethou Law currently.  And when he did

20  mention it to me on the 20th, it was to say he shouldn't be

21  forcibly medicated without a judge ordering it.

22          As a matter of fact, I think I noted in my

23  November report, he said the same thing.  And when I pointed

24  out to him that that doesn't have anything to do with the

25  fact that he's going to go to trial, he didn't say anything.

1       So I think over time he's -- he no longer has that

2  really disorganized, difficult to understand definition of

3  Ethou Law, and now he defines it differently.  And he

4  really, with me, has not focused on it for a reason for him

5  to be released or not having to go to trial at all.

6  Q    Have you tried to press him on the issue or does he

7  simply not bring it up?

8  A    He didn't bring it up.  He brought it up one time, and

9  when I asked him to define it, like I say, he said he

10 overheard me to say that Ethou Law means that somebody

11 cannot be forcibly medicated without the judge ordering it.

12 And then I said well, that really doesn't have anything to

13 do with you going to trial and being released, and he did

14 not disagree with me.  It wasn't something that he

15 perseverated on or jargoned on about.

16 Q    And was it that he also --

17         MR. LOONAM:  Objection, your Honor.

18         THE COURT:  Sustained.  Next question.

19         MR. RUHNKE:  I didn't hear anything.  I didn't

20 hear anybody object.  Did anybody object?

21         THE COURT:  Yeah.  Yeah.  The objection is based

22 upon the fact that what?

23         MR. LOONAM:  I was objecting over Mr. Ruhnke

24 speaking over the --

25         THE COURT:  The fact that there was cross

1   communication.

2          MR. RUHNKE:  I'm sorry.  I did not mean to do

3   that.  If I interrupted you, go ahead.

4          THE WITNESS:  I was just going to say at this

5   point in time he's not asserting Ethou Law as a basis for

6   him to be released or for him not to face trial.  So his

7   presentation is very, very different now with medications

8   then what it was prior to him being treated.

9          THE COURT:  Has he recently explained to you what

10  he means by Ethou Law?

11         THE WITNESS:  Yes, as I indicated now, he just

12  says it means that a person can't be medicated for

13  competency restoration against their will unless the judge

14  orders it.  He said he heard me say that in the hallway.

15  And I said, well, you may have heard me say that, because

16  that is what the case law says.  He wasn't willing to

17  concede that I never said the word Ethou Law.

18         But again, he's not related Ethou Law to me to

19  mean that he should be released or any of the really

20  disorganized things that he said back to me in 2009.

21  BY MR. RUHNKE:

22  Q    And have you pressed him on the issue or are you simply

23  observing that he has not brought it up?

24         MR. LOONAM:  Objection, asked and answered.

25         MR. RUHNKE:  Okay.  The answer was no?

1        MR. LOONAM:  No.  The answer was I did ask him and

2    he said it was -- we can have a readback.

3        THE COURT:  All right.  Listen, don't have

4    communication, all right?  I think she's explained it

5    satisfactory.  Go on with the next question.

6    BY MR. RUHNKE:

7    Q    There was also the topic of the Supreme Court having

8    actually ordered his release; is that correct?

9    A    Yes.  That was a common theme early on, prior to him

10   being medicated and before -- when many -- I think he

11   started that one maybe in 2009, and then through probably

12   2013 he was focused on that.

13   Q    On the topic of your speaking to the prosecutors for

14   him he raised that half-a-dozen times during your March 20th

15   interview, correct?

16   A    Yes.  I didn't count how many times, but I would

17   estimate five or six times.

18   Q    And he's actually raised that with you before at

19   Springfield, correct?

20   A    Yes, he's raised that back in November of 2014 during

21   our interviews as well.

22   Q    And that's not your role; is that correct?

23   A    That's correct.

24   Q    And you reminded him of that the first time he raised

25   it, correct?

PRESTON BAECHT - CROSS/MR. RUHNKE          45

1  A     That's correct.

2  Q     And you reminded him of that each of the five or six

3  times he raised it on March 20th, correct?

4  A     Correct.

5  Q     And he still continued to raise it?

6  A     As I said, he raised it approximately five to six

7  times, even after I told him that wasn't my role.  His

8  assertion is that I'm the government doctor and you're in

9  communication with him and you can make that happen.

10        THE COURT:  Was he aware that the government did

11  not want to speak to him?

12        MR. LOONAM:  Well --

13        THE WITNESS:  I told him that it was my

14  understanding that they were no longer interested in

15  speaking to him.  And he was aware of that; but again, he

16  indicated that he was hopeful that if they learned that he

17  had information that he could share with them, then perhaps

18  they would reconsider that.

19        THE COURT:  Okay.

20  Q     Did you discuss with him at all how rational it was to

21  think that the government would offer him any kind of

22  leniency or cooperation or exoneration?

23  A     Yes, I did.

24  Q     And in your view, did that seem to be a realistic goal

25  for him to pursue?

PRESTON BAECHT - CROSS/MR. RUHNKE                46

1          MR. LOONAM:  Objection.

2          THE COURT:  Sustained.  Sustained as to the form

3   of the question.

4          MR. RUHNKE:  In her view, your Honor, I'm asking.

5   I'm asking what her view is.  She's opined about --

6          THE COURT:  No, I don't think it's a proper

7   question.  Go on, ask another question.

8   Q    In your report finding him competent, the first one

9   November 20th, you said that Mr. Hardy had had a strategy,

10  it might not be a successful one, but he had a strategy for

11  his defense.  Can you tell us what that strategy was?

12  A    He, in his conversation with his mother, had talked

13  about wanting to testify against his codefendant and offered

14  that to the prosecution, that the codefendant was the person

15  who was actually responsible for being the leader and doing

16  all of the things that he's accused of doing.

17         He also told me in the interview something

18  slightly different which was that he was -- had learned

19  through a third party that the codefendant may plead guilty

20  and take responsibility for being the leader.

21  Q    And do you know if there is any basis in reality for

22  those statements to him -- by him?

23         MR. LOONAM:  Objection.

24         THE COURT:  Well, I'll letter her answer it if she

25  can.

1    THE WITNESS:  Well, that's what he was saying in

2   November.  And now in March he's wanting to say something

3   different, so it would seem to me that is slightly because

4   maybe he thought that strategy wasn't going to be effective.

5   Q    All right.  And are you aware, and I just want to know

6   if you've been aware that there have been two trials of

7   members of this alleged enterprise in which a half-a-dozen

8   cooperating witnesses have testified, all of whom have

9   identified Mr. Hardy as the leader of the organization and

10  that convictions were returned in both those cases, do you

11  know that?

12  A    Mr. Hardy told me that there was over ten cooperating

13  witnesses against him, but I have not followed those trials

14  or read anything about them or was aware of anything from

15  them.

16  Q    And Mr. Hardy has also said that he is innocent, that

17  he's done nothing wrong.  And that actually speaking with

18  the prosecutors, his main goal is to be exonerated, correct,

19  and released?

20  A    Well, he indicated to me that he thought he could --

21  well, he said several things.  He said he thought he could

22  demonstrate to the prosecutors that he was not guilty of the

23  things that he was accused of.  And that if they were just

24  in their role as prosecutors, they would not pursue trying

25  to convict somebody that -- of a crime, if they knew that

1   somebody else actually committed the crime.  And he also --

2   I'm sorry and he also--

3   Q    I'm sorry.  I thought you were done.

4   A    No.  There is a delay with the camera thing.

5        But he also -- when I said to him it's my

6   understanding that that is not believed to be realistic,

7   that he be exonerated in light of everything, and that most

8   individuals, if they want to cooperate, typically have

9   to accept some responsibility for wrongdoing, is that

10  something that you're willing to do and he said yes.

11       Again, he did not go into details on me with what

12  he would be willing to say he did.

13       And in my November report I also noted at that

14  time that he told me then he would be willing to do a deal

15  if he would be offered 15 years.

16  Q    15 years?

17  A    15 years of incarceration, yes.

18  Q    With time served, correct?  Credit for time served?

19  A    I would image so, but he didn't say specifically.

20  Q    All right.  And his thought is all the government's

21  cooperators are lying; is that correct?

22  A    Yes, that they're lying for secondary gain, that many

23  of them were able to obtain better deals for themselves,

24  because they pointed the finger at him.

25  Q    And to your knowledge, these government cooperators are

PRESTON BAECHT - CROSS/MR. RUHNKE                49

1   the same witnesses that the government relied upon to get

2   convictions in earlier cases, correct, to your

3   understanding?

4   A    I've been told that.

5            MR. LOONAM:  Objection, foundation.

6            THE WITNESS:  I haven't --

7            THE COURT:  Sustained.

8   Q    I want you to assume hypothetically that many of these

9   cooperating witnesses testified at trials under oath, were

10  presented by the government as truthful, as presented by the

11  government as witnesses who should be relied upon by the

12  jury.  And as a result of, in part their testimony,

13  convictions were returned and defendants received major

14  prison terms; in one case, life.

15           How realistic is it in your view that this is a

16  rational strategy to go to the government and tell the

17  government that their witnesses are all lying?

18           MR. LOONAM:  Objection.

19           THE COURT:  Sustained.  You know, he spoke to you,

20  Doctor, about wanting to cooperate with the government is

21  what I glean from your answers, correct?

22           THE WITNESS:  Correct.

23           THE COURT:  All right.  And that was recently as

24  how long ago did he express that?  Was that back on

25  March 20th?

1        THE WITNESS:  He expressed that March 20th, just a

2    few days ago.  He also expressed it in November of 2014.

3        THE COURT:  All right.  So he told you that he

4    knew there were a number of cooperators in other cases and

5    he wished to become a cooperator also?  I just want to

6    understand the thrust of what he said to you.

7        THE WITNESS:  Yes.  He said that he had

8    information about some of the cooperating witnesses to show

9    that they were culpable.  Some of the things that he has

10   been accused of, he also said he had information on other

11   individuals that the prosecution perhaps wasn't aware of.

12       THE COURT:  Now, you mentioned something about his

13   mentioning 15 years.  He was hoping that with his

14   cooperation he could cut a deal, so to speak, where he would

15   get out of jail in 15 years time?

16       THE WITNESS:  Well, what he told me back in

17   November is that he'd be willing to accept a deal if it was

18   not too much time in prison.  And when I asked him, you

19   know, what would be acceptable to him, he said 15 years.

20       THE COURT:  Did he discuss that with you again

21   this past March 20th?

22       THE WITNESS:  He did not put a year on it.  On

23   March 20th what he did say was that he would be willing to

24   admit to some wrongdoing, if necessary.

25       THE COURT:  All right.  Any further --

1          THE WITNESS:  He did not tell me exactly what he
2    would admit to.
3          THE COURT:  All right.  Any further questions,
4    Mr. Ruhnke?
5          MR. RUHNKE:  Yes, sir.
6    BY MR. RUHNKE:
7    Q    Doctor, you're aware of the fact that -- and I'm
8    exploring your statement that he had a theory of the defense
9    and what that would entail.
10         Now, Mr. Hardy, as we know, was diagnosed as a
11   schizophrenic?
12   A    Yes, he was diagnosed as --
13   Q    Over the years he's clamed to be the President of the
14   United States?
15         THE COURT:  Yeah, we know all of that.  Go ahead.
16   Q    He's claimed to be Essa Son of Jesus.  He's claimed to
17   have taken orders for being a star.  In your own general
18   opinion, how good of a witness do you think he would make in
19   a case?
20         MR. LOONAM:  Objection.
21         THE COURT:  Sustained.  Sustained.
22         MR. RUHNKE:  Your Honor, I'm exploring how
23   rational --
24         THE COURT:  I understand, but I'm sustaining the
25   objection.

PRESTON BAECHT - CROSS/MR. RUHNKE          52

1       MR. RUHNKE:  I understand the sustaining, I'm

2  trying to understand the basis.

3       THE COURT:  No, I understand.  It's argument.  I

4  don't think she has the competency to talk about that.  I

5  think you want to know what the conversations were that she

6  had with Mr. Hardy, what her assessment was in her

7  professional point of view.  I don't think we have to go

8  into trial strategy of whether she thinks he would be a good

9  witness or whatever.

10 Q    Doctor, have they delivered those documents to you yet?

11 A    Yes, I have a stack of documents here.

12 Q    All right.  Terrific.  Let's look at the documents that

13 are headed "3500 LAPB2," they are all Forensic Examination

14 Interviews.

15 A    Yes, they are here.

16 Q    So I'm going to take you through some of them.  Since I

17 didn't get them until just before the hearing marked up as

18 exhibits, I'm going to refer you to the dates of the

19 documents.

20      The first one -- do you see the first one in there

21 dated October 3, 2014, it's the one we went over before,

22 okay?

23 A    Yes, I do.

24 Q    On the next one dated November 9th, 2014, do you have

25 that one?  It should be the next page, November -- or

1   September 9th?

2   A     When I -- September 9th?

3   Q     September 9, 2014.

4   A     Okay.  Yeah, it's a couple pages back, but I have that

5   one.

6   Q     Okay.  And during that interview he discussed his case

7   continually insisted that he's being incarcerated for no

8   reason and there was no evidence against him suggesting he

9   committed a crime.  Those are things he told you on that

10  date, correct?

11  A     Correct.

12  Q     Look to the -- well, there is another category of

13  documents called "Clinical Interventions."  Is that in the

14  same packet?

15  A     Yes, it is.

16  Q     Okay.  Would you look at the Clinical Intervention

17  dated September 5th, 2014?  Do you see that?

18  A     Yes.

19  Q     Do you see the Clinical Intervention Clinical Contact?

20  A     Yes, I do.

21  Q     Okay.  And during that clinical intervention, clinical

22  contact, did you write at the first paragraph, "When asked

23  about his legal case and issues related to competency, he

24  continued to assert he was arrested illegally and that he

25  Ethou Law applied to his case."?

1   A    Yes.  Back in early September he did say that.

2   Q    On August 28, 2014, do you see a clinical forensic

3   examination interview?

4   A    Yes, I do.

5   Q    Okay.  And this was -- tell me physically how do these

6   take place?  Where are you and where is he when this

7   happens?

8   A    Often times it's sitting at a table on his housing

9   unit; sometimes it's at his door, it really depended on what

10  he was doing at that point in time.

11  Q    During this particular interview -- and I think it's

12  fair to say it's repeated several times throughout these

13  interviews -- the following statement is made, "No psychotic

14  symptoms were reported or observed during this interaction,

15  but no attempt was made to elicit them."  Correct?

16  A    Correct.

17  Q    Okay.  So there is a difference between what he's

18  saying to you in your efforts to actually draw them out,

19  correct?

20  A    Yes.  And what we find is that as individuals are

21  treated with medication early on, the delusions are very

22  prominent, and they will just talk about them spontaneously.

23  But as the medication starts to work, you find they are much

24  less preoccupied with those beliefs and they don't discuss

25  them spontaneously.  So it's harder and harder to see them,

1    because they are not as prominent and not as relevant to

2    them day-to-day.

3    Q    And the delusions remain, correct?  I mean, the

4    delusions are still there, he's just not talking about them,

5    correct?

6    A    Sometimes.  And sometimes what you'll find is that with

7    individuals that are restored competency, they often will

8    have a hard time saying that they were wrong.  And so what

9    may happen is if you were to ask them about the belief

10   system they reported prior to being treated, they may still

11   say that is what was happening back then.  They won't get up

12   and say, you know, I was really ill and that never happened.

13   But what we're looking for is are they able to still discuss

14   their case without relying upon that delusional belief for

15   the basis of their defense?

16          So I'm not surprised that Mr. Hardy may mention

17   some of those beliefs that he used to have.  The key is, is

18   he still fixated on them that he thinks that is his defense

19   strategy?  And the good news in this case is that I don't

20   think he does.  I don't think he thinks Ethou Law is his

21   ticket to walking out the door.  He mentions it in passing,

22   but with me anyway, he hasn't been focused on it.

23   Q    Speaking of insight, how much insight does Mr. Hardy

24   have into the fact that he's mentally ill in your judgment?

25   A    He has poor insight into the fact that he's mentally

1    ill.  It was curious to me back that in November, he asked

2    me to find him incompetent.  And I said well, if I find you

3    incompetent I have to say you have a mental illness.  So I

4    said are you saying you have a mental illness?  He said,

5    yeah, fine, go ahead and say I have a mental illness.

6    Q    His main goal was to get back to New York, right?

7              MR. LOONAM:  Objection.

8              MR. RUHNKE:  To find him incompetent, but send him

9    back to New York?

10              THE COURT:  Objection overruled.  Let him ask his

11    question.  Go ahead.

12              THE WITNESS:  It was twofold.  One was he wanted

13    to be found competent, and one was to go back to New York.

14    He was really aware of what incompetency was and if his was

15    found incompetent, it's something that we had discussed at

16    length.

17              He also knew he could go to New York if he were

18    found competent as well, so I don't think the whole goal was

19    to get back to New York.  I think it was twofold; he wanted

20    to be found incompetent and he wanted the opportunity to go

21    back to New York for awhile.

22              But again, he -- at that time he would say -- he

23    said I was mentally ill, but I think more than likely if you

24    were to ask him today, do you have a mental illness, he

25    would not want to say that he has one.

1    BY MR. RUHNKE:

2    Q    So on another topic, while he was there, he took some

3    classes in competency restoration.  Do you know what I'm

4    talking about?

5    A    Yes, I do.

6    Q    He attended some of them and then he refused to attend

7    a whole series of them, correct?

8    A    Correct.

9    Q    One of the topics that was taught at these classes, and

10   let me just have some background, your Honor.  This is

11   offered to inmates who are found incompetent to teach them

12   about what the courts are, what the lawyers do, what the

13   role of the judge is, et cetera, correct?

14   A    Correct.

15   Q    And one of the things he was doing and one of the

16   classes he took was on being cooperative with counsel, and

17   why that was a good idea.  Do you remember reading that

18   note?

19   A    Could you refer me to specifically which one it was?

20   Q    I could find you the date in a second.

21   A    Okay.

22   Q    The date is a Forensic Examination administrative note

23   dated April 29, 2014.

24   A    Okay.

25   Q    Do you got it?

1  A     I'll look at it in just one second.

2          MR. LOONAM:  9 a.m.?

3          MR. RUHNKE:  9 a.m.

4          MR. LOONAM:  So it's within --

5          THE WITNESS:  Here it is.

6          MR. LOONAM:  You got it?  Okay.

7  BY MR. RUHNKE:

8  Q     In looking at the last paragraph where -- I guess this

9  is an intern that prepares this, and you review it because

10  your name is on it, that it discusses the attorney/client

11  relationship and why it was important to tell your attorney

12  everything he stated, "'To best help you and so there is no

13  surprises in court.'  He also was able to describe how to

14  talk with the attorney during the court, i.e. writing them a

15  note.  And lastly, he was able to identify that appropriate

16  behavior in court was important to maintain a good

17  impression of yourself."  Am I reading that correctly?

18  A     Yes, you are.

19  Q     Okay.  Despite being able to recognize this is how he's

20  supposed to behave, is it not fair to say that discussing

21  his defense strategy, he has not shared with his defense

22  attorney information about his cooperation or anything else

23  would happen if he spoke to the government?

24          MR. LOONAM:  Objection.

25          THE WITNESS:  My understanding --

PRESTON BAECHT - CROSS/MR. RUHNKE                59

1            THE COURT:  Well, if she can answer that, go
2      ahead.
3            MR. RUHNKE:  It's in the report.  I mean...
4            THE COURT:  Go ahead.
5            MR. RUHNKE:  Go ahead.
6            THE WITNESS:  My understanding is that he has not
7      discussed that with you; similar with me, he was vague in
8      that.  And what he said to me was that essentially that he
9      didn't want to talk about it at that point in time, he
10     wanted to say it directly to the prosecutors.
11     Q   Okay.  So I want to go directly now to your interview
12     with Mr. Hardy on March 20th, 2015, at MCC New York.  Do you
13     have that, I think it's G-6, and it should be in front of
14     you as Government Exhibit 6?
15           MR. LOONAM:  It's the report from the 20th?
16           MR. RUHNKE:  Yes, from the 20th.
17           THE WITNESS:  Are those my handwritten notes?
18           MR. LOONAM:  No, it's your most recent report.
19           THE COURT:  Your most recent report, I guess it
20     was rendered yesterday.
21           THE WITNESS:  Oh, yes, I have that.
22     BY MR. RUHNKE:
23     Q   Okay.  You have it.  So you start to describe the
24     interview at page 18 of the report that you spent
25     approximately -- do you have that?  I just want to be sure.

1    A    Yes, I have it now.

2    Q    So you spend approximately 90 minutes with him on that

3    date?

4    A    That's correct.

5    Q    Okay.  And you asked him about the antipsychotic

6    medication and state that he didn't report experiencing any

7    significant side effects as a result.  Did you observe any

8    side effects?

9    A    No, I did not.

10   Q    Did you ask him if he was having side effects?

11   A    I asked him if he was still taking his medication, he

12   said yes.  I said, are you having any problems with it, and

13   he just shrugged his shoulders.

14   Q    So then when you started talking about the case he said

15   he was frustrated with his defense counsel; namely, me,

16   because I objected to him speaking directly to the

17   prosecutors.  And he then said he wished to speak to the

18   prosecutors because, "After I tell them what I have to tell

19   them, they'll see if I'm innocent or guilty."  And then you

20   go on to note --

21   A    Correct.

22   Q    That's correct, right?  That's your quote from him in

23   that interview, right?

24   A    Yep, that's correct.

25   Q    You then went on to ask him what information he could

1  provide, and you said he could give names of people the

2  government was not aware, and also information of

3  individuals known to be involved in the case.  He said, I

4  have a lot to offer, quote, unquote, correct?

5  A    Correct.

6  Q    Now, you're also aware Mr. Hardy has been incarcerated

7  for the past almost 11 years, correct?

8  A    Correct.

9  Q    And he asked you on several occasions to facilitate

10  such a meeting.  He also was unwilling to give any details

11  regarding what he would tell the government, and he wanted

12  to provide the information directly to them, correct?

13  A    Correct.

14  Q    When you asked him if he believed he would be

15  exonerated and released if given the opportunity to meet

16  with the prosecutors, he stated that he would be exonerated

17  because quote, I am innocent, closed quote; is that correct?

18  A    That is correct.

19  Q    And then when you said that was not realistic because

20  it was completely unrealistic and that typically individuals

21  have to admit some wrongdoing in order to be offered a deal,

22  he said he wanted to cooperate and he would be willing to

23  cop to some things, closed quote.  Correct?

24  A    Yes.

25  Q    He never told you what those things were that he would

1   be willing to cop to?

2   A    No, he did not.

3   Q    You asked him if there were any defense strategies that

4   he had discussed with defense counsel, any other strategies,

5   and he said basically no, who is there to ask, what's there

6   to talk about.  They don't have anything but cooperating

7   witnesses, people that's lying.  It's my word against their

8   word, that's enough for reasonable doubt, closed quote.

9   Correct, that's what he told you?

10  A    Correct, that's what he said.

11  Q    And then you asked him if he had ever spoken to defense

12  counsel and attempted to explain how these witnesses were

13  lying or what lies they were telling, he said he had not,

14  correct?

15  A    He said that they their allegations were fake

16  statements, that he was the leader as opposed to anything

17  specific that he could challenge.

18  Q    The topic then turned to the idea of his working

19  relationship with me.  And it repeated at that point that he

20  believes that I, as his defense lawyer, could get the case

21  dismissed, quote, on a technicality, closed quote, but I am

22  refusing to do so, correct?

23  A    Actually what he said was, I think "he" referring to

24  you, "could have done much more than he did," and that you

25  should have attempted to have his case dismissed a long time

ago. And when I asked him how, he said on a technicality.

He did indicate that he was aware that others don't agree with him that it should be dismissed on a technicality, but his assertion was that you should have tried harder.

Q Did he ever explain what this technicality is?

A He said that -- at this point in time he said that -- he mentions the fact that you were focused on the indictment, he was focused on the complaint. And then he started talking about something that was wrong in the criminal complaint.

Back in November he indicated to me that he thought there needed to be some overt individual act in order to be indicted under that specific statute, and he talked at that time that that was what he thought should have been the basis for a dismissal.

Q You're not a lawyer, but are you aware just in your general knowledge, that a complaint, once its filed, as soon as there is an indictment, the complaint really has no further legal effect in the case, are you aware of that?

A As you said, I'm not an attorney. And he is aware that his contention is not agreed upon by you or others in the legal system. And --

Q Is he aware that it's flat out irrational?

A I don't know that he would view it as irrational. I

1   think he would simply say that he's right and that he

2   understands everybody disagrees with him, but I think he

3   would still think he is right.

4          He is not focused on that any longer as being a

5   basis for having no trial.  He recognizing that a trial is

6   coming if he doesn't get the deal that he is offered.

7          I seem to recall -- I see people make mistakes

8   like that in their interpretations all the time.  And the

9   question is, is it a function of the mental illness?  In

10  this regard, it doesn't appear to be a function of his

11  mental illness.

12         As I discussed earlier, he had a lengthy

13  conversation with the mother that he conceded that he had

14  understood what you told him about it and looked it up and

15  realized that you were right.

16  Q    And then you listened to another call with his mother

17  the next day, correct?

18  A    I have to look.  There were several dates.  Which one

19  are you referring to and I can look at it?

20  Q    I'm referring to a call that took place on November 12,

21  2014.

22  A    Okay.

23  Q    Do you remember that that's one of the calls that you

24  listened to as well?

25  A    I did.  I did not put detail of what was discussed

1   beyond saying that he's -- he spoke in a coherent manner, he

2   didn't express any delusional ideas of the case, but I

3   didn't detail exactly what statements.

4   Q    If you remember, towards the end of that conversation,

5   do you recall him saying, "I looked up those cases about not

6   needing an overt act and all the cases involved somebody who

7   got caught trying to do something, and I just got arrested

8   at the airport, I didn't do anything, I got arrested at the

9   airport."

10          So the next day he's back to the same -- do you

11  remember that, that discussion?

12  A    It sounds familiar, but I don't remember it in detail,

13  no.

14  Q    Okay.  And so as your conversation goes on, you asked

15  him, even though there is a trial coming up, whether he's

16  willing to discuss defense strategy, and he just keeps

17  repeating he wants to meet with the prosecutors, correct,

18  and I keep objecting, that's what he told you?

19  A    Yes.  He said that he would be meeting with you next

20  week.  And I asked him if he would be willing to talk to you

21  at that point, and he reiterated that he wanted to meet with

22  the prosecuting attorneys and avoid having to go to trial.

23  Q    And he does not see why I don't believe it's in his

24  best interest, because he thinks it's his best option,

25  that's what he told you, correct?

1   A    Yes.  He told me he did not think he could win at

2   trial.

3   Q    He went on to say, quote, not the way they're going

4   about it, like, what they're doing is legal.  Why would

5   Ruhnke do this?  What he did knowing this may be my only way

6   out of jail, it's unbelievable.  I am innocent.  It's really

7   crazy.  It's not realistic they think they can do something

8   like this, closed quote.  That's what he told you, right?

9   A    Yes.

10  Q    Okay.  And then after you asked him about being

11  competent, which you testified about earlier.  He commented

12  later on, quote, they're trying to hide my case from the US

13  Supreme Court.  Now nobody knows what Ethou Law is.

14        When asked to explain these statements he stated,

15  quote, Ethou Law says it's illegal how they're trying to go

16  about this, closed quote.

17        He then repeats that the case should have been

18  dismissed over a technicality because there was no act

19  identified.  And then he tells you that he remembers that

20  you referred to Ethou Law in the hallway in Springfield

21  outside his cell on one past occasion, correct?

22  A    Yes.  And that's where he --

23  Q    And I think you testified --

24  A    That's where he said that -- that's where he said that

25  I said that someone couldn't be forcibly medicated for

1    incompetency unless a judge ordered it.

2    Q    But he also -- I think in 2009 when you testified you

3    also mentioned he told you at that time before he was

4    medicated that he had heard you discussing Ethou Law outside

5    his cell when you were having a conversation; is that

6    correct?

7    A    Yes, he did as well.

8    Q    So in 2015 he repeats that statement that he knows you

9    were discussing Ethou Law, because he heard you do it,

10   correct?

11   A    Yes.  I don't recall how he -- what he said he heard me

12   saying back in 2009.  I believe it was probably different

13   than the way he described it 2015, and that would be

14   consistent with the treatment that he received.

15   Q    And actually, the statement that he recalls you're

16   saying is that, quote, Ethou Law says someone can't be

17   medicated against their will to restore competency unless a

18   judge orders it, correct?

19   A    Correct.

20   Q    Okay.  Mr. Loonam asked you earlier whether Mr. Hardy

21   was fixated on his desire to meet with the prosecutors.  And

22   in your report you so state, correct, at the top of page 23?

23            MR. LOONAM:  Objection to foundation.

24            THE COURT:  Well, I don't think the question is

25   probative.

PRESTON BAECHT - CROSS/MR. RUHNKE                68

1        Let me ask you this, Mr. Ruhnke, we've been going

2   a little over an hour and a half.  I'm ready to take a

3   little break here.  I don't mean to rush you; if needs be,

4   we can come back tomorrow, but how much more time do you

5   anticipate your cross-examination will take?

6           MR. RUHNKE:  Your Honor, my witness is not

7   available tomorrow, and that's known to the Court.

8           THE COURT:  Right.

9           MR. RUHNKE:  So do you want to approach and we'll

10  talk about --

11          THE COURT:  I want to meet your witness today, if

12  we can, but you're in charge now, you let me know what you

13  plan.

14          MR. RUHNKE:  Well, I'm nearing the end of my

15  cross-examination.

16          THE COURT:  Okay.  Let's take a ten-minute break

17  to use the facilities now.  You'll come back and complete

18  the cross-examination and we'll stay late, if needs be, to

19  listen to your witness today.

20          MR. RUHNKE:  Thank you, your Honor.  I appreciate

21  it.

22          THE COURT:  All right.

23          (Continued on the next page.)

24

25

1                    (in open court.)

2           THE COURT:  All right.  Everyone is here.  Let's

3    continue with the questioning, Mr. Ruhnke.

4           MR. RUHNKE:  Yes, Your Honor.

5    CROSS-EXAMINATION (Continued)

6    BY MR. RUHNKE:

7    Q    I am on page 21 of your report.  I said page 23 before, I

8    was referring to the date.  So on page 21 of your report and

9    where you render your opinion as to Mr. Hardy, you described

10   this as a difficult and complex case; correct?

11   A    Correct.

12   Q    And I think fundamentally, your viewpoint is that Mr.

13   Hardy's strategy and other ways of trying to defend this case

14   are not the result of delusions, but are just simply

15   unrealistic; is that correct?

16   A    Yes.  At this point, I think that his illness is

17   adequately controlled with medication, that he's completely in

18   touch with reality in the sense of not claiming to be someone

19   other than Damion Hardy.  He recognizes the charges against

20   him.  And I think he's very desperate right now and very much

21   in denial and overwhelmed by the reality that he could be

22   going to trial.

23           THE COURT:  He's aware of the reality that the trial

24   is about to start; right?

25           THE WITNESS:  Yes.  And he was visibly upset while

PRESTON BAECHT - CROSS / RUHNKE                    70

1   we were discussing it.

2           THE COURT:  And he has hopes and expectations that

3   perhaps if he can talk to the government and they will listen

4   to him that better things could happen; right?

5           THE WITNESS:  That's what he expressed to me, yes.

6   Q    And in your bottom line in the final paragraph on page

7   21, you state:  "In my opinion, although his expectations may

8   be unrealistic, they are not delusional in nature."  Is that

9   correct?

10  A    That is correct.

11  Q    Among the items you took into consideration in writing

12  your March 23 report was a motion that I filed and my partner

13  filed on behalf of Mr. Hardy seeking this very hearing;

14  correct?

15  A    Correct.

16  Q    And in the motion, statements are made that the

17  government has expressed a willingness to speak with Mr. Hardy

18  or had expressed a willingness to speak with Mr. Hardy under

19  what's called a proffer agreement, but that in order to have

20  that happen he had to take responsibility for all of his

21  actions, including everything alleged in the indictment, and

22  that they could not see a circumstance where he would be

23  exonerated.  Do you remember that being in the motion?

24  A    Yes, I do.

25  Q    And that that information was communicated to Mr. Hardy

1    to no avail, in terms of his continuing desire to speak to the

2    prosecutor; correct?

3    A    Correct.

4    Q    And, again, you're not an attorney, but are you aware of

5    the fact that if a defendant does speak to the government and

6    an agreement is not reached, that discussion may produce

7    limitations on the ability of defense counsel to put on a

8    defense at all?  Are you aware of that?

9    A    You have that in the motion.

10   Q    Are you aware of that?

11   A    Yes.  I read it in the motion.

12   Q    Do you accept that?  The government is not objecting.  Do

13   you accept that as something that Mr. Hardy should have taken

14   into consideration?

15   A    I accept that what you're saying is accurate, yes.

16   Q    And it's your view that he could assist in his defense if

17   he wanted to, and it's your view that he just doesn't -- he

18   chooses not to; is that correct?

19   A    He indicated to me that at this point in time, he doesn't

20   think he can win at trial and he thinks that trying to work

21   out an agreement with the prosecution is his only option.

22   Q    He still discusses Ethou Law; correct?

23   A    He did not discuss it in the manner that he did years ago

24   prior to medication.  He mentioned it.  He mentioned it as

25   being in relation to the fact that a defendant can't be

PRESTON BAECHT - CROSS / RUHNKE          72

1  forcibly medicated.  He did not in any way describe to me now

2  or in November of 2014 that it was the basis for a defense

3  strategy or that he should be released.

4  Q   Does he continue to believe, in your view, that there's a

5  U.S. Supreme Court case that has essentially ordered him to be

6  released?

7  A   He mentioned that at this time the Supreme Court case

8  couldn't be found.  He mentioned that previously.  But at the

9  same time, just because someone says something, it doesn't

10 mean they're -- they believe it wholeheartedly.  You want to

11 look at their actions and their behavior.

12         And in this case, he may mention it, but his actions

13 and behavior suggest that he does not believe that to be the

14 case wholeheartedly; or even if he believes he is correct, he

15 recognizes that other people do not.

16 Q   And you're aware certainly that he has filed motions with

17 the Court asking the Court's assistance in locating this

18 Supreme Court case that doesn't exist in the past?

19 A   I believe he has in the past.  I'm not aware of any

20 recent motions for that.

21 Q   And are you aware that he's now seeking to discharge his

22 defense counsel for not assisting him in meeting with the

23 government?

24 A   I had heard that he might have filed something recently,

25 but I haven't seen a copy of it.

PRESTON BAECHT - CROSS / RUHNKE                73

1          MR. RUHNKE:  Just check with co-counsel.

2          (Pause.)

3    Q    You mentioned that you had listened to two MCC calls, one

4    in January and one in February.  Do you recall that the first

5    call, the one in January between he and his mother, he sounds

6    particularly depressed that he's in the box?

7    A    Yes, he did.

8    Q    But do you remember when the call ends he tells her

9    again, I was never supposed to be arrested, I'm not supposed

10   to be here?

11   A    Yes, I recall that.

12   Q    And then the second call in February, do you recall that

13   he calls his mother and then he asks her to get her cell phone

14   and call a friend, because he's got some questions he wants

15   her to ask the friend?  Do you remember that?

16   A    Yes, I do.

17   Q    And the thrust of that conversation is he has wanted the

18   friend to go out to talk to a federal agent at the airport, an

19   ICE agent at the airport, to tell the ICE agent that Hardy

20   wants -- Mr. Hardy wants to meet with him.  Do you remember

21   that?

22   A    Yes, I do.

23   Q    And the response that's transmitted by Mrs. Hardy, who's

24   talking to the friend on another phone, to Mr. Hardy is that

25   the friend spoke to the agent and the agent said it's illegal

PRESTON BAECHT - CROSS / RUHNKE                74

1   for them to do that because he's represented by an attorney

2   and, therefore, the agent cannot go see him.  Do you remember

3   that being the information conveyed?

4   A    Yes, I do.

5   Q    And do you recall that even in the face of that

6   information, Mr. Hardy persists in asking his mother, please

7   tell him to make that happen, please tell him to come see me,

8   I want you to make that happen, seven or eight times after

9   being told that the agent has already said he won't come to

10  see him?

11  A    Yes, but I believe at one point he said something about

12  then contact my attorney if that's what's necessary.

13  Q    But he continued to press the point despite being told

14  that the agent could not speak to him because he had an

15  attorney; correct?

16  A    Yes.  And the quote that I have in my report on page 16

17  is:  "Tell him to go to my attorney then cause I need to speak

18  to him."

19            MR. RUHNKE:  I have nothing further, Your Honor.

20            THE COURT:  Do we have any redirect?

21            MR. LOONAM:  Very brief, Your Honor.

22  REDIRECT EXAMINATION

23  BY MR. LOONAM:

24  Q    Dr. Preston, after the call -- can you hear me?

25  A    Yes, I can.

1  Q    After the call that Mr. Ruhnke was just referencing where

2  the defendant had spoken with his mother about having a friend

3  reach out to an ICE agent to set up a meeting with the

4  government and whether or not the attorney was an impediment

5  to that meeting, are you aware of whether the defendant

6  subsequently filed or wrote a letter to the government?

7  A    Yes.  I have a copy of that that was provided to me,

8  dated March 1st, 2015.

9         MR. LOONAM:  And that, Your Honor, is in evidence as

10 Government Exhibit 8.

11 Q    And what does Mr. Hardy write to me in that letter?

12 A    It says:  "James Loonam, my name is Damion Hardy.  I have

13 been trying to speak to you for approximately six years now,

14 but the attorneys have been trying to stop it.  I waive my

15 right as of now to have an attorney present during the

16 meeting.  Would you call me in so I can speak to you

17 immediately.  Again, I waive my right to have an attorney

18 present during the meeting.  Sincerely, Damion Hardy."

19 Q    On the calls you listened to from 2014 or from 2015, did

20 you ever hear the defendant make a reference on the call to

21 Ethou Law?

22 A    No, I don't believe I do recall that.

23 Q    And when the defendant made a reference to Ethou Law in

24 2015, did he make any statements that he believed the origin

25 of Ethou Law was George Washington or Jesus?

1          MR. LOONAM:  Are we frozen?

2          THE COURT:  We just lost her.

3          MR. LOONAM:  That what wasn't an important question

4   anyway, so I'll withdraw the question.

5          THE COURT:  I think the record speaks for itself.

6          MR. LOONAM:  Sure, Your Honor.

7          THE COURT:  We do have to get on with the next

8   witness and we're keeping everybody very late today.

9          MR. LOONAM:  No further questions.

10          THE COURT:  And if you need to have her called back

11   at some later time, you can reflect upon that.  In the

12   meantime, let's move on to the defendant's expert.

13          MR. RUHNKE:  I call Richard Dudley.

14          (Witness sworn.)

15          COURTROOM DEPUTY:  Please state and spell your name.

16          THE WITNESS:  Richard G. Dudley, D-u-d-l-e-y, Jr.

17          THE COURT:  Now, Dr. Dudley, we're keeping everybody

18   here as an accommodation to you, but the matter is important,

19   as you know, and if anybody feels any time pressures we'll

20   just have to make arrangements for you to come back again at

21   some time that's convenient for all of us.  I don't want to

22   feel as if we're rushing to judgment.  Okay?  Let's see how we

23   go today.

24          MR. RUHNKE:  Thank you, Your Honor.  I'm going to

25   run very quickly through Dr. Dudley's qualifications.

1      THE COURT:  I think I know his qualifications.  I

2  have seen them and I've read his reports in the past as well.

3      MR. LOONAM:  And we stipulate to his expert status,

4  Your Honor.

5  **RICHARD G. DUDLEY, JR., M.D.,**

6  Called by the Defendant, having been first duly sworn, was

7  examined and testified as follows:

8  DIRECT EXAMINATION

9  BY MR. RUHNKE:

10  Q    Are you board certified in forensic psychiatry?

11  A    Board certified in psychiatry.

12  Q    Medical degree from Columbia University?

13  A    Medical degree from Temple University.

14  Q    Undergrad?

15  A    Medical degree from Temple University School of Medicine;

16  and my internship and residency at Northwestern in Chicago.

17  Q    Have I asked you to undertake a forensic evaluation of

18  the defendant in this case?

19  A    Yes.

20  Q    Did you review certain materials in the course of that

21  evaluation, including transcripts, reports from the Bureau of

22  Prisons, and records, a voluminous collection of documents

23  reflecting to Mr. Hardy?

24  A    Yes.

25      THE COURT:  Let me interject here.  I'm not meaning

to rush anybody, but I read the doctor's report. I saw all the references to material that he has reviewed in it. I just want the record to reflect that I've gone over it very carefully.

Let me hear now the basis once again for his opinions. It's all in your report. And now I'm having you here testify, and the primary reason is to give Mr. Ruhnke, defense counsel, an opportunity to question you about your report. So you can just state for the record the opinion that you rendered in your report. I think it was dated what, last week sometime?

THE WITNESS: Yes.

THE COURT: So just give the opinion, the basis for it, and we'll allow Mr. Ruhnke to have full opportunity to question you about it. I don't think you have to go through everything that's in your comprehensive report again. We know what that is.

So let me have your opinion and then as to whether you think he is capable of going to trial next week. We start next week. And I think your answer is that you don't think he is competent to do that, right?

THE WITNESS: That is correct.

THE COURT: And the basis for that? You can explain it now on the record in court.

THE WITNESS: Well, it's my opinion that he

1  continues to suffer from several delusions, and that when you

2  explore these delusions with him you can understand how they

3  influence his conduct and behavior in a way that renders him

4  unable to rationally understand the charges against him,

5  although he factually understands them unable to rationally

6  understand the proceeding and the role of the players,

7  including the judge and the prosecutor and everybody, and

8  unable to assist his attorney in his own defense.

9         And those delusions, in my opinion, include a belief

10 that he has -- that the charges against him, the case against

11 him is an illegal one; number two, that it's already been

12 dismissed; number three, that the prosecutor and you, the

13 judge, are prepared to move forward with this case despite

14 knowing that it's an illegal case that's already been

15 dismissed, and that his attorney has not filed papers to bring

16 this to the attention of the Court, papers that would talk

17 about it being dismissed, other technicalities which he has

18 enumerated.

19        That notwithstanding, he has another delusional

20 belief that if he meets with the prosecutor and lays all of

21 this out, including some of the facts that he knows, that he

22 will be exonerated, that he'll be released.

23        And, therefore, given those beliefs, there's no

24 reason to work with his attorney about some other defense,

25 because the charges are illegal, the case has already been

DUDLEY - DIRECT / RUHNKE                    80

1    dismissed.

2           THE COURT:  Let me ask you this:  Now, you've been

3    the psychiatrist here for some period of time; right?

4           THE WITNESS:  "Here" meaning on this case or

5    "here" --

6           THE COURT:  In this case.

7           THE WITNESS:  Yes.

8           THE COURT:  And just correct me if I'm wrong, but

9    there came a point in time after he was medicated where you

10   opined that you thought he was capable of going to trial.  Am

11   I correct or not correct about that?

12          THE WITNESS:  That's not correct.  I saw him early

13   in -- I saw him in January, and in January he still had these

14   same delusions that he had had -- you know, let me step back.

15          In January, I saw him.  He was clearly much better.

16   He was less agitated.  The speech was less pressured.  His

17   affect was less -- you know, he was some -- as was described

18   earlier, he was somewhat dysthymic, but he didn't have the

19   kind of inappropriate affect that he had before, so he was

20   clearly much better.  Some of the thinking had calmed down.

21          But some core delusional beliefs that, in my

22   opinion, had always affected his competency were still there.

23   But my thought -- what I said to the attorney was, is that,

24   you know, he's just come out of Springfield, they feel that

25   he's much better.  We need to see whether these difficulties

1    still interfere with his ability to --

2            THE COURT:  If the trial were to have started back

3    then in January, when we speak of the date that you are now

4    testifying about, do you think at that time he would have been

5    capable of going forward with the trial?

6            THE WITNESS:  No.

7            THE COURT:  Not even at that time?

8            THE WITNESS:  Correct.

9            THE COURT:  You would have rendered the same opinion

10   then that you're doing right now --

11           THE WITNESS:  Yes.

12           THE COURT:  -- if we had this hearing two months

13   ago?

14           THE WITNESS:  Right.

15           THE COURT:  What we're going to do now is we'll let

16   Mr. Ruhnke question you.

17           MR. LOONAM:  I apologize, Your Honor.  If I could

18   just -- I know Dr. Preston Baecht has obligations.  If we can

19   just release her.  She's back, so if the witness can be

20   excused.

21           THE COURT:  Thank you.  I think you can be excused

22   now.  We don't need you anymore.  All right.

23           MR. LOONAM:  Thank you, Your Honor.

24           THE COURT:  So what I want to do, Mr. Ruhnke, is I

25   want Mr. Loonam to have the opportunity to question and then

1   you can come back and question him again.

2          MR. RUHNKE:  Your Honor, I'd like to lay a

3   foundation for the opinion and the factual basis.

4          THE COURT:  I think we've done that.  I have his

5   report and he's given his opinion.  He's given the basis for

6   it.  I'm not going to preclude you.  I just want to give Mr.

7   Loonam an opportunity to question him, and then you can come

8   back and question him more.  I often do that when it comes to

9   experts.

10          MR. RUHNKE:  Can I just elicit the encounters he's

11   had with Mr. Hardy, Your Honor?

12          THE COURT:  Well, I'm not going to preclude you from

13   doing that.  The question is doing it now or doing it after we

14   hear from Mr. Loonam.  That's all I'm suggesting.

15          MR. RUHNKE:  Well, if I can get an opportunity to

16   complete a direct, yes, sure, we'll let Mr. Loonam go.

17          THE COURT:  That's the way I like to conduct these

18   types of expert matters.  Mr. Loonam, you question him.  And

19   you're going to have all the time you need, Mr. Ruhnke, to

20   question him afterwards.

21          MR. LOONAM:  Yes, sir.

22   CROSS-EXAMINATION

23   BY MR. LOONAM:

24   Q    Good afternoon, Doctor.

25   A    Good evening.

1           THE COURT:  Not quite yet.

2    Q    You told the judge that you've been the psychiatrist in

3    this case for quite some time; correct?

4    A    Yes.

5    Q    When is the first time you conducted any evaluation of

6    Damion Hardy?

7    A    You mean the first time I attempted to?

8    Q    No, the first time you actually conducted an evaluation

9    of Damion Hardy.

10   A    The first time I was actually able to talk to him myself

11   was in January.

12   Q    January of 2015?

13   A    Right.

14   Q    And, in fact, your other interactions with Mr. Hardy were

15   not in the context of evaluations.  You sat in on meetings

16   with Mr. Ruhnke and you were opining on the opinions of

17   Dr. Sarrazin and Dr. Preston Baecht; correct?

18   A    That's not quite right.  I'm sorry.  The first time I

19   went to see him, he wouldn't see me.  The second time, I sat

20   in on his meetings with his attorneys.

21           And what I said at prior proceedings was, is that I

22   had no reason to disagree with them, with the diagnoses that

23   were put forward by those who then subsequently had an

24   opportunity to evaluate him in the various settings that we've

25   already talked about today.

DUDLEY - CROSS / LOONAM                84

1      And my memory is that the bulk of the focus of my

2 testimony was whether he would -- whether the use of

3 psychopharmacologic agents would return him to competency.

4 Q    Did you testify, sir, that during that time period you

5 were not conducting your own evaluation of Damion Hardy?

6 A    Yes, that's what I'm saying.  I said, I think my

7 testimony was that I had no reason, based on the information

8 that was available to me, to disagree with them

9 diagnostically, that I had not been able to do an evaluation

10 of my own, and that the bulk of my testimony was not on that

11 but was, instead, on the use of psychopharmacologic agents in

12 a person with his history.

13 Q    Just to be clear, you were not conducting your own

14 evaluation; right?

15 A    I just said that.

16      MR. RUHNKE:  Your Honor, asked and answered several

17 times.

18 Q    And so during your evaluation, have you ever reached your

19 own diagnosis for Damion Hardy?

20 A    I agree now, based on my own sitting down and talking

21 with him, that he suffers from schizophrenia.

22 Q    So the first time that you were able to meet with Damion

23 Hardy and now have reached this diagnosis is after he's been

24 medicated in January of 2015; is that correct?

25 A    That is correct.

DUDLEY - CROSS / LOONAM                    85

1    Q    Now, in your evaluation you met with Hardy twice;

2    correct?

3    A    That is correct.

4    Q    And how did you conduct your evaluation?  Were you alone

5    or were others in the room with you?

6    A    I was alone.

7    Q    And how long did you meet with Damion Hardy on the first

8    occasion?

9    A    About two hours.

10   Q    And how long did you meet with Damion Hardy on the second

11   occasion?

12   A    The same.

13          THE COURT:  Ten hours?

14          THE WITNESS:  Two hours.

15   Q    And did you advise Damion Hardy at the outset of your

16   evaluation that whatever he told you could be reported in

17   court?

18   A    Yes.  I mean, I told him -- we talked about why I was

19   there and -- well, what I do is I say, do you know why I'm

20   here and what the purpose of this examination is?  And then I

21   have him describe to me what that is and what his

22   understanding of that is.

23   Q    Okay.  And did he give you an accurate understanding as

24   to why you were there and that he understood that whatever he

25   told you could be discussed by you in open court?

1   A    He understood that whatever he told me would be discussed

2   between me and his attorney.  Then if it was decided that I

3   would testify in open court, I would testify in open court.

4   Q    What's your basis -- where do you understand he came to

5   that understanding?  Do you have any knowledge as to how he

6   learned that?

7   A    It's my sense that his attorney told him I was coming to

8   see him.

9   Q    And what about the idea that whatever he told you could

10  be related in open court?

11  A    Where did he get that idea from?

12  Q    Yes.

13  A    From me.

14  Q    At what point?  I thought you said -- at what point did

15  you tell him that?

16  A    No, I said that I don't begin with a lecture, I begin

17  with asking them if they understand why I'm here and then

18  engage them in a discussion.

19  Q    Okay.  And then in his response to you when you said, why

20  am I here, and you're engaging him in discussion, did he

21  volunteer that he understood that whatever he said could be

22  shared in open court?  Did he volunteer that?

23  A    I explained the procedure that after I met with him that

24  I would talk with his attorney and then there would be some

25  decision as to whether I would go to court or not.

DUDLEY - CROSS / LOONAM                    87

1   Q    Okay.  And did he acknowledge at least the possibility
2   and consent to that?
3   A    I thought he understood what I said.
4   Q    Okay.  Now, did you go in --
5             THE COURT:  Let me interrupt.  Did he understood why
6   you were there?  Did he ever tell you anything about the
7   pending trial and that you were there to evaluate his mental
8   competency?  Did you have any discussion about that at all?
9             THE WITNESS:  I think he was much more clear the
10  second time that the issue was the competency.
11            THE COURT:  The second time.  That would just be
12  recently, a few days ago?
13            THE WITNESS:  Right.
14            THE COURT:  So he knew that he was facing a trial?
15            THE WITNESS:  Well, he knew he was facing a trial
16  when I saw him the first time.
17            THE COURT:  And the second time also?
18            THE WITNESS:  Right.
19            THE COURT:  Did he express any anxiety or concern
20  about having to go to trial next week?
21            THE WITNESS:  He -- what he expressed to me was that
22  that shouldn't happen.
23            THE COURT:  He didn't think that he should be going
24  to trial?
25            THE WITNESS:  Right.

1          THE COURT:  But he knew that it was scheduled to

2    happen?

3          THE WITNESS:  He knew that it was scheduled to

4    happen, and that he was anxious for these other steps that

5    I've already described to you be taken instead of waiting

6    around and going to trial.

7          THE COURT:  Namely what?  What other steps?  Speak

8    to the government?

9          THE WITNESS:  Yes.

10          THE COURT:  Did he tell you he wanted to speak to

11   the government?

12          THE WITNESS:  Yes.

13          THE COURT:  Did he tell you what he wanted to speak

14   to them about?

15          THE WITNESS:  He -- as I indicated, he told me that

16   the charges against him were illegal, they had already been

17   dismissed; and despite the government's effort to move forward

18   with this, knowing these things, that if he sat down with the

19   government, talked about the truth of the matter, that they

20   would see all of this.

21          THE COURT:  Did he ever say anything to you about

22   any desire or willingness on his part to cooperate with the

23   government in exchange for some leniency on sentencing?

24          THE WITNESS:  That's not the way it was presented to

25   me.

1             THE COURT:  How was it presented to you?

2             THE WITNESS:  It was presented to me that if he had

3    an opportunity to meet with the government and talk to the

4    government about what really happened that the government

5    would suddenly realize that there was really no case against

6    him.

7             THE COURT:  Now, you heard Dr. Preston Baecht, as

8    you were in Court --

9             THE WITNESS:  Yes, I did.

10            THE COURT:  -- relate the conversation that she had

11   with him not too long ago where they discussed cooperating

12   possibly with the government, working out some sort of a deal

13   with the government.  You heard all of that.

14            THE WITNESS:  Yes, I did.

15            THE COURT:  Did that subject come up in the course

16   of your conversation?

17            THE WITNESS:  Not working out a deal with the

18   government.

19            THE COURT:  So he may have said that to Dr. Preston

20   Baecht.  You don't question that, do you?

21            THE WITNESS:  I'm not -- I have no basis on which to

22   question it.

23            THE COURT:  All right.  Any further questions, Mr.

24   Loonam?

25            MR. LOONAM:  Just very briefly.

1  Q    Did Damion Hardy tell you that Mr. Ruhnke told him that

2  he had a 90 percent chance of losing at trial?

3  A    Yes.

4  Q    And that he believes that Mr. Ruhnke was going to trial

5  because Mr. Ruhnke wanted to gain some sort of publicity or

6  notoriety by being associated with this trial?

7  A    He questioned whether that was a possibility.

8  Q    And that he wanted to meet with the government and that

9  Mr. Ruhnke was not facilitating his desire to meet with the

10 government; correct?

11 A    That is correct.

12 Q    And on January 15th, 2015, how many times did the

13 defendant discuss Ethou Law with you?

14 A    None.

15 Q    March 5th, 2015, how many times did the defendant discuss

16 Ethou Law with you?

17 A    None.

18 Q    You issued your report on March 10.  Mr. Ruhnke sent you

19 some e-mails on March 4th expressing some things that he

20 wanted you to explore; correct?

21 A    Correct.

22 Q    And so he gave you specific areas of his perception of

23 Mr. Hardy that he wanted you to explore; correct?

24 A    Yes.  He laid out why he -- my understanding was he was

25 laying out why he was concerned about the question of

1  competence.

2  Q    So during your evaluation, you didn't go in with just a

3  blank slate and sort of look at Hardy and make your assessment

4  of his competence, you were given information by Mr. Ruhnke

5  with respect to Mr. Ruhnke's perceptions and then you went in

6  to conduct your evaluation; correct?

7  A    I think it's a little bit more complicated than that.

8  Q    Explain it.

9  A    As I indicated, that when I saw him back in January I

10  still thought that he had these delusional thoughts, but the

11  question was would they interfere with his ability to

12  rationally understand what was happening to him, participate

13  with his attorneys in his defense.

14         So we had a discussion after the January evaluation

15  that these are things we need to look at to see kind of how

16  it's going to affect his behavior.  So what I understood his

17  memo to be was a response to that.

18  Q    Apart from the March 4th e-mail, did Mr. Ruhnke share

19  with you prior to your January meeting with Damion Hardy Mr.

20  Ruhnke's perceptions of Mr. Hardy's competence and issues he

21  was having with Mr. Ruhnke -- I mean, with Mr. Hardy?

22  A    Prior to the January meeting, what he asked me to do was,

23  you know, he's now back from Springfield, he's -- they've

24  opined that he's been -- his competency is restored, so I

25  would like you to see him.

1  Q    And didn't express that there were any issues, a conflict

2  at that point, in January?

3  A    Not particularly.  He asked me to go see him.

4  Q    And then you saw him again in March; correct?

5  A    That is correct.

6  Q    But prior to March, did Mr. Ruhnke express to you that a

7  conflict had developed and that the source of the conflict was

8  Mr. Hardy's desire to meet with the government, among other

9  things?

10 A    What I believe he expressed to me was what I just told

11 you, which is that in response to the discussion, follow-up to

12 the discussion that we had had back in January, he outlined to

13 me a list of things that he thought were reflective of

14 these -- his thinking interfering with his ability to work on

15 his case.

16 Q    Okay.  And if you were to discuss that and summarize that

17 for the Court very briefly, is it fair to summarize that as he

18 wants to meet with the government and he thinks Mr. Ruhnke

19 should move to dismiss his case on a technicality?

20 A    You have the memo.

21 Q    Fair enough.  You don't recall?

22 A    I don't recall without looking at it more.  I mean, I

23 recall what I said; but to be more detailed than that, I

24 haven't actually looked at that memo.

25 Q    Fair enough.  Phone calls, how many phone calls did you

DUDLEY - CROSS / LOONAM                    93

1    listen to of Damion Hardy's prior to issuing your March 10th
2    report?
3    A    I listened to two of them and then some subsequent to
4    that.
5    Q    Okay.  Did you listen to the call where the defendant
6    Damion Hardy was speaking with Lil' Kim and asked for money to
7    hire a lawyer?
8    A    I don't believe so.
9    Q    Did you listen to --
10   A    The ones that I -- there were some from since he's been
11   released, two since he's -- two since he's been at -- back at
12   MCC, and some of the prison ones I listened to subsequent to
13   that, but I didn't listen to all of them.
14   Q    Sure.  I apologize.
15   A    I'm sorry.  I mean Springfield ones I listened to
16   subsequently.
17   Q    Just to be clear, prior to the March 10th report, did you
18   listen to any BOP calls?
19   A    I listened to -- I did not listen to the calls from
20   Springfield until subsequent to that.
21   Q    So in reaching your report then, you didn't listen to any
22   of the BOP calls?
23   A    That is correct.
24   Q    Okay.  And so if you had heard a discussion of the
25   defendant wanting to hire Ben Brafman to represent him, would

1   that have made any impact on your opinion?

2   A    No.

3   Q    If you had heard the defendant asking different people he

4   knew for money, including Lil' Kim and Foxy Brown, so that he

5   could hire a lawyer, would that have had any impact on your

6   opinion?

7   A    No.

8   Q    You're aware that the government does cooperate people

9   who are responsible for serious crimes; correct?

10  A    Am I aware of that?

11  Q    Yes.

12  A    Yes.

13  Q    Are you aware that the defendant in a call made a

14  reference to Sammy "the Bull" Gravano?

15  A    I'm sorry?

16  Q    Are you aware on a call that the defendant made a

17  reference to Sammy "the Bull" Gravano?

18  A    I'm not aware of that.

19  Q    Do you know who Sammy "the Bull" Gravano is?

20  A    No.

21  Q    Can I ask you why you wouldn't listen to the BOP calls

22  prior to issuing an expert report concerning the defendant's

23  competence when you have a lot of data of the defendant

24  speaking with his mother, with his friends?  Isn't that

25  information relevant to making a competence determination?

DUDLEY - CROSS / LOONAM                              95

1  A    It depends on what's in it.  But I certainly listened to

2  some of them subsequent to that.

3  Q    But I'm saying prior to the time you issued your report,

4  you didn't.  Why did you deem it was not necessary to listen

5  to the BOP calls that were available to you prior to rendering

6  your opinion?

7  A    I don't think I made that deem.  I think that the --

8  there was a concern -- I -- this was a letter that I wrote to

9  Mr. Ruhnke summarizing kind of what my opinion was.

10 Q    So this isn't an evaluation report; right?

11 A    Well, it certainly includes an evaluation opinion.  If I

12 was writing a full report, it would have been much more

13 detailed.

14       THE COURT:  Let me ask you this:  Did you listen at

15 all at any time to the conversations Mr. Hardy had with his

16 mother, and the most recent one I understand was in February?

17       THE WITNESS:  Yes, I did.

18       THE COURT:  Can you describe, in your own

19 professional assessment, was it a rational conversation?  Was

20 there anything remarkable about it?  Was there anything that

21 the would support or, contrary-wise, not support your opinion?

22       THE WITNESS:  I think there's two things that

23 characterize the conversations with his mother.  One is that,

24 for the most part, they don't get into issues to which he is

25 delusional about.  So, you know, if you're talking to him

     1    about something else, you know, how much I hate being in

     2    solitary, it sounds like a rational discussion.

     3         When you get into something that he's delusional

     4    about, you -- his talking is consistent with what I'm saying.

     5    So, for example -- can I give an example?

     6         THE COURT:  I'm sorry, go ahead.

     7         THE WITNESS:  I'll give you two examples.  One of

     8    those is the example that we talked about a little earlier,

     9    whereby on the one hand he says, yes, my lawyer told me this

    10    about the charges and I looked it up on the computer, you

    11    know, and the computer -- what the computer says seems to be

    12    consistent with what my lawyer said about what -- you know,

    13    about what is the basis for an arrest.  Then he comes back the

    14    next day -- and this is the classic sort of thing you would

    15    see with somebody with a psychotic delusion -- I read the

    16    cases, clearly they are different from mine.  And he makes --

    17    and so he is able to hold on and continue to not give up that

    18    belief.

    19         Similarly, there's another conversation where he

    20    talks to his mother about wanting to meet with the government

    21    and testify.  She lams into him, saying, that's crazy, I can't

    22    believe you want to do that.  She really confronts him.  And

    23    despite that, she can't change his position.  That's how fixed

    24    his thinking is and irrational it is that he won't give it up.

    25         THE COURT:  There's no question he wanted to meet

DUDLEY - CROSS / LOONAM                     97

1   with the government.  I think that's pretty clear.

2            THE WITNESS:  Right.

3            THE COURT:  But that in and of itself doesn't really

4   qualify as a delusional thought.

5            THE WITNESS:  Well, that's why I made out a series.

6   It's this package of delusions that's irrational, and it's

7   even irrational one to the other.  I mean, that he would

8   believe that -- that -- that you and the government are

9   prepared to move forward on a case that you know is illegal

10  and has been dismissed, and then at the same time have a

11  belief that, however, if he sits down with the government that

12  can be undone.  So they're even internally irrational, again,

13  indicative of how disordered the thinking is.

14           THE COURT:  They're inconsistent.  But getting back

15  to the conversation --

16           THE WITNESS:  Well, they're --

17           THE COURT:  Let me ask you this:  I get a sense that

18  you're telling me that you can be delusional about certain

19  things; otherwise, you can seem rational and coherent.

20  There's sort of a dichotomy in terms of how people function.

21           THE WITNESS:  No, I'm not saying that.  What I'm

22  saying is that when you have delusions, you know, and you talk

23  about information that relates to those delusions, you're

24  going to hear the delusions.  If you talk about who won the

25  Mets game, you know, you're not going to have a delusional

DUDLEY - CROSS / LOONAM                    98

1  discussion about who won the Mets game if that's not part of

2  your delusions.

3          THE COURT:  All right.  Well, but certainly the

4  conversation he had with his mother in many respects was not

5  delusional, I take it; right?

6          THE WITNESS:  That the topics they discussed were

7  not part of his delusions.

8          THE COURT:  Did they discuss --

9          THE WITNESS:  But when they did, when they did talk

10 about things that were part of his delusion system, then you

11 could see.

12         THE COURT:  Well, his insistence that he wanted to

13 speak to the government is what you're talking about now;

14 right?

15         THE WITNESS:  Or the argument -- or the discussion,

16 the subsequent discussion about whether his -- whether the

17 charges against him were legal.

18         THE COURT:  And he used the word "legal" when he

19 spoke to his mother?

20         THE WITNESS:  That's what he described when he spoke

21 with me.

22         THE COURT:  How about the conversation with his

23 mother?

24         THE WITNESS:  That they're nonsense.

25         THE COURT:  That they're nonsense?

1          THE WITNESS:  And that they were not -- that he

2     shouldn't have had those charges.

3          THE COURT:  Right.  He said he should not have been

4     charged --

5          THE WITNESS:  And that it was nonsense.

6          THE COURT:  -- and that they were nonsense, but he

7     didn't say that they were illegal at that time and that they

8     were dismissed, he didn't say that to his mother?

9          THE WITNESS:  Well, he has said to his mother on

10    numerous occasions that I shouldn't be here, that these were

11    nonsense, that I shouldn't have been charged.

12         THE COURT:  I understand.  All right.  Any other

13    questions, Mr. Loonam?

14         MR. LOONAM:  Yes.

15    Q    You opined that Hardy -- that it's a fixated ideation;

16    correct?  That his desire to speak with the government

17    irrationally and his desire -- that the case is illegal is a

18    fixated ideation, is that your opinion?

19    A    Yes.

20    Q    The significance of the fact of a fixated ideation is any

21    time that the topic comes up and that topic is discussed that

22    fixated ideation should manifest itself; correct?

23    A    The idea is that he -- no, the idea is that he continues

24    to believe it despite evidence to the contrary.  Now, I think

25    there's an important piece here, right, that I should mention,

1  and anybody who treats people with schizophrenia or any other

2  psychotic disorder knows this.  That -- and you see this in

3  the hospital.  You know, so that if I tell you -- if I

4  repeatedly tell you, that's crazy, that's crazy, you know,

5  that's why you're in here and you're going to stay in here

6  until you stop saying that, you know, eventually people just

7  will stop saying it.  That doesn't mean -- they won't stop

8  believing it, but they'll stop volunteering it.

9  Q    So when the defendant is having conversations with his

10  friends and his mother talking about his case and these

11  beliefs don't manifest themselves, you don't place any

12  significance on that?

13  A    Not if they don't come up.

14  Q    No, if the case is being discussed and his strategy for

15  the case and his need for money for lawyers and what he's

16  going to do going forward, if the case itself is discussed and

17  he doesn't bring up what you are opining are fixated ideation,

18  you don't place any significance on that?

19  A    No.  I think it depends on -- it depends on how the case

20  is discussed.

21  Q    And you referenced treating patients and you see this in

22  the hospital.  What percentage of your work right now is

23  forensic as opposed to treating patients?

24  A    Right now?

25  Q    Yes.

SHERRY BRYANT, RMR, CRR

1  A    Right now I'm almost retired, so I'm just doing a few

2  forensic cases a year.

3  Q    A few forensic cases a year?

4  A    Yes.

5  Q    How many patients do you currently have?

6  A    I don't have any.  I stopped teaching.  I stopped seeing

7  patients.

8  Q    So 100 percent of your work is forensic?

9  A    Well, 100 percent of the amount of work that I still do

10 is forensic.

11 Q    And as of 2009, 90 percent of your work was forensic;

12 correct?

13 A    No, I don't think that was --

14 Q    You had two patients in 2009 and they were leftover

15 patients?

16 A    That's right, I had started to do that already in 2009.

17 Q    So 90 percent of your work in 2009 was forensic, not

18 treating patients; right?

19 A    Correct.

20         MR. LOONAM:  One moment, Your Honor.

21         (Pause.)

22 Q    And just -- if Ethou Law was a fixated ideation, did you

23 discuss the case in such a way that you would expect it to

24 have come up in your two meetings with the defendant that

25 lasted over four hours where Ethou Law didn't come up once?

1  A    No.

2  Q    You wouldn't expect it to come up?

3  A    No.

4  Q    Why not?

5  A    I think it's important in understanding how delusional

6  thinking works to go with it, to allow the person -- as

7  opposed to challenging it, to allow them to talk about their

8  thinking so that you can figure out and understand not only

9  the depth of the thinking but how it relates to their

10  behavior.  Then you go back after you've done that.

11        And that's why I feel so confident that this

12  thinking influences his behavior in relevant ways to his

13  competency.  Then you go back and you begin to challenge it.

14  It's on the basis of challenging it that you become -- it

15  becomes clear that this belief is fixed.

16  Q    And did you challenge the beliefs that Hardy expressed to

17  you during the course of your evaluation of him?

18  A    Yes.

19  Q    And during the challenging of that, he never mentioned

20  Ethou Law in the four hours that you met with him?

21  A    No.

22  Q    And you knew that Ethou Law was his previous delusion

23  because you were present in the 2009 hearing where Dr. Preston

24  Baecht testified, as Mr. Ruhnke read aloud, his delusion

25  concerning Ethou Law.  So you were aware of his previous

1  delusion concerning Ethou Law; correct?

2  A    I was aware that that was part of his delusional system,

3  yes.

4  Q    And despite the fact --

5  A    As was being President of the United States and a bunch

6  of other stuff.

7  Q    And you were aware of those delusions and you challenged

8  them, and yet still those delusions -- he didn't raise those

9  delusions during your four hours with him; correct?

10 A    The delusions I challenged were the ones that he was

11 presenting when I was with him.  I didn't go back and ask

12 about delusions that he had reported years ago and did not

13 appear to be reporting now.

14            MR. LOONAM:  No further questions.

15            THE COURT:  The floor is yours, Mr. Ruhnke.

16            MR. RUHNKE:  Thank you, Your Honor.  I'm going to

17 try to lead Dr. Dudley somewhat.  If it gets objectionable,

18 I'm sure the prosecution will put an end to it.

19 REDIRECT EXAMINATION

20 BY MR. RUHNKE:

21 Q    Just to backtrack a little bit, Dr. Dudley, you first saw

22 Damion Hardy in approximately 2007; is that correct?

23 A    That is correct.

24 Q    And we, meaning former counsel Francisco Celedonio and I,

25 asked you to go see him to evaluate him for competency, for

1    mental condition.  What happened when you went to see him?

2    A    He wouldn't talk to me.

3    Q    Did he come into the room and just not talk, or do you

4    remember?

5    A    I don't remember, but I remember I didn't walk away

6    with....

7    Q    And then on another occasion in 2007, you sat in on a

8    meeting between Mr. Hardy, Mr. Celedonio and myself in the

9    Special Housing Unit at MDC.  Do you remember that?

10   A    That is correct.

11   Q    And then you didn't see -- then you saw him physically in

12   2009, in the sense that he was at a hearing in this courtroom.

13   Do you remember that?

14   A    That is correct.  Yes, sir.

15   Q    And then the next time you saw him was January 15, 2015.

16   A    That is correct.

17   Q    Prior to seeing him, you were familiar with the BOP

18   reports, you were familiar with the multiple findings of

19   mental illness and incompetence; correct?

20   A    That is correct.

21   Q    Described his delusions in those reports; correct?

22   A    That is correct.

23   Q    Described Ethou Law; correct?

24   A    Right.

25   Q    President of the United States, TI the rapper, a whole

1  series of delusions.  When you saw him on January 15, 2015 at

2  MCC, did you notice any difference in him from when you had

3  seen him four or five years, six years earlier?

4  A    Yes.

5  Q    And what were those differences?

6  A    He was calmer.  He did not appear to be particularly

7  agitated.  He did not appear to be particularly pressured in

8  his speech.  And he seemed to be -- I would say that's

9  primarily it.

10 Q    And although you started to move towards retirement in

11 2009, prior to 2009 had you had an active private caseload of

12 patients who had mental illnesses?

13 A    Yes.  Prior to that, my practice was 50 percent patients

14 and 50 percent forensic, plus the teaching at the medical

15 school and the law.

16 Q    And would many of those patients have schizophrenia?

17 A    They had psychotic, either psychotic disorders or

18 disorders with psychotic symptoms.  So some had schiz -- you

19 know, there were some with schizophrenia, there were some with

20 bipolar disorder, with other psychotic features.

21 Q    And when somebody receives antipsychotic medication, is

22 it common that the more florid symptoms, if I can refer to it

23 that way, the pressured speech, the irritability, the

24 agitation, the inability to keep focused, those tend to

25 diminish under antipsychotic medication?

1   A    Pretty much always, yes.

2   Q    Not always, but --

3   A    I said pretty much always.

4   Q    Oh, pretty much always.  And does that mean that the

5   underlying delusions are necessarily gone?

6   A    It kind of depends on when they start treatment, but they

7   may or may not.

8   Q    And after seeing him on January 15, did you and I have a

9   telephone conversation where you said, in essence, he's

10  obviously better and we need to see if he can cooperate in

11  getting ready for a defense?

12  A    That is correct.

13  Q    So let's put it on hold for the time being?

14  A    That is correct.

15  Q    And I then asked you to see him again about a month

16  before the trial was scheduled to start.  Did you notice any

17  difference between how he appeared on March 5th as opposed to

18  how he appeared to you on January 15, about three months

19  earlier, two months earlier?

20  A    The -- I mean, he was essentially -- I mean, he was

21  somewhat more agitated, he was somewhat more depressed, but

22  the -- with regard to his thought process, it was basically

23  unchanged.

24  Q    And were the delusions present?

25  A    The delusions were present both times.

1    Q    And is it your opinion, to a reasonable degree of medical

2    certainty, that his delusions interfere with his ability to

3    have a rational understanding of the charges, the process, and

4    to assist in his own defense?  What is your opinion on that?

5    A    Yes.

6              MR. LOONAM:  Judge, objection.  If we could just

7    have defense counsel lay a foundation very briefly for when

8    he's saying delusions what he's referring to, because there's

9    been a lot of discussion of TI, the President, whatever, just

10   so the record is clear.

11             THE COURT:  He gave his opinion.  We have his

12   report.  It's all right.  Objection overruled.  Next question.

13   Q    Did he have a delusion that there was no case to begin

14   with?

15             THE COURT:  I think you testified.  I don't want to

16   be repetitious necessarily, if there's something else you want

17   to add, but I think you focused on the fact that he thought

18   that the case was dismissed, right, and that was the primary

19   reason for you to conclude that he was delusional?

20             THE WITNESS:  No, that there was no legal case

21   against him in the first place, one; number two, that the case

22   has then subsequently been dismissed.

23             THE COURT:  Dismissed.  He used the word

24   "dismissed"?

25             THE WITNESS:  Right.  That number three, those

1   number one and number two notwithstanding, that the case was

2   never legal in the first place, and number two, it has been

3   dismissed, that the prosecutor, in cooperation with the judge,

4   are prepared to try to present this case as if it is, in fact,

5   a legal legitimate case to a jury.

6           THE COURT:  All right.  So what I'm thinking about

7   is he didn't say that to Dr. Preston Baecht, at least

8   according to her testimony.  I don't recall her saying that

9   she was told by him recently that the case was dismissed.  She

10  told about how he wanted to speak to the government and that

11  there's no basis for the lawsuit against him, he was willing

12  to maybe cop a plea or take a plea if he would not be

13  incarcerated for a long period of time.  She disclosed all

14  that information when she testified.

15          And you're telling me now that when he spoke to you,

16  he was not saying the same things to you, he was saying

17  something totally opposite to that?  I just want to get a feel

18  of whether he gave two different versions of events, one when

19  he spoke to her, one when he spoke to you.

20          THE WITNESS:  I'm saying that when he spoke to me,

21  he said to me what I just told you.  I'm saying that my

22  approach to doing an examination with someone who has a

23  thought disorder is to entertain the thought disorder, to not

24  begin the discussion by challenging it or questioning it or

25  avoiding it.  And in that way, I get a better understanding

1    about what is the content of the disorder, of the thought

2    disorder and how it influences their behavior, and then I go

3    back and challenge it.

4         THE COURT:  Did you ever ask him whether he ever

5    said anything contrary to anybody else about wanting to work

6    out a deal, meeting with the government, work out a

7    cooperation arrangement, anything of that nature?  Did you

8    ever discuss that with him?

9         THE WITNESS:  I discussed with him -- well, first of

10   all, he met with her after he met with me, and so I couldn't

11   have asked him.

12        THE COURT:  That's correct.

13        THE WITNESS:  The -- but I asked him -- when he kept

14   asking this and asking me to set it up, asking me to ask his

15   attorney to set it up, that he had asked his attorney to set

16   it up, I asked him what did he think would happen and why did

17   he want to do it, and that's the way I approached it.

18        Then after he -- after I allowed him to discuss

19   that, then I went back and began to challenge each level of

20   the thinking, to see whether it was -- because, by definition,

21   it's a fixed belief despite evidence to the contrary.  So I

22   tried to suggest to him what other people had said, that the

23   lawyer already told him, my understanding.

24        THE COURT:  So the fact that he said something

25   contrary to Dr. Preston Baecht, he spoke to her after your

1  report, that's not inconsistent with your conclusion that he

2  still has these delusional beliefs?

3            THE WITNESS:  Well, as you know, I didn't get a

4  chance to question her.  I'm not sure whether it's actually

5  contrary.

6            THE COURT:  I mean, I'm just going on what she said.

7            THE WITNESS:  No, no, but I'm not sure whether it's

8  contrary.  I'm not sure that her approach to confrontation,

9  which is that, well, if you're going to talk to the attorney

10 they're going to, you know, expect -- I mean, to the

11 prosecutor, they're going to expect some sort of, you know --

12           THE COURT:  I understand that.

13           THE WITNESS:  That may have elicited a different

14 sort of response.

15           THE COURT:  I guess what I'm focusing on is the part

16 of her testimony after you had read your report where she

17 communicated that he was willing to talk to the government, to

18 work out a deal, and even he would be even willing to plead to

19 some deal if he could work out a proper plea arrangement.  I

20 think she testified, in sum and substance, like that after you

21 rendered your report.

22           THE WITNESS:  That is correct.

23           THE COURT:  That doesn't strike me as delusional at

24 that particular time.  That sounds like somebody who wants to

25 try to work out a cooperation deal with the government to save

1    his own neck.  I mean, that's not an uncommon thing.

2         THE WITNESS:  And what I'm saying is that I didn't

3    have an opportunity to question her to find out whether

4    subsequent to that, you know, like -- I mean, I think given

5    what he has said historically, there's a reasonable set of

6    questions, like, well, will you ever serve this time, you

7    know, will it ever really happen or, you know, are you really

8    still believing that you will be released, which is what he's

9    been saying.

10        THE COURT:  When he spoke to you, he was calm, he

11   was communicative, he answered your question, by and large.

12   Do I have a correct sense of that?

13        THE WITNESS:  When I saw him the first time, he was

14   more calm.

15        THE COURT:  The last time.

16        THE WITNESS:  The last time I saw him, he was much

17   more anxious, much more distressed.  The -- in fact, the -- I

18   actually -- I mean, I don't know if I should say this, but I

19   actually told the attorney that I thought that he was so fixed

20   on these things and so distressed, when asked what did I think

21   was going to happen, I think the next thing that's going to

22   happen is he's going to get rid of you.

23        THE COURT:  Get what?

24        THE WITNESS:  Get rid of you, the attorney.

25        THE COURT:  But he knew he was scheduled to go to

1  trial, that he was aware of; right?

2          THE WITNESS:  That's right.

3          THE COURT:  Do you consider it unusual or somewhat

4  of any psychological significance or psychiatric significance

5  that a person who was on the eve of trial would be anxious and

6  be concerned about things?

7          THE WITNESS:  I don't find it unusual that a person

8  on the eve of trial would be anxious.  I find it unusual that

9  a person on the eve of trial would be psychotic.

10          THE COURT:  Any further questions you wish to ask?

11  Q    Just to dot the i and cross the t, what is your opinion

12  as to whether Mr. Hardy is competent to go to trial?

13  A    That he's not.

14          MR. RUHNKE:  Thank you.  I don't have anything

15  further.

16          THE COURT:  Any further questions, Mr. Loonam?

17  RECROSS-EXAMINATION

18  BY MR. LOONAM:

19  Q    One point of clarification.  There was something

20  inconsistent, that I perceived as inconsistent.  I thought you

21  told the judge in the judge's questions that when you saw

22  Hardy in January you did not believe he was competent and you

23  had the same incompetent opinion in January.  Is that what you

24  told the judge?

25  A    I told the judge that -- let me go back.  What I told Mr.

1    Ruhnke after January, because I still thought that he had the

2    same delusional system that he had before, but that we should

3    wait and see whether it was going to interfere with his

4    ability to function in the ways that were important to

5    competency.  That we hadn't had a chance -- he had just come

6    back, you haven't tried to work with him yet, we should wait

7    and see what's going to happen.

8           The judge asked me if the trial was going to be back

9    in January, what would have been my opinion.

10   Q    Okay.

11   A    And that would have been my opinion.

12   Q    And your opinion in January would have been that he was

13   not competent?

14   A    Right.

15   Q    Okay.  And then I thought on direct examination by Mr.

16   Ruhnke, the direct after my cross, that you told Mr. Ruhnke

17   that he was better and that he was competent in January, and

18   that you should wait and --

19   A    I told Mr. Ruhnke that he was better, that he still had

20   the same delusional system, but in order to be able to be

21   clear that he's unable to function, we have to wait and see

22   whether he's unable to function.

23          MR. LOONAM:  Okay.  Your Honor, we'll rely on the

24   record.

25          THE COURT:  Anything further, Mr. Ruhnke?

PROCEEDINGS                          114

1        MR. RUHNKE:  No, Your Honor.

2        THE COURT:  Thank you, Dr. Dudley, you may step

3   down.  It's 10 to 6 and I think we've accomplished what we

4   want to accomplish today in getting the expert testimony.

5        Here's my present thinking.  It's Tuesday.  I'll

6   give you folks an opportunity if you want to give me letter

7   submissions to address the issues here as a result of this

8   testimony.  If you don't wish to do that, then I'll just

9   render my decision in due course.  It's up to you, but why

10  don't you think about it and maybe we'll take probably the

11  rest of the week before I render my decision.

12       But we should be prepared to go forward as scheduled

13  for the next week's events, selection of the jury and the

14  trial to follow thereafter, on the assumption that I will

15  determine that he is capable of going forward.  But I'll keep

16  an open mind until I get what your submissions will be and

17  give you a chance to do that.

18       If that's satisfactory to everybody, can you have

19  them in by Thursday afternoon?  Mr. Ruhnke, do you want the

20  opportunity to give me anything in writing?

21       MR. RUHNKE:  Yes, Your Honor, that would be fine.

22       THE COURT:  All right.

23       MR. LOONAM:  Your Honor, I would beg the Court's

24  indulgence.  I have to be in D.C. tomorrow through Thursday,

25  and so if I could just have till sometime on Friday.

```
                        PROCEEDINGS                    115
```

1        THE COURT:  Friday is okay.

2        MR. LOONAM:  Thanks, Judge.

3        THE COURT:  We put in seven-day workdays.

4        MR. LOONAM:  I appreciate it.

5        THE COURT:  So by the end of Friday, whatever you

6    want me to consider, submit it to me by Friday 5:00, and then

7    we'll render the decision that we have to render certainly

8    before the trial is scheduled to happen.  And everyone plan on

9    going forward, though.  That's the right thing to do in the

10   meantime, in anticipation that we will be doing that.  Okay?

11       MR. LOONAM:  Yes, sir.

12       MR. RUHNKE:  Your Honor, just one brief point Mr.

13   Hardy has asked me to raise with the Court, which is better

14   than having him shout out to the Court, that he doesn't

15   believe he requires medication any longer and I'm

16   communicating that to the Court.

17       THE COURT:  I'm not competent to make that

18   assessment, obviously.  Mr. Loonam?

19       MR. LOONAM:  Look, I mean, Mr. Hardy has raised his

20   coherent argument repeatedly that the basis for the medication

21   order is dangerousness and that he doesn't believe that --

22   since there hasn't been an incident in quite some time that

23   he's no longer a danger and, therefore, there's no basis to

24   medicate him.

25       Dr. Preston Baecht and I believe Dr. Sarrazin have

```
                        PROCEEDINGS                    116
```

1   submitted letters to the Court in response to the Court's

2   request and Mr. Ruhnke's request some time ago, explaining

3   that Mr. Hardy's dangerousness emanates from his mental

4   illness and that if they were to remove the medication, he

5   then would be a danger to BOP staff members and, therefore,

6   there's no -- therefore, the basis for the order remains in

7   effect.

8           THE COURT:  I think it's important to err on the

9   side of caution.  I'm concerned about how he's being medically

10  treated in the MCC.  I assume that there's medical supervision

11  and that he's taking the medicine that he has been prescribed

12  to take and somebody is attending to that.

13          MR. LOONAM:  Yes, Your Honor.  That's my

14  understanding and --

15          MR. RUHNKE:  My understanding as well is that he is

16  being appropriately medicated and if there's any issues on

17  that, we'll raise it.

18          THE COURT:  I think his own best interests and also

19  it's a safety valve so that he can stay out of the SHU.  I'm

20  concerned about that.  I'd like to see him have the freedom

21  that he's entitled to have, albeit that he's not at liberty,

22  but I'm going to continue to talk to the warden about that and

23  see how his behavior is.  And if his behavior continues to be

24  appropriate, then he can be treated appropriately at the MCC.

25          I mean, and so I think that if you were to err on

PROCEEDINGS                    117

1   the side of caution to continue the medication, it would

2   really be in his best interests, because it would minimize the

3   risk of him being returned to the SHU, which we all want to

4   make sure does not happen.  So that's my take on it.

5           MR. LOONAM:  Even beyond that, Your Honor, just to

6   make sure that the record is clear, that it's the government's

7   position that if he wasn't medicated that he would pose a risk

8   of physical harm to BOP staff members.

9           THE COURT:  We don't know about these things, but I

10  think we're going to stay the course here and there's good

11  reasons to do that.  Mr. Ruhnke, anything else today?

12          MR. RUHNKE:  Nothing, Your Honor.  Thank you.

13          THE COURT:  All right.  So we're scheduled to meet

14  again I guess is it Tuesday for a jury selection?

15          MR. RUHNKE:  Tuesday is jury selection.

16          THE COURT:  You'll hear from me before then, in

17  terms of the decision which we have to render.

18          As far as the application that he would like you to

19  be relieved, I'll look at his papers.  I haven't had a chance

20  to look at it yet.  It's not likely to happen, but, of course,

21  we'll give him due diligence.

22          And we're going to go forward with the anonymous

23  jury, but I'm not going to require any form of sequestration

24  or overreaching by marshals bringing the jurors in and out and

25  taking them home and back in certainly the first instance.  I

PROCEEDINGS                118

1    want the jurors to feel that this is a normal process.  I'm

2    going to be telling them that it is a normal process and that

3    if anything untoward happens, we'll deal with it.  But let's

4    err -- let's in the first instance not put this initial burden

5    upon the jurors.  I think that's the right way to proceed.

6    And I'll deliver some comments on the record in terms of why

7    we're going to have this anonymous jury but no sequestration

8    before the trial starts.  I think that's pretty much all I

9    have to do.

10         You're all squared away with your questionnaires.

11   You're going to be working very diligently I'm sure, as I

12   suspect you will be.  I guess by Tuesday, we'll have winnowed

13   down the group to -- how many are we hopeful to have here,

14   Mike?

15         COURTROOM DEPUTY:  We're hoping about 120, a list on

16   Monday of 120 they agree upon to come back on Tuesday.

17         THE COURT:  If we can produce 120 to come back here,

18   that would be a good thing to do.

19         Then the other thought I am having is that I'm a

20   great believer in allowing lawyers to participate in voir

21   dire, and we're going to allow Mr. Loonam to do that and Mr.

22   Ruhnke.

23         MR. RUHNKE:  And Ms. Barrett.

24         THE COURT:  Yes, and co-counsel as well.  So we'll

25   have a mix of my questions, and I'm going to -- you may want

SHERRY BRYANT, RMR, CRR

PROCEEDINGS                              119

1   to eyeball certain things that you'd like me to question about

2   in the normal course of questioning without fear that you're

3   going to be precluded from following up as well, and we'll

4   give you a reasonable amount of time to ask follow-up

5   questions, I suspect.

6              MR. LOONAM:  Just to be clear on the procedure, Your

7   Honor, do you anticipate all the questions flowing through

8   you?

9              THE COURT:  No.

10             MR. LOONAM:  So you anticipate the government and

11  defense counsel asking questions directly of the jurors?

12             THE COURT:  Yes.  But I want you to first give me a

13  heads-up on each juror that I would possibly question them

14  about.  If you can eyeball certain things in their responses,

15  then I will use that as the vehicle for the judge to talk to

16  the jurors, but I will not preclude you from after that.

17             You may be perfectly happy with the way I do it all,

18  but I want you to feel that you can have some follow-up

19  opportunities within a reasonable period of time if you'd like

20  to do that.

21             MR. LOONAM:  Very glad.  There are some former DAs

22  on this case.

23             THE COURT:  It's a good balance.  Well, we're

24  dealing with highly skilled attorneys, such as Mr. Ruhnke, and

25  Mr. Loonam is catching up to you, but you have some more gray

PROCEEDINGS                    120

1    hair than he has.

2              MR. RUHNKE:  A few more years to catch up.

3              THE COURT:  I've had the opportunity of having Mr.

4    Ruhnke before me in court in a death penalty case, and I was

5    very impressed with the ability that he showed to the Court of

6    being a professional and being very, very aggressive and

7    effective on behalf of representing his client.

8              MR. LOONAM:  Oh, I watched him, Your Honor.

9              THE COURT:  So Mr. Hardy may not truly appreciate

10   that, because he wasn't here as I was watching Mr. Ruhnke

11   perform on prior occasions, but I'm just telling him that you

12   have a very, very fine counsel.  I can tell you this from my

13   own personal observations and experiences with him.  It would

14   probably be in your best interests to cooperate with him, if

15   you can do so, because he's a very skilled lawyer and you're

16   going to get a very, very good defense if the matter goes to

17   trial with you as a defendant, which I suspect it might.

18             MR. RUHNKE:  In the interest of domestic

19   tranquility, he has a very talented partner.

20             THE COURT:  A very talented partner also, there's no

21   question about it.  So, in any event, we'll see you all

22   Tuesday I guess at 10:00.  Is that what the schedule is for?

23             COURTROOM DEPUTY:  Yes.

24             THE COURT:  Okay.  Thanks a lot.

25             (Whereupon, the matter was adjourned at 5:57 p.m.)

121

1

2                                     **INDEX**

3       **LEA ANN PRESTON BAECHT**

4       DIRECT EXAMINATION BY MR. LOONAM                    9

5       CROSS-EXAMINATION BY MR. RUHNKE                    34

6       REDIRECT EXAMINATION BY MR. LOONAM                 74

7

8       **RICHARD G. DUDLEY, JR., M.D.**

9       DIRECT EXAMINATION BY MR. RUHNKE                   77

10      CROSS-EXAMINATION BY MR. LOONAM                    82

11      REDIRECT EXAMINATION BY MR. RUHNKE                103

12      RECROSS-EXAMINATION BY MR. LOONAM                 112

13

14

15                                   **EXHIBITS**

16      Government Exhibits 1 to 8                          7

17

18

19

20                              ---oOo---

21

22

23

24

25