2525

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,          )
                    Plaintiff,     )     04CR00706 (FB)
                                   )
V.                                 )     United States Courthouse
                                   )     Brooklyn, New York
                                   )
DAMION HARDY AND AARON             )     WEDNESDAY, APRIL 22, 2015
GRANTON,                           )     10:00 a.m.
                    Defendants.    )
_____)


          TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
           BEFORE THE HONORABLE FREDERIC BLOCK
            UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:
FOR THE GOVERNMENT:        LORETTA LYNCH
                           United States Attorney
                           Eastern District of New York
                           BY:  SOUMYA DAYANANDA
                           BY:  MATTHEW S. AMATRUDA
                           BY:  RENA PAUL
                           Assistant United States Attorneys
                           271 Cadman Plaza East
                           Brooklyn, New York 11201


FOR DEFENDANT HARDY:       RUHNKE & BARRETT
                           BY:  JEAN D. BARRETT, ESQ.
                           BY:  DAVID A. RUHNKE, ESQ.
                           47 Park Street
                           Montclair, New Jersey 07042


FOR DEFENDANT GRANTON:     LAW OFFICE OF ROBERT M. BEECHER
                           BY:  ROBERT M. BEECHER, ESQ.
                           67 Wall Street, Suite 2211
                           New York, New York 10005

2526

1    (APPEARANCES CONTINUED)

2

3                              LAW OFFICE OF CARL JORDAN HERMAN
                               BY:  CARL JORDAN HERMAN, ESQ.
4                              443 Northfield Avenue
                               West Orange, New Jersey 07052

5

6                              LAW OFFICE OF KENDRA PANNITTI
                               BY:  KENDRA PANNITTI, ESQ.
7                              251 Tenth Street, Number 4A
                               Hoboken, New Jersey 07030

8

9

10   THE COURT REPORTER:       NICOLE CANALES, RPR, CSR
                               225 Cadman Plaza East
11                             Brooklyn, New York 11201
                               cnlsnic@aol.com

12

     Proceedings recorded by mechanical stenography, transcript
13   produced by Computer-Assisted Transcript.

14

15

16

17

18

19

20

21

22

23

24

25

2527

1                (In open court.)

2                COURTROOM DEPUTY:  Criminal cause on trial, the

3     United States of America versus Damion Hardy and Aaron

4     Granton.

5                All counsel and parties are present.

6                THE COURT:  Is there any reason why we can't bring

7     the jurors in now and get off to a prompt start today?

8                MR. AMATRUDA:  No, Your Honor.

9                THE COURT:  So let's do that.

10               While the jurors are coming in, Ms. Barrett, let me

11    talk to you for a few seconds.  After 35 days of trial, or

12    whatever it is, you get to the point where you're trying to

13    focus on everything as best as you can.  I'm sorry if we had a

14    little interaction here where I just didn't pick up on what

15    you wanted me to do.  The problem is I'm trying to get a

16    handle of what your concerns are.  You talk and you talk and

17    you don't ask me to do anything.

18               If you wanted me to, for example, Exhibit 8013,

19    whatever, judge, I want you to strike that testimony or that

20    evidence, then I have a specific motion that I can deal with

21    it, but I didn't get a handle on what you wanted me to do.

22    You were making comments.  I'm trying to listen politely, but

23    with all due respect, you didn't ask me to do anything.  So my

24    sense is that these exhibits, which I haven't seen, are

25    hundreds of pages of telephone records which were offered into

1    evidence and you don't want those hundreds of pages received.

2          So try, if you can, in the future tell me exactly

3    what you want me to do and then I can make a ruling.

4          So, I am interpreting what you're saying as not

5    wanting to have all of that exhibit into evidence, however

6    many pages they are.  We had chats about this page and that

7    page.  I didn't realize we were talking about hundreds of

8    pages.  So if that's what your application is, then I'm going

9    to deny it, but I don't know what it is you specifically

10   wanted me to do.  So that's why we had a little problem

11   yesterday with my apologies, okay.  So we're going to allow it

12   into evidence and then you can argue to the jury whatever you

13   want from that document that's in evidence.  I don't know how

14   many pages we're talking about.

15         Okay?

16         MS. BARRETT:  Judge, okay.  So maybe I should

17   clarify as for the record --

18         THE COURT:  Well, we'll have chance to do that after

19   the jury's not here.

20         MS. BARRETT:  That's fine.

21         THE COURT:  Because I don't like to be

22   disrespectful, but I just didn't understand what you wanted me

23   to do.

24         MS. BARRETT:  Right.  Well, I'll appreciate the

25   opportunity to clarify it later.

2529

1          THE COURT:  We understand that.

2          MS. BARRETT:  Thank you.

3          (Dwayne Myers resumes the witness stand.)

4          THE COURT:  Another two or three hours?

5          MR. AMATRUDA:  I was up all night thinking of

6    questions, judge.

7          No, it's going to be fast.

8          COURTROOM DEPUTY:  All rise.

9          (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Myers - Direct / Amatruda*                                2530

1            (Jury enters the courtroom.)

2            THE COURT:  For the purpose of full disclosure,

3    which is my professional obligation, I must disclose that

4    Juror No. 11 made cookies for the judge and the staff.

5    Nothing to do with the lawsuit at all, but I don't know

6    whether this disqualifies me, but I did eat a couple of them

7    and they were delicious.

8            So we have a jury that's outstanding in many ways,

9    their culinary talents have been manifested, their promptness,

10   and everything else.  They're going to be very, very serious,

11   they have been, and they're going to be super serious when we

12   get to the point of the concluding remarks and you'll hear me

13   explain the law and it's going to be very extensive and

14   elaborate, but you're up to it, I'm sure, and we'll be getting

15   super, super serious very soon here.

16           All right, Mr. Amatruda, go ahead.

17           MR. AMATRUDA:  Thank you, Your Honor.

18   DIRECT EXAMINATION (continued)

19   BY MR. AMATRUDA:

20   Q    Mr. Myers, yesterday we finished with starting to talk

21   about some activity relating to medical clinics in early 2001.

22           Did you get tell involved in that activity?

23   A    Yes, sir.

24   Q    Who asked you to get involved in that activity?

25   A    World.

*Myers - Direct / Amatruda*                    2531

1   Q    What did World say to you about that activity?

2   A    He explained to me that he spoke with Muhammed Noor and

3   they wanted to bring all the guys from Brooklyn that he knew

4   to be reputed as gangsters to come together as a unit, lock

5   down what was known as the insurance fraud scam at that

6   particular time.  He said that they had different places where

7   guys was collecting money from different rehabilitation

8   centers and it was basically separated, but we was all come

9   under one banner.

10  Q    What did you understand, briefly, ambulance chasing to

11  be?  Did that involve insurance fraud?

12  A    Yes, sir.

13  Q    Now, did you meet with World somewhere?

14  A    Yes.

15  Q    Where?

16  A    We went -- we went to I think it was up on Nostrand

17  Avenue.

18  Q    I'm asking you you met at a place that was associated

19  with --

20  A    We met at Muhammed Noor's office.

21  Q    Who else was there, if anybody?

22  A    Well, me and P Black traveled there.  When I got there,

23  it was at least 15, 20 different people that I -- I had heard

24  of from the neighborhood.

25  Q    Did you see anybody from CMB there?

*Myers - Direct / Amatruda*                                    2532

1  A    I recall seeing Boo there.

2  Q    Was World there?

3  A    Yes.

4  Q    Did you talk to the people who were gathered?

5  A    Briefly.

6  Q    What did you do after that?

7  A    We had all went and got in vehicles and was going to go

8  around to the different rehabilitation centers and let them

9  know that the people that they were dealing with, that they

10 would no longer be dealing with those individuals, that they

11 would have to deal with World.

12 Q    Approximately how many people were there?

13 A    When I walked into the room, it was like 15, 20 people.

14 Q    So how many cars full of people, do you recall?

15 A    I don't recall how many cars it was.

16 Q    Did you go to a medical clinic?

17 A    Yes, sir.

18 Q    And what happened at a medical clinic that you went to?

19 A    We went to a medical clinic and World and another

20 individual went inside to speak to the -- to the man who ran

21 the place, and at that particular time, the individual that he

22 was dealing with on -- in the capacity that we were trying to

23 get him to deal with us came to the establishment.  When he

24 got there --

25 Q    I'm sorry to interrupt you, but this was the person at

*Myers - Direct / Amatruda*                                2533

1    the medical clinic had somebody who was doing what you wanted

2    to do with World?

3    A    Exactly.

4    Q    All right.  And what happened then?

5    A    He came there and he started explaining that this was his

6    establishment, that he was working with these people, and

7    ultimately him and World got into an argument where they

8    started exchanging words back and forth with one another.

9    Q    Does anything stick out in your mind about that argument?

10   A    Yes.  At the particular time, World said to the guy, "Do

11   you know who I am?  My name is World," and he spelled his name

12   out to the guy, and then the guy laughed and said, "My name is

13   such and such," spelled his name back, being facetious like,

14   you know, mocking him.

15   Q    And what happened, what did you and World and the group

16   do after that?

17   A    We decided that at that point that this individual was

18   going to be the individual to -- who be the example for

19   everybody else.  He -- it just so --

20   Q    Sorry.  What did you mean by that, make an example?

21   A    It was well-known at that time that --

22        MR. RUHNKE:  Objection, Your Honor.

23   A    Well, at that time --

24   Q    Can you just say in terms of making an example what your

25   intent was about that?

*Myers - Direct / Amatruda*                    2534

1          THE COURT:  You have to be more specific.  You can't

2     say things that is well-known and things like "I believe."

3     You understand.

4          THE WITNESS:  Okay.

5          THE COURT:  Go ahead.

6     Q    You were going to --

7     A    We were planning to do him physical harm.

8     Q    Did you speak with World about that?

9     A    Yes.

10    Q    Can you explain the conversation?

11    A    He was arguing with the guy and I was telling him, I was

12    kind of upset that he was going back and forth with the guy.

13    So I told him, I said, I said, "Yo, stop arguing with this

14    dude.  Come on."  So we went outside and that was when he was

15    like, "Nah," he was like, "You know what, he the one," meaning

16    they was --

17    Q    World was speaking saying that?

18    A    Yes.

19    Q    Okay.  Continue.

20    A    So we waited for the guy outside.  Ultimately it started

21    snowing very hard.  Some of the individuals that had been with

22    us at that time left, but we stayed and we waited for this

23    individual while he was inside of the establishment speaking

24    with the people.  Then he came out of the -- the establishment

25    and left and we followed him.

1    Q     Can I interrupt you for one second?

2    A     Yes, sir.

3    Q     What, if anything, did World say he would do if somebody

4    shot this person?

5    A     I'm getting to that part.

6    Q     Okay.

7    A     At this point, he didn't say what he would do at -- we

8    would just follow him around at first.  Then when he had

9    stopped at another place, that's when World had a discussion

10   and explained to the individuals that was present that he was

11   going to pay for -- pay money up front for the guy to be dealt

12   with.

13   Q     What do you mean by "dealt with"?

14   A     To be shot.

15   Q     So what did you do after that?

16   A     I was in the car with Puff at the time.  So he called

17   Puff's phone and told me to come to the vehicle that he was

18   in.  He was in a black Mercedes-Benz SUV with two individuals.

19   I got out that vehicle, I got out the vehicle with Puff.  I

20   went into that vehicle and I got in the car with him and he

21   said, "Listen, you know I'm putting up two grand.  Muhammed

22   Noor is giving me the money to pay whoever who just going to

23   be putting him to work up front so there ain't going to be no

24   bullshit with the money."  So I said, "All right."  He said,

25   "But look, you know you owe."  I said, "What you mean?"  He

1    said, "You know you fucked up with the other situation,"

2    pertaining to my brother.  So I'm sitting there looking at him

3    and I'm thinking, you know, I thought we past that.  So he

4    says, "Just handle this and then you ain't got to -- and, you

5    know, we straight."  So I looked at him, I said, "So after

6    this, we done with that.  I don't never got to hear anything

7    about that again."  He said, "Yeah, do this and we good."  So

8    I said, "All right."

9    Q    Did you follow the individual that had worked for the

10   medical clinic?

11   A    Yes.  At this particular time, he was stationary.  He was

12   standing in front of the establishment that we had followed

13   him to.

14   Q    And what did you do?

15   A    I got out of the vehicle.  I remember -- I don't remember

16   the street it was on, but I remember it was in Bushwick.  I

17   walked past him and the -- the two individuals that he was

18   speaking with on the opposite side of the street first.  Then

19   I crossed to the side that they were on, but like a half a

20   block away and acting like I was on a pay phone.  I saw the

21   flashing lights from the SUV blinking like hurrying me up.  So

22   I waited, it was a car coming past.  I remember the car went

23   past, so then I started walking towards the individual.  I had

24   the firearm in my back pocket.  As I approached, the -- the

25   two men saw -- the two men that he was speaking with saw me

*Myers - Direct / Amatruda*                              2537

1   first and they looked at me and it caused him to turn around

2   and look at me, and I don't know if he recognized me from the

3   previous meeting, but he looked at me and he said, "What's

4   up?"  And I said, "You know what's up," and I pointed the gun

5   and fired three shots.

6   Q    Do you know whether you hit him?

7   A    I think that I did.

8   Q    After that, what did you do?

9   A    I started running and as I got into the middle of the

10  street, one of the guys that had been in the SUV by the name

11  of China was in the middle of the street and he's facing me

12  and he's firing, and the first thing come to my mind is I -- I

13  thought that I was being double-crossed, but I didn't realize

14  that he was shooting at them as well.

15  Q    And what did you do after that shooting?

16  A    We ran to the vehicle.  I ran and got inside the vehicle.

17  Then he came and got in the vehicle and that's when he was

18  like, "Yo, I was holding you down."  I was like, "Oh."

19          So we get in the vehicle.  Then we started making

20  our way, I remember it being snowing, and World was

21  instructing him to go to my apartment to drop me off.

22  Q    When you said the lights were blinking on the SUV, is

23  that the SUV you referred to earlier that World was in?

24  A    Yes.

25  Q    Do you know someone named Dog?

1   A     Yes.

2   Q     How did you know Dog?

3   A     I met Dog through my cousin Kidda.

4   Q     And do you know where Dog was from?

5   A     Manhattan.

6   Q     Did you have a discussion with -- well, let me ask you

7   this question.

8           You had a discussion with E-Bay about Dog, correct?

9   A     Yes, sir.

10  Q     And did E-Bay tell you that he killed someone named --

11          MR. HERMAN:  Objection to the leading, judge.

12          THE COURT:  Objection sustained.

13          MR. AMATRUDA:  Judge, I actually have a really good

14  reason for leading right now.  I want to limit this witness's

15  testimony and I don't want anything to come out that

16  shouldn't.

17          THE COURT:  All right.  Based on that

18  representation, I'll allow you to do it.

19          MR. AMATRUDA:  Okay.

20  BY MR. AMATRUDA:

21  Q     Did E-Bay tell you that he killed someone named Troy for

22  Dog?

23  A     Yes.

24  Q     Did he tell you whether or not he was paid for that?

25  A     Yes.

1    Q     How much did he tell you he was paid?

2    A     Two hundred dollars.

3    Q     Did he speak to you at all further about money with

4    respect to CMB at that point?

5    A     There was -- in respect to CMB?

6    Q     Correct, in respect to getting paid for that job, and

7    only Troy.

8    A     He spoke about getting paid for -- as far as the getting

9    paid situation, the conversation that I recall having with

10   him, we were talking and he told me how much that he got paid

11   for --

12   Q     Troy?

13   A     -- for killing Troy, and I was upset with him.  I was

14   like, "What is wrong with you?  Like, why would you do that?"

15   And he said to me, "It's not about what I got paid now.  It's

16   what I get in the future.  They see my work."

17   Q     Okay.  Now, at a certain point while you were in CMB, did

18   you meet someone named Stro?

19   A     Yes.

20         MR. RUHNKE:  Your Honor, I don't mean to interrupt.

21   Are we past the medical clinic now?

22         MR. AMATRUDA:  For the most part.  I just wanted to

23   play a portion of the tape just to ask him one question, but

24   if you want to do a limiting, that's fine.

25         MR. RUHNKE:  I just wanted to have you remind the

1    jury that this is not an event that's charged in the

2    indictment.

3           THE COURT:  Right.  This is not in the indictment,

4    and this is, once again, being referenced for purposes of

5    showing the nature of the enterprise, I suspect.

6           MR. RUHNKE:  Thank you.

7           THE COURT:  Next question.

8           MR. AMATRUDA:  Okay.

9    BY MR. AMATRUDA:

10   Q    Who introduced you to Stro?

11   A    I met Stro through work.

12   Q    Was there any -- did you, in 2002, have any discussions

13   with anyone from CMB about a kidnapping?

14   A    Yes.  There was a night when we were all together.  I

15   remember World, Stro, me, Taz, Boo was present, Popsie, Tion

16   and some other individuals were there, and World had brought

17   all of us together because he had wanted to have a discussion

18   with some -- an aspiring rapper by the name of Huddy Combs.

19   So we went to a club where he was supposed to be performing

20   that night.  We got there and we were told that the guy hadn't

21   shown yet.  We waited for a while and he never showed up and

22   they said that the guy wasn't coming.  So the people that were

23   present became impatient about the situation 'cause they

24   thought they were going to be able to make some money out the

25   situation.

1          Then the talk started about robbing certain

2   individuals who were walking past us with jewelry on, Rolexes

3   and things like that.

4   Q    Outside of the club?

5   A    Outside of the club.

6   Q    Okay.  And did people get robbed that night?

7   A    Yes, sir.

8   Q    Did you participate in the robberies?

9   A    In a fashion.  I didn't participate in the robbery

10  itself, but I had loaned Popsie and Tion some walkie-talkie

11  that I had that I had used from a previous robbery they had

12  with them that particular night.

13  Q    Did you ever have a conversation with World about PC

14  related to a robbery?

15  A    Yes.

16  Q    And was that this robbery or a different one?

17  A    This was this robbery.

18  Q    And what was that conversation?

19  A    They had robbed some individual and we -- me -- me and

20  Taz had been there when it actually happened and they fled the

21  scene and all that.  So while we were leaving, I called him

22  and I said to them, I said, "Where my PC?"  And they said,

23  "You don't need no money."  So I said, "Y'all used my

24  walkie-talkies.  I want my PC."  So he was like, "Yo, come on,

25  son.  We trying to get on.  You already on.  You don't need

*Myers - Direct / Amatruda*                                    2542

1    the money."  So I said, "Yo, just bring me my walkie-talkies

2    and we ain't got to talk about it no more."  So he was like,

3    "Yo, listen, we about to do this job and we need the

4    walkie-talkies.  So once we finish that, we'll bring them to

5    you."

6    Q    And who were you talking with?

7    A    I was talking to Popsie and Tion.

8    Q    I'm going to show you Government Exhibit 58.  It's not in

9    evidence.

10          THE COURT:  Do you want this in evidence?

11          MR. AMATRUDA:  Yes, I'll move it in evidence.

12          THE COURT:  Is there any objection to it?

13          MR. RUHNKE:  He's got to tell us who it is first.

14          (The above-referred to exhibit was published to the

15   witness.)

16   Q    Do you recognize that person?

17   A    Yes.

18          THE COURT:  I have 58 in evidence already back on

19   the 14th of the month.

20          COURTROOM DEPUTY:  Correct.

21   Q    If so, can you just tell us have you met that person

22   before?

23   A    I met him.

24   Q    Do you remember his name?

25   A    No, I don't.

*Myers - Direct / Amatruda*                    2543

1    Q    How did you meet him?

2    A    I him through World.

3    Q    Before I get to what I believe is the last topic I want

4    to cover with you, I just want to play for you a portion of

5    Government Exhibit 502, and I'm just going to ask you if you

6    recognize any of the voices that you're about to hear.

7              (Audio recording played.)

8    Q    Do you recognize one of the voices there?

9    A    I recognize World's voice.

10   Q    Do you remember what the voice said?

11   A    He said, "You know who it is."

12   Q    I want to turn your attention now to July 25th of 2003.

13             At that time, where were you living?

14   A    What date again?

15   Q    I'm going to refer to the murder of Tyrone Baum now.

16   A    Okay.

17   Q    At that time, where were you living?

18   A    I think I was living in Flatbush at the time.

19   Q    And do you recall what you were doing for money at that

20   time?

21   A    Me and Taz was hustling out of town.

22   Q    And where was that out of town?

23   A    Lynchburg, Virginia.

24   Q    At some point, did you have a discussion concerning

25   someone named T Rock?

1  A    Yes, sir.

2  Q    Who did you have that discussion with?

3  A    There were multiple times where T Rock's name came up.

4  We had heard that he was coming home.

5  Q    I'm sorry to interrupt you, but can you give me the names

6  of the people that you talked about T Rock with?

7  A    Me, Taz, World, E-Bay, Boo.

8  Q    And I'm going to show you what's in evidence as

9  Government Exhibit 1009.

10          (The above-referred to exhibit was published.)

11  Q    Do you recognize that individual?

12  A    Yes, sir.

13  Q    Who is that?

14  A    It's T Rock.

15  Q    Just so everything's clear, is this the same T Rock that

16  you had been involved in some criminal activity with back in

17  the '90s?

18  A    Yes, sir.

19  Q    So what was the discussion that you had with World and

20  the other people about T Rock?

21  A    We had heard that he was coming home from prison and

22  we -- Abu Bakr had been speaking to someone who was close to

23  Homo's camp who was saying that T Rock was calling a lot,

24  asking questions about what happened to his brother and he was

25  saying that the Black-O Mack-O and a lot of the individuals

1  was saying that dudes from CMB had something to do with his

2  brother's murder.  So we were hearing that T Rock was saying

3  that he was going to come home and kill World and Taz.

4  Q    What, if anything, did World say about that?

5  A    He was saying that he had to go too.

6  Q    Was there a point on the day -- well, let me take you to

7  the day that T Rock died.

8  A    Yes.

9  Q    Earlier that day before his death, what were you doing?

10  A    We had went to the mosque.

11  Q    Who is we?

12  A    Me, Muhammed, Taz, Abu Bakr, it was a lot -- it was a lot

13  of us.

14  Q    Around what time of day?  You don't have to give the

15  exact time, but what time of day did you go to the mosque?

16  A    It was going on like 1:15 because we had to be there at

17  one o'clock, but we were a few minutes late.

18  Q    Did you go to services?  Did you attend services?

19  A    Yes, we -- yeah.

20  Q    And what happened around the time that you were going to

21  services?

22  A    We came out, it was a hot summer day, so we decided to go

23  to the store to get some waters.  I went by myself at first

24  and I was in the store and then Taz walked in behind me.  So

25  when I went to the register, I had already -- I was ahead of

*Myers - Direct / Amatruda*                                    2546

1   him.  So as I stepped out the door of the store, I was

2   standing there with the water bottle in my hand and I happen

3   to look up the block and I saw T Rock walking up the block

4   with a reflector jacket on as if he were working construction.

5   Q    Did you recognize T Rock at that point?

6   A    Immediately.

7   Q    What did you do?

8   A    I was kind of shocked because I know this guy from when I

9   was 19 years old.  He -- he wasn't looking around like -- for

10  the person to be throwing around threats --

11  Q    I'm sorry to interrupt you, but we've heard the term "be

12  on point."

13  A    Yes.

14  Q    In other words, be aware of your surroundings?

15  A    Yes.

16  Q    So you can use that term.  The jury will understand it.

17  A    Yes, he wasn't on point at all because he was walking and

18  I looked at him and I saw him and he never looked me directly

19  in the face, which I thought that if he did he would have

20  recognized me.

21         So at that time, I assumed that he was basically

22  creeping on me because he wouldn't make eye contact.  So he

23  kept --

24  Q    So what did you do?

25  A    So I'm standing there with the bottle of water in my hand

1    and then Taz steps out.  So as he walks past, I look at Taz

2    and I says, "You know who that is."  And he turns around and

3    he looks at him and from the descriptions that he's gotten of

4    T Rock, he turned and he said, "T Rock?"  I said, "Yeah," and

5    we start --

6    Q    Let me interrupt you for one second.

7            Did Taz have any kind of history related to T Rock

8    that you were aware of?

9    A    Yes.  Taz was under the impression that T Rock was one of

10   the individuals that had murdered his father.

11   Q    So after you identified T Rock to Taz, what happened?

12   A    We started -- we made a left going back towards the

13   mosque and Abu Bakr was coming towards us not realizing that

14   anything was going on.  So Taz said, "Yo, I think we just saw

15   T Rock."  So Abu Bakr said that he didn't know him, but he had

16   met him before, he would know him if he see him again.  So he

17   went around the corner, he looked around the corner, and then

18   he came back and he was like, "Yeah, that's him."

19   Q    So Abu Bakr said, "Yes, that's him," meaning T Rock?

20   A    Yes.

21   Q    At that point, who, if anybody, did Taz contact?

22   A    At that point, Taz called the guy named Ty.

23   Q    And what happened after that?

24   A    We waited for Ty for a while.  Ty came and --

25   Q    Let me interrupt you.

1           Had you met Ty before?

2   A    Yes.

3   Q    And who was Ty?

4   A    Ty was -- he was a captain on Rikers Island who -- a guy

5   who boasted of carrying a legal firearm who Taz would have

6   with us a lot, who professed that if any violence were to ever

7   happen, you know, he could shoot someone and say that he was

8   protecting us 'cause he had a legal gun.

9   Q    Were you aware of anything that Taz did for Ty?

10  A    Yes, Taz gave him a lot of money.

11  Q    So you were waiting for Ty.

12          What happened?

13  A    Well, Ty came and he pulled up, but when he pulled up, he

14  pulled up in the vehicle with his kids in the vehicle.  So

15  when he get out the vehicle, Taz starts explaining to him

16  what's going on.  So he said to Taz, he said, "Look, man, I

17  got to keep it real with you, man.  I ain't with this

18  bullshit, you understand.  I'm a family man."  So Taz said,

19  "What you mean?"  He said, "Look, man, I can't do this, man.

20  You know, I can't be involved in this kind of stuff, you know,

21  so."

22  Q    What kind of car was he in?

23  A    He was in a mini-van.

24  Q    With kids in it?

25  A    Yes.

Case 1:04-cr-00706-FB   Document 974   Filed 04/30/15   Page 25 of 272 PageID #: 10222

1    Q     So what did Ty do?

2    A     So Taz asked him did he bring his gun.  So he said yeah.

3    So he reached under the seat and took -- took out a -- a

4    revolver and passed it to Taz, and the gun didn't have bullets

5    in it.  So I was laughing about the situation because I knew

6    what type of arrangement that they had and, you know, Taz had

7    been paying different bills for this guy and, you know, giving

8    him money a lot under the impression that this guy was going

9    to be, you know, someone who would participate in the violence

10   when it occurs.

11   Q     Understood.

12         So what did Taz do at that point?

13   A     So Taz was mad at him.  They were arguing back and forth.

14   So Taz told him, "Yo, look, don't go nowhere just yet.  Stay

15   with me right here until Kizzy come.  Let me call Kizzy."

16   Q     Who's Kizzy?

17   A     Kizzy was Taz's daughter's mother.

18   Q     At that time, did you have a telephone?

19   A     Yes, I did.

20   Q     And did Taz have a telephone?

21   A     Yes, I did.

22   Q     And was there any connection between your two telephones

23   at that point?

24   A     Yes.  Taz had got both of our cellphones from a young

25   lady that he was dealing with.  Our cellphone numbers were one

*Myers - Direct / Amatruda*                           2550

1   number apart.  They --

2   Q    Do you remember her name?

3   A    Tanya.

4   Q    And so at that point, did you speak to anybody?

5        THE COURT:  Yes or no.

6   A    Yes.  Yes.

7   Q    Who did you speak with?

8   A    I spoke with World.

9   Q    How did you speak with him?

10  A    I believe I called him.

11  Q    On the telephone?

12  A    Yes.

13  Q    What did you say to each other?

14  A    I told him where we were at and that we had saw T Rock.

15  Q    What did World say?

16  A    He asked me what was going on.

17  Q    And what did you tell him?

18  A    I told him that Taz was making plans to try to send

19  somebody to hit him.

20  Q    What did World say about that?

21  A    He told me -- I told him that I was about to leave.  So

22  he told me not to leave, to stay there to make sure that they

23  get it done.

24  Q    And your understanding of "get it done" was what?

25  A    To kill T Rock.

1    Q    And did you stay?

2    A    By that time, I was --

3              THE COURT:  Did you stay, yes or no?

4              THE WITNESS:  Yes, I did.  Yes.

5    Q    What, if anything, did World say to you, if at all, about

6    Taz?

7    A    I don't understand.

8    Q    What, if anything, did World say to you on the phone

9    about Taz, anything?

10   A    I'm not recalling anything specific.

11   Q    Fine.

12             So at that point, did Abu Bakr go anywhere?

13   A    Abu Bakr went and picked up Boo.

14   Q    At that point that day, did you see Moo?

15   A    Yes.

16   Q    How did you see Moo?

17   A    Moo had been with us the whole time when we went to the

18   mosque.

19   Q    And Abu Bakr went to go get Boo.

20             Did you have an understanding of what the purpose

21   was?

22   A    Yes, he wanted Abu Bakr -- he wanted Abu Bakr to go and

23   get Moo because initially he asked me, Taz asked me to shoot

24   T Rock and I told him that I wasn't going to do it because I

25   knew the guy and had history with him and I didn't want to be

*Myers - Direct / Amatruda*                                    2552

1    the one to do it.  So he had Abu Bakr go and get Boo.

2    Q    And what kind of car did Abu Bakr drive that day?

3    A    I'm not recalling.

4    Q    What happened, did you see Kizzy at that point?

5    A    Yes, Kizzy pulled up in a taxicab.

6    Q    And what, if anything, did Kizzy have with her?

7    A    She had a firearm.

8    Q    And what, if anything, at that point did Taz do?

9    A    Taz took the gun and he had asked me to stay until Kizzy

10   got there.  So when Kizzy got there, I told him that I was

11   going to leave --

12              THE COURT:  What did Taz do, is the question.

13   A    Oh, we had went -- he told her wait.  We got in the

14   vehicle and waited for Boo.

15   Q    Did you have a conversation with Taz at that point?

16   A    Yeah, we -- we were speaking --

17              THE COURT:  The answer is "yes."

18   A    Yes.

19   Q    Do you remember what you discussed?

20   A    At one point, Taz was talking about paying Boo $4,000 to

21   shoot T Rock.

22   Q    Did you talk to World at all at that point?

23   A    Yes.

24   Q    What did you talk about?

25   A    He asked me who was going to be the individual who

1   actually put the work in.

2   Q    And what did you say?

3   A    By that time, Boo had been there and Boo didn't want me

4   to tell World --

5            THE COURT:  What did you say to him?

6   A    I told him that Desperado was going to be the individual

7   to actually do the shooting.

8   Q    And what was your conversation with Taz about what you

9   would say to World, or with Boo about what you would say to

10  World?

11  A    He was sitting there when I told World 'cause he asked me

12  not to tell World that he was getting paid to do it.  He

13  didn't want World to know that he was getting paid because he

14  should have been doing it for free.

15  Q    I'm sorry, I've been distracted by the judge interrupting

16  you.

17           Can you repeat that answer?

18  A    Yes.  Boo asked me to tell World that Desperado was going

19  to be the one to do the shooting because he didn't want World

20  to know that Taz was going to actually pay him because he

21  wasn't supposed to be getting paid for this.  It was supposed

22  to be a hit for the team because T Rock had been talking about

23  killing World and then Taz --

24           THE COURT:  He was trying to keep that information

25  away from World.

*Myers - Direct / Amatruda*                    2554

1        THE WITNESS:  Exactly.

2        THE COURT:  Okay, next question.

3   Q    Did you speak to World at all at that point?

4   A    That's all I remember from that point telling him

5   about --

6        THE COURT:  The question is did you speak to World

7   at that time, yes or no?

8        THE WITNESS:  Yes.

9   Q    And at what point did -- and so you had told World that

10  Desperado was going to do it; is that right?

11  A    Yes, sir.

12  Q    What happened after that?

13  A    We went to where the block that we had saw T Rock go up,

14  but he wasn't there.  The construction team had been gone.  So

15  before we were leaving, we were talking about the situation

16  and Abu Bakr said you know what, it was two construction sites

17  over here.  Maybe he's at the other one.  So he went to check

18  to see if he was at the other construction site, which was

19  like two blocks away.

20  Q    And who were you with at that point?

21  A    I had Taz's girlfriend Kizzy in the vehicle with me.  I

22  had a guy that who had traveled with us from Lynchburg,

23  Virginia named Jonathan in the vehicle at that time.  I think

24  my cousin was there as well.

25  Q    Which cousin?

*Myers - Direct / Amatruda*                           2555

1   A     His name is Hedda.

2   Q     And who was with Abu Bakr, did you see?

3   A     Boo.

4   Q     And where was Taz?

5   A     Taz was in with Ty.

6   Q     So what happened after that?

7   A     We were all communicating with each other via phone and I

8   was going up the block, I can't remember what's the name of

9   the street, and I decided to make a U-turn and go back in the

10  opposite direction.  Once I made that turn, it came through

11  the Nextel that they actually saw T Rock on the corner.  By

12  the time I got to the intersection, the light was red.  Boo

13  was coming out of the store.  I saw T Rock on the right-hand

14  side of the block on the corner speaking to two individuals.

15  Boo crossed the street.  He had a soda in his hand.  He had

16  his hand in back of him and he was crossing the street and he

17  ran behind T Rock and fired shots.

18  Q     Did you see what happened to T Rock?

19  A     I just seen him fall.

20  Q     What did you do at that point?

21  A     I was sitting at the light, so I had to wait for the

22  light to turn green, and the area became congested at that

23  time with the people and the cars.  So slowly I made my way

24  past and then I left and went to the projects.

25  Q     Did you see what Boo did after he shot T Rock?

1  A     He ran up the street towards where Abu Bakr's vehicle

2  was.

3  Q     Did you speak again with World that day?

4  A     I don't recall.

5  Q     Did you speak with World about T Rock after that?

6  A     Yes.

7  Q     What did you discuss?

8  A     We just discussed the situation in its entirety.  At that

9  particular time, World had been saying things to me like,

10 "Check," like during our conversation, and I didn't understand

11 what he was saying at the time.  I thought he was saying like

12 check another individual off the list.

13 Q     So what did he say?

14 A     Like I said, we just had a general conversation.  I don't

15 remember the specifics of the conversation.  I just remember

16 that --

17 Q     When he said the "check" to you, did that ever change

18 what he said, or only "check"?

19 A     Well, later on it became "checkmate."

20 Q     Later on when?

21 A     After Peanut.

22 Q     Did you have a conversation with Abu Bakr about what had

23 happened?

24 A     Yes.  We spoke with Abu Bakr, me and Taz, because someone

25 had taken down the license plates of Abu Bakr's vehicle when

1    Boo got inside of the vehicle and they had -- his parole

2    officer had went to his house looking for him questioning him

3    about the vehicle.  So he called Taz and explained Taz that he

4    needed to do something with the vehicle.  So him and Taz put

5    together a plan to go and have somebody to go into a

6    check-cashing place and be speaking to the cashier and have

7    the vehicle parked where the cashier could actually see them

8    and for someone to walk in and go, "Yo, somebody's stealing

9    your vehicle," so the cashier could witness that he was

10   actually inside the establishment while somebody was taking

11   his vehicle to say that the vehicle wasn't in his possession.

12   Q    And do you know did they tell you whether that happened,

13   Taz and Abu Bakr?

14   A    Yes.

15   Q    What did they say?

16   A    They said they had got it done.

17   Q    And had World discussed anything to you about what he

18   wanted to do with the car?

19   A    No.

20   Q    Do you know whether Boo got paid for T Rock?

21   A    Yes.  At that time when Taz --

22            THE COURT:  The question is do you know whether he

23   got paid.

24            THE WITNESS:  Yes, sir.

25   Q    And who paid him?

*Myers - Direct / Amatruda*                    2558

1    A    Taz.

2    Q    Do you remember did Taz pay him the entire amount?

3    A    No, he didn't.  He gave him $2,000.  He said I have 2,000

4    on me now, I'll give you 2,000 later.

5              THE COURT:  How do you know he did that?

6              THE WITNESS:  I was sitting in the vehicle with him.

7              THE COURT:  All right.  Next question.

8    Q    After T Rock, where were you living?

9    A    Flatbush.

10   Q    At some point in 2004, were you involved in a

11   drug-related shootout?  Were you shot?

12   A    Yes.

13   Q    Can you explain what happened for you to be shot?

14   A    I was in Lafayette Gardens where we had the heroin, and

15   one of the individuals who was selling heroin for me at the

16   time, I was speaking with his mother and I asked her did she

17   want something to eat and she said yes.  So I went to the --

18   go to the Chinese restaurant --

19   Q    I'm sorry to cut you off, but I can shorten this a little

20   bit.

21             Did you have an interaction with somebody about

22   drugs?

23   A    Yes.

24   Q    Did somebody tell you something about an individual who

25   was selling drugs?

1   A      No.  Well, the guy who I was going --

2           THE COURT:  The answer is yes or no.

3   A      No.

4           THE COURT:  Is this relevant, by the way, whether he

5   was shot or not?  He says he was shot.  I don't think you

6   need to go into the details of going to a Chinese restaurant

7   and back and forth.

8           MR. AMATRUDA:  Well, I just want to get out that the

9   shooting was drug related.

10  Q     Was it drug related?

11          THE COURT:  He said he was shot, it was drug

12  related.

13          What's your next question?

14          MR. AMATRUDA:  I have two more questions and then I

15  think I'm done.

16          THE COURT:  Okay.

17  BY MR. AMATRUDA:

18  Q     When you watched E-Bay firing towards Peanut, did you see

19  what he was firing towards?  Was it a person, a car, a

20  building?  What was he firing towards?

21  A     I couldn't see which direction he was pointing.  I just

22  see him go behind the vehicle and he basically just

23  disappeared at that point.

24  Q     Do you know what kind of -- did you know what gun was

25  used to shoot Peanut?

1    A    Yes.

2    Q    What gun?

3    A    A Smith and Wesson .40 caliber.

4    Q    How about JR?

5    A    I was told it was a TEC-9.

6    Q    And do you know what kind of gun was used to shoot

7    T Rock?

8    A    A 9-millimeter.

9         MR. AMATRUDA:  I have nothing further.

10         THE COURT:  All right.  Mr. Ruhnke, you have some

11    questions.

12         MR. RUHNKE:  Yes, sir.

13    CROSS-EXAMINATION

14    BY MR. RUHNKE:

15    Q    Mr. Myers, you never told us about the prostitutes, did

16    you?

17    A    Yes, I did.

18    Q    You testified to the jury about extorting prostitutes?

19    A    I didn't testify to the jury about it, but I told the

20    prosecutor about it.

21    Q    Okay.  So you and Puffy, Puffy is Zareh Sarkissian, got

22    up a scheme where you pretended to be cops, right?

23    A    Yes, sir.

24    Q    And while pretending to be cops, you would rob people,

25    right?

1   A     Yes.

2   Q     Pull their car over, demand that they get out of the car,

3   show badges, guns, dress up like cops, drive a cop-like car,

4   correct?

5   A     Yes.

6   Q     And all to let the people let their guard down or feel

7   that they're in the presence of law enforcement, correct?

8   A     Yes, sir.

9   Q     Feel that, "Well, you know, at least I'm with a cop, I'm

10  not in any danger," right?

11  A     Yes, sir.

12  Q     And you did this anywhere from six to ten different

13  times, right?

14  A     I don't know the number of times.

15  Q     Six to ten sound about right?

16  A     Probably less than that.

17  Q     And one thing you would do is you'd hang out at hip-hop

18  clubs and wait for people to come out with jewelry and money

19  and follow them and pull them over, right?

20  A     Yes.

21  Q     And then you would rob them, right?

22  A     Yes, sir.

23  Q     Then you came up with this plan to kind of extort

24  prostitutes, right?

25  A     Yes.

*Myers - Cross / Ruhnke*                              2562

1   Q    Okay.  Hard to say, but the answer's yes, correct?

2   A    Yes, because when you say "extort," it wasn't like -- if

3   you want me to explain, I'll explain what we did.

4   Q    You'll get a chance to explain.  Let me ask the

5   questions.

6   A    Okay.

7   Q    The plan went that you and Puffy, Zareh Sarkissian, would

8   pretend to be cops, you would approach somebody who was

9   obviously a streetwalker, a prostitute, and tell them

10  basically, "Get out of town" or "Get off this block.  I don't

11  want to see you here anymore," right?  That was part of it?

12            MR. AMATRUDA:  Objection.  That was a four-part

13  compound question.

14            THE COURT:  Yeah, I think that the form of the

15  question has to be broken down.

16  Q    You would identify people who were prostitutes, correct?

17  A    Yes, sir.

18  Q    You would stop your vehicle, right?

19  A    Yes, sir.

20  Q    You would pretend that you were police officers, right?

21  A    Yes, sir.

22  Q    You would tell the woman, "I don't want to see you on the

23  block anymore.  Please get off the block," right?

24  A    Yes, sir.

25  Q    You would then go around the block and she would still be

1  there, right?

2  A    Yes.

3  Q    And then you would pull her in the car and say, "Sorry, I

4  got to take you downtown"?

5  A    Yes.

6  Q    Then when you had her in the car, you would say things

7  like, "You know, maybe we could work this out some other way,"

8  right?

9  A    Yes.

10 Q    And that other way would be to engage in sex --

11 A    Yes, sir.

12 Q    -- with these prostitutes, correct?

13 A    Yes.

14 Q    How many times did you do that?

15 A    Probably like twice.

16 Q    You mentioned before that when you were fooling around

17 with the Bloods, all of a sudden, they were doing stuff that

18 wasn't consistent with your religion, right?

19 A    Yes.

20 Q    I assume your religion is Islam?

21 A    Yes, sir.

22 Q    Does Islam condone murder?

23 A    No.

24 Q    Robbery?

25 A    No.

1   Q     Extortion?

2   A     No.

3   Q     Drug dealing?

4   A     No.

5   Q     Hurting people?

6   A     No.

7   Q     Frightening people?

8   A     No.

9   Q     You've done all those things?

10  A     Yes, I have.

11  Q     A little while ago you talked about a conversation

12  involving a check and a checkmate; am I correct?

13  A     Yes, sir.

14  Q     And you said that after T Rock was murdered, World,

15  Damion Hardy, my client, would say things to you like "check,

16  check," and you weren't quite clear on what he was doing,

17  right?

18  A     Yes, sir.

19  Q     Then later after Ivery Davis was killed it became

20  "checkmate"?

21  A     Yes, sir.

22  Q     So your recollection is Ivery Davis was killed after

23  T Rock?

24  A     Well, you're correct.

25  Q     I'm correct that Ivery Davis --

1    A    You're correct in the timeline, but the matter still

2    exists that that was the conversation I was just trying to

3    give --

4               THE COURT:  The question is who was killed first.

5               THE WITNESS:  Yes.

6               THE COURT:  The question is who was killed first,

7    Davis?  I think that's what the nature of the question is, to

8    find out who was killed first.

9               Do you understand what I'm asking you?

10              THE WITNESS:  Yes, sir.

11              THE COURT:  Do you know who was killed first?

12              THE WITNESS:  If I recall, it was Peanut.

13   BY MR. RUHNKE:

14   Q    So the conversation couldn't have changed from "check" to

15   "checkmate" after Ivery Davis was killed if you were talking

16   about it at the time of T Rock, right?

17   A    That would be correct.

18   Q    You never considered yourself a member of Cash Money

19   Brothers, whatever that is; is that correct?

20   A    I didn't consider myself a member, but I -- my actions

21   said that I was.  Everything -- I participated in everything

22   that a member would participate in and I reaped the benefits.

23   Q    You thought it was kind of childlike that they would have

24   a name like Cash Money Brothers from a movie, right?

25   A    Yes, I did.

*Myers - Cross / Ruhnke*                                    2566

1   Q    And really there were two different crews, according to

2   your testimony; there were those who dealt with Wise and those

3   who dealt with World?

4   A    Yes.

5   Q    And although they sometimes helped each other out, it

6   really was the Wise crew and then there was the World crew,

7   correct?

8   A    Well, all of these individuals would sell for either Wise

9   or World.  World had a different rapport with a different

10  range of individuals.  Wise dealt with the younger guys.

11  World dealt with the guys that grew up with him.

12  Q    Now, going back to this fake cop thing you had going with

13  Puff, Zareh Sarkissian.

14        During one of those things someone was killed,

15  right?

16  A    Yes, sir.

17  Q    The plan was to buy PlayStations at a time when they were

18  very expensive, right?

19  A    Yes.

20  Q    And did Puff tell you that he had talked to the seller

21  and thought that the seller might be kind of not on the

22  up-and-up too?  Do you remember having that conversation?

23  A    I don't recall that conversation.

24  Q    But you were armed during that encounter, correct?

25  A    Yes, I was.

1    Q    And Puffy was certainly armed during that encounter,

2    correct?

3    A    Yes, sir.

4    Q    And Puffy's brother was also in on that one, right?

5    A    Yes.

6    Q    And he was armed, correct?

7    A    Yes.

8    Q    And what happened is you met these sellers of

9    PlayStations at a, what, at a movie complex, right?

10   A    Yes, sir.

11   Q    In the parking lot behind it?

12   A    That's correct.

13   Q    And the conversation went back and forth, and all of a

14   sudden, things started to go bad, right?

15   A    Well, actually, it went bad after me and Puffy's brother

16   who was leaving the parking lot was when we heard the shots.

17   Q    So what happened is Puff tried to drive off and one of

18   the people you had ripped off jumped on the car, right?

19   A    Yes.

20   Q    And as Puff is driving along, you hear shots and turns

21   out he killed the guy?

22   A    Yes.

23   Q    You've been in custody now for ten years?

24   A    Yes, sir.

25   Q    At the time you were arrested, you faced a possibility of

1    a mandatory life sentence, right?

2    A    Yes, sir.

3    Q    At the time you were arrested, you faced the possibility

4    of the death penalty, right?

5    A    Yes, sir.

6    Q    And somewhere along the way, the possibility of the death

7    penalty went away, right?

8    A    Yes.

9    Q    And you believe that was because you're cooperating with

10   the Government, correct?

11   A    I don't know why that went -- I know that the case was

12   presented before the grand -- the attorney general and I got a

13   letter back from a lawyer saying that he wasn't going to

14   pursue the death penalty.

15   Q    My question was do you believe that that was in

16   connection with the fact that you were cooperating?

17   A    Yes.

18   Q    So now you don't face the death penalty, and if the

19   Government writes a 5K letter for you, there's a possibility

20   of your getting time served, right?

21   A    Yes, sir.

22   Q    So you've gone from mandatory life, possible death

23   penalty to a potential for time served, correct?

24   A    Correct.

25   Q    Obviously you're hoping for time served, correct?

1  A    Yes.

2  Q    Do you think you're ready to come out of prison?

3  A    Yes, I -- yes, I -- yes, I do think that I'm ready to

4  come out.

5  Q    You've been rehabilitated?

6  A    I mean, sir, I've been in prison for ten years.  I know

7  the amount of time that I've been in prison doesn't pay for my

8  activity and the crimes that I participated in, but whatever

9  time that I get, whatever time the judge decides to give me,

10  that's the time that I'm willing to get.

11  Q    But when it's time to be sentenced, you're going to say

12  to the judge, "I believe that I am ready to come out of prison

13  and rejoin society despite of everything I've done," right?

14  A    Yes, I will.

15  Q    Just to fix the time a little bit, you murdered Kojack a

16  couple of days after Wise was shot, correct?

17  A    Yes, sir.

18  Q    In fact, Wise was still alive when you murdered Kojack,

19  correct?

20  A    Yes, sir.

21  Q    Brain dead reported, but still alive, right?

22  A    Yes, sir.

23  Q    And you had two real reasons for doing that.  One is you

24  wanted to sort of re-establish yourself as an upstanding

25  member of the group who had nothing to do with Wise's death,

*Myers - Cross / Ruhnke*                                    2570

1    correct?

2    A    Yes.

3    Q    And the other one was simply you wanted to take vengeance

4    because Wise had been your best friend?

5    A    Yes.

6    Q    And that was a personal reason of your own, right?

7    A    Yes.

8    Q    You told us that from time to time you were committing

9    armed robberies; is that correct?

10   A    Yes, sir.

11   Q    Through what period of your life were you committing

12   armed robberies?

13   A    Up until the time that I was dealing with Puffy.

14   Q    And when was that?  Give me a year.

15   A    I can't recall what year that was that me and Puffy

16   stopped dealing with one another.

17   Q    But at some point -- when did you start doing armed

18   robberies?

19   A    At the age of 15 to 16 years old.

20   Q    How old are you now?

21   A    45.

22   Q    And how old were you when you met Puffy?

23   A    Probably in my 30s.

24   Q    So from the time you were 15 up until your 30s, minus

25   some time in prison, you were doing armed robberies on a

1   regular basis?

2   A      Yes.

3   Q      And where would you commit these armed robberies?

4   A      In various places.

5   Q      Name a couple.

6   A      Train stations, buildings.

7          I don't know what you want me to tell you.

8   Q      Always in Brooklyn?

9   A      No.

10  Q      By train stations, do you mean subways?

11  A      Yes, sir.

12  Q      So somebody would be standing on a subway platform at

13  nighttime waiting for a train by themselves and you'd come up

14  with a gun?

15  A      No, no, no.  When I say "train stations," I'm describing

16  the times when I was snatching jewelry.  Those were the places

17  where I would snatch jewelry at.

18  Q      The chain snatching was something different than the

19  armed robberies, right?

20  A      Yes.

21  Q      Chain snatching is somebody's walking around with a gold

22  chain --

23  A      Yes.

24  Q      -- minding their own business and you'd run up behind

25  them or in front of them, just grab it off their neck and

1   break it and steal it, right?

2   A    Yes.

3   Q    And keep going, and you would just keep running, right?

4   A    Yes, sir.

5   Q    Armed robberies are walking up to a person with a gun and

6   saying, "Give me your money or I'm going to kill you"?

7   A    Yes.

8   Q    And how many times did you do that?

9   A    I couldn't even count.

10  Q    A hundred times?

11  A    I doubt if it was a hundred times.

12  Q    Eighty times, getting there?

13  A    I don't know, sir.

14  Q    Did you ever look at people, look them in the eye when

15  you did that?

16  A    No.

17  Q    Did they look frightened?

18  A    Of course.

19  Q    Anybody ever scream?

20  A    No.

21  Q    Did you ever hit anybody?

22  A    Of course I have.

23  Q    No, in the course of an armed robbery, did you ever smack

24  anybody with a gun?

25  A    Never had to.

1   Q    Did you ever shoot anybody during an armed robbery?

2   A    No.

3   Q    Anybody ever refuse?

4   A    No.

5   Q    You would show the gun and people would basically be

6   terrified and they would give you what you wanted, right?

7   A    Yes.

8   Q    And you wanted what you wanted and you took it at the

9   point of a gun?

10  A    Yes, sir.

11  Q    Now, in the course of your testimony here, you haven't

12  given us very many specific dates and times, right?

13  A    Correct.

14  Q    I mean, you're here in 2015 talking about things that

15  happened 15, 20 years ago, right?

16  A    Correct.

17  Q    Do you remember who was president in the year 2000?

18       You don't have to answer that.  I'm trying to figure

19  it out.  Even I couldn't figure it out.  So I'll move on to

20  another question.

21       MR. AMATRUDA:  Objection.

22       THE COURT:  Sometimes we get interesting questions.

23  Q    Back to serious questioning.

24       I mean, you've basically given us these things

25  occurred around the year 1998 or around 2000.  You know, other

1    than we know when murders occurred because there's lots of

2    police reports and things like that, but other than that,

3    you've had to give a sort of a range of years, right?

4    A    Yes.

5    Q    You've talked about conversations that you had with World

6    over the telephone in a couple of contexts, one context being

7    while he was in prison, right?

8    A    Yes, sir.

9    Q    In the course of those phone calls, you discussed,

10   according to you, Wise's murder, among other things, right?

11   A    Yes, sir.

12   Q    You discussed who was going to take over the drugs now

13   that Wise is dead, correct, according to you?

14   A    Yes.

15   Q    How many phone calls do you think you had, according to

16   you, with Mr. Hardy, Damion Hardy, while he was in prison?

17   A    I don't recall the exact amount of phone calls that we

18   had.  We spoke frequently.

19   Q    So the best you know is it was frequently?

20   A    Yes.

21   Q    I mean, it's been 20 years.

22        Were you concerned that these calls were recorded?

23   A    No.

24   Q    Were some of the calls three-way calls?

25        Do you know what I mean by that?

*Myers - Cross / Ruhnke*                                    2575

1    A    Yes, I do.

2         Yes, some of them were.

3    Q    And the way that would work is somebody would call a

4    number maybe on an approved phone number list and ask that

5    person to make a three-way call that would bring another

6    person in, correct?

7    A    Yes, sir.

8    Q    And that other person might be, for example, you,

9    correct?

10   A    Yes.

11   Q    Did you ever go to visit Damion Hardy while he was in

12   jail?

13   A    No.

14   Q    Have you ever visited anyone in prison?

15   A    Yes.

16   Q    And you've been in prison yourself and have had visitors,

17   right?

18   A    Yes, sir.

19   Q    And you know that in state prison the visits are

20   face-to-face, correct?

21   A    Yes, sir.

22   Q    They're not over a phone or through a window, it's just

23   two people talking face-to-face, correct?

24   A    Yes, sir.

25   Q    There's even conjugal visits in some state prisons,

1    correct?

2    A    Yes, sir.

3    Q    Do you understand what the word "kite" means, K-I-T-E?

4    A    Yes, I do.

5    Q    Is that a slang street term for a message smuggled,

6    basically, out of prison?

7    A    Yes.

8    Q    And a kite can also refer to, again, clandestine

9    communications within prison from prisoner to prisoner, for

10   example?

11   A    Yes.

12   Q    Clandestine meaning unauthorized, unknown to authorities,

13   right?

14   A    Yes.

15   Q    Now, do you remember a time when detectives came to speak

16   with you about the murder of Ivery Davis?

17   A    Yes.

18   Q    At the time they came to you, you had a choice of

19   speaking to them or not speaking to them, correct?

20   A    Yes, sir.

21   Q    And do you recall the date of when that occurred?

22   A    No, I don't.

23   Q    Would it have been on or about May of 2001, May 1, 2001?

24   A    Possibly.

25   Q    And you were, at that point, in custody for a robbery,

1   right?  You could have said no, you didn't want to be

2   interviewed, but you did decide to speak with them, correct?

3   A     Yes.

4   Q     And you decided that you would lie to them, right?

5   A     Yes.

6   Q     Were you ever on parole?

7   A     Yes, I was.

8   Q     Did you ever lie to the parole officer?

9   A     Of course I have.

10  Q     Because if you told them the truth about what you were

11  doing, you would be in violation of parole, right?

12  A     Yes, sir.

13  Q     Makes perfect sense to you?

14  A     Yes.

15  Q     And you could have said no when the detectives came to

16  see you about Ivery Davis, but you decided you did want to

17  speak to them, correct?

18  A     No, I couldn't have said no.  They told me that I had to

19  speak with them.

20  Q     And you decided if they were going to force you to speak

21  to them that you would simply lie to them, right?

22  A     Yes, I decided to lie to them.

23  Q     And you said that you really had no idea who murdered

24  Ivery Davis, right?

25  A     Yes.

*Myers - Cross / Ruhnke*                                   2578

1    Q    Flat out lie, right?

2    A    Flat lie.

3    Q    Because according to you, you were there when it

4    happened?

5    A    Yes, sir.

6    Q    And you said that you never had any dealings with Ivery

7    Davis, and that was another flat out lie, right?

8    A    Of course.

9    Q    You did tell them when they asked you do you know any

10   reason why somebody would want to kill Nut, Peanut, Ivery

11   Davis, you told them, quote, Well, Nut had 101 enemies.

12            Do you remember telling them that?

13   A    Yes.

14   Q    Well, certainly drug dealers have lots of enemies or

15   people who may want to do them harm; is that correct?

16   A    Yes, sir.

17   Q    Drug dealing is a risky business, right?

18   A    Yes.

19

20            (Continued on following page.)

21

22

23

24

25

1    CROSS-EXAMINATION (CONT'D.)

2    BY MR. RUHNKE:

3    Q     High reward, high risk?

4    A     Yes.

5    Q     One of the risks is you're going to get busted and go to

6    prison, right?

7    A     Yes, sir.

8    Q     One of the risks is that other drug dealers may cheat

9    you, right?

10   A     Yes, sir.

11   Q     A lot of cheating and lying going on in that business,

12   right?

13   A     Yes, sir.

14   Q     Another risk is that someone, a robbery crew may want to

15   move in on you and steal your money, steal your drugs, right?

16   A     That's correct.

17   Q     And you know if you're a drug dealer and you get robbed

18   of $100,000 and five kilos of cocaine, you can't go to the

19   79th Precinct and say someone just took my cocaine and my

20   hundred grand, right?

21   A     Yes, sir.

22   Q     So, that's another problem.

23            You also knew about Ivery Davis that he would slap

24   and abuse women and that made him enemies of their husbands,

25   fathers, brothers, right?

*Myers - cross - Ruhnke*                                              2580

1   A     Yes.

2   Q     And that was true, right?

3   A     As far as I know.

4   Q     So, that was another reason why people might want to go

5   after Ivery Davis that you told the police on that day in May

6   of 2001?

7   A     Yes, sir.

8   Q     You told the police that at the time Ivery Davis was

9   killed you were with your girlfriend whose name is Lavine

10  Marks at Lafayette Gardens, is that true?

11  A     Say that again.

12  Q     You were with your girlfriend whose name is Lavine?

13  A     Yes.

14  Q     Lavine Marks?

15  A     Yes.

16  Q     That's what you told them?

17  A     Yes, sir.

18  Q     Flat out lie?

19  A     Yes, sir.  The name.

20  Q     Okay.  Well, you weren't with any girlfriend?

21  A     I wasn't with her and I lied about the name too.

22  Q     You didn't even have a girlfriend named Lavine Marks?

23  A     No, actually at the time I was trying to say her name, I

24  didn't know her last name, I just gave the right first name,

25  wrong last name.

*Myers - cross - Ruhnke*                                                    2581

1    Q     Okay.  So, you had a girlfriend named Lavine?

2    A     Lavina.

3    Q     Lavina?

4    A     Yeah.

5    Q     Okay.  And so, a lot of this stuff was simply made up to

6    protect yourself, right?

7    A     Yes, sir.

8    Q     Now, when it came to the Baum brothers, Darryl Baum and

9    T Rock; Darryl Baum was known as Homicide, right?

10   A     Yes, sir.

11   Q     Homicide was, in sum and substance, a very feared street

12   gangster, correct?

13   A     Yes, sir.

14   Q     His reputation was for having committed murders, right?

15   A     Yes, sir.

16   Q     You don't know it for a fact but you know he had a

17   reputation for having killed people?

18   A     Yes.

19   Q     And Tyrone Baum was Darryl's brother, right?

20   A     Yes.

21   Q     And.  According to your testimony, Taz believed that

22   Tyrone Baum was one the people responsible for his father's

23   murder, Edward -- what was Taz's father's name, Patrick Cooke?

24   A     Yes, yes.

25   Q     And Patrick Cooke was himself a drug dealer?

*Myers - cross - Ruhnke*                                    2582

1   A    So I heard, I couldn't confirm that.

2   Q    So, like father, like son in that --

3              MR. AMATRUDA:  Objection.

4              THE COURT:  Sustained as to the question.  Don't

5   answer it.

6   Q    And so, in reality, Taz had a motive for wanting both

7   Baum brothers dead, right?

8   A    Yes.

9   Q    He wanted Tyrone Baum dead, T Rock, because T Rock had

10  played a role in the murder of Taz's father and Taz is Edward

11  Cooke, right?

12  A    Yes, sir.

13  Q    He wanted Darryl Baum dead because Darryl Baum had robbed

14  a gambling spot that Taz was running and Taz had wound up

15  getting shot by this guy Black-O Mack-O, right?

16  A    Yes.

17  Q    So, Taz had a reason for wanting both of these guys dead,

18  right?

19  A    Yes, sir.

20  Q    Okay.  You talked about I think a shoplifting ring that

21  you were involved in?

22  A    Yes.

23  Q    Okay.  And that there were two or three women who were

24  like professional shoplifters?

25  A    Yes.

*Myers - cross - Ruhnke*                                                2583

1   Q    Their names?

2   A    One girl name was Tawana, one girl name was Keisha,

3   another girl name was Red.

4   Q    Okay.  And any last names?

5   A    I could probably remember if I thought about it hard but.

6   Q    Is Red somebody whose sister got murdered at some point?

7   A    Yes.

8   Q    Okay.  All right.  So, people would go into, what, fur

9   stores, high end stores, what kind of stores?

10  A    All kind of stores.

11  Q    Clothing stores mostly?

12  A    Yes.

13  Q    And the plan would be to shop lift and steal large

14  quantities of clothing, right?

15  A    Yes, sir.

16  Q    Is it so that the women involved would have some kind of

17  vest or even a garter belt kind of thing under their coats and

18  they would like hook stuff on to it, right?

19  A    Yes.

20  Q    And so, they would just be there with a coat on and

21  hooking all this stuff on them and your role was to be the

22  muscle, right?

23  A    Yes, sir.

24  Q    If something went wrong, you were there to protect them,

25  right?

1   A    Yes.

2   Q    And you got caught doing this, what, two, three times?

3   A    Yes, sir.

4   Q    How many times did you do it, 50?

5   A    Not 50.

6   Q    Okay.

7   A    I don't know how many times but --

8   Q    A lot?

9   A    A lot though.

10  Q    And what did you get out of this?

11  A    Money, clothing.

12  Q    So, part of the deal was you'd get -- when they sold the

13  merchandise, you'd get a cut of it?

14  A    Yes.

15  Q    And part of the deal was if they shoplifted something

16  that you were kind of attracted to, they'd give that to you as

17  part of your --

18  A    Exactly.

19  Q    Okay.  Remember the time you had to beat up a sales

20  clerk?

21  A    Yes.

22  Q    And what happened on that occasion was somebody got on to

23  the fact that, hey, these women are stealing the store, right?

24  A    Yes.

25  Q    And a sales clerk tried to stop them, right?

1    A    Yes.

2    Q    A male or female?

3    A    Female.

4    Q    Okay.  And you just beat the heck out of her, didn't you?

5    A    I don't recall how it went, I just remember the

6    altercation happening and I was arrested.

7    Q    And how big were you back then?

8    A    I don't know.

9    Q    And you punched her in the face?

10   A    I don't recall punching her in the face.

11   Q    What happened to your memory?

12   A    What you mean what happened?

13            THE COURT:  Is there a reason why you don't remember

14   that you punched her in the face?

15            THE WITNESS:  I don't remember the specifics of

16   everything that happened in my life.

17            THE COURT:  Do you remember punching her in the face

18   at all?

19            THE WITNESS:  I don't remember exactly punching her.

20   I remember trying to get out of the store.

21   Q    How many times have you punched women?

22            MR. AMATRUDA:  Objection.

23            THE COURT:  Overruled.

24   Q    How many times?

25   A    I don't know.

1  Q     Ten times?

2  A     I don't know.

3  Q     Okay.  More?

4  A     I don't know.

5  Q     Okay.

6              THE COURT:  I guess the question assumes that you

7  have punched a woman.  I mean I'm not clear, have you ever

8  punched a woman?

9              THE WITNESS:  I don't recall punching a woman in the

10 face.

11             THE COURT:  You don't recall ever punching a woman

12 in the face?

13             THE WITNESS:  No.

14             THE COURT:  All right.

15 Q     Something you wouldn't forget, right?

16             THE COURT:  He's answered the question.  Next

17 question.

18 Q     And you were released from prison in what year; 1995 did

19 you come out of prison?

20 A     Yes.

21 Q     And what had you been in prison for?

22 A     At that time I had went to prison for the robbery.

23 Q     And how much time did you get for the robbery?

24 A     Two to four.

25 Q     And you came out of prison and you were on parole, right?

*Myers - cross - Ruhnke*                                              2587

1    A    Yes.

2    Q    Lying to your parole officer?

3    A    Yes.

4    Q    And you went right back to the life of crime?

5    A    Yes, I did.

6    Q    Burglaries?

7    A    Yes.

8    Q    So, another thing you used to do was break into stores?

9    A    Yes.

10   Q    100 times?

11   A    Less than that.

12   Q    Okay.  A lot?

13   A    A lot.

14   Q    Can you name one store that you broke into?

15   A    Farmers Market.

16   Q    What's Farmers Market?

17   A    Farmers Market is a store across the street from my

18   housing complex.

19   Q    And what did you do when you got in -- was this at night,

20   the store was closed?

21   A    Yes, sir.

22   Q    How many people went in?

23   A    Probably two or three.

24   Q    And what did you do?

25   A    We used to go in and loot the merchandise.

*Myers - cross - Ruhnke*                                           2588

1    Q    And you'd loot the merchandise, the store owners would

2    come in the next day and, you know, their stuff was all gone,

3    stolen?

4    A    Yes.

5    Q    By you?

6    A    Yes.

7    Q    You went back to robberies, right?

8    A    Yes.

9    Q    You went back to hurting people, scaring people?

10   A    Yes.

11   Q    Okay.  You went back to dealing drugs?

12   A    Yes, sir.

13   Q    Carrying firearms?

14   A    Yes, sir.

15   Q    Roaming the city armed and dangerous, right?

16   A    Yes.

17   Q    You chose that life?

18   A    Yes, I did.

19   Q    You could have chose different, right?

20   A    Definitely.

21   Q    You've admitted to beating people up and shooting people,

22   right?

23   A    Yes, sir.

24   Q    You've admitted to framing people, if necessary, right;

25   framing people, if necessary?

*Myers - cross - Ruhnke*                                           2589

1   A     Yes.

2             THE COURT:  Do you know what that means?

3             THE WITNESS:  Yes.

4   Q     And the answer was yes?

5   A     I've lied on people before, yes.

6   Q     So, that's framing people, right?

7   A     Yes.

8   Q     You described yourself from time to time as a thug,

9   right?

10  A     Yes.

11  Q     Going back to the Bloods, according to you, Damion Hardy

12  was actually never a Blood; is that correct?

13  A     Correct.

14  Q     You were a Blood for a while, right?

15  A     No.

16  Q     You were never a Blood?

17  A     I professed to be a Blood with Damion Hardy.

18  Q     Okay.  And as you've told us, Bloods were a bunch of

19  young kids who wanted to do things against your religion and

20  you distanced yourself, correct, from them?

21  A     No, I didn't say they wanted to do things against my

22  religion, I didn't state it like that.

23  Q     Yesterday when you were testifying did you say that?

24  A     I said they were doing things, I said, and -- I didn't

25  say specifically like as if they were targeting my religion

1  like they wanted to do things against my religion, like the

2  way you're wording it to me sounds as if they're, you know,

3  targeting my religion specifically.  I was having conflict of

4  what was going on, what I was seeing pertaining to some of the

5  things that I was being taught within my religion.

6  Q    Okay.  So, what the Bloods were doing you determined to

7  be really inconsistent with Islam, right?

8  A    Yes.

9  Q    And because of that, you didn't want to pursue any

10  further relationship with the Bloods, right?

11  A    Yes.

12  Q    Okay.  But that was like in 1998, right?

13  A    Yes.

14  Q    Okay.  But for the next like eight years you just

15  continued to live a life of crime, right?

16  A    Yes, sir.

17  Q    Violated every principle of Islam, right?

18  A    Not every one but a lot of them.

19  Q    Most of them?

20  A    Yes.

21  Q    Okay.  And it is your testimony just -- oh, false names,

22  I forgot about false names.  You used false names?

23  A    Yes, I have.

24  Q    How often?

25  A    I wouldn't be able to recall how many times I have done

*Myers - cross - Ruhnke*                                          2591

1   it.

2   Q    Okay.  More than ten times?

3   A    I don't think so.

4   Q    Okay.  And you use a false name to fool people, right?

5   A    Yes.

6   Q    You would get pulled over by the police or arrested and

7   instead of saying my name is Dwayne Myers, you would say my

8   name is something else, correct?

9   A    Yes.

10  Q    What are some of the names that you used, false names?

11  A    Gregory Johnson, Mark Adams.

12  Q    Others?

13  A    Those are the names.

14  Q    You only used two?

15  A    No, I've used more but those are the ones I recall.

16  Q    And when did you use the name Gregory Johnson?

17  A    When I was locked up for the particular case that you

18  asked me about with the clothing store.

19  Q    Okay.  The one that you punched the woman?

20  A    Yes.

21  Q    Okay.  So, you were locked up for that one and when they

22  came to arrest you and asked you what your name was, you lied

23  to the police and said "I'm Gregory Johnson"?

24  A    Yes, sir.

25  Q    And the reason for doing that is to stop them from

*Myers - cross - Ruhnke*                    2592

1   finding out who you really are?

2   A    Yes.

3   Q    Did you have any warrants out for you at that point?

4   A    I don't think that I had a warrant but I was on parole I

5   remember.

6   Q    You certainly didn't want Parole to know you had been

7   arrested?

8   A    Exactly.

9   Q    Okay.  And have you ever had warrants out on you?

10  A    I assume that I have.

11  Q    Okay.  Have you ever jumped bail?

12  A    No.

13  Q    Have you ever known that the police were looking for you

14  and not turned yourself in?

15  A    You wouldn't believe me if I told you that my mother

16  wouldn't allow me to live in her household with the police

17  looking for me, any time that the police came to my house

18  looking for me my mother would march me down to the precinct.

19  Q    Okay.  And did your mother approve of your activities --

20            MR. AMATRUDA:  Objection.

21  A    No way.

22            THE COURT:  He answered it.

23  Q    But you continued anyway?

24  A    Yes.

25  Q    So, you consider yourself really rehabilitated, ready to

*Myers - cross - Ruhnke*                                      2593

1    join society?

2    A     I like to believe so, sir.

3              MR. RUHNKE:  Okay.  I don't have anything further.

4              THE COURT:  Now, Mr. Herman or Mr. Beecher, do you

5    have any questions?

6              MR. BEECHER:  I have a lot of questions.

7              THE COURT:  You have some questions I assume.

8              MR. BEECHER:  We can take a break now.

9              THE COURT:  I think this may be --

10             MR. RUHNKE:  Your Honor, I'm sorry, there is one

11   more question I forgot to ask about.

12             THE COURT:  Go ahead.

13   Q     You were arrested for the murder of Troy Davis, right?

14   A     Yes.

15   Q     And an eyewitness actually claims to have seen you do the

16   murder, right?

17   A     That's what I was told.

18   Q     Okay.  And you had a false alibi all ready to go, right?

19   A     Yes.

20   Q     You had spoken to your girlfriend, what's her name?

21   A     My girlfriend I didn't know at that time, you're talking

22   about in connection with that.

23   Q     The story was you were playing video games and therefore

24   could not have been the one who killed Troy Davis, right?

25   A     No, no.

1    Q     You were in somebody's apartment?

2    A     Yes.

3    Q     You were in somebody's apartment so you could not have

4    been there but that was a lie, right?

5    A     Yes, it was.

6    Q     And she actually went down and spoke to the District

7    Attorney, right?

8    A     Yes.

9    Q     You knew that?

10   A     Yes.

11   Q     She passed your lie on to the District Attorney, right?

12   A     Yes.

13   Q     And then that case against you was dismissed, right?

14   A     Yes.

15            MR. RUHNKE:  Okay.  Now I have nothing further, Your

16   Honor.

17            THE COURT:  All right.  This is the appropriate time

18   to take our morning break for 15 minutes.

19            And then, Mr. Beecher, you'll have

20   cross-examination, correct?

21            MR. BEECHER:  Yes.

22            THE CLERK:  All rise.

23            (Jury leaves courtroom.)

24            (Witness steps down.)

25            (Recess taken.)

1             (Witness resumes the stand.)

2             THE COURT:  Mr. Beecher, cross-examination on behalf

3    of your client, Mr. Granton, go ahead.

4             MR. BEECHER:  Thank you, Your Honor.

5    CROSS-EXAMINATION

6    BY MR. BEECHER:

7    Q    It is still the morning so I'll say good morning,

8    Mr. Meyers.

9    A    Good morning, sir.

10   Q    My name is Robert Beecher and I represent E-Bay, Aaron

11   Granton, okay?

12   A    Yes.

13   Q    I'm going to ask you some questions and if there's

14   anything that you don't understand, please right away just

15   stop me and we'll clarify things for you, okay?

16   A    Yes, sir.

17   Q    All right.  Now, you've pled guilty to murder?

18   A    Yes, sir.

19   Q    Racketeering?

20   A    Yes, sir.

21   Q    Robbery?

22   A    Yes, sir.

23   Q    And assorted related crimes; is that correct?

24   A    Yes, sir.

25   Q    And, of course, you pled guilty under the terms of a

1  cooperation agreement?

2  A    Yes, sir.

3  Q    And you are seeking, as has been pointed out, essentially

4  what is known in our system as the holy grail, the holy grail

5  being a 5K letter, right?

6  A    Yes, sir.

7  Q    Without a 5K you're down the tubes, right?

8  A    Yes, sir.

9  Q    And you told us that really it doesn't make much

10 difference what the outcome of the trial is, what's only

11 important is the government's opinion of you, correct --

12          MR. AMATRUDA:  Objection.

13 Q    -- of your testimony, how they evaluate your testimony,

14 correct?

15 A    Yes, sir.

16 Q    And that means that you are not allowed to lie under

17 oath?

18 A    Correct, sir.

19 Q    And you are also not permitted to lie during the course

20 of your meetings with the government?

21 A    Correct.

22 Q    The proffer sessions?

23 A    Yes, sir.

24 Q    And you had a number of those, didn't you?

25 A    I don't know what you're talking about.

1    Q    You had a number of meetings with the government before

2    you came to court to testify?

3    A    Yes.

4    Q    Do you remember about how many?

5    A    No.

6    Q    But it was a lot?

7    A    Yes.

8    Q    Now, you do understand that a lie cannot only be

9    something that you say is false; for example, if you were

10   asked to tell somebody what time it was and you knew that it

11   was 12 noon and you told them, I swear that it is 6:00 in the

12   morning, that would be a lie, right?

13   A    Yes.

14   Q    Do you know what a lie of omission is, when you fail to

15   tell somebody something that you are required to tell them?

16   A    Yes.

17   Q    I'd like to take a look, if you don't mind, at your

18   cooperation agreement which is in evidence as Government

19   Exhibit 73 and I'm just going to put it up here on the Elmo

20   and I've highlighted some things so it will be easier for you

21   to follow, okay.

22           Now, you can see that, right?

23   A    Yes.

24   Q    Now, under the terms of this agreement with the

25   government, you are not going to be charged with participation

*Myers - cross - Beecher*                                    2598

1    in criminal activity involving, number one, conspiracy to

2    murder Michael Colon on April 14th, 1998, do you see that?

3    A    Yes.

4    Q    The murder of and conspiracy to murder Gerard Mackens,

5    number two; the murder and -- number three -- conspiracy to

6    murder Ivery Davis; carjacking, robbery and felony murder of

7    Prince Osua on December 11th, 2000, correct?

8    A    Yes.

9    Q    The murder of and conspiracy to murder Tyrone Baum,

10   correct?

11   A    Yes.

12   Q    Attempted murder of an individual after confrontation at

13   a medical clinic in or about 2000, that's number seven,

14   correct?

15   A    Yes.

16   Q    Conspiracy to commit kidnapping and robbery by

17   impersonating New York City police officers in or about 2000,

18   correct?

19   A    Yes, sir.

20   Q    And, by the way, there were other times outside of the

21   year 2000, and correct me if I'm wrong, that you impersonated

22   a police officer and committed robberies outside of the year

23   2000?

24   A    I don't recall the time frame, I couldn't be able to say

25   outside of that year during the time that we had committed

1   that particular type of crime, I don't know the duration of

2   time we were doing it or the length of, you know, I couldn't

3   say.

4   Q    But, in any event, you will not be prosecuted for any

5   kidnapping, robbery, etc., while impersonating New York City

6   police officers in or about 2000, right?

7   A    Correct.

8   Q    Also, you won't be prosecuted for distributing, aiding

9   and abetting in the distribution of and conspiracy to

10  distribute cocaine base in or about and between 1992 and 1993

11  and in or about and between 1996 and 2004, right?

12  A    Correct.

13  Q    Distribution of and conspiracy to distribute heroin in or

14  about and between 2000 and 2005, that's number nine, correct?

15  A    Correct.

16  Q    And actually some of these coverages that you're getting

17  cover a whole slew of criminal conduct, it may be listed here

18  as distribution of heroin between 2000 to 2005 but just so the

19  jury doesn't get the wrong impression, that covered any

20  distribution of heroin offenses during that period of time,

21  during that five year span, correct?

22  A    Yes.

23  Q    Unlawful possession, number ten, of firearms in or about

24  and between 1995 and 2004, again a nine year period?

25  A    Yes, sir.

1  Q    Correct.

2         And, finally, robbery and conspiracy to commit armed

3  robberies in or about and between 2000 and 2002, correct?

4  A    Correct.

5  Q    So, all of these offenses that we just went over are

6  offenses for which you will not be prosecuted assuming you get

7  your holy grail, the 5K, right?

8  A    Yes, sir.

9  Q    Now, you told us that you quit school in 10th grade?

10 A    Yes, sir.

11 Q    And you went to prison for robbery and criminal trespass

12 shortly thereafter, right?

13 A    That was in the beginning, yes.

14 Q    Right.  And, you know, you'll have to excuse me,

15 sometimes I'm going to move to a date which is out of

16 chronological order.

17 A    I understand.

18 Q    So, let's keep track of these things, okay?

19 A    Yes, sir.

20 Q    And you broke into lockers to steal other young people's

21 valuables; is that right?

22 A    Yes, sir.

23 Q    And you didn't care if those kids in school found those

24 things you were stealing to be precious to them, did you?

25 A    Correct.

*Myers - cross - Beecher*                                          2601

1    Q    It didn't matter that they were important to them, you

2    broke into the lockers and stole them anyway?

3    A    That's true.

4    Q    And essentially you went on a crime spree?

5    A    Yes.

6    Q    Is that true?

7    A    Yes.

8    Q    Now, you told us just a few moments ago when Mr. Ruhnke

9    was questioning you and yesterday that you engaged in purse

10   snatching, correct?

11   A    Yes, sir.

12   Q    And also you went into various areas of the city to do

13   that, right?

14   A    Yes, sir.

15   Q    Now, a purse snatch, would that be similar to a chain

16   snatch?

17   A    Yes.

18   Q    Where you would run up to somebody and just grab their

19   purse?

20   A    Yes, sir.

21   Q    And it wouldn't matter what was in the purse, you'd just

22   grab it, you wouldn't know what was in it when you grabbed it?

23   A    Correct.

24   Q    But you were, of course, hoping that there would be

25   credit cards and money, right?

1    A    Correct.

2    Q    And if there were credit cards in the purse, what would

3    you do with those?

4    A    I never did any -- had any dealings with credit cards, I

5    never had any interest in credit cards.  I don't know what

6    you're asking me about.

7    Q    Did you throw them away?

8    A    Yes, because I had no knowledge of any crime that could

9    even be committed with a credit card during the time that I

10   was snatching pocketbooks.

11   Q    But if there was anything that was not of value to you

12   personally, you would discard it, you'd throw it away?

13   A    Yes.

14   Q    And it wouldn't matter if it had any value to the person

15   or people whose purse it was?

16   A    That's correct.

17   Q    It wouldn't matter to you?

18   A    That's correct.

19   Q    So, if it had say a birth certificate or a passport or a

20   wallet containing baby pictures or other memorabilia

21   concerning loved ones, into the garbage, right?

22   A    Correct.

23   Q    Now, I want to get to the chain snatching.  You did a lot

24   of those, right?

25   A    Yes, sir.

1    Q    Can you recall approximately how many chain snatches,

2    just an approximate number?

3    A    It's been a long time, that happened a long time ago.  I

4    know that it was a lot, I couldn't give you a number.

5    Q    Now, do you recall ever snatching a chain with a

6    religious symbol on the chain, like a crucifix or a Star of

7    David or some other --

8    A    I don't recall but more than likely I have.

9    Q    How about a precious keepsake locket on the chain,

10   perhaps a parent's wedding ring?

11   A    Possibly.

12   Q    But that didn't bother you?

13   A    No, sir.

14   Q    By the way, would it have bothered you if somebody came

15   up and snatched your chain that you were wearing?

16   A    Definitely.

17   Q    Because it would be important to you, right?

18   A    Yes, sir.

19   Q    But you didn't think that the things that you were

20   stealing from other people might be important to them, did

21   you?

22   A    Yes, I did, that's why I ran.

23   Q    Well, you ran because you did not want to get caught?

24   A    Yeah.

25   Q    Yeah, right?

*Myers - cross - Beecher*                                    2604

1   A    Yeah.

2   Q    You didn't run because you were worried about the

3   victim's reaction to you stealing from them, you ran because

4   you did not want to get apprehended, right?

5   A    You could say that, yes.

6   Q    Now, you told us about a 1987 robbery with a gun, I

7   believe it was 1987 and if I'm wrong, please correct me, okay,

8   to which you pled guilty and a 1988 armed robbery while on

9   probation for the previous armed robbery, is that correct?

10  A    Correct.

11  Q    And this bought you one year at Rikers Island and a

12  concurrent sentence of one year for violating the conditions

13  of your probation, correct?

14  A    Yes, sir.

15  Q    The conditions of your probation meaning that you were

16  not to commit any further criminal offenses while you were out

17  on probation for the first robbery, right?

18  A    Yes.

19  Q    And you did, however, go out and commit yet another armed

20  robbery and got a one-year bit on that?

21  A    In the state.

22  Q    In the city?

23  A    Yes.

24  Q    Rikers.  And in the city if you get a one-year bit, you

25  do eight months, right?

1   A    Correct.

2   Q    That's actually a pretty cheap price to pay, isn't it,

3   for what you did?

4   A    Yes, sir.

5   Q    And you thought so at the time, right?

6   A    Yes.

7   Q    In fact, you thought to yourself that's a pretty good

8   deal for me, right?

9   A    Yes, sir.

10  Q    Because it was an armed robbery, right?

11  A    Yes, sir.

12  Q    And by armed robbery, we're talking about a robbery at a

13  point of a gun, right?

14  A    Yes, sir.

15  Q    Now, when you came home in about 1989 you started

16  committing drug crimes, correct?

17  A    Yes.

18  Q    As well as the robberies?

19  A    Yes.

20  Q    And what kind of drugs were you selling at the time?

21  A    Basically anything.

22  Q    Heroin?

23  A    Heroin.

24  Q    Powder cocaine?

25  A    Powder cocaine.

Myers - cross - Beecher                                    2606

1    Q    Crack cocaine?

2    A    Crack cocaine, yes.

3    Q    I hesitate to include weed because it's 2015 but at the

4    time you weren't supposed to sell weed either, were you?

5    A    Exactly.

6    Q    Yeah.  But you did?

7    A    Yes.

8    Q    Who did you sell to?

9    A    Whoever was interested in buying it.

10   Q    Any interested buyer?

11   A    Yes.

12   Q    And that might include somebody who was a helpless

13   addict, right?

14   A    Yes.

15   Q    If you saw somebody who was clearly in extremis, so to

16   speak, as an addict, it wouldn't bother you at all to sell

17   them a narcotic drug?

18   A    No, sir.

19   Q    And that's because if you did you that, they would remain

20   in their condition, their addicted condition and would perhaps

21   come back for more?

22   A    Yes.

23   Q    How about young people, did you sell to young people?

24   A    I didn't know the ages of people that I was doing

25   business with, that wasn't something that I did.

1    Q    It's not like you carded them, right?

2    A    It wasn't like I asked ages and things like that.  If

3    they came to buy drugs, I sold them drugs.

4    Q    I'd like to talk about the knockout game, do you remember

5    that?

6    A    Yes, sir.

7    Q    This was when you would come upon some unsuspecting

8    citizen and just knock them out?

9    A    Yes.

10   Q    Right.  So, somebody might be walking down the street

11   minding their very own business and there would come Dwayne

12   Myers, Thor, and just knock them out?

13   A    Yes.

14   Q    Was that for kicks and giggles, I mean what was that

15   about?

16   A    You described it.

17   Q    Kicks and giggles?

18   A    Yes.

19   Q    Is this how you got the name Thor --

20   A    Yes, sir.

21   Q    -- if I recall correctly.

22         Now, by the way, can we assume that you were not

23   named Thor after a fictional superhero that appears in

24   American comic books published by Marvel Comics, right, that's

25   not how you got the name?

*Myers - cross - Beecher*                                    2608

1   A    Yes.

2   Q    That is, yes, that is not or --

3   A    That is so.

4   Q    That is so?

5   A    Yes.

6   Q    So, because you were knocking people out and were a tough

7   guy, somebody decided that a moniker you should have would be

8   after the comic book Thor, right?

9   A    Yes.

10  Q    So, it clearly was not based on the Norse mythological

11  deity of the same name, right?  Norse, N O R S E.

12  A    I understand what you're saying.

13  Q    Northern, okay, in Norse mythology.

14          Now, in Norse mythology Thor is a hammer wielding

15  guy associated with thunder, lightning, storms, oak trees,

16  strength; now, that describes you so far, right?

17  A    Yes.

18  Q    Okay.  This is where the definition goes off:  And the

19  protection of mankind and also hallowing, healing and

20  fertility, that would not have been you; the protection of

21  mankind and hallowing and healing and fertility, that wasn't

22  the Thor that you were, was it?

23  A    Correct.

24  Q    You were the hammer wielding tough guy, right?

25  A    Correct.

1  Q     Because you knocked people out and it wouldn't matter who
2  they were, right?
3  A     Correct.
4  Q     For kicks and giggles?
5  A     Yes, sir.
6  Q     Now, you had already been to jail, violated the
7  conditions of your probation, right?
8  A     Yes.
9  Q     While you were knocking people out?
10 A     Yes.
11 Q     Now, knocking somebody out can either be under New York
12 State law a very simple assault like you knock somebody down,
13 they're not really seriously injured, or it could be a much
14 more serious kind of assault that they end up being seriously
15 injured, correct?
16 A     Yes.
17 Q     So, that little game that you were playing for kicks and
18 giggles, that was a violation of your probation conditions,
19 was it not?
20 A     Yes, it was.
21 Q     That didn't concern you though, did it?
22 A     No, sir.
23 Q     And it was at that time you decided to get involved as
24 the muscle for a protection racket, correct?
25 A     Yes, sir.

Myers - cross - Beecher                              2610

1  Q    What we commonly call extortion?

2  A    Yes.

3  Q    And that was an extortion and protection racket, correct?

4  A    Yes.

5  Q    And that was with Top, correct?

6  A    Yes, sir.

7  Q    And T Rock, correct?

8  A    Yes.

9  Q    And some others, right?

10 A    Yes, sir.

11 Q    Now, exactly how did that game work, the extortion

12 racket?

13 A    You want me to explain it to you?

14 Q    Well, explain it to me and to the jury again.

15 A    Well, I was on the lower level of that agreement, what

16 was said to the individuals who owned these businesses I don't

17 know.  I just knew that when a show of force needed to be

18 shown, I was the individual that was there to do it.

19 Q    In other words, these businesses run by business people,

20 honest business people, correct?

21 A    Yes.

22 Q    You would go in and tell them that unless they paid

23 monies to you and your crew, they would have a problem, namely

24 you, Thor?

25 A    Yes.

*Myers - cross - Beecher*                                          2611

1    Q      Right.

2            And that problem would consist of going in to the

3    business and perhaps knocking somebody out, right?

4    A      Yes.

5    Q      Unless they paid you?

6    A      Say that again.

7    Q      Unless you got paid?

8    A      Yes.

9    Q      All of this was about money, wasn't it?  I mean all of

10   these things that you did, selling drugs and robberies and the

11   protection, that was all about money?

12   A      Yes.

13   Q      And because money is important, isn't it?

14   A      Yes.

15   Q      It's better to have it, right?

16   A      Yes.

17   Q      Than to need it and not to have it, right?

18   A      Yes.

19   Q      And you chose a way to get money which involved

20   perpetrating various and sundry felonies, correct?

21   A      Correct.

22   Q      Now, was it about that time that you found yourself going

23   up to New London?

24   A      Yes.

25   Q      And, alas, you were arrested up there and that venture,

Myers - cross - Beecher                                    2612

1   to use your words, depleted all of your funds, correct?

2   A    Yes.

3   Q    And so, you came back to New York and LG where you once

4   again began committing robberies, correct?

5   A    Correct.

6   Q    You were out of money, right?

7   A    Correct.

8   Q    Because all of your funds were depleted in this venture

9   up in New London which didn't quite work out the way you

10  anticipated it would, right?

11  A    Yes.

12  Q    During one of those attempted robberies back down here in

13  Brooklyn there was a snafu and folks started shooting, folks

14  that you were with started shooting at members of the New York

15  City Police Department in the undercover car, right?

16  A    Yes.

17  Q    Because they were mistaken, these police officers on

18  patrol were mistaken for the intended victims who were trying

19  to escape the clutches of your robbery crew at that time,

20  correct?

21  A    Yes.

22  Q    And so, just started shooting at them, I mean if you

23  didn't get the opportunity to rob them, you might as well

24  shoot them, that's what happened, isn't it?  Isn't that what

25  happened?

*Myers - cross - Beecher*                                          2613

1   A    Yes.

2   Q    And then we talked about this a little while ago, the

3   clothing store caper, but I don't want to go over how that

4   whole thing worked because Mr. Ruhnke went over that in some

5   detail so I don't want to belabor the point, it is fresh in

6   the jury's mind.  You did a two to four bit on that, right?

7   A    Yes, sir.

8   Q    And you pled guilty to that?

9   A    Yes.

10  Q    That was when, in or about 1992, am I right about that?

11  A    '93.

12  Q    '93, okay.

13       And I believe, again correct me if I'm wrong, that

14  when you got home from state prison that a young woman named

15  Patrice wanted to fight with another young woman, remember

16  that you told us about that yesterday?

17  A    The timeline is wrong.

18  Q    The timeline is wrong?

19  A    Yes.

20  Q    Correct me on the timeline, when did that altercation --

21  when was that supposed to have occurred?

22  A    With Patrice?

23  Q    Yes?

24  A    In 1989.

25  Q    I'm off by several years, but, in any event, going back

1   to that, this particular combat was thwarted and so you went

2   up to the Footman's apartment, right?

3   A    Yeah.

4   Q    And that was when you first met E-Bay?

5   A    If I recall correctly, yes.

6   Q    And E-Bay and Mr. Robert Footman, also known as Troub,

7   for trouble, they were told that they were not going to throw

8   the girl to the wolves, correct?

9   A    Yes.

10  Q    In fact, those were your words --

11  A    Yes.

12  Q    -- that they said to you.  Okay.

13          Now, you told us that you were waiting to be

14  sentenced and that was on the clothing store caper and while

15  awaiting sentencing you continued to rob people, right?

16  A    Yes.

17  Q    While you were awaiting sentencing, right?

18  A    Yes.

19  Q    You were released and you were told to come back for

20  sentencing, correct?

21  A    Correct.

22  Q    And in the interim you had to report to the New York City

23  Department of Probation, right?

24  A    Yes.

25  Q    And the sentencing judge admonished you, told you, warned

1    you that, look, you've pled guilty, if you go out and you

2    screw up again, this plea deal is off, you're not going to get

3    the two to four, you're going to get a much steeper sentence,

4    right?

5    A    Yes.

6    Q    But that didn't seem to bother you because while you were

7    awaiting sentencing you went out and continued to perpetrate

8    robberies, isn't that true?

9    A    Correct.

10   Q    In fact, it's fair to say that your criminal history, the

11   one that's on paper, doesn't even come close to reflecting

12   your actual criminal offenses, isn't that true?

13   A    Possibly.

14   Q    Well, if you had gotten arrested for all the robberies

15   that you had perpetrated, all of the assaults that you had

16   perpetrated, all of the drug dealing that you had perpetrated,

17   your rap sheet would be about 150 pages long, you'd never get

18   out of jail, I mean isn't that true?

19   A    Yes.

20              (Continued on next page.)

21

22

23

24

25

Myers - Cross - Beecher                              2616

1   Q    By the way, were you committing these robberies every day

2   or every other day?  If you don't remember, I know there were

3   a lot of them.

4   A    Close to it.

5   Q    Close to every day, so let's -- we don't want to say

6   every day.  Why don't we say four or five days a week instead

7   of seven days a week.  What day of the week did you rest from

8   robbery?

9   A    I wouldn't know.

10  Q    So that really -- that was possibly hundreds of

11  robberies --

12  A    Possibly.

13  Q    -- if not more.  I want to get to the shooting of the

14  crazy Troy, Troy Davis.  And he was selling heroin, right?

15  A    Yes.

16  Q    And the general opinion was that Mr. Troy Davis had --

17  his elevator didn't go all the way to the top.  People thought

18  he was a little bit off; that's why they called him crazy,

19  right?

20  A    Yes.

21  Q    Now, and this -- Mr. Ruhnke covered this, but I think

22  it's important enough that I want to briefly cover it again.

23  Okay?  You told us that you witnessed that through the glass

24  doors of the lobby at 456 DeKalb in LG, correct?

25  A    Yes.

1    Q    And that you saw Mr. Granton, E-Bay, standing over crazy

2    Troy shooting him, correct?

3    A    Correct.

4    Q    But, actually, it was you who got arrested for Mr. Davis'

5    murder, correct?

6    A    Correct.

7    Q    And that was because an eyewitness, whose name I won't

8    mention, told the police that she was looking out of her

9    window --

10              MR. AMATRUDA:  I'm going to object, your Honor.

11              THE COURT:  Sustained.

12              MR. BEECHER:  Is that overruled, your Honor?

13              THE COURT:  Sustaining the objection, yes.

14              MR. BEECHER:  You sustained the objection?

15              THE COURT:  We do that once in awhile.

16              MR. BEECHER:  Okay.

17              THE COURT:  I'm doing that because you started to

18    testify a little bit, and we don't want to do that.

19              MR. BEECHER:  Sometimes we do that on cross.  We

20    lead a little bit.  That's our job.

21    Q    But you persuaded Tina Clark?

22    A    Yes.

23    Q    And, by the way, Tina Clark lived in the apartment where

24    you bagged up drugs?

25    A    Yes.

NICOLE CANALES, CSR, RPR

Myers - Cross - Beecher                    2618

1    Q    You persuaded her to lie for you, right?

2    A    Yes.

3    Q    And say that you were in her apartment at the time of the

4    shooting?

5    A    Yes.

6    Q    Of course that wasn't true?

7    A    True.

8    Q    And you told us that, at that time, you did not have --

9    at -- about that time, that you did not have a good

10   relationship with E-Bay, right?

11   A    Right.

12   Q    But that you eventually reconciled with him in or about

13   1995 -- or 1998; is that true?

14   A    Yes.

15   Q    Now, during the time before he was murdered, before Wise

16   was murdered, on June 12th, 1999, you didn't actually see

17   E-Bay around LG, did you?

18   A    No.

19   Q    And, in fact, you eventually saw him, after an absence of

20   a few years, at Wise's funeral, yes?

21   A    Yes.

22   Q    Now, regarding a warming of relations with E-Bay, when

23   you heard that he was in the hospital, a few years later, in

24   2004, in February of 2004, you visited him frequently, didn't

25   you?

Myers - Cross - Beecher                          2619

1  A     Yes.

2  Q     And you often went with Moo?

3  A     With who?

4  Q     Mohammed?

5  A     Yes.

6  Q     You knew he had been in a coma or was in a coma, correct?

7  A     Yes.

8  Q     And you knew that he might very well die, correct?

9  A     I didn't know if he was going to die or not.

10 Q     Well, he was in a coma; he'd been shot in the brain?

11 A     He was in a medically induced coma when he came into the

12 hospital.  He was talking, so I didn't think he was going to

13 die.

14       THE COURT:  You knew he was not in good shape,

15 right?

16       THE WITNESS:  Exactly.  I knew that.

17 Q     Regarding the murder of Wise, you told us yesterday that

18 shortly after hearing the gunshots and seeing that Wise was

19 killed, you gave the gun that you had in your back pocket to

20 Keith, correct?

21 A     Yes.

22 Q     And then you heard two shots, correct?

23 A     I didn't say how many shots I heard.  I said I heard

24 shots.

25 Q     You heard shots.  Excuse me.  However, that is not

NICOLE CANALES, CSR, RPR

Myers - Cross - Beecher                    2620

1   necessarily so.  That's because -- do you recall testifying at

2   a prior proceeding regarding the events surrounding the death

3   of Wise?

4   A    Yes, I do.

5   Q    And that was in about 2008; do you recall that?

6   A    Yes.

7   Q    When you testified in a prior proceeding?

8   A    Yes.

9   Q    And do you recall testifying, at that time -- and I'm

10  going to have to put the readers on.  Do you recall

11  testifying -- going back to June 12th, 1999, you, Keith --

12          "Keith came up and asked you for a gun, correct?"

13          "Yes."

14          "And did you give him a gun, at that point?"

15          "No, I didn't?"

16          "Why not?"

17          "Well, for me, I didn't have a firearm on me, at the

18  time."

19          "So what did you do after Keith asked you for a gun,

20  and you did not -- and you didn't give it to him?"  Question.

21          Answer:  "I didn't give to him for two reasons.  One

22  reason was, as I said, I didn't have one, and he asked me for

23  it.  There was a lot of people, a lot of older people,

24  outside, a lot of females, and things like that.  And I felt

25  if I were to pass him a firearm, like, you know, people would

NICOLE CANALES, CSR, RPR

Myers - Cross - Beecher                    2621

1   just go and tell the police.  Thor was the one who gave him

2   the gun.  I didn't really know what was going on.  It wasn't

3   really explained to me, the extent of the argument.  So I went

4   upstairs.  I took the clothing and stuff that I purchased

5   while I was downtown to my house, and then --" etcetera.

6            Do you recall giving that testimony --

7   A    Not like that.

8   Q    -- on June 12th, 2008?

9   A    No, my story was that --

10  Q    I just read --

11  A    There were two separate times when Keith asked me about a

12  gun.  You're describing two separate times.  The first time

13  when Keith asked me for the gun, I didn't give him the gun

14  because I didn't have one on me.  I testified earlier that

15  when I left Keith, at that point, went to his house, was when

16  I got the gun.  After that incident was when Wise was shot.

17  That's when I had the gun on me.  That's when I gave him the

18  gun.

19  Q    So there were two times on -- excuse me.  On that day, is

20  that how you're clarifying it?

21  A    Yes, sir.

22  Q    Okay.  Now, shortly thereafter, you told us that some

23  young kid told you that -- Kojack, who we know is Jerard

24  Mackins, had given a gun to Neno, Wise's killer?

25  A    Yes, sir.

Myers - Cross - Beecher                          2622

1    Q    And that was because this young man had come up to you

2    and asked you what kind of gun was used to kill Wise?

3    A    Yes.

4    Q    And you actually acted surprised that he would ask you

5    that?

6    A    I was wondering why.

7    Q    You were wondering why he was asking.  And based on

8    this -- this is an utterly vague information that this young

9    man gave you, the fact -- Kojack had given the gun to Neno,

10   Wise's killer.  You assumed Mr. Mackins eventually planned to

11   kill Wise and provided the instrumentality to accomplish that

12   to Neno; in other words, that Mackins had decided to kill Wise

13   and gave him -- gave Neno the gun to do so.  That's what you

14   assumed, correct?

15            MR. AMATRUDA:  Objection.

16            THE COURT:  I think that the question is a little

17   bit attenuated.  Maybe you can rephrase.

18   Q    Well, when you found out that Jerard Mackins had provided

19   the firearm to Neno to kill Wise, you engaged in a mental

20   calculous, correct?

21   A    Yes.

22   Q    And that calculous was that Jerard Mackins wanted Wise

23   killed, correct?

24   A    Yes.

25   Q    You actually assumed that, correct, based on the

NICOLE CANALES, CSR, RPR

Myers - Cross - Beecher                         2623

1   information you had?

2   A    Yes.

3   Q    Now, you then waited to ambush Jerard Mackins in the

4   lobby of 456, correct?

5   A    Correct.

6   Q    Now, you didn't know him, right?

7   A    We wasn't a person -- I had seen him, but we --

8   Q    You were not personal friends.  It was basically, as we

9   would say, kind of a hi and bye?

10  A    Wouldn't --

11  Q    Wouldn't be that?

12  A    Only if in immediate speaking range.  It wasn't like I

13  would go out of my way to say hi to him, or anything like

14  that.

15  Q    You had just seen him?

16  A    Yeah, just seen him.

17  Q    But you laid in wait to ambush him and kill him in the

18  lobby of 456 DeKalb, right?

19  A    Yes.

20  Q    Eventually Kojack arrived, just as you had hoped, and

21  nodded to you, correct?

22  A    Yes.

23  Q    Gave you a nod, an acknowledgment that you were there, a

24  polite, courteous thing to do?

25  A    Correct.

1  Q    It was one of those I don't know you, but I will give you
2  a friendly nod, kind of nod, right?
3  A    Yes.
4  Q    Now, and your way of returning that courtesy was that you
5  blew him away?  You blew him away, right?
6  A    Correct.
7  Q    Now, what kind of a gun did you use for that?
8  A    I remember it being a nine-millimeter.
9  Q    It was a nine-millimeter?
10  A    Yes.
11  Q    Do you remember how many bullets were loaded into the
12  nine-millimeter?
13  A    No.
14  Q    It was fully loaded?
15  A    Yes.
16  Q    Was it an extra capacity magazine, if you recall?
17  A    I didn't have that knowledge, at the time.
18  Q    Okay.  But you fired until there were no bullets left to
19  fire?
20  A    Yes.
21  Q    And so based on an assumption only, you just -- you blew
22  up Mr. Mackins, right?
23  A    Yes.
24  Q    Do you know what they say about an assumption?
25            THE COURT:  That's an objection request.

1    Q    But you assumed?

2              THE COURT:  He already testified.

3              MR. BEECHER:  I have an exhibit here.

4              THE COURT:  Go ahead.  Next question.

5    Q    You know, when you assume, what happens?

6              THE COURT:  Why don't you save that for your

7    argument in summation.  That's not really any factual

8    significance.  Let's move on.  Save your cute little exhibit.

9    Q    All right.  I'd like to go back, if I could, a few years,

10   back to 1995.  And, again, if I've got the timeline wrong, you

11   can correct me, so the jury gets the correct timeline.  Okay?

12   A    Yes.

13   Q    When you were released from state prison, that was in or

14   about November 1995?

15   A    Yes.

16   Q    Okay.  And you were released on parole, correct?

17   A    Yes.

18   Q    And you had a parole officer?

19   A    Yes.

20   Q    And do you remember the name of your parole officer, by

21   any chance?

22   A    Campagna.

23   Q    I'm sorry?

24   A    Campagna.

25   Q    Campagno?

Myers - Cross - Beecher                          2626

1   A     Campagna.

2   Q     Campagna?

3   A     Yes.

4   Q     So something like C-a-m-p-a-g-n-a?

5   A     Yes.

6   Q     And Prole Officer Campagna met with you, correct?

7   A     Yes.

8   Q     And you were given a sheet of paper with your parole

9   conditions on it, correct?

10  A     Correct.

11  Q     And those conditions were enumerated on the list of

12  things that you could do and that you could not do, correct?

13  A     Correct.

14  Q     One of the things you were obliged to do under your

15  parole conditions was to seek gainful employment, right?

16  A     Yes.

17  Q     And you were also obliged not to associate with other

18  convicted criminals, correct?

19  A     Correct.

20  Q     And you were obliged, of course, not to commit any

21  further criminal offenses, correct?

22  A     Yes, sir.

23  Q     Because that would be a violation of your parole, right?

24  A     Yes, sir.

25  Q     And if you got caught committing another criminal

1   offense, namely you were arrested, you could be violated on

2   your parole and receive additional prison time, correct?

3   A    Yes, sir.

4   Q    So that was an incentive to go straight, so to speak?

5   A    Yes.

6   Q    But you didn't go straight, did you?

7   A    No, sir.

8   Q    I'd like to get to your -- if I could, your venture with

9   a Bloods gang.  Mr. Ruhnke went over some of this, and I'm not

10  going to belabor the point, but I just want to clarify a few

11  things.  You mentioned in order to be a Blood, there was an

12  initiation?

13  A    Yes.

14  Q    And that initiation included a rite of passage called

15  "jumping in"?

16  A    Yes.

17  Q    Now, this involved picking out a random, innocent

18  stranger and assaulting him, correct?

19  A    Yes.

20  Q    Very similar to the knockout game, right?

21  A    Yes.

22  Q    So you were already familiar with assaulting a complete

23  stranger?

24  A    Yes, sir.

25  Q    And, at this time, you were, what, you weighed about 250,

Myers - Cross - Beecher                    2628

1   if I'm correct?

2   A    Somewhere's about but not exactly, at that time.

3   Q    But you were a big guy?

4   A    Yes.

5   Q    You were Thor, right?

6   A    Yes.

7   Q    And you also were a boxer?

8   A    Yes.

9   Q    So you were trained in the techniques of knocking people

10  out, right?

11  A    Yes.

12  Q    That's what boxers were trained to do.  You were trained

13  to do it, right?

14  A    Yes.

15  Q    But boxers wear gloves, and they're heavily padded,

16  right?

17  A    Yes.

18  Q    One of the reasons they're heavily padded is to protect

19  the other combatant, so that although they're fighting and

20  engaged to knock somebody out, they don't -- they try not to

21  seriously injure you, right?

22  A    Yes.

23  Q    That's what they have in the gyms, a sparring -- a

24  sparring partner.  Not only do you have the leather helmet,

25  but you have the padded gloves, right?

```
                    Myers - Cross - Beecher                2629
```

1   A    Yes.

2   Q    When you were engaged in the knockout game and jumping

3   in, you just had your bare fists, right?

4   A    Yes.

5   Q    And this was about the time of the murder of Michael

6   Colon at the Empire Roller Rink, right?  This is about that

7   time?

8   A    Okay.

9   Q    If I'm wrong correct me, but this was about that time?

10  A    Is what about that time.

11  Q    The thing with the Bloods and the jumping in initiation,

12  which you laughed about?

13  A    The initiation had already happened once before.

14  Q    It already happened?

15  A    Yes.

16  Q    And you detailed for us yesterday, -- it was either

17  yesterday or the day before -- your participation in that

18  particular homicide of Michael Colon?

19  A    Yes.

20  Q    Now, yesterday -- and Mr. Ruhnke went into this, and I

21  want to touch upon it briefly -- you told us that your

22  religious beliefs were not consistent with the initiation

23  rights of the Bloods gang, right?

24  A    Of course.

25  Q    Now, how is that -- how is that consistent?  How does

Myers - Cross - Beecher                    2630

1    that comport with your testimony on the 20th, which was on

2    Monday, that you were trying to become a member of the Bloods

3    gang?  I mean, just set me straight on this --

4    A    The question I was asked was why did I stop being a

5    member of the Blood gang, and I gave the reason why.  That was

6    one of the reasons why; it was conflicting with what I

7    believed, as far as my religion.

8            THE COURT:  Let me interrupt.  I think that all has

9    been covered.

10           MR. BEECHER:  You're right, Judge.

11           THE COURT:  The jury understands this.  It's been

12   fairly explored.  Move on.

13   Q    Now, would it be fair to say that there were lots of

14   firearms available in and around LG and Bed-Stuy, at that

15   time?

16   A    Yes.

17   Q    Now, guns would even be rented to those who wanted them

18   for a day or so, correct?  In other words, if somebody wanted

19   to pay a fee for a gun, to get a gun -- I'm not saying you

20   personally?

21           THE COURT:  It was easy to get firearms, correct?

22           THE WITNESS:  Yes.

23           THE COURT:  Go ahead.

24   Q    And the time that guns were stolen from hiding places,

25   correct?

Myers - Cross - Beecher                    2631

1    A    Not that I know of.

2    Q    The hiding places were that good that guns were never

3    discovered --

4         THE COURT:  Mr. Beecher, look, I know there are some

5    disadvantages of going second on cross-examination because you

6    run the risk of repetition, but I really would like to

7    conclude this, and maybe redirect, before our lunch break, if

8    that's possible.  I'm going to push you a little bit, with all

9    due respect.  Okay?

10        MR. BEECHER:  I have to tell you, Judge, I will move

11   forward with some of this, but I'm going to get to some other

12   things that may take some bit of time.

13        THE COURT:  Try to avoid repetition.

14        MR. BEECHER:  I don't think this was covered, so I'm

15   going to cover it now.

16        THE COURT:  Go ahead.

17   Q    During trial preparation for this trial, you recently

18   informed the government that regarding the Tyrone Baum murder,

19   you were instructed by Taz and Boo to tell World that

20   Desperado, that's Abdul Azziz, killed T-Rock, so that Boo did

21   not have to share his cut of the money with World; is that

22   correct?

23   A    Yes.

24   Q    And while we're on the subject of money, I'd like to take

25   you --

1           MR. BEECHER:  Judge, this could take a little bit of

2    time.

3           THE COURT:  Let me hear the questions.  And, now, I

4    don't want to circumscribe your cross-examination, I'm just

5    trying to avoid unnecessary repetition.

6    Q    Now, I'm going to ask you to take a look at what has been

7    marked as Defendants A, G -- I think --

8           THE COURT:  Why don't you just ask him the question,

9    and let's see how it goes.

10          MR. BEECHER:  Could I hand this to the witness,

11   your Honor?

12          THE COURT:  Is this in evidence?

13          MR. BEECHER:  Not yet.

14          THE COURT:  Ask him the question first.

15   Q    Are you familiar with your inmate records account, your

16   financial account?

17   A    Yes, sir.

18   Q    Okay.  And I'd like you to -- that details the moneys

19   coming in and going out of your account, right?

20   A    Yes.

21   Q    Now, could I --

22          THE COURT:  Do you have a record of that account?

23          MR. BEECHER:  I have a record in my hand.

24          THE COURT:  What does the government say about that?

25   Do you have objection to it being in evidence?  This is a

NICOLE CANALES, CSR, RPR

Myers - Cross - Beecher                    2633

1    defendant's exhibit.

2              MR. AMATRUDA:  I just don't know what the relevance

3    is.

4              THE COURT:  I don't know either.

5              MR. BEECHER:  We're going to get there.

6              THE COURT:  If we can move it along.  If it's an

7    inmate account, and if it's a legitimate record, and if you

8    want to fuss about it, let me know.  Otherwise, let's move on.

9              MR. AMATRUDA:  We have no objection.

10             THE COURT:  That will be defendant's exhibit, and

11   what number could we give that?

12             MR. BEECHER:  This is the only one we have.

13             THE COURT:  That's your first.

14             MR. HERMAN:  Yes, first one.

15             THE COURT:  All right.  Go ahead.

16   Q    If you need to refer to it, it's in evidence now, and

17   I'll bring it up to you.

18             THE COURT:  We're going to mark that -- let's see.

19   For recordkeeping, defendant granted exhibit --

20             THE CLERK:  Two.  We've already used one.

21             THE COURT:  We did one for Hardy, so that will be

22   DG1.  The other Hardy was DH1.  Go ahead.

23             (Defendant's Exhibit DG1  was received in evidence.)

24             MR. BEECHER:  Your Honor, this -- before this is --

25   you know, we have some addresses in here, which we'll redact.

NICOLE CANALES, CSR, RPR

1          THE COURT:  I haven't seen it, so if you agree

2    things should not be before the jury, I'm very pleased.

3          MR. BEECHER:  I think it would be inappropriate.

4          THE COURT:  Go ahead.

5    Q    Now, your inmate account records, they indicate from in

6    or about September of 2005, through and including April of

7    2015, there was approximately $37,702 deposited into your

8    inmate account at MDC or MCC, wherever you were.

9          THE COURT:  Does that sound about right to you?  I

10   mean, he's reading from the actual record.  Is there any

11   dispute about that?

12         THE WITNESS:  I don't know the amount that has been

13   in my account the entire time that I've been there, but I know

14   the amount that's in there at this particular time.

15   Q    But this might -- I don't want you --

16         THE COURT:  If it's in evidence, tell the jury.

17   Let's move on.  You can tell the jury what's in that exhibit.

18   Does it show that amount of money?

19         MR. BEECHER:  Yes, it does.

20         THE COURT:  At what particular time?

21         MR. BEECHER:  During this time period, and those

22   funds --

23         THE COURT:  Just a second.  Which time period?

24         MR. BEECHER:  From --

25         THE COURT:  You can read it.

NICOLE CANALES, CSR, RPR

Myers - Cross - Beecher                  2635

1        MR. BEECHER:  September 2005, through and including

2   April 2015.

3             THE COURT:  You have how much money in there?

4             MR. BEECHER:  $37,702.

5             THE COURT:  What else do you wish the jurors to hear

6   about that?

7   Q    And you actually sent to your wife about $2,600 from in

8   and about April 2015, through and including April 8th, 2015,

9   just a couple of weeks ago?

10            THE COURT:  That sounds about right to you?

11  A    I have been sending money to my sister, yes?

12  Q    Your sister.  I'm sorry.  Could you explain, because it's

13  in evidence, what the drop box is?  That's money sent through

14  Idaho rather than Western Union, correct?

15  A    Yes.

16  Q    And you got -- on January 4th, 2006, you got $2,000 sent

17  from Philadelphia; do you recall that?

18  A    Say that again.

19  Q    January 4th, is the date, 2006.  You got $2,000 from

20  Philadelphia.

21  A    Yes, that's the money that was returned to me that was in

22  my apartment, I think.

23  Q    Okay.  Now, do you know what K2 is?

24  A    No.

25  Q    You don't know what K2 is?

1    A    No.

2    Q    But you've been selling K2 in the MDC, and you don't know

3    what it is?

4    A    Come again.

5    Q    You've been selling K2 at MDC, K2?

6    A    That's mistaken.

7    Q    That's not true?

8    A    No.

9    Q    That you had not been selling K2?

10   A    I have not been selling K2.

11   Q    But you sent your sister $2,600.  Is that from a job you

12   had at MDC?

13            THE COURT:  He testified about that already.  Go

14   ahead.

15            THE WITNESS:  Yes, I have been sending my sister

16   money.

17            THE COURT:  You don't have to say it again.  You

18   said it once.  Next question.

19   Q    Now -- at any rate you said that didn't happen.  Just to

20   be clear, I'm going to backtrack.  And regarding the death of

21   Peanut, you told us yesterday that on the day of Peanut's

22   murder, you went to Club Cheetah.  You spent about a half hour

23   or so there.  Then you went back to Brooklyn, right?

24   A    Yes, sir.

25   Q    And then you went to Jimbo's apartment?

Myers - Cross - Beecher                    2637

1    A    Yes, sir.

2    Q    And then you went back to Club NV, correct?

3    A    Yes.

4    Q    Is that your testimony?

5    A    Back to my apartment.

6    Q    So a lot of back and forth between Brooklyn and

7    Manhattan, and all in the space of a couple of hours, correct?

8    A    Yes, sir.

9            MR. BEECHER:  You know, I think I'm finished.  I

10   just want to check one thing.

11           THE COURT:  Take your time.

12           MR. BEECHER:  You know, there's been something else

13   that has been bothering me, and I'm not finished.

14           THE COURT:  Whatever you need to do.

15           MR. BEECHER:  But I think we ought to do it after

16   lunch.

17           THE COURT:  Well, tell me how much more time you

18   need.  I'm not going to put you under undue pressure, if you

19   can complete it now.  You seem to be almost finished.

20           MR. BEECHER:  Just a second.

21           THE COURT:  If you have a further question that pops

22   into your head during lunchtime --

23           MR. BEECHER:  There are a couple things that were

24   bothering me that I didn't go over.

25   Q    By the way, did you know that K2 is a drug?

NICOLE CANALES, CSR, RPR

Myers - Cross - Beecher                    2638

1    A    I don't even know what K2 is.

2    Q    Okay.  Now, remember a bit back we discussed how a lie of

3    omission, leaving something out, when you spoke with

4    representatives of the government that that was a no no?

5    A    Yes, sir.

6    Q    Now, you've been in custody for quite some time, about 9

7    years, 10 years?

8    A    Yes.

9    Q    And, of course, during this period of incarceration,

10   aside from meeting on numerous occasions with the government,

11   you met and befriended other detainees, correct?

12   A    Yes.

13   Q    And while you have been with these other detainees, you

14   had conversations with them; wouldn't that be fair to say?

15   A    Yes.

16   Q    And one of those individuals that you had a conversation

17   with was a barber in the jail.  Do you remember the barber,

18   Tyson?

19   A    Not particularly.

20   Q    Ronnie was his first name?

21   A    No.

22   Q    He was cutting hair?

23   A    I remember a lot of people.  I don't remember anybody by

24   that name.

25   Q    And you met him in the old MDC building, that would be

Myers - Cross - Beecher                    2639

1   the east building, not the west building, right?  Do you

2   remember that?

3   A    It's possible, yes.

4   Q    Because he remembers you?

5           MR. AMATRUDA:  Objection.

6           THE COURT:  Objection sustained.

7   Q    And he remembers --

8           MR AMATRUDA:  Objection.

9           THE COURT:  Just one second.  If you want to

10  testify, you can do it, but, you know --

11          This is a good time to remind you folks again what

12  I've told you time and time again.  What a lawyer says in his

13  question is not evidence, and you've seen a lot of evidence.

14  It's only if the witness says, yes, that's true, or there's

15  independent evidence can you consider that as evidence.  When

16  we give lawyers a little bit of slack, especially on

17  cross-examination, that goes to all witnesses and lawyers;

18  that there comes a time when you know it's repetitious, or I

19  don't think it's relevant, then I'll intervene.  Let's see

20  what happens here.

21          Any other questions?

22          MR. BEECHER:  Yes, your Honor.

23  Q    You had conversations with other people that you were

24  incarcerated with at MDC?

25          THE COURT:  He said he has.

NICOLE CANALES, CSR, RPR

Myers - Cross - Beecher                          2640

1   Q    One of those people was the barber, Tyson?

2          THE COURT:  He says he doesn't remember.

3   Q    And you told Tyson and various other people that you had

4   killed --

5          THE COURT:  He said he doesn't remember having a

6   conversation with Tyson.

7          MR. BEECHER:  But I'm going to remind him of what

8   the contents were.

9          THE COURT:  You want to testify, we'll switch your

10  locations.

11         MR. BEECHER:  Judge, I'm not testifying.

12         THE COURT:  Did you ever say to anybody in jail

13  whether he killed somebody?  Is that what you want to ask?

14         MR. BEECHER:  Well, a little more specific than

15  that.

16         THE COURT:  So you can ask him that, and let's see

17  whether he says yes or no.

18  Q    Do you recall having told a number of people in jail that

19  you've killed an entire family in Jamaica, Queens?  Do you

20  remember that?

21  A    No, sir.

22         THE COURT:  You don't remember saying that?

23         THE WITNESS:  No.

24         THE COURT:  So that's not in evidence.  Next

25  question.

NICOLE CANALES, CSR, RPR

Myers - Cross - Beecher                    2641

1   Q    That you did that with Moo and Taz?

2   A    No.

3   Q    An entire family?

4   A    No.

5   Q    You don't remember that?

6   A    I don't remember that, because that didn't happen.

7   Q    Now, do you remember creating a fake letter regarding

8   Popsie Sessoms?

9   A    I did not create a fake letter regarding Popsie.

10  Q    That's just a rumor?

11  A    Yes.

12  Q    Now, you had a diamond on --

13  A    Come again.

14  Q    Did you ever wear a diamond in your tooth?

15  A    Yes.

16  Q    And do you remember telling people that that diamond --

17  that the diamonds that you got were from a diamond heist?

18  A    I remember explaining where I got the diamonds from.

19  Q    Well, was that from a diamond heist?

20  A    It wasn't a diamond heist.

21  Q    Somebody stealing diamonds?

22  A    Yes.

23  Q    Call it a heist.  Somebody stole the diamonds?

24  A    Yes.

25  Q    And that there was a falling out with one of the -- with

Myers - Cross - Beecher                     2642

1    one of the girls who was procuring the diamonds?

2    A    No, I don't know nothing about that aspect of it.

3    Q    Do you remember -- we're almost finished, Judge?

4         THE COURT:  You take your time, if you want to take

5    a break now.

6         MR. BEECHER:  I don't think we need to.  I think

7    we've -- well, probably go to about three minutes after 1:00.

8         THE COURT:  Why don't we do this, because during the

9    lunch break, when you speak to Mr. Herman, you may think of

10   some other questions instead of going back and forth like

11   this --

12        MR. BEECHER:  You know, you're right.  Might as well

13   take it now.

14        THE COURT:  Let's take our lunch break now.  When

15   you come back, you'll wrap up your cross-examination.

16        Don't talk about the case.

17        THE CLERK:  When are we coming back?

18        THE COURT:  I think 2:00 o'clock will be a good

19   idea.

20        THE CLERK:  All rise.

21           (Outside the presence of the jury.)

22        THE COURT:  So my sense is that -- I imagine,

23   Mr. Amatruda, you may have some redirect?

24        MR. AMATRUDA:  It will be quick.

25        THE COURT:  There's reason to believe by 3:30, if

Proceedings                                    2643

1    not a little bit before, we will have completed, I assume, the

2    government's case.

3            MR. AMATRUDA:  We have one more witness, but I don't

4    think she's going to take very long.  We should be done 3:30

5    or --

6            THE COURT:  Fine.  I'm not putting you under any

7    pressure.

8            MR. AMATRUDA:  So, at this time, it's going to be

9    incumbent upon the defendant for the defendant to do whatever

10   the defendant wishes to do, and there's that question about

11   806 yesterday.  Have we worked all that out?

12           MR. REHNKE:  Worked out 99 percent of it, but the

13   sticking point is I think it's important that I be allowed to

14   put it into evidence, the fact that still has a 5K --

15           THE COURT:  I'm going to allow you to do that, but

16   how do you propose to do that if the government is not willing

17   to stipulate to that?

18           MR. AMATRUDA:  Judge, can you explain what the

19   theory of relevance is for that?  I just don't see how it

20   impeaches that.

21           THE COURT:  Here's my take on it, there's not a lot

22   that's out there that's been written about 806, but the

23   cooperation agreement is appropriate to have that in evidence.

24   But I have a sense we have to visualize a person testifying in

25   court and what we would allow for cross-examination purposes.

NICOLE CANALES, CSR, RPR

Proceedings                                                2644

1   I think that's conceptionally what 806 is about.  If that were

2   to happen, I would allow the question to be posed, and we

3   would have a viable cooperation agreement.  That's my theory.

4   I would rather error on the side of allowing that type of

5   stuff, because the jury has a hard time, perhaps,

6   understanding how you can impeach somebody that hasn't

7   testified.  I may have to explain a little bit about that to

8   them, but I'm going to allow it.

9              MR. AMATRUDA:  Your Honor's made his ruling.  A

10  couple things, one, I'll tell you what's coming down the pike,

11  which is a big summation point, putting the government on

12  trial about how we act with cooperators.

13             THE COURT:  We'll worry about that --

14             MR. AMATRUDA:  I can guarantee it's going to happen.

15             THE COURT:  We'll take it as it comes.  I think it's

16  appropriate to have the jury know that if he were testifying,

17  he would be testifying under a cooperation agreement, and that

18  the cooperation agreement is still in existence.  That's my

19  ruling.  I know you're apprehensive about the big 800-pound

20  gorilla --

21             MR. AMATRUDA:  Can I move on to something else?

22  Mr. Ruhnke wants to put in the entire criminal complaint

23  against Taz into evidence.

24             THE COURT:  Normally we don't do that.

25             MR. AMATRUDA:  That's what I'm objecting to.

NICOLE CANALES, CSR, RPR

Proceedings                                              2645

1           MR. REHNKE:  Your Honor, it's the same theory.  I

2    mean, the criminal complaint is four pages long, and it says

3    he was dealing with an undercover agent.  Calls were recorded.

4    A deal was set up.  It was surveilled, and he was arrested.  I

5    mean, there's nothing prejudicial.

6           MR. PAUL:  You can call Taz for the same purposes,

7    if you would like.

8           THE COURT:  Let me have the document.  I'll look at

9    it over lunchtime.  Anything else besides that?

10          MR. AMATRUDA:  I don't have anything.

11          THE COURT:  We may have to tell the jury a little

12   about the about 806.  We have some of that in the charge

13   already, about --

14          MR. AMATRUDA:  I think one point that I am going to

15   make on summation, I'll tell you, is that if the government's

16   view of Taz is on evidence, I'm going to tell the jury that I

17   was not comfortable calling him to testify because of problems

18   with him being truthful.  So I'm going to say that, because

19   what that evidence does is put me on trial for my evaluation

20   of a cooperator.  It's now an issue, and I'm going to defend

21   it in front of the jury that way.

22          THE COURT:  Let's take a little bit of a deep

23   breath.  Okay.  It's not an insignificant issue, because how

24   you process these types of situations when you have a

25   cooperator but not another cooperator, the jury is likely

NICOLE CANALES, CSR, RPR

Proceedings                                      2646

1    feel -- not be able to resist the concept of speculation.  Why

2    isn't it this person hasn't testified?  It is not a missing

3    witness type of dynamic, because this person was available to

4    both parties, and I think maybe something should be said to

5    the jurors so that they don't speculate about that.

6             And I'm going to tell them about that in glowing

7    technicolor during my charge.  I always say don't speculate,

8    and I'm going to tell you very clearly here, when it comes to

9    Taz, AKA, Cooke, do not speculate about why he's not

10   testifying.  And I will give very strong instructions about

11   that, and I think when you hear that, it will --

12            MR. AMATRUDA:  It doesn't cover it, and you're

13   making a mess.  That's the truth.  You're making a mess --

14            MR. REHNKE:  Can I get a word in?

15            THE COURT:  You can get a word in.

16            MR. REHNKE:  What Mr. Amatruda is saying is he

17   intends to sum up on facts not in evidence and place his own

18   credibility in front of the jury.  That's classically improper

19   in summation.

20            THE COURT:  I think so also.

21            MR. AMATRUDA:  I think that what should happen,

22   then, is that we should call a witness to testify about what

23   goes into to deciding whether to breach a cooperator or not.

24            MR. REHNKE:  Get Ms. Gorney (phonetic) in here --

25            MR. PAUL:  Or James Luna.

NICOLE CANALES, CSR, RPR

```
                    Proceedings                    2647

 1          THE COURT:  Well, if we're going to open the door to

 2    the fact that this person is still -- has not had his

 3    cooperation agreement rendered nugatory by the government,

 4    we'll see -- you know, you want to explain why that hasn't

 5    happened, maybe that's appropriate.  What do you say about

 6    that, Mr. Ruhnke?

 7          MR. REHNKE:  I don't see any need to call a witness.

 8    Are we really going to go -- why don't I call Sean Herrin

 9    (phonetic), and bring him back?

10          MR. AMATRUDA:  Bring them all in, their opinion,

11    because that's what you want in evidence.

12          THE COURT:  You have a lot of evidence here, and I

13    appreciate your concerns and your anxiety.  What I'm trying to

14    tell you is that I'm going to talk to the jury extensively

15    about the fact that the government did not have to call any

16    witness that they've heard, and it's in the charge, but I'm

17    going to stop and elaborate extemporaneously when I tell the

18    jury about that.  And I think after I do that, some of your

19    anxiety will be assuaged.

20          MR. AMATRUDA:  I don't believe you; I'll tell you

21    that right now.

22          THE COURT:  Let's not get over anxious about it.

23    All right.  So you do the best you can.  What else do you want

24    me to look at?

25          MR. REHNKE:  Your Honor, you wanted to look at the
```

Proceedings                                    2648

1   Complaint, and I just --

2           THE COURT:  I'll look at the Complaint, and I'll

3   make my ruling.

4           MR. REHNKE:  It's -- 3500-EC-21, is the way it's

5   identified now.  I'll put a defense sticker on it.

6           THE COURT:  Take a look at it over lunch.  This is

7   being proposed as impeachment material for a nontestifying

8   coconspirator, correct?

9           MS. DAYANANDA:  I'm sorry, your Honor?

10          THE COURT:  This is being proposed as impeachment

11  material for a nontestifying coconspirator?

12          MS. DAYANANDA:  Correct.

13          THE COURT:  So we're clear on what Mr. Ruhnke wants

14  me to consider here.

15          MS. DAYANANDA:  Yes, I think the point of the

16  government is that is an affidavit of agent from the FBI that

17  does not go to the credibility of the witness Cooke.

18          THE COURT:  I'm going to look at this to see

19  whether -- if he were to testify I would allow this into

20  evidence as impeachment material.

21          MR. REHNKE:  Or allow him to be questioned about --

22          THE COURT:  Just a second.  It's this document that

23  you want in evidence.  I'll make my ruling at 2:00 o'clock.

24  We'll come back at 2:00 o'clock.  What I try to do is make a

25  pristine record, so when somebody reads it, obviously, the

NICOLE CANALES, CSR, RPR

Proceedings                                2649

1    Supreme Court or Justice Sotomayor reads it, they have to

2    follow the bouncing ball understand exactly what the issue was

3    and what the ruling was.  And I want to have a clear record.

4           MS. DAYANANDA:  I understand that, your Honor.  Just

5    one point regarding this Complaint, is that Mr. Ruhnke is

6    getting in the guilty plea transcript, the information, that

7    Mr. Cooke pled guilty to.  This is the affidavit of the agent.

8           THE COURT:  I hear your argument.  I may not allow

9    it.

10          MS. DAYANANDA:  Okay.

11          THE COURT:  But I think that a judge should read it.

12          MR. AMATRUDA:  So I think we should plan, though,

13   because I don't think your instruction will cover there a

14   rebuttal witness we're going to call that the stipulation that

15   the cooperation agreement is still in effect.  We need to do

16   that, and you're instructions, I don't think, are going to do

17   it.

18          THE COURT:  I don't know what we need a rebuttal

19   witness for.  He's going to explain why the cooperation

20   agreement is still --

21          MR. AMATRUDA:  Yeah.

22          THE COURT:  Give me your proffer.  What he's going

23   to say?  You're making a big deal on something that I'm not on

24   the same page with you, with all due respect.  It's a fairly

25   simple thing.  He's a cooperator.  He hasn't been called.

Proceedings                           2650

1   Cooperation agreement is still in existence.  If he were

2   called, the jury would know about that.

3           MR. AMATRUDA:  Maybe you're not understanding the

4   whole picture.  The issue is Mr. Ruhnke -- and we've agreed to

5   let him put in evidence that this defendant breached his

6   cooperation agreement by lying.  Okay.  And our office made a

7   determination --

8           THE COURT:  Nonetheless, it's your decision whether

9   or not you're still going to --

10          MR. AMATRUDA:  -- to ratify that agreement.

11          THE COURT:  Tell them that.

12          MR. AMATRUDA:  But, then, the reasons why -- I'll

13  tell you right now, what Mr. Ruhnke's going to argue is based

14  on our conduct the cooperators don't think there's any result

15  for them if they lie.  That's the argument.  I mean, that's

16  the only way this is relevant.

17          THE COURT:  He's entitled to make that argument.

18          MR. AMATRUDA:  What's that?

19          THE COURT:  He's entitled to make that argument,

20  right?

21          MR. AMATRUDA:  Based on relevant evidence.

22          THE COURT:  See you at 2:00 o'clock, Mr. Amatruda.

23          MR. REHNKE:  There's already an example --

24          THE COURT:  We've heard your arguments.

25              (Recess in proceedings.)

NICOLE CANALES, CSR, RPR

Proceedings                                2651

1        (Outside the presence of the jury and defendants.)

2        THE COURT:  We can talk about scheduling matters.  I

3   think the way things are breaking, I think if I end the day

4   with giving the jurors the first 29 pages of my charge, and I

5   think that would, you know, constitute a full day's work, as a

6   practical matter.  And it works out fine, because then we'll

7   have all of all tomorrow for summations.  I hope that we can

8   finish summations in one day's time.  I think that's probably

9   a realistic sense of things.  And dependant upon when

10  summations have been concluded, I'll start the charge tomorrow

11  afternoon or the next morning.  But the jury's going to have

12  this case by Friday, for sure.  And then I'll see where we're

13  at, whether I'll tell the jurors we're starting deliberations

14  on Friday or Monday.  We'll have to see.

15        And we'll wait for the defendants.  Just as a

16  general comment, it's perfectly understandable that at this

17  particular stage of a trial, things get a little bit revved

18  up, maybe some tensions are heightened.  It's part of the

19  process.  And I only ask you to just try to discipline

20  yourself with respect to not talking over each other.  It may

21  be hard to do that sometimes, in the heat of combat.  Just be

22  mindful of the fact that we have a reporter here who has a

23  hard time taking down two or three voices at the same time.  I

24  don't preclude anybody from having an opportunity from

25  expressing their concerns, and then I will make my rulings.

NICOLE CANALES, CSR, RPR

Proceedings                                              2652

1   That's the way the process works.  I can admonish -- maybe

2   admonish is maybe not the right word.

3           The Complaint is not going to be allowed in

4   evidence.  It's not of evidentiary quality, so that's my

5   ruling with respect to that.  Certainly you've agreed to allow

6   in evidence many documents that are of evidentiary quality,

7   and I appreciate the fact that you'll work together to do

8   that, so you'll have my rulings in terms of the Complaint.

9           Now, I do understand the anxiety of Mr. Amatruda and

10  the government, but I try to assuage by telling you I'll take

11  care of it, but I think it may not be a bad idea just to

12  caution defense counsel that the government's good faith is

13  not an issue in this case, so I'm going to monitor very

14  carefully the fact that you don't cross the line.  The jurors

15  are going to be told that it's the government is absolute

16  discretion to allow, or withdraw, or allow a cooperation

17  agreement to stand.  You can talk about issues that go to

18  credibility, but anything about the government possibly acting

19  in bad faith or fast and loose is going to be dealt with by

20  the Court in ways defense counsel does not want the Court to

21  articulate.  Sort of a cautionary tale.

22          MR. REHNKE:  This happens to be my 40th year as a

23  lawyer, and I've never once called the government's good faith

24  into question, and I'm not about to start today.

25          THE COURT:  It's good to talk it through, and issues

NICOLE CANALES, CSR, RPR

Proceedings                                    2653

1    of credibility, fine.  Certainly you can talk about the

2    cooperators.  That's your responsibility.

3            MR. REHNKE:  Your Honor, just for the Court's

4    information, I've proposed a stipulation to the government on

5    the circumstances of Mr. Cooke's -- Taz.  I'm sorry.  Taz's

6    guilty plea, and they're reviewing that now.

7            THE COURT:  Okay.

8            MR. REHNKE:  And it's pretty plain.  I'm unable to

9    produce it in hard copy, and may just have to read it to the

10   jury.  I'll produce it in hard copy tonight.

11           THE COURT:  Hopefully you'll come to some resolution

12   of how to present that to the jury.

13           MS. DAYANANDA:  Your Honor, we are going to add a

14   line or two.

15           THE COURT:  You know, in terms of the heatedness

16   that happened before we broke, I just feel it's important for

17   us to have a moment to reflect and to cool it a little bit.

18   And understand I've been doing this for 20 years, too.

19   All right.

20           MR. REHNKE:  Your Honor, we're basically going to

21   need some time between the end of the government's case and

22   the beginning of the defense case to discuss that, and I think

23   there's a defense witness.  Make a Rule 29 motions --

24           THE COURT:  I think we'll have the opportunity today

25   to do it, but, you know, I want to give them at least sort of

Proceedings                      2654

1    a boiler plate of the charge today.  It's a good thing to do.

2              MR. REHNKE:  Understood.

3              MS. DAYANANDA:  In light of this argument about

4    Mr. Cooke, we wanted to include the instruction about equally

5    unavailable witnesses.

6              THE COURT:  I'll probably say that.

7              MS. DAYANANDA:  I don't think it's part of the first

8    28 pages.

9              THE COURT:  I may say that.

10             MS. DAYANANDA:  We'd ask that you do it.

11             THE COURT:  Not everything in the written charge is

12   what I tell the jury.  I do it so you pay attention and don't

13   fall asleep while I'm charging the jury.

14             MS. DAYANANDA:  Okay.

15             THE COURT:  Mr. Beecher, you have further questions

16   you wanted to ask?

17             MR. BEECHER:  Yes, I do, your Honor.

18             THE COURT:  You might as well get prepared.  Do we

19   have Mr. Myers here?

20                  (In the presence of the jury.)

21             THE COURT:  Mr. Beecher, let's wrap up your

22   cross-examination of this witness.  You're still under oath.

23   Go ahead.

24

25

NICOLE CANALES, CSR, RPR

1    CROSS-EXAMINATION (CONTINUED)

2    BY MR. BEECHER:

3    Q    Now, you're aware, of course, of the fact that contraband

4    is often smuggled into prison facilities, correct?

5    A    Yes, sir.

6    Q    That would include, but not necessarily be limited to

7    something such as a cell phone?

8    A    Yes.

9    Q    And drugs, correct?

10   A    Yes.

11   Q    Drugs would often be smuggled into prison by a family

12   member, right?

13   A    I guess so.

14   Q    A girlfriend?

15   A    Yes.

16   Q    Or another friend would bring drugs into the facility?

17   A    Yes.

18   Q    And then they would be exchanged by something like

19   kissing; a balloon would be exchanged mouth to mouth, that

20   kind of thing?

21   A    Yes.

22   Q    That's true.  And that could include all kinds of

23   different drugs, right?

24   A    Yes.

25   Q    Now, you can't have money in jail, right?  You can't

Myers - Cross - Beecher                    2656

1  have, like, currency like we have on the street?

2  A    No.

3  Q    And so the only way you get currency is by having moneys

4  deposited into your inmate account, correct?

5  A    Yes, sir.

6  Q    So if somebody was engaging in transactions in the jail

7  with other inmates, they couldn't pay you money, right?

8  A    Correct.

9  Q    So you might arrange for somebody, or that person might

10  arrange for somebody to deposit moneys into an inmate account

11  in lieu of an exchange of funds, right?

12  A    Yes.

13  Q    Now, I mentioned earlier that during the period of 2005,

14  or whenever it was, going forward, you had over $37,000

15  deposited into your account; remember that?

16  A    Yes, sir.

17  Q    Over a hundred people deposited moneys into your account?

18  A hundred.

19        MR. AMATRUDA:  Is there a question?

20  Q    Do you know that to be true?

21        THE COURT:  Do you know how many people deposited

22  money into your account?

23        THE WITNESS:  Possibly.  Yes.

24  Q    Do you have a hundred best friends?

25  A    No.

Myers - Cross - Beecher                          2657

1    Q    Now, did you know who Patrick Cooke was?  Patrick Cooke?

2    A    No.  I know of him.  I heard of him, but I didn't know

3    him personally.

4    Q    You knew that he was murdered?

5    A    Yes.

6    Q    And that he was Taz's father?

7    A    Yes.

8    Q    And he was running a gambling spot, correct?

9    A    Yes.

10   Q    Did you also know that he was a correction officer?

11   A    I heard something to that degree.

12   Q    Now, there was a time when you wanted to be a bounty

13   hunter.  Do you remember that, when you were out on the

14   street?

15   A    Yes.

16   Q    Do you remember going to school -- there was a school in

17   Queens, right?

18   A    Yes.

19   Q    And I think it was you, Taz, and Moo went to the school?

20   A    No, I didn't go to the school.

21   Q    Wanted to go to the school?

22   A    No, Taz and Abu Bakr actually went to the school.

23   Q    They went to the school?

24   A    Yes.  I didn't.

25   Q    And that's where they got the badges?

Myers - Cross - Beecher                           2658

1    A    Yes.

2    Q    And they used those badges to impersonate police

3    officers?

4    A    Well, what they used the badges for, I had no idea.  I

5    don't know what they used the badges for.

6    Q    But you impersonated?

7    A    Yeah, but it had nothing to do with what Taz, Boo, and

8    Mohammed had going on.

9    Q    Where'd you get your badge from?

10   A    My badge was a courtesy badge.

11   Q    A courtesy shield?

12   A    Yes.

13   Q    Did you get that from a police officer or somebody?

14   A    No, it was something I bought off of someone.

15   Q    You bought it off of someone?

16   A    Yes.

17   Q    And you knew when you bought it that you were going to

18   use it?

19   A    Yes.

20   Q    Now, as we mentioned a bit earlier, you had a number of

21   acquaintances over the last number of years that you were

22   friendly with inside of MDC, correct?

23   A    Yes.

24   Q    You had conversations with them, correct?

25   A    Yes.

Myers - Cross - Beecher                    2659

1  Q    Do you remember having a conversation with an inmate who

2  was locked up with you about the fact that you, and Moo, and

3  Taz robbed and raped a girl in Queens?

4  A    No.

5  Q    You don't remember having that conversation?

6  A    No.

7  Q    And that you were going to a house to rob the girl, and

8  Taz had actually raped the girl but was blaming it on you?

9  A    That's not true.

10  Q    That's not true?

11  A    No, that's not true at all.

12  Q    None of those details -- they just fell out of thin air?

13             MR. AMATRUDA:  Objection.

14             THE COURT:  Sustained.  Disregard the comments of

15  counsel.

16             MR. BEECHER:  Now, I think I am just about

17  completed, your Honor, but I would like to consult with my

18  co-counsel.

19             THE COURT:  Go ahead.

20                (Counsel consults with co-counsel.)

21             MR. BEECHER:  It's always good when you have a

22  learned co-counsel to remind you of something you may have

23  forgotten.

24             THE COURT:  Go ahead.

25  Q    I remember we discussed a little bit earlier that the

Myers - Cross - Beecher                    2660

1  diamonds that you had gotten were stolen.  Do you remember

2  that?

3  A    Yes, sir.

4  Q    Did you tell the government about that?

5  A    Yes, I did.

6  Q    You did.  Just curious.  Thank you very much, Mr. Myers.

7        THE COURT:  Thank you.

8        Now, is there any redirect?

9        MR. AMATRUDA:  Yes, your Honor.

10 REDIRECT EXAMINATION

11 BY MR. AMATRUDA:

12 Q    Mr. Myers, you were asked on direct examination a bunch

13 of questions about ways that inmates communicate with each

14 other, like three-way phone calls.  When's the last time that

15 you spoke to Boo?

16 A    Right before he was arrested pertaining to this case.

17 Q    Was he arrested before or after you?

18 A    Before.

19 Q    And when were you arrested?  Do you remember the day?

20 A    I think -- it was on September 19th, I think.

21 Q    Okay.  Of what year?

22 A    2005.

23 Q    When was the last time you talked to Trouble?

24 A    Probably a year before I was arrested.

25 Q    Taz, when is the last time you spoke with him?

Myers - Redirect - Amatruda                    2661

1    A    I haven't spoken with him directly.  I had got a message

2    from him that -- from somebody in transit that came from the

3    prison that he was in, that said he -- to tell me what's up.

4    But as far as me speaking directory to him, I haven't spoken

5    to him.

6    Q    When's the last time you spoke to Sambo?

7    A    Probably two months ago.  I was coming from a visit, and

8    Sambo was coming from court, and the elevator and the pen that

9    he was in, I had to walk past and he was at the door.  And he

10   screamed out to me, and I looked, and I said what's up, and he

11   said ain't shit, you know, something about his court.  And I

12   said all right.  Keep your head up.  And he said all right.

13   And I went on the elevator, and they took me upstairs.

14   Q    What about -- you knew somebody named Plum, right?

15   A    Yes.

16   Q    When's the last time you spoke with her?

17   A    I haven't spoken to Plum in a long time, but I actually

18   seen her since I been locked up on this case.

19   Q    How'd you see her?

20   A    I was coming in from court one day.  I was coming from a

21   proffer session, actually, and she was coming from court, and

22   they had both of us in R and D, Receiving and Delivery,

23   together.

24   Q    Did you talk to her?

25   A    I didn't get a chance to say anything to her.

Myers - Redirect - Amatruda                    2662

1   Q    When's the last time you spoke with Moo?

2   A    I think I spoke with Moo -- the last time I spoke with

3   him I was incarcerated on this case?

4   Q    How long ago was that?

5   A    That was in 2005, probably would be the first month that

6   I been locked up.

7   Q    How about DJ?

8   A    I haven't spoken to him since we were in the same unit

9   together.

10  Q    When was that?

11  A    2005, when we first got locked up.

12  Q    And how about Puff?

13  A    I haven't spoken to him at all.

14  Q    Since when?

15  A    I hadn't spoken to him for a number of years, before the

16  case even happened.

17  Q    While you were -- while this case was pending, did you

18  learn any information about ballistics evidence?

19  A    No.

20  Q    You were -- you said on direct that you had reaped the

21  benefits of CMB.  You said that to Mr. Ruhnke.  What did you

22  mean by that?

23  A    That I had got paid for the things that I was doing.

24  Q    And you said that you saw E-Bay in 1999 at Wise's

25  funeral.  Had you seen him at all before that?

Myers - Redirect - Amatruda                    2663

1    A    Yes.

2    Q    When?

3    A    In the projects.

4    Q    You mentioned that you had established an alibi with Tina

5    Clark.  I think you mentioned that you had done that

6    immediately after the shooting actually happened, before you

7    were arrested?

8    A    Yes.

9    Q    Why did you establish an alibi if you didn't do it?

10   A    I just didn't want to be a part of the situation, as far

11   as having to say that I saw what happened.  Not necessarily to

12   say that I didn't do it, but just to -- not to have to be able

13   to point anyone out.

14   Q    Okay.  You mentioned on cross-examination that you had --

15   the questions about the money that was on T-Rock for the

16   murder of T-Rock?

17   A    Yes.

18   Q    Did you tell the government about that when you first

19   started meeting with them?

20   A    Yes.

21   Q    And during your meetings with the government, did you

22   admit to killing Kojack?

23   A    Yes, sir.

24   Q    Did you admit to participating in the murder of Michael

25   Colon?

Myers - Redirect - Amatruda                    2664

1    A      Yes.

2    Q      And Tyrone Baum?

3    A      Yes.

4    Q      You have spent time on parole, correct?

5    A      Yes, sir.

6    Q      And when you were on parole, there were questions about

7    you were lying to your parole officer; is that right?

8    A      Yes.

9    Q      Did your parole officer ever catch you lying to them?

10   A      No.

11   Q      If you lie here today, what happens?

12   A      I don't get my cooperation agreement.

13   Q      And then what?

14   A      I get sentenced to the maximum term.

15   Q      You said to Mr. Ruhnke that you felt that you were ready

16   to rejoin society.  What makes you think you're ready to do

17   that?

18   A      Just realizing that every individual is not always

19   capable of being in control of all of the situations he finds

20   himself in, but you are capable of making choices as how you

21   respond to those things.  And in the past, I've made a lot of

22   wrong choices, and I know that I have been productive in

23   society, but I know that I can -- I believe that all of those

24   things were things that I did not necessarily for money but

25   for -- out of peer pressure.  As a man, as an adult now, I

Myers - Redirect - Amatruda                    2665

1  don't feel those pressures anymore.  I don't really think

2  about what other people think about me, and my standing in the

3  neighborhood, and things like that.  I'm more concerned with

4  how I portray myself to the people in my family that I have to

5  have a long last being impression on, like my grandson and my

6  daughter.

7  Q    You answer questions with Mr. Beecher about money in

8  prison.  What were you doing for money while you were in jail?

9  A    In prison -- I'm in federal prison.  I'm in federal

10  prison with guys that are --

11           MR. HERMAN:  Objection.  Nonresponsive.

12           THE COURT:  Where did you get the money from?

13           THE WITNESS:  The money that I get from prison comes

14  from contracts that I have inside of the prison of inmates

15  that pay when they want you to wash their clothes.  They want

16  you to prepare their food.  They want to portray this rich-guy

17  attitude, and they pay other inmates to do the necessary

18  things, that other inmates do, that they feel is below them.

19  Q    So you're kind of like a servant?

20  A    Exactly.

21  Q    What is it that causes you to do that for money?

22  A    So that my family doesn't have to send me money and I'm

23  able to send money home to my sister to take care of my

24  daughter.

25           MS. DAYANANDA:  Nothing further.

NICOLE CANALES, CSR, RPR

1          THE COURT:  Any further questions?

2          MR. BEECHER:  I can do it from here, Judge.

3    RECROSS-EXAMINATION

4    BY MR. BEECHER:

5    Q    Where exactly is the club Cheetah?  Do you remember?

6    A    It's been so long I forgot now.

7    Q    Is it in Manhattan?

8    A    Yes.

9    Q    In the midtown area?

10   A    Lower midtown.

11   Q    Lower midtown.  Club NV, do you remember where that was?

12   A    Come again.

13   Q    The Club NV?

14   A    It's around in lower -- in that area, as well.

15   Q    Could it be further downtown than that?  Could it be?

16   A    I couldn't give you an exact description of where exactly

17   it's at.  It's been so long that I've been there.

18         MR. BEECHER:  Nothing further.

19         THE COURT:  That completes the questioning of this

20   witness.  The witness may step down.

21         Mr. Amatruda, you said there's something else you

22   want to offer into evidence as part of the government's case?

23         MR. AMATRUDA:  One quick witness, Judge.

24         THE COURT:  That deals with some records, I guess?

25         MR. AMATRUDA:  It does, your Honor, and then we also

Proceedings                                    2667

1   have some stipulations.  I don't know if --

2          THE COURT:  So is the witness available now?  Let's

3   complete the witness' testimony first.

4          MR. AMATRUDA:  Sure.

5          MS. BARRETT:  Your Honor, I believe that the ruling

6   needs to be made before the witness testifies.

7          THE COURT:  The what?

8          MS. BARRETT:  The motion, your Honor, said that I

9   could renew.

10          THE COURT:  Let's hear the witness' testimony.

11          THE CLERK:  Good afternoon.  I ask you if you can

12   remain standing and raise your right hand.  Do you affirm to

13   tell you truth, please?

14          THE WITNESS:  Yes.

15          THE CLERK:  Please state and spell your name.

16          THE WITNESS:  Jacklyn Spaeth, J-a-c-k-l-y-n,

17   S-p-a-e-t-h.

18   JACKLYN SPAETH,

19   called as a witness by the government, having been first duly

20   sworn, was examined and testified as follows:

21          THE CLERK:  Thank you.

22          THE COURT:  What number?

23          THE INTERPRETER:  Forty-eight.

24          THE COURT:  Fifty-eight.

25          THE CLERK:  Fifty-eight, yeah.

Spaeth - Direct - Amatruda                    2668

1          THE COURT:  Your witness.

2          MR. AMATRUDA:  Thank you.

3  DIRECT EXAMINATION

4  BY MS. AMATRUDA:

5  Q    What do you do for a living?

6  A    I work for the FBI.

7  Q    What do you do for them?

8  A    I'm an operation analysis.

9  Q    What do you do at that job?

10 A    I analyze photo records.

11 Q    I'm going to show you what's been marked for

12 identification as Exhibits 8023, 8024, 8021 and 8022, which

13 got out of order, by the way.

14          THE COURT:  8022.  What else?

15          MR. AMATRUDA:  8021.  8021 through 8024, your Honor.

16 Q    Are those charts of phone records that you analyzed in

17 this case?

18 A    Yes.

19 Q    And do the -- does the information in the charts

20 accurately represent the phone records that you analyzed to

21 the extent that you responded to a request from me to analyze

22 certain communications between telephones?

23 A    Yes.

24 Q    So I'll move those exhibits into evidence, 8021 through

25 8024?

Spaeth - Direct - Amatruda                    2669

1          THE COURT:  I haven't seen it.  Is there any

2    objection to these exhibits.

3          MS. BARRETT:  Not to the exhibits, your Honor.

4          THE COURT:  So the exhibits are in evidence.

5          (Government's Exhibit 8021 through 8024  were

6    received in evidence.)

7    Q    Okay.  Just so the jury -- we'll be getting more

8    information on this during the summations, but I just want --

9          THE COURT:  These are photo records?

10          MR. AMATRUDA:  These are charts of the phone

11    records, summarizing them.

12          THE COURT:  Now, the phone records that these refer

13    to are in evidence or not in evidence?

14          MR. AMATRUDA:  They've been stipulated to,

15    your Honor, with the exception of three that Ms. Ruhnke had

16    raised the objections to.

17          THE COURT:  These are charts that are culled from

18    documents that are in evidence?

19          MR. AMATRUDA:  Yes.

20          THE COURT:  Except in three situations?

21          MR. AMATRUDA:  Two.

22          THE COURT:  I'm a little bit unclear.  Do you want

23    to show me what those two situations are, so I can visually

24    look at what you're talking about.

25          MR. AMATRUDA:  Sure, Judge.

Spaeth - Direct - Amatruda                    2670

1           THE COURT:  Let's get to the bottom of this.  It's

2    okay to have charts of complex documents, like a series of

3    checks and phone records.  So the underlying documents are in

4    evidence, but you can then have a chart that the witnesses can

5    testify to that's drawn from the documents as to the accuracy

6    (phonetic) represented from those documents.  And then we can

7    allow those charts in evidence as well, which is what the

8    government wishes to do now.  Let me just clarify it so we can

9    get beyond this.

10          There are two pieces of paper that              Ms.

11   Barrett seems to be concerned about.  I'd like to see what

12   they are.  Am I on the right page here?

13          MS. BARRETT:  Your Honor, I believe if we can

14   approach sidebar we can resolve the issue quickly.

15          THE COURT:  Let's do it quickly.

16          (Sidebar - Outside the presence of the jury.)

```
                         Sidebar                        2671

  1                     (Sidebar.)

  2          THE COURT:  You want me to look at these pieces of

  3   paper.  What is the issue?

  4          MS. BARRETT:  Judge, this is the issue that we

  5   raised before that your Honor was going to want me to clarify.

  6   We have stipulated to the authenticity of the phone records,

  7   and we didn't stipulate to the admissibility of two portions,

  8   two sets of records, for the following reasons --

  9          THE COURT:  Well, just one second.

 10          MS. BARRETT:  Sure.

 11          THE COURT:  We're talking about which exhibit now?

 12   8020?

 13          MS. BARRETT:  And 8013.

 14          THE COURT:  Are these phone records?  There's no

 15   question that these are accurate phone records.  You're not

 16   questioning that, you're questioning about the information

 17   contained therein you don't think should be before the jury;

 18   is that what you're trying to say?

 19          MS. BARRETT:  What I'm trying to say, there's

 20   inadequate foundation for the association of those records

 21   with individuals that the government intends to --

 22          THE COURT:  Here's my ruling -- I think what you

 23   want me to do is not allow these documents to be in evidence;

 24   yes or no?

 25          MS. BARRETT:  Yes.
```

NICOLE CANALES, CSR, RPR

Sidebar                                            2672

1          THE COURT:  So I'm not going to -- I'm going to

2    allow them in evidence, so your objection is noted.  These are

3    authenticated documents.  They're in evidence, as far as what

4    the information is that's contained therein.  You can argue

5    what you want to the jury.  The government can argue to the

6    contrary.  The jury is going to be perfectly capable of seeing

7    whether or not there's anything there that's of probative

8    value.  You think the jury can assess all the information.

9    Your objection is noted.  Let's proceed now.

10         MS. BARRETT:  Fine.  Thank you, your Honor.

11                    (Sidebar concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Spaeth - Direct - Amatruda                    2673

1              (In the presence of the jury.)

2          THE COURT:  We're allowing the charts to be in

3     evidence; they're reflective of information contained on these

4     voluminous phone records, if that's a correct

5     characterization?

6          MR. AMATRUDA:  That's correct, your Honor.

7          THE COURT:  Let's go forward.

8     Q    So the chart 8023 in evidence -- I'm going to show you,

9     Ms. Spaeth, and we can just give the jury an idea.  This is a

10    chart for the time frame between January and February 12th of

11    2001?

12    A    Yes.

13    Q    Which is when we heard some evidence about some medical

14    clinics, and I asked you to document the connection between

15    the phone numbers on -- that are listed on the left-hand side;

16    is that right?

17    A    Yes.

18    Q    And the chart itself is a timeline, correct?

19    A    Yes.

20    Q    So if you move from the left side of the chart to the

21    right side of the chart, it would show you from earlier time

22    period to later, correct?

23    A    Yes.

24    Q    And on this chart, there are arrows with writing near

25    them?

Spaeth - Direct - Amatruda                2674

1   A    Yes.

2   Q    What do those arrows and writing mean?

3   A    They represent the individual calls for that time period.

4   Q    Between the numbers, correct?

5   A    Yes.

6   Q    And the red writing gives the date and time of the calls;

7   is that right?

8   A    Yes.

9   Q    And there are also arrows at the bottom of -- I'm sorry.

10  Each one is an arrow with a dot at the top and the arrow on

11  another side.  What does that represent?

12  A    The dot represents the beginning of the communication,

13  and the arrow represents the ending of the communication.

14  Q    And then there's one line in this chart that ends.

15  What's the significance of that?

16  A    That means that the communication for that telephone

17  ended during starting that time period, so it ended before

18  February 12th, 2001.

19        MR. AMATRUDA:  I'm not going to take up too much

20  time, because Ms. Dayananda is going to spend time on these in

21  her summation.

22  Q    But 8021 and 8022 is from July 10th of 2002, which is

23  when we heard some evidence about a kidnapping.  Again, you

24  charted the communications between the various numbers there?

25  A    Yes.

Spaeth - Direct - Amatruda                    2675

1   Q    And with respect to the number here, which is 4028, that

2   number, did you do any review of the records for that time

3   period for that number?

4   A    Yes.

5   Q    And what was it that you were able to learn from looking

6   at those records, with respect to that number's communication

7   with the other numbers?

8   A    It was in communication with multiple numbers for that

9   time period.

10  Q    Okay.  And, lastly, I'll show you 8024, which is from

11  July 25th, 2003, which we heard testimony about the murder of

12  Tyrone Baum that day, and, again, your chart shows the

13  communication between various telephones for that?

14  A    Yes.

15  Q    Okay.  And let me just ask you, again, with respect to

16  the number ending in 4028, was there anything unique about

17  that number?

18  A    In regards to?

19  Q    What other numbers it was in contact with?

20  A    It was in contact with 3911 -- excuse me.  917-548-3911,

21  and 718-773-2501.

22  Q    Okay.

23        MR. AMATRUDA:  Thank you very much.

24        THE COURT:  Any questions?  Ms. Barrett, do you wish

25  to inquire?

Spaeth - Cross - Barrett                        2676

1           MS. BARRETT:  Yes, I do, sir.

2           THE COURT:  Go ahead.

3    CROSS-EXAMINATION

4    BY MS. BARRETT:

5    Q    Good afternoon, Ms. Spaeth?

6    A    Good afternoon.

7    Q    In your preparation for these charts, did you review all

8    of the phone records over the course of the year or so that

9    the records were gathered?

10   A    I reviewed the time periods that were requested.

11   Q    Okay.  And could you specify what those dates were?

12   A    Yeah.  It was July 25th, 2003, and the period of January

13   through February 12th, 2001, and then July 10th and July 11th

14   of 2002.

15   Q    But you've made no comparisons with regard to the uses of

16   these particular numbers over the course of the period of time

17   that the records were gathered; is that right?

18   A    I only formulated my data based on the time periods that

19   were requested.

20   Q    And there's no way to tell who was using the phone from

21   the data that you analyzed; is that right?

22   A    Yes.

23   Q    And how about the length of the calls, would you

24   incorporate the length of the calls in your analysis?

25   A    Not the length, no.

NICOLE CANALES, CSR, RPR

Spaeth - Cross - Barrett                          2677

1   Q    So if a call went to voicemail, we wouldn't be able to

2   tell from this chart; is that right?

3   A    Yes.

4   Q    And we would not be able to tell from this chart whether

5   or not there was any conversation whatsoever in connection

6   with that call, correct?

7   A    Correct.

8   Q    And there's no way of telling, obviously, what was being

9   said during those telephone calls, right?

10  A    Correct.

11  Q    Now, three of the numbers that you analyzed were land

12  lines; is that correct?

13  A    You would have to tell me specifics.

14  Q    Okay.  Well, there was one 212 number, three 682025, and

15  then there were two 718 numbers, 9408184 and 7732501?

16  A    I believe those are land lines?

17  Q    Are you familiar with the subscriber information for

18  those telephone numbers?

19  A    No.

20  Q    The remaining numbers, which is are -- have 347, 646, and

21  917 area codes are cell phones; is that right?

22  A    I would have to look at the information to confirm,

23  but --

24  Q    So you didn't do any analysis as to what kind of phones?

25  A    I just don't have it in front of me right now, but --

NICOLE CANALES, CSR, RPR

Spaeth - Cross - Barrett                          2678

1    Q    Can you tell from --
2              MS. BARRETT:  I'm sorry is this on?
3              THE CLERK:  Yes.
4              MS. BARRETT:  How did you do this?
5              THE WITNESS:  I can see it.
6    Q    Now, can you see that on your monitor?
7    A    Yeah, I can see it.
8    Q    So if we're looking at this -- this is the --
9              MS. BARRETT:  Pardon me, your Honor.  Government
10   Exhibit 8021.
11   Q    And the 917-548-3911, is that a cell phone?
12   A    917548 -- I don't remember off the top of my head right
13   now if it was a cell phone or a land line.
14   Q    How about the 917-334-4028?
15   A    Same.  I wouldn't remember off the top of my head if it
16   was a cell phone or a land line.
17   Q    And the same is true for the 2347 numbers at the bottom?
18   A    It's the same?
19   Q    That you don't recall off the top of your head; is that
20   right?
21   A    Whether it was, yes.
22   Q    Did you examine the subscriber information in these
23   records?
24   A    No.
25   Q    You did not.  So you wouldn't know whether or not -- the

Spaeth - Cross - Barrett                    2679

1    names of the subscribers at all; is that right?

2    A     I didn't examine the records for subscriber information.

3              MS. BARRETT:  That's all I have.  Thank you.

4              THE COURT:  Any further questions by anyone?

5              MR. REHNKE:  No, your Honor.

6              MR. AMATRUDA:  Thank you, Judge.

7              THE COURT:  Thank you.  You may step down.  Does the

8    government have any other evidence it wishes to present?

9              MR. AMATRUDA:  Just stipulations.

10             THE COURT:  You have stipulations now?

11             MR. AMATRUDA:  Sure.

12             THE COURT:  How many do we have?

13             MR. AMATRUDA:  Four.

14             THE COURT:  So they will be in evidence.  Do you

15   have them marked?

16             MR. AMATRUDA:  Yes, your Honor.  They're exhibits

17   9,000, 9,004, 9 -- do you have your paper ready?

18             THE COURT:  9,000.

19             MR. AMATRUDA:  9,000, 9,004, 9,006, and 9,007.

20             THE COURT:  All right.  So let's hear the

21   stipulations now.  They're in evidence.

22             (Government's Exhibit 9,000, 9004, 9006, 9,007  were

23   received in evidence.)

24             MR. AMATRUDA:  The first on is 9,000.  It states it

25   is hereby stipulated and agreed by and between the undersigned

NICOLE CANALES, CSR, RPR

Proceedings                                    2680

1    parties that Government Exhibit 8000 is a true and accurate

2    copy of Sprint records related to telephone numbers

3    9176869346, 9177234900, 9176210242, 9174065776, and

4    6462999192.

5              The next one says the Government Exhibit 8006 is a

6    true and accurate copy of Sprint records related to telephone

7    numbers 6462981100, 6462462000, 6462989000, 6462985200,

8    3473849400, and 9177015828.  Government Exhibit 8009 is a true

9    and accurate copy of Sprint records related to telephone

10   numbers 3472287014, and 5702740218.  Government Exhibit 8011

11   is a true and accurate copy of Sprint records related to

12   telephone number 9175483911.  Government Exhibit 8013 is a

13   true and accurate copy of Sprint records related to telephone

14   number 9173344028.  Government Exhibit 8014 is a true and

15   accurate copy of Sprint records related to telephone numbers

16   3479920131 and 3479920173.

17             Government Exhibit 8015 an a true and accurate copy

18   of Sprint records related to telephone numbers 6462941333,

19   9175781922, 9175788252, and 6462961645.  Government

20   Exhibit 8018 is a true and accurate copy of Sprint records

21   related to telephone number 3474325115.  Government

22   Exhibit 8020 is a true and accurate copy of Sprint records

23   related to telephone number 3477246931.

24             The information contained in government exhibits

25   listed in paragraphs one through -- it says 1 through 8, but

NICOLE CANALES, CSR, RPR

Proceedings                    2681

1   I'll correct that to 1 to 10.  The stipulation was recorded

2   and maintained in Sprint's ordinary course of business.  It

3   was Sprint's regular practice to record and maintain the

4   information contained in government exhibits listed in

5   paragraphs 1 through 8.  It should be 1 through 10 of this

6   stipulation.  Sprint recorded and maintained information

7   contained in the government exhibits listed in paragraphs 1

8   through 10 of this stipulation, at or near the time of its

9   making, from information made or transmitted by a person with

10  knowledge.

11          Government Exhibits 8001 and 8012 are true and

12  accurate copies of Verizon records related to telephone

13  numbers 71871390652 and 7186381096.  Government Exhibit 8004

14  is a true and accurate copy of Verizon records related to

15  telephone number 7186239682.  Government Exhibit 8005 is a

16  true and accurate copy of Verizon records related to telephone

17  numbers 2123682025 and 2122818200.  Government Exhibit 8007 is

18  a true and accurate copy of Verizon records related to

19  telephone number 7188323332.  Government Exhibit 8016 is a

20  true and accurate copy of Verizon records related to telephone

21  numbers 7187732501, 7183732158, 7187124013, and 7183989579.

22          Government Exhibit 8017 is a true and accurate copy

23  of Verizon records related to telephone number 7189408184.

24  The information contained in the government exhibits listed

25  in -- there's an error on the paragraph numbers 12 -- no.

Proceedings                                    2682

1   12 through 17 of this stipulation was recorded and maintained

2   in Verizon's ordinary course of business.  It was Verizon's

3   regular practice to maintain the information contained in the

4   government exhibits listed in paragraphs 12 through 17 of this

5   stipulation.  Verizon recorded and maintained the information

6   contained in the government exhibits listed in paragraphs 12

7   through 17 of this stipulation, at or near the time of its

8   making, from information made or transmitted by a person with

9   knowledge.

10          Government Exhibit 8002 is a true and accurate copy

11  of the Singular Wireless records related to telephone numbers

12  9175391113, 9178475076 and 9179511551.  Government

13  Exhibit 8008 is a true and accurate copy Singular wireless

14  records related to telephone number 7187552346 and 7187558963.

15  The government's information -- or the information listed in

16  government exhibits in paragraphs 19 through 21 of this

17  stipulation was recorded and maintained in Singular Wireless'

18  ordinary course of business.

19          It was Singular Wireless' regular practice to record

20  and maintain the information contained -- listed in paragraphs

21  19 through 21 of this stipulation.  Singular Wireless recorded

22  and maintained the information contained in the government

23  exhibits listed in paragraphs 19 through 21 of this

24  stipulation, at or near the time of its making, from

25  information made or transmitted by a person with knowledge.

Proceedings                    2683

1        Government Exhibit 8003 is a true and accurate copy

2   of Zetel Communication Inc.'s records related to telephone

3   number 7182219802.  The information contained in the

4   government exhibits listed in paragraph 24 of this stipulation

5   was recorded and maintained in Zetel Communication Inc.'s

6   ordinary course of business.  It was Zetel Communication

7   Inc.'s regular practice to record and maintain the information

8   contained in the Government Exhibit listed in paragraph 24 of

9   this stipulation.

10       Zetel Communication recorded and maintained the

11  information contained in Government Exhibit listed in

12  paragraph 24 of this stipulation, at or near the time of its

13  making, with information transmitted by a person with

14  knowledge.  Government Exhibit 8018 is a true accurate copy of

15  T-Mobile records related to telephone number 3472078534.

16  Information contained in Government Exhibit listed in

17  paragraph 27 of this stipulation was recorded and maintained

18  in T-Mobile's ordinary course of business.

19       It was T-Mobile's regular practice to record and

20  maintain the information contained in the Government Exhibit

21  listed in paragraph 27 of this stipulation.  T-Mobile recorded

22  and maintained information contained in the Government Exhibit

23  listed in paragraph 27 of this stipulation at or near the time

24  of its making from information made or transmitted by a person

25  of knowledge.

Proceedings                          2684

1          THE COURT:  Mr. Amatruda, let me interrupt.  My

2   guess is that the jurors are just fogged out.

3          MR. AMATRUDA:  I am too.

4          THE COURT:  So let's see how we can do it.  They're

5   all in evidence.  Okay.  So I don't think you have to read it

6   to the jurors.

7          MR. AMATRUDA:  You waited this long.

8          THE COURT:  You should have told me.

9          MR. AMATRUDA:  You're right.  I'm done, though.  All

10  I have to read is that we wanted to make clear to the jurors

11  the above telephone records do not identify the participants

12  in the telephone calls related to the records, and that was

13  the end.

14         THE COURT:  That's the end.  My apologies for not

15  interrupting you, at this time.  But, you know, it's normal

16  for the stipulations to be read, and I have no idea, because I

17  hadn't seen it, about the length of it.  If I knew that in

18  advance, I would spared Mr. Amatruda the need to read it,

19  because it's in evidence.  That means during summations,

20  anybody wants to refer to anything in evidence, they can do

21  that at that particular time.  But it's done and over with.  I

22  thank counsel for doing this, because even though it took a

23  little bit of time to read this, it obviated the need to call

24  people from the various telephone companies to just lay a

25  foundation to allow those documents to be introduced into

Proceedings                                                   2685

1   evidence.

2           It's the perfect example of how the Court

3   appreciates when counsel can collectively agree to do that, to

4   save really unnecessary and unrealistic time, and not have to

5   burden people to come in here and testify just about these

6   kind of recordkeeping.  Okay.  So I think we completed that.

7           Anything else that the government wishes to have in

8   evidence?

9           MR. PAUL:  Your Honor, we have three more

10  stipulations that are much shorter.

11          THE COURT:  Now, let me ask you this, do you want to

12  really read them, or you think you can just rely upon the fact

13  that we can identify them in evidence and you can refer to

14  them if you want to, or defense counsel can refer to them?

15          MR. PAUL:  I'd like to read them, your Honor.  It's

16  going to take less than a minute, probably.

17          THE COURT:  Okay.  Let's have them now.

18          MR. PAUL:  So I'm just going to read.  They're all

19  stipulated to by the parties.  So the first reads --

20          THE COURT:  What number?

21          MR. PAUL:  This one's 9,007.

22          THE COURT:  Okay.

23          MR. PAUL:  This one reads:  On or about

24  December 1st -- December 21st, 2000, the defendant, Damion

25  Hardy, provided following contact information to a New York

NICOLE CANALES, CSR, RPR

Proceedings                                    2686

1    state government agency.  There's an address and then a

2    telephone number, which is 3682025.  The next is Government

3    Exhibit 9004.  And, Judge, I just want to make sure that you

4    have on your records this correctly.  We have Government

5    Exhibit 58.

6                THE COURT:  Sixty-eight?

7                MR. PAUL:  Fifty-eight.  You may have it as an

8    incorrect exhibit, as 58.

9                THE COURT:  I have 58 as a head shot.

10               MR. PAUL:  Okay.  So the parties are agreeing that

11   this head shot, if called to testify, Government Exhibit 58,

12   New York City -- a member of the New York City Police

13   Department would state that the individual depicted in the

14   exhibit is Robert Bootie, so that's 58.

15               THE COURT:  Go ahead.

16               MR. PAUL:  All right.  As well as Avalorn -- and I

17   may be mispronouncing it.  That's A-v-a-l-o-r-n, Jones, is the

18   mother of Kenway Jones, also known as Stro.  And, finally, if

19   called to testify as a witness, a Homeland Security

20   investigations agent qualified as a narcotics trafficking

21   expert would testify that cocaine and heroin are transported

22   into the State of New York from other countries or states.

23               THE COURT:  What stipulation number is that?

24               MR. PAUL:  That was 9,006.

25               THE COURT:  9,006.

NICOLE CANALES, CSR, RPR

```
                    Proceedings                    2687
```

1              MS. PAUL:  Yes.

2              THE COURT:  That's it?

3              MR. PAUL:  That's it.  Okay.  Anything else?

4              MR. AMATRUDA:  Judge, can we talk for one minute?  I

5      think we're ready to rest.  I just want to make sure --

6              THE COURT:  Go ahead.  You're seeing the wrap up,

7      you see, now, of many many days of the government's case.  So

8      let's hear what Mr. Amatruda has to say.

9              Want to read more stipulations?

10             MR. AMATRUDA:  No, Judge, at this point, the

11     government rests.

12             THE COURT:  The rest is sort of a work of art.

13     Nobody has rested very much over the last month.  They're

14     still not resting, but that means that the government has

15     presented to you folks all of the evidence it wishes for you

16     to consider on its direct case.  And so we've reached that

17     point in the trial that we started on March 31st, and you've

18     been very patient, and now we turn to the defendant to hear

19     what the defendant wishes to do.

20             Now, you're going to make a motion.

21             MR. REHNKE:  I'm going to make motions, your Honor,

22     and there's going to be a little bit of discussion with the

23     government.

24             THE COURT:  You haven't completed your discussions

25     with the government yet?

Proceedings                                        2688

 1          MR. REHNKE:  Not yet.

 2          THE COURT:  So, then, what you're going to did now

 3    is -- the record will reflect you're making appropriate Rule

 4    29 motions, and you're going to be able to talk to me about it

 5    without the jurors being here, since these are matters of law.

 6    So at the end of the government's case, the defendants have

 7    right to make certain motions.  They involve issues which are

 8    not your concern.  The record will reflect that this is the

 9    time where the defendants will have the need to make these

10    motions, and then we'll be discussing what those motions are

11    all about without you're being here.  But we'll do that when

12    we send you home tonight, and then the lawyers will have the

13    opportunity to speak to Court without you being here on these

14    legal matters.  All right.

15          Now, I'm understanding that the defense counsel

16    wishes to have a moment to reflect upon a few things before

17    you tell me how you're going to proceed.  You need ten minutes

18    or so?

19          MR. REHNKE:  We're talking about a stipulation,

20    your Honor.  That has not been resolved.

21          THE COURT:  Talking about a stipulation.  How much

22    more time do you need?  Do you have anything you can do in the

23    meantime?

24          MR. REHNKE:  Yes.  I can offer some documents

25    without objection, and then we can discuss --

NICOLE CANALES, CSR, RPR

Proceedings                                          2689

1    THE COURT:  Let's take care of what you can do now.

2    If you still need time to put the finishing touches to a

3    proposed description, then we'll take a little recess.  These

4    are matters we discuss without you're being here.  They

5    involve processing of the trial and documents the defense

6    wishes to introduce, so I have a sense of what it is, but you

7    don't have a clue nor should you.

8           MS. DAYANANDA:  Your Honor, could we just have the

9    break to review it so it goes smoothly?

10          THE COURT:  You need 10, 15 minutes?  Aside from

11   these stipulations, Mr. Granton, will you be producing any

12   other evidence?

13          MR. BEECHER:  Yes, there's a witness who is outside.

14   I just ask Ms. Pannitti to go and make sure he's still there.

15          THE COURT:  If you have somebody there, let's take

16   care of all the witnesses, and then maybe the government can

17   take a look at these documents, and we can proceed that way.

18   Does that make sense?

19          MR. REHNKE:  Yes, your Honor.

20          THE COURT:  Let's bring that person into the court

21   now.  The defendant has the right to have witnesses, and I

22   explained to you a hundred years ago that the defendant

23   doesn't have any burden.  The defendants don't have to do

24   anything.  They can just rest on the proposition that the

25   government will be successful based on the evidence the

Proceedings                                    2690

1   government produced.  And a lot of the evidence that the

2   defendant introduces as a practical matter comes out during

3   the course of examination.  So they have the right to have

4   witnesses, and we have a witness here.

5             THE CLERK:  Good afternoon.  Take the witness stand,

6   please.

7             THE COURT:  This is a witness being called for

8   Mr. Granton, correct.

9             MR. BEECHER:  Yes.  That's correct.  Hal Wilkerson,

10  and he is with the New York State Division of Parole.

11            THE CLERK:  Good afternoon.  Ask you to remain

12  standing.  Do you affirm to tell the truth?

13            THE WITNESS:  Yes.

14            THE INTERPRETER:  Thank you.  Please have a seat and

15  if you can please state and spell your name.

16            THE WITNESS:  Senior parole officer Hall Wilkerson,

17  H-a-l, W-i-l-k-e-r-s-o-n.

18  HAL WILKERSON,

19  called as a witness by the defense, having been first duly

20  sworn, was examined and testified as follows:

21            THE CLERK:  Thank you.

22            THE COURT:  Your witness.

23  DIRECT EXAMINATION

24  BY MR. BEECHER:

25  Q    Good afternoon, Mr. Wilkerson.  It's been a long day for

NICOLE CANALES, CSR, RPR

Wilkerson - Direct - Beecher                    2691

1   you, and we finally got you here.  You have met me before,

2   correct?

3   A     Yes.

4   Q     You know that I'm Robert Beecher, and that I represent

5   Aaron Granton, who is also known as Eric Moore, correct?

6   A     Yes.

7   Q     And I had spoken to you on the telephone about six weeks

8   ago; do you recall that?

9   A     Yes.

10  Q     About Mr. Granton's parole supervision?

11  A     That's correct.

12  Q     Now, if you can just tell the jury what your duties are

13  as senior parole officer.  Just educate the jury as to what

14  you do and how long you've been with the New York State

15  Division of Parole?

16  A     Approximately two months ago, I just completed 17 years

17  with the Division and was recently promoted to senior parole

18  officer, but during the time as an active parole officer, our

19  duties are to supervise those that have been released from the

20  correctional facility, and they're completing their sentence

21  out in the communities.

22         The details vary.  We conduct field visits, where we

23  go to the parolee's residence, verify if he resides there.  We

24  speak with family members, make referrals to substance abuse

25  treatment programs, anti-aggression programs, in an effort to

Wilkerson - Direct - Beecher                    2692

1    have them rehabilitate back into the community.  When they're

2    released, they have conditions of release that they have to

3    abide by.  As long as they do that, and they finish their

4    term, then they max out from parole supervision.

5             During their period of supervision on parole, if

6    they don't abide by the conditions by the state, and things

7    aren't working out, then we would go to the next level, and

8    the state would actually issue a warrant, and then we would

9    return them back into custody.

10            (Proceedings continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   DIRECT EXAMINATION (Cont'd.)

2   BY MR. BEECHER:

3   Q    Now, Senior Parole Officer Wilkerson, congratulations on

4   your promotion, by the way.

5   A    Thank you.

6   Q    Can you recall when you began supervising Mr. Granton?

7   A    I began supervising Mr. Granton approximately 1999.

8   Q    And do you recall why he was under your supervision?

9   A    I believe his conviction was for a robbery.

10  Q    And at that time what area were you assigned to?

11  A    Covering the 75th Precinct area which is East New York,

12  Brooklyn.

13  Q    Is that commonly known as Area 5?

14  A    I'm not sure, that might be a term used by NYPD so, but

15  with the Division of Parole we're assigned to a precinct area.

16  Q    A precinct area?

17  A    Right, so that was the 75th Precinct area which covers

18  East New York, Brooklyn.

19  Q    And can you tell the jury please when you first met

20  Mr. Granton when he was released?

21  A    Mr. Granton's case really sticks in my head because of a

22  particular incident that happened when I first started

23  supervising Mr. Granton.  I conducted a field visit to his

24  residence with my partner, knocked on the door and asked for

25  Mr. Eric Moore which is how he was known to our agency.  The

1    family members stated that there was no such person residing

2    at the residence and we explained, excuse me, we're here from

3    the Division of Parole and we're here for a Mr. Eric Moore and

4    once again it was told to me that no such person resided at

5    the residence.  So, at that point I apologized to the family

6    that we had misinformation but upon further review of the case

7    record when we got back to the office we found that the

8    subject's actual name was Aaron Granton and so that's what

9    really -- after all these years that just still sticks into my

10   head.

11           So, during a follow-up field visit, once we went

12   back to the residence again and met the same family members

13   and said, yes, we were here a few days ago in regards to

14   Mr. Eric Moore but I'm asking for Mr. Aaron Granton and then

15   the family was receptive and said, oh, okay, Aaron, he's in

16   his room in the back and so I took that as a -- chalked it up

17   as a lesson learned as an officer that often times our records

18   are under alias names.

19           THE COURT:  That's how you met him, that was

20   question, that's how you met him?

21           THE WITNESS:  Yes.

22           THE COURT:  Next question.

23           THE WITNESS:  And --

24           THE COURT:  You don't have to answer any more.

25   Q    But he was at home when he was expected to be home,

1  correct?

2  A    Yes, so that was the initial meeting of Mr. Granton in

3  his residence and meeting of his family.

4  Q    Now, during your supervision of him was he ever not in

5  compliance with the terms and conditions of his parole?

6  A    His overall adjustment to parole was fair.  He reported

7  to Parole as instructed, he abided by the state mandates and

8  we really didn't have any problems with him during his

9  supervision period.

10 Q    And did there come a time when his supervision was

11 terminated or abbreviated?

12 A    Yes, I believe he was released a little bit earlier than

13 his maximum expiration date but off the top of my head I don't

14 recall the exact amount of time.

15 Q    Now, when somebody is terminated or his parole is

16 abbreviated, he's released early, is that often done on say

17 your recommendation as his supervising parole officer?

18 A    Repeat the question please.

19        THE COURT:  His question is do you know why he was

20 released early?

21        THE WITNESS:  Some cases the person that's on parole

22 is eligible for what's called a three-year discharge and in

23 that particular case we would have to kind of write a review

24 package on what the person was doing out in the community for

25 the past three years and at the end of that report we have the

*Wilkerson - cross - Paul*                                2696

1   option of, based on what he's been doing in the community, we

2   could recommend that he be released early or we could put in a

3   recommendation that the person needs to be further supervised.

4              THE COURT:  Did you recommend that he be released

5   early?

6              THE WITNESS:  Off the top of my head, I can't

7   recall.

8              THE COURT:  But somebody did -- well, he was

9   released early?

10             THE WITNESS:  Yes.

11             THE COURT:  Obviously he was released early because

12  your department thought he qualified for early release, right?

13             THE WITNESS:  Yes.

14             THE COURT:  That's his answer.

15             MR. BEECHER:  I don't have any further questions.

16             THE COURT:  Any questions, any cross-examination?

17  CROSS-EXAMINATION

18  BY MS. PAUL:

19  Q    Good afternoon again.

20  A    Good afternoon.

21  Q    So, you just talked about meeting Mr. Granton and you

22  said that you had initially gone to see a person by the name

23  of Eric Moore?

24  A    Correct.

25  Q    So, which in your experience as a parole officer

*Wilkerson - cross - Paul*                                    2697

1    indicates that Mr. Granton in the past provided a false name

2    to law enforcement?

3    A    Often times we have cases where the person when they

4    commit the crime, they don't give their true name, they get

5    arrested by NYPD or whatever agency and they just make up a

6    name but once they go into the penal system their name goes

7    through the system with them, so when he came out our agency

8    knew him as Eric Moore but his true name in the files is Aaron

9    Granton.

10   Q    Okay.  And that's because he provided a false name to law

11   enforcement?

12              THE COURT:  Well, do you know that?

13              THE WITNESS:  Yes.

14              THE COURT:  You know that?

15              THE WITNESS:  Yes.

16              THE COURT:  It had to be a false name that was

17   provided?

18              THE WITNESS:  Yes.

19   Q    You said that he was convicted of robbery and released

20   under your supervision in about 1999?

21   A    April of 1999.

22   Q    And you said you don't remember exactly when he was

23   discharged?

24   A    Not exactly but I believe it was around 2002.

25   Q    All right.  And you said there was some period of time

1   that he was discharged early, it was about three months,

2   right?

3   A    Yes.

4   Q    And in terms of the reason for his discharge, as you sit

5   here you don't know, right?

6   A    Correct.

7             MS. PAUL:  I have nothing further.

8             THE COURT:  Anything further?

9             MR. BEECHER:  Just from here, Your Honor.

10            THE COURT:  Go ahead.

11

12  REDIRECT EXAMINATION

13  BY MR. BEECHER:

14  Q    But now, Officer Wilkerson, he would not have been

15  discharged if he was violating the conditions of his parole,

16  correct?

17  A    That's correct.

18            MR. BEECHER:  I don't have anything else.

19            THE COURT:  Another question?

20            MS. PAUL:  I'm sorry, I may, Judge.

21            (Pause.)

22            THE COURT:  You can ask it right there, I mean you

23  don't have to move up there.

24            MS. PAUL:  I like the mike, Judge, it makes me feel

25  like I'm doing something.

1  RECROSS-EXAMINATION

2  BY MS. PAUL:

3  Q    So, in your experience, Officer Wilkerson, is it your

4  experience that people on parole continue to commit crimes?

5  A    Yes.

6            MS. PAUL:  Nothing else.

7            THE COURT:  You have no knowledge as to whether

8  there were any crimes committed here by Mr. Granton, you would

9  have no knowledge one way or the other I take it?

10           THE WITNESS:  No.

11           THE COURT:  You may step down.

12           (Witness steps down.)

13           THE COURT:  Now, do you need some time or do we have

14  anything we can do now before we take our little break?

15           MS. DAYANANDA:  We need some time.

16           THE COURT:  Let's take our afternoon break and I

17  think what's going to happen now, just to give you a heads-up

18  that I suspect this is not going to take too long hopefully

19  and I'm going to talk to you a little bit before I send you

20  home; we're going to have summations starting tomorrow morning

21  promptly.  Time wise things seem to be breaking in a rational

22  reasonable way.  So, tomorrow we'll have probably a full day I

23  would suspect, a major part of the day of summations.  We'll

24  talk a little bit more about that before I send you home, but

25  I'm going to use the rest of the time today to give you some

2700

1    of the charge because the charge that I'm going to give you is

2    like 70 some odd pages long by necessity.  Because of the

3    multiplicity of the charges it's a long charge, it's going to

4    take me a while to explain it to you but the first part of it

5    deals with general instructions that apply in all cases.  So,

6    I think that that could take about an hour and I can get us

7    started by at least breaking it up a little bit by giving you

8    the so-called first part of the charge and then after the

9    summations I'll come back and tell you specifically about the

10   crimes that are alleged in the indictment and the law that

11   applies to it all and then how you go about your jury

12   deliberations.

13          So, I think that probably the last part of my charge

14   will take a few hours and I think that probably that will be

15   happening Friday, I can't tell you for sure because I don't

16   know how long the summations will be of counsel, I don't like

17   to put them under undue pressure, but for all intents and

18   purposes you will be starting your deliberations probably

19   sometime Friday afternoon and I guess you'll get organized and

20   basically come back Monday to really get into it.  We'll see

21   how it all works, okay.

22          So, that's what you can anticipate.

23          Let's reconvene at 3:30 and see whether we can wrap

24   this up.

25          THE CLERK:  All rise.

2701

1          (Jury leaves courtroom.)

2          (Recess taken.)

3          THE COURT:  Yes.

4          MR. RUHNKE:  Your Honor, we have agreed on a

5    stipulation but the government wants to revisit your ruling

6    that the documents can go in.

7          MS. DAYANANDA:  There's one issue, Your Honor.

8    Mr. Ruhnke would like to put in the plea allocutions to --

9          THE COURT:  Which do you have exception to?

10         MS. DAYANANDA:  Just the documents that are coming

11   in.

12         THE COURT:  Which documents?  I thought you

13   stipulated that you're going to allow the documents in.

14         MS. DAYANANDA:  There's two things that we're just

15   bringing to your attention.  We don't believe that the

16   information itself needs to go in.  There's two informations,

17   making a false statement and to the RICO count.  It's

18   confusing to the jury.  We have no issue --

19         THE COURT:  Have you agreed on anything?

20         MS. DAYANANDA:  Yes.

21         THE COURT:  And you're wanting to tell the jury what

22   you have agreed to have in evidence, correct?

23         MS. DAYANANDA:  That's fine.

24         THE COURT:  Now, you have not agreed on, what are

25   the two items?  You can show me what they are.

2702

1          MR. RUHNKE:  Your Honor had ruled them in yesterday,
2   that's over objection.
3          THE COURT:  Let me take a look.  If I made a
4   mistake, it is an opportunity to correct my mistake.
5          MS. DAYANANDA:  Your Honor, as it is now, we're
6   agreeing to the cooperation agreement going in.
7          THE COURT:  Just one second.  Let me see what you
8   have an issue with.  Show me the document.
9          MS. DAYANANDA:  The issue is with both the
10  informations going in, Your Honor.
11         THE COURT:  Just one second, stop.
12         MS. DAYANANDA:  Sure.
13         THE COURT:  I've been handed two documents, let's
14  take them one at a time.  One has been marked Defendant's
15  Exhibit DH 34, superseding information, and that is the
16  information charging Edward Cooke with making a false
17  statement.  Okay.
18         Now, yesterday I thought that all of this was agreed
19  upon but now you've had some second thoughts and you don't
20  want the jury to see the superseding information, correct?
21         MS. DAYANANDA:  That's correct, Your Honor.
22         THE COURT:  Normally the information would not be
23  something that would be presented to a witness and would not
24  be of evidentiary quality, similar to the affidavit of the
25  agents.

1          MR. RUHNKE:  But I would be able to ask him were you

2     charged on a certain day in March 2015 with these offenses and

3     were you charged with the crimes of doing X, Y and Z, yes,

4     that's all I mean, I can't do that because he's not here.

5          MS. DAYANANDA:  Your Honor, it is covered in the

6     stipulation that we've drafted.

7          THE COURT:  Just one second.  Do you have a

8     stipulation that says that it was charged?

9          MS. DAYANANDA:  Yes.

10         THE COURT:  Then this superseding information is

11    just basically duplicative or redundant, right?

12         There's nothing in there that's different than the

13    stipulation, is there?

14         MS. DAYANANDA:  There's nothing different than

15    what's in the stipulation.

16         THE COURT:  What is it of a substantive nature that

17    is your problem with it if it's in the stipulation?  If it's

18    consistent with the stipulation, why does it make a

19    difference?

20         MS. DAYANANDA:  Your Honor, more of the issue is to

21    the RICO information going in.  I believe it is duplicative of

22    putting in --

23         THE COURT:  I'm just doing one at a time.  I am a

24    very disciplined judge.  It is important for me to be in

25    charge of the operation so we don't have a record that goes

2704

1   all over the place and so our court reporters don't submit a

2   mass resignation, so bear with me, okay.

3          MS. DAYANANDA:  I understand, Judge.

4          THE COURT:  Just take it one at a time.  Why do you

5   need the superseding information if the stipulation covers it?

6          MR. RUHNKE:  Right, the stipulation does not cover

7   the RICO information.

8          THE COURT:  Well, I'm just talking about making the

9   false statement, I'm talking about one document at a time,

10  okay, so you don't need that document.

11         MR. RUHNKE:  Because it is the actual charge that he

12  pled guilty to.

13         THE COURT:  So, actually if the stipulation covers

14  it, I think that's sufficient.  We don't need to have the

15  information because normally that's not something that's in

16  evidence anyway and you have a stipulation that covers that

17  which I think is fine, so I don't get it.  So, we don't have

18  to burden the record with documents which are not necessary.

19         Now, let's turn to the next one, DH 31.

20         MR. RUHNKE:  Let me explain DH 31, Your Honor, why

21  that is necessary and is not covered by the stipulation.  This

22  is the plea agreement -- I'm sorry, these are the charges that

23  Mr. Cooke entered a plea to and every witness who has

24  testified has been asked did there come a time when you

25  entered a plea to certain charges.  These are those charges.

2705

1        THE COURT:  Do we have a stipulation or any document

2   that shows the plea that he entered into?

3        MS. DAYANANDA:  We have the cooperation agreement as

4   well as his allocution to those charges.  This is duplicative

5   of what --

6        THE COURT:  We have an allocution to the charges?

7        MS. DAYANANDA:  We have no issue with the allocution

8   going in, correct.

9        THE COURT:  So, if that's the case, we'll let it go

10  that way.  I mean we don't have to deal with this.  It is

11  really kind of silly stuff.  If it is covered in the

12  allocution, if it is covered in the cooperation agreement, it

13  is sufficient.  This 806 stuff is tricky, kind of difficult

14  stuff because.  How does a jury even grasp all of that.  I

15  mean I have to tell them that this information, the

16  stipulation and these other documents can be considered by

17  them to assess the credibility of somebody who hasn't

18  testified.

19        MS. DAYANANDA:  I understand.

20        THE COURT:  It is just so awkward.

21        MS. DAYANANDA:  I think Mr. Ruhnke will be able to

22  make his points with what he's getting in now, Your Honor.

23        THE COURT:  I think so also but I guess I'll tell

24  the jury, look, they're going to have to decide whether the

25  people who testified about what Cooke said to them were

2706

1   testifying honestly and they can further consider these

2   documents to see whether or not Cooke himself would be

3   believable, I guess that's what I'm going to tell them.

4           MR. RUHNKE:  Okay.

5           THE COURT:  It's really odd stuff.

6           MR. RUHNKE:  One other matter so people don't

7   misinterpret, on the criminal history which is marked DH 30 we

8   agreed the only thing that's relevant is that he has a

9   conviction for Robbery in the First Degree.

10          MS. DAYANANDA:  The document is not going in, we'll

11  orally agree to that.

12          THE COURT:  So we're all set.

13          MS. DAYANANDA:  Great.

14          THE COURT:  So, the record will reflect that what I

15  just referenced here, the superseding informations, will not

16  be considered to be in evidence.  I'm satisfied that the

17  substance of what's contained in there is covered by your

18  stipulation which the Court greatly appreciates and with the

19  other documents that you have agreed to be in evidence, we can

20  take care of that when the jury comes back.

21          MR. RUHNKE:  Fine, Your Honor, I'll take those

22  documents back.

23          THE COURT:  If I were a juror, I'd scratch my chin

24  and say what is this all about, you know.

25          MR. RUHNKE:  Your Honor, I assume since we're

2707

1  putting on a defense case that you've either deferred the Rule

2  29 decision or something.

3          THE COURT:  Yes.

4          MR. RUHNKE:  Okay.

5          THE COURT:  Yes.

6          MR. RUHNKE:  Deferred it to the jury or deferred it

7  to later argument.

8          THE COURT:  The jury is going to hear the

9  preliminary thing which will apply regardless of what the

10 ruling is going to be obviously.

11         MR. RUHNKE:  Okay.

12         THE COURT:  All right.

13         MR. RUHNKE:  Theoretically if you grant the motion,

14 we just won't be here tomorrow.

15         THE COURT:  We're not getting into the substantive

16 counts.  I want to make sure your record is properly covered.

17 Your motions are deemed to have been made and when the jury

18 goes home today, you will have an opportunity if you want to

19 spread on the record whatever you wish in support of the

20 motion but there's not going to be any damage or harm done by

21 me giving the boilerplate to the jury, they're going to get

22 that regardless of what the ruling on the motions would be.

23         MR. RUHNKE:  My only concern would be any thought

24 that we had waived somehow an argument.

25         THE COURT:  No.

2708

1          MR. RUHNKE:  Okay.  Thank you.

2          THE CLERK:  All rise.

3          (Jury enters courtroom.)

4          THE CLERK:  You can all be seated.

5          THE COURT:  All right.

6          So, at this time Mr. Ruhnke is now going to present

7    some evidence on behalf of his client.

8          The courtroom is yours, Mr. Ruhnke.

9          MR. RUHNKE:  Okay.  Thank you, Your Honor.  The

10   first document to be offered without objection is Defendant's

11   Exhibit DH 30 which is the criminal history of Edward Cooke,

12   also known as Taz, and we've agreed that the only relevant

13   portion of that, I'll display on the Elmo, is that he has a

14   conviction for Robbery in the First Degree, displaying what

15   appears to be a firearm, and that's all of DH 30 that will go

16   into evidence.

17         THE COURT:  Okay.

18         MR. RUHNKE:  The second document is marked DH 32 and

19   it consists of the cooperation agreement of Edward Cooke, also

20   known as Taz, and I won't read obviously the whole thing but

21   that he faces a maximum term of imprisonment of life and zero

22   on the first count, and a maximum term of imprisonment up to

23   life on the second count which is a narcotics charge.

24         The next document to go into evidence with regard to

25   Mr. Cooke is DH 33, which is a transcript of his guilty plea

2709

1   which was entered on April 14, 2005, about a decade ago.

2           And the next document is a stipulation which I'll

3   mark DH 37, just because I've got that as a number, and we're

4   going to reduce this to a signed copy tomorrow, but the

5   stipulation reads as follows:

6           The following is hereby stipulated by and between

7   the parties:  In 2010 the government became aware of the

8   circumstances that cooperating witness Edward Cooke, a/k/a

9   Taz, had engaged in sexual relations and was corresponding

10  with a female corrections officer, CO, at his place of

11  confinement, the Metropolitan Detention Center in Brooklyn.

12  When interviewed about this on July 1, 2010 by Special Agents

13  of the Office of Inspector General and the FBI, Mr. Cooke made

14  a materially false statement and told the agents that he had

15  not engaged in sexual relations with the CO and had not

16  corresponded with her.

17          On March 16, 2015 Mr. Cooke was charged by

18  information with a violation of 18, United States Code,

19  Section 1001, making a false statement in a matter within the

20  jurisdiction of the executive branch of the government of the

21  United States.  That charge carries a maximum penalty of up to

22  five years.

23          The cooperation agreement that Mr. Cooke entered

24  into in 2005 remains in effect.  Whether a cooperation

25  agreement remains in effect involves a number of

2710

1  considerations including in this case that Mr. Cooked already

2  served the mandatory minimum sentence and the lack of a 5K

3  motion does not affect the statutory minimum penalties

4  provided and Mr. Cooke remains incarcerated.

5        That's the stipulation.

6        And the final document is marked DH 36 which is a

7  transcript of a guilty plea to that false statement charge

8  entered by Mr. Cooke on March 16, 2015, a month ago.

9        And those are the documents and that's the extent of

10  our case.

11        MS. BARRETT:  That's DH 35, Mr. Ruhnke.

12        MR. RUHNKE:  DH 35.

13        THE COURT:  Now, Mr. Herman or Mr. Beecher, do you

14  wish to add anything?

15        MR. BEECHER:  Nothing, Your Honor.  The defense

16  rests for Mr. Granton.

17        THE COURT:  And I take it there is no rebuttal case

18  by the government.

19        MS. DAYANANDA:  No, Your Honor.

20        Members of the jury, you've heard all the evidence.

21  All right.  Now, I'm going to use the rest of day to explain

22  the preliminary aspects of my charge but before I do that I

23  just want to explain something in respect to what you just

24  heard in respect to Mr. Cooke.

25        Now, he is not being called as a witness and you are

2711

1   to understand that whether or not he's available or not, it's

2   not for you to speculate.  The government doesn't have to call

3   everybody whose name you heard as a witness.  You cannot

4   ascribe to the government any negative assessments because of

5   that or bad faith, that's not at all the case.  The government

6   is not acting in bad faith.  It has the absolute right to call

7   the witnesses it chooses to call.

8           Your decision has to be based upon the evidence in

9   the case and not to speculate as to why somebody has been

10  called or not called as a witness and I'm going to remind you

11  about that again when I give you my instructions but I just

12  thought I wanted to tell you that now because I guess

13  logically or common sense you're wondering what's going on

14  here, you're hearing things about Mr. Cooke, he hasn't been

15  called as a witness.

16          Now, there's a rule of law which is what I'm

17  applying here when I allow this type of evidence to be

18  presented before you by the defendant and what the rule of law

19  provides is basically this:  When you have someone testifying

20  about what arguably would be the statements or comments made

21  by a co-conspirator, and it's for you to determine who

22  co-conspirators are, you've heard lots of testimony here about

23  what witnesses said, about what Mr. Cooke, a/k/a Taz, has said

24  to them, so they're one step removed.  Those types of

25  statements can be allowed as statements of a co-conspirator,

2712

1    and I'll explain to you how you assess whether somebody is a

2    co-conspirator, so that you can accept the testimony of

3    somebody talking about the statements made by a

4    co-conspirator, you'll have to make that determination based

5    upon the charge that I'll explain to you.

6           So, here you heard lots of testimony from a number

7    of witnesses, you're going to be assessing the credibility of

8    those people, all the witnesses who have testified as to

9    whether whatever they told you is believable or not.  As I

10   told you at the beginning of the trial, credibility

11   assessments are part of your fact finding responsibility.  So,

12   you're going to hear a lot about that, right.

13          The reason why we allow the evidence to be put in

14   about Mr. Cooke's past misdeeds is because, under the law,

15   once a statement of a co-conspirator is allowed to be placed

16   in evidence, then the co-conspirator's credibility may be

17   attacked and supported by any evidence that would be

18   admissible for those purposes if the declarant had testified

19   as a witness and the law provides that the court, meaning the

20   judge, may admit evidence of that declarant's inconsistent

21   statement or conduct regardless of when it occurred or whether

22   the declarant had an opportunity to explain or deny it.

23          So, I'm reading exactly what the rule of evidence

24   provides to give you a little bit of an understanding as to

25   why we're allowing this type of evidence about Mr. Cooke you

1  see.  So, you can assess it as bearing upon his credibility as

2  if he were called to testify even though he's not being called

3  to testify and even though you cannot hold that against the

4  government because the government has not called him as a

5  witness.

6       It's a little convoluted, it is not, you know,

7  simple.  I'm trying my best to explain something to you which

8  is not transparent and obvious but I thought I would take a

9  moment to give you this little explanation since we just

10  allowed into evidence material for you to assess, if you do

11  find that Cooke was a co-conspirator, and you can assess it

12  based upon whether you believe what he may have said to the

13  other person who testified was believable or not because of

14  all the information that you have now been presented.  So, it

15  is part of your credibility determinations that you have to

16  engage in.  I hope I don't lose you on that.

17       So, with this, I'm going to come down now and give

18  you for the next hour before we leave today the beginning part

19  of the charge.  Okay.  I'll do it right now down there and,

20  Holly, you can join me.

21       (Pause.)

22       THE COURT:  So, I like to do this because it gives

23  me a chance to get off the mountain and do a little exercise

24  and it has I think some practical purposes because you'll

25  notice that I don't have a big booming voice, I used to but

*Charge of the Court*                                                    2714

1  just yelling at the lawyers for the last 20 years, whether

2  they're government lawyers, defendant's lawyers, and they yell

3  at me sometimes too, it is all part of the process.

4          So, when I come down here, I think it enhances

5  communication.  I can also try out my new eyeglasses, right,

6  in front of you and it breaks a little of the tension and I

7  think the first time that I charged the jury I did it from up

8  on the mount where I think all my other colleagues do it and I

9  thought Juror Number Seven was sound asleep, that one right

10 there (indicating) and ever since I decided to do it this way

11 nobody has fallen sleep because when the judge is inches away

12 from you, you don't do that, right.

13         On a serious note though, I think it enhances

14 communication because right now I'm sort of talking to you

15 like a professor to explain the law to you as part of my

16 responsibility and I think if I do it like this on a less

17 formal and less structured basis, that it aids in

18 comprehension.  So, those are my --

19         MS. DAYANANDA:  Judge, I am sorry to interrupt.

20         MR. RUHNKE:  I think we have a common application.

21 Do you have a microphone?

22         THE COURT:  We have no microphone here?

23         MR. RUHNKE:  No, it doesn't appear to be.

24         MS. DAYANANDA:  We can't hear a word you're saying.

25         THE COURT:  You heard me just now, right?

*Charge of the Court*                                          2715

1          A JUROR:  Yes.

2          A JUROR:  Yes.

3          THE COURT:  Now, the lawyers are probably going to

4    be summing up from here also, correct?

5          MS. DAYANANDA:  Correct.

6          THE COURT:  And you will want a microphone I guess.

7          MS. DAYANANDA:  I'm hoping we'll have the moving

8    microphone.

9          THE COURT:  Mike, his name is appropriate, he's

10   called Mike for good reasons.

11         Mike has been doing this for 20 years, it is the

12   first time he hasn't had a mike.

13         (Pause.)

14         THE COURT:  It looks like I'm going to go back up

15   there.  All good deeds, right.

16         MS. DAYANANDA:  Your Honor, maybe this might work if

17   we want to move the podium here, a little angle.

18         THE COURT:  How is this?

19         The government doesn't necessarily win because Ms.

20   Dayananda figured this out but I appreciate that effort.

21         Is this okay?  Would you rather have me do it up

22   here?

23         A JUROR:  That's fine.

24         THE COURT:  All right.

25         Now, I'm going to be looking down at a 70 plus page

1    document and the good news is that you're going to have this

2    in the jury room together with a nice table of contents but

3    the law requires me to orally deliver the charge to you and I

4    don't read it exactly but I definitely do refer to it

5    extensively because I think I will stop from time to time and

6    explain certain things to you but what I am telling you now is

7    the real charge that you must follow but you will have this

8    document as a guide.

9           Now, there should not be anything substantively

10   different from what I am telling you and what is in this

11   document but if there is a variance, it is what I'm telling

12   you that is the real charge, okay.

13          So, I told you I think the charge is going to be

14   divided into three parts and the first part which I'm going to

15   give you now while it is raining before you go home today is

16   the general rules that define and govern the duties of a jury

17   in a criminal case.  They apply to just about all criminal

18   cases, some variation on the theme, but essentially it's the

19   general principles of law that you have to be told about and

20   we have already mentioned a lot of them so there may be some

21   repetition but it's a good thing to do I think in any event.

22          Second, I will then come back after the lawyers give

23   you their summations to then tell you about the legal elements

24   of all these crimes, that is the specific elements that the

25   government must prove beyond a reasonable doubt to warrant

*Charge of the Court*                                          2717

1    finding guilt, if it can do that; and third, I'll give you

2    concluding remarks on how you go about your deliberations.

3            So, today we're going to talk about the first part

4    and that's going to help break up a long charge and get you

5    oriented to the process and tomorrow when we come back you

6    will hear the government, Ms. Dayananda who is going to be

7    delivering the summations --

8            Mike, you forgot the mike.

9            THE CLERK:  I didn't know you wanted the mike.  You

10   didn't tell me you wanted the mike.

11           THE COURT:  After 20 years, you know we don't have a

12   microphone here.

13           THE CLERK:  You never use a mike.

14           THE COURT:  Everybody wants me to use a mike.

15           THE CLERK:  It's the first time.

16           THE COURT:  My voice is fading, Mike, I must be

17   yelling at you too much these days.

18           Bear with me, this won't take long.

19           (Pause.)

20           THE COURT:  Who was it that requested I use the

21   mike?

22           MR. HERMAN:  We can't hear you back here.

23           MR. RUHNKE:  The government too.

24           MS. DAYANANDA:  We all did.

25           THE COURT:  How is this working?

*Charge of the Court*                                    2718

1           (Pause in the proceedings.)

2           THE COURT:  Okay.  How is this, better?  Is it on?

3     Everybody hear me okay now?

4           MR. RUHNKE:  Yes, Your Honor.

5           THE COURT:  All right.  So, just whistle if you

6     can't.

7           Now, you must accept my instructions of the law and

8     apply them to the facts as you determine them.  So, if any

9     attorney has stated a legal principle different from any that

10    I am going to tell you, you have to accept my instructions and

11    follow my instructions.

12          You should not single out any instruction as alone

13    stating the law; rather, you should consider my instructions

14    as a whole.  You should not be concerned about the wisdom of

15    any rule that I state.  Regardless of any opinion that you may

16    have as to what the law may be or ought to be, it would

17    violate your sworn duty to base a verdict upon any view of the

18    law other than that which I give you.

19          So, we may have our separate opinions and I'm sure

20    we do, you don't always agree with everything Congress does.

21    When it comes to being here, we have to be on the same page,

22    we have to accept the law, judge and jury, whether we like it

23    or not and you have to accept the law, otherwise we have

24    chaos, okay, so we understand that.

25          So, let's talk about our respective roles again.

1  Once again, you are the sole and exclusive judges of the

2  facts.  You pass upon the weight of the evidence.  You

3  determine the credibility, once again, of the witnesses.  You

4  resolve such conflicts as there may be in their testimony and

5  you draw whatever reasonable inferences you decide to draw

6  from the facts as you have determined them, reasonable

7  inferences, not speculation.  We'll be talking a little bit

8  more about that.

9        I will later discuss with you how you pass upon the

10 credibility or believability of the witnesses.

11       Now, in determining the facts, you must rely upon

12 your own recollection of the evidence.  What the lawyers have

13 said in their opening statements, what they're going to say in

14 their closing arguments, what they've said in their objections

15 and even in the questions is not evidence.  I have told you in

16 that connection that you should bear in mind that a question

17 put to a witness is never evidence, it is only the answer

18 which is the evidence.  Nor is anything I may have said during

19 the trial, or may say during these instructions with respect

20 to a fact matter to be taken as substitution for your own

21 independent recollection because what I say is not evidence

22 either.

23       So, the evidence before you consists of the answers

24 given by the witnesses, that is the testimony they gave as you

25 recall it and the exhibits that were received in evidence.  I

1  already told you we're going to have a compilation of all the

2  exhibits as an exhibit list which you'll have at your disposal

3  and you'll be able to call for any exhibits which you may want

4  to see in the jury room.

5        Since you are the sole and exclusive judges of the

6  facts, I do not mean to indicate any opinion as to the facts

7  or what your verdict should be.  The rulings I have made

8  during the trial are not any indication of my views of what

9  your decision should be as to whether or not the guilt of the

10 defendants has been proven beyond a reasonable doubt.  You are

11 expressly to understand that the Court has no opinion as to

12 the verdict you should render.

13        Now, under your oath as jurors you are not to be

14 swayed by fear, prejudice, bias or sympathy.  It must be clear

15 to you that once you let fear, prejudice, bias or sympathy

16 interfere with your thinking, there is a risk that you will

17 not arrive at a true and just verdict.  In a similar vein, it

18 would also be improper to base your verdict on any sympathy or

19 prejudice you may feel about the defendant's race, religion,

20 national origin, sex or age.  There may be some places in the

21 country where a judge might be more concerned about that but

22 here in Brooklyn where we have this wonderful diversity I

23 think everybody gets it that a person's race, religion,

24 national origin or sex or age has nothing to do with anything

25 at all, okay.

*Charge of the Court*                                     2721

1        Now, the fact that the prosecution is brought in the

2   name of the U.S. entitles the government to no greater

3   consideration than that accorded to any other party to a

4   litigation.  By the same token, it is entitled to no less

5   consideration.  That is because all parties, whether the

6   government or individuals, stand as equals at the bar of

7   justice.

8        Now, as you know, there are two defendants on trial,

9   Damion Hardy and Aaron Granton.  For each count, your verdict

10  must be determined separately with respect to each defendant

11  based on the evidence or lack of evidence presented against

12  that defendant, and without regard to the guilt or innocence

13  of the other defendant or anyone else.

14        So, you'll recall from time to time, I instructed

15  you many times, the lawyers reminded me that a particular

16  document or piece of evidence or testimony was just being

17  introduced against one of the defendants and not both of the

18  defendants and you saw how that played out.  So, you have to

19  assess each defendant individually.  You're going to be

20  getting individual verdict sheets for each defendant, so you

21  are aware of that and I've given you instructions throughout

22  that you're not to commingle matters when they have only been

23  presented in respect to one defendant.  So, when I refer to a

24  defendant in my charge or the defendant, I am referring to

25  each defendant separately.

*Charge of the Court*                                                    2722

1              All right.  Now, we spoke about the burden of proof.

2    This is a good time to tell you once again about that.  The

3    law presumes a defendant to be innocent of all the charges

4    against him.  So, I instruct you again that each defendant is

5    to be presumed to be innocent throughout your deliberations on

6    each count in which he is charged until such time, if ever,

7    that you as a jury are satisfied that the government has

8    proven him guilty beyond a reasonable doubt on the particular

9    count.  Thus, the defendant, although accused of crimes in the

10   indictment, begins the trial with a clean slate, with no

11   evidence against him.  The indictment, as I have already told

12   you, is not evidence of any kind.  The defendant is, of

13   course, not on trial for any act or crime not contained in the

14   indictment.  The law permits nothing but legal evidence

15   presented before you folks in court to be considered in

16   support of any charge against a defendant.

17             The burden, as you know, is always upon the

18   government to prove guilt beyond a reasonable doubt.  This

19   burden never shifts to the defendant, for the law never

20   imposes upon a defendant in a criminal case the burden or duty

21   of calling any witnesses or producing any evidence.  A

22   defendant is not even obligated to produce any evidence by

23   cross-examining the witnesses for the government.  Of course,

24   they can and they chose to do that, you saw that, but that was

25   not something they're obliged to do.  The presumption of

1   innocence alone, therefore, is sufficient to acquit a

2   defendant.

3          It is not required that the government prove guilt

4   beyond all possible doubt.  The test is one of reasonable

5   doubt.  A reasonable doubt is a doubt based upon reason and

6   common sense, the kind of doubt that would make a reasonable

7   person hesitate to act.  Proof beyond a reasonable doubt must,

8   therefore, be proof of such a convincing character that a

9   reasonable person would not hesitate to rely and act upon it

10  in the most important of his or her own affairs.  You should

11  consider all the proof presented at trial, or any lack of

12  proof, in determining if you have a reasonable doubt.

13         In considering each count in the indictment, unless

14  the government proves, beyond a reasonable doubt, that the

15  defendant has committed each and every element of the offense

16  charged in that count, you must find the defendant not guilty

17  of the offense charged in that count.  If you view the

18  evidence with respect to the count as reasonably permitting

19  either of two conclusions, that is one of innocence, the other

20  of guilt, you must adopt the conclusion of innocence.  This

21  does not mean that the government's burden is ever less than

22  proof beyond a reasonable doubt.

23         Now, there are two types of evidence which you may

24  properly use in deciding whether a defendant is guilty or not

25  guilty.  One type of evidence is called direct evidence and

*Charge of the Court*                                          2724

1  that is exactly what it sounds like, you have direct evidence

2  of me talking to you, me scratching my right ear right now,

3  and so that is when a witness testifies as to what he saw or

4  heard or observed, that's direct evidence.

5          Now, the other type of evidence which you can

6  consider is what we call circumstantial evidence.  You've

7  heard that phrase bandied about I'm sure throughout the years

8  and certainly you see it on TV a lot and things of that

9  nature.  So, what is it, it's evidence which tends to prove a

10 disputed fact by proof of other facts and so, to drive that

11 point home, you know, me and my colleagues usually give this

12 example which works like a charm:

13         You don't have any direct evidence of whether it's

14 sunny outside or whether it's now raining.  When I went out at

15 1:00 it was sunny and it was warm and it seemed pretty nice,

16 but right now you don't know whether or not -- you know the

17 forecast was for rain, you have no idea what's happening now.

18 We don't have a window that you can see out so you have no

19 direct evidence of that.

20         If somebody walks into the courtroom now with an

21 umbrella, you know they shouldn't be doing that, but

22 hypothetically if they did that, you have direct evidence of

23 that but you still don't know whether it's sunny or whether

24 it's now raining outside because you have no direct evidence

25 of that.

1      So, somebody else walks in a few moments later with

2  a raincoat dripping wet.  You have direct evidence of that for

3  sure but you still don't have direct evidence of whether it is

4  raining outside or it's sunny.  So, you can then conclude

5  based upon those facts which I just explained that in fact

6  it's no longer a sunny day outside.

7      So, once again, circumstantial evidence is evidence

8  which tends to prove a disputed fact by proof of other facts.

9  You see, it's like one stepped removed, so you have a good

10  sense of that.

11      So, now, circumstantial evidence is of no less value

12  than direct evidence.  So, on the combination of facts which I

13  just asked you to assume, it would be reasonable and logical

14  for you to conclude that it now had been raining.  That's all

15  there is to circumstantial evidence.  It's for you to make

16  that decision based upon the facts that you observe, okay.

17      So, it is a general rule that the law makes no

18  distinction between direct and circumstantial evidence but

19  simply requires that before convicting a defendant, the jury

20  must be satisfied of the defendant's guilt from all of the

21  evidence in the case, be it direct and/or circumstantial

22  evidence.

23      Now, we use the word "inference."  You should

24  consider the evidence in light of your common sense and

25  experience, and you may draw, once again, reasonable

1    inferences from the evidence.  Now, there are times when

2    different inferences may be drawn from facts, whether proven

3    by direct or circumstantial evidence.  The government asks you

4    to draw one set of inferences, while the defense asks you to

5    draw another, and you may hear arguments during summation

6    about all these things.  It is for you and you alone to decide

7    what inferences you will draw.

8            Now, it is important for you to understand that an

9    inference is a deduction or conclusion which you, the jury,

10   are permitted but not required to draw from the facts which

11   have been established by either direct or circumstantial

12   evidence.  In drawing inferences, you should use your common

13   sense.  The process of drawing inferences from facts in

14   evidence is not a matter of guesswork or speculation.

15           So, when you consider the evidence, you are

16   permitted to draw from the facts which you find to be proven

17   such reasonable inferences as would be justified in light of

18   your experience.

19           So, let me remind you that whether based upon direct

20   or circumstantial evidence or upon the logical, reasonable

21   inferences drawn from such evidence, you must be satisfied of

22   the defendant's guilt beyond a reasonable doubt before you may

23   convict.

24           Now, here I put down the written part of the charge,

25   take my reading glasses off and I'm going to tell you that you

1    have to be very mindful of the difference between drawing an

2    inference from facts in evidence that reasonably can be

3    deduced or gleaned from those facts, on the one hand, and mere

4    speculation, on the other hand.  We are all, you know, human

5    beings and we like to speculate about all sorts of things and

6    guess about all sorts of things and as the judge, I'm

7    particularly concerned that I caution you against doing that.

8    Easier said than done, but when you're deliberating ask

9    yourself am I speculating about something not in evidence or

10   am I drawing a reasonable inference from what is in evidence.

11         So, for example, I learned my lesson the hard way;

12   the first time I charged the jury, I spoke to them afterwards

13   and one of the jurors said something to me that seemed to be

14   one of the reasons why the jury came to the decision the jury

15   came to based upon a witness that didn't testify and I was

16   really terribly distressed by that but when I told the juror,

17   I said that I told you don't speculate, you have no idea, but

18   here I'll tell you that the witness was dead and the juror

19   turned white.  So, I always stop now and use that as a graphic

20   example of the danger and risk you can engage in by

21   speculation.

22         Now, in this case I told you about Mr. Cooke, a/k/a

23   Taz, I told you don't speculate as to why the government has

24   not called him as a witness.  It would be wrong for you to do

25   that.  I told you you can consider evidence that we allowed on

*Charge of the Court*                                          2728

1    the issue of his credibility as well as the credibility of the

2    people who were talking about what he said to them, right, you

3    understand that, but to speculate about that would be engaging

4    in troubled waters.  You cannot do that.

5            The government has the right to call witnesses as it

6    chooses, to present the evidence that it believes it wants to

7    present and your decision is based solely upon that and not

8    any speculation.  Now, when I come and talk to you after you

9    render your verdict, you can ask me all sorts of questions

10   okay, but don't -- and I'll satisfy whatever speculations you

11   have, but make sure you check each other out carefully during

12   your deliberations to make sure you're not going to speculate

13   about anything here that's not in evidence because there's a

14   lot of things you heard.  So, this is a case where, you know,

15   there's a risk of speculation here perhaps more than if it was

16   a two or three day trial perhaps, okay.  So, you get me, you

17   understand me?

18           A JUROR:  Yes.

19           THE COURT:  If you have any problems with any of

20   this, you'll have the opportunity to come back and question me

21   about it, so just bear that in mind, okay.

22           Now, let's go to credibility.  You've heard a lot

23   about that.  You have had the opportunity to observe all of

24   the witnesses.  I told you early on that by all means, you can

25   keep notes if it helps you focus and to remember things.

*Charge of the Court*                                    2729

1    You're going to have an opportunity to get the transcript and

2    to get back any testimony that you think you want to hear or

3    have read back to you.  You'll have an opportunity to hear my

4    instructions again; if you're confused about anything, you can

5    ask me questions, I can straighten it out for you.  So, relax,

6    you'll have all of these opportunities.  But I told you early

7    on that if you take notes, that's fine, but don't let it

8    distract you from sizing up the credibility of the witnesses

9    because that will be part of your fact finding responsibility.

10          So, it is your job to decide how believable the

11   witnesses were in their testimony.  You are the sole judges of

12   the credibility of the witnesses and of the importance of

13   their testimony.  Remember, again, that the burden of proof is

14   always on the government.  The defendants are not required to

15   call any witnesses, offer any evidence because they're

16   presumed to be innocent.  Be careful about speculation.

17          It must be clear to you by now that you are being

18   called upon to resolve various factual issues under the

19   indictment in the face of the very different pictures painted

20   by the government and the defense which cannot be reconciled.

21   An important part of your decision will involve making

22   judgments about the testimony of the witnesses you have

23   listened to and observed.  In making those judgments, you

24   should carefully scrutinize the testimony of the witnesses,

25   the circumstances under which the witnesses testified, and any

*Charge of the Court*                                      2730

1    other matter in evidence which may help you to decide the

2    truth and the importance of the witness' testimony.

3              Now, your decision whether or not to believe a

4    witness may depend on a number of common sense things.

5              (Pause.)

6              THE COURT:  Your decision whether or not to believe

7    a witness may depend on how the witness impressed you.  Was

8    the witness candid, frank and forthright?  Or did the witness

9    seem as if he or she was hiding something, being evasive or

10   suspect in some way?  How did the way the witness testify on

11   direct examination compare with how the witness testified on

12   cross-examination?  These are things which may aid you in

13   thinking about how you go about assessing credibility, common

14   sense things.  Was the witness consistent in his or her

15   testimony or did he or she contradict himself or herself?  Did

16   the witness appear to know what he or she was talking about

17   and did the witness strike you as someone who was trying to

18   report his or her knowledge accurately?  Was the witness

19   perhaps honest, but nonetheless mistaken?

20             Now, how much you choose to believe a witness may be

21   influenced by the witness' bias.  Does the witness have a

22   relationship with the government or the defendant which may

23   affect how he or she testified?  Does the witness have some

24   incentive, loyalty or motive that might cause the witness to

25   shade the truth?  Or does the witness have some bias,

Case 1:04-cr-00706-FB   Document 974   Filed 04/30/15   Page 207 of 272 PageID #: 10404

*Charge of the Court*                                    2731


1  prejudice or hostility that may have caused the witness,

2  consciously or not, to give you something other than a

3  completely accurate account of the facts to which the witness

4  testified?

5          Even if the witness was impartial, you should

6  consider whether the witness had an opportunity to observe the

7  facts the witness testified about.  You should also consider

8  the witness' ability to express himself or herself.  Ask

9  yourself whether the witness' recollection of the facts stands

10  up in light of all the other evidence.

11          Now, if any witness is shown to have intentionally

12  lied on the witness stand about any material matter, not

13  anything insignificant or inconsequential, any material

14  matter, you have the right to conclude that he or she also

15  lied about other matters.  Now, what you can do is you can

16  disregard all of the witness' testimony, or you may accept

17  whatever part you think deserves to be believed.

18          It is up to you to determine whether the witness

19  testified falsely and whether he or she did so deliberately.

20  It is entirely up to you to determine the weight, if any, that

21  should be given to the witness's testimony on the basis of all

22  of the evidence and your God given common sense.

23          In sum, what you must try to do in deciding

24  credibility is to size a person up in light of his or her

25  demeanor, the explanations given, and the other evidence in

HOLLY DRISCOLL, CSR
OFFICIAL COURT REPORTER

*Charge of the Court*                                            2732

1    the case, just as you would in any important matter where you

2    are trying to decide if a person is truthful, straightforward

3    and accurate in his or her recollection.  In deciding the

4    question of credibility, remember that you should use, once

5    again, your common sense, your good judgment and your life

6    experience.

7              Now, some of the witnesses in this case are or were

8    law enforcement officials.  A bunch of them are retired after

9    20 years, you recall that.  Now, that the witness may be a law

10   enforcement official does not mean that his or her testimony

11   is deserving of more or less consideration or greater or

12   lesser weight than that of an ordinary witness.  It is for you

13   to decide after weighing all is the evidence, in light of the

14   instructions I have just given to you about factors relevant

15   in determining the credibility of a witness, whether you

16   accept the testimony of a witness who is a law enforcement

17   official and what weight, if any, it deserves.

18             Now, you also heard from some expert witnesses.  An

19   expert is allowed to express his opinion on those matters

20   about which he has special knowledge and training.  Expert

21   testimony is presented to you on the theory that someone who

22   is experienced in the field can assist you in understanding

23   the evidence or in reaching an independent decision on the

24   facts.  An example of expert testimony were the doctors who

25   testified about the autopsies, for example, and other

*Charge of the Court*                                                 2733

1   testimony by the law enforcement officials.

2          In weighing an expert's testimony, you may consider

3   the expert's qualifications, his or her opinions and reasons

4   for testifying, as well as all of the other considerations

5   that ordinarily apply to your deciding whether or not to

6   believe a witness' testimony.  You may give the expert's

7   testimony whatever weight, if any, you find it deserves in

8   light of all the evidence in the case.  You should not,

9   however, accept the witness' testimony merely because he or

10  she is an expert.  Nor should you substitute it for your own

11  reason, judgment and common sense.

12         Now we're going to talk about impeachment by prior

13  inconsistent statements after I take a sip of water.  We're

14  moving along, see that it is good that I break it up,

15  otherwise, you know, I think that it's easier for you to

16  comprehend these things.  If any of you need a break at any

17  time, let me know.  I think we can probably make it till 5:00

18  today, okay, and we'll end at that time, and when I give you

19  the rest of the instructions, we'll take breaks and we'll just

20  do it gradually, okay.

21         (Pause.)

22         Now, you've heard evidence that certain witnesses

23  made statements on earlier occasions which counsel argues are

24  inconsistent with the trial testimony.  Evidence of a prior

25  inconsistent statement is not to be considered by you as

1    affirmative evidence bearing on the defendant's guilt or

2    non-guilt.  Evidence of the prior inconsistent statement is

3    placed before you for limited purposes of helping you decide

4    whether to believe the trial testimony of a witness who

5    allegedly contradicted himself or herself.  If you find that a

6    witness made an earlier statement that contradicts with his or

7    her trial testimony, you may consider that fact in deciding

8    how much of the trial testimony, if any, to believe.

9            In making this determination, you may consider

10   whether the witness purposely made a false statement or

11   whether it was an innocent mistake; whether the inconsistency

12   concerns an important fact, or whether it had to do with a

13   small detail; whether the witness had an explanation for the

14   inconsistency, and whether that explanation appealed to your

15   common sense.

16           It is your exclusive duty, based upon all the

17   evidence and your good judgment, to determine whether any

18   prior statements were inconsistent, and if so, how much, if

19   any, weight to be given to the inconsistent statement in

20   determining whether to believe all or part of the witness'

21   testimony.  You heard referenced by counsel that there was

22   testimony that some witnesses gave on other occasions, you

23   heard it all, you can consider whether anything on a prior

24   occasion was inconsistent and if so, how you assess it all in

25   terms of what you heard in court here, okay.

1          Now, cooperation agreements, obviously we have a

2    bunch of those in evidence, right.  Okay.  You heard testimony

3    from the government witnesses who testified pursuant to

4    cooperation agreements, which provide that, in exchange for

5    agreeing to cooperate and testify, the cooperation would be

6    brought to the attention of the sentencing judge.

7          Now, the government is permitted to enter into such

8    agreements and to make such promises.  The agreements make

9    reference to, among other things, a motion pursuant to Section

10   5K1.1 of the United States Sentencing Guidelines which

11   provides a framework for federal courts to use to determine

12   sentences.  Section 5K1.1 provides that the government can

13   make a motion which can be in the form of a letter stating

14   that a defendant has provided substantial assistance in the

15   investigation or prosecution of another person.  The witness'

16   sentencing judge, which I think is going to be me in all these

17   cases, may then consider a Section 5K1.1 motion in deciding

18   what sentence to impose.  If such a motion has been filed, the

19   judge may, but is not required to, impose a sentence below a

20   minimum sentence that would otherwise be required by law.

21          Two factors to be kept in mind in this regard:  One,

22   only the government can make such a motion and it cannot be

23   compelled to do so; and two, the sentencing court, meaning me,

24   has complete discretion as to whether it will or will not

25   grant that motion and is free to impose whatever sentence it

*Charge of the Court*                                    2736

1  deems to be appropriate.  Thus, regardless of whether or not a

2  Section 5K1.1 motion is made, the final determination as to

3  the sentence to be imposed rests with the court and not with

4  the government.

5          In respect to the testimony of these witnesses, the

6  government argues, as it is permitted to do, that it must take

7  its witnesses as it finds them.  It argues that often only

8  people who themselves take part in criminal activity have the

9  knowledge to show criminal behavior by others.  For those very

10 reasons, the law allows the use of testimony of this nature.

11 Indeed, it is the law that this type of testimony may be

12 enough in and of itself for a conviction if the jury finds

13 that the testimony proves guilt beyond a reasonable doubt.

14         It is also the case, however, that this type of

15 testimony is of such a nature that it must be scrutinized with

16 great care and viewed with particular caution when you decide

17 how much of the testimony, if any, to believe.

18         I have given you some general instructions on

19 credibility, I'm not going to repeat them here, but I'm going

20 to say a few additional things that you may wish to consider

21 during your deliberations regarding these types of witnesses.

22         You should ask yourselves whether these types of

23 witnesses would benefit more by lying or by telling the truth.

24 Was the testimony made up in any way because the witness

25 believed or hoped that he would somehow receive favorable

1    treatment by testifying falsely?  Was the witness motivated to

2    construct plausible lies in the hope that the lies would not

3    be detected and that he would receive the benefit of the

4    cooperation agreement?  Or did the witness believe that his or

5    her interests would be best served by testifying truthfully by

6    identifying those who were criminally involved?  If you

7    believe that the witness was motivated by hopes of personal

8    gain, was the motivation one which would cause him to lie, or

9    was it one which would cause him to tell the truth?  Did this

10   motivation color the witness' testimony?

11           So, in sum, you should look at all the evidence in

12   deciding what credence and what weight, if any, you really

13   want to give to the testimony of these types of witnesses.

14           Now, I already told you a lot about co-conspirator

15   statements but I'm now going to tell you more about it.

16           Some of the charges against the defendants alleged

17   that they participated in conspiracies.  In that regard, I

18   allowed into evidence the acts and statements of others

19   because these acts and statements were committed by persons

20   who, the government charges, were also confederates or

21   co-conspirators of the defendants.

22           The reason for allowing this evidence has to do with

23   the nature of the crime of conspiracy.  A conspiracy is often

24   referred to as a partnership in crime.  Thus, as in other

25   types of partnerships, when people enter into a conspiracy to

1  accomplish an unlawful end, each and every member becomes an

2  agent of the other conspirators in carrying out the

3  conspiracy.

4         Accordingly, the reasonably foreseeable acts,

5  declarations, statements and omissions of any member of the

6  conspiracy in furtherance of the common purpose of the

7  conspiracy are deemed, under the law, to be the acts of all of

8  the members and all of the members are responsible for such

9  acts, declarations, statements and omissions.

10        Thus, if you find, beyond a reasonable doubt, that

11  the defendant was a member of one of the conspiracies charged

12  in the indictment, then the acts done or statements made in

13  furtherance of the conspiracy by persons also found by you to

14  have been members of that conspiracy may be considered against

15  that defendant.  This is so even if such acts were done and

16  statements were made in the defendant's absence and without

17  his knowledge.

18        However, before you may consider the statements or

19  acts of a co-conspirator in deciding the issue of the

20  defendant's guilt, you must first determine that the acts and

21  statements were made during the existence and in furtherance

22  of the unlawful scheme.  If the acts were done or the

23  statements made by someone who you do not find to have been a

24  member of the conspiracy, or if they were not done or said in

25  furtherance of the conspiracy, they may not be considered by

*Charge of the Court*                                                    2739

1   you as evidence against the defendant.  And I explained some

2   of that to you when I told you why we were allowing into

3   evidence the records of the alleged co-conspirator Taz or

4   Cooke, okay.

5            So, now, references have been made to interviews

6   that the attorneys for the government conducted with their

7   witnesses prior to the witness testifying.  You should not

8   draw any unfavorable inference from that conduct.  I instruct

9   you that the attorneys do not only have a right to interview

10  witnesses prior to putting them on the stand but it is their

11  responsibility to do so.  There was lots of testimony about

12  the witnesses meeting with the government on many occasions.

13  The government has the absolute right to do that, to interview

14  people who they will then decide whether to call as witnesses

15  or not, so you should understand that.

16           You heard a lot of stipulations and I told you that

17  when the attorneys on both sides stipulate and agree as to the

18  existence of a fact, you must accept the stipulation and

19  regard that fact as proven.  Now, there is no legal

20  requirement that the government use any specific investigative

21  techniques or pursue every investigative lead to prove its

22  case.  Law enforcement techniques are not your concern.  The

23  law also does not require the government to call as witnesses

24  all persons who may have been present at any time or place

25  involved in the case or who may appear to have some knowledge

*Charge of the Court*                                               2740

1    of the matters at issue in this trial.  I told you that

2    before, so I repeat that again now.  Nor does the law require

3    the government to produce as exhibits all papers and things

4    mentioned during the course of the trial.  Your job is to

5    determine whether the evidence that the government did produce

6    and the witnesses that it did produce proves guilt beyond a

7    reasonable doubt.

8            Now, as I have told you, the defendant in a criminal

9    case has no obligation to testify or to present any other

10   evidence because it is the government's burden to prove a

11   defendant's guilt.  That burden remains with the government

12   throughout the entire trial and never shifts to a defendant.

13   In addition, our great Constitution provides that the

14   government cannot compel a defendant to testify against

15   himself.  Nevertheless, a defendant has a right to testify and

16   present other evidence in his own defense.  Here the

17   defendants have chose to exercise their constitutional right

18   not to testify.  Since they had the absolute right to make

19   that choice, no negative inference can be drawn against either

20   of them for not testifying.  This is a situation where

21   speculation is always a concern, why didn't somebody testify,

22   you know, so you have to understand that if you engage in that

23   speculation, you're going to be violating the Constitution of

24   the United States.  You don't want to do that, you have to

25   accept that, okay.

*Charge of the Court*                                              2741

1        Now, finally, you have heard testimony as to the

2   involvement of other individuals in criminal activity.  That

3   these individuals are not on trial before you is not a matter

4   of concern.  You should not speculate, once again, as to the

5   reasons these individuals are not on trial before you.  I

6   focused your attention on Cooke but that's not the only one,

7   that was just an example because evidence was introduced

8   relating to Cooke so I took that moment to tell you about this

9   at that time but you're not to speculate again, all right.

10  Thus, this fact should not control or influence your verdict

11  as to either defendant.

12        So, these are preliminary instructions.  I have a

13  little more time so I'm going to go a little further by

14  telling you that we're going to pretty soon talk about the

15  charges in the indictment but I want to remind you first

16  before I do that tomorrow that the indictment -- not tomorrow,

17  maybe the next day, that the indictment itself is not

18  evidence.  It merely describes the charges made against the

19  defendant.  It is an accusation and may not be considered by

20  you as any evidence of guilt.  I told you that in my

21  preliminary instructions back on April 2nd or 3rd or whatever.

22        The indictment charges that the offenses allegedly

23  took place on or about certain dates.  The proof need not

24  establish with certainty the exact date of the alleged

25  offenses.  It is sufficient if the evidence proves that the

1   offenses were committed on a date reasonably near the date

2   alleged.

3           You know, one other thing just crossed my mind about

4   speculation.  You've heard everything that's happened 10, 15

5   years ago, you might say why is it 10, 15 years ago.  Don't

6   speculate.  You can ask me that question after you render your

7   verdict.  It's irrelevant.  The fact is that there may be

8   reasons and if you speculate as to why, you would be wrong in

9   all probability.  There's one potential there for speculation

10  which I'm concerned about in this particular case, all right.

11          So now, you know, let me tell you a little bit more,

12  I think I can give you some general definitions.

13          The indictment contains 26 counts.  Counts One and

14  Two, Four through Nine, Sixteen through Nineteen and

15  Twenty-Three and Twenty-Four apply to both defendants.  As I

16  told you, you must consider each defendant separately.  Counts

17  Three, Ten through Fifteen and Twenty through Twenty-Two apply

18  to Damion Hardy alone.  Counts Twenty-Five and Twenty-Six

19  apply to Aaron Granton alone.

20          Now, it's all going to become clear to you as to how

21  they're going to be lined up when I go through all the

22  explanation of these counts when I give you the balance of the

23  charge, so before I give you any instructions let me define

24  some terms and concepts that will come up throughout my

25  instructions.  I will remind you when to apply these

1   definitions as they come up.

2         Tomorrow we're going to start at ten o'clock with

3   summations.  I don't know how long they're going to take.

4   Nobody is under any pressure but since we have three and then

5   a rebuttal, it could be the better part of the day.  Get a

6   good night's sleep and pay attention.

7         After that I am going to come back and explain a

8   little bit more to you.  Right now I'm going to give you some

9   general definitions that I think I can impart to you now and

10  then we're going to be talking about the specific charges

11  after the summations.

12        So, let me talk about the words "knowingly" and

13  "intentionally" and "willfully."  You'll hear these phrases

14  throughout the charge.

15        A person acts knowingly if he acts purposely and

16  voluntarily and not because of a mistake, accident or other

17  innocent reason.  A person acts intentionally if he acts with

18  the intent to do something the law forbids.  A person need not

19  be aware of the specific law or rule that his conduct may be

20  violating but he must act with the intent to do whatever it is

21  the law proscribes, prevents, in other words.

22        A person acts willfully if he acts with knowledge

23  that his conduct is unlawful and with the intent to do

24  something the law forbids or to fail to do something the law

25  requires to be done, that is to say with a bad purpose either

1    to disobey or to disregard the law.

2         These issues require you to make a determination

3    about someone's state of mind, something that can rarely be

4    proven directly.  A wise and careful consideration of all of

5    the circumstances before you may, however, permit you to make

6    a determination as to someone's state of mind.  Indeed, in

7    your everyday affairs, you are frequently called upon to

8    determine a person's state of mind from his words and actions

9    in given circumstances.  You're asked to do so here.

10         Now, I'm going to explain to you -- let me just see

11   whether -- I'll hold off on that.  I was going to give you the

12   definitions of conspiracy today.

13         So, you heard conspiracy, you know we're dealing

14   with conspiracies here.  Let me tell you what a conspiracy is.

15         First, there's conspiracy under federal law and then

16   there's conspiracy under state law.  You're going to hear

17   references to this when I explain the law to you.

18         A conspiracy is a kind of criminal partnership, at

19   the heart of which is an agreement or understanding by two or

20   more persons to violate other laws.  A conspiracy to commit a

21   crime is an entirely separate and different offense from the

22   underlying crime the conspirators intended to commit.  In

23   other words, you can conspire to commit a crime even if you

24   don't commit the crime.  Thus, to prove the crime of

25   conspiracy, the government need not prove that the defendant

1   actually committed the unlawful acts charged as the objectives

2   of the conspiracy.  Since the heart of the crime of conspiracy

3   is an agreement or understanding by two or more persons to

4   violate other laws, if a conspiracy exists, even if it should

5   fail to achieve its purpose, it is still punishable as a

6   crime.  You can conspire to commit a crime.

7           In order to prove the crime of conspiracy, the

8   government must establish the following elements beyond a

9   reasonable doubt:

10          First, that two or more persons entered into the

11  particular unlawful agreement charged in the conspiracy count;

12  and

13          Second, that the defendant knowingly and

14  intentionally became a member of the conspiracy.

15          I will discuss each of those now.

16          The existence of an agreement.

17          First, the government has to prove beyond a

18  reasonable doubt that two or more persons entered into the

19  particular unlawful agreement charged in the conspiracy count.

20  One cannot commit the crime of conspiracy by oneself.  Rather,

21  the proof must convince you that at least two persons had

22  joined together in a common criminal scheme.

23          Now, the government need not prove that members of

24  the conspiracy met together or entered into any express or

25  formal agreement.  You need not find that the alleged

1   conspirators stated in words or writing what the scheme was,

2   its object or purpose, or the means by which it was to be

3   accomplished.  It is sufficient to show that the conspirators

4   tacitly came to a mutual understanding to accomplish an

5   unlawful act by means of a joint plan or common design.  I

6   caution you, however, that the government does not meet its

7   burden of showing an unlawful agreement simply by

8   demonstrating that the underlying criminal act took place.

9         You may, of course, find the existence of an

10  agreement between two or more persons to engage in criminal

11  conduct has been established by direct proof.  However, since

12  a conspiracy is by its very nature characterized by secrecy,

13  direct proof may not be available.  You may, therefore, infer

14  the existence of a conspiracy from the circumstances of this

15  case and the conduct of the parties involved.

16        In a very real sense then, in the context of

17  conspiracy cases, actions often speak louder than words.  You

18  may, in determining whether an agreement existed here,

19  consider the actions or statements of all of those you find to

20  be participants in the conspiracy as proof that a common

21  design existed to act together for the accomplishment of the

22  unlawful purpose stated in the indictment.

23        Now, the second element of conspiracy deals with

24  membership in the conspiracy.  You have to be a member of the

25  conspiracy.  So, you have to find that the defendant knowingly

1   and deliberately joined in and participated in the unlawful

2   agreement or plan with a specific intent to advance or further

3   some unlawful objective or purpose of the conspiracy.  Thus,

4   if a person with an understanding of the unlawful character of

5   the plan knowingly and intentionally encourages, advises or

6   assists for the purpose of furthering the unlawful undertaking

7   or scheme, he thereby becomes a conspirator.

8            Furthermore, one who willfully joins an existing

9   conspiracy is charged with the same responsibility as if he

10  had been one of the originators or instigators of the

11  conspiracy.

12           I further instruct you that to become a member of

13  the conspiracy, the defendant need not have known the

14  identities of each and every other member, nor need he have

15  been told of all of their activities.  Moreover, the defendant

16  need not have been fully informed of all of the details or the

17  scope of the conspiracy in order to justify an inference of

18  knowledge on his part.  Furthermore, the defendant need not

19  have joined in all of the conspiracy's unlawful objectives or

20  been a member of the conspiracy for the entire time of its

21  existence.  There need only be some evidence from which it can

22  reasonably be inferred that the defendant knew of the

23  existence of the scheme and knowingly joined and participated

24  in it.

25           (Continued on next page.)

1    The evidence must be clear.  I want to stress the merely being

2    present at a place where criminal conduct is underway does not

3    make a person a member of a conspiracy to commit that crime.

4    This is true even if the person knows that a crime is being

5    committed.

6            However, although mere presence or mere association

7    with conspirators is not enough, it is a factor that you may

8    consider, among others, in determining whether a defendant was

9    a member of the conspiracy.  If defendant was present and

10   intended to assist in the commission of the offense, this

11   would not be mere presence.  Thus, the defendant's presence

12   may establish his membership in the conspiracy if all the

13   circumstances, considered together, show that his presence was

14   intended to advance the goals of the conspiracy.

15           Similarly, the fact that a person, without any

16   knowledge that a crime is being committed, merely happens to

17   act in a way that furthers purposes or objectives of the

18   conspiracy does not make that person a member.  More is

19   required under the law.  Even giving comfort or assistance to

20   a member of the conspiracy does not make that person a member

21   of the conspiracy.  What is required, once again, is that the

22   defendant has participated with knowledge of at least some of

23   the purposes or objectives of the conspiracy and with the

24   intention of aiding in the accomplishment of those unlawful

25   ends.

1      The extent of a defendant's participation in the

2  conspiracy has no bearing on the issue of guilt.  Each member

3  of the conspiracy may perform separately and distinct acts and

4  may perform them at different times.  Some conspirators may

5  play major roles, while others play minor roles in the scheme.

6      In sum, the key inquiry is simply whether the

7  defendant joined the conspiracy with an awareness of at least

8  some of the basic aims and purposes of the unlawful agreement

9  and with the intent to help it succeed.  I'm almost done, but

10  there's also going to be reference to conspiracy under state

11  law, so the definition of conspiracy that I just gave you

12  applies to the federal conspiracy crimes that you'll hear

13  about.  But New York Law also makes it illegal to conspire to

14  commit another state crime, even if the other crime is never

15  actually completed.

16      The crime of conspiracy under New York Law differs

17  somewhat to the definition of conspiracy of federal in this

18  case.  Here's the difference.

19      In order to prove that a defendant committed the

20  crime of conspiracy under New York Law, the government must

21  establish the following three elements beyond a reasonable

22  doubt:

23      First, that there was a meeting of the minds between

24  two or more people, or an agreement or plan, either expressed

25  or implied;

1          Second, that those agreeing to have a common corrupt

2   intent to commit an unlawful act; and

3          Third, that there is at least one overt act

4   committed on the part of at least on of the conspirators in

5   furtherance of the corrupt agreement.

6          The first two elements are, in sum and substance,

7   the same as the definition of conspiracy under federal law.

8   You should, therefore, use my prior definition to determine

9   whether the first elements have been proven.

10          The third element, by contrast, is not part of my

11   prior definition.  That's because New York Law, unlike federal

12   law, requires an overt act in furtherance of the conspiracy.

13          An overt act is any step, action conduct which is

14   taken to achieve or further the objective of the conspiracy.

15   The overt act itself need not be criminal nor need it be the

16   very crime which is the purpose of the conspiracy.  An overt

17   act, therefore, is one which is committed or caused to be

18   committed by any member of the conspiracy in an effort to

19   accomplish some objective or purpose of the conspiracy.

20          Only one overt act must be found to prove existence

21   of the conspiracy.  It is not necessary that each member of

22   the conspiracy committed or participated in that overt act.

23   Rather, in the eyes of the law, the act of one member of the

24   conspiracy becomes the act of all members.  Thus, proof of

25   overt act by only one of the co-conspirators is sufficient.

The charge of the Court                    2751

1        Again, I caution you that an overt act is required

2   to prove a conspiracy only under New York Law; it is not

3   required to prove conspiracy under federal law.  As we come to

4   conspiracies alleged in the indictment, I will tell you

5   whether to apply the federal definition or the state

6   definition.

7        Now, I'm going to just tell you about aiding and

8   abetting, and then we're going to send you home, and we'll

9   come back tomorrow 10:00 o'clock.

10       Under federal law, a person who aids, abets,

11  counsels, commands, induces or procures a crime is just as

12  guilty of the crime as if he committed it himself, as is a

13  person who willfully causes an act to be done which if

14  directly performed by him or another would be a crime.

15  Similar, New York law creates criminal liability for any

16  person who acting with the mental culpability required for the

17  commission of a crime solicits, requests, commands,

18  importunes, or intentionally aids another person to commit the

19  acts constituting in the crime.  We call this

20  aiding-and-abetting liability.

21       For aiding-and-abetting liability to apply, you must

22  find that the government has proven beyond a reasonable doubt

23  two elements:

24       And you'll hear throughout the charge that the

25  government's claiming that aiding-and-abetting liability

1   should also attach.  All right.

2          First, that another person actually committed the

3   crime charged; and

4          Second, either that the defendant aided or abetted

5   that person in the commission of that crime, or that the

6   defendant willfully caused the other person to commit the

7   crime.  So, as you can see, the first requirement is that you

8   must find that another person has committed the crime charged.

9   Obviously, no one can be convicted of aiding and abetting the

10  criminal acts of another if no crime was committed by the

11  other person in the first place.

12         If you do find the crime charged was committed by

13  another, you must consider the second element, which can be

14  satisfied in either of two ways;

15         First, the government may prove that the defendant

16  aided and abetted the commission of that crime.  In order to

17  aid and abet another to commit a crime, it is necessary that

18  the defendant willfully and knowingly associated himself in

19  some way with the crime, and that he willfully and knowingly

20  sought by some act to help make the crime succeed.

21         The mere presence of a defendant where the crime is

22  being committed, even coupled with the knowledge by a

23  defendant that the crime is being committed, or the mere

24  acquiescence of the defendant in the criminal conduct of

25  others, even with guilty knowledge, is not sufficient to

1  establish aiding and abetting.

2          The defendant must have performed some act that

3  directly facilitated or encourage the crime.  To determine

4  whether the defendant aided and abetted the commission of the

5  crime charged, ask yourselves these questions:

6          One:  Did he participate in the crime charged as

7  something he wished to bring about?

8          Two:  Did he associate himself with the criminal

9  venture knowingly and willfully?

10          Three:  Did he seek by his actions to make the

11  criminal venture succeed?

12  If he did these, things then the defendant was an aider and

13  abettor, and, therefore, guilty of offense on

14  aiding-and-abetting theory.  If, on the other hand, your

15  answer to any questions is "no," then the defendant is not an

16  aider and abettor, and you must not find him guilty under that

17  theory.

18          In the alternative, the government may prove that

19  the defendant willfully caused another person to commit the

20  crime.  The meaning of the term "willfully caused" can be

21  found in the answers to the following questions:

22          One:  Did the defendant have the mental state

23  required for the underlying crime?

24          Two:  Did the defendant intentionally caused another

25  person to take the action or actions that constitute the

The charge of the Court                    2754

1    underlying crime?

2         If you are persuaded beyond a reasonable doubt that

3    the answer to all of these questions is "yes," then the

4    defendant is guilty of the underlying crime.  This is if he

5    himself actually committed.  I will give you a simple example.

6    Has nothing to do with the facts of this case.  If someone

7    intends to import drugs into the United States and, to do so,

8    secretly places the drugs into another person's suitcase, the

9    person is guilty of importing drugs, even though he did not

10   personally carry the drugs through customs, and even though

11   the second person did so unsuspectedly.

12        One final not about aiding and abetting:  It applies

13   to conspiracies.  If a person aids and abets a conspiracy, he

14   effectively becomes liable as a member of the conspiracy; a

15   separate theory of aiding and abetting liability would be

16   redundant.

17        Now, that is all I'm going to do today.  It's

18   enough.  And it's a lot, and you have to just sit and listen

19   as carefully as you can.  But for me to break this up, I think

20   is useful and helpful, because when I speak to you again,

21   we're going to go into the specific counts.  There's 20

22   some-odd counts, you see.  It's going to take some time.  It's

23   going to take patients.  We'll take breaks as need be.  Fear

24   not.  I think we've accomplished a lot by giving you these

25   preliminaries now.  And, once again, you're going to have the

The charge of the Court                    2755

1   whole charge to use as a guide if you would like to do that

2   during the deliberations, so you need not worry in between now

3   and the time you start your deliberations you may have forgot

4   anything I told you here.

5          I think you know what the plans are.  You're to get

6   a good night sleep.  You're not going to talk.  You've been

7   outstanding jurors, and you're just going to base your

8   determination on the evidence that you've heard since March

9   31st.  And tomorrow is a big, big day, because the government

10  and the defendants' attorneys are going to have the

11  opportunity to speak to you, and they're going to make an

12  effort to, you know, avail upon you as to how your verdict

13  should come out.  Obviously, we call that summations, and I

14  may have told you this before, of course the government has

15  burden of proof.  The government will go first.  And I'm not

16  going to put her under any pressure, but it's going to take a

17  little while.  I suspect after she finishes --

18         Have you folks decided who would like to go first or

19  second?  It's up to you.  Who will be speaking for the

20  defendant first.

21         MR. HERMAN:  I will.

22         THE COURT:  Mr. Herman will speak on behalf of

23  Mr. Granton.  And then Mr. Ruhnke is going to speak on behalf

24  of Mr. Hardy.  When that is done, the government has the

25  opportunity to present a brief rebuttal.  Now, the purpose of

1   your rebuttal is not to repeat the government summation.  I

2   suspect somebody else is going to give the rebuttal.

3   Mr. Amatruda will recover his voice by that time, I'm sure, so

4   there's not going to be a repeat.  It's just to give the

5   government the last word.  The government has the burden of

6   proof.  Somebody has to give the last word, so it's not going

7   to be the same length as the original summation by

8   Ms. DataHand.  And we'll see how long the defendants'

9   summations are.

10          Then I'll give Mr. Amatruda some sense of what I

11   think the appropriate amount of time he could spend on the

12   rebuttal.  It will be something related to the defendants'

13   summations.  Could be a half hour.  We'll see how it goes.  So

14   I think that probably would be consuming the major part if not

15   all of tomorrow.  And you're going to be obviously listening

16   intently.  I caution you again that what the lawyers say, they

17   all have acted with absolute maximum good faith here.  I'm

18   proud of all of their professional talents and how they've

19   conducted themselves.

20          They're entitled to really try their hardest to

21   convince you their obligation is to represent their clients,

22   but they still have to be -- each be professional about it, so

23   they're not allowed to say anything that is incendiary, and

24   they're supposed to keep their eye on the ball.  I'll give

25   them plenty of flexibility, and I'll see how it goes, and I

The charge of the Court                    2757

1    already told you that I'd like to see that there's not any

2    interruptions.  Nobody interrupted me.  I would like to see

3    that they're extending that courtesy by his or her adversary.

4    As far as any factual statements, and there's going to be a

5    lot of facts presented to you, I don't think that the other

6    lawyer has to think -- that's not correct.  It's for you to

7    determine whether the lawyers factually tell you something,

8    whether you agree or not agree.  If you request it, you've got

9    the record.

10        We're not going to obviate the word objection, but I

11   think we'll go a long way towards extending the courtesy to

12   the lawyers, to giving you summations without necessary

13   transcriptions.  After we complete the summations, then you're

14   going to have the opportunity to see me again.  I'll speak to

15   you, and then I'll explain the law to you in great detail

16   about all of these crimes that were charged as to the

17   defendants and explain how you go about your deliberations.  I

18   don't know when that's going to happen.  It will depend upon

19   when summations have been concluded.  It may happen late

20   Friday afternoon or first thing Friday morning.

21        I think you can anticipate it will all be done some

22   time Friday, and you may commence with deliberations.  If it's

23   late in the day, you'll go home early and start Monday

24   morning.  The important thing is to keep next week open.

25   We're pretty much on schedule.  I think we've anticipated it

The charge of the Court                    2758

1  would be this time that we would be at this stage.  We may be
2  ahead of schedule.  When you deliberate, nobody here knows.
3  You folks are getting along with each other.  I hear you
4  talking with each other, and that's great.  Once the bell
5  rings, you're going to be carefree going through your
6  deliberations.  You take whatever time it takes.  And so
7  nobody can predict that.  Nobody can, right.  The important
8  thing is to keep yourself flexible.
9          No job interviews Monday.
10         UNIDENTIFIED JUROR:  6:00 o'clock Monday.
11         THE COURT:  You can certainly go home, so that's
12 going to be okay for you.
13         UNIDENTIFIED JUROR:  Great.  Thank you.
14         THE COURT:  I think you get the idea what we're
15 talking about, and you've been terrific.  It's been a long,
16 long trial.  I'll see you tomorrow.  Don't talk about the
17 case.  Resist the temptation.  10:00 o'clock.
18         (Outside the presence of the jury.)
19         THE COURT:  Need to say anything?  Tomorrow.  10:00.
20         MR. RUHNKE:  Can we make brief Rule 29 argument
21 tomorrow?
22         THE COURT:  You can do whatever you want.
23         MR. RUHNKE:  It won't take long.
24         THE COURT:  If you want to do that before summations
25 or you want to do it afterwards.

The charge of the Court                    2759

1          MR. RUHNKE:  As long as it's preserved, any time is

2     convenient.

3          THE COURT:  Let's try to make good use of the

4     jurors; when breaks happen, we can make the arguments at that

5     time.  It's clearly preserved on the record, no question about

6     it.

7          MR. RUHNKE:  Thank you, your Honor.

8          THE COURT:  See you tomorrow, 10:00 o'clock.

9                    (Proceedings adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2760

1                                    I N D E X

2

3    WITNESSES                                            PAGE

4

5

6        DWAYNE MYERS

7        DIRECT EXAMINATION (continued) BY

8        MR. AMATRUDA                                      2530

9        CROSS-EXAMINATION BY MR. RUHNKE                   2560

10       CROSS-EXAMINATION

11       BY MR. BEECHER                                    2595

12       CROSS-EXAMINATION (CONTINUED) BY MR.

13       BEECHER                                           2655

14       REDIRECT EXAMINATION BY MR. AMATRUDA              2660

15       RECROSS-EXAMINATION BY MR. BEECHER                2666

16       **JACKLYN SPAETH**                                2667

17       DIRECT EXAMINATION BY MS. AMATRUDA                2668

18       CROSS-EXAMINATION BY MS. BARRETT                  2676

19       **HAL WILKERSON**                                 2690

20       DIRECT EXAMINATION BY MR. BEECHER                 2690

21       CROSS-EXAMINATION

22       BY MS. PAUL                                       2696

23       REDIRECT EXAMINATION

24       BY MR. BEECHER                                    2698

25

2761

1       RECROSS-EXAMINATION

2       BY MS. PAUL                                    2699

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2762

1                           **E X H I B I T S**

2

3

4      Defendant's Exhibit DG1                          2633

5

6      Government's Exhibit 8021 through 8024           2669

7

8      Government's Exhibit 9,000, 9004, 9006,

9      9,007                                            2679

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$100,000** [1] - 2579:18
**$2,000** [3] - 2558:3, 2635:16, 2635:19
**$2,600** [2] - 2635:7, 2636:11
**$37,000** [1] - 2656:14
**$37,702** [2] - 2634:7, 2635:4
**$4,000** [1] - 2552:20

## '

**'90s** [1] - 2544:17
**'93** [2] - 2613:11, 2613:12

## 0

**04CR00706** [1] - 2525:4
**07030** [1] - 2526:7
**07042** [1] - 2525:21
**07052** [1] - 2526:4

## 1

**1** [7] - 2576:23, 2680:25, 2681:1, 2681:5, 2681:7, 2709:12
**10** [7] - 2638:7, 2681:1, 2681:5, 2681:8, 2689:10, 2742:4, 2742:5
**100** [1] - 2587:10
**10005** [1] - 2525:25
**1001** [1] - 2709:19
**1009** [1] - 2544:9
**101** [1] - 2578:11
**10:00** [5] - 2525:7, 2751:9, 2758:17, 2758:19, 2759:8
**10th** [3] - 2600:9, 2674:22, 2676:13
**11** [1] - 2530:4
**11201** [2] - 2525:17, 2526:11
**11th** [2] - 2598:7, 2676:13
**12** [5] - 2597:11, 2681:25, 2682:1, 2682:4, 2682:6
**12th** [6] - 2618:16, 2620:11, 2621:8, 2673:10, 2674:18, 2676:13
**14** [1] - 2709:1
**14th** [2] - 2542:19, 2598:2
**15** [9] - 2531:23, 2532:13, 2570:19, 2570:24, 2573:15, 2594:18, 2689:10, 2742:4, 2742:5
**150** [1] - 2615:17
**16** [3] - 2570:19, 2709:17, 2710:8
**17** [4] - 2682:1, 2682:4, 2682:7, 2691:16
**18** [1] - 2709:18
**19** [4] - 2546:9, 2682:16, 2682:21, 2682:23
**1987** [2] - 2604:6, 2604:7
**1988** [1] - 2604:8
**1989** [2] - 2605:15, 2613:24
**1992** [2] - 2599:10, 2613:10
**1993** [1] - 2599:10
**1995** [5] - 2586:18, 2599:24, 2618:13, 2625:10, 2625:14
**1996** [1] - 2599:11
**1998** [4] - 2573:25, 2590:12, 2598:2, 2618:13

**1999** [6] - 2618:16, 2620:11, 2662:24, 2693:7, 2697:20, 2697:21
**19th** [1] - 2660:20
**1:00** [2] - 2642:7, 2724:15
**1:15** [1] - 2545:16
**1st** [1] - 2685:24

## 2

**2,000** [2] - 2558:3, 2558:4
**20** [10] - 2531:23, 2532:13, 2573:15, 2574:21, 2653:18, 2714:1, 2715:11, 2717:11, 2732:9, 2754:21
**2000** [12] - 2573:17, 2573:25, 2598:7, 2598:13, 2598:17, 2598:21, 2598:23, 2599:6, 2599:14, 2599:18, 2600:3, 2685:24
**2001** [7] - 2530:21, 2576:23, 2580:6, 2673:11, 2674:18, 2676:13
**2002** [5] - 2540:12, 2600:3, 2674:22, 2676:14, 2697:24
**2003** [3] - 2543:12, 2675:11, 2676:12
**2004** [5] - 2558:10, 2599:11, 2599:24, 2618:24
**2005** [12] - 2599:14, 2599:18, 2634:6, 2635:1, 2656:13, 2660:22, 2662:5, 2662:11, 2709:1, 2709:24
**2006** [2] - 2635:16, 2635:19
**2008** [2] - 2620:5, 2621:8
**2010** [2] - 2709:7, 2709:12
**2015** [10] - 2525:7, 2573:14, 2606:3, 2634:7, 2635:2, 2635:8, 2703:2, 2709:17, 2710:8
**20th** [1] - 2630:1
**21** [3] - 2682:16, 2682:21, 2682:23
**212** [1] - 2677:14
**2122818200** [1] - 2681:17
**2123682025** [1] - 2681:17
**21st** [1] - 2685:24
**22** [1] - 2525:7
**2211** [1] - 2525:24
**225** [1] - 2526:10
**2347** [1] - 2678:17
**24** [3] - 2683:4, 2683:8, 2683:12
**250** [1] - 2627:25
**251** [1] - 2526:7
**2530** [1] - 2760:8
**2560** [1] - 2760:9
**2595** [1] - 2760:11
**25th** [3] - 2543:12, 2675:11, 2676:12
**26** [1] - 2742:13
**2633** [1] - 2762:4
**2655** [1] - 2760:13
**2660** [1] - 2760:14
**2666** [1] - 2760:15
**2667** [1] - 2760:16
**2668** [1] - 2760:17
**2669** [1] - 2762:6
**2676** [1] - 2760:18
**2679** [1] - 2762:9
**2690** [2] - 2760:19, 2760:20

**2696** [1] - 2760:22
**2698** [1] - 2760:24
**2699** [1] - 2761:2
**27** [3] - 2683:17, 2683:21, 2683:23
**271** [1] - 2525:17
**28** [1] - 2654:8
**29** [5] - 2651:4, 2653:23, 2688:4, 2707:2, 2758:20
**2:00** [4] - 2642:18, 2648:23, 2648:24, 2650:22
**2nd** [1] - 2741:21

## 3

**30** [3] - 2706:7, 2708:11, 2708:15
**30s** [2] - 2570:23, 2570:24
**31** [2] - 2704:19, 2704:20
**31st** [2] - 2687:17, 2755:9
**32** [1] - 2708:18
**33** [1] - 2708:25
**34** [1] - 2702:15
**347** [1] - 2677:20
**3472078534** [1] - 2683:15
**3472287014** [1] - 2680:10
**3473849400** [1] - 2680:8
**3474325115** [1] - 2680:21
**3477246931** [1] - 2680:23
**3479920131** [1] - 2680:16
**3479920173** [1] - 2680:16
**35** [3] - 2527:11, 2710:11, 2710:12
**3500-EC-21** [1] - 2648:4
**36** [1] - 2710:6
**3682025** [1] - 2686:2
**37** [1] - 2709:3
**3911** [1] - 2675:20
**3:30** [2] - 2642:25, 2643:4, 2700:23
**3rd** [1] - 2741:21

## 4

**40** [1] - 2560:3
**4028** [2] - 2675:1, 2675:16
**40th** [1] - 2652:22
**443** [1] - 2526:3
**45** [1] - 2570:21
**456** [3] - 2616:24, 2623:4, 2623:18
**47** [1] - 2525:21
**4A** [1] - 2526:7
**4th** [2] - 2635:16, 2635:19

## 5

**5** [1] - 2693:13
**50** [2] - 2584:4, 2584:5
**502** [1] - 2543:5
**5702740218** [1] - 2680:10
**58** [7] - 2542:8, 2542:18, 2686:5, 2686:8, 2686:9, 2686:11, 2686:14
**5:00** [1] - 2733:17
**5K** [6] - 2568:19, 2596:5, 2596:7, 2600:7, 2643:14, 2710:2
**5K1.1** [4] - 2735:10, 2735:12, 2735:17,

2736:2

**6**

**646** [1] - 2677:20
**6462462000** [1] - 2680:7
**6462941333** [1] - 2680:18
**6462961645** [1] - 2680:19
**6462981100** [1] - 2680:7
**6462985200** [1] - 2680:7
**6462989000** [1] - 2680:7
**6462999192** [1] - 2680:4
**67** [1] - 2525:24
**682025** [1] - 2677:14
**6:00** [2] - 2597:11, 2758:10

**7**

**70** [2] - 2700:2, 2715:25
**718** [1] - 2677:15
**718-773-2501** [1] - 2675:21
**7182219802** [1] - 2683:3
**7183732158** [1] - 2681:21
**7183989579** [1] - 2681:21
**7186239682** [1] - 2681:15
**7186381096** [1] - 2681:13
**7187124013** [1] - 2681:21
**71871390652** [1] - 2681:13
**7187552346** [1] - 2682:14
**7187558963** [1] - 2682:14
**7187732501** [1] - 2681:21
**7188323332** [1] - 2681:19
**7189408184** [1] - 2681:23
**73** [1] - 2597:19
**75th** [2] - 2693:11, 2693:17
**7732501** [1] - 2677:15
**79th** [1] - 2579:19

**8**

**8** [2] - 2680:25, 2681:5
**800-pound** [1] - 2644:19
**8000** [1] - 2680:1
**8001** [1] - 2681:11
**8002** [1] - 2682:10
**8003** [1] - 2683:1
**8004** [1] - 2681:13
**8005** [1] - 2681:15
**8006** [1] - 2680:5
**8007** [1] - 2681:17
**8008** [1] - 2682:13
**8009** [1] - 2680:8
**8011** [1] - 2680:10
**8012** [1] - 2681:11
**8013** [3] - 2527:18, 2671:13, 2680:12
**8014** [1] - 2680:14
**8015** [1] - 2680:17
**8016** [1] - 2681:19
**8017** [1] - 2681:22
**8018** [2] - 2680:20, 2683:14
**8020** [2] - 2671:12, 2680:22
**8021** [8] - 2668:12, 2668:15, 2668:24,

2669:5, 2674:22, 2678:10, 2762:6
**8022** [3] - 2668:12, 2668:14, 2674:22
**8023** [2] - 2668:12, 2673:8
**8024** [6] - 2668:12, 2668:15, 2668:25, 2669:5, 2675:10, 2762:6
**806** [5] - 2643:11, 2643:22, 2644:1, 2645:12, 2705:13
**8th** [1] - 2635:8

**9**

**9** [2] - 2638:6, 2679:17
**9,000** [6] - 2679:17, 2679:18, 2679:19, 2679:22, 2679:24, 2762:8
**9,004** [2] - 2679:17, 2679:19
**9,006** [3] - 2679:19, 2686:24, 2686:25
**9,007** [4] - 2679:19, 2679:22, 2685:21, 2762:9
**9-millimeter** [1] - 2560:18
**9004** [2] - 2679:22, 2686:3, 2762:8
**9006** [2] - 2679:22, 2762:8
**917** [1] - 2677:21
**917-334-4028** [1] - 2678:14
**917-548-3911** [2] - 2675:20, 2678:11
**9173344028** [1] - 2680:14
**9174065776** [1] - 2680:3
**9175391113** [1] - 2682:12
**917548** [1] - 2678:12
**9175483911** [1] - 2680:19
**9175781922** [1] - 2680:19
**9175788252** [1] - 2680:19
**9176210242** [1] - 2680:3
**9176869346** [1] - 2680:3
**9177015828** [1] - 2680:8
**9177234900** [1] - 2680:3
**9178475076** [1] - 2682:12
**9179511551** [1] - 2682:12
**9408184** [1] - 2677:15
**99** [1] - 2643:12

**A**

**a.m** [1] - 2525:7
**a/k/a** [3] - 2709:8, 2711:23, 2727:22
**Aaron** [9] - 2527:3, 2595:10, 2691:5, 2694:8, 2694:14, 2694:15, 2697:8, 2721:9, 2742:19
**AARON** [1] - 2525:7
**abbreviated** [2] - 2695:11, 2695:16
**Abdul** [1] - 2631:20
**abet** [1] - 2752:17
**abets** [2] - 2751:10, 2754:13
**abetted** [3] - 2752:4, 2752:16, 2753:4
**abetting** [10] - 2599:9, 2751:8, 2751:20, 2751:21, 2751:25, 2752:9, 2753:1, 2753:14, 2754:12, 2754:15
**abettor** [2] - 2753:13, 2753:16
**abide** [2] - 2692:3, 2692:6
**abided** [1] - 2695:7
**ability** [1] - 2731:8
**able** [13] - 2540:24, 2590:25, 2598:24, 2646:1, 2663:12, 2665:23, 2675:5,

2677:1, 2677:4, 2688:4, 2703:1, 2705:21, 2720:3
**above-referred** [2] - 2542:14, 2544:10
**absence** [2] - 2618:19, 2738:16
**absolute** [2] - 2652:15, 2711:6, 2739:13, 2740:18, 2756:17
**Abu** [20] - 2544:22, 2545:12, 2547:13, 2547:15, 2547:19, 2551:12, 2551:13, 2551:19, 2551:22, 2552:1, 2552:2, 2554:16, 2555:2, 2556:1, 2556:22, 2556:24, 2556:25, 2557:13, 2657:22
**abuse** [2] - 2579:24, 2691:24
**accept** [10] - 2712:2, 2718:7, 2718:10, 2718:22, 2718:23, 2731:16, 2732:16, 2733:9, 2739:18, 2740:25
**accident** [1] - 2743:16
**accomplish** [4] - 2622:11, 2738:1, 2746:4, 2750:19
**accomplished** [2] - 2746:3, 2754:24
**accomplishment** [2] - 2746:21, 2748:24
**accorded** [1] - 2721:3
**according** [7] - 2566:1, 2574:10, 2574:13, 2574:15, 2578:3, 2581:21, 2589:11
**accordingly** [1] - 2738:4
**account** [14] - 2632:15, 2632:16, 2632:19, 2632:22, 2633:7, 2634:5, 2634:8, 2634:13, 2656:4, 2656:10, 2656:15, 2656:17, 2656:22, 2731:3
**accuracy** [1] - 2670:5
**accurate** [22] - 2671:15, 2680:1, 2680:6, 2680:9, 2680:11, 2680:13, 2680:15, 2680:17, 2680:20, 2680:22, 2681:12, 2681:14, 2681:16, 2681:18, 2681:20, 2681:22, 2682:10, 2682:13, 2683:1, 2683:14, 2731:3, 2732:3
**accurately** [2] - 2668:20, 2730:18
**accusation** [1] - 2741:19
**accused** [1] - 2722:9
**achieve** [2] - 2745:5, 2750:14
**acknowledgment** [1] - 2623:23
**acquaintances** [1] - 2658:21
**acquiescence** [1] - 2752:24
**acquit** [1] - 2723:1
**act** [24] - 2644:12, 2722:13, 2723:7, 2723:9, 2743:20, 2746:5, 2746:8, 2746:21, 2748:17, 2750:2, 2750:3, 2750:12, 2750:13, 2750:15, 2750:17, 2750:20, 2750:22, 2750:23, 2750:24, 2750:25, 2751:1, 2751:13, 2752:20, 2753:2
**acted** [2] - 2622:4, 2756:17
**acting** [4] - 2536:20, 2652:18, 2711:6, 2751:16
**action** [2] - 2750:13, 2753:25
**actions** [6] - 2565:20, 2744:8, 2746:17, 2746:19, 2753:10, 2753:25
**active** [1] - 2691:18
**activities** [2] - 2592:19, 2747:15
**activity** [9] - 2530:21, 2530:22, 2530:24, 2531:1, 2544:16, 2569:8, 2598:1,

2736:8, 2741:2
**acts** [20] - 2737:18, 2737:19, 2738:4, 2738:7, 2738:9, 2738:12, 2738:15, 2738:19, 2738:20, 2738:22, 2743:15, 2743:17, 2743:22, 2745:1, 2749:3, 2751:19, 2752:10
**actual** [4] - 2615:12, 2634:10, 2694:8, 2704:11
**Adams** [1] - 2591:11
**add** [2] - 2653:13, 2710:14
**addict** [2] - 2606:13, 2606:16
**addicted** [1] - 2606:20
**addition** [1] - 2740:13
**additional** [2] - 2627:2, 2736:20
**address** [1] - 2686:1
**addresses** [1] - 2633:25
**adjourned** [1] - 2759:9
**adjustment** [1] - 2695:6
**admissibility** [1] - 2671:7
**admissible** [1] - 2712:18
**admit** [3] - 2663:22, 2663:24, 2712:20
**admitted** [2] - 2588:21, 2588:24
**admonish** [2] - 2652:1, 2652:2
**admonished** [1] - 2614:25
**adopt** [1] - 2723:20
**adult** [1] - 2664:25
**advance** [3] - 2684:18, 2747:2, 2748:14
**adversary** [1] - 2757:3
**advises** [1] - 2747:5
**affairs** [2] - 2723:10, 2744:7
**affect** [2] - 2710:3, 2730:23
**affidavit** [3] - 2648:16, 2649:7, 2702:24
**affirm** [2] - 2667:12, 2690:12
**afternoon** [12] - 2651:11, 2667:11, 2676:5, 2676:6, 2690:5, 2690:11, 2690:25, 2696:19, 2696:20, 2699:16, 2700:19, 2757:20
**afterwards** [2] - 2727:12, 2758:25
**age** [3] - 2570:19, 2720:20, 2720:24
**agency** [4] - 2686:1, 2693:25, 2697:5, 2697:7
**agent** [5] - 2645:3, 2648:16, 2649:7, 2686:20, 2738:2
**Agents** [1] - 2709:12
**agents** [2] - 2702:25, 2709:14
**ages** [2] - 2606:24, 2607:2
**aggression** [1] - 2691:25
**ago** [16] - 2564:11, 2573:15, 2601:8, 2603:3, 2613:2, 2635:9, 2661:7, 2662:4, 2689:22, 2691:8, 2691:16, 2694:13, 2709:1, 2710:8, 2742:5
**agree** [7] - 2634:1, 2685:3, 2706:11, 2718:20, 2739:17, 2757:8
**agreed** [11] - 2650:4, 2652:5, 2679:25, 2701:4, 2701:19, 2701:22, 2701:24, 2702:18, 2706:8, 2706:19, 2708:12
**agreeing** [4] - 2686:10, 2702:6, 2735:5, 2750:1
**agreement** [37] - 2596:1, 2597:18, 2597:24, 2610:15, 2643:23, 2644:3, 2644:17, 2644:18, 2647:3, 2649:15,

2649:20, 2650:1, 2650:6, 2650:10, 2652:17, 2664:12, 2702:6, 2704:22, 2705:3, 2705:12, 2708:19, 2709:23, 2709:25, 2737:4, 2744:19, 2745:3, 2745:11, 2745:16, 2745:19, 2745:25, 2746:7, 2746:10, 2746:18, 2747:2, 2749:8, 2749:24, 2750:5
**agreements** [4] - 2735:1, 2735:4, 2735:8
**ahead** [20] - 2530:16, 2534:5, 2545:25, 2593:12, 2595:3, 2625:4, 2630:23, 2631:16, 2633:15, 2633:22, 2634:4, 2636:14, 2654:23, 2659:19, 2659:24, 2676:2, 2686:15, 2687:6, 2698:10, 2758:2
**aid** [2] - 2730:12, 2752:17
**aided** [3] - 2752:4, 2752:16, 2753:4
**aider** [2] - 2753:12, 2753:16
**aiding** [11] - 2599:8, 2748:24, 2751:7, 2751:20, 2751:21, 2751:25, 2752:9, 2753:1, 2753:14, 2754:12, 2754:15
**aiding-and-abetting** [4] - 2751:20, 2751:21, 2751:25, 2753:14
**aids** [4] - 2714:17, 2751:10, 2751:18, 2754:13
**aims** [1] - 2749:8
**ain't** [5] - 2535:23, 2536:4, 2542:2, 2548:17, 2661:11
**air** [1] - 2659:12
**AKA** [1] - 2646:9
**alas** [1] - 2611:25
**alias** [1] - 2694:18
**alibi** [3] - 2593:18, 2663:4, 2663:9
**alive** [2] - 2569:18, 2569:21
**alleged** [7] - 2700:10, 2737:16, 2739:3, 2741:24, 2742:2, 2745:25, 2751:4
**allegedly** [2] - 2734:5, 2741:22
**allocution** [4] - 2705:4, 2705:6, 2705:7, 2705:12
**allocutions** [1] - 2701:8
**allow** [20] - 2528:11, 2538:18, 2592:16, 2643:15, 2643:25, 2644:2, 2644:8, 2648:19, 2648:21, 2649:8, 2652:5, 2652:16, 2670:7, 2671:23, 2672:2, 2684:25, 2701:13, 2711:17, 2712:13
**allowed** [10] - 2596:16, 2643:13, 2652:3, 2711:25, 2712:15, 2713:10, 2727:25, 2732:19, 2737:17, 2756:23
**allowing** [5] - 2644:4, 2673:2, 2712:25, 2737:22, 2739:2
**allows** [1] - 2736:10
**almost** [3] - 2637:19, 2642:3, 2749:9
**alone** [5] - 2718:12, 2723:1, 2726:6, 2742:18, 2742:19
**altercation** [2] - 2585:6, 2613:20
**alternative** [1] - 2753:18
**Amatruda** [11] - 2530:16, 2642:23, 2646:16, 2650:22, 2652:9, 2666:21, 2684:1, 2684:18, 2687:8, 2756:3, 2756:10
**AMATRUDA** [82] - 2525:15, 2527:8,

2529:5, 2530:17, 2530:19, 2538:13, 2538:19, 2538:20, 2539:22, 2540:8, 2540:9, 2542:11, 2559:8, 2559:14, 2559:17, 2560:9, 2562:12, 2573:21, 2582:3, 2585:22, 2592:20, 2596:12, 2617:10, 2622:15, 2633:2, 2633:9, 2639:5, 2639:8, 2642:24, 2643:3, 2643:8, 2643:18, 2644:9, 2644:14, 2644:21, 2644:25, 2645:10, 2645:14, 2646:12, 2646:21, 2647:10, 2647:20, 2649:12, 2649:21, 2650:3, 2650:10, 2650:12, 2650:18, 2650:21, 2656:19, 2659:13, 2660:9, 2660:11, 2666:23, 2666:25, 2667:4, 2668:2, 2668:4, 2668:15, 2669:10, 2669:14, 2669:19, 2669:21, 2669:25, 2673:6, 2674:19, 2675:23, 2679:6, 2679:9, 2679:11, 2679:13, 2679:16, 2679:19, 2679:24, 2684:3, 2684:7, 2684:9, 2687:4, 2687:10, 2760:8, 2760:14, 2760:17
**ambulance** [1] - 2531:10
**ambush** [2] - 2623:3, 2623:17
**America** [1] - 2527:3
**AMERICA** [1] - 2525:3
**American** [1] - 2607:24
**amount** [8] - 2558:2, 2569:7, 2574:17, 2634:12, 2634:14, 2634:18, 2695:14, 2756:11
**analysis** [3] - 2668:8, 2676:24, 2677:24
**analyze** [2] - 2668:10, 2668:21
**analyzed** [4] - 2668:16, 2668:20, 2676:21, 2677:11
**AND** [1] - 2525:7
**angle** [1] - 2715:17
**answer** [13] - 2552:17, 2553:17, 2559:2, 2573:18, 2582:5, 2589:4, 2620:21, 2665:7, 2694:24, 2696:14, 2719:17, 2753:15, 2754:3
**answer's** [1] - 2562:1
**answered** [2] - 2586:16, 2592:22
**answers** [2] - 2719:23, 2753:21
**anti** [1] - 2691:25
**anti-aggression** [1] - 2691:25
**anticipate** [2] - 2700:22, 2757:21
**anticipated** [2] - 2612:10, 2757:25
**anxiety** [3] - 2647:13, 2647:19, 2652:9
**anxious** [1] - 2647:22
**anyway** [3] - 2592:23, 2601:2, 2704:16
**apart** [1] - 2550:1
**apartment** [5] - 2537:21, 2594:1, 2594:3, 2614:2, 2617:23, 2618:3, 2635:22, 2636:25, 2637:5
**apologies** [2] - 2528:11, 2684:14
**apologized** [1] - 2694:5
**appealed** [1] - 2734:14
**appear** [3] - 2714:23, 2730:16, 2739:25
**APPEARANCES** [2] - 2525:13, 2526:1
**application** [2] - 2528:8, 2714:20
**applies** [3] - 2700:11, 2749:12, 2754:12
**apply** [11] - 2700:5, 2707:9, 2716:17, 2718:8, 2733:5, 2742:15, 2742:17,

2742:19, 2742:25, 2751:5, 2751:21
**applying** [1] - 2711:17
**appreciate** [4] - 2528:24, 2647:13, 2652:7, 2715:20
**appreciates** [2] - 2685:3, 2706:18
**apprehended** [1] - 2604:4
**apprehensive** [1] - 2644:19
**approach** [2] - 2562:8, 2670:14
**approached** [1] - 2536:24
**appropriate** [8] - 2594:17, 2643:23, 2644:16, 2647:5, 2688:3, 2715:9, 2736:1, 2756:11
**approve** [1] - 2592:19
**approved** [1] - 2575:4
**approximate** [1] - 2603:2
**APRIL** [1] - 2525:7
**April** [8] - 2598:2, 2634:6, 2635:2, 2635:8, 2697:21, 2709:1, 2741:21
**area** [9] - 2555:22, 2666:9, 2666:14, 2677:21, 2693:10, 2693:11, 2693:15, 2693:16, 2693:17
**Area** [1] - 2693:13
**areas** [1] - 2601:12
**arguably** [1] - 2711:20
**argue** [4] - 2528:12, 2650:13, 2672:4, 2672:5
**argues** [3] - 2733:23, 2736:6, 2736:7
**arguing** [3] - 2534:11, 2534:13, 2549:13
**argument** [12] - 2533:7, 2533:9, 2621:3, 2625:7, 2649:8, 2650:15, 2650:17, 2650:19, 2654:3, 2707:7, 2707:24, 2758:20
**arguments** [4] - 2650:24, 2719:14, 2726:5, 2759:4
**armed** [19] - 2566:24, 2567:1, 2567:6, 2570:9, 2570:12, 2570:17, 2570:25, 2571:3, 2571:19, 2572:5, 2572:23, 2573:1, 2588:15, 2600:2, 2604:8, 2604:9, 2604:19, 2605:10, 2605:12
**arrange** [2] - 2656:9, 2656:10
**arrangement** [1] - 2549:6
**arrest** [1] - 2591:22
**arrested** [17] - 2567:25, 2568:3, 2585:6, 2591:6, 2592:7, 2593:13, 2611:25, 2615:14, 2617:4, 2627:1, 2645:4, 2660:16, 2660:17, 2660:19, 2660:24, 2663:7, 2697:5
**arrive** [1] - 2720:17
**arrived** [1] - 2623:20
**arrow** [3] - 2674:10, 2674:13
**arrows** [3] - 2673:24, 2674:2, 2674:9
**art** [1] - 2687:12
**articulate** [1] - 2652:21
**ascribe** [1] - 2711:4
**aside** [2] - 2638:10, 2689:10
**asleep** [2] - 2654:13, 2714:9
**aspect** [1] - 2642:2
**aspects** [1] - 2710:22
**aspiring** [1] - 2540:18
**assault** [2] - 2609:12, 2609:14
**assaulting** [2] - 2627:18, 2627:22

**assaults** [1] - 2615:15
**assess** [8] - 2672:8, 2705:17, 2712:1, 2713:1, 2713:10, 2713:11, 2721:19, 2734:24
**assessing** [2] - 2712:7, 2730:13
**assessments** [2] - 2711:4, 2712:11
**assigned** [2] - 2693:10, 2693:15
**assist** [2] - 2732:22, 2748:10
**assistance** [2] - 2735:14, 2748:19
**Assistant** [1] - 2525:16
**Assisted** [1] - 2526:13
**assists** [1] - 2747:6
**associate** [2] - 2626:17, 2753:8
**associated** [3] - 2531:18, 2608:15, 2752:18
**association** [2] - 2671:20, 2748:6
**assorted** [1] - 2595:23
**assuage** [1] - 2652:10
**assuaged** [1] - 2647:19
**assume** [8] - 2563:20, 2592:10, 2593:7, 2607:22, 2625:5, 2643:1, 2706:25, 2725:13
**assumed** [5] - 2546:21, 2622:10, 2622:14, 2622:25, 2625:1
**assumes** [1] - 2586:6
**assuming** [1] - 2600:6
**assumption** [2] - 2624:21, 2624:24
**attach** [1] - 2752:1
**attacked** [1] - 2712:17
**attempted** [2] - 2598:12, 2612:12
**attend** [1] - 2545:18
**attention** [6] - 2543:12, 2654:12, 2701:15, 2735:6, 2741:6, 2743:6
**attenuated** [1] - 2622:17
**attitude** [1] - 2665:17
**attorney** [2] - 2568:12, 2718:9
**Attorney** [3] - 2525:14, 2594:7, 2594:11
**attorneys** [4] - 2739:6, 2739:9, 2739:17, 2755:10
**Attorneys** [1] - 2525:14
**attracted** [1] - 2584:16
**audio** [1] - 2543:7
**authenticated** [1] - 2672:3
**authenticity** [1] - 2671:6
**authorities** [1] - 2576:12
**autopsies** [1] - 2732:25
**avail** [1] - 2755:12
**available** [5] - 2630:14, 2646:3, 2667:2, 2711:1, 2746:13
**Avalorn** [1] - 2686:16
**AVALORN** [1] - 2686:17
**Avenue** [2] - 2526:3, 2531:17
**avoid** [2] - 2631:13, 2632:5
**awaiting** [3] - 2614:15, 2614:17, 2615:7
**aware** [7] - 2546:14, 2547:8, 2548:9, 2655:3, 2709:7, 2721:21, 2743:19
**awareness** [1] - 2749:7
**awhile** [1] - 2617:15
**awkward** [1] - 2705:20
**Azziz** [1] - 2631:20

**B**

**baby** [1] - 2602:20
**backtrack** [1] - 2636:20
**bad** [7] - 2567:14, 2567:15, 2652:11, 2652:19, 2711:5, 2711:6, 2743:25
**badge** [2] - 2658:9, 2658:10
**badges** [5] - 2561:3, 2657:25, 2658:2, 2658:4, 2658:5
**bagged** [1] - 2617:24
**bail** [1] - 2592:11
**Bakr** [18] - 2544:22, 2545:12, 2547:13, 2547:15, 2547:19, 2551:12, 2551:13, 2551:19, 2551:22, 2552:1, 2552:2, 2554:16, 2555:2, 2556:22, 2556:24, 2557:13, 2657:22
**Bakr's** [2] - 2556:1, 2556:25
**balance** [1] - 2742:22
**ball** [2] - 2649:2, 2756:24
**ballistics** [1] - 2662:18
**balloon** [1] - 2655:19
**bandied** [1] - 2724:7
**banner** [1] - 2531:9
**bar** [1] - 2721:6
**barber** [3] - 2638:17, 2640:1
**bare** [1] - 2629:3
**BARRETT** [24] - 2525:19, 2525:20, 2528:16, 2528:20, 2528:24, 2529:2, 2667:5, 2667:8, 2669:3, 2670:13, 2671:4, 2671:10, 2671:13, 2671:19, 2671:25, 2672:10, 2676:1, 2676:4, 2678:2, 2678:4, 2678:9, 2679:3, 2710:11, 2760:18
**Barrett** [3] - 2527:10, 2670:11, 2675:24
**base** [4] - 2599:10, 2718:17, 2720:18, 2755:7
**based** [21] - 2538:17, 2608:10, 2622:7, 2622:25, 2624:21, 2650:13, 2650:21, 2676:18, 2689:25, 2696:1, 2711:8, 2712:4, 2713:12, 2721:11, 2723:5, 2725:5, 2725:16, 2726:19, 2727:15, 2728:7, 2734:16
**basic** [1] - 2749:8
**basis** [3] - 2571:1, 2714:17, 2731:21
**Baum** [14] - 2543:15, 2581:8, 2581:9, 2581:19, 2581:22, 2582:7, 2582:9, 2582:13, 2598:9, 2631:18, 2664:2, 2675:12
**Bay** [13] - 2538:8, 2538:10, 2538:21, 2544:7, 2559:18, 2595:10, 2614:4, 2614:6, 2617:1, 2618:10, 2618:17, 2618:22, 2662:24
**bear** [4] - 2704:2, 2717:18, 2719:16, 2728:21
**bearing** [3] - 2713:1, 2734:1, 2749:2
**beat** [2] - 2584:19, 2585:4
**beating** [1] - 2588:21
**became** [6] - 2540:23, 2555:22, 2556:19, 2564:19, 2709:7, 2745:14
**become** [3] - 2630:2, 2742:20, 2747:12
**becomes** [4] - 2738:1, 2747:7, 2750:24,

2754:14

**Bed** [1] - 2630:14

**Bed-Stuy** [1] - 2630:14

**Beecher** [10] - 2593:4, 2594:19, 2595:2, 2595:10, 2631:4, 2654:15, 2654:21, 2665:7, 2691:4, 2710:13

**BEECHER** [60] - 2525:23, 2525:24, 2593:6, 2593:8, 2594:21, 2595:4, 2595:6, 2617:12, 2617:14, 2617:16, 2617:19, 2625:3, 2630:10, 2631:10, 2631:14, 2632:1, 2632:10, 2632:13, 2632:23, 2633:5, 2633:12, 2633:24, 2634:3, 2634:19, 2634:21, 2634:24, 2635:1, 2635:4, 2637:9, 2637:12, 2637:15, 2637:20, 2637:23, 2639:22, 2640:7, 2640:11, 2640:14, 2642:6, 2642:12, 2654:17, 2655:2, 2659:16, 2659:21, 2666:2, 2666:4, 2666:18, 2689:13, 2690:9, 2690:24, 2693:2, 2696:15, 2698:9, 2698:13, 2698:18, 2710:15, 2760:11, 2760:13, 2760:15, 2760:20, 2760:24

**BEFORE** [1] - 2525:11

**befriended** [1] - 2638:11

**began** [3] - 2612:4, 2693:6, 2693:7

**beginning** [5] - 2600:13, 2653:22, 2674:12, 2712:10, 2713:18

**begins** [1] - 2722:10

**behalf** [4] - 2595:2, 2708:7, 2755:22, 2755:23

**behavior** [1] - 2736:9

**behind** [5] - 2545:24, 2555:17, 2559:22, 2567:11, 2571:24

**beings** [1] - 2727:5

**belabor** [2] - 2613:5, 2627:10

**beliefs** [1] - 2629:22

**believability** [1] - 2719:10

**believable** [4] - 2706:3, 2712:9, 2713:13, 2729:10

**believes** [1] - 2728:6

**bell** [1] - 2758:4

**below** [2] - 2665:18, 2735:19

**belt** [1] - 2583:17

**benefit** [2] - 2736:23, 2737:3

**benefits** [2] - 2565:22, 2662:21

**Benz** [1] - 2535:18

**best** [7] - 2527:13, 2570:4, 2574:19, 2647:23, 2656:24, 2713:7, 2737:5

**better** [3] - 2611:15, 2718:2, 2743:5

**between** [22] - 2549:22, 2599:10, 2599:11, 2599:14, 2599:18, 2599:24, 2600:3, 2637:6, 2653:21, 2668:22, 2673:10, 2673:14, 2674:4, 2674:24, 2675:13, 2679:25, 2709:6, 2725:18, 2727:1, 2746:10, 2749:23, 2755:2

**beyond** [18] - 2670:9, 2716:25, 2720:10, 2722:8, 2722:18, 2723:4, 2723:7, 2723:14, 2723:22, 2726:22, 2736:13, 2738:10, 2740:6, 2745:8, 2745:17, 2749:21, 2751:22, 2754:2

**bias** [4] - 2720:14, 2720:15, 2730:21,

2730:25

**big** [8] - 2585:7, 2628:3, 2644:11, 2644:19, 2649:23, 2713:25, 2755:9

**bills** [1] - 2549:7

**birth** [1] - 2602:19

**bit** [32] - 2558:20, 2569:15, 2604:20, 2604:24, 2613:6, 2616:18, 2617:18, 2617:20, 2622:17, 2631:8, 2631:12, 2632:1, 2638:2, 2639:16, 2643:1, 2644:7, 2645:22, 2651:17, 2653:17, 2658:20, 2659:25, 2669:22, 2684:23, 2687:22, 2695:12, 2699:19, 2699:24, 2700:7, 2712:24, 2719:7, 2742:11, 2743:8

**black** [1] - 2535:18

**Black** [3] - 2531:22, 2544:25, 2582:15

**Black-O** [2] - 2544:25, 2582:15

**blaming** [1] - 2659:8

**blew** [3] - 2624:5, 2624:21

**blinking** [2] - 2536:21, 2537:22

**BLOCK** [1] - 2525:11

**block** [10] - 2536:20, 2546:3, 2554:13, 2555:8, 2555:14, 2562:10, 2562:23, 2562:25

**blocks** [1] - 2554:19

**Blood** [6] - 2589:12, 2589:14, 2589:16, 2589:17, 2627:11, 2630:5

**Bloods** [9] - 2563:17, 2589:11, 2589:18, 2590:6, 2590:10, 2627:9, 2629:11, 2629:23, 2630:2

**boasted** [1] - 2548:5

**boiler** [1] - 2654:1

**boilerplate** [1] - 2707:21

**Boo** [22] - 2532:1, 2540:15, 2544:7, 2551:13, 2551:19, 2552:14, 2552:20, 2553:3, 2553:9, 2553:18, 2555:3, 2555:12, 2555:15, 2555:25, 2557:1, 2557:20, 2631:19, 2631:20, 2658:7, 2660:15

**book** [1] - 2608:8

**books** [1] - 2607:24

**booming** [1] - 2713:25

**Bootie** [1] - 2686:14

**bother** [3] - 2603:12, 2606:16, 2615:6

**bothered** [1] - 2603:14

**bothering** [2] - 2637:13, 2637:24

**bottle** [2] - 2546:2, 2546:25

**bottom** [3] - 2670:1, 2674:9, 2678:17

**bought** [4] - 2604:11, 2658:14, 2658:15, 2658:17

**bouncing** [1] - 2649:2

**bounty** [1] - 2657:12

**box** [1] - 2635:13

**boxer** [1] - 2628:7

**boxers** [2] - 2628:12, 2628:15

**brain** [2] - 2569:21, 2619:10

**branch** [1] - 2709:20

**breach** [1] - 2646:23

**breached** [1] - 2650:5

**break** [15] - 2572:1, 2587:8, 2593:8, 2594:18, 2631:7, 2642:5, 2642:9,

2642:14, 2689:9, 2699:14, 2699:16, 2717:4, 2733:14, 2733:16, 2754:19

**breaking** [3] - 2651:3, 2699:21, 2700:7

**breaks** [4] - 2714:6, 2733:19, 2754:22, 2759:4

**breath** [1] - 2645:23

**brief** [2] - 2755:25, 2758:20

**briefly** [4] - 2531:10, 2532:5, 2616:22, 2629:21

**bring** [12] - 2527:6, 2531:3, 2542:1, 2542:4, 2549:2, 2575:5, 2633:17, 2647:9, 2647:10, 2655:16, 2689:20, 2753:7

**bringing** [1] - 2701:15

**broke** [4] - 2587:14, 2600:20, 2601:2, 2653:16

**broken** [1] - 2562:15

**Brooklyn** [12] - 2525:6, 2525:17, 2526:11, 2531:3, 2571:8, 2612:13, 2636:23, 2637:6, 2693:12, 2693:18, 2709:11, 2720:22

**brother** [3] - 2536:2, 2544:24, 2567:4, 2567:15, 2581:19

**brother's** [1] - 2545:2

**brothers** [3] - 2579:25, 2581:8, 2582:7

**Brothers** [2] - 2565:19, 2565:24

**brought** [3] - 2540:16, 2721:1, 2735:6

**building** [2] - 2559:20, 2638:25, 2639:1

**buildings** [1] - 2571:6

**bullets** [3] - 2549:4, 2624:11, 2624:18

**bullshit** [2] - 2535:24, 2548:18

**bunch** [4] - 2589:18, 2660:12, 2732:8, 2735:2

**burden** [14] - 2685:5, 2689:23, 2704:18, 2722:1, 2722:17, 2722:19, 2722:20, 2723:21, 2729:13, 2740:10, 2740:11, 2746:7, 2755:15, 2756:5

**burglaries** [1] - 2587:6

**Bushwick** [1] - 2536:16

**business** [13] - 2571:24, 2578:17, 2579:11, 2606:25, 2607:11, 2610:19, 2610:20, 2611:3, 2681:2, 2682:2, 2682:18, 2683:6, 2683:18

**businesses** [2] - 2610:16, 2610:19

**busted** [1] - 2579:5

**buy** [2] - 2566:17, 2607:3

**buyer** [1] - 2606:10

**buying** [1] - 2606:9

**BY** [38] - 2525:15, 2525:15, 2525:16, 2525:20, 2525:20, 2525:24, 2526:3, 2526:6, 2530:19, 2538:20, 2540:9, 2559:17, 2560:14, 2565:13, 2579:2, 2595:6, 2655:2, 2660:11, 2666:4, 2668:4, 2676:4, 2690:24, 2693:2, 2696:18, 2698:13, 2699:2, 2760:7, 2760:9, 2760:11, 2760:12, 2760:14, 2760:15, 2760:17, 2760:18, 2760:20, 2760:22, 2760:24, 2761:2

**bye** [1] - 2623:9

# C

Cadman [2] - 2525:17, 2526:10
calculous [2] - 2622:20, 2622:22
caliber [1] - 2560:3
camp [1] - 2544:23
Campagna [3] - 2625:22, 2626:2, 2626:6
campagna [2] - 2625:24, 2626:1
CAMPAGNA [1] - 2626:4
Campagno [1] - 2625:25
CANALES [1] - 2526:10
candid [1] - 2730:8
cannot [8] - 2597:8, 2711:3, 2713:3, 2728:4, 2729:20, 2735:22, 2740:14, 2745:20
capable [3] - 2664:19, 2664:20, 2672:6
capacity [2] - 2532:22, 2624:16
caper [2] - 2613:3, 2614:14
captain [1] - 2548:4
car [15] - 2535:16, 2535:20, 2536:22, 2548:22, 2552:2, 2557:18, 2559:19, 2561:2, 2561:3, 2563:3, 2563:6, 2567:18, 2612:15
card [1] - 2602:9
carded [1] - 2607:1
cards [4] - 2601:25, 2602:2, 2602:4, 2602:5
care [7] - 2600:23, 2652:11, 2665:23, 2689:1, 2689:16, 2706:20, 2736:16
carefree [1] - 2758:5
careful [2] - 2729:16, 2744:4
carefully [4] - 2652:14, 2728:11, 2729:24, 2754:19
carjacking [1] - 2598:6
CARL [2] - 2526:2, 2526:3
carries [1] - 2709:21
carry [1] - 2754:10
carrying [3] - 2548:5, 2588:13, 2738:2
cars [3] - 2532:14, 2532:15, 2555:23
case [46] - 2568:11, 2591:17, 2594:13, 2642:16, 2643:2, 2651:12, 2652:13, 2653:21, 2653:22, 2660:16, 2661:18, 2662:3, 2662:16, 2662:17, 2666:22, 2668:17, 2687:7, 2687:16, 2688:6, 2693:21, 2694:6, 2695:23, 2705:9, 2707:1, 2710:1, 2710:10, 2710:17, 2711:5, 2711:9, 2716:17, 2722:20, 2725:21, 2727:22, 2728:14, 2732:1, 2732:7, 2733:8, 2736:14, 2739:22, 2739:25, 2740:9, 2742:10, 2746:15, 2749:18, 2754:6, 2758:17
cases [6] - 2695:21, 2697:3, 2700:5, 2716:18, 2735:17, 2746:17
Cash [2] - 2565:18, 2565:24
cashier [3] - 2557:6, 2557:7, 2557:9
cashing [1] - 2557:6
catch [1] - 2664:9
caught [3] - 2584:2, 2603:23, 2626:25
CAUSE [1] - 2525:10
caused [7] - 2537:1, 2731:1, 2750:17,

2752:6, 2753:19, 2753:20, 2753:24
causes [2] - 2665:21, 2751:13
caution [6] - 2652:12, 2727:7, 2736:16, 2746:6, 2751:1, 2756:16
cautionary [1] - 2652:21
cell [5] - 2655:7, 2677:21, 2678:11, 2678:13, 2678:16
cellphone [1] - 2549:25
cellphones [1] - 2549:24
Center [1] - 2709:11
centers [2] - 2531:8, 2532:8
certain [9] - 2539:17, 2541:1, 2668:22, 2688:7, 2703:2, 2704:25, 2716:6, 2733:22, 2741:23
certainly [7] - 2567:1, 2578:14, 2592:6, 2652:5, 2653:1, 2724:8, 2758:11
certainty [1] - 2741:24
certificate [1] - 2602:19
chain [10] - 2571:18, 2571:21, 2571:22, 2601:15, 2602:23, 2603:1, 2603:5, 2603:6, 2603:9, 2603:15
chalked [1] - 2694:16
chance [5] - 2528:18, 2562:4, 2625:21, 2661:25, 2713:23
change [1] - 2556:17
changed [1] - 2565:14
chaos [1] - 2718:24
character [2] - 2723:8, 2747:4
characterization [1] - 2673:5
characterized [1] - 2746:12
charge [32] - 2645:12, 2646:7, 2647:16, 2651:4, 2651:10, 2654:1, 2654:11, 2700:1, 2700:3, 2700:8, 2700:13, 2703:25, 2704:11, 2708:23, 2709:21, 2710:7, 2710:22, 2712:5, 2713:19, 2716:3, 2716:7, 2716:12, 2716:13, 2717:4, 2721:24, 2722:16, 2726:24, 2742:23, 2743:14, 2751:24, 2755:1
charged [22] - 2540:1, 2597:25, 2703:2, 2703:3, 2703:8, 2709:17, 2714:7, 2722:6, 2723:16, 2723:17, 2727:12, 2738:11, 2745:1, 2745:11, 2745:19, 2747:9, 2752:3, 2752:8, 2752:12, 2753:5, 2753:6, 2757:16
charges [13] - 2700:3, 2704:22, 2704:25, 2705:4, 2705:6, 2722:3, 2737:16, 2737:20, 2741:15, 2741:18, 2741:22, 2743:10
charging [2] - 2654:13, 2702:16
charm [1] - 2724:12
chart [11] - 2670:4, 2673:8, 2673:10, 2673:18, 2673:20, 2673:21, 2673:24, 2674:14, 2675:12, 2677:2, 2677:4
charted [1] - 2674:24
charts [8] - 2668:16, 2668:19, 2669:10, 2669:17, 2670:2, 2670:7, 2673:2, 2676:7
chasing [1] - 2531:10
chats [1] - 2528:6
cheap [1] - 2605:2
cheat [1] - 2579:8

cheating [1] - 2579:11
check [11] - 2554:17, 2556:12, 2556:17, 2556:18, 2557:6, 2564:12, 2564:15, 2564:16, 2565:14, 2637:10, 2728:11
Check [1] - 2556:10
check-cashing [1] - 2557:6
checkmate [4] - 2556:19, 2564:12, 2564:20, 2565:15
checks [1] - 2670:3
Cheetah [2] - 2636:22, 2666:5
childlike [1] - 2565:23
chin [1] - 2706:23
China [1] - 2537:11
Chinese [2] - 2558:18, 2559:6
choice [2] - 2576:18, 2740:19
choices [2] - 2664:20, 2664:22
choose [1] - 2730:20
chooses [2] - 2711:7, 2728:6
chose [5] - 2588:17, 2588:19, 2611:19, 2722:24, 2740:17
chronological [1] - 2600:16
circumscribe [1] - 2632:4
circumstances [7] - 2653:5, 2709:8, 2729:25, 2744:5, 2744:9, 2746:14, 2748:13
circumstantial [9] - 2724:6, 2725:7, 2725:11, 2725:15, 2725:18, 2725:21, 2726:3, 2726:11, 2726:20
citizen [1] - 2607:8
City [6] - 2598:17, 2599:5, 2612:15, 2614:22, 2686:12
city [4] - 2588:15, 2601:12, 2604:22, 2604:24
claiming [1] - 2751:25
claims [1] - 2593:15
clandestine [2] - 2576:8, 2576:12
clarify [6] - 2528:17, 2528:25, 2595:15, 2627:10, 2670:8, 2671:5
clarifying [1] - 2621:20
Clark [3] - 2617:21, 2617:23, 2663:5
classically [1] - 2646:18
clean [1] - 2722:10
clear [11] - 2544:15, 2564:16, 2586:7, 2636:20, 2648:13, 2649:3, 2684:10, 2720:14, 2729:17, 2742:20, 2748:1
clearly [4] - 2606:15, 2608:10, 2646:8, 2759:5
clerk [2] - 2584:20, 2584:25
CLERK [18] - 2594:22, 2633:20, 2642:17, 2642:20, 2667:11, 2667:15, 2667:21, 2667:25, 2678:3, 2690:5, 2690:11, 2690:21, 2700:8, 2708:2, 2708:4, 2717:9, 2717:13, 2717:15
client [3] - 2564:15, 2595:3, 2708:7
clients [1] - 2756:21
clinic [7] - 2532:16, 2532:18, 2532:19, 2533:1, 2536:10, 2539:21, 2598:13
clinics [2] - 2530:21, 2673:14
close [4] - 2544:22, 2615:11, 2616:4, 2616:5
closed [1] - 2587:20

**closing** [1] - 2719:14
**clothes** [1] - 2665:15
**clothing** [7] - 2583:11, 2583:14, 2584:11, 2591:18, 2613:3, 2614:14, 2621:4
**club** [5] - 2540:19, 2541:4, 2541:5, 2666:5, 2666:11
**Club** [3] - 2636:22, 2637:2, 2666:13
**clubs** [1] - 2561:18
**clue** [1] - 2689:7
**clutches** [1] - 2612:19
**CMB** [7] - 2531:25, 2539:4, 2539:5, 2539:17, 2540:13, 2545:1, 2662:21
**cnlsnic@aol.com** [1] - 2526:11
**CO** [2] - 2709:10, 2709:15
**co** [16] - 2659:18, 2659:20, 2659:22, 2711:21, 2711:22, 2711:25, 2712:2, 2712:4, 2712:15, 2712:16, 2713:11, 2737:14, 2737:20, 2738:19, 2739:3, 2750:25
**co-conspirator** [9] - 2711:21, 2711:25, 2712:2, 2712:4, 2712:15, 2713:11, 2737:14, 2738:19, 2739:3
**co-conspirator's** [1] - 2712:16
**co-conspirators** [3] - 2711:22, 2737:20, 2750:25
**co-counsel** [3] - 2659:18, 2659:20, 2659:22
**coat** [1] - 2583:20
**coats** [1] - 2583:17
**cocaine** [8] - 2579:18, 2579:19, 2599:10, 2605:24, 2605:25, 2606:1, 2606:2, 2686:21
**coconspirator** [2] - 2648:8, 2648:11
**Code** [1] - 2709:18
**codes** [1] - 2677:21
**colleagues** [2] - 2714:8, 2724:11
**collecting** [1] - 2531:7
**collectively** [1] - 2685:3
**Colon** [4] - 2598:2, 2629:6, 2629:18, 2663:25
**color** [1] - 2737:10
**coma** [4] - 2619:6, 2619:10, 2619:11
**combat** [2] - 2614:1, 2651:21
**combatant** [1] - 2628:19
**combination** [1] - 2725:12
**Combs** [1] - 2540:18
**comfort** [1] - 2748:19
**comfortable** [1] - 2645:17
**comic** [2] - 2607:24, 2608:8
**Comics** [1] - 2607:24
**coming** [16] - 2527:10, 2536:22, 2540:22, 2544:4, 2544:21, 2547:13, 2555:13, 2632:19, 2642:17, 2644:10, 2661:7, 2661:8, 2661:20, 2661:21, 2701:10
**commands** [2] - 2751:11, 2751:17
**commence** [1] - 2757:22
**comment** [1] - 2651:16
**comments** [3] - 2527:22, 2659:14, 2711:20

**commingle** [1] - 2721:22
**commission** [5] - 2748:10, 2751:17, 2752:5, 2752:16, 2753:4
**commit** [21] - 2571:3, 2598:16, 2600:2, 2604:16, 2604:19, 2626:20, 2697:4, 2699:4, 2744:20, 2744:22, 2744:23, 2744:24, 2745:6, 2745:20, 2748:3, 2749:14, 2750:2, 2751:18, 2752:6, 2752:17, 2753:19
**committed** [24] - 2581:14, 2598:22, 2598:25, 2602:9, 2699:8, 2723:15, 2737:19, 2742:1, 2745:1, 2748:5, 2748:16, 2749:19, 2750:4, 2750:17, 2750:18, 2750:22, 2751:12, 2752:2, 2752:8, 2752:10, 2752:12, 2752:22, 2752:23, 2754:5
**committing** [4] - 2570:8, 2570:11, 2605:16, 2612:4, 2616:1, 2626:25
**common** [16] - 2711:13, 2714:20, 2723:6, 2725:24, 2726:12, 2730:4, 2730:13, 2731:22, 2732:5, 2733:11, 2734:15, 2738:6, 2745:22, 2746:5, 2746:20, 2750:1
**commonly** [2] - 2610:1, 2693:13
**communicate** [1] - 2660:13
**communicating** [1] - 2555:7
**Communication** [4] - 2683:2, 2683:5, 2683:6, 2683:10
**communication** [8] - 2674:12, 2674:13, 2674:16, 2675:6, 2675:8, 2675:13, 2714:5, 2714:14
**communications** [3] - 2576:9, 2668:22, 2674:24
**communities** [1] - 2691:21
**community** [3] - 2692:1, 2695:24, 2696:1
**companies** [1] - 2684:24
**compare** [1] - 2730:11
**comparisons** [1] - 2676:15
**compel** [1] - 2740:14
**compelled** [1] - 2735:23
**compilation** [1] - 2720:1
**complaint** [2] - 2644:22, 2645:2
**Complaint** [5] - 2648:1, 2648:2, 2649:5, 2652:3, 2652:8
**complete** [5] - 2627:22, 2637:19, 2667:3, 2735:24, 2757:13
**completed** [3] - 2643:1, 2659:17, 2685:6, 2687:24, 2691:16, 2749:15
**completely** [1] - 2731:3
**completes** [1] - 2666:19
**completing** [1] - 2691:20
**complex** [3] - 2567:9, 2587:18, 2670:2
**compliance** [1] - 2695:5
**comport** [1] - 2630:1
**compound** [1] - 2562:13
**comprehend** [1] - 2733:16
**comprehension** [1] - 2714:18
**Computer** [1] - 2526:13
**Computer-Assisted** [1] - 2526:13
**concept** [1] - 2646:1

**conceptionally** [1] - 2644:1
**concepts** [1] - 2742:24
**concern** [6] - 2609:21, 2688:8, 2707:23, 2739:22, 2740:21, 2741:4
**concerned** [7] - 2574:22, 2665:3, 2670:11, 2718:14, 2720:21, 2727:7, 2742:10
**concerning** [2] - 2543:24, 2602:21
**concerns** [4] - 2527:16, 2647:13, 2651:25, 2734:12
**conclude** [4] - 2631:7, 2725:4, 2725:14, 2731:14
**concluded** [3] - 2651:10, 2672:11, 2757:19
**concluding** [2] - 2530:12, 2717:2
**conclusion** [2] - 2723:20, 2726:9
**conclusions** [1] - 2723:19
**concurrent** [1] - 2604:12
**condition** [2] - 2606:20
**conditions** [11] - 2604:12, 2604:15, 2609:7, 2609:18, 2626:9, 2626:11, 2626:15, 2692:2, 2692:6, 2695:5, 2698:15
**condone** [1] - 2563:22
**conduct** [12] - 2599:17, 2650:14, 2691:22, 2712:21, 2739:8, 2743:19, 2743:23, 2746:11, 2746:15, 2748:2, 2750:13, 2752:24
**conducted** [3] - 2693:23, 2739:6, 2756:19
**confederates** [1] - 2737:20
**confinement** [1] - 2709:11
**confirm** [2] - 2582:1, 2677:22
**conflict** [1] - 2590:3
**conflicting** [1] - 2630:6
**conflicts** [1] - 2719:4
**confrontation** [1] - 2598:12
**confused** [1] - 2729:4
**confusing** [1] - 2701:18
**congested** [1] - 2555:22
**congratulations** [1] - 2693:3
**Congress** [1] - 2718:20
**conjugal** [1] - 2575:25
**connection** [6] - 2549:22, 2568:16, 2593:22, 2673:14, 2677:5, 2719:16
**consciously** [1] - 2731:2
**consider** [25] - 2565:20, 2592:25, 2639:15, 2648:14, 2687:16, 2706:1, 2718:13, 2723:11, 2724:6, 2725:24, 2726:15, 2727:25, 2731:6, 2731:7, 2733:2, 2734:7, 2734:9, 2734:23, 2735:17, 2736:20, 2738:18, 2742:16, 2746:19, 2748:8, 2752:13
**consideration** [4] - 2721:3, 2721:5, 2732:11, 2744:4
**considerations** [2] - 2710:1, 2733:4
**considered** [9] - 2565:18, 2705:16, 2706:16, 2722:15, 2733:25, 2738:14, 2738:25, 2741:19, 2748:13
**considering** [1] - 2723:13
**consist** [1] - 2611:2

**consistent** [5] - 2563:18, 2629:22, 2629:25, 2703:18, 2730:14
**consists** [2] - 2708:19, 2719:23
**conspiracies** [5] - 2737:17, 2738:11, 2744:14, 2751:4, 2754:13
**conspiracy** [78] - 2598:1, 2598:4, 2598:5, 2598:9, 2598:16, 2599:9, 2599:13, 2600:2, 2737:23, 2737:25, 2738:3, 2738:6, 2738:7, 2738:13, 2738:14, 2738:24, 2738:25, 2744:12, 2744:13, 2744:14, 2744:15, 2744:16, 2744:18, 2744:20, 2744:25, 2745:2, 2745:4, 2745:7, 2745:11, 2745:14, 2745:19, 2745:20, 2745:24, 2746:12, 2746:14, 2746:17, 2746:20, 2746:23, 2746:24, 2746:25, 2747:3, 2747:9, 2747:11, 2747:13, 2747:17, 2747:20, 2748:3, 2748:9, 2748:12, 2748:14, 2748:18, 2748:20, 2748:21, 2748:23, 2749:2, 2749:3, 2749:7, 2749:10, 2749:11, 2749:12, 2749:16, 2749:17, 2749:20, 2750:7, 2750:12, 2750:14, 2750:16, 2750:18, 2750:19, 2750:21, 2750:22, 2750:24, 2751:2, 2751:3, 2754:13, 2754:14
**conspiracy's** [1] - 2747:19
**conspirator** [10] - 2711:21, 2711:25, 2712:2, 2712:4, 2712:15, 2713:11, 2737:14, 2738:19, 2739:3, 2747:7
**conspirator's** [1] - 2712:16
**conspirators** [10] - 2711:22, 2737:20, 2738:2, 2744:22, 2746:1, 2746:3, 2748:7, 2749:4, 2750:4, 2750:25
**conspire** [3] - 2744:23, 2745:6, 2749:13
**constitute** [2] - 2651:5, 2753:25
**constituting** [1] - 2751:19
**Constitution** [2] - 2740:13, 2740:23
**constitutional** [1] - 2740:17
**construct** [1] - 2737:2
**construction** [4] - 2546:4, 2554:14, 2554:16, 2554:18
**consult** [1] - 2659:17
**consults** [1] - 2659:20
**consuming** [1] - 2756:14
**CONT'D** [1] - 2579:1
**Cont'd** [1] - 2693:1
**contact** [5] - 2546:22, 2547:21, 2675:19, 2675:20, 2685:25
**contained** [19] - 2671:17, 2672:4, 2673:3, 2680:24, 2681:4, 2681:7, 2681:24, 2682:3, 2682:6, 2682:20, 2682:22, 2683:3, 2683:8, 2683:11, 2683:16, 2683:20, 2683:22, 2706:17, 2722:13
**containing** [1] - 2602:20
**contains** [1] - 2742:13
**contents** [2] - 2640:8, 2716:2
**context** [2] - 2574:6, 2746:16
**contexts** [1] - 2574:6
**continue** [2] - 2534:19, 2699:4
**continued** [10] - 2529:9, 2530:18,

2590:15, 2592:23, 2614:15, 2615:7, 2615:20, 2692:10, 2747:25, 2760:7
**CONTINUED** [3] - 2526:1, 2655:1, 2760:12
**Continued** [1] - 2578:20
**contraband** [1] - 2655:3
**contracts** [1] - 2665:14
**contradict** [1] - 2730:15
**contradicted** [1] - 2734:5
**contradicts** [1] - 2734:6
**contrary** [1] - 2672:6
**contrast** [1] - 2750:10
**control** [2] - 2664:19, 2741:10
**convenient** [1] - 2759:2
**conversation** [21] - 2534:10, 2539:9, 2541:13, 2541:18, 2552:15, 2553:8, 2556:10, 2556:14, 2556:15, 2556:22, 2564:11, 2565:2, 2565:14, 2566:22, 2566:23, 2567:13, 2638:16, 2640:6, 2659:1, 2659:5, 2677:5
**conversations** [4] - 2574:5, 2638:14, 2639:23, 2658:24
**convict** [1] - 2726:23
**convicted** [3] - 2626:18, 2697:19, 2752:9
**convicting** [1] - 2725:19
**conviction** [4] - 2693:9, 2706:9, 2708:14, 2736:12
**convince** [2] - 2745:21, 2756:21
**convincing** [1] - 2723:8
**convoluted** [1] - 2713:6
**Cooke** [31] - 2581:23, 2581:25, 2582:11, 2646:9, 2648:17, 2649:7, 2654:4, 2657:1, 2702:16, 2704:23, 2705:25, 2706:2, 2708:11, 2708:19, 2708:25, 2709:8, 2709:13, 2709:17, 2709:23, 2710:4, 2710:8, 2710:24, 2711:14, 2711:23, 2712:25, 2713:11, 2727:22, 2739:4, 2741:6, 2741:8
**cooke's** [1] - 2653:5
**Cooke's** [1] - 2712:14
**cooked** [1] - 2710:1
**cookies** [1] - 2530:4
**cool** [1] - 2653:17
**cooperate** [1] - 2735:5
**cooperating** [3] - 2568:9, 2568:16, 2709:8
**cooperation** [23] - 2596:1, 2597:18, 2643:23, 2644:3, 2644:17, 2644:18, 2647:3, 2649:15, 2649:19, 2650:1, 2650:6, 2652:16, 2664:12, 2702:6, 2705:3, 2705:12, 2708:19, 2709:23, 2709:24, 2735:1, 2735:4, 2735:5, 2737:4
**cooperator** [5] - 2645:20, 2645:25, 2646:23, 2649:25
**cooperators** [3] - 2644:12, 2650:14, 2653:2
**cop** [3] - 2561:3, 2561:9, 2566:12
**cop-like** [1] - 2561:3
**copies** [1] - 2681:12

**cops** [4] - 2560:22, 2560:24, 2561:3, 2562:8
**copy** [21] - 2653:9, 2653:10, 2680:2, 2680:6, 2680:9, 2680:11, 2680:13, 2680:15, 2680:17, 2680:20, 2680:22, 2681:14, 2681:16, 2681:18, 2681:20, 2681:22, 2682:10, 2682:13, 2683:1, 2683:14, 2709:4
**corner** [4] - 2547:17, 2555:11, 2555:14
**correct** [179] - 2538:8, 2539:6, 2542:20, 2561:4, 2561:7, 2562:1, 2562:16, 2563:12, 2564:12, 2564:24, 2564:25, 2565:1, 2565:17, 2565:19, 2566:7, 2566:24, 2567:2, 2567:6, 2567:12, 2568:10, 2568:23, 2568:24, 2568:25, 2569:16, 2569:19, 2570:1, 2570:9, 2573:13, 2573:16, 2574:13, 2575:6, 2575:9, 2575:20, 2575:23, 2576:1, 2576:19, 2577:2, 2577:17, 2578:15, 2579:16, 2581:12, 2589:12, 2589:13, 2589:20, 2591:8, 2594:20, 2595:23, 2596:11, 2596:14, 2596:18, 2596:21, 2598:7, 2598:10, 2598:14, 2598:18, 2598:21, 2599:7, 2599:12, 2599:14, 2599:15, 2599:21, 2600:1, 2600:3, 2600:4, 2600:25, 2601:10, 2601:23, 2602:1, 2602:16, 2602:18, 2602:22, 2604:7, 2604:9, 2604:10, 2604:13, 2605:1, 2605:16, 2608:23, 2608:25, 2609:3, 2609:15, 2609:24, 2610:3, 2610:5, 2610:7, 2610:20, 2611:20, 2611:21, 2612:1, 2612:4, 2612:5, 2612:7, 2612:20, 2613:13, 2613:20, 2614:8, 2614:20, 2614:21, 2615:9, 2616:24, 2617:2, 2617:3, 2617:5, 2617:6, 2619:6, 2619:8, 2619:20, 2619:22, 2620:12, 2621:14, 2622:20, 2622:23, 2622:25, 2623:4, 2623:5, 2623:21, 2623:25, 2624:6, 2625:11, 2625:16, 2626:6, 2626:9, 2626:10, 2626:12, 2626:13, 2626:18, 2626:19, 2626:21, 2627:2, 2627:18, 2628:1, 2629:9, 2630:18, 2630:21, 2630:25, 2631:22, 2635:14, 2637:2, 2637:7, 2638:11, 2648:8, 2648:12, 2655:4, 2655:9, 2656:4, 2656:8, 2657:8, 2658:22, 2658:24, 2664:4, 2673:4, 2673:6, 2673:18, 2673:22, 2674:4, 2677:6, 2677:7, 2677:10, 2677:12, 2681:1, 2690:8, 2690:9, 2691:2, 2691:5, 2691:11, 2695:1, 2696:24, 2698:6, 2698:16, 2698:17, 2701:22, 2702:4, 2702:20, 2702:21, 2705:8, 2715:4, 2715:5, 2757:6
**correction** [1] - 2657:10
**correctional** [1] - 2691:20
**corrections** [1] - 2709:10
**correctly** [3] - 2607:21, 2614:5, 2686:4
**corresponded** [1] - 2709:16
**corresponding** [1] - 2709:9
**corrupt** [2] - 2750:1, 2750:5
**counsel** [15] - 2527:5, 2652:12,

2652:20, 2659:15, 2659:18, 2659:20, 2659:22, 2684:22, 2685:3, 2685:14, 2688:15, 2700:16, 2733:23, 2734:21

**counsels** [1] - 2751:11

**count** [13] - 2572:9, 2701:17, 2708:22, 2708:23, 2721:9, 2722:6, 2722:9, 2723:13, 2723:16, 2723:17, 2723:18, 2745:11, 2745:19

**countries** [1] - 2686:22

**country** [1] - 2720:21

**Counts** [1] - 2742:13

**counts** [7] - 2707:16, 2742:13, 2742:16, 2742:18, 2742:22, 2754:21, 2754:22

**couple** [8] - 2530:6, 2569:16, 2571:5, 2574:6, 2635:9, 2637:7, 2637:23, 2644:10

**coupled** [1] - 2752:22

**course** [28] - 2572:18, 2572:22, 2572:23, 2573:11, 2574:9, 2577:9, 2578:8, 2595:25, 2596:19, 2601:24, 2618:6, 2626:20, 2629:24, 2638:9, 2655:3, 2676:8, 2676:16, 2681:2, 2682:2, 2682:18, 2683:6, 2683:18, 2690:3, 2722:13, 2722:23, 2740:4, 2744:9, 2755:14

**Court** [7] - 2649:1, 2652:20, 2685:2, 2688:13, 2706:18, 2720:11

**COURT** [309] - 2525:1, 2526:10, 2527:6, 2527:9, 2528:18, 2528:21, 2529:1, 2529:4, 2530:2, 2534:1, 2534:5, 2538:12, 2538:17, 2540:3, 2540:7, 2542:10, 2542:12, 2542:18, 2550:5, 2551:3, 2552:12, 2552:17, 2553:5, 2553:24, 2554:2, 2554:6, 2557:22, 2558:5, 2558:7, 2559:2, 2559:4, 2559:11, 2559:16, 2560:10, 2562:14, 2565:4, 2565:6, 2565:11, 2573:22, 2582:4, 2585:13, 2585:17, 2585:23, 2586:6, 2586:11, 2586:14, 2586:16, 2589:2, 2592:22, 2593:4, 2593:7, 2593:9, 2593:12, 2594:17, 2595:2, 2617:11, 2617:13, 2617:15, 2617:17, 2619:14, 2622:16, 2624:25, 2625:2, 2625:4, 2625:6, 2630:8, 2630:11, 2630:21, 2630:23, 2631:4, 2631:13, 2631:16, 2632:3, 2632:8, 2632:12, 2632:14, 2632:22, 2632:24, 2633:4, 2633:6, 2633:10, 2633:13, 2633:15, 2633:18, 2633:21, 2634:1, 2634:4, 2634:9, 2634:16, 2634:20, 2634:23, 2634:25, 2635:3, 2635:5, 2635:10, 2636:13, 2636:17, 2637:11, 2637:14, 2637:17, 2637:21, 2639:6, 2639:9, 2639:25, 2640:2, 2640:5, 2640:9, 2640:12, 2640:16, 2640:22, 2640:24, 2642:4, 2642:8, 2642:14, 2642:18, 2642:22, 2642:25, 2643:6, 2643:15, 2643:21, 2644:13, 2644:15, 2644:24, 2645:8, 2645:11, 2645:22, 2646:15, 2646:20, 2647:1, 2647:12, 2647:22, 2648:2, 2648:6, 2648:10, 2648:13, 2648:18, 2648:22, 2649:8, 2649:11,

2649:18, 2649:22, 2650:8, 2650:11, 2650:17, 2650:19, 2650:22, 2650:24, 2651:2, 2652:25, 2653:7, 2653:11, 2653:15, 2653:24, 2654:6, 2654:9, 2654:11, 2654:15, 2654:18, 2654:21, 2656:21, 2659:14, 2659:19, 2659:24, 2660:7, 2665:12, 2666:1, 2666:19, 2666:24, 2667:2, 2667:7, 2667:10, 2667:22, 2667:24, 2668:1, 2668:14, 2669:1, 2669:4, 2669:9, 2669:12, 2669:17, 2669:20, 2669:22, 2670:1, 2670:15, 2671:2, 2671:9, 2671:11, 2671:14, 2671:22, 2672:1, 2673:2, 2673:7, 2675:24, 2676:2, 2679:4, 2679:7, 2679:10, 2679:12, 2679:14, 2679:18, 2679:20, 2684:1, 2684:4, 2684:8, 2684:14, 2685:11, 2685:17, 2685:20, 2685:22, 2686:6, 2686:9, 2686:15, 2686:23, 2686:25, 2687:2, 2687:6, 2687:12, 2687:24, 2688:2, 2688:21, 2689:1, 2689:10, 2689:15, 2689:20, 2690:7, 2690:22, 2694:19, 2694:22, 2694:24, 2695:19, 2696:4, 2696:8, 2696:11, 2696:14, 2696:16, 2697:12, 2697:14, 2697:16, 2698:8, 2698:10, 2698:19, 2698:22, 2699:7, 2699:11, 2699:13, 2699:16, 2701:3, 2701:9, 2701:12, 2701:19, 2701:21, 2701:24, 2702:3, 2702:7, 2702:11, 2702:13, 2702:22, 2703:7, 2703:10, 2703:16, 2703:23, 2704:4, 2704:8, 2704:13, 2705:1, 2705:6, 2705:9, 2705:20, 2705:23, 2706:5, 2706:12, 2706:14, 2706:20, 2707:3, 2707:5, 2707:8, 2707:12, 2707:15, 2707:25, 2708:5, 2708:17, 2710:13, 2710:17, 2713:22, 2714:22, 2714:25, 2715:3, 2715:6, 2715:9, 2715:14, 2715:18, 2715:24, 2717:11, 2717:14, 2717:16, 2717:20, 2717:25, 2718:2, 2718:5, 2728:19, 2730:6, 2755:22, 2758:11, 2758:14, 2758:19, 2758:22, 2758:24, 2759:3, 2759:8

**court** [14] - 2527:1, 2597:2, 2643:25, 2661:8, 2661:11, 2661:20, 2661:21, 2689:20, 2704:1, 2712:19, 2722:15, 2734:25, 2735:23, 2736:3

**Court's** [1] - 2653:3

**courteous** [1] - 2623:24

**courtesy** [5] - 2624:4, 2658:10, 2658:11, 2757:3, 2757:11

**Courthouse** [1] - 2525:5

**courtroom** [6] - 2530:1, 2594:23, 2701:1, 2708:3, 2708:8, 2724:20

**COURTROOM** [3] - 2527:2, 2529:8, 2542:20

**courts** [1] - 2735:11

**cousin** [3] - 2538:3, 2554:24, 2554:25

**cover** [7] - 2543:4, 2599:17, 2616:22, 2631:15, 2646:12, 2649:13, 2704:6

**coverages** [1] - 2599:16

**covered** [10] - 2599:19, 2616:21,

2630:9, 2631:14, 2703:5, 2704:21, 2705:11, 2705:12, 2706:17, 2707:16

**covering** [1] - 2693:11

**covers** [4] - 2693:17, 2704:5, 2704:13, 2704:16

**crack** [2] - 2606:1, 2606:2

**crazy** [3] - 2616:14, 2616:18, 2617:1

**create** [1] - 2641:9

**creates** [1] - 2751:15

**creating** [1] - 2641:7

**credence** [1] - 2737:12

**credibility** [22] - 2646:18, 2648:17, 2652:18, 2653:1, 2705:17, 2712:7, 2712:10, 2712:16, 2713:1, 2713:15, 2719:3, 2719:10, 2728:1, 2728:22, 2729:8, 2729:12, 2730:13, 2731:24, 2732:4, 2732:15, 2736:19

**credit** [5] - 2601:25, 2602:2, 2602:4, 2602:5, 2602:9

**creeping** [1] - 2546:22

**crew** [5] - 2566:6, 2579:14, 2610:23, 2612:19

**crews** [1] - 2566:1

**crime** [51] - 2587:4, 2590:15, 2599:1, 2601:4, 2602:8, 2697:4, 2722:13, 2737:23, 2737:24, 2744:21, 2744:22, 2744:23, 2744:24, 2745:2, 2745:6, 2745:7, 2745:20, 2748:3, 2748:4, 2748:16, 2749:14, 2749:16, 2749:20, 2750:16, 2751:11, 2751:12, 2751:14, 2751:17, 2751:19, 2752:3, 2752:5, 2752:7, 2752:8, 2752:10, 2752:12, 2752:16, 2752:17, 2752:19, 2752:20, 2752:21, 2752:23, 2753:3, 2753:5, 2753:6, 2753:20, 2753:23, 2754:1, 2754:4

**crimes** [11] - 2569:8, 2595:23, 2605:16, 2699:4, 2699:8, 2700:10, 2703:3, 2716:24, 2722:9, 2749:12, 2757:16

**CRIMINAL** [1] - 2525:10

**criminal** [32] - 2527:2, 2544:16, 2598:1, 2599:17, 2600:11, 2604:16, 2615:10, 2615:12, 2626:21, 2626:25, 2644:22, 2645:2, 2706:7, 2708:11, 2716:17, 2722:20, 2736:8, 2736:9, 2740:8, 2741:2, 2744:18, 2745:22, 2746:8, 2746:10, 2748:2, 2751:5, 2751:15, 2752:10, 2752:24, 2753:8, 2753:11

**criminally** [1] - 2737:6

**criminals** [1] - 2626:18

**cross** [14] - 2594:20, 2595:2, 2617:19, 2631:5, 2632:4, 2639:17, 2642:15, 2643:25, 2652:14, 2654:22, 2663:14, 2696:16, 2722:23, 2730:12

**CROSS** [11] - 2560:13, 2579:1, 2595:5, 2655:1, 2676:3, 2696:17, 2760:9, 2760:10, 2760:12, 2760:18, 2760:21

**cross-examination** [11] - 2594:20, 2595:2, 2631:5, 2632:4, 2639:17, 2642:15, 2643:25, 2654:22, 2663:14, 2696:16, 2730:12

**CROSS-EXAMINATION** [11] - 2560:13, 2579:1, 2595:5, 2655:1, 2676:3, 2696:17, 2760:9, 2760:10, 2760:12, 2760:18, 2760:21

**cross-examining** [1] - 2722:23

**crossed** [4] - 2536:19, 2537:13, 2555:15, 2742:3

**crossing** [1] - 2555:16

**crucifix** [1] - 2603:6

**CSR** [1] - 2526:10

**culinary** [1] - 2530:9

**culled** [1] - 2669:17

**culpability** [1] - 2751:16

**curious** [1] - 2660:6

**currency** [2] - 2656:1, 2656:3

**custody** [4] - 2567:23, 2576:25, 2638:6, 2692:9

**customs** [1] - 2754:10

**cut** [3] - 2558:19, 2584:13, 2631:21

**cute** [1] - 2625:8

**cutting** [1] - 2638:22

## D

**damage** [1] - 2707:20

**Damion** [9] - 2527:3, 2564:15, 2574:16, 2575:11, 2589:11, 2589:17, 2685:24, 2721:9, 2742:18

**DAMION** [1] - 2525:7

**danger** [2] - 2561:10, 2727:20

**dangerous** [1] - 2588:15

**Darryl** [4] - 2581:8, 2581:9, 2582:13

**Darryl's** [1] - 2581:19

**data** [2] - 2676:18, 2676:21

**DataHand** [1] - 2756:8

**date** [9] - 2543:14, 2576:21, 2600:15, 2635:19, 2674:6, 2695:13, 2741:24, 2742:1

**dates** [3] - 2573:12, 2676:11, 2741:23

**daughter** [2] - 2665:6, 2665:24

**daughter's** [1] - 2549:17

**David** [1] - 2603:7

**DAVID** [1] - 2525:20

**Davis** [18] - 2564:19, 2564:22, 2564:25, 2565:7, 2565:15, 2576:16, 2577:16, 2577:24, 2578:7, 2578:11, 2579:23, 2580:5, 2580:8, 2593:13, 2593:24, 2598:6, 2616:14, 2616:16

**davis'** [2] - 2617:4

**day's** [2] - 2651:5, 2651:8

**Dayananda** [3] - 2674:20, 2715:20, 2717:6

**DAYANANDA** [41] - 2525:15, 2648:9, 2648:12, 2648:15, 2649:4, 2649:10, 2653:13, 2654:3, 2654:7, 2654:10, 2654:14, 2665:25, 2689:8, 2699:15, 2701:7, 2701:10, 2701:14, 2701:20, 2701:23, 2702:5, 2702:9, 2702:12, 2702:21, 2703:5, 2703:9, 2703:14, 2703:20, 2704:3, 2705:3, 2705:7, 2705:19, 2705:21, 2706:10, 2706:13,

2710:19, 2714:19, 2714:24, 2715:5, 2715:7, 2715:16, 2717:24

**days** [7] - 2527:11, 2569:16, 2616:6, 2616:7, 2687:7, 2694:13, 2717:17

**dead** [7] - 2569:21, 2574:13, 2582:7, 2582:9, 2582:13, 2582:17, 2727:18

**deal** [10] - 2527:20, 2532:11, 2532:23, 2584:12, 2584:15, 2605:8, 2615:2, 2645:4, 2649:23, 2705:10

**dealer** [2] - 2579:17, 2581:25

**dealers** [2] - 2578:14, 2579:8

**dealing** [12] - 2532:9, 2532:10, 2532:22, 2549:25, 2564:3, 2570:13, 2570:16, 2578:17, 2588:11, 2615:16, 2645:3, 2744:13

**dealings** [2] - 2578:6, 2602:4

**deals** [3] - 2666:24, 2700:5, 2746:23

**dealt** [7] - 2535:11, 2535:13, 2566:2, 2566:3, 2566:10, 2566:11, 2652:19

**death** [9] - 2549:5, 2568:4, 2568:6, 2568:14, 2568:18, 2568:22, 2569:25, 2620:2, 2636:20

**decade** [1] - 2709:1

**December** [3] - 2598:7, 2685:24

**decide** [11] - 2577:2, 2705:24, 2719:5, 2726:6, 2729:10, 2730:1, 2732:2, 2732:13, 2734:3, 2736:16, 2739:14

**decided** [12] - 2533:17, 2545:22, 2555:9, 2577:4, 2577:16, 2577:20, 2577:22, 2608:7, 2609:23, 2622:12, 2714:10, 2755:18

**decides** [1] - 2736:18

**deciding** [9] - 2646:23, 2723:24, 2731:23, 2732:3, 2733:5, 2734:7, 2735:17, 2737:12, 2738:19

**decision** [11] - 2650:8, 2707:2, 2711:8, 2720:9, 2725:16, 2727:14, 2728:7, 2729:21, 2730:3, 2730:6, 2732:23

**declarant** [2] - 2712:18, 2712:22

**declarant's** [1] - 2712:20

**declarations** [2] - 2738:5, 2738:9

**deduced** [1] - 2727:3

**deduction** [1] - 2726:9

**deeds** [1] - 2715:15

**deemed** [2] - 2707:17, 2738:7

**deems** [1] - 2736:1

**deep** [1] - 2645:22

**defend** [1] - 2645:20

**defendant** [74] - 2633:19, 2643:9, 2643:10, 2650:5, 2685:24, 2687:18, 2687:19, 2689:21, 2689:22, 2690:2, 2711:18, 2721:10, 2721:12, 2721:13, 2721:19, 2721:20, 2721:23, 2721:24, 2722:12, 2722:16, 2722:19, 2722:20, 2722:22, 2723:2, 2723:15, 2723:16, 2723:24, 2725:19, 2730:22, 2735:14, 2738:11, 2738:15, 2739:1, 2740:8, 2740:12, 2740:14, 2740:15, 2741:11, 2741:19, 2742:16, 2744:25, 2745:13, 2746:25, 2747:13, 2747:15, 2747:18,

2747:22, 2748:8, 2748:9, 2748:22, 2749:7, 2749:19, 2752:4, 2752:6, 2752:15, 2752:18, 2752:21, 2752:23, 2752:24, 2753:2, 2753:4, 2753:12, 2753:15, 2753:19, 2753:22, 2753:24, 2754:4, 2755:20

**DEFENDANT** [2] - 2525:19, 2525:23

**defendant's** [12] - 2633:1, 2633:10, 2714:2, 2720:19, 2725:20, 2726:22, 2734:1, 2738:16, 2738:20, 2740:11, 2748:11, 2749:1

**Defendant's** [2] - 2633:23, 2702:14, 2708:10, 2762:4

**defendants** [15] - 2651:1, 2651:15, 2688:6, 2688:9, 2689:23, 2720:10, 2721:8, 2721:17, 2721:18, 2729:14, 2737:16, 2737:21, 2740:17, 2742:15, 2757:17

**Defendants** [2] - 2525:8, 2632:7

**defendants'** [3] - 2755:10, 2756:8, 2756:12

**defense** [14] - 2648:5, 2652:12, 2652:20, 2653:22, 2653:23, 2685:14, 2688:15, 2689:5, 2690:19, 2707:1, 2710:15, 2726:4, 2729:20, 2740:16

**deferred** [3] - 2707:1, 2707:6

**define** [2] - 2716:16, 2742:23

**definitely** [3] - 2588:20, 2603:16, 2716:4

**definition** [8] - 2608:18, 2749:11, 2749:17, 2750:7, 2750:8, 2750:11, 2751:5, 2751:6

**definitions** [4] - 2742:12, 2743:1, 2743:9, 2744:12

**degree** [1] - 2657:11

**Degree** [2] - 2706:9, 2708:14

**deity** [1] - 2608:11

**DeKalb** [2] - 2616:24, 2623:18

**deliberate** [1] - 2758:2

**deliberately** [2] - 2731:19, 2747:1

**deliberating** [1] - 2727:8

**deliberations** [12] - 2651:13, 2700:12, 2700:18, 2717:2, 2722:5, 2728:12, 2736:21, 2755:2, 2755:3, 2757:17, 2757:22, 2758:6

**delicious** [1] - 2530:7

**deliver** [1] - 2716:3

**delivering** [1] - 2717:7

**Delivery** [1] - 2661:22

**demand** [1] - 2561:2

**demeanor** [1] - 2731:25

**demonstrating** [1] - 2746:8

**deny** [2] - 2528:9, 2712:22

**department** [1] - 2696:12

**Department** [3] - 2612:15, 2614:23, 2686:13

**dependant** [1] - 2651:9

**depicted** [1] - 2686:13

**depleted** [2] - 2612:1, 2612:8

**deposit** [1] - 2656:10

**deposited** [5] - 2634:7, 2656:4, 2656:15, 2656:17, 2656:21

**DEPUTY** [3] - 2527:2, 2529:8, 2542:20
**described** [2] - 2589:8, 2607:16
**describes** [2] - 2608:16, 2741:18
**describing** [2] - 2571:15, 2621:12
**description** [2] - 2666:16, 2689:3
**descriptions** [1] - 2547:3
**deserves** [3] - 2731:17, 2732:17, 2733:7
**deserving** [1] - 2732:11
**design** [2] - 2746:5, 2746:21
**Desperado** [4] - 2553:6, 2553:18, 2554:10, 2631:20
**despite** [1] - 2569:13
**detail** [3] - 2613:5, 2734:13, 2757:15
**detailed** [1] - 2629:16
**details** [5] - 2559:6, 2632:18, 2659:12, 2691:22, 2747:16
**detainees** [2] - 2638:11, 2638:13
**detected** [1] - 2737:3
**detectives** [2] - 2576:15, 2577:15
**Detention** [1] - 2709:11
**determination** [7] - 2650:7, 2712:4, 2734:9, 2736:2, 2744:2, 2744:6, 2755:8
**determinations** [1] - 2713:15
**determine** [13] - 2711:21, 2718:8, 2719:3, 2731:18, 2731:20, 2734:17, 2735:11, 2738:20, 2740:5, 2744:8, 2750:8, 2753:3, 2757:7
**determined** [3] - 2590:6, 2719:6, 2721:10
**determining** [6] - 2719:11, 2723:12, 2732:15, 2734:20, 2746:18, 2748:8
**DG1** [3] - 2633:22, 2633:23, 2762:4
**DH** [12] - 2702:15, 2704:19, 2704:20, 2706:7, 2708:11, 2708:15, 2708:18, 2708:25, 2709:3, 2710:6, 2710:11, 2710:12
**DH1** [1] - 2633:22
**diamond** [6] - 2641:12, 2641:14, 2641:16, 2641:17, 2641:19, 2641:20
**diamonds** [6] - 2641:17, 2641:18, 2641:21, 2641:23, 2642:1, 2660:1
**die** [3] - 2619:8, 2619:9, 2619:13
**died** [1] - 2545:7
**difference** [4] - 2596:10, 2703:19, 2727:1, 2749:18
**different** [21] - 2531:6, 2531:7, 2531:23, 2532:8, 2541:16, 2549:7, 2561:12, 2566:1, 2566:9, 2571:18, 2588:19, 2655:23, 2703:12, 2703:14, 2716:10, 2718:9, 2726:2, 2729:19, 2744:21, 2749:4
**differs** [1] - 2749:16
**difficult** [1] - 2705:13
**direct** [21] - 2660:12, 2662:20, 2687:16, 2723:25, 2724:1, 2724:4, 2724:13, 2724:19, 2724:22, 2724:24, 2725:2, 2725:3, 2725:12, 2725:18, 2725:21, 2726:3, 2726:11, 2726:19, 2730:11, 2746:11, 2746:13
**DIRECT** [7] - 2530:18, 2668:3, 2690:23,

2693:1, 2760:7, 2760:17, 2760:20
**direction** [2] - 2555:10, 2559:21
**directly** [5] - 2546:18, 2661:1, 2744:4, 2751:14, 2753:3
**directory** [1] - 2661:4
**disadvantages** [1] - 2631:5
**disappeared** [1] - 2559:23
**discard** [1] - 2602:12
**discharge** [2] - 2695:22, 2698:4
**discharged** [3] - 2697:23, 2698:1, 2698:15
**discipline** [1] - 2651:19
**disciplined** [1] - 2703:24
**disclose** [1] - 2530:3
**disclosure** [1] - 2530:2
**discovered** [1] - 2631:3
**discretion** [2] - 2652:16, 2735:24
**discuss** [4] - 2556:7, 2653:22, 2688:25, 2689:4, 2719:9, 2745:15
**discussed** [7] - 2552:19, 2556:8, 2557:17, 2574:9, 2574:12, 2638:2, 2659:25
**discussing** [1] - 2688:10
**discussion** [8] - 2535:9, 2538:6, 2538:8, 2540:17, 2543:24, 2544:2, 2544:19, 2687:22
**discussions** [2] - 2540:12, 2687:24
**dismissed** [1] - 2594:13
**disobey** [1] - 2744:1
**display** [1] - 2708:13
**displaying** [1] - 2708:14
**disposal** [1] - 2720:2
**dispute** [1] - 2634:11
**disputed** [2] - 2724:10, 2725:8
**disqualifies** [1] - 2530:6
**disregard** [3] - 2659:14, 2731:16, 2744:1
**disrespectful** [1] - 2528:22
**distanced** [1] - 2589:20
**distinct** [1] - 2749:3
**distinction** [1] - 2725:18
**distract** [1] - 2729:8
**distracted** [1] - 2553:15
**distressed** [1] - 2727:16
**distribute** [2] - 2599:10, 2599:13
**distributing** [1] - 2599:8
**distribution** [4] - 2599:9, 2599:13, 2599:18, 2599:20
**DISTRICT** [3] - 2525:1, 2525:1, 2525:11
**District** [3] - 2525:14, 2594:6, 2594:11
**diversity** [1] - 2720:22
**divided** [1] - 2716:14
**Division** [5] - 2690:10, 2691:15, 2691:17, 2693:15, 2694:3
**DJ** [1] - 2662:7
**doctors** [1] - 2732:24
**document** [18] - 2528:13, 2645:8, 2648:22, 2673:14, 2702:8, 2704:9, 2704:10, 2705:1, 2706:10, 2708:10, 2708:18, 2708:24, 2709:2, 2710:6, 2716:1, 2716:8, 2716:11, 2721:16

**documents** [23] - 2652:6, 2669:18, 2670:2, 2670:3, 2670:5, 2670:6, 2671:23, 2672:3, 2684:25, 2688:24, 2689:5, 2689:17, 2701:6, 2701:10, 2701:12, 2701:13, 2702:13, 2704:18, 2705:16, 2706:2, 2706:19, 2706:22, 2710:9
**Dog** [6] - 2537:25, 2538:2, 2538:3, 2538:4, 2538:8, 2538:22
**dollars** [1] - 2539:2
**done** [24] - 2536:6, 2550:23, 2550:24, 2557:16, 2559:15, 2564:9, 2569:13, 2590:25, 2643:4, 2663:5, 2684:9, 2684:21, 2695:16, 2707:20, 2727:8, 2738:12, 2738:15, 2738:22, 2738:24, 2743:25, 2749:9, 2751:13, 2755:24, 2757:21
**door** [4] - 2546:1, 2647:1, 2661:9, 2693:24
**doors** [1] - 2616:24
**dot** [2] - 2674:10, 2674:12
**double** [1] - 2537:13
**double-crossed** [1] - 2537:13
**doubt** [23] - 2572:11, 2716:25, 2720:10, 2722:8, 2722:18, 2723:4, 2723:5, 2723:6, 2723:7, 2723:12, 2723:14, 2723:22, 2726:22, 2736:13, 2738:10, 2740:7, 2745:9, 2745:18, 2749:22, 2751:22, 2754:2
**down** [23] - 2531:5, 2537:18, 2556:25, 2561:6, 2562:15, 2592:18, 2594:6, 2594:24, 2596:7, 2607:10, 2609:12, 2612:12, 2644:10, 2651:23, 2666:20, 2679:7, 2699:11, 2699:12, 2713:17, 2713:19, 2714:4, 2715:25, 2726:24
**downtown** [3] - 2563:4, 2621:5, 2666:15
**drafted** [1] - 2703:6
**draw** [9] - 2719:5, 2725:25, 2726:4, 2726:5, 2726:7, 2726:10, 2726:16, 2739:8
**drawing** [4] - 2726:12, 2726:13, 2727:1, 2727:10
**drawn** [4] - 2670:5, 2726:2, 2726:21, 2740:19
**dress** [1] - 2561:3
**dripping** [1] - 2725:2
**drive** [4] - 2552:2, 2561:3, 2567:17, 2724:10
**driving** [1] - 2567:20
**drop** [2] - 2537:21, 2635:13
**drug** [14] - 2558:11, 2559:9, 2559:10, 2559:11, 2564:3, 2578:14, 2578:17, 2579:8, 2579:17, 2581:25, 2605:16, 2606:17, 2615:16, 2637:25
**drug-related** [1] - 2558:11
**drugs** [18] - 2558:22, 2558:25, 2574:12, 2579:15, 2588:11, 2605:20, 2607:3, 2611:10, 2617:24, 2655:9, 2655:11, 2655:16, 2655:23, 2754:7, 2754:8, 2754:9, 2754:10

**dude** [1] - 2534:14
**dudes** [1] - 2545:1
**due** [3] - 2527:23, 2631:9, 2649:24
**duly** [2] - 2667:19, 2690:19
**duplicative** [3] - 2703:11, 2703:21, 2705:4
**duration** [1] - 2599:1
**during** [39] - 2556:10, 2566:14, 2566:24, 2567:1, 2573:1, 2596:19, 2598:25, 2599:20, 2599:21, 2602:9, 2612:12, 2618:15, 2631:17, 2634:21, 2637:22, 2638:9, 2642:8, 2646:7, 2656:13, 2663:21, 2669:8, 2674:17, 2677:9, 2684:19, 2690:2, 2691:18, 2692:5, 2694:11, 2695:4, 2695:8, 2719:18, 2719:19, 2720:8, 2726:5, 2728:11, 2736:21, 2738:21, 2740:4, 2755:2
**duties** [2] - 2691:12, 2691:19, 2716:16
**duty** [3] - 2718:17, 2722:20, 2734:16
**DWAYNE** [1] - 2760:6
**Dwayne** [3] - 2529:3, 2591:7, 2607:11
**dynamic** [1] - 2646:3

## E

**E-Bay** [13] - 2538:8, 2538:10, 2538:21, 2544:7, 2559:18, 2595:10, 2614:4, 2614:6, 2617:1, 2618:10, 2618:17, 2618:22, 2662:24
**ear** [1] - 2724:2
**early** [12] - 2530:21, 2695:16, 2695:20, 2696:2, 2696:5, 2696:9, 2696:11, 2696:12, 2698:1, 2728:24, 2729:6, 2757:23
**easier** [1] - 2597:20, 2727:8, 2733:15
**East** [4] - 2525:17, 2526:10, 2693:11, 2693:18
**east** [1] - 2639:1
**EASTERN** [1] - 2525:1
**Eastern** [1] - 2525:14
**easy** [1] - 2630:21
**eat** [2] - 2530:6, 2558:17
**educate** [1] - 2691:13
**Edward** [6] - 2581:23, 2582:10, 2702:16, 2708:11, 2708:19, 2709:8
**effect** [3] - 2649:15, 2709:24, 2709:25
**effectively** [1] - 2754:14
**effort** [4] - 2691:25, 2715:20, 2750:18, 2755:12
**eight** [7] - 2590:14, 2604:25, 2667:23, 2667:24, 2667:25, 2686:6, 2686:7
**eighty** [1] - 2572:12
**either** [15] - 2566:8, 2606:4, 2609:11, 2629:16, 2633:4, 2707:1, 2719:22, 2723:19, 2726:11, 2740:19, 2741:11, 2743:25, 2744:24, 2752:4, 2752:14
**elaborate** [2] - 2530:14, 2647:17
**element** [4] - 2723:15, 2746:23, 2750:10, 2752:13
**elements** [7] - 2716:23, 2716:24, 2745:8, 2749:21, 2750:6, 2750:9, 2751:23

**elevator** [3] - 2616:17, 2661:8, 2661:13
**eligible** [1] - 2695:22
**Elmo** [2] - 2597:19, 2708:13
**Empire** [1] - 2629:6
**employment** [1] - 2626:15
**encounter** [2] - 2566:24, 2567:1
**encourage** [1] - 2753:3
**encourages** [1] - 2747:5
**end** [10] - 2583:9, 2609:14, 2651:3, 2653:21, 2684:13, 2684:14, 2688:6, 2695:25, 2733:18, 2738:1
**ended** [2] - 2674:17
**ending** [2] - 2674:13, 2675:16
**ends** [2] - 2674:14, 2748:25
**enemies** [3] - 2578:11, 2578:14, 2579:24
**enforcement** [8] - 2561:7, 2697:2, 2697:11, 2732:8, 2732:10, 2732:16, 2733:1, 2739:22
**engage** [5] - 2563:10, 2713:16, 2727:20, 2740:22, 2746:10
**engaged** [6] - 2601:9, 2622:19, 2628:20, 2629:2, 2709:9, 2709:15
**engaging** [2] - 2656:6, 2728:3
**enhances** [2] - 2714:4, 2714:13
**enter** [2] - 2735:7, 2737:25
**entered** [9] - 2704:23, 2704:25, 2705:2, 2709:1, 2709:23, 2710:8, 2745:10, 2745:18, 2745:24
**enterprise** [1] - 2540:5
**enters** [2] - 2530:1, 2708:3
**entire** [7] - 2558:2, 2634:13, 2640:19, 2641:3, 2644:22, 2740:12, 2747:20
**entirely** [2] - 2731:20, 2744:21
**entirety** [1] - 2556:8
**entitled** [4] - 2650:17, 2650:19, 2721:4, 2756:20
**entitles** [1] - 2721:2
**enumerated** [1] - 2626:11
**equally** [1] - 2654:4
**equals** [1] - 2721:6
**Eric** [6] - 2691:5, 2693:25, 2694:3, 2694:14, 2696:23, 2697:8
**error** [2] - 2644:4, 2681:25
**escape** [1] - 2612:19
**especially** [1] - 2639:16
**ESQ** [5] - 2525:20, 2525:20, 2525:24, 2526:3, 2526:6
**essentially** [3] - 2596:3, 2601:4, 2716:18
**establish** [7] - 2569:24, 2663:9, 2741:24, 2745:8, 2748:12, 2749:21, 2753:1
**established** [3] - 2663:4, 2726:11, 2746:11
**establishment** [6] - 2532:23, 2533:6, 2534:23, 2534:24, 2536:12, 2557:10
**etc** [1] - 2599:5
**etcetera** [1] - 2621:5
**evaluate** [1] - 2596:13
**evaluation** [1] - 2645:19

**evasive** [1] - 2730:9
**event** [4] - 2540:1, 2599:4, 2613:25, 2716:21
**events** [1] - 2620:2
**eventually** [4] - 2618:12, 2618:19, 2622:10, 2623:20
**everyday** [1] - 2744:7
**evidence** [166] - 2527:20, 2528:1, 2528:5, 2528:12, 2528:13, 2542:9, 2542:10, 2542:11, 2542:18, 2544:8, 2597:18, 2632:12, 2632:25, 2633:16, 2633:23, 2634:16, 2635:13, 2639:13, 2639:15, 2640:24, 2643:14, 2643:23, 2644:23, 2645:16, 2645:19, 2646:17, 2647:11, 2647:12, 2648:20, 2648:23, 2650:5, 2650:21, 2652:4, 2652:6, 2662:18, 2666:22, 2668:24, 2669:4, 2669:6, 2669:13, 2669:18, 2670:4, 2670:7, 2671:23, 2672:2, 2672:3, 2673:3, 2673:8, 2673:13, 2674:23, 2679:8, 2679:14, 2679:21, 2679:23, 2684:5, 2684:19, 2684:20, 2685:1, 2685:8, 2685:13, 2687:15, 2689:12, 2689:25, 2690:1, 2701:22, 2704:16, 2706:16, 2706:19, 2708:7, 2708:16, 2708:24, 2710:20, 2711:8, 2711:17, 2712:13, 2712:16, 2712:17, 2712:20, 2712:23, 2712:25, 2713:10, 2719:2, 2719:12, 2719:15, 2719:17, 2719:18, 2719:21, 2719:23, 2719:25, 2721:11, 2721:16, 2722:11, 2722:12, 2722:14, 2722:21, 2722:22, 2723:18, 2723:23, 2723:25, 2724:1, 2724:4, 2724:5, 2724:6, 2724:9, 2724:13, 2724:19, 2724:22, 2724:24, 2725:2, 2725:3, 2725:7, 2725:11, 2725:12, 2725:15, 2725:18, 2725:21, 2725:22, 2725:24, 2726:1, 2726:3, 2726:12, 2726:14, 2726:15, 2726:20, 2726:21, 2727:2, 2727:9, 2727:10, 2727:25, 2728:6, 2728:13, 2729:15, 2730:1, 2731:10, 2731:22, 2731:25, 2732:13, 2732:23, 2733:8, 2733:22, 2733:24, 2734:1, 2734:2, 2734:17, 2735:2, 2737:11, 2737:18, 2737:22, 2739:1, 2739:3, 2740:5, 2740:10, 2740:16, 2741:7, 2741:18, 2741:20, 2741:25, 2747:21, 2748:1, 2755:8
**evidentiary** [3] - 2652:4, 2652:6, 2702:24
**exact** [5] - 2545:15, 2574:17, 2666:16, 2695:14, 2741:24
**exactly** [19] - 2528:2, 2533:3, 2554:1, 2584:18, 2585:19, 2592:8, 2606:5, 2610:11, 2619:16, 2628:2, 2649:2, 2665:20, 2666:5, 2666:16, 2697:22, 2697:24, 2712:23, 2716:4, 2724:1
**examination** [14] - 2594:20, 2595:2, 2631:5, 2632:4, 2639:17, 2642:15, 2643:25, 2654:22, 2660:12, 2663:14, 2690:3, 2696:16, 2730:11, 2730:12
**EXAMINATION** [26] - 2530:18, 2560:13,

2579:1, 2595:5, 2655:1, 2660:10, 2666:3, 2668:3, 2676:3, 2690:23, 2693:1, 2696:17, 2698:12, 2699:1, 2760:7, 2760:9, 2760:10, 2760:12, 2760:14, 2760:15, 2760:17, 2760:18, 2760:20, 2760:21, 2760:23, 2761:1

**examine** [2] - 2678:22, 2679:2

**examined** [2] - 2667:20, 2690:20

**examining** [1] - 2722:23

**example** [16] - 2527:18, 2533:18, 2533:20, 2533:24, 2575:8, 2576:10, 2597:9, 2650:23, 2685:2, 2724:12, 2727:11, 2727:20, 2732:24, 2732:25, 2741:7, 2754:5

**except** [1] - 2669:20

**exception** [2] - 2669:15, 2701:9

**exchange** [2] - 2656:11, 2735:4

**exchanged** [2] - 2655:18, 2655:19

**exchanging** [1] - 2533:8

**exclusive** [3] - 2719:1, 2720:5, 2734:16

**excuse** [5] - 2600:14, 2619:25, 2621:19, 2675:20, 2694:2

**executive** [1] - 2709:20

**exercise** [2] - 2713:23, 2740:17

**Exhibit** [40] - 2527:18, 2542:8, 2543:5, 2544:9, 2597:19, 2633:23, 2669:5, 2678:10, 2679:22, 2680:1, 2680:5, 2680:8, 2680:10, 2680:12, 2680:14, 2680:17, 2680:20, 2680:22, 2681:13, 2681:15, 2681:17, 2681:19, 2681:22, 2682:10, 2682:13, 2683:1, 2683:8, 2683:11, 2683:14, 2683:16, 2683:20, 2683:22, 2686:3, 2686:5, 2686:11, 2702:15, 2708:11, 2762:4, 2762:6, 2762:8

**exhibit** [13] - 2528:5, 2542:14, 2544:10, 2625:3, 2625:8, 2633:1, 2633:10, 2633:19, 2634:17, 2671:11, 2686:8, 2686:14, 2720:2

**Exhibits** [2] - 2668:12, 2681:11

**exhibits** [19] - 2527:24, 2668:24, 2669:2, 2669:3, 2669:4, 2679:16, 2680:24, 2681:4, 2681:7, 2681:24, 2682:4, 2682:6, 2682:16, 2682:23, 2683:4, 2719:25, 2720:2, 2720:3, 2740:3

**existed** [2] - 2746:18, 2746:21

**existence** [10] - 2644:18, 2650:1, 2738:21, 2739:18, 2745:16, 2746:9, 2746:14, 2747:21, 2747:23, 2750:20

**existing** [1] - 2747:8

**exists** [2] - 2565:2, 2745:4

**expected** [1] - 2694:25

**expensive** [1] - 2566:18

**experience** [6] - 2696:25, 2699:3, 2699:4, 2725:25, 2726:18, 2732:6

**experienced** [1] - 2732:22

**expert** [6] - 2686:21, 2732:18, 2732:19, 2732:20, 2732:24, 2733:10

**expert's** [3] - 2733:2, 2733:3, 2733:6

**expiration** [1] - 2695:13

**explain** [28] - 2530:13, 2534:10, 2558:13, 2562:3, 2562:4, 2610:13, 2610:14, 2635:12, 2643:18, 2644:7, 2647:4, 2649:19, 2700:4, 2704:20, 2710:21, 2710:23, 2712:1, 2712:5, 2712:22, 2713:7, 2714:15, 2716:6, 2743:7, 2744:10, 2744:17, 2757:15, 2757:17

**explained** [8] - 2531:2, 2535:10, 2557:3, 2621:3, 2689:22, 2694:2, 2725:5, 2739:1

**explaining** [3] - 2533:5, 2548:15, 2641:18

**explanation** [4] - 2713:9, 2734:13, 2734:14, 2742:22

**explanations** [1] - 2731:25

**explored** [1] - 2630:12

**express** [3] - 2731:8, 2732:19, 2745:24

**expressed** [1] - 2749:24

**expressing** [1] - 2651:25

**expressly** [1] - 2720:11

**extemporaneously** [1] - 2647:17

**extending** [2] - 2757:3, 2757:11

**extensive** [1] - 2530:13

**extensively** [2] - 2647:14, 2716:5

**extent** [4] - 2621:3, 2668:21, 2710:9, 2749:1

**extort** [2] - 2561:23, 2562:2

**extorting** [1] - 2560:18

**extortion** [4] - 2564:1, 2610:1, 2610:3, 2610:11

**extra** [1] - 2624:16

**extremist** [1] - 2606:15

**eye** [3] - 2546:22, 2572:14, 2756:24

**eyeglasses** [1] - 2714:5

**eyes** [1] - 2750:23

**eyewitness** [2] - 2593:15, 2617:7

# F

**face** [13] - 2546:19, 2568:18, 2575:20, 2575:23, 2585:9, 2585:10, 2585:14, 2585:17, 2586:10, 2586:12, 2729:19

**face-to-face** [2] - 2575:20, 2575:23

**faced** [2] - 2567:25, 2568:3

**faces** [1] - 2708:21

**facetious** [1] - 2533:13

**facilitated** [1] - 2753:3

**facilities** [1] - 2655:4

**facility** [2] - 2655:16, 2691:20

**facing** [1] - 2537:11

**fact** [32] - 2568:16, 2569:18, 2581:16, 2584:23, 2605:7, 2614:10, 2615:10, 2618:19, 2622:9, 2643:14, 2647:2, 2647:15, 2651:22, 2652:7, 2652:14, 2655:3, 2659:2, 2685:12, 2712:11, 2719:20, 2721:1, 2724:10, 2725:5, 2725:8, 2729:9, 2734:7, 2734:12, 2739:18, 2739:19, 2741:10, 2742:7, 2748:15

**factor** [1] - 2748:7

**factors** [2] - 2732:14, 2735:21

**facts** [24] - 2646:17, 2718:8, 2719:2, 2719:6, 2719:11, 2720:6, 2724:10, 2725:5, 2725:8, 2725:12, 2725:16, 2726:2, 2726:10, 2726:13, 2726:16, 2727:2, 2727:3, 2731:3, 2731:7, 2731:9, 2732:24, 2754:6, 2757:5

**factual** [3] - 2625:7, 2729:18, 2757:4

**factually** [1] - 2757:7

**fading** [1] - 2717:16

**fail** [3] - 2597:14, 2743:24, 2745:5

**fair** [4] - 2615:10, 2630:13, 2638:14, 2695:6

**fairly** [2] - 2630:12, 2649:24

**faith** [6] - 2652:12, 2652:19, 2652:23, 2711:5, 2711:6, 2756:17

**fake** [3] - 2566:12, 2641:7, 2641:9

**fall** [2] - 2555:19, 2654:13

**fallen** [1] - 2714:11

**falling** [1] - 2641:25

**false** [17] - 2590:21, 2590:22, 2591:4, 2591:10, 2593:18, 2597:9, 2697:1, 2697:10, 2697:16, 2701:17, 2702:16, 2704:9, 2709:14, 2709:19, 2710:7, 2734:10

**falsely** [2] - 2731:19, 2737:1

**familiar** [3] - 2627:22, 2632:15, 2677:17

**family** [12] - 2548:18, 2640:19, 2641:3, 2655:11, 2665:4, 2665:22, 2691:24, 2694:1, 2694:5, 2694:12, 2694:15, 2695:3

**far** [8] - 2539:8, 2580:3, 2608:16, 2630:7, 2661:4, 2663:10, 2672:3, 2757:4

**Farmers** [3] - 2587:15, 2587:16, 2587:17

**fashion** [1] - 2541:9

**fast** [2] - 2529:7, 2652:19

**father** [4] - 2547:10, 2582:2, 2582:10, 2657:6

**father's** [2] - 2581:22, 2581:23

**fathers** [1] - 2579:25

**favorable** [1] - 2736:25

**FB** [1] - 2525:4

**FBI** [3] - 2648:16, 2668:6, 2709:13

**fear** [3] - 2720:14, 2720:15, 2754:23

**feared** [1] - 2581:11

**February** [4] - 2618:24, 2673:10, 2674:18, 2676:13

**federal** [11] - 2665:9, 2735:11, 2744:15, 2749:12, 2749:17, 2750:7, 2750:11, 2751:3, 2751:5, 2751:10

**fee** [1] - 2630:19

**fell** [1] - 2659:12

**felonies** [1] - 2611:20

**felony** [1] - 2598:6

**felt** [2] - 2620:24, 2664:15

**female** [3] - 2585:2, 2585:3, 2709:10

**females** [1] - 2620:24

**fertility** [2] - 2608:20, 2608:21

**few** [12] - 2527:11, 2545:17, 2601:8,

2618:20, 2618:23, 2625:9, 2627:10, 2688:16, 2694:13, 2700:14, 2725:1, 2736:20
**fictional** [1] - 2607:23
**field** [4] - 2691:22, 2693:23, 2694:11, 2732:22
**Fifteen** [1] - 2742:17
**fifty** [3] - 2667:24, 2667:25, 2686:7
**fifty-eight** [3] - 2667:24, 2667:25, 2686:7
**fight** [1] - 2613:15
**fighting** [1] - 2628:19
**figure** [2] - 2573:18, 2573:19
**figured** [1] - 2715:20
**filed** [1] - 2735:18
**files** [1] - 2697:8
**final** [3] - 2710:6, 2736:2, 2754:12
**finally** [4] - 2600:2, 2686:18, 2691:1, 2741:1
**financial** [1] - 2632:16
**fine** [11] - 2528:20, 2539:24, 2551:11, 2643:6, 2651:6, 2653:1, 2701:23, 2704:17, 2706:21, 2715:23, 2729:7
**Fine** [1] - 2672:10
**finish** [3] - 2542:4, 2651:8, 2692:3
**finished** [5] - 2530:20, 2637:9, 2637:13, 2637:19, 2642:3
**finishes** [1] - 2755:17
**finishing** [1] - 2689:2
**fire** [1] - 2624:19
**firearm** [7] - 2536:24, 2548:5, 2552:7, 2620:17, 2620:25, 2622:19, 2708:15
**firearms** [4] - 2588:13, 2599:23, 2630:14, 2630:21
**fired** [3] - 2537:5, 2555:17, 2624:18
**firing** [4] - 2537:12, 2559:18, 2559:19, 2559:20
**First** [2] - 2706:9, 2708:14
**first** [56] - 2535:8, 2536:18, 2537:1, 2537:12, 2542:13, 2545:23, 2565:4, 2565:6, 2565:8, 2565:11, 2580:24, 2604:17, 2614:4, 2621:12, 2632:14, 2633:13, 2633:14, 2638:20, 2651:4, 2654:7, 2662:5, 2662:11, 2663:18, 2667:3, 2667:19, 2679:24, 2685:19, 2690:19, 2693:19, 2693:22, 2700:4, 2700:8, 2708:10, 2708:22, 2714:7, 2715:12, 2716:14, 2717:3, 2717:15, 2727:12, 2738:20, 2741:15, 2744:15, 2745:10, 2745:17, 2749:23, 2750:6, 2750:9, 2752:2, 2752:7, 2752:11, 2752:15, 2755:15, 2755:18, 2755:20, 2757:20
**fists** [1] - 2629:3
**Five** [1] - 2742:18
**five** [4] - 2579:18, 2599:21, 2616:6, 2709:22
**fix** [1] - 2569:15
**flashing** [1] - 2536:21
**flat** [4] - 2578:1, 2578:2, 2578:7, 2580:18

**Flatbush** [2] - 2543:18, 2558:9
**fled** [1] - 2541:20
**flexibility** [1] - 2756:25
**flexible** [1] - 2758:8
**focus** [2] - 2527:13, 2728:25
**focused** [1] - 2741:6
**fogged** [1] - 2684:2
**folks** [7] - 2612:13, 2639:11, 2687:15, 2722:15, 2755:18, 2758:3
**follow** [8] - 2535:8, 2536:9, 2561:19, 2597:21, 2649:2, 2694:11, 2716:7, 2718:11
**follow-up** [1] - 2694:11
**followed** [2] - 2534:25, 2536:12
**following** [8] - 2529:9, 2578:20, 2671:8, 2685:25, 2692:10, 2709:6, 2745:8, 2749:21, 2753:21
**follows** [3] - 2667:20, 2690:20, 2709:5
**food** [1] - 2665:16
**fool** [1] - 2591:4
**fooling** [1] - 2563:16
**Footman** [1] - 2614:6
**Footman's** [1] - 2614:2
**FOR** [4] - 2525:10, 2525:13, 2525:19, 2525:23
**forbids** [2] - 2743:18, 2743:24
**force** [2] - 2577:20, 2610:17
**forecast** [1] - 2724:17
**foreseeable** [1] - 2738:4
**forget** [1] - 2586:15
**forgot** [5] - 2590:22, 2593:11, 2666:6, 2717:8, 2755:3
**forgotten** [1] - 2659:23
**form** [2] - 2562:14, 2735:13
**formal** [2] - 2714:17, 2745:25
**formulated** [1] - 2676:18
**forth** [7] - 2533:8, 2534:12, 2549:13, 2559:7, 2567:13, 2637:6, 2642:10
**forthright** [1] - 2730:8
**forty** [1] - 2667:23
**forty-eight** [1] - 2667:23
**forward** [3] - 2631:11, 2656:14, 2673:7
**foundation** [2] - 2671:20, 2684:25
**four** [7] - 2562:12, 2586:24, 2613:6, 2615:3, 2616:6, 2645:2, 2679:13
**Four** [2] - 2742:14, 2742:15
**four-part** [1] - 2562:12
**frame** [2] - 2598:24, 2673:10
**framework** [1] - 2735:11
**framing** [3] - 2588:24, 2588:25, 2589:6
**frank** [1] - 2730:8
**fraud** [2] - 2531:5, 2531:11
**FREDERIC** [1] - 2525:11
**free** [2] - 2553:14, 2735:25
**frequently** [4] - 2574:18, 2574:19, 2618:24, 2744:7
**fresh** [1] - 2613:5
**Friday** [7] - 2651:12, 2651:14, 2700:15, 2700:19, 2757:20, 2757:22
**friend** [2] - 2570:4, 2655:16
**friendly** [2] - 2624:2, 2658:22

**friends** [2] - 2623:8, 2656:24
**frightened** [1] - 2572:17
**frightening** [1] - 2564:7
**front** [8] - 2535:11, 2535:23, 2536:12, 2571:25, 2645:21, 2646:18, 2677:25, 2714:6
**fucked** [1] - 2536:1
**full** [4] - 2530:2, 2532:14, 2651:5, 2699:22
**fully** [2] - 2624:14, 2747:16
**funds** [4] - 2612:1, 2612:8, 2634:22, 2656:11
**funeral** [2] - 2618:20, 2662:25
**fur** [1] - 2583:8
**furtherance** [5] - 2738:6, 2738:13, 2738:21, 2738:25, 2750:5, 2750:12
**furthering** [1] - 2747:6
**furthermore** [2] - 2747:8, 2747:18
**furthers** [1] - 2748:17
**fuss** [1] - 2633:8
**future** [2] - 2528:2, 2539:16

## G

**gain** [1] - 2737:8
**gainful** [1] - 2626:15
**gambling** [2] - 2582:14, 2657:8
**game** [5] - 2607:4, 2609:17, 2610:11, 2627:20, 2629:2
**games** [1] - 2593:23
**gang** [4] - 2627:9, 2629:23, 2630:3, 2630:5
**gangster** [1] - 2581:12
**gangsters** [1] - 2531:4
**garbage** [1] - 2602:21
**Gardens** [2] - 2558:14, 2580:10
**garter** [1] - 2583:17
**gathered** [3] - 2532:4, 2676:9, 2676:17
**General** [1] - 2709:13
**general** [11] - 2556:14, 2568:12, 2616:16, 2651:16, 2700:5, 2716:16, 2716:19, 2725:17, 2736:18, 2742:12, 2743:9
**Gerard** [1] - 2598:4
**giggles** [4] - 2607:14, 2607:17, 2609:4, 2609:18
**girl** [7] - 2583:2, 2583:3, 2614:8, 2659:3, 2659:7, 2659:8
**girlfriend** [9] - 2554:21, 2580:9, 2580:12, 2580:20, 2580:22, 2581:1, 2593:20, 2593:21, 2655:14
**girls** [1] - 2642:1
**given** [14] - 2573:12, 2573:24, 2621:24, 2622:9, 2626:8, 2719:24, 2721:21, 2731:21, 2731:22, 2731:25, 2732:14, 2734:19, 2736:18, 2744:9
**glass** [1] - 2616:23
**glasses** [1] - 2726:25
**gleaned** [1] - 2727:3
**gloves** [2] - 2628:15, 2628:25
**glowing** [1] - 2646:6

**goals** [1] - 2748:14
**God** [1] - 2731:22
**gold** [1] - 2571:21
**gorilla** [1] - 2644:20
**Gorney** [1] - 2646:24
**govern** [1] - 2716:16
**GOVERNMENT** [1] - 2525:13
**government** [103] - 2596:20, 2597:1,
  2597:25, 2631:18, 2632:24, 2638:4,
  2638:10, 2643:16, 2644:11, 2647:3,
  2647:15, 2648:16, 2652:10, 2652:15,
  2652:18, 2653:4, 2660:4, 2663:18,
  2663:21, 2667:19, 2670:8, 2671:21,
  2672:5, 2678:9, 2679:8, 2680:24,
  2681:4, 2681:7, 2681:11, 2681:24,
  2682:4, 2682:6, 2682:16, 2682:22,
  2683:4, 2685:7, 2686:1, 2687:11,
  2687:14, 2687:23, 2687:25, 2689:16,
  2689:25, 2690:1, 2701:5, 2709:7,
  2709:20, 2710:18, 2711:2, 2711:4,
  2711:5, 2713:4, 2714:2, 2715:19,
  2716:25, 2717:6, 2717:23, 2721:2,
  2721:6, 2722:7, 2722:18, 2722:23,
  2723:3, 2723:14, 2726:3, 2727:23,
  2728:5, 2729:14, 2729:20, 2730:22,
  2735:3, 2735:7, 2735:12, 2735:22,
  2736:4, 2736:6, 2737:20, 2739:6,
  2739:12, 2739:13, 2739:20, 2739:23,
  2740:3, 2740:5, 2740:11, 2740:14,
  2744:25, 2745:8, 2745:17, 2745:23,
  2746:6, 2749:20, 2751:22, 2752:15,
  2753:18, 2755:9, 2755:14, 2755:15,
  2755:24, 2756:1, 2756:5
**Government** [32] - 2542:8, 2543:5,
  2544:9, 2568:10, 2568:19, 2597:18,
  2680:1, 2680:5, 2680:8, 2680:10,
  2680:12, 2680:14, 2680:17, 2680:19,
  2680:21, 2681:13, 2681:15, 2681:17,
  2681:19, 2681:22, 2682:10, 2682:12,
  2683:1, 2683:8, 2683:11, 2683:14,
  2683:16, 2683:20, 2683:22, 2686:2,
  2686:4, 2686:11
**Government's** [4] - 2669:5, 2679:22,
  2762:6, 2762:8
**government's** [13] - 2596:11, 2643:2,
  2645:15, 2652:12, 2652:23, 2653:21,
  2666:22, 2682:15, 2687:7, 2688:6,
  2723:21, 2740:10, 2751:25
**grab** [3] - 2571:25, 2601:18, 2601:22
**grabbed** [1] - 2601:22
**grade** [1] - 2600:9
**gradually** [1] - 2733:20
**grail** [3] - 2596:4, 2600:7
**grand** [3] - 2535:21, 2568:12, 2579:20
**grandson** [1] - 2665:5
**grant** [2] - 2707:13, 2735:25
**granted** [1] - 2633:19
**GRANTON** [2] - 2525:7, 2525:23
**granton** [2] - 2690:8, 2755:23
**Granton** [20] - 2527:4, 2595:3, 2595:11,
  2617:1, 2689:11, 2691:5, 2693:6,

2693:7, 2693:20, 2693:23, 2694:8,
  2694:14, 2695:2, 2696:21, 2697:1,
  2697:9, 2699:8, 2710:16, 2721:9,
  2742:19
**Granton's** [2] - 2691:10, 2693:21
**graphic** [1] - 2727:19
**grasp** [1] - 2705:14
**great** [6] - 2706:13, 2736:16, 2740:13,
  2757:15, 2758:4, 2758:13
**greater** [2] - 2721:2, 2732:11
**greatly** [1] - 2706:18
**green** [1] - 2555:22
**Gregory** [3] - 2591:11, 2591:16,
  2591:23
**grew** [1] - 2566:11
**group** [2] - 2533:15, 2569:25
**guarantee** [1] - 2644:14
**guard** [2] - 2561:6
**guess** [10] - 2586:6, 2655:13, 2666:24,
  2684:2, 2700:19, 2705:23, 2706:3,
  2711:12, 2715:6, 2727:6
**guesswork** [1] - 2726:14
**guide** [2] - 2716:8, 2755:1
**Guidelines** [1] - 2735:10
**guilt** [16] - 2717:1, 2720:9, 2721:12,
  2722:18, 2723:3, 2723:20, 2725:20,
  2726:22, 2734:1, 2734:2, 2736:13,
  2738:20, 2740:6, 2740:11, 2741:20,
  2749:2
**guilty** [21] - 2595:17, 2595:25, 2604:8,
  2613:8, 2615:1, 2649:6, 2649:7,
  2653:6, 2704:12, 2708:25, 2710:7,
  2722:8, 2723:16, 2723:24, 2723:25,
  2751:12, 2752:25, 2753:13, 2753:16,
  2754:4, 2754:9
**gun** [33] - 2537:4, 2548:8, 2549:2,
  2549:4, 2552:9, 2559:24, 2560:2,
  2560:6, 2571:14, 2572:5, 2572:24,
  2573:5, 2573:9, 2604:6, 2605:13,
  2619:19, 2620:12, 2620:14, 2620:19,
  2621:2, 2621:12, 2621:13, 2621:16,
  2621:17, 2621:18, 2621:24, 2622:2,
  2622:9, 2622:13, 2624:7, 2630:19
**guns** [4] - 2561:3, 2630:17, 2630:24,
  2631:2
**gunshots** [1] - 2619:18
**guy** [24] - 2533:10, 2533:12, 2534:11,
  2534:12, 2534:20, 2535:11, 2540:20,
  2540:22, 2546:8, 2547:22, 2548:4,
  2549:7, 2549:8, 2551:25, 2554:22,
  2559:1, 2567:21, 2582:15, 2608:7,
  2608:15, 2608:24, 2628:3, 2665:16
**guys** [7] - 2531:3, 2531:7, 2537:10,
  2566:10, 2566:11, 2582:17, 2665:10
**gyms** [1] - 2628:23

# H

**hair** [1] - 2638:22
**hal** [1] - 2690:9
**HAL** [3] - 2690:17, 2690:18, 2760:19
**half** [3] - 2536:19, 2636:22, 2756:13

**Hall** [1] - 2690:16
**hallowing** [2] - 2608:19, 2608:21
**hammer** [2] - 2608:14, 2608:24
**hand** [12] - 2546:2, 2546:25, 2555:13,
  2555:15, 2555:16, 2632:10, 2632:23,
  2667:12, 2673:15, 2727:3, 2727:4,
  2753:14
**handed** [1] - 2702:13
**handle** [3] - 2527:16, 2527:21, 2536:4
**hang** [1] - 2561:17
**hard** [9] - 2534:21, 2562:1, 2583:5,
  2644:5, 2651:21, 2651:23, 2653:9,
  2653:10, 2727:11
**hardest** [1] - 2756:20
**HARDY** [2] - 2525:7, 2525:19
**Hardy** [13] - 2527:3, 2564:15, 2574:16,
  2575:11, 2589:11, 2589:17, 2633:21,
  2633:22, 2685:25, 2721:9, 2742:18,
  2755:24
**harm** [3] - 2534:7, 2578:15, 2707:20
**head** [11] - 2637:22, 2661:12, 2678:12,
  2678:15, 2678:19, 2686:9, 2686:11,
  2693:21, 2694:10, 2695:13, 2696:6
**heads** [1] - 2699:17
**heads-up** [1] - 2699:17
**healing** [2] - 2608:19, 2608:21
**hear** [28] - 2530:12, 2536:6, 2543:6,
  2567:20, 2632:3, 2635:5, 2646:11,
  2649:8, 2667:10, 2679:20, 2687:8,
  2687:18, 2698:5, 2707:8, 2712:6,
  2712:12, 2714:24, 2717:6, 2717:22,
  2718:3, 2726:5, 2729:2, 2729:3,
  2743:13, 2744:16, 2749:12, 2751:24,
  2758:3
**heard** [39] - 2531:23, 2544:4, 2544:21,
  2546:11, 2567:16, 2582:1, 2618:23,
  2619:22, 2619:23, 2619:25, 2647:16,
  2650:24, 2657:2, 2657:11, 2673:13,
  2674:23, 2675:11, 2710:20, 2710:24,
  2711:3, 2711:22, 2712:6, 2714:25,
  2724:4, 2724:7, 2728:14, 2728:22,
  2732:18, 2733:22, 2734:21, 2734:23,
  2734:25, 2735:2, 2739:16, 2741:1,
  2742:4, 2744:13, 2755:8
**hearing** [3] - 2545:2, 2619:18, 2711:14
**heart** [2] - 2744:19, 2745:2
**heat** [1] - 2651:21
**heatedness** [1] - 2653:15
**heavily** [2] - 2628:15, 2628:18
**heck** [1] - 2585:4
**Hedda** [1] - 2555:1
**heightened** [1] - 2651:18
**heist** [3] - 2641:17, 2641:19, 2641:20,
  2641:23
**helmet** [1] - 2628:24
**help** [4] - 2717:4, 2730:1, 2749:9,
  2752:20
**helped** [1] - 2566:5
**helpful** [1] - 2754:20
**helping** [1] - 2734:3
**helpless** [1] - 2606:12

**helps** [1] - 2728:25
**hereby** [2] - 2679:25, 2709:6
**HERMAN** [7] - 2526:2, 2526:3, 2538:11, 2633:14, 2665:11, 2717:22, 2755:21
**Herman** [4] - 2593:4, 2642:9, 2710:13, 2755:22
**heroin** [9] - 2558:14, 2558:15, 2599:13, 2599:18, 2599:20, 2605:22, 2605:23, 2616:14, 2686:21
**Herrin** [1] - 2647:8
**herself** [3] - 2730:15, 2731:8, 2734:5
**hesitate** [3] - 2606:3, 2723:7, 2723:9
**hi** [2] - 2623:9, 2623:13
**hiding** [3] - 2630:24, 2631:2, 2730:9
**high** [3] - 2579:3, 2583:9
**highlighted** [1] - 2597:20
**himself** [11] - 2581:25, 2664:20, 2706:2, 2730:15, 2731:8, 2734:5, 2740:15, 2751:12, 2752:18, 2753:8, 2754:5
**hip** [1] - 2561:17
**hip-hop** [1] - 2561:17
**history** [5] - 2547:7, 2551:25, 2615:10, 2706:7, 2708:11
**hit** [4] - 2537:6, 2550:19, 2553:22, 2572:21
**Hoboken** [1] - 2526:7
**hold** [2] - 2713:3, 2744:11
**holding** [1] - 2537:18
**Holly** [1] - 2713:20
**holy** [3] - 2596:4, 2600:7
**home** [17] - 2544:4, 2544:21, 2545:3, 2605:15, 2613:14, 2665:23, 2688:12, 2694:25, 2699:20, 2699:24, 2707:18, 2716:15, 2724:11, 2751:8, 2757:23, 2758:11
**Homeland** [1] - 2686:19
**Homicide** [1] - 2581:9
**homicide** [2] - 2581:11, 2629:18
**Homo's** [1] - 2544:23
**honest** [2] - 2610:20, 2730:19
**honestly** [1] - 2706:1
**Honor** [60] - 2527:8, 2530:17, 2533:22, 2539:20, 2593:10, 2594:16, 2595:4, 2617:10, 2617:12, 2632:11, 2633:24, 2639:22, 2645:1, 2647:25, 2648:9, 2649:4, 2653:3, 2653:13, 2653:20, 2654:17, 2659:17, 2660:9, 2666:25, 2667:5, 2667:8, 2668:15, 2669:3, 2669:15, 2670:13, 2671:5, 2672:10, 2673:6, 2678:9, 2679:5, 2679:16, 2685:9, 2685:15, 2687:21, 2688:20, 2689:8, 2689:19, 2698:9, 2701:4, 2701:7, 2702:1, 2702:5, 2702:10, 2702:21, 2703:5, 2703:20, 2704:20, 2705:22, 2706:21, 2706:25, 2708:9, 2710:15, 2710:19, 2715:16, 2718:4, 2759:7
**Honor's** [1] - 2644:9
**HONORABLE** [1] - 2525:11
**hook** [1] - 2583:18
**hooking** [1] - 2583:21

**hop** [1] - 2561:17
**hope** [3] - 2651:7, 2713:16, 2737:2
**hoped** [2] - 2623:20, 2736:25
**hopefully** [2] - 2653:11, 2699:18
**hopes** [1] - 2751:18
**hoping** [3] - 2568:25, 2601:24, 2715:7
**hospital** [2] - 2618:23, 2619:12
**hostility** [1] - 2731:1
**hot** [1] - 2545:22
**hour** [4] - 2636:22, 2700:6, 2713:18, 2756:13
**hours** [3] - 2529:4, 2637:7, 2700:14
**house** [5] - 2557:2, 2592:17, 2621:5, 2621:15, 2659:7
**household** [1] - 2592:16
**housing** [1] - 2587:18
**how'd** [1] - 2661:19
**Huddy** [1] - 2540:18
**human** [1] - 2727:4
**hundred** [4] - 2539:2, 2572:10, 2572:11, 2579:20, 2656:17, 2656:18, 2656:24, 2689:22
**hundreds** [4] - 2527:25, 2528:1, 2528:7, 2616:10
**hunter** [1] - 2657:13
**hurrying** [1] - 2536:21
**hurting** [2] - 2564:5, 2588:9
**husbands** [1] - 2579:24
**hustling** [1] - 2543:21
**hypothetically** [1] - 2724:22

## I

**Idaho** [1] - 2635:14
**idea** [9] - 2577:23, 2642:19, 2652:11, 2658:4, 2673:9, 2684:16, 2724:17, 2727:17, 2758:14
**identification** [1] - 2668:12
**identified** [2] - 2547:11, 2648:5
**identify** [3] - 2562:16, 2684:11, 2685:13
**identifying** [1] - 2737:6
**identities** [1] - 2747:14
**illegal** [1] - 2749:13
**imagine** [1] - 2642:22
**immediate** [1] - 2623:12
**immediately** [2] - 2546:6, 2663:6
**impart** [1] - 2743:9
**impartial** [1] - 2731:5
**impatient** [1] - 2540:23
**impeach** [1] - 2644:6
**impeaches** [1] - 2643:20
**impeachment** [4] - 2648:7, 2648:10, 2648:20, 2733:12
**impersonate** [1] - 2658:2
**impersonated** [2] - 2598:21, 2658:6
**impersonating** [2] - 2598:17, 2599:5
**implied** [1] - 2749:25
**import** [1] - 2754:7
**importance** [2] - 2729:12, 2730:2
**important** [16] - 2596:11, 2601:1, 2603:17, 2603:20, 2611:13, 2616:22,

2643:13, 2653:16, 2703:24, 2723:10, 2726:8, 2729:21, 2732:1, 2734:12, 2757:24, 2758:7
**importing** [1] - 2754:9
**importunes** [1] - 2751:18
**impose** [3] - 2735:18, 2735:19, 2735:25
**imposed** [1] - 2736:3
**imposes** [1] - 2722:20
**impressed** [1] - 2730:7
**impression** [4] - 2547:9, 2549:8, 2599:19, 2665:5
**imprisonment** [2] - 2708:21, 2708:22
**improper** [2] - 2646:18, 2720:18
**inadequate** [1] - 2671:20
**inappropriate** [1] - 2634:3
**Inc.'s** [3] - 2683:2, 2683:5, 2683:7
**incarcerated** [3] - 2639:24, 2662:3, 2710:4
**incarceration** [1] - 2638:9
**incendiary** [1] - 2656:23
**incentive** [2] - 2627:4, 2730:24
**inches** [1] - 2714:11
**incident** [2] - 2621:16, 2693:22
**include** [5] - 2606:3, 2606:12, 2654:4, 2655:6, 2655:22
**included** [1] - 2627:14
**including** [4] - 2634:6, 2635:1, 2635:8, 2710:1
**inconsequential** [1] - 2731:13
**inconsistency** [2] - 2734:11, 2734:14
**inconsistent** [9] - 2590:7, 2712:20, 2733:13, 2733:24, 2733:25, 2734:2, 2734:18, 2734:19, 2734:24
**incorporate** [1] - 2676:24
**incorrect** [1] - 2686:8
**incumbent** [1] - 2643:9
**indeed** [2] - 2736:11, 2744:6
**independent** [3] - 2639:15, 2719:21, 2732:23
**indicate** [2] - 2634:5, 2720:6
**indicates** [1] - 2697:1
**indicating** [1] - 2714:10
**indication** [1] - 2720:8
**indictment** [16] - 2540:2, 2540:3, 2700:10, 2722:10, 2722:11, 2722:14, 2723:13, 2729:19, 2738:12, 2741:15, 2741:16, 2741:17, 2741:22, 2742:13, 2746:22, 2751:4
**individual** [19] - 2532:20, 2532:21, 2533:17, 2533:18, 2534:23, 2536:9, 2536:23, 2541:19, 2544:11, 2552:25, 2553:6, 2556:12, 2558:24, 2598:12, 2610:18, 2664:18, 2674:3, 2686:13, 2721:20
**individually** [1] - 2721:19
**individuals** [20] - 2532:10, 2534:21, 2535:10, 2535:18, 2536:17, 2540:16, 2541:2, 2544:25, 2547:10, 2555:14, 2558:15, 2566:8, 2566:10, 2610:16, 2638:16, 2671:21, 2721:6, 2741:2, 2741:3, 2741:5

**induced** [1] - 2619:11
**induces** [1] - 2751:11
**infer** [1] - 2746:13
**inference** [7] - 2725:23, 2726:9, 2727:2, 2727:10, 2739:8, 2740:19, 2747:17
**inferences** [10] - 2719:5, 2719:7, 2726:1, 2726:2, 2726:4, 2726:7, 2726:12, 2726:13, 2726:17, 2726:21
**inferred** [1] - 2747:22
**influence** [1] - 2741:10
**influenced** [1] - 2730:21
**information** [51] - 2553:24, 2622:8, 2623:1, 2649:6, 2653:4, 2662:18, 2668:19, 2669:8, 2671:16, 2672:4, 2672:8, 2673:3, 2677:17, 2677:22, 2678:22, 2679:2, 2680:24, 2681:4, 2681:6, 2681:9, 2681:24, 2682:3, 2682:5, 2682:8, 2682:15, 2682:20, 2682:22, 2682:25, 2683:3, 2683:7, 2683:11, 2683:13, 2683:16, 2683:20, 2683:22, 2683:24, 2685:25, 2701:16, 2702:15, 2702:16, 2702:20, 2702:22, 2703:10, 2703:21, 2704:5, 2704:7, 2704:15, 2705:15, 2709:18, 2713:14
**informations** [3] - 2701:16, 2702:10, 2706:15
**informed** [2] - 2631:18, 2747:16
**initial** [1] - 2695:2
**initiation** [5] - 2627:12, 2627:14, 2629:11, 2629:13, 2629:22
**injure** [1] - 2628:21
**injured** [2] - 2609:13, 2609:15
**inmate** [7] - 2632:15, 2633:7, 2634:5, 2634:8, 2656:4, 2656:10, 2659:1
**inmates** [5] - 2656:7, 2660:13, 2665:14, 2665:17, 2665:18
**innocence** [4] - 2721:12, 2723:1, 2723:19, 2723:20
**innocent** [6] - 2627:17, 2722:3, 2722:5, 2729:16, 2734:11, 2743:17
**inquire** [1] - 2675:25
**inquiry** [1] - 2749:6
**inside** [7] - 2532:20, 2534:23, 2537:16, 2557:1, 2557:10, 2658:22, 2665:14
**insignificant** [2] - 2645:23, 2731:13
**Inspector** [1] - 2709:13
**instead** [3] - 2591:7, 2616:6, 2642:10
**instigators** [1] - 2747:10
**instruct** [3] - 2722:4, 2739:8, 2747:12
**instructed** [3] - 2631:19, 2695:7, 2721:14
**instructing** [1] - 2537:21
**instruction** [3] - 2649:13, 2654:4, 2718:12
**instructions** [18] - 2646:10, 2649:16, 2700:5, 2711:11, 2718:7, 2718:10, 2718:11, 2718:13, 2719:19, 2721:21, 2729:4, 2732:14, 2733:19, 2736:18, 2741:12, 2741:21, 2742:23, 2742:25
**instrumentality** [1] - 2622:11
**insurance** [2] - 2531:5, 2531:11

**intended** [4] - 2612:18, 2744:22, 2748:10, 2748:14
**intends** [2] - 2646:17, 2671:21, 2754:7
**intent** [7] - 2533:25, 2743:18, 2743:20, 2743:23, 2747:2, 2749:9, 2750:2
**intention** [1] - 2748:24
**intentionally** [7] - 2731:11, 2743:13, 2743:17, 2745:14, 2747:5, 2751:18, 2753:24
**intently** [1] - 2756:16
**intents** [1] - 2700:17
**interaction** [2] - 2527:14, 2558:21
**interest** [1] - 2602:5
**interested** [2] - 2606:9, 2606:10
**interesting** [1] - 2573:22
**interests** [1] - 2737:5
**interfere** [1] - 2720:16
**interim** [1] - 2614:22
**INTERPRETER** [2] - 2667:23, 2690:14
**interpreting** [1] - 2528:4
**interrupt** [10] - 2532:25, 2535:1, 2539:20, 2544:5, 2546:11, 2547:6, 2547:25, 2630:8, 2684:1, 2714:19
**interrupted** [1] - 2757:2
**interrupting** [2] - 2553:15, 2684:15
**interruptions** [1] - 2757:2
**intersection** [1] - 2555:12
**intervene** [1] - 2639:19
**interview** [2] - 2739:9, 2739:13
**interviewed** [2] - 2577:2, 2709:12
**interviews** [2] - 2739:5, 2758:9
**introduce** [1] - 2689:6
**introduced** [4] - 2540:10, 2684:25, 2721:17, 2741:7
**introduces** [1] - 2690:2
**investigation** [1] - 2735:15
**investigations** [1] - 2686:20
**investigative** [2] - 2739:20, 2739:21
**involve** [4] - 2531:11, 2688:7, 2689:5, 2729:21
**involved** [13] - 2530:22, 2530:24, 2544:16, 2548:20, 2558:10, 2582:21, 2583:16, 2609:23, 2611:19, 2627:17, 2737:6, 2739:25, 2746:15
**involvement** [1] - 2741:2
**involves** [1] - 2709:25
**involving** [2] - 2564:12, 2598:1
**irrelevant** [1] - 2742:7
**Islam** [4] - 2563:20, 2563:22, 2590:7, 2590:17
**Island** [2] - 2548:4, 2604:11
**issue** [19] - 2645:20, 2645:23, 2649:2, 2650:4, 2652:13, 2670:14, 2671:3, 2671:4, 2692:8, 2701:7, 2701:18, 2702:8, 2702:9, 2703:20, 2705:7, 2728:1, 2738:19, 2740:1, 2749:2
**issues** [5] - 2652:17, 2652:25, 2688:7, 2729:18, 2744:2
**items** [1] - 2701:25
**itself** [6] - 2541:10, 2673:18, 2701:16, 2736:12, 2741:17, 2750:15

**Ivery** [13] - 2564:19, 2564:22, 2564:25, 2565:15, 2576:16, 2577:16, 2577:24, 2578:6, 2578:10, 2579:23, 2580:5, 2580:8, 2598:6

## J

**jacket** [1] - 2546:4
**jacklyn** [1] - 2667:16
**JACKLYN** [3] - 2667:16, 2667:18, 2760:16
**jail** [9] - 2575:12, 2609:6, 2615:18, 2638:17, 2640:12, 2640:18, 2655:25, 2656:6, 2665:8
**Jamaica** [1] - 2640:19
**James** [1] - 2646:25
**January** [4] - 2635:16, 2635:19, 2673:10, 2676:12
**JEAN** [1] - 2525:20
**Jerard** [4] - 2621:23, 2622:18, 2622:22, 2623:3
**Jersey** [3] - 2525:21, 2526:4, 2526:7
**jewelry** [4] - 2541:2, 2561:18, 2571:16, 2571:17
**Jimbo's** [1] - 2636:25
**job** [8] - 2539:6, 2542:3, 2617:20, 2636:11, 2668:9, 2729:10, 2740:4, 2758:9
**Johnson** [3] - 2591:11, 2591:16, 2591:23
**join** [2] - 2593:1, 2713:20
**joined** [5] - 2745:22, 2747:1, 2747:19, 2747:23, 2749:7
**joins** [1] - 2747:8
**joint** [1] - 2746:5
**Jonathan** [1] - 2554:23
**Jones** [2] - 2686:17, 2686:18
**JORDAN** [2] - 2526:2, 2526:3
**JR** [1] - 2560:4
**Judge** [13] - 2630:10, 2631:10, 2642:3, 2666:2, 2666:23, 2669:25, 2679:6, 2686:3, 2687:10, 2698:20, 2698:24, 2704:3
**judge** [26] - 2527:19, 2528:16, 2529:6, 2530:4, 2538:11, 2538:13, 2553:15, 2569:9, 2569:12, 2614:25, 2632:1, 2640:11, 2643:18, 2649:11, 2671:4, 2687:4, 2703:24, 2712:20, 2714:11, 2714:19, 2718:22, 2720:21, 2727:6, 2735:6, 2735:16, 2735:19
**JUDGE** [1] - 2525:11
**judges** [2] - 2719:1, 2720:5, 2729:11
**judgment** [3] - 2732:5, 2733:11, 2734:17
**judgments** [2] - 2729:22, 2729:23
**July** [7] - 2543:12, 2674:22, 2675:11, 2676:12, 2676:13, 2709:12
**jumped** [2] - 2567:18, 2592:11
**jumping** [3] - 2627:15, 2629:2, 2629:11
**June** [3] - 2618:16, 2620:11, 2621:8
**jurisdiction** [1] - 2709:20

**Juror** [2] - 2530:4, 2714:9
**juror** [3] - 2706:23, 2727:16, 2727:18
**JUROR** [6] - 2715:1, 2715:2, 2715:23, 2728:18, 2758:10, 2758:13
**jurors** [15] - 2527:7, 2527:10, 2635:5, 2646:5, 2651:4, 2651:13, 2652:14, 2684:2, 2684:6, 2684:10, 2685:5, 2720:13, 2727:13, 2755:7, 2759:4
**JURY** [1] - 2525:10
**jury** [69] - 2528:12, 2530:8, 2540:1, 2546:16, 2560:18, 2560:19, 2594:23, 2599:19, 2610:14, 2625:11, 2630:11, 2634:2, 2634:16, 2634:17, 2642:21, 2644:5, 2644:16, 2645:11, 2645:16, 2645:21, 2645:25, 2646:18, 2647:14, 2647:18, 2650:2, 2651:1, 2653:10, 2653:12, 2654:12, 2654:13, 2654:20, 2669:7, 2670:16, 2671:17, 2672:5, 2672:6, 2672:8, 2673:1, 2673:9, 2691:12, 2691:13, 2693:19, 2700:11, 2701:1, 2701:18, 2701:21, 2702:20, 2705:14, 2705:24, 2706:20, 2707:6, 2707:8, 2707:17, 2707:21, 2708:3, 2710:20, 2714:7, 2716:2, 2716:16, 2718:22, 2720:4, 2722:7, 2725:19, 2726:9, 2727:12, 2727:14, 2736:12, 2758:18
**Jury** [1] - 2530:1
**jury's** [3] - 2528:19, 2613:6, 2651:11
**Justice** [1] - 2649:1
**justice** [1] - 2721:7
**justified** [1] - 2726:17
**justify** [1] - 2747:17

## K

**K2** [9] - 2635:23, 2635:25, 2636:2, 2636:5, 2636:9, 2636:10, 2637:25, 2638:1
**keep** [10] - 2548:17, 2553:24, 2572:3, 2600:18, 2661:12, 2728:25, 2756:24, 2757:24, 2758:8
**keepsake** [1] - 2603:9
**Keisha** [1] - 2583:2
**Keith** [7] - 2619:20, 2620:11, 2620:12, 2620:19, 2621:11, 2621:13, 2621:15
**KENDRA** [2] - 2526:6, 2526:6
**Kenway** [1] - 2686:18
**kept** [2] - 2546:23, 2735:21
**key** [1] - 2749:6
**kicks** [2] - 2607:14, 2607:17, 2609:4, 2609:17
**kid** [1] - 2621:23
**Kidda** [1] - 2538:3
**kidnapping** [4] - 2540:13, 2598:16, 2599:5, 2674:23
**kids** [4] - 2548:14, 2548:24, 2589:19, 2600:23
**kill** [9] - 2545:3, 2550:25, 2572:6, 2578:10, 2622:2, 2622:11, 2622:12, 2622:19, 2623:17
**killed** [20] - 2538:10, 2538:21, 2564:19,

2564:22, 2565:4, 2565:6, 2565:8, 2565:11, 2565:15, 2566:14, 2567:21, 2580:9, 2581:17, 2593:24, 2619:19, 2622:23, 2631:20, 2640:4, 2640:13, 2640:19
**killer** [2] - 2621:24, 2622:10
**killing** [3] - 2539:13, 2553:23, 2663:22
**kilos** [1] - 2579:18
**kind** [32] - 2534:12, 2546:8, 2547:7, 2548:20, 2548:22, 2552:2, 2559:24, 2560:6, 2561:23, 2565:23, 2566:21, 2583:9, 2583:10, 2583:16, 2583:17, 2584:16, 2605:20, 2609:14, 2622:2, 2623:9, 2624:2, 2624:7, 2655:20, 2665:19, 2677:24, 2685:6, 2695:23, 2705:11, 2705:13, 2722:12, 2723:6, 2744:18
**kinds** [1] - 2655:22
**kissing** [1] - 2655:19
**kite** [2] - 2576:3, 2576:8
**KITE** [1] - 2576:3
**Kizzy** [10] - 2549:15, 2549:16, 2549:17, 2552:4, 2552:5, 2552:6, 2552:9, 2552:10, 2554:21
**knock** [4] - 2607:8, 2607:12, 2609:12, 2628:20
**knocked** [2] - 2609:1, 2693:24
**knocking** [5] - 2608:6, 2609:9, 2609:11, 2611:3, 2628:9
**knockout** [3] - 2607:4, 2627:20, 2629:2
**knowingly** [9] - 2743:12, 2743:15, 2745:13, 2746:25, 2747:5, 2747:23, 2752:18, 2752:19, 2753:9
**knowledge** [20] - 2602:8, 2624:17, 2681:10, 2682:9, 2682:25, 2683:14, 2683:25, 2699:7, 2699:9, 2730:18, 2732:20, 2736:9, 2738:17, 2739:25, 2743:22, 2747:18, 2748:16, 2748:22, 2752:22, 2752:25
**known** [14] - 2531:5, 2533:21, 2534:2, 2581:9, 2592:13, 2596:4, 2614:6, 2686:18, 2691:5, 2693:13, 2693:25, 2708:12, 2708:20, 2747:13
**knows** [2] - 2748:4, 2758:2
**Kojack** [6] - 2569:15, 2569:18, 2621:23, 2622:9, 2623:20, 2663:22

## L

**lack** [3] - 2710:2, 2721:11, 2723:11
**lady** [1] - 2549:25
**Lafayette** [2] - 2558:14, 2580:10
**laid** [1] - 2623:17
**land** [4] - 2677:11, 2677:16, 2678:13, 2678:16
**large** [1] - 2583:13
**last** [18] - 2543:3, 2580:24, 2580:25, 2583:4, 2658:21, 2660:14, 2660:23, 2660:25, 2661:6, 2661:16, 2662:1, 2662:2, 2665:5, 2687:13, 2700:13, 2714:1, 2756:5, 2756:6
**lastly** [1] - 2675:10

**late** [3] - 2545:17, 2757:19, 2757:23
**laughed** [2] - 2533:12, 2629:12
**laughing** [1] - 2549:5
**Lavina** [2] - 2581:2, 2581:3
**Lavine** [5] - 2580:9, 2580:12, 2580:14, 2580:22, 2581:1
**LAW** [2] - 2525:23, 2526:2, 2526:6
**Law** [5] - 2749:13, 2749:16, 2749:20, 2750:11, 2751:2
**law** [53] - 2530:13, 2561:7, 2609:12, 2688:5, 2697:2, 2697:10, 2700:10, 2711:16, 2711:18, 2712:14, 2712:19, 2714:15, 2716:3, 2716:19, 2718:7, 2718:13, 2718:16, 2718:18, 2718:22, 2718:23, 2722:3, 2722:14, 2722:19, 2725:17, 2732:8, 2732:9, 2732:16, 2733:1, 2735:20, 2736:10, 2736:11, 2738:7, 2739:22, 2739:23, 2740:2, 2743:18, 2743:19, 2743:21, 2743:24, 2744:1, 2744:15, 2744:16, 2744:17, 2748:19, 2749:11, 2750:7, 2750:12, 2750:23, 2751:3, 2751:10, 2751:15, 2757:15
**laws** [2] - 2744:20, 2745:4
**lawsuit** [1] - 2530:5
**lawyer** [4] - 2568:13, 2639:12, 2652:23, 2757:6
**lawyers** [13] - 2639:16, 2639:17, 2688:12, 2714:1, 2714:2, 2715:3, 2716:22, 2719:12, 2721:15, 2756:16, 2757:7, 2757:12
**lay** [1] - 2684:24
**lead** [2] - 2617:20, 2739:21
**leading** [2] - 2538:11, 2538:14
**learn** [2] - 2662:18, 2675:5
**learned** [2] - 2659:22, 2694:17, 2727:11
**least** [9] - 2531:23, 2561:9, 2653:25, 2700:7, 2745:21, 2748:22, 2749:7, 2750:3, 2750:4
**leather** [1] - 2628:24
**leave** [4] - 2550:21, 2550:22, 2552:11, 2713:18
**leaves** [2] - 2594:23, 2701:1
**leaving** [4] - 2541:21, 2554:15, 2567:16, 2638:3
**left** [8] - 2534:22, 2534:25, 2547:12, 2555:24, 2621:15, 2624:18, 2673:15, 2673:20
**left-hand** [1] - 2673:15
**legal** [7] - 2548:5, 2548:8, 2688:14, 2716:23, 2718:9, 2722:14, 2739:19
**legitimate** [1] - 2633:7
**length** [6] - 2599:2, 2676:23, 2676:24, 2676:25, 2684:17, 2756:7
**less** [9] - 2561:16, 2587:11, 2685:16, 2714:16, 2714:17, 2721:4, 2723:21, 2725:11, 2732:11
**lesser** [1] - 2732:12
**lesson** [2] - 2694:17, 2727:11
**letter** [6] - 2568:13, 2568:19, 2596:5, 2641:7, 2641:9, 2735:13

**level** [2] - 2610:15, 2692:7
**LG** [4] - 2612:3, 2616:24, 2618:17, 2630:14
**liability** [5] - 2751:15, 2751:20, 2751:21, 2751:25, 2754:15
**liable** [1] - 2754:14
**license** [1] - 2556:25
**lie** [20] - 2577:4, 2577:8, 2577:21, 2577:22, 2578:1, 2578:2, 2578:7, 2580:18, 2594:4, 2594:11, 2596:16, 2596:19, 2597:8, 2597:12, 2597:14, 2618:1, 2638:2, 2650:15, 2664:11, 2737:8
**lied** [5] - 2580:21, 2589:5, 2591:22, 2731:12, 2731:15
**lies** [2] - 2737:2
**lieu** [1] - 2656:11
**life** [10] - 2568:1, 2568:22, 2570:11, 2585:16, 2587:4, 2588:17, 2590:15, 2708:21, 2708:23, 2732:5
**lift** [1] - 2583:13
**light** [10] - 2555:12, 2555:21, 2555:22, 2654:3, 2725:24, 2726:17, 2731:10, 2731:24, 2732:13, 2733:8
**lightning** [1] - 2608:15
**lights** [2] - 2536:21, 2537:22
**likely** [2] - 2603:8, 2645:25
**limit** [1] - 2538:14
**limited** [2] - 2655:6, 2734:3
**limiting** [1] - 2539:24
**line** [5] - 2652:14, 2653:14, 2674:14, 2678:13, 2678:16
**lined** [1] - 2742:21
**lines** [2] - 2677:12, 2677:16
**list** [4] - 2556:12, 2575:4, 2626:11, 2720:2
**listed** [17] - 2599:17, 2673:15, 2680:25, 2681:4, 2681:7, 2681:24, 2682:4, 2682:6, 2682:15, 2682:20, 2682:23, 2683:4, 2683:8, 2683:11, 2683:16, 2683:21, 2683:23
**Listen** [1] - 2535:21
**listen** [3] - 2527:22, 2542:3, 2754:18
**listened** [1] - 2729:23
**listening** [1] - 2756:15
**litigation** [1] - 2721:4
**live** [2] - 2590:15, 2592:16
**lived** [1] - 2617:23
**living** [5] - 2543:13, 2543:17, 2543:18, 2558:8, 2668:5
**loaded** [2] - 2624:11, 2624:14
**loaned** [1] - 2541:10
**lobby** [3] - 2616:24, 2623:4, 2623:18
**locations** [1] - 2640:10
**lock** [1] - 2531:4
**locked** [2] - 2591:17, 2591:21, 2659:2, 2661:18, 2662:6, 2662:11
**lockers** [2] - 2600:20, 2601:2
**locket** [1] - 2603:9
**logical** [2] - 2725:13, 2726:20
**logically** [1] - 2711:13

**London** [2] - 2611:23, 2612:9
**look** [25] - 2535:25, 2537:2, 2546:3, 2547:1, 2549:14, 2572:14, 2572:17, 2597:17, 2615:1, 2631:4, 2632:6, 2645:8, 2647:24, 2647:25, 2648:2, 2648:6, 2648:18, 2669:24, 2671:2, 2677:22, 2689:17, 2702:3, 2705:24, 2737:11
**Look** [2] - 2548:16, 2548:19
**looked** [7] - 2536:5, 2537:1, 2537:3, 2546:18, 2547:17, 2661:10
**looking** [10] - 2536:2, 2546:9, 2557:2, 2592:13, 2592:17, 2592:18, 2617:8, 2675:5, 2678:8, 2715:25
**looks** [2] - 2547:3, 2715:14
**loose** [1] - 2652:19
**loot** [2] - 2587:25, 2588:1
**LORETTA** [1] - 2525:13
**lose** [1] - 2713:16
**louder** [1] - 2746:17
**loved** [1] - 2602:21
**lower** [4] - 2610:15, 2666:10, 2666:11, 2666:14
**loyalty** [1] - 2730:24
**Luna** [1] - 2646:25
**lunch** [5] - 2631:7, 2637:16, 2642:9, 2642:14, 2648:6
**lunchtime** [1] - 2637:22, 2645:9
**lying** [6] - 2579:11, 2587:2, 2650:6, 2664:7, 2664:9, 2736:23
**LYNCH** [1] - 2525:13
**Lynchburg** [2] - 2543:23, 2554:22

# M

**Mack** [2] - 2544:25, 2582:15
**Mack-O** [2] - 2544:25, 2582:15
**Mackens** [1] - 2598:4
**Mackins** [7] - 2621:24, 2622:10, 2622:12, 2622:18, 2622:22, 2623:3, 2624:22
**mad** [1] - 2549:13
**magazine** [1] - 2624:16
**maintain** [5] - 2681:3, 2682:3, 2682:20, 2683:7, 2683:20
**maintained** [10] - 2681:2, 2681:6, 2682:1, 2682:5, 2682:17, 2682:22, 2683:5, 2683:10, 2683:17, 2683:22
**major** [3] - 2699:23, 2749:5, 2756:14
**male** [1] - 2585:2
**man** [9] - 2532:20, 2548:16, 2548:17, 2548:18, 2548:19, 2622:1, 2622:9, 2664:25
**mandates** [1] - 2695:7
**mandatory** [3] - 2568:1, 2568:22, 2710:2
**Manhattan** [3] - 2538:5, 2637:7, 2666:7
**manifested** [1] - 2530:9
**mankind** [2] - 2608:19, 2608:21
**march** [1] - 2592:18
**March** [5] - 2687:17, 2703:2, 2709:17,

2710:8, 2755:8

**mark** [2] - 2633:18, 2709:3
**Mark** [1] - 2591:11
**marked** [7] - 2632:7, 2668:11, 2679:15, 2702:14, 2706:7, 2708:18, 2710:6
**Market** [3] - 2587:15, 2587:16, 2587:17
**Marks** [3] - 2580:10, 2580:14, 2580:22
**Marvel** [1] - 2607:24
**mass** [1] - 2704:2
**material** [6] - 2648:7, 2648:11, 2648:20, 2713:10, 2731:12, 2731:13
**materially** [1] - 2709:14
**matter** [7] - 2565:1, 2601:1, 2601:21, 2602:14, 2602:17, 2609:1, 2651:6, 2690:2, 2706:6, 2709:19, 2719:20, 2726:14, 2730:1, 2731:12, 2731:14, 2732:1, 2741:3
**matters** [8] - 2651:2, 2688:5, 2688:14, 2689:4, 2721:22, 2731:15, 2732:19, 2740:1
**MATTHEW** [1] - 2525:15
**max** [1] - 2692:4
**maximum** [6] - 2664:14, 2695:13, 2708:21, 2708:22, 2709:21, 2756:17
**MCC** [1] - 2634:8
**MDC** [7] - 2634:8, 2636:2, 2636:5, 2636:12, 2638:25, 2639:24, 2658:22
**mean** [31] - 2533:20, 2535:13, 2535:25, 2539:20, 2548:19, 2569:6, 2571:10, 2573:14, 2573:24, 2574:21, 2574:25, 2585:12, 2586:7, 2607:14, 2611:9, 2612:22, 2615:18, 2630:3, 2634:10, 2645:2, 2645:5, 2650:15, 2662:22, 2674:2, 2698:22, 2703:4, 2705:10, 2705:15, 2720:6, 2723:21, 2732:10
**meaning** [7] - 2534:15, 2547:19, 2576:12, 2604:15, 2712:19, 2735:23, 2753:20
**means** [9] - 2576:3, 2589:2, 2596:16, 2674:16, 2684:19, 2687:14, 2728:24, 2746:2, 2746:5
**meantime** [1] - 2688:23
**mechanical** [1] - 2526:12
**medical** [9] - 2530:21, 2532:16, 2532:18, 2532:19, 2533:1, 2536:10, 2539:21, 2598:13, 2673:13
**medically** [1] - 2619:11
**meet** [4] - 2531:13, 2539:18, 2543:1, 2746:6
**meeting** [8] - 2537:3, 2638:10, 2663:19, 2695:2, 2695:3, 2696:21, 2739:12, 2749:23
**meetings** [3] - 2596:20, 2597:1, 2663:21
**member** [27] - 2565:18, 2565:20, 2565:22, 2569:25, 2630:2, 2630:5, 2655:12, 2686:12, 2738:1, 2738:5, 2738:11, 2738:24, 2745:14, 2746:24, 2747:12, 2747:14, 2747:20, 2748:3, 2748:9, 2748:18, 2748:20, 2749:2, 2750:18, 2750:21, 2750:23, 2754:14
**members** [10] - 2612:14, 2691:24,

2694:1, 2694:12, 2710:20, 2738:8,
2738:14, 2745:23, 2750:24
**membership** [2] - 2746:24, 2748:12
**memorabilia** [1] - 2602:20
**memory** [1] - 2585:11
**men** [2] - 2536:25
**mental** [3] - 2622:19, 2751:16, 2753:22
**mention** [1] - 2617:8
**mentioned** [9] - 2563:16, 2627:11,
2656:13, 2658:20, 2663:4, 2663:5,
2663:14, 2716:20, 2740:4
**Mercedes** [1] - 2535:18
**Mercedes-Benz** [1] - 2535:18
**merchandise** [3] - 2584:13, 2587:25,
2588:1
**mere** [6] - 2727:3, 2748:6, 2748:11,
2752:21, 2752:23
**merely** [4] - 2733:9, 2741:18, 2748:1,
2748:16
**mess** [2] - 2646:13
**message** [2] - 2576:5, 2661:1
**met** [20] - 2531:18, 2531:20, 2538:3,
2540:11, 2542:21, 2542:23, 2547:16,
2548:1, 2567:8, 2570:22, 2614:4,
2626:6, 2638:11, 2638:25, 2691:1,
2693:19, 2694:12, 2694:19, 2694:20,
2745:24
**Metropolitan** [1] - 2709:11
**Meyers** [1] - 2595:8
**Michael** [4] - 2598:2, 2629:5, 2629:18,
2663:24
**microphone** [5] - 2714:21, 2714:22,
2715:6, 2715:8, 2717:12
**middle** [2] - 2537:9, 2537:11
**midtown** [3] - 2666:9, 2666:10, 2666:11
**might** [18] - 2566:21, 2575:8, 2580:4,
2603:20, 2606:12, 2607:10, 2612:23,
2619:8, 2634:15, 2642:12, 2654:18,
2656:9, 2693:14, 2715:16, 2720:21,
2730:24, 2742:5
**Mike** [2] - 2715:10, 2717:16
**mike** [11] - 2698:24, 2715:9, 2715:11,
2715:12, 2717:8, 2717:9, 2717:10,
2717:13, 2717:14, 2717:21
**millimeter** [3] - 2624:8, 2624:9, 2624:12
**mind** [11] - 2533:9, 2537:12, 2597:17,
2613:6, 2719:16, 2728:21, 2735:21,
2742:3, 2744:3, 2744:6, 2744:8
**mindful** [2] - 2651:22, 2727:1
**minding** [2] - 2571:24, 2607:11
**minds** [1] - 2749:23
**mini** [1] - 2548:23
**mini-van** [1] - 2548:23
**minimum** [3] - 2710:2, 2710:3, 2735:20
**minor** [1] - 2749:5
**minus** [1] - 2570:24
**minute** [2] - 2685:16, 2687:4
**minutes** [5] - 2545:17, 2594:18, 2642:7,
2688:17, 2689:10
**misdeeds** [1] - 2712:14
**misinformation** [1] - 2694:6

**misinterpret** [1] - 2706:7
**mispronouncing** [1] - 2686:17
**missing** [1] - 2646:2
**mistake** [4] - 2702:4, 2734:11, 2743:16
**mistaken** [4] - 2612:17, 2612:18,
2636:6, 2730:19
**Mobile** [2] - 2683:15, 2683:21
**Mobile's** [1] - 2683:18, 2683:19
**mocking** [1] - 2533:14
**Mohammed** [2] - 2619:4, 2658:8
**moment** [4] - 2653:17, 2688:16, 2673:9,
2741:8
**moments** [2] - 2601:8, 2725:1
**Monday** [6] - 2630:2, 2651:14, 2700:20,
2757:23, 2758:9, 2758:10
**Money** [2] - 2565:18, 2565:24
**money** [41] - 2531:7, 2535:11, 2535:22,
2535:24, 2539:3, 2540:24, 2541:23,
2542:1, 2543:19, 2548:10, 2549:8,
2561:18, 2572:6, 2579:15, 2584:11,
2601:25, 2611:9, 2611:11, 2611:13,
2611:19, 2612:6, 2631:21, 2631:24,
2634:18, 2635:3, 2635:11, 2635:13,
2635:21, 2636:16, 2655:25, 2656:7,
2656:22, 2663:15, 2664:24, 2665:7,
2665:8, 2665:12, 2665:13, 2665:21,
2665:22, 2665:23
**moneys** [4] - 2632:18, 2656:3, 2656:10,
2656:17
**monies** [1] - 2610:23
**moniker** [1] - 2608:7
**monitor** [2] - 2652:13, 2678:6
**Montclair** [1] - 2525:21
**month** [4] - 2542:19, 2662:5, 2687:13,
2710:8
**months** [4] - 2604:25, 2661:7, 2691:16,
2698:1
**Moo** [10] - 2551:14, 2551:16, 2551:17,
2551:23, 2619:2, 2641:1, 2657:19,
2659:2, 2662:1, 2662:2
**Moore** [6] - 2691:5, 2693:25, 2694:3,
2694:14, 2696:23, 2697:8
**moreover** [1] - 2747:15
**morning** [9] - 2594:18, 2595:7, 2595:9,
2597:12, 2651:11, 2699:20, 2757:20,
2757:24
**mosque** [4] - 2545:10, 2545:15,
2547:13, 2551:18
**most** [3] - 2539:22, 2590:19, 2723:10
**mostly** [1] - 2583:11
**mother** [6] - 2549:17, 2558:16, 2592:15,
2592:18, 2592:19, 2686:18
**motion** [13] - 2527:20, 2667:8, 2687:20,
2707:13, 2707:20, 2710:3, 2735:9,
2735:13, 2751:17, 2735:18, 2735:22,
2735:25, 2736:2
**motions** [8] - 2653:23, 2687:21, 2688:4,
2688:7, 2688:10, 2707:17, 2707:22
**motivated** [2] - 2737:1, 2737:7
**motivation** [2] - 2737:8, 2737:10
**motive** [2] - 2582:6, 2730:24

**mount** [1] - 2714:8
**mountain** [1] - 2713:23
**mouth** [2] - 2655:19
**move** [15] - 2542:11, 2573:19, 2579:15,
2600:15, 2625:8, 2630:12, 2631:10,
2633:6, 2633:8, 2634:17, 2644:21,
2668:24, 2673:20, 2698:23, 2715:17
**movie** [2] - 2565:24, 2567:9
**moving** [2] - 2715:7, 2733:14
**MR** [215] - 2527:8, 2529:5, 2530:17,
2530:19, 2533:22, 2538:11, 2538:13,
2538:19, 2538:20, 2539:20, 2539:22,
2539:25, 2540:6, 2540:8, 2540:9,
2542:11, 2542:13, 2559:8, 2559:14,
2559:17, 2560:9, 2560:12, 2560:14,
2562:12, 2565:13, 2573:21, 2579:2,
2582:3, 2585:22, 2592:20, 2593:3,
2593:6, 2593:8, 2593:10, 2594:15,
2594:21, 2595:4, 2595:6, 2596:12,
2617:10, 2617:12, 2617:14, 2617:16,
2617:19, 2622:15, 2625:3, 2630:10,
2631:10, 2631:14, 2632:1, 2632:10,
2632:13, 2632:23, 2633:2, 2633:5,
2633:9, 2633:12, 2633:14, 2633:24,
2634:3, 2634:19, 2634:21, 2634:24,
2635:1, 2635:4, 2637:9, 2637:12,
2637:15, 2637:20, 2637:23, 2639:5,
2639:8, 2639:22, 2640:7, 2640:11,
2640:14, 2642:6, 2642:12, 2642:24,
2643:3, 2643:8, 2643:12, 2643:18,
2644:9, 2644:14, 2644:21, 2644:25,
2645:1, 2645:6, 2645:10, 2645:14,
2646:12, 2646:14, 2646:16, 2646:21,
2646:24, 2646:25, 2647:7, 2647:10,
2647:20, 2647:25, 2648:4, 2648:21,
2649:12, 2649:21, 2650:3, 2650:10,
2650:12, 2650:18, 2650:21, 2650:23,
2652:22, 2653:3, 2653:8, 2653:20,
2654:2, 2654:17, 2655:2, 2656:19,
2659:13, 2659:16, 2659:21, 2660:9,
2660:11, 2665:11, 2666:2, 2666:4,
2666:18, 2666:23, 2666:25, 2667:4,
2668:2, 2668:15, 2669:10, 2669:14,
2669:19, 2669:21, 2669:25, 2673:6,
2674:19, 2675:23, 2679:5, 2679:6,
2679:9, 2679:11, 2679:13, 2679:16,
2679:19, 2679:24, 2684:3, 2684:7,
2684:9, 2685:9, 2685:15, 2685:18,
2685:21, 2685:23, 2686:7, 2686:10,
2686:16, 2686:24, 2687:3, 2687:4,
2687:10, 2687:21, 2688:1, 2688:19,
2688:24, 2689:13, 2689:19, 2690:9,
2690:24, 2693:2, 2696:15, 2698:9,
2698:13, 2698:18, 2701:4, 2702:1,
2703:1, 2704:6, 2704:11, 2704:20,
2706:4, 2706:6, 2706:21, 2706:25,
2707:4, 2707:6, 2707:11, 2707:13,
2707:23, 2708:1, 2708:9, 2708:18,
2710:12, 2710:15, 2714:20, 2714:23,
2717:22, 2717:23, 2718:4, 2755:21,
2758:20, 2758:23, 2759:1, 2759:7,
2760:8, 2760:9, 2760:11, 2760:12,

2760:14, 2760:15, 2760:20, 2760:24
**MS** [73] - 2528:16, 2528:20, 2528:24, 2529:2, 2648:9, 2648:12, 2648:15, 2649:4, 2649:10, 2653:13, 2654:3, 2654:7, 2654:10, 2654:14, 2665:25, 2667:5, 2667:8, 2668:4, 2669:3, 2670:13, 2671:4, 2671:10, 2671:13, 2671:19, 2671:25, 2672:10, 2676:1, 2676:4, 2678:2, 2678:4, 2678:9, 2679:3, 2687:1, 2689:8, 2696:18, 2698:7, 2698:20, 2698:24, 2699:2, 2699:6, 2699:15, 2701:7, 2701:10, 2701:14, 2701:20, 2701:23, 2702:5, 2702:9, 2702:12, 2702:21, 2703:5, 2703:9, 2703:14, 2703:20, 2704:3, 2705:3, 2705:7, 2705:19, 2705:21, 2706:10, 2706:13, 2710:11, 2710:19, 2714:19, 2714:24, 2715:5, 2715:7, 2715:16, 2717:24, 2760:17, 2760:18, 2760:22, 2761:2
**Muhammed** [4] - 2531:2, 2531:20, 2535:21, 2545:12
**multiple** [2] - 2544:3, 2675:8
**multiplicity** [1] - 2700:3
**murder** [22] - 2543:15, 2545:2, 2563:22, 2574:10, 2576:16, 2581:23, 2582:10, 2593:13, 2593:16, 2595:17, 2598:2, 2598:4, 2598:5, 2598:6, 2598:9, 2598:12, 2617:5, 2619:17, 2629:5, 2631:18, 2636:22, 2663:16, 2663:24, 2675:11
**murdered** [9] - 2547:10, 2564:14, 2569:15, 2569:18, 2577:23, 2583:6, 2618:15, 2618:16, 2657:4
**murders** [2] - 2574:1, 2581:14
**muscle** [2] - 2583:22, 2609:24
**must** [31] - 2530:3, 2716:7, 2716:25, 2717:16, 2718:7, 2719:11, 2720:14, 2721:10, 2723:7, 2723:16, 2723:20, 2725:20, 2726:21, 2729:17, 2731:23, 2736:6, 2736:15, 2738:20, 2739:18, 2742:16, 2743:20, 2745:8, 2745:21, 2748:1, 2749:20, 2750:20, 2751:21, 2752:8, 2752:13, 2753:2, 2753:16
**mutual** [1] - 2746:4
**MYERS** [1] - 2760:6
**Myers** [7] - 2529:3, 2530:20, 2560:15, 2591:7, 2607:12, 2660:6, 2660:12
**myers** [1] - 2654:19
**mythological** [1] - 2608:10
**mythology** [2] - 2608:13, 2608:14

# N

**Nah** [1] - 2534:15
**name** [54] - 2533:11, 2533:12, 2533:13, 2537:10, 2540:18, 2542:24, 2544:3, 2550:2, 2555:1, 2555:8, 2565:24, 2571:5, 2580:9, 2580:12, 2580:19, 2580:21, 2580:23, 2580:24, 2580:25, 2581:23, 2583:2, 2583:3, 2587:14, 2591:4, 2591:7, 2591:8, 2591:16,

2591:22, 2593:20, 2595:10, 2607:19, 2607:25, 2608:11, 2617:7, 2625:20, 2638:20, 2638:24, 2667:15, 2690:15, 2694:8, 2696:22, 2697:1, 2697:4, 2697:6, 2697:8, 2697:10, 2697:16, 2711:3, 2715:9, 2721:2
**named** [12] - 2537:25, 2538:10, 2538:21, 2539:18, 2543:25, 2547:22, 2554:23, 2580:22, 2581:1, 2607:23, 2613:14, 2661:14
**namely** [2] - 2610:23, 2627:1
**names** [11] - 2544:5, 2583:1, 2583:4, 2590:21, 2590:22, 2591:10, 2591:13, 2679:1, 2694:18
**narcotic** [1] - 2606:17
**narcotics** [2] - 2686:20, 2708:23
**nation** [1] - 2720:23
**national** [1] - 2720:20
**nature** [8] - 2540:5, 2565:7, 2703:16, 2724:9, 2736:10, 2736:15, 2737:23, 2746:12
**near** [7] - 2673:24, 2681:8, 2682:7, 2682:24, 2683:12, 2683:23, 2742:1
**necessarily** [5] - 2620:1, 2655:6, 2663:11, 2664:24, 2715:19
**necessary** [8] - 2588:24, 2588:25, 2665:17, 2704:18, 2704:21, 2750:21, 2752:17, 2757:12
**necessity** [1] - 2700:2
**neck** [1] - 2571:25
**need** [41] - 2541:23, 2541:25, 2542:3, 2559:6, 2611:17, 2633:16, 2637:14, 2637:18, 2642:6, 2647:7, 2649:15, 2649:18, 2653:21, 2684:18, 2684:23, 2688:9, 2688:17, 2688:22, 2689:2, 2689:10, 2699:13, 2699:15, 2704:5, 2704:10, 2704:14, 2733:16, 2741:23, 2743:18, 2744:25, 2745:23, 2745:25, 2747:13, 2747:14, 2747:16, 2747:18, 2747:21, 2750:15, 2754:23, 2755:2, 2758:19
**needed** [2] - 2557:4, 2610:17
**needs** [3] - 2667:6, 2696:3, 2701:16
**negative** [2] - 2711:4, 2740:19
**neighborhood** [2] - 2531:24, 2665:3
**Neno** [5] - 2621:24, 2622:9, 2622:12, 2622:13, 2622:19
**never** [20] - 2536:6, 2540:21, 2546:18, 2560:15, 2565:18, 2572:25, 2578:6, 2589:12, 2589:16, 2602:4, 2602:5, 2615:17, 2631:2, 2652:23, 2717:13, 2719:17, 2722:19, 2740:12, 2749:14
**nevertheless** [1] - 2740:15
**NEW** [1] - 2525:1
**new** [1] - 2714:5
**New** [31] - 2525:6, 2525:14, 2525:17, 2525:21, 2525:25, 2526:4, 2526:7, 2526:11, 2598:17, 2599:5, 2609:11, 2611:23, 2612:3, 2612:9, 2612:14, 2614:22, 2685:25, 2686:12, 2686:22, 2690:10, 2691:14, 2693:11, 2693:18,

2749:13, 2749:16, 2749:20, 2750:11, 2751:2, 2751:15
**news** [1] - 2716:1
**next** [23] - 2540:7, 2554:2, 2558:7, 2559:13, 2586:16, 2588:2, 2590:14, 2615:20, 2625:4, 2636:18, 2640:24, 2651:11, 2680:5, 2686:2, 2692:7, 2694:22, 2704:19, 2708:24, 2709:2, 2713:18, 2741:17, 2747:25, 2757:24
**Nextel** [1] - 2555:11
**nice** [2] - 2716:2, 2724:15
**NICOLE** [1] - 2526:10
**NICOLE** [1] - 2526:10
**night** [7] - 2529:5, 2540:14, 2540:20, 2541:6, 2541:12, 2587:19, 2755:6
**night's** [1] - 2743:6
**nighttime** [1] - 2571:13
**nine** [5] - 2599:14, 2599:24, 2624:8, 2624:9, 2624:12
**Nine** [1] - 2742:14
**nine-millimeter** [3] - 2624:8, 2624:9, 2624:12
**Nineteen** [1] - 2742:14
**nobody** [7] - 2687:13, 2714:11, 2743:4, 2757:2, 2758:2, 2758:7
**non** [1] - 2734:2
**non-guilt** [1] - 2734:2
**none** [1] - 2659:12
**nonetheless** [2] - 2650:8, 2730:19
**nonresponsive** [1] - 2665:11
**nontestifying** [2] - 2648:7, 2648:11
**noon** [1] - 2597:11
**Noor** [2] - 2531:2, 2535:22
**Noor's** [1] - 2531:20
**normal** [1] - 2684:15
**normally** [3] - 2644:24, 2702:22, 2704:15
**Norse** [4] - 2608:10, 2608:11, 2608:13, 2608:14
**northern** [1] - 2608:13
**Northfield** [1] - 2526:3
**Nostrand** [1] - 2531:16
**note** [1] - 2714:13
**noted** [2] - 2672:2, 2672:9
**notes** [2] - 2728:25, 2729:7
**nothing** [17] - 2530:5, 2560:9, 2569:25, 2594:15, 2642:2, 2645:5, 2658:7, 2665:25, 2666:18, 2698:7, 2699:6, 2703:12, 2703:14, 2710:15, 2720:24, 2722:14, 2754:6
**notice** [1] - 2713:25
**November** [1] - 2625:14
**nowhere** [1] - 2549:14
**nugatory** [1] - 2647:3
**Number** [2] - 2526:7, 2714:9
**number** [43] - 2550:1, 2561:14, 2575:4, 2596:24, 2597:1, 2598:1, 2598:5, 2598:13, 2599:14, 2599:23, 2603:2, 2603:4, 2633:11, 2640:18, 2658:20, 2658:21, 2662:15, 2667:22, 2675:1, 2675:2, 2675:3, 2675:16, 2675:17, 2677:14, 2680:12, 2680:14, 2680:21,

2680:23, 2681:15, 2681:19, 2681:23, 2682:14, 2683:3, 2683:15, 2685:20, 2686:2, 2686:23, 2709:3, 2709:25, 2712:6, 2730:4

**number's** [1] - 2675:6

**numbers** [23] - 2549:25, 2673:15, 2674:4, 2674:24, 2675:7, 2675:8, 2675:19, 2676:16, 2677:11, 2677:15, 2677:18, 2677:20, 2678:17, 2680:2, 2680:7, 2680:10, 2680:15, 2680:18, 2681:13, 2681:17, 2681:21, 2681:25, 2682:11

**numerous** [1] - 2638:10

**Nut** [2] - 2578:10, 2578:11

**NV** [3] - 2637:2, 2666:11, 2666:13

**NYPD** [2] - 2693:14, 2697:5

**O**

**o'clock** [10] - 2545:17, 2642:18, 2648:23, 2648:24, 2650:22, 2743:2, 2751:9, 2758:10, 2758:17, 2759:8

**oak** [1] - 2608:15

**oath** [3] - 2596:17, 2654:22, 2720:13

**object** [2] - 2617:10, 2746:2

**objecting** [1] - 2644:25

**objection** [28] - 2533:22, 2538:11, 2538:12, 2542:12, 2562:12, 2573:21, 2582:3, 2585:22, 2592:20, 2596:12, 2617:13, 2617:14, 2622:15, 2624:25, 2632:25, 2633:9, 2639:5, 2639:6, 2639:8, 2659:13, 2665:11, 2669:2, 2672:2, 2672:9, 2688:25, 2702:2, 2708:10, 2757:10

**objections** [2] - 2669:16, 2719:14

**objective** [3] - 2747:3, 2750:14, 2750:19

**objectives** [4] - 2745:1, 2747:19, 2748:17, 2748:23

**obligated** [1] - 2722:22

**obligation** [3] - 2530:3, 2740:9, 2756:21

**obliged** [4] - 2626:14, 2626:17, 2626:20, 2722:25

**observe** [3] - 2725:16, 2728:23, 2731:6

**observed** [2] - 2724:4, 2729:23

**obviate** [1] - 2757:10

**obviated** [1] - 2684:23

**obvious** [1] - 2713:8

**obviously** [11] - 2562:9, 2568:25, 2648:25, 2677:8, 2696:11, 2707:10, 2708:20, 2735:1, 2752:9, 2755:13, 2756:15

**occasion** [2] - 2584:22, 2734:24

**occasions** [4] - 2638:10, 2733:23, 2734:22, 2739:12

**occurred** [5] - 2573:25, 2574:1, 2576:21, 2613:21, 2712:21

**occurs** [1] - 2549:10

**odd** [3] - 2700:2, 2706:5, 2754:22

**OF** [6] - 2525:1, 2525:3, 2525:10, 2525:23, 2526:2, 2526:6

**offense** [6] - 2627:1, 2723:15, 2723:17, 2744:21, 2748:10, 2753:13

**offenses** [10] - 2599:20, 2600:5, 2600:6, 2604:16, 2615:12, 2626:21, 2703:2, 2741:22, 2741:25, 2742:1

**offer** [3] - 2666:22, 2688:24, 2729:15

**offered** [2] - 2527:25, 2708:10

**Office** [1] - 2709:13

**office** [3] - 2531:20, 2650:6, 2694:7

**OFFICE** [3] - 2525:23, 2526:2, 2526:6

**officer** [18] - 2557:2, 2577:8, 2587:2, 2598:22, 2625:18, 2625:20, 2657:10, 2658:13, 2664:7, 2664:9, 2690:16, 2691:13, 2691:18, 2694:17, 2695:17, 2696:25, 2709:10

**Officer** [4] - 2626:6, 2693:3, 2698:14, 2699:3

**officers** [5] - 2562:20, 2598:17, 2599:6, 2612:17, 2658:3

**official** [2] - 2732:10, 2732:17

**officials** [2] - 2732:8, 2733:1

**often** [10] - 2590:24, 2619:2, 2655:4, 2655:11, 2694:17, 2695:16, 2697:3, 2736:7, 2737:23, 2746:17

**old** [5] - 2546:9, 2570:19, 2570:20, 2570:22, 2638:25

**older** [1] - 2620:23

**omission** [2] - 2597:14, 2638:3

**omissions** [2] - 2738:5, 2738:9

**once** [23] - 2540:4, 2542:4, 2555:10, 2612:3, 2617:15, 2629:13, 2636:18, 2652:23, 2694:4, 2694:11, 2697:6, 2712:15, 2719:1, 2719:3, 2720:15, 2722:2, 2725:7, 2725:25, 2732:4, 2741:4, 2748:21, 2754:25, 2758:4

**One** [1] - 2742:13

**one** [119] - 2531:9, 2533:8, 2534:15, 2535:1, 2537:10, 2539:23, 2541:16, 2543:8, 2545:17, 2547:6, 2547:9, 2549:25, 2552:1, 2552:20, 2553:19, 2554:17, 2558:15, 2561:17, 2566:14, 2567:4, 2567:17, 2569:23, 2570:3, 2570:16, 2574:6, 2579:5, 2579:8, 2581:22, 2583:2, 2587:14, 2590:18, 2591:19, 2591:21, 2593:10, 2593:24, 2598:1, 2604:11, 2604:12, 2604:20, 2604:24, 2612:12, 2615:11, 2620:21, 2620:22, 2621:1, 2621:14, 2624:1, 2626:14, 2628:18, 2630:6, 2633:12, 2633:14, 2633:20, 2633:21, 2637:10, 2638:16, 2639:9, 2640:1, 2641:25, 2642:1, 2643:3, 2644:10, 2645:14, 2649:5, 2651:8, 2661:20, 2666:23, 2671:9, 2674:10, 2674:14, 2677:14, 2680:5, 2680:25, 2685:23, 2687:4, 2699:9, 2701:7, 2702:7, 2702:11, 2702:14, 2703:7, 2703:23, 2704:4, 2704:9, 2704:19, 2706:6, 2711:24, 2714:9, 2721:17, 2721:23, 2723:4, 2723:19, 2723:25, 2725:9, 2726:4, 2727:3, 2727:13, 2727:14, 2735:21, 2737:8, 2737:9, 2738:11, 2741:6, 2742:3, 2742:9, 2745:20, 2747:8,

2747:10, 2750:3, 2750:17, 2750:20, 2750:23, 2750:25, 2752:9, 2753:6, 2753:22, 2754:12

**one's** [1] - 2685:21

**one-year** [2] - 2604:20, 2604:24

**ones** [2] - 2591:15, 2602:21

**oneself** [1] - 2745:20

**open** [3] - 2527:1, 2647:1, 2757:24

**opening** [1] - 2719:13

**operation** [2] - 2668:8, 2703:25

**opinion** [7] - 2596:11, 2616:16, 2647:10, 2718:15, 2720:6, 2720:11, 2732:19

**opinions** [2] - 2718:19, 2733:3

**opportunities** [1] - 2729:6

**opportunity** [16] - 2528:25, 2612:23, 2651:24, 2653:24, 2688:13, 2702:4, 2707:18, 2712:22, 2728:20, 2728:23, 2729:1, 2729:3, 2731:6, 2755:11, 2755:25, 2757:14

**opposite** [2] - 2536:18, 2555:10

**option** [1] - 2706:17

**orally** [2] - 2706:11, 2716:3

**Orange** [1] - 2526:4

**order** [7] - 2600:16, 2627:11, 2668:13, 2745:7, 2747:17, 2749:19, 2752:16

**ordinarily** [1] - 2733:5

**ordinary** [6] - 2681:2, 2682:2, 2682:18, 2683:6, 2683:18, 2732:12

**organized** [1] - 2700:19

**oriented** [1] - 2717:5

**origin** [2] - 2720:20, 2720:24

**original** [1] - 2756:7

**originators** [1] - 2747:10

**Osua** [1] - 2598:7

**otherwise** [4] - 2633:8, 2718:23, 2733:15, 2735:20

**ought** [2] - 2637:15, 2718:16

**outcome** [1] - 2596:10

**Outside** [1] - 2670:16

**outside** [16] - 2534:14, 2534:20, 2541:4, 2541:5, 2598:20, 2598:22, 2598:25, 2620:24, 2642:21, 2651:1, 2689:13, 2724:14, 2724:24, 2725:4, 2725:6, 2758:18

**outstanding** [2] - 2530:8, 2755:7

**overall** [1] - 2695:6

**overruled** [2] - 2585:23, 2617:12

**overt** [9] - 2750:3, 2750:12, 2750:13, 2750:15, 2750:16, 2750:20, 2750:22, 2750:25, 2751:1

**owe** [1] - 2535:25

**own** [9] - 2570:6, 2571:24, 2607:11, 2646:17, 2719:12, 2719:20, 2723:10, 2733:10, 2740:16

**owned** [1] - 2610:16

**owners** [1] - 2588:1

**P**

**package** [1] - 2695:24

**padded** [3] - 2628:15, 2628:18, 2628:25
**page** [11] - 2528:6, 2528:7, 2529:9, 2578:20, 2615:20, 2649:24, 2670:12, 2692:10, 2715:25, 2718:21, 2747:25
**PAGE** [1] - 2760:3
**pages** [10] - 2527:25, 2528:1, 2528:6, 2528:8, 2528:14, 2615:17, 2645:2, 2651:4, 2654:8, 2700:2
**paid** [17] - 2538:24, 2539:1, 2539:6, 2539:8, 2539:9, 2539:10, 2539:15, 2553:12, 2553:13, 2553:21, 2557:20, 2557:23, 2557:25, 2610:22, 2611:5, 2611:7, 2662:23
**painted** [1] - 2729:19
**Pannitti** [1] - 2689:14
**PANNITTI** [2] - 2526:6, 2526:6
**paper** [5] - 2615:11, 2626:8, 2670:10, 2671:3, 2679:17
**papers** [1] - 2740:3
**paragraph** [7] - 2681:25, 2683:4, 2683:8, 2683:12, 2683:17, 2683:21, 2683:23
**paragraphs** [8] - 2680:25, 2681:5, 2681:7, 2682:4, 2682:6, 2682:16, 2682:20, 2682:23
**pardon** [1] - 2678:9
**parent's** [1] - 2603:10
**Park** [1] - 2525:21
**parked** [1] - 2557:7
**parking** [2] - 2567:11, 2567:16
**Parole** [7] - 2592:6, 2690:10, 2691:15, 2693:3, 2693:15, 2694:3, 2695:7
**parole** [33] - 2557:1, 2577:6, 2577:8, 2577:11, 2586:25, 2587:2, 2592:4, 2625:16, 2625:18, 2625:20, 2626:8, 2626:15, 2626:23, 2627:2, 2664:4, 2664:6, 2664:7, 2664:9, 2690:16, 2691:10, 2691:13, 2691:17, 2691:18, 2692:4, 2692:5, 2695:5, 2695:6, 2695:15, 2695:17, 2695:21, 2696:25, 2698:15, 2699:4
**parolee's** [1] - 2691:23
**part** [33] - 2535:5, 2539:22, 2562:11, 2562:12, 2584:12, 2584:15, 2584:17, 2651:18, 2654:7, 2663:10, 2666:22, 2699:23, 2700:4, 2700:8, 2700:13, 2712:11, 2713:15, 2713:18, 2714:3, 2714:15, 2716:14, 2717:3, 2726:24, 2729:9, 2729:21, 2731:17, 2734:20, 2736:8, 2747:3, 2747:18, 2750:4, 2750:10, 2756:14
**participants** [2] - 2684:11, 2746:20
**participate** [5] - 2541:8, 2541:9, 2549:9, 2565:22, 2753:6
**participated** [7] - 2565:21, 2569:8, 2737:17, 2747:1, 2747:23, 2748:22, 2750:22
**participating** [1] - 2663:24
**participation** [3] - 2597:25, 2629:17, 2749:1
**particular** [23] - 2531:6, 2532:21,

2533:10, 2536:11, 2541:12, 2556:9, 2591:17, 2599:1, 2614:1, 2629:18, 2634:14, 2634:20, 2651:17, 2676:16, 2684:21, 2693:22, 2695:23, 2721:15, 2722:8, 2736:16, 2742:10, 2745:11, 2745:19
**particularly** [2] - 2638:19, 2727:7
**parties** [8] - 2527:5, 2646:4, 2680:1, 2685:19, 2686:10, 2709:7, 2721:5, 2746:15
**partner** [2] - 2628:24, 2693:24
**partnership** [2] - 2737:24, 2744:18
**partnerships** [1] - 2737:25
**parts** [1] - 2716:14
**party** [1] - 2721:3
**pass** [3] - 2620:25, 2719:2, 2719:9
**passage** [1] - 2721:14
**passed** [2] - 2549:4, 2594:11
**passport** [1] - 2602:19
**past** [13] - 2536:3, 2536:17, 2536:22, 2536:23, 2539:21, 2541:2, 2547:1, 2555:24, 2661:9, 2664:21, 2695:25, 2697:1, 2712:14
**patient** [1] - 2687:18
**patients** [2] - 2754:23
**Patrice** [2] - 2613:15, 2613:22
**Patrick** [4] - 2581:23, 2581:25, 2657:1
**patrol** [1] - 2612:18
**PAUL** [22] - 2525:16, 2645:6, 2646:25, 2685:9, 2685:15, 2685:18, 2685:21, 2685:23, 2686:7, 2686:10, 2686:16, 2686:24, 2687:1, 2687:3, 2696:18, 2698:7, 2698:20, 2698:24, 2699:2, 2699:6, 2760:22, 2761:2
**Pause** [2] - 2713:21, 2717:19
**pause** [5] - 2698:21, 2715:13, 2718:1, 2730:5, 2733:21
**pay** [14] - 2535:11, 2535:22, 2536:20, 2553:20, 2558:2, 2569:7, 2605:2, 2630:19, 2654:12, 2656:7, 2665:15, 2665:17, 2743:6
**paying** [2] - 2549:7, 2552:20
**PC** [3] - 2541:13, 2541:22, 2541:24
**Peanut** [6] - 2556:21, 2559:18, 2559:25, 2565:12, 2578:10, 2636:21
**Peanut's** [1] - 2636:21
**peer** [1] - 2664:25
**pen** [1] - 2661:8
**penal** [1] - 2697:6
**penalties** [1] - 2710:3
**penalty** [6] - 2568:4, 2568:7, 2568:14, 2568:18, 2568:23, 2709:21
**pending** [1] - 2662:17
**people** [75] - 2531:23, 2532:4, 2532:9, 2532:12, 2532:13, 2532:14, 2533:6, 2534:24, 2540:22, 2541:6, 2544:6, 2544:20, 2555:23, 2560:24, 2561:6, 2561:18, 2562:16, 2564:5, 2564:7, 2567:18, 2572:14, 2573:5, 2575:23, 2578:15, 2580:4, 2581:17, 2581:22, 2583:8, 2587:22, 2588:9, 2588:21,

2588:24, 2588:25, 2589:5, 2589:6, 2591:4, 2602:15, 2603:20, 2606:23, 2606:24, 2608:6, 2609:1, 2609:9, 2610:19, 2610:20, 2614:15, 2616:17, 2620:23, 2620:25, 2628:9, 2638:23, 2639:23, 2640:1, 2640:3, 2640:18, 2641:16, 2656:17, 2656:21, 2665:2, 2665:4, 2684:24, 2685:5, 2699:4, 2705:25, 2706:6, 2712:8, 2728:2, 2736:8, 2737:25, 2739:14, 2749:24
**people's** [1] - 2600:20
**percent** [1] - 2643:12
**perfect** [2] - 2577:13, 2685:2
**perfectly** [2] - 2651:16, 2672:6
**perform** [2] - 2749:3, 2749:4
**performed** [2] - 2751:14, 2753:2
**performing** [1] - 2540:19
**perhaps** [7] - 2603:10, 2606:20, 2611:3, 2644:5, 2728:15, 2728:16, 2730:19
**period** [17] - 2570:11, 2599:20, 2599:24, 2634:21, 2634:23, 2638:9, 2656:13, 2673:22, 2674:3, 2674:17, 2675:3, 2675:9, 2676:12, 2676:16, 2692:5, 2695:9, 2697:25
**periods** [2] - 2676:10, 2676:18
**permit** [1] - 2744:5
**permits** [1] - 2722:14
**permitted** [5] - 2596:19, 2726:10, 2726:16, 2735:7, 2736:6
**permitting** [1] - 2723:18
**perpetrate** [1] - 2615:7
**perpetrated** [2] - 2615:15, 2615:16
**perpetrating** [1] - 2611:20
**person** [60] - 2532:25, 2535:4, 2542:16, 2542:21, 2546:10, 2559:19, 2572:5, 2575:5, 2575:6, 2575:8, 2602:14, 2623:7, 2643:24, 2646:2, 2646:3, 2647:2, 2656:9, 2681:9, 2682:8, 2682:25, 2683:13, 2683:24, 2689:20, 2694:1, 2694:4, 2695:21, 2695:24, 2696:3, 2696:22, 2697:3, 2713:13, 2723:7, 2723:9, 2731:24, 2732:2, 2735:15, 2743:15, 2743:17, 2743:18, 2743:22, 2747:4, 2748:3, 2748:4, 2748:15, 2748:18, 2748:20, 2751:10, 2751:13, 2751:16, 2751:18, 2752:2, 2752:5, 2752:6, 2752:8, 2752:11, 2753:19, 2753:25, 2754:9, 2754:11, 2754:13
**person's** [3] - 2720:23, 2744:8, 2754:8
**personal** [3] - 2570:6, 2623:8, 2737:7
**personally** [4] - 2602:12, 2630:20, 2657:3, 2754:10
**persons** [9] - 2737:19, 2738:13, 2739:24, 2744:20, 2745:3, 2745:10, 2745:18, 2745:21, 2746:10
**persuaded** [3] - 2617:21, 2618:1, 2754:2
**pertaining** [3] - 2536:2, 2590:4, 2660:16
**Philadelphia** [2] - 2635:17, 2635:20
**phone** [26] - 2535:17, 2536:20, 2551:8,

2555:7, 2574:9, 2574:15, 2574:17,
2575:4, 2575:22, 2655:7, 2660:14,
2668:16, 2668:20, 2669:10, 2669:12,
2670:3, 2671:6, 2671:14, 2671:15,
2673:4, 2673:15, 2676:8, 2676:20,
2678:11, 2678:13, 2678:16
**phones** [2] - 2677:21, 2677:24
**phonetic** [3] - 2646:24, 2647:9, 2670:6
**photo** [2] - 2668:10, 2669:9
**phrase** [1] - 2724:7
**phrases** [1] - 2743:13
**physical** [1] - 2534:7
**pick** [1] - 2527:14
**picked** [1] - 2551:13
**picking** [1] - 2627:17
**picture** [1] - 2650:4
**pictures** [2] - 2602:20, 2729:19
**piece** [1] - 2721:16
**pieces** [2] - 2670:10, 2671:2
**pike** [1] - 2644:10
**place** [12] - 2531:18, 2532:21, 2535:9,
2557:6, 2646:17, 2704:1, 2709:10,
2739:24, 2741:23, 2746:8, 2748:2,
2752:11
**placed** [2] - 2712:15, 2734:3
**places** [7] - 2531:6, 2571:4, 2571:16,
2630:24, 2631:2, 2720:20, 2754:8
**plain** [1] - 2653:8
**Plaintiff** [1] - 2525:4
**plan** [10] - 2557:5, 2561:23, 2562:7,
2566:17, 2583:13, 2649:12, 2746:5,
2747:2, 2747:5, 2749:24
**planned** [1] - 2622:10
**planning** [1] - 2534:7
**plans** [2] - 2550:18, 2755:5
**plate** [1] - 2654:1
**plates** [1] - 2556:25
**platform** [1] - 2571:12
**plausible** [1] - 2737:2
**play** [4] - 2539:23, 2543:4, 2749:5
**played** [3] - 2543:7, 2582:10, 2721:18
**playing** [2] - 2593:23, 2609:17
**PlayStations** [2] - 2566:17, 2567:9
**Plaza** [2] - 2525:17, 2526:10
**plea** [10] - 2615:2, 2649:6, 2653:6,
2701:8, 2704:22, 2704:23, 2704:25,
2705:2, 2708:25, 2710:7
**pleased** [1] - 2634:2
**pled** [7] - 2595:17, 2595:25, 2604:8,
2613:8, 2615:1, 2649:7, 2704:12
**plenty** [1] - 2756:25
**Plum** [2] - 2661:14, 2661:17
**plus** [1] - 2715:25
**pocket** [2] - 2536:24, 2619:19
**pocketbooks** [1] - 2602:10
**podium** [1] - 2715:17
**point** [50] - 2527:12, 2530:12, 2533:17,
2535:7, 2539:4, 2539:17, 2543:24,
2545:6, 2546:5, 2546:12, 2546:17,
2547:21, 2547:22, 2549:12, 2549:23,
2550:4, 2551:12, 2551:14, 2552:4,

2552:8, 2552:15, 2552:20, 2552:22,
2554:3, 2554:4, 2554:9, 2554:20,
2555:20, 2558:10, 2559:23, 2570:17,
2573:9, 2576:25, 2583:6, 2592:3,
2605:13, 2613:5, 2620:14, 2621:15,
2627:10, 2643:13, 2644:11, 2645:14,
2648:15, 2649:5, 2663:13, 2687:10,
2687:17, 2694:5, 2724:11
**pointed** [2] - 2537:4, 2596:3
**pointing** [1] - 2559:21
**points** [1] - 2705:22
**Police** [2] - 2612:15, 2686:12
**police** [17] - 2562:20, 2574:2, 2580:5,
2580:8, 2591:6, 2591:23, 2592:13,
2592:16, 2592:17, 2598:17, 2598:22,
2599:6, 2612:17, 2617:8, 2621:1,
2658:2, 2658:13
**polite** [1] - 2623:24
**politely** [1] - 2527:22
**pops** [1] - 2559:23
**Popsie** [5] - 2540:15, 2541:10, 2542:7,
2641:8, 2641:9
**portion** [3] - 2539:23, 2543:4, 2708:13
**portions** [1] - 2671:7
**portray** [2] - 2665:4, 2665:16
**posed** [1] - 2644:2
**possession** [2] - 2557:11, 2599:23
**possibility** [4] - 2567:25, 2568:3,
2568:6, 2568:19
**possible** [4] - 2568:22, 2631:8, 2639:3,
2723:4
**possibly** [7] - 2576:24, 2603:11,
2615:13, 2616:10, 2616:12, 2652:18,
2656:23
**potential** [2] - 2568:23, 2742:9
**powder** [2] - 2605:24, 2605:25
**practical** [3] - 2651:6, 2690:2, 2713:24
**practice** [5] - 2681:3, 2682:3, 2682:19,
2683:7, 2683:19
**precinct** [3] - 2592:18, 2693:15,
2693:16
**Precinct** [3] - 2579:19, 2693:11,
2693:17
**precious** [2] - 2600:24, 2603:9
**preclude** [1] - 2651:24
**predict** [1] - 2758:7
**prejudice** [4] - 2720:14, 2720:15,
2720:19, 2731:1
**prejudicial** [1] - 2645:5
**preliminaries** [1] - 2754:25
**preliminary** [4] - 2707:9, 2710:22,
2741:12, 2741:21
**preparation** [2] - 2631:17, 2676:7
**prepare** [1] - 2665:16
**prepared** [1] - 2654:18
**presence** [12] - 2561:7, 2642:21,
2651:1, 2654:20, 2670:16, 2673:1,
2748:6, 2748:11, 2748:13, 2752:21,
2758:18
**present** [15] - 2527:5, 2535:10, 2540:15,
2540:23, 2653:12, 2679:8, 2708:6,

2728:6, 2728:7, 2739:24, 2740:9,
2740:16, 2748:2, 2748:9, 2755:25
**presented** [11] - 2568:12, 2687:15,
2702:23, 2711:18, 2713:14, 2721:11,
2721:23, 2722:15, 2723:11, 2732:21,
2757:5
**preserved** [2] - 2759:1, 2759:5
**president** [1] - 2573:17
**pressure** [6] - 2637:18, 2643:7,
2664:25, 2700:17, 2743:4, 2755:16
**pressures** [1] - 2665:1
**presumed** [2] - 2722:5, 2729:16
**presumes** [1] - 2722:3
**presumption** [1] - 2722:25
**pretend** [2] - 2562:8, 2562:20
**pretended** [1] - 2560:22
**pretending** [1] - 2560:24
**pretty** [6] - 2605:2, 2605:7, 2653:8,
2724:15, 2741:14, 2757:25
**prevents** [1] - 2743:21
**previous** [3] - 2537:3, 2541:11, 2604:9
**price** [1] - 2605:2
**Prince** [1] - 2598:7
**principle** [2] - 2590:17, 2718:9
**principles** [1] - 2716:19
**prison** [32] - 2544:21, 2569:2, 2569:6,
2569:7, 2569:12, 2570:25, 2574:7,
2574:16, 2575:14, 2575:16, 2575:19,
2576:6, 2576:9, 2579:6, 2586:18,
2586:19, 2586:21, 2586:22, 2586:25,
2600:11, 2613:14, 2625:13, 2627:2,
2655:4, 2655:11, 2661:3, 2665:8,
2665:9, 2665:10, 2665:13, 2665:14
**prisoner** [2] - 2576:9
**prisons** [1] - 2575:25
**pristine** [1] - 2648:25
**probability** [1] - 2742:9
**probation** [6] - 2604:9, 2604:13,
2604:15, 2604:17, 2609:7, 2609:18
**Probation** [1] - 2614:23
**probative** [1] - 2672:7
**problem** [6] - 2527:15, 2528:10,
2579:22, 2610:23, 2611:2, 2703:17
**problems** [3] - 2645:17, 2695:8,
2728:19
**proceed** [3] - 2672:9, 2688:17, 2689:17
**proceeding** [2] - 2620:2, 2620:7
**proceedings** [3] - 2650:25, 2692:10,
2718:1
**Proceedings** [2] - 2526:12, 2759:9
**process** [6] - 2645:24, 2651:19, 2652:1,
2714:3, 2717:5, 2726:13
**processing** [1] - 2689:5
**procures** [1] - 2751:11
**procuring** [1] - 2642:1
**produce** [6] - 2653:9, 2653:10, 2722:22,
2740:3, 2740:5, 2740:6
**produced** [2] - 2526:13, 2690:1
**producing** [2] - 2689:11, 2722:21
**productive** [1] - 2664:22
**professed** [2] - 2548:6, 2589:17

**professional** [4] - 2530:3, 2582:24, 2756:18, 2756:22
**professor** [1] - 2714:15
**proffer** [3] - 2596:22, 2649:22, 2661:21
**programs** [2] - 2691:25
**projects** [2] - 2555:24, 2663:3
**Prole** [1] - 2626:6
**promises** [1] - 2735:8
**promoted** [1] - 2691:17
**promotion** [1] - 2693:4
**prompt** [1] - 2527:7
**promptly** [1] - 2699:21
**promptness** [1] - 2530:9
**proof** [17] - 2722:1, 2723:7, 2723:8, 2723:11, 2723:12, 2723:22, 2724:10, 2725:8, 2729:13, 2741:23, 2745:21, 2746:11, 2746:13, 2746:20, 2750:24, 2755:15, 2756:6
**properly** [2] - 2707:16, 2723:24
**propose** [1] - 2643:16
**proposed** [4] - 2648:7, 2648:10, 2653:4, 2689:3
**proposition** [1] - 2689:24
**proscribes** [1] - 2743:21
**prosecuted** [3] - 2599:4, 2599:8, 2600:6
**prosecution** [2] - 2721:1, 2735:15
**prosecutor** [1] - 2560:20
**prostitute** [1] - 2562:9
**prostitutes** [5] - 2560:15, 2560:18, 2561:24, 2562:16, 2563:12
**protect** [3] - 2581:6, 2583:24, 2628:18
**protecting** [1] - 2548:8
**protection** [5] - 2608:19, 2608:20, 2609:24, 2610:3, 2611:11
**proud** [1] - 2756:18
**prove** [18] - 2716:25, 2722:18, 2723:3, 2724:9, 2725:8, 2739:21, 2740:10, 2744:24, 2744:25, 2745:7, 2745:17, 2745:23, 2749:19, 2750:20, 2751:2, 2751:3, 2752:15, 2753:18
**proven** [8] - 2720:10, 2722:8, 2726:2, 2726:16, 2739:19, 2744:4, 2750:9, 2751:22
**proves** [4] - 2723:14, 2736:13, 2740:6, 2741:25
**provide** [1] - 2735:4
**provided** [8] - 2622:11, 2622:18, 2685:25, 2697:1, 2697:10, 2697:17, 2710:4, 2735:14
**provides** [6] - 2711:19, 2712:19, 2712:24, 2735:11, 2735:12, 2740:13
**published** [3] - 2542:14, 2544:10, 2607:24
**Puff** [7] - 2535:16, 2535:19, 2566:13, 2566:20, 2567:17, 2567:20, 2662:12
**Puff's** [1] - 2535:17
**Puffy** [7] - 2560:21, 2562:7, 2567:1, 2570:13, 2570:15, 2570:22
**Puffy's** [2] - 2567:4, 2567:15
**pull** [3] - 2561:2, 2561:19, 2563:3
**pulled** [5] - 2548:13, 2548:14, 2552:5,

2591:6
**punched** [6] - 2585:9, 2585:14, 2585:21, 2586:7, 2586:8, 2591:19
**punching** [5] - 2585:10, 2585:17, 2585:19, 2586:9, 2586:11
**punishable** [1] - 2745:5
**purchased** [1] - 2621:4
**purpose** [12] - 2530:2, 2551:20, 2738:6, 2743:25, 2745:5, 2746:2, 2746:22, 2747:3, 2747:6, 2750:16, 2750:19, 2755:25
**purposely** [2] - 2734:10, 2743:15
**purposes** [10] - 2540:4, 2643:25, 2645:6, 2700:18, 2712:18, 2713:24, 2734:3, 2748:17, 2748:23, 2749:8
**purse** [6] - 2601:9, 2601:15, 2601:19, 2601:21, 2602:2, 2602:15
**pursuant** [2] - 2735:3, 2735:9
**pursue** [3] - 2568:14, 2590:9, 2739:21
**push** [1] - 2604:3
**put** [18] - 2553:1, 2557:4, 2597:19, 2620:10, 2637:18, 2643:14, 2644:22, 2645:19, 2648:5, 2650:5, 2689:2, 2696:2, 2700:17, 2701:8, 2712:13, 2719:17, 2726:24, 2755:16
**putting** [7] - 2535:21, 2535:23, 2643:6, 2644:11, 2703:22, 2707:1, 2739:10

## Q

**qualifications** [1] - 2733:3
**qualified** [2] - 2686:20, 2696:12
**quality** [3] - 2652:4, 2652:6, 2702:24
**quantities** [1] - 2583:14
**Queens** [3] - 2640:19, 2657:17, 2659:3
**questioned** [1] - 2648:21
**questioning** [6] - 2557:2, 2573:23, 2601:9, 2666:19, 2671:16
**questions** [30] - 2529:6, 2544:24, 2559:14, 2560:11, 2562:5, 2573:22, 2593:5, 2593:6, 2593:7, 2595:13, 2632:3, 2639:21, 2642:10, 2654:15, 2660:13, 2663:15, 2664:6, 2665:7, 2666:1, 2675:24, 2679:4, 2696:15, 2696:16, 2719:15, 2728:9, 2729:5, 2753:5, 2753:15, 2753:21, 2754:3
**quick** [2] - 2642:24, 2666:23
**quickly** [2] - 2670:14, 2670:15
**quit** [1] - 2600:9
**quite** [3] - 2564:16, 2612:9, 2638:6
**quote** [1] - 2578:11

## R

**race** [2] - 2720:19, 2720:23
**racket** [2] - 2609:24, 2610:3, 2610:12
**racketeering** [1] - 2595:19
**rain** [1] - 2724:17
**raincoat** [1] - 2725:2
**raining** [5] - 2716:15, 2724:14, 2724:24, 2725:4, 2725:14
**raise** [1] - 2667:12

**raised** [2] - 2669:16, 2671:5
**ran** [8] - 2532:20, 2537:16, 2555:17, 2556:1, 2603:22, 2603:23, 2604:3
**random** [1] - 2627:17
**range** [3] - 2566:10, 2574:3, 2623:12
**rap** [1] - 2615:17
**raped** [2] - 2659:3, 2659:8
**rapper** [1] - 2540:18
**rapport** [1] - 2566:9
**rarely** [2] - 2744:3
**rate** [1] - 2636:19
**rather** [6] - 2635:14, 2644:4, 2715:21, 2718:13, 2745:20, 2750:23
**ratify** [1] - 2650:10
**rational** [1] - 2699:21
**re** [1] - 2569:24
**re-establish** [1] - 2569:24
**reached** [2] - 2549:3, 2687:16
**reaching** [1] - 2732:23
**reaction** [1] - 2604:3
**read** [16] - 2621:10, 2634:25, 2649:11, 2653:9, 2684:5, 2684:10, 2684:16, 2684:18, 2684:23, 2685:12, 2685:15, 2685:18, 2687:9, 2708:20, 2716:4, 2729:3
**readers** [1] - 2620:10
**reading** [3] - 2634:10, 2712:23, 2726:25
**reads** [5] - 2648:25, 2649:1, 2685:19, 2685:23, 2709:5
**ready** [9] - 2569:2, 2569:3, 2569:12, 2592:25, 2593:18, 2664:15, 2664:16, 2679:17, 2687:5
**real** [5] - 2548:17, 2569:23, 2716:7, 2716:12, 2746:16
**realistic** [1] - 2651:9
**reality** [1] - 2582:6
**realize** [2] - 2528:7, 2537:13
**realizing** [2] - 2547:13, 2664:18
**really** [27] - 2538:13, 2566:1, 2566:6, 2577:23, 2590:7, 2592:1, 2592:25, 2596:9, 2609:13, 2616:10, 2621:2, 2621:3, 2625:7, 2631:6, 2647:8, 2665:1, 2685:4, 2685:12, 2693:21, 2694:9, 2695:8, 2700:20, 2705:11, 2706:5, 2727:16, 2737:12, 2756:20
**reaped** [2] - 2565:22, 2662:20
**reason** [17] - 2527:6, 2538:14, 2570:6, 2578:10, 2580:4, 2582:17, 2585:13, 2591:25, 2620:22, 2630:5, 2642:25, 2698:4, 2712:13, 2723:5, 2733:11, 2737:22, 2743:17
**reasonable** [20] - 2699:22, 2716:25, 2719:5, 2719:6, 2720:10, 2722:8, 2722:18, 2723:4, 2723:5, 2723:6, 2723:7, 2723:9, 2723:12, 2723:14, 2723:22, 2725:13, 2725:25, 2726:17, 2726:20, 2726:22, 2727:10, 2736:13, 2738:10, 2740:7, 2742:1, 2745:9, 2745:18, 2749:21, 2751:22, 2754:2
**reasonably** [4] - 2723:18, 2727:2, 2738:4, 2747:22

**reasons** [12] - 2569:23, 2620:21, 2628:18, 2630:6, 2650:12, 2671:8, 2715:10, 2727:14, 2733:3, 2736:10, 2741:5, 2742:8

**rebuttal** [8] - 2649:14, 2649:18, 2710:17, 2743:5, 2755:25, 2756:1, 2756:2, 2756:12

**recalling** [2] - 2551:10, 2552:3

**receive** [3] - 2627:2, 2736:25, 2737:3

**received** [5] - 2528:1, 2633:23, 2669:6, 2679:23, 2719:25

**Receiving** [1] - 2661:22

**recently** [2] - 2631:17, 2691:17

**receptive** [1] - 2694:15

**recess** [4] - 2594:25, 2650:25, 2689:3, 2701:2

**recognize** [6] - 2542:16, 2543:6, 2543:8, 2543:9, 2544:11, 2546:5

**recognized** [2] - 2537:2, 2546:20

**recollection** [5] - 2564:22, 2719:12, 2719:21, 2731:9, 2732:3

**recommend** [2] - 2696:2, 2696:4

**recommendation** [2] - 2695:17, 2696:3

**reconciled** [2] - 2618:12, 2729:20

**reconvene** [1] - 2700:23

**record** [21] - 2528:17, 2632:22, 2632:23, 2633:7, 2634:10, 2648:25, 2649:3, 2681:3, 2682:19, 2683:7, 2683:19, 2688:3, 2688:8, 2694:7, 2703:25, 2704:18, 2706:14, 2707:16, 2707:19, 2757:9, 2759:5

**recorded** [13] - 2526:12, 2574:22, 2645:3, 2681:1, 2681:6, 2682:1, 2682:5, 2682:17, 2682:21, 2683:5, 2683:10, 2683:17, 2683:21

**recording** [1] - 2543:7

**recordkeeping** [2] - 2633:19, 2685:6

**records** [48] - 2527:25, 2632:15, 2634:5, 2666:24, 2668:10, 2668:16, 2668:20, 2669:9, 2669:11, 2669:12, 2670:3, 2671:6, 2671:8, 2671:14, 2671:15, 2671:20, 2673:4, 2675:2, 2676:6, 2676:8, 2676:9, 2676:17, 2678:23, 2679:2, 2680:2, 2680:6, 2680:9, 2680:11, 2680:13, 2680:15, 2680:18, 2680:20, 2680:22, 2681:12, 2681:14, 2681:16, 2681:18, 2681:20, 2681:23, 2682:11, 2682:14, 2683:2, 2683:15, 2684:11, 2684:12, 2686:4, 2694:17, 2739:3

**recover** [1] - 2756:3

**RECROSS** [4] - 2666:3, 2699:1, 2760:15, 2761:1

**RECROSS-EXAMINATION** [4] - 2666:3, 2699:1, 2760:15, 2761:1

**red** [2] - 2555:12, 2674:6

**Red** [2] - 2583:3, 2583:6

**redact** [1] - 2633:25

**REDIRECT** [4] - 2660:10, 2698:12, 2760:14, 2760:23

**redirect** [3] - 2631:7, 2642:23, 2660:8

**reduce** [1] - 2709:4

**redundant** [2] - 2703:11, 2754:16

**refer** [9] - 2543:15, 2576:8, 2633:16, 2669:12, 2684:20, 2685:13, 2685:14, 2716:4, 2721:23

**reference** [2] - 2735:9, 2749:10

**referenced** [3] - 2540:4, 2706:15, 2734:21

**references** [2] - 2739:5, 2744:17

**referrals** [1] - 2691:24

**referred** [4] - 2537:23, 2542:14, 2544:10, 2737:24

**referring** [1] - 2721:24

**reflect** [5] - 2653:17, 2688:3, 2688:8, 2688:16, 2706:14

**reflecting** [1] - 2615:11

**reflective** [1] - 2673:3

**reflector** [1] - 2546:4

**refuse** [1] - 2573:3

**regard** [6] - 2676:15, 2708:24, 2721:12, 2735:21, 2737:17, 2739:19

**regarding** [9] - 2618:22, 2619:17, 2620:2, 2631:18, 2636:20, 2641:7, 2641:9, 2649:5, 2736:21

**regardless** [5] - 2707:9, 2707:22, 2712:21, 2718:15, 2736:1

**regards** [2] - 2675:18, 2694:13

**register** [1] - 2545:25

**regular** [6] - 2571:1, 2681:3, 2682:3, 2682:19, 2683:7, 2683:19

**rehabilitate** [1] - 2692:1

**rehabilitated** [2] - 2569:5, 2592:25

**rehabilitation** [2] - 2531:7, 2532:8

**REHNKE** [21] - 2643:12, 2645:1, 2646:14, 2646:16, 2646:24, 2647:7, 2647:25, 2648:4, 2648:21, 2650:23, 2652:22, 2653:3, 2653:8, 2653:20, 2654:2, 2679:5, 2687:21, 2688:1, 2688:19, 2688:24, 2689:19

**rejoin** [2] - 2569:13, 2664:16

**related** [28] - 2541:14, 2547:7, 2558:11, 2559:9, 2559:10, 2559:12, 2595:23, 2680:2, 2680:6, 2680:9, 2680:11, 2680:13, 2680:15, 2680:18, 2680:21, 2680:23, 2681:12, 2681:14, 2681:16, 2681:18, 2681:20, 2681:23, 2682:11, 2682:14, 2683:2, 2683:15, 2684:12, 2756:12

**relating** [2] - 2530:21, 2741:8

**relations** [3] - 2618:22, 2709:9, 2709:15

**relationship** [3] - 2590:10, 2618:10, 2730:22

**relax** [1] - 2729:5

**release** [2] - 2692:2, 2696:12

**released** [15] - 2586:18, 2614:19, 2625:13, 2625:16, 2691:19, 2692:2, 2693:20, 2695:12, 2695:16, 2695:20, 2696:2, 2696:4, 2696:9, 2696:11, 2697:19

**relevance** [2] - 2633:2, 2643:19

**relevant** [7] - 2559:4, 2639:19, 2650:16,

**reasons** [12] - 2650:21, 2706:8, 2708:12, 2732:14

**religion** [11] - 2563:18, 2563:20, 2589:19, 2589:22, 2589:25, 2590:1, 2590:3, 2590:5, 2630:7, 2720:19, 2720:23

**religious** [2] - 2603:6, 2629:22

**rely** [3] - 2685:12, 2719:11, 2723:9

**remain** [3] - 2606:19, 2667:12, 2690:11

**remaining** [1] - 2677:20

**remains** [2] - 2709:24, 2709:25, 2710:4, 2740:11

**remarks** [2] - 2530:12, 2717:2

**remember** [66] - 2536:15, 2536:16, 2536:22, 2537:20, 2540:15, 2542:24, 2543:10, 2550:2, 2552:19, 2554:4, 2555:8, 2556:15, 2558:2, 2566:22, 2573:17, 2576:15, 2578:12, 2583:5, 2584:19, 2585:5, 2585:13, 2585:15, 2585:17, 2585:19, 2585:20, 2592:5, 2597:4, 2607:4, 2613:15, 2616:2, 2624:8, 2624:11, 2625:20, 2638:2, 2638:17, 2638:23, 2639:2, 2640:2, 2640:5, 2640:20, 2640:22, 2641:5, 2641:6, 2641:7, 2641:16, 2641:18, 2642:3, 2656:15, 2657:13, 2657:16, 2659:1, 2659:5, 2659:25, 2660:1, 2660:19, 2666:5, 2666:11, 2678:12, 2678:15, 2697:22, 2728:25, 2729:13, 2732:4

**remembers** [2] - 2639:4, 2639:7

**remind** [8] - 2539:25, 2639:11, 2640:7, 2659:22, 2711:10, 2726:19, 2741:15, 2742:25

**reminded** [1] - 2721:15

**removed** [2] - 2711:24, 2725:9

**RENA** [1] - 2525:16

**render** [3] - 2720:12, 2728:9, 2742:6

**rendered** [1] - 2647:3

**renew** [1] - 2667:9

**rented** [1] - 2630:17

**repeat** [6] - 2553:17, 2695:18, 2736:19, 2740:2, 2756:1, 2756:4

**repetition** [4] - 2631:6, 2631:13, 2632:5, 2716:21

**repetitious** [1] - 2639:18

**rephrase** [1] - 2622:17

**report** [3] - 2614:22, 2695:25, 2730:18

**reported** [2] - 2569:21, 2695:6

**REPORTER** [1] - 2526:10

**reporter** [1] - 2651:22

**reporters** [1] - 2704:1

**reports** [1] - 2574:2

**represent** [6] - 2595:10, 2668:20, 2674:3, 2674:11, 2691:4, 2756:21

**representation** [1] - 2538:18

**representatives** [1] - 2638:4

**represented** [1] - 2670:6

**represents** [2] - 2674:12, 2674:13

**reputation** [2] - 2581:14, 2581:17

**reputed** [1] - 2531:4

**request** [3] - 2624:25, 2668:21, 2757:8

<br>

**requested** [3] - 2676:10, 2676:19, 2717:20
**requests** [1] - 2751:17
**require** [3] - 2739:23, 2740:2, 2744:2
**required** [12] - 2597:15, 2723:3, 2726:10, 2729:14, 2735:19, 2735:20, 2748:19, 2748:21, 2751:1, 2751:3, 2751:16, 2753:23
**requirement** [2] - 2739:20, 2752:7
**requires** [4] - 2716:3, 2725:19, 2743:25, 2750:12
**resided** [1] - 2694:4
**residence** [6] - 2691:23, 2693:24, 2694:2, 2694:5, 2694:12, 2695:3
**resides** [1] - 2691:23
**residing** [1] - 2694:1
**resignation** [1] - 2704:2
**resist** [2] - 2646:1, 2758:17
**resolution** [1] - 2653:11
**resolve** [3] - 2670:14, 2719:4, 2729:18
**resolved** [1] - 2688:20
**respect** [18] - 2527:23, 2539:4, 2539:5, 2539:6, 2631:9, 2649:24, 2651:20, 2652:5, 2675:1, 2675:6, 2675:15, 2710:23, 2710:24, 2719:19, 2721:10, 2721:23, 2723:18, 2736:5
**respective** [1] - 2718:25
**respond** [1] - 2664:21
**responded** [1] - 2668:21
**responsibility** [6] - 2653:2, 2712:11, 2714:16, 2729:9, 2739:11, 2747:9
**responsible** [2] - 2581:22, 2738:8
**rest** [7] - 2616:7, 2687:5, 2687:12, 2689:24, 2699:25, 2710:21, 2733:19
**restaurant** [2] - 2588:18, 2559:6
**rested** [1] - 2687:13
**resting** [1] - 2687:14
**rests** [3] - 2687:11, 2710:16, 2736:3
**result** [1] - 2650:14
**resumes** [2] - 2529:3, 2595:1
**retired** [1] - 2732:8
**return** [1] - 2692:9
**returned** [1] - 2635:21
**returning** [1] - 2624:4
**review** [5] - 2675:2, 2676:7, 2689:9, 2694:6, 2695:23
**reviewed** [1] - 2676:10
**reviewing** [1] - 2653:6
**revisit** [1] - 2701:5
**revolver** [1] - 2549:4
**revved** [1] - 2651:17
**reward** [1] - 2579:3
**rich** [1] - 2665:16
**rich-guy** [1] - 2665:16
**RICO** [3] - 2701:17, 2703:21, 2704:7
**right-hand** [1] - 2555:13
**rights** [1] - 2629:23
**Rikers** [3] - 2548:4, 2604:11, 2604:24
**ring** [2] - 2582:20, 2603:10
**rings** [1] - 2758:5
**Rink** [1] - 2629:6

**ripped** [1] - 2567:18
**rise** [5] - 2529:8, 2594:22, 2642:20, 2700:25, 2708:2
**risk** [6] - 2579:3, 2579:14, 2631:6, 2720:16, 2727:20, 2728:15
**risks** [2] - 2579:5, 2579:8
**risky** [1] - 2578:17
**rite** [1] - 2627:14
**roaming** [1] - 2588:15
**rob** [5] - 2560:24, 2561:21, 2612:23, 2614:15, 2659:7
**robbed** [5] - 2541:6, 2541:19, 2579:17, 2582:13, 2659:3
**robberies** [19] - 2541:8, 2570:9, 2570:12, 2570:18, 2570:25, 2571:3, 2571:19, 2572:5, 2588:7, 2598:22, 2600:3, 2605:18, 2611:10, 2612:4, 2612:12, 2615:8, 2615:14, 2616:1, 2616:11
**Robbery** [2] - 2706:9, 2708:14
**robbery** [30] - 2541:9, 2541:11, 2541:14, 2541:16, 2541:17, 2563:24, 2572:23, 2573:1, 2576:25, 2579:14, 2586:22, 2586:23, 2595:21, 2598:6, 2598:16, 2599:5, 2600:2, 2600:11, 2604:6, 2604:8, 2604:9, 2604:17, 2604:20, 2605:10, 2605:12, 2612:19, 2616:8, 2693:9, 2697:19
**robbing** [1] - 2541:1
**Robert** [4] - 2595:10, 2614:6, 2686:14, 2691:4
**ROBERT** [2] - 2525:23, 2525:24
**Rock** [42] - 2543:25, 2544:6, 2544:14, 2544:15, 2544:20, 2544:23, 2545:2, 2545:7, 2546:3, 2546:5, 2547:4, 2547:7, 2547:9, 2547:11, 2547:15, 2547:19, 2550:14, 2550:25, 2551:24, 2552:21, 2553:22, 2554:13, 2555:11, 2555:13, 2555:17, 2555:18, 2555:25, 2556:5, 2557:20, 2558:8, 2560:7, 2564:14, 2564:23, 2565:16, 2581:9, 2582:9, 2610:7, 2631:20, 2663:15, 2663:16
**Rock's** [1] - 2544:3
**role** [2] - 2582:10, 2583:21
**roles** [3] - 2718:25, 2749:5
**Rolexes** [1] - 2541:2
**Roller** [1] - 2629:6
**Ronnie** [1] - 2638:20
**room** [4] - 2532:13, 2694:16, 2716:2, 2720:4
**RPR** [1] - 2526:10
**Ruhnke** [20] - 2560:10, 2601:8, 2613:4, 2616:21, 2627:9, 2629:20, 2644:22, 2647:6, 2648:13, 2649:5, 2650:4, 2662:21, 2664:15, 2669:15, 2701:8, 2705:21, 2708:6, 2708:8, 2710:11, 2755:23
**RUHNKE** [42] - 2525:19, 2525:20, 2533:22, 2539:20, 2539:25, 2540:6, 2542:13, 2560:12, 2560:14, 2565:13,

2579:2, 2593:3, 2593:10, 2594:15, 2701:4, 2702:1, 2703:1, 2704:6, 2704:11, 2704:20, 2706:4, 2706:6, 2706:21, 2706:25, 2707:4, 2707:6, 2707:11, 2707:13, 2707:23, 2708:1, 2708:9, 2708:18, 2710:12, 2714:20, 2714:23, 2717:23, 2718:4, 2758:20, 2758:23, 2759:1, 2759:7, 2760:9
**Ruhnke's** [1] - 2650:13
**rule** [6] - 2711:16, 2711:18, 2712:23, 2718:15, 2725:17, 2743:19
**Rule** [4] - 2653:23, 2688:3, 2707:1, 2758:20
**ruled** [1] - 2702:1
**rules** [1] - 2716:16
**ruling** [12] - 2528:3, 2644:9, 2644:19, 2648:3, 2648:23, 2649:3, 2652:5, 2667:5, 2671:22, 2701:5, 2707:10, 2707:22
**rulings** [3] - 2651:25, 2652:8, 2720:7
**rumor** [1] - 2641:10
**run** [5] - 2571:24, 2601:18, 2604:2, 2610:19, 2631:6
**running** [4] - 2537:9, 2572:3, 2582:14, 2657:8

## S

**S-p-a-e-t-h** [1] - 2667:17
**sales** [2] - 2584:19, 2584:25
**Sambo** [2] - 2661:6, 2661:8
**Sarkissian** [3] - 2560:21, 2562:7, 2566:13
**satisfied** [5] - 2706:16, 2722:7, 2725:20, 2726:21, 2752:14
**satisfy** [1] - 2728:10
**save** [3] - 2625:6, 2625:8, 2685:4
**saw** [18] - 2536:20, 2536:25, 2546:3, 2546:18, 2547:14, 2550:14, 2554:13, 2555:11, 2555:13, 2606:15, 2617:1, 2618:19, 2662:24, 2663:11, 2721:18, 2722:24, 2724:3
**scam** [1] - 2531:5
**scaring** [1] - 2588:9
**scene** [1] - 2541:21
**schedule** [2] - 2757:25, 2758:2
**scheduling** [1] - 2651:2
**scheme** [7] - 2560:22, 2738:22, 2745:22, 2746:1, 2747:7, 2747:23, 2749:5
**school** [9] - 2600:9, 2600:23, 2657:16, 2657:19, 2657:20, 2657:21, 2657:22, 2657:23
**scope** [1] - 2747:17
**scratch** [1] - 2706:23
**scratching** [1] - 2724:2
**scream** [1] - 2572:19
**screamed** [1] - 2661:10
**screw** [1] - 2615:2
**scrutinize** [1] - 2729:24
**scrutinized** [1] - 2736:15
**Sean** [1] - 2647:8

seat [2] - 2549:3, 2690:14
seated [1] - 2708:4
second [22] - 2535:1, 2547:6, 2631:5,
2634:23, 2637:20, 2639:9, 2648:22,
2671:9, 2702:7, 2702:11, 2702:19,
2703:7, 2708:18, 2708:23, 2716:22,
2745:13, 2746:23, 2750:1, 2752:4,
2752:13, 2754:11, 2755:19
seconds [1] - 2527:11
secrecy [1] - 2746:12
secretly [1] - 2754:8
section [1] - 2735:12
Section [4] - 2709:19, 2735:9, 2735:17,
2736:2
Security [1] - 2686:19
see [61] - 2531:25, 2539:16, 2547:16,
2551:14, 2551:16, 2552:4, 2554:18,
2555:2, 2555:18, 2555:25, 2557:7,
2559:18, 2559:21, 2559:22, 2562:11,
2562:22, 2577:16, 2597:22, 2598:2,
2618:16, 2632:9, 2633:18, 2639:19,
2640:16, 2643:19, 2647:4, 2647:7,
2648:18, 2650:22, 2651:12, 2651:14,
2661:19, 2670:11, 2678:5, 2678:6,
2678:7, 2684:4, 2687:7, 2696:22,
2700:20, 2700:23, 2702:7, 2702:20,
2706:2, 2713:1, 2720:4, 2724:8,
2724:18, 2725:9, 2733:14, 2744:10,
2752:7, 2754:22, 2756:8, 2756:13,
2756:25, 2757:1, 2757:2, 2757:14,
2758:16, 2759:8
seeing [5] - 2532:1, 2590:4, 2619:18,
2672:6, 2687:6
seek [2] - 2626:15, 2753:10
seeking [1] - 2596:3
seem [4] - 2615:6, 2637:19, 2699:21,
2730:9
sell [5] - 2566:8, 2606:4, 2606:8,
2606:16, 2606:23
seller [2] - 2566:20, 2566:21
sellers [1] - 2567:8
selling [9] - 2558:15, 2558:25, 2605:20,
2611:10, 2616:14, 2636:2, 2636:5,
2636:9, 2636:10
send [7] - 2550:18, 2665:22, 2665:23,
2688:12, 2699:19, 2699:24, 2751:8
sending [2] - 2635:11, 2636:15
SENIOR [1] - 2525:11
senior [3] - 2690:16, 2691:13, 2691:17
Senior [1] - 2693:3
sense [20] - 2527:24, 2577:13, 2642:22,
2643:24, 2651:9, 2689:6, 2689:18,
2711:13, 2723:6, 2725:10, 2725:24,
2726:13, 2730:4, 2730:14, 2731:22,
2732:5, 2733:11, 2734:15, 2746:16,
2756:10
sent [4] - 2635:7, 2635:13, 2635:16,
2636:11
sentence [10] - 2568:1, 2604:12,
2615:3, 2691:20, 2710:2, 2735:18,
2735:19, 2735:20, 2735:25, 2736:3

sentenced [3] - 2569:11, 2614:14,
2664:14
sentences [1] - 2735:12
sentencing [8] - 2614:15, 2614:17,
2614:20, 2614:25, 2615:7, 2735:6,
2735:16, 2735:23
Sentencing [1] - 2735:10
separate [5] - 2621:11, 2621:12,
2718:19, 2744:21, 2754:15
separated [1] - 2531:8
separately [4] - 2721:10, 2721:25,
2742:16, 2749:3
September [3] - 2634:6, 2635:1,
2660:20
series [1] - 2670:2
serious [6] - 2530:10, 2530:11, 2530:15,
2573:23, 2609:14, 2714:13
seriously [3] - 2609:13, 2609:14,
2628:21
servant [1] - 2665:19
served [5] - 2568:20, 2568:23, 2568:25,
2710:2, 2737:5
services [3] - 2545:18, 2545:21
session [1] - 2661:21
sessions [1] - 2596:22
Sessoms [1] - 2641:8
set [4] - 2630:3, 2645:4, 2706:12,
2726:4
sets [1] - 2671:8
Seven [1] - 2714:9
seven [2] - 2598:13, 2616:7
several [1] - 2613:25
sex [3] - 2563:10, 2720:20, 2720:24
sexual [2] - 2709:9, 2709:15
shade [1] - 2730:25
shape [1] - 2619:14
share [1] - 2631:21
sheet [2] - 2615:17, 2626:8
sheets [1] - 2721:20
shield [1] - 2658:11
shifts [2] - 2722:19, 2740:12
shit [1] - 2661:11
shocked [1] - 2546:8
shoot [7] - 2548:7, 2551:23, 2552:21,
2559:25, 2560:6, 2573:1, 2612:24
shooting [13] - 2537:14, 2537:15,
2553:7, 2553:19, 2559:9, 2588:21,
2612:13, 2612:14, 2612:22, 2616:13,
2617:2, 2618:4, 2663:6
shootout [1] - 2558:11
shop [1] - 2583:13
shoplifted [1] - 2584:15
shoplifters [1] - 2582:24
shoplifting [1] - 2582:20
shorten [1] - 2558:19
shorter [1] - 2685:10
shortly [3] - 2600:12, 2619:18, 2621:22
shot [14] - 2535:4, 2535:14, 2555:25,
2558:11, 2558:13, 2559:5, 2559:11,
2569:16, 2582:15, 2619:10, 2621:16,
2686:9, 2686:11

shots [8] - 2537:5, 2555:17, 2567:16,
2567:20, 2619:22, 2619:23, 2619:24,
2619:25
show [16] - 2542:8, 2544:8, 2561:3,
2573:5, 2610:17, 2634:18, 2668:11,
2669:23, 2673:8, 2673:21, 2675:10,
2701:25, 2702:8, 2736:9, 2746:3,
2748:13
showed [1] - 2540:21
showing [2] - 2540:5, 2746:7
shown [2] - 2540:21, 2610:18, 2731:11
shows [2] - 2675:12, 2705:2
side [3] - 2536:18, 2536:19, 2555:14,
2644:4, 2673:15, 2673:20, 2673:21,
2674:11
sidebar [3] - 2670:14, 2670:16, 2672:11
Sidebar [1] - 2671:1
sides [1] - 2739:17
signed [1] - 2709:4
significance [2] - 2625:8, 2674:15
silly [1] - 2705:11
similar [6] - 2601:15, 2627:20, 2702:24,
2720:17, 2751:15
similarly [1] - 2748:15
simple [4] - 2609:12, 2649:25, 2713:7,
2754:5
simply [6] - 2570:3, 2577:21, 2581:5,
2725:19, 2746:7, 2749:6
single [1] - 2718:12
Singular [5] - 2682:11, 2682:13,
2682:17, 2682:19, 2682:21
sip [1] - 2733:13
sister [6] - 2583:6, 2635:11, 2635:12,
2636:11, 2636:15, 2665:23
sit [2] - 2698:4, 2754:18
site [1] - 2554:18
sites [1] - 2554:16
sitting [4] - 2536:2, 2553:11, 2555:21,
2558:6
situation [9] - 2536:1, 2539:9, 2540:23,
2540:25, 2549:5, 2554:15, 2556:8,
2663:10, 2740:20
situations [4] - 2645:24, 2664:19,
2669:20, 2669:23
Six [1] - 2742:18
six [3] - 2561:12, 2561:15, 2691:7
Sixteen [1] - 2742:14
sixty [1] - 2686:6
sixty-eight [1] - 2686:6
size [1] - 2731:24
sizing [1] - 2729:8
slack [1] - 2639:16
slang [1] - 2576:5
slap [1] - 2579:23
slate [1] - 2577:19
sleep [3] - 2714:11, 2743:6, 2755:6
slew [1] - 2599:17
slowly [1] - 2555:23
smack [1] - 2572:23
small [1] - 2734:13
Smith [1] - 2560:3

smoothly [1] - 2689:9
smuggled [3] - 2576:5, 2655:4, 2655:11
snafu [1] - 2612:13
snatch [3] - 2571:17, 2601:15, 2601:16
snatched [1] - 2603:15
snatches [1] - 2603:1
snatching [7] - 2571:16, 2571:18, 2571:21, 2601:10, 2602:10, 2602:23, 2603:5
snowing [2] - 2534:21, 2537:20
so-called [1] - 2700:8
society [4] - 2569:13, 2593:1, 2664:16, 2664:23
soda [1] - 2555:15
sold [2] - 2584:12, 2607:3
sole [3] - 2719:1, 2720:5, 2729:11
solely [1] - 2728:7
solicits [1] - 2751:17
some-odd [1] - 2754:22
someone [20] - 2537:25, 2538:10, 2538:21, 2539:18, 2543:25, 2544:22, 2548:7, 2549:9, 2556:24, 2557:8, 2566:14, 2579:14, 2579:19, 2658:14, 2658:15, 2711:19, 2730:17, 2732:21, 2738:23, 2754:6
sometime [1] - 2700:19
sometimes [6] - 2566:5, 2573:22, 2600:15, 2617:19, 2651:21, 2714:3
somewhat [1] - 2749:17
somewhere [2] - 2531:13, 2568:6
somewhere's [1] - 2628:2
son [2] - 2541:25, 2582:2
soon [2] - 2530:15, 2741:14
sorry [17] - 2527:13, 2532:25, 2533:20, 2544:5, 2546:11, 2553:15, 2558:19, 2593:10, 2625:23, 2635:12, 2648:9, 2653:5, 2674:9, 2678:2, 2698:20, 2704:22, 2714:19
Sorry [1] - 2563:3
sort [6] - 2569:24, 2574:3, 2652:21, 2653:25, 2687:12, 2714:14
sorts [3] - 2727:5, 2727:6, 2728:9
Sotomayor [1] - 2649:1
sought [1] - 2752:20
SOUMYA [1] - 2525:15
sound [3] - 2561:15, 2634:9, 2714:9
sounds [2] - 2590:2, 2635:10, 2724:1
space [1] - 2637:7
Spaeth [3] - 2667:16, 2673:9, 2676:5
SPAETH [2] - 2667:18, 2760:16
span [1] - 2599:21
spared [1] - 2684:18
sparring [2] - 2628:23, 2628:24
speaking [14] - 2534:17, 2534:23, 2536:18, 2536:25, 2544:22, 2552:16, 2555:14, 2557:6, 2558:16, 2576:19, 2623:12, 2661:4, 2755:19
Special [1] - 2709:12
special [1] - 2732:20
specific [11] - 2527:20, 2534:1, 2551:10, 2573:12, 2640:14, 2716:24,

2739:20, 2743:10, 2743:19, 2747:2, 2754:21
specifically [4] - 2528:9, 2589:25, 2590:3, 2700:9
specifics [3] - 2556:15, 2585:15, 2677:13
specify [1] - 2676:11
speculate [14] - 2646:5, 2646:7, 2646:9, 2711:2, 2711:9, 2727:5, 2727:17, 2727:23, 2728:3, 2728:12, 2741:4, 2741:9, 2742:6, 2742:8
speculating [1] - 2727:9
speculation [12] - 2646:1, 2719:7, 2726:14, 2727:4, 2727:21, 2728:8, 2728:15, 2729:16, 2740:21, 2740:23, 2742:4, 2742:9
speculations [1] - 2728:10
spell [2] - 2667:15, 2690:15
spelled [2] - 2533:11, 2533:13
spend [2] - 2674:20, 2756:11
spent [2] - 2636:22, 2664:4
spoken [8] - 2593:20, 2661:1, 2661:4, 2661:17, 2662:8, 2662:13, 2662:15, 2691:7
spot [2] - 2582:14, 2657:8
spread [1] - 2707:19
spree [1] - 2601:4
Sprint [10] - 2680:2, 2680:6, 2680:9, 2680:11, 2680:13, 2680:15, 2680:18, 2680:20, 2680:22, 2681:6
Sprint's [2] - 2681:2, 2681:3
staff [1] - 2530:4
stage [2] - 2651:17, 2758:1
stand [7] - 2529:3, 2595:1, 2652:17, 2690:5, 2721:6, 2731:12, 2739:10
standing [8] - 2536:12, 2546:2, 2546:25, 2571:12, 2617:1, 2665:2, 2667:12, 2690:12
stands [1] - 2731:9
Star [1] - 2601:4
start [8] - 2527:7, 2547:5, 2570:17, 2651:10, 2652:24, 2743:2, 2755:3, 2757:23
started [18] - 2533:5, 2533:8, 2534:20, 2536:23, 2537:9, 2537:19, 2541:1, 2547:12, 2567:14, 2605:15, 2612:13, 2612:14, 2612:22, 2617:17, 2663:19, 2687:17, 2693:22, 2700:7
starting [5] - 2530:20, 2651:13, 2674:17, 2699:20, 2700:18
starts [1] - 2548:15
state [22] - 2575:19, 2575:25, 2589:22, 2604:21, 2613:14, 2625:13, 2667:15, 2686:1, 2686:13, 2690:15, 2692:6, 2692:8, 2695:7, 2718:15, 2744:3, 2744:6, 2744:8, 2744:16, 2749:10, 2749:14, 2751:5, 2753:22
State [4] - 2609:12, 2686:22, 2690:10, 2691:14
statement [13] - 2701:17, 2702:17, 2704:9, 2709:14, 2709:19, 2710:7,

2712:15, 2712:21, 2733:25, 2734:2, 2734:6, 2734:10, 2734:19
statements [20] - 2711:20, 2711:25, 2712:3, 2719:13, 2733:13, 2733:23, 2734:18, 2737:15, 2737:18, 2737:19, 2738:5, 2738:9, 2738:12, 2738:16, 2738:18, 2738:21, 2738:23, 2746:19, 2757:4
states [2] - 2679:24, 2686:22
STATES [3] - 2525:1, 2525:3, 2525:11
States [9] - 2525:5, 2525:14, 2525:16, 2527:3, 2709:18, 2709:21, 2735:10, 2740:24, 2754:7
stating [2] - 2718:13, 2735:13
stationary [1] - 2536:11
stations [3] - 2571:6, 2571:10, 2571:15
statutory [1] - 2710:3
stay [5] - 2549:14, 2550:22, 2551:1, 2551:3, 2552:9
stayed [1] - 2534:22
steal [5] - 2572:1, 2579:15, 2583:13, 2600:20
stealing [6] - 2557:8, 2584:23, 2600:24, 2603:20, 2604:3, 2641:21
steeper [1] - 2615:3
stenography [1] - 2526:12
step [5] - 2666:20, 2679:7, 2699:11, 2711:24, 2750:13
stepped [2] - 2546:1, 2725:9
steps [3] - 2547:1, 2594:24, 2699:12
stick [1] - 2533:9
sticker [1] - 2648:5
sticking [1] - 2643:13
sticks [2] - 2693:21, 2694:9
still [21] - 2562:25, 2565:1, 2569:18, 2569:21, 2595:7, 2643:14, 2644:18, 2647:2, 2649:15, 2649:20, 2650:1, 2650:9, 2654:22, 2687:14, 2689:2, 2689:14, 2694:9, 2724:23, 2725:3, 2745:5, 2756:22
stipulate [3] - 2643:17, 2671:7, 2739:17
stipulated [6] - 2669:14, 2671:6, 2679:25, 2685:19, 2701:13, 2709:6
stipulation [39] - 2649:14, 2653:4, 2681:1, 2681:6, 2681:8, 2682:1, 2682:5, 2682:7, 2682:17, 2682:21, 2682:24, 2683:4, 2683:9, 2683:12, 2683:17, 2683:21, 2683:23, 2686:23, 2688:19, 2688:21, 2701:5, 2703:6, 2703:8, 2703:13, 2703:15, 2703:17, 2703:18, 2704:5, 2704:6, 2704:13, 2704:16, 2704:21, 2705:1, 2705:16, 2706:18, 2709:2, 2709:5, 2710:5, 2739:18
stipulations [9] - 2667:1, 2679:9, 2679:10, 2679:21, 2684:16, 2685:10, 2687:9, 2689:11, 2739:16
stole [2] - 2601:2, 2641:23
stolen [3] - 2588:3, 2630:24, 2660:1
stop [10] - 2534:13, 2562:18, 2584:25, 2591:25, 2595:15, 2630:4, 2647:17,

2702:11, 2716:5, 2727:19

**stopped** [13] - 2535:9, 2570:16

**store** [13] - 2545:23, 2545:24, 2546:1, 2555:13, 2584:23, 2585:20, 2587:14, 2587:17, 2587:20, 2588:1, 2591:18, 2613:3, 2614:14

**stores** [6] - 2583:9, 2583:10, 2583:11, 2587:8

**storms** [1] - 2608:15

**story** [2] - 2593:23, 2621:9

**straight** [4] - 2536:5, 2627:4, 2627:6, 2630:3

**straighten** [1] - 2729:5

**straightforward** [1] - 2732:2

**stranger** [2] - 2627:18, 2627:23

**street** [14] - 2536:16, 2536:18, 2537:10, 2537:11, 2555:9, 2555:15, 2555:16, 2556:1, 2576:5, 2581:11, 2587:17, 2607:10, 2656:1, 2657:14

**Street** [3] - 2525:21, 2525:24, 2526:7

**streetwalker** [1] - 2562:9

**strength** [1] - 2608:16

**stress** [1] - 2748:1

**strike** [2] - 2527:19, 2730:17

**Stro** [5] - 2539:18, 2540:10, 2540:11, 2540:15, 2686:18

**strong** [1] - 2646:10

**structured** [1] - 2714:17

**stuff** [12] - 2548:20, 2563:17, 2581:5, 2583:18, 2583:21, 2588:2, 2641:4, 2644:5, 2705:11, 2705:13, 2705:14, 2706:5

**Stuy** [1] - 2630:14

**subject** [1] - 2631:24

**subject's** [1] - 2694:8

**submit** [1] - 2704:1

**subscriber** [3] - 2677:17, 2678:22, 2679:2

**subscribers** [1] - 2679:1

**substance** [4] - 2581:11, 2691:24, 2706:17, 2750:6

**substantial** [1] - 2735:14

**substantive** [2] - 2703:16, 2707:15

**substantively** [1] - 2716:9

**substitute** [1] - 2733:10

**substitution** [1] - 2719:20

**subway** [1] - 2571:12

**subways** [1] - 2571:10

**succeed** [3] - 2749:9, 2752:20, 2753:11

**successful** [1] - 2689:25

**sudden** [2] - 2563:17, 2567:14

**sufficient** [7] - 2704:14, 2705:13, 2723:1, 2741:25, 2746:3, 2750:25, 2752:25

**suitcase** [1] - 2754:8

**Suite** [1] - 2525:24

**sum** [6] - 2581:11, 2646:17, 2731:23, 2737:11, 2749:6, 2750:6

**summarizing** [1] - 2669:11

**summation** [8] - 2625:7, 2644:11, 2645:15, 2646:19, 2674:21, 2726:5,

2756:1, 2756:7

**summations** [20] - 2651:7, 2651:8, 2651:10, 2669:8, 2684:19, 2699:20, 2699:23, 2700:9, 2700:16, 2716:23, 2717:7, 2743:3, 2743:11, 2755:13, 2756:9, 2756:13, 2757:12, 2757:13, 2757:19, 2758:24

**summer** [1] - 2545:22

**summing** [1] - 2715:4

**sundry** [1] - 2611:20

**sunny** [5] - 2724:14, 2724:15, 2724:23, 2725:4, 2725:6

**super** [3] - 2530:11, 2530:15

**superhero** [1] - 2607:23

**superseding** [5] - 2702:15, 2702:20, 2703:10, 2704:5, 2706:15

**supervise** [1] - 2691:19

**supervised** [1] - 2696:3

**supervising** [4] - 2693:6, 2693:7, 2693:23, 2695:17

**supervision** [8] - 2691:10, 2692:4, 2692:5, 2693:8, 2695:4, 2695:9, 2695:10, 2697:20

**support** [2] - 2707:19, 2722:16

**supported** [1] - 2712:17

**supposed** [6] - 2540:19, 2553:21, 2606:4, 2613:21, 2756:24

**Supreme** [1] - 2649:1

**surprised** [1] - 2622:4

**surrounding** [1] - 2620:2

**surroundings** [1] - 2546:14

**surveilled** [1] - 2645:4

**suspect** [4] - 2540:5, 2699:18, 2699:23, 2730:10, 2755:17, 2756:2

**sustained** [4] - 2538:12, 2582:4, 2617:11, 2617:14, 2639:6, 2659:14

**sustaining** [1] - 2617:13

**SUV** [5] - 2535:18, 2536:21, 2537:10, 2537:22, 2537:23

**swayed** [1] - 2720:14

**swear** [1] - 2597:11

**switch** [1] - 2640:9

**sworn** [3] - 2667:20, 2690:20, 2718:17

**symbol** [1] - 2603:6

**sympathy** [3] - 2720:14, 2720:15, 2720:18

**system** [3] - 2596:4, 2697:6, 2697:7

---

# T

**T-Mobile** [2] - 2683:15, 2683:21

**T-Mobile's** [2] - 2683:18, 2683:19

**T-Rock** [3] - 2631:20, 2663:15, 2663:16

**table** [1] - 2716:2

**tacitly** [1] - 2746:4

**tale** [1] - 2652:21

**talents** [2] - 2530:9, 2756:18

**talkie** [1] - 2541:10

**talkies** [3] - 2541:24, 2542:1, 2542:4

**Tanya** [1] - 2550:3

**tape** [1] - 2539:23

**targeting** [2] - 2589:25, 2590:3

**taught** [1] - 2590:5

**Tawana** [1] - 2583:2

**taxicab** [1] - 2552:5

**Taz** [76] - 2540:15, 2541:20, 2543:21, 2544:7, 2545:3, 2545:12, 2545:24, 2547:1, 2547:7, 2547:9, 2547:11, 2547:14, 2547:21, 2547:22, 2548:5, 2548:9, 2548:10, 2548:15, 2548:16, 2548:18, 2549:2, 2549:4, 2549:6, 2549:12, 2549:13, 2549:14, 2549:20, 2549:24, 2550:18, 2551:6, 2551:9, 2551:23, 2552:8, 2552:9, 2552:12, 2552:15, 2552:20, 2553:8, 2553:20, 2553:23, 2555:4, 2555:5, 2556:24, 2557:3, 2557:4, 2557:13, 2557:21, 2558:1, 2558:2, 2581:21, 2582:6, 2582:10, 2582:14, 2582:17, 2631:19, 2641:1, 2644:23, 2645:6, 2645:16, 2646:9, 2653:5, 2657:19, 2657:22, 2658:7, 2659:3, 2659:8, 2660:25, 2708:12, 2708:20, 2709:9, 2711:23, 2727:23, 2739:3

**Taz's** [6] - 2549:17, 2554:21, 2581:23, 2582:10, 2653:5, 2657:6

**team** [2] - 2553:22, 2554:14

**TEC-9** [1] - 2560:5

**technicolor** [1] - 2646:7

**techniques** [3] - 2628:9, 2739:21, 2739:22

**telephone** [32] - 2527:25, 2549:18, 2549:20, 2550:11, 2574:6, 2674:16, 2677:9, 2677:18, 2680:2, 2680:6, 2680:9, 2680:12, 2680:13, 2680:15, 2680:18, 2680:21, 2680:23, 2681:12, 2681:15, 2681:16, 2681:19, 2681:20, 2681:23, 2682:11, 2682:14, 2682:23, 2683:15, 2684:11, 2684:12, 2684:24, 2686:2, 2691:7

**telephones** [3] - 2549:22, 2668:22, 2675:13

**temptation** [1] - 2758:17

**ten** [9] - 2561:12, 2561:15, 2567:23, 2569:6, 2586:1, 2591:2, 2599:23, 2688:17, 2743:2

**Ten** [1] - 2742:17

**tends** [2] - 2724:9, 2725:8

**tension** [1] - 2714:6

**tensions** [1] - 2651:18

**Tenth** [1] - 2526:7

**term** [9] - 2546:11, 2546:16, 2576:5, 2664:14, 2692:4, 2693:14, 2708:21, 2708:22, 2753:20

**terminated** [2] - 2695:11, 2695:15

**terms** [9] - 2533:24, 2595:25, 2597:24, 2652:8, 2653:15, 2695:5, 2698:4, 2734:25, 2742:24

**terribly** [1] - 2727:16

**terrific** [1] - 2758:15

**terrified** [1] - 2573:6

**test** [1] - 2723:4

**testified** [23] - 2560:18, 2620:7, 2621:14, 2625:2, 2636:13, 2644:7, 2646:2, 2667:20, 2690:20, 2704:24, 2705:18, 2705:25, 2712:8, 2712:18, 2713:13, 2729:25, 2730:11, 2730:23, 2731:4, 2731:7, 2731:19, 2732:25, 2735:3

**testifies** [2] - 2667:6, 2724:3

**testify** [23] - 2560:19, 2597:2, 2617:18, 2639:10, 2640:9, 2645:17, 2646:22, 2648:19, 2670:5, 2685:5, 2686:11, 2686:19, 2686:21, 2713:2, 2713:3, 2727:15, 2730:10, 2735:5, 2740:9, 2740:14, 2740:15, 2740:18, 2740:21

**testifying** [16] - 2589:23, 2620:1, 2620:9, 2620:11, 2640:11, 2643:24, 2644:16, 2644:17, 2646:10, 2706:1, 2711:19, 2733:4, 2737:1, 2737:5, 2739:7, 2740:20

**testimony** [56] - 2527:19, 2538:15, 2566:2, 2573:11, 2581:21, 2590:21, 2596:13, 2621:6, 2630:1, 2637:4, 2667:3, 2667:10, 2675:11, 2711:22, 2712:2, 2712:6, 2719:4, 2719:24, 2721:16, 2729:2, 2729:11, 2729:13, 2729:22, 2729:24, 2730:2, 2730:15, 2731:16, 2731:21, 2732:10, 2732:16, 2732:21, 2732:24, 2733:1, 2733:2, 2733:6, 2733:7, 2733:9, 2733:24, 2734:4, 2734:7, 2734:8, 2734:21, 2734:22, 2735:2, 2736:5, 2736:10, 2736:11, 2736:13, 2736:15, 2736:17, 2736:24, 2737:10, 2737:13, 2739:11, 2741:1

**THE** [365] - 2525:11, 2525:13, 2526:10, 2527:6, 2527:9, 2528:18, 2528:21, 2529:1, 2529:4, 2530:2, 2534:1, 2534:4, 2534:5, 2538:12, 2538:17, 2540:3, 2540:7, 2542:10, 2542:12, 2542:18, 2550:5, 2551:3, 2551:4, 2552:12, 2552:17, 2553:5, 2553:24, 2554:1, 2554:2, 2554:6, 2554:8, 2557:22, 2557:24, 2558:5, 2558:6, 2558:7, 2559:2, 2559:4, 2559:11, 2559:16, 2560:10, 2562:14, 2565:4, 2565:5, 2565:6, 2565:10, 2565:11, 2565:12, 2573:22, 2582:4, 2585:13, 2585:15, 2585:17, 2585:19, 2585:23, 2586:6, 2586:9, 2586:11, 2586:13, 2586:14, 2586:16, 2589:2, 2589:3, 2592:22, 2593:4, 2593:7, 2593:9, 2593:12, 2594:17, 2594:22, 2595:2, 2617:11, 2617:13, 2617:15, 2617:17, 2619:14, 2619:16, 2622:16, 2624:25, 2625:2, 2625:4, 2625:6, 2630:8, 2630:11, 2630:21, 2630:22, 2630:23, 2631:4, 2631:13, 2631:16, 2632:3, 2632:8, 2632:12, 2632:14, 2632:22, 2632:24, 2633:4, 2633:6, 2633:10, 2633:13, 2633:15, 2633:18, 2633:20, 2633:21, 2634:1, 2634:4, 2634:9, 2634:12, 2634:16, 2634:20, 2634:23,

2634:25, 2635:3, 2635:5, 2635:10, 2636:13, 2636:15, 2636:17, 2637:11, 2637:14, 2637:17, 2637:21, 2639:6, 2639:9, 2639:25, 2640:2, 2640:5, 2640:9, 2640:12, 2640:16, 2640:22, 2640:23, 2640:24, 2642:4, 2642:8, 2642:14, 2642:17, 2642:18, 2642:20, 2642:22, 2642:25, 2643:6, 2643:15, 2643:21, 2644:13, 2644:15, 2644:24, 2645:8, 2645:11, 2645:22, 2646:15, 2646:20, 2647:1, 2647:12, 2647:22, 2648:2, 2648:6, 2648:10, 2648:13, 2648:18, 2648:22, 2649:8, 2649:11, 2649:18, 2649:22, 2650:8, 2650:11, 2650:17, 2650:19, 2650:22, 2650:24, 2651:2, 2652:25, 2653:7, 2653:11, 2653:15, 2653:24, 2654:6, 2654:9, 2654:11, 2654:15, 2654:18, 2654:21, 2656:21, 2656:23, 2659:14, 2659:19, 2659:24, 2660:7, 2665:12, 2665:13, 2666:1, 2666:19, 2666:24, 2667:2, 2667:7, 2667:10, 2667:11, 2667:14, 2667:15, 2667:16, 2667:21, 2667:22, 2667:23, 2667:24, 2667:25, 2668:1, 2668:14, 2669:1, 2669:4, 2669:9, 2669:12, 2669:17, 2669:20, 2669:22, 2670:1, 2670:15, 2671:9, 2671:11, 2671:14, 2671:22, 2672:1, 2673:2, 2673:7, 2675:24, 2676:2, 2678:3, 2678:5, 2679:4, 2679:7, 2679:10, 2679:12, 2679:14, 2679:18, 2679:20, 2684:1, 2684:4, 2684:8, 2684:14, 2685:11, 2685:17, 2685:20, 2685:22, 2686:6, 2686:9, 2686:15, 2686:23, 2686:25, 2687:2, 2687:6, 2687:12, 2687:24, 2688:2, 2688:21, 2689:1, 2689:10, 2689:15, 2689:20, 2690:5, 2690:7, 2690:11, 2690:13, 2690:14, 2690:16, 2690:21, 2690:22, 2694:19, 2694:21, 2694:22, 2694:23, 2694:24, 2695:19, 2695:21, 2696:4, 2696:6, 2696:8, 2696:10, 2696:11, 2696:13, 2696:14, 2696:16, 2697:12, 2697:13, 2697:14, 2697:15, 2697:16, 2697:18, 2698:8, 2698:10, 2698:19, 2698:22, 2699:7, 2699:10, 2699:11, 2699:13, 2699:16, 2700:25, 2701:3, 2701:9, 2701:12, 2701:19, 2701:21, 2701:24, 2702:3, 2702:7, 2702:11, 2702:13, 2702:22, 2703:7, 2703:10, 2703:16, 2703:23, 2704:4, 2704:8, 2704:13, 2705:1, 2705:6, 2705:9, 2705:20, 2705:23, 2706:5, 2706:12, 2706:14, 2706:23, 2707:3, 2707:5, 2707:8, 2707:12, 2707:15, 2707:25, 2708:2, 2708:4, 2708:5, 2708:17, 2710:13, 2710:17, 2713:22, 2714:22, 2714:25, 2715:3, 2715:6, 2715:9, 2715:14, 2715:18, 2715:24, 2717:9, 2717:11, 2717:13, 2717:14, 2717:15, 2717:16, 2717:20, 2717:25, 2718:2, 2718:5, 2728:19, 2730:6, 2755:22, 2758:11,

2758:14, 2758:19, 2758:22, 2758:24, 2759:3, 2759:8

**theme** [1] - 2716:18

**themselves** [3] - 2571:13, 2736:8, 2756:19

**theoretically** [1] - 2707:13

**theory** [7] - 2643:19, 2644:3, 2645:1, 2732:21, 2753:14, 2753:17, 2754:15

**thereafter** [2] - 2600:12, 2621:22

**thereby** [1] - 2747:7

**therefore** [7] - 2593:23, 2723:1, 2723:8, 2746:13, 2750:8, 2750:17, 2753:13

**therein** [2] - 2671:17, 2672:4

**they've** [4] - 2647:16, 2669:14, 2719:14, 2756:18

**thin** [1] - 2659:12

**thinking** [4] - 2529:5, 2536:3, 2720:16, 2730:13

**third** [3] - 2717:1, 2750:3, 2750:10

**Thor** [9] - 2607:12, 2607:19, 2607:23, 2608:8, 2608:14, 2608:22, 2610:24, 2621:1, 2628:5

**thoughts** [1] - 2702:19

**threats** [1] - 2546:10

**three** [24] - 2529:4, 2537:5, 2574:24, 2575:5, 2582:23, 2584:2, 2587:23, 2598:5, 2642:7, 2651:23, 2660:14, 2669:15, 2669:20, 2677:11, 2677:14, 2685:9, 2695:22, 2695:25, 2698:1, 2716:14, 2728:16, 2743:4, 2749:21, 2753:10

**Three** [2] - 2742:15, 2742:17

**three-way** [3] - 2574:24, 2575:5, 2660:14

**three-year** [1] - 2695:22

**throughout** [7] - 2721:21, 2722:5, 2724:7, 2740:12, 2742:24, 2743:14, 2751:24

**throw** [3] - 2602:7, 2602:12, 2614:7

**throwing** [1] - 2546:10

**thug** [1] - 2589:8

**thunder** [1] - 2608:15

**thwarted** [1] - 2614:1

**timeline** [7] - 2565:1, 2613:17, 2613:18, 2613:20, 2625:10, 2625:11, 2673:18

**Tina** [3] - 2617:21, 2617:23, 2663:4

**Tion** [3] - 2540:15, 2541:10, 2542:7

**today** [13] - 2527:7, 2652:24, 2653:24, 2654:1, 2664:11, 2699:25, 2707:18, 2713:18, 2716:15, 2717:3, 2733:18, 2744:12, 2754:17

**together** [12] - 2531:4, 2540:14, 2540:17, 2557:5, 2652:7, 2661:23, 2662:9, 2716:2, 2745:22, 2745:24, 2746:21, 2748:13

**token** [1] - 2721:4

**tomorrow** [19] - 2651:7, 2651:10, 2699:20, 2699:22, 2707:14, 2709:4, 2717:5, 2741:16, 2743:2, 2751:9, 2755:9, 2756:15, 2758:16, 2758:19, 2758:21, 2759:8

**tonight** [2] - 2653:10, 2688:12
**took** [12] - 2549:3, 2552:9, 2573:8, 2579:19, 2621:4, 2661:13, 2684:22, 2694:16, 2741:8, 2741:23, 2746:8
**tooth** [1] - 2641:14
**top** [7] - 2616:17, 2674:10, 2678:12, 2678:15, 2678:19, 2695:13, 2696:6
**Top** [1] - 2610:5
**topic** [1] - 2543:3
**touch** [1] - 2629:21
**touches** [1] - 2689:2
**tough** [2] - 2608:6, 2608:24
**towards** [8] - 2536:23, 2547:12, 2547:13, 2556:1, 2559:18, 2559:19, 2559:20, 2757:11
**town** [3] - 2543:21, 2543:22, 2562:10
**track** [1] - 2600:18
**trafficking** [1] - 2686:20
**train** [4] - 2571:6, 2571:10, 2571:13, 2571:15
**trained** [3] - 2628:9, 2628:12
**training** [1] - 2732:20
**transactions** [1] - 2656:6
**transcript** [5] - 2526:12, 2649:6, 2708:25, 2710:7, 2729:1
**TRANSCRIPT** [1] - 2525:10
**Transcript** [1] - 2526:13
**transcriptions** [1] - 2757:13
**transit** [1] - 2661:2
**transmitted** [5] - 2681:9, 2682:8, 2682:25, 2683:13, 2683:24
**transparent** [1] - 2713:8
**transported** [1] - 2686:21
**traveled** [2] - 2531:22, 2554:22
**treatment** [2] - 2691:25, 2737:1
**trees** [1] - 2608:15
**trespass** [1] - 2600:11
**trial** [28] - 2527:2, 2527:11, 2596:10, 2631:17, 2644:12, 2645:19, 2651:17, 2687:17, 2689:5, 2712:10, 2719:19, 2720:8, 2721:8, 2722:10, 2722:13, 2723:11, 2728:16, 2733:24, 2734:4, 2734:7, 2734:8, 2740:1, 2740:4, 2740:12, 2741:3, 2741:5, 2758:16
**TRIAL** [1] - 2525:10
**tricky** [1] - 2705:13
**tried** [2] - 2567:17, 2584:25
**Troub** [1] - 2614:6
**Trouble** [1] - 2660:23
**trouble** [1] - 2614:7
**troubled** [1] - 2728:4
**Troy** [10] - 2538:21, 2539:7, 2539:12, 2539:13, 2593:13, 2593:24, 2616:14, 2616:16, 2617:2
**true** [41] - 2580:2, 2580:10, 2601:3, 2601:6, 2615:8, 2615:12, 2615:18, 2618:6, 2618:7, 2618:13, 2636:7, 2639:14, 2655:22, 2656:20, 2659:9, 2659:10, 2659:11, 2678:17, 2680:1, 2680:6, 2680:8, 2680:11, 2680:13, 2680:14, 2680:17, 2680:20, 2680:22,

2681:11, 2681:14, 2681:16, 2681:18, 2681:20, 2682:12, 2682:10, 2682:13, 2683:1, 2683:14, 2697:4, 2697:8, 2720:17, 2748:4
**truth** [8] - 2577:10, 2646:13, 2667:13, 2690:12, 2730:2, 2730:25, 2736:23, 2737:9
**truthful** [2] - 2645:18, 2732:2
**truthfully** [1] - 2737:5
**try** [11] - 2528:2, 2550:18, 2628:20, 2631:13, 2648:24, 2651:19, 2652:10, 2714:5, 2731:23, 2756:20, 2759:3
**trying** [19] - 2527:12, 2527:15, 2527:22, 2532:22, 2541:25, 2553:24, 2565:2, 2573:18, 2580:23, 2585:20, 2612:18, 2630:2, 2632:5, 2647:13, 2671:18, 2671:19, 2713:7, 2730:17, 2732:2
**tubes** [1] - 2596:7
**turn** [7] - 2537:1, 2543:12, 2555:9, 2555:10, 2555:22, 2687:18, 2704:19
**turned** [3] - 2547:4, 2592:14, 2727:19
**turns** [2] - 2547:2, 2567:20
**TV** [1] - 2724:8
**Twenty** [6] - 2742:15, 2742:17, 2742:18
**Twenty-Five** [1] - 2742:18
**Twenty-Four** [1] - 2742:15
**Twenty-Six** [1] - 2742:18
**Twenty-Three** [1] - 2742:15
**Twenty-Two** [1] - 2742:17
**twice** [1] - 2563:15
**Two** [2] - 2742:14, 2742:17
**two** [61] - 2529:4, 2535:18, 2535:21, 2536:17, 2536:25, 2539:2, 2549:22, 2554:16, 2554:19, 2555:14, 2559:14, 2566:1, 2569:23, 2575:23, 2582:23, 2584:2, 2586:24, 2587:23, 2591:14, 2598:5, 2613:6, 2615:3, 2619:22, 2620:21, 2621:11, 2621:12, 2621:19, 2633:20, 2651:23, 2653:14, 2661:7, 2669:21, 2669:23, 2670:10, 2671:7, 2671:8, 2677:15, 2691:16, 2701:14, 2701:16, 2701:25, 2702:13, 2721:8, 2723:19, 2723:23, 2728:16, 2735:21, 2735:23, 2744:19, 2745:3, 2745:10, 2745:18, 2745:21, 2746:10, 2749:24, 2750:6, 2751:23, 2752:14, 2753:8, 2753:24
**Ty** [11] - 2547:22, 2547:24, 2548:1, 2548:3, 2548:4, 2548:9, 2548:11, 2548:13, 2549:1, 2555:5
**type** [10] - 2549:6, 2599:1, 2644:4, 2646:3, 2711:17, 2712:25, 2723:25, 2724:5, 2736:11, 2736:14
**types** [7] - 2645:24, 2711:24, 2723:23, 2736:21, 2736:22, 2737:13, 2737:25
**Tyrone** [8] - 2543:15, 2581:19, 2581:22, 2582:9, 2598:9, 2631:18, 2664:2, 2675:12
**Tyson** [4] - 2638:18, 2640:1, 2640:3, 2640:6

**U**

**U-turn** [1] - 2555:9
**U.S** [1] - 2721:2
**ultimately** [2] - 2533:7, 2534:20
**umbrella** [1] - 2724:21
**unable** [1] - 2653:8
**unauthorized** [1] - 2576:12
**unavailable** [1] - 2654:5
**unclear** [1] - 2669:22
**under** [36] - 2531:9, 2547:9, 2549:3, 2549:8, 2583:17, 2595:25, 2596:16, 2597:24, 2609:11, 2626:14, 2637:18, 2643:6, 2644:17, 2654:22, 2693:8, 2694:18, 2697:20, 2700:17, 2712:14, 2720:13, 2729:18, 2729:25, 2738:7, 2743:4, 2744:15, 2744:16, 2748:19, 2749:10, 2749:16, 2749:20, 2750:7, 2751:2, 2751:3, 2751:10, 2753:16, 2755:16
**undercover** [2] - 2612:15, 2645:3
**underlying** [6] - 2670:3, 2744:22, 2746:8, 2753:23, 2754:1, 2754:4
**undersigned** [1] - 2679:25
**understandable** [1] - 2651:16
**understood** [2] - 2549:11, 2654:2
**undertaking** [1] - 2747:6
**underway** [1] - 2748:2
**undue** [2] - 2637:18, 2700:17
**unfavorable** [1] - 2739:8
**UNIDENTIFIED** [2] - 2758:10, 2758:13
**Union** [1] - 2635:14
**unique** [1] - 2675:16
**unit** [2] - 2531:4, 2662:8
**UNITED** [3] - 2525:1, 2525:3, 2525:11
**United** [2] - 2525:5, 2525:14, 2525:16, 2527:3, 2709:18, 2709:21, 2735:10, 2740:24, 2754:7
**unknown** [1] - 2576:12
**unlawful** [18] - 2599:23, 2738:1, 2738:22, 2743:23, 2745:1, 2745:11, 2745:19, 2746:5, 2746:7, 2746:22, 2747:1, 2747:3, 2747:4, 2747:6, 2747:19, 2748:24, 2749:8, 2750:2
**unless** [4] - 2610:22, 2611:5, 2611:7, 2723:13
**unlike** [1] - 2750:11
**unnecessary** [2] - 2632:5, 2685:4
**unrealistic** [1] - 2685:4
**unsuspectedly** [1] - 2754:11
**unsuspecting** [1] - 2607:7
**up** [94] - 2527:14, 2529:5, 2530:14, 2531:16, 2535:11, 2535:21, 2535:23, 2536:1, 2536:21, 2537:4, 2540:21, 2544:3, 2546:3, 2548:13, 2548:14, 2551:13, 2552:5, 2554:13, 2555:8, 2556:1, 2560:22, 2561:3, 2561:23, 2566:11, 2566:22, 2570:13, 2570:24, 2571:13, 2571:24, 2572:5, 2581:5, 2582:14, 2584:19, 2588:21, 2591:17, 2591:21, 2597:19, 2601:18, 2603:15,

2609:14, 2611:23, 2611:25, 2612:9, 2614:2, 2615:2, 2617:24, 2620:12, 2622:1, 2624:22, 2633:17, 2642:15, 2645:4, 2646:17, 2651:18, 2654:21, 2659:2, 2661:3, 2661:10, 2661:12, 2661:18, 2662:6, 2662:11, 2674:19, 2687:6, 2694:11, 2694:16, 2697:5, 2698:23, 2699:17, 2700:7, 2700:24, 2708:22, 2709:21, 2714:7, 2715:4, 2715:14, 2715:21, 2717:4, 2729:8, 2731:10, 2731:18, 2731:20, 2731:24, 2733:14, 2736:24, 2742:21, 2742:24, 2743:1, 2754:19, 2755:19
**up-and-up** [1] - 2566:22
**upset** [2] - 2534:12, 2539:13
**upstairs** [2] - 2621:4, 2661:13
**upstanding** [1] - 2569:24
**useful** [1] - 2754:20
**uses** [1] - 2676:15
**utterly** [1] - 2622:8

## V

**vague** [1] - 2622:8
**valuables** [1] - 2600:21
**value** [4] - 2602:11, 2602:14, 2672:8, 2725:11
**van** [1] - 2548:23
**variance** [1] - 2716:11
**variation** [1] - 2716:18
**various** [8] - 2571:4, 2601:12, 2611:20, 2640:3, 2674:24, 2675:13, 2684:24, 2729:18
**vary** [1] - 2691:22
**vehicle** [27] - 2535:17, 2535:19, 2535:20, 2536:15, 2537:16, 2537:17, 2537:19, 2548:14, 2548:15, 2552:14, 2554:21, 2554:23, 2556:1, 2556:25, 2557:1, 2557:3, 2557:4, 2557:7, 2557:9, 2557:11, 2558:6, 2559:22, 2562:18
**vehicles** [1] - 2532:7
**vein** [1] - 2720:17
**vengeance** [1] - 2570:3
**venture** [5] - 2611:25, 2612:8, 2627:8, 2753:9, 2753:11
**verdict** [11] - 2718:17, 2720:7, 2720:12, 2720:17, 2720:18, 2721:9, 2721:20, 2728:9, 2741:10, 2742:7, 2755:12
**verify** [1] - 2691:23
**Verizon** [7] - 2681:12, 2681:14, 2681:16, 2681:18, 2681:20, 2681:23, 2682:5
**Verizon's** [2] - 2682:2
**versus** [1] - 2527:3
**vest** [1] - 2583:17
**via** [1] - 2555:7
**viable** [1] - 2644:3
**victim's** [1] - 2604:3
**victims** [1] - 2612:18
**video** [1] - 2593:23
**view** [3] - 2645:16, 2718:17, 2723:17

**viewed** [1] - 2736:16
**views** [1] - 2720:8
**violate** [3] - 2718:17, 2744:20, 2745:4
**violated** [3] - 2590:17, 2609:6, 2627:1
**violating** [4] - 2604:12, 2698:15, 2740:23, 2743:20
**violation** [4] - 2577:11, 2609:18, 2626:23, 2709:18
**violence** [2] - 2548:6, 2549:9
**Virginia** [2] - 2543:23, 2554:23
**visit** [4] - 2575:11, 2661:7, 2693:23, 2694:11
**visited** [2] - 2575:14, 2618:24
**visitors** [1] - 2575:16
**visits** [3] - 2575:19, 2575:25, 2691:22
**visualize** [1] - 2643:24
**visually** [1] - 2669:23
**voice** [5] - 2543:9, 2543:10, 2713:25, 2717:16, 2756:3
**voicemail** [1] - 2677:1
**voices** [3] - 2543:6, 2543:8, 2651:23
**voluminous** [1] - 2673:4
**voluntarily** [1] - 2743:16

## W

**W-i-l-k-e-r-s-o-n** [1] - 2690:17
**wait** [5] - 2552:13, 2555:21, 2561:18, 2623:17, 2651:15
**waited** [8] - 2534:20, 2534:22, 2536:22, 2540:21, 2547:24, 2552:14, 2623:3, 2684:7
**waiting** [3] - 2548:11, 2571:13, 2614:13
**waived** [1] - 2707:24
**walk** [2] - 2557:8, 2661:9
**walked** [3] - 2532:13, 2536:17, 2545:24
**walkie** [4] - 2541:10, 2541:24, 2542:1, 2542:4
**walkie-talkie** [1] - 2541:10
**walkie-talkies** [3] - 2541:24, 2542:1, 2542:4
**walking** [7] - 2536:23, 2541:2, 2546:3, 2546:17, 2571:21, 2572:5, 2607:10
**walks** [3] - 2547:1, 2724:20, 2725:1
**Wall** [1] - 2525:24
**wallet** [1] - 2602:20
**wants** [6] - 2644:22, 2648:13, 2684:20, 2701:5, 2717:14, 2728:6
**warm** [1] - 2724:15
**warming** [1] - 2618:22
**warned** [1] - 2614:25
**warrant** [3] - 2592:4, 2692:8, 2716:25
**warrants** [2] - 2592:3, 2592:9
**wash** [1] - 2665:15
**watched** [1] - 2559:18
**water** [3] - 2546:2, 2546:25, 2733:13
**waters** [2] - 2545:23, 2728:4
**ways** [4] - 2530:8, 2652:20, 2660:13, 2752:14
**wear** [2] - 2628:15, 2641:14
**wearing** [1] - 2603:15

**wedding** [1] - 2603:10
**WEDNESDAY** [1] - 2525:7
**weed** [2] - 2606:3, 2606:4
**week** [4] - 2616:6, 2616:7, 2757:24
**weeks** [2] - 2635:9, 2691:7
**weighed** [1] - 2627:25
**weighing** [2] - 2732:13, 2733:2
**weight** [7] - 2719:2, 2731:20, 2732:12, 2732:17, 2733:7, 2734:19, 2737:12
**well-known** [2] - 2533:21, 2534:2
**Wesson** [1] - 2560:3
**West** [1] - 2526:4
**west** [1] - 2639:1
**Western** [1] - 2635:14
**wet** [1] - 2725:2
**whatsoever** [1] - 2677:5
**Where'd** [1] - 2658:9
**whistle** [1] - 2718:5
**white** [1] - 2727:19
**whole** [7] - 2551:17, 2599:17, 2613:4, 2650:4, 2708:20, 2718:14, 2755:1
**wielding** [2] - 2608:14, 2608:24
**wife** [1] - 2635:7
**Wilkerson** [7] - 2690:9, 2690:16, 2693:3, 2698:14, 2699:3
**WILKERSON** [2] - 2690:18, 2760:19
**wilkerson** [1] - 2690:25
**willfully** [10] - 2743:13, 2743:22, 2747:8, 2751:13, 2752:6, 2752:18, 2752:19, 2753:9, 2753:19, 2753:20
**willing** [2] - 2569:10, 2643:16
**win** [1] - 2715:19
**window** [3] - 2575:22, 2617:9, 2724:18
**Wireless** [2] - 2682:11, 2682:21
**wireless** [1] - 2682:13
**Wireless'** [2] - 2682:17, 2682:19
**wisdom** [1] - 2718:14
**Wise** [15] - 2566:2, 2566:6, 2566:8, 2569:16, 2569:18, 2570:4, 2574:13, 2618:15, 2619:17, 2619:18, 2620:3, 2621:16, 2622:2, 2622:11, 2622:12, 2622:19, 2622:22
**wise** [3] - 2566:10, 2699:21, 2744:4
**Wise's** [6] - 2569:25, 2574:10, 2618:20, 2621:24, 2622:10, 2662:24
**wish** [5] - 2635:5, 2675:24, 2707:19, 2710:14, 2736:20
**wished** [1] - 2753:7
**wishes** [8] - 2643:10, 2670:8, 2679:8, 2685:7, 2687:15, 2687:19, 2688:16, 2689:6
**withdraw** [1] - 2652:16
**witness** [83] - 2529:3, 2542:15, 2557:9, 2594:24, 2595:1, 2632:10, 2639:14, 2643:3, 2646:3, 2646:22, 2647:7, 2647:16, 2648:17, 2649:14, 2649:19, 2653:23, 2654:22, 2666:20, 2666:23, 2667:2, 2667:6, 2667:19, 2668:1, 2686:19, 2689:13, 2690:4, 2690:5, 2690:7, 2690:19, 2690:22, 2699:12, 2702:23, 2704:23, 2709:8, 2710:25,

2711:3, 2711:10, 2711:15, 2712:19, 2713:5, 2719:17, 2724:3, 2727:15, 2727:18, 2727:24, 2730:4, 2730:7, 2730:8, 2730:10, 2730:11, 2730:14, 2730:16, 2730:17, 2730:18, 2730:20, 2730:21, 2730:23, 2730:24, 2730:25, 2731:1, 2731:3, 2731:5, 2731:6, 2731:7, 2731:11, 2731:12, 2731:18, 2732:9, 2732:12, 2732:15, 2732:16, 2734:4, 2734:6, 2734:10, 2734:13, 2736:24, 2737:1, 2737:4, 2737:7, 2739:7

**WITNESS** [36] - 2534:4, 2551:4, 2554:1, 2554:8, 2557:24, 2558:6, 2565:5, 2565:10, 2565:12, 2585:15, 2585:19, 2586:9, 2586:13, 2589:3, 2619:16, 2630:22, 2634:12, 2636:15, 2640:23, 2656:23, 2665:13, 2667:14, 2667:16, 2678:5, 2690:13, 2690:16, 2694:21, 2694:23, 2695:21, 2696:6, 2696:10, 2696:13, 2697:13, 2697:15, 2697:18, 2699:10

**witness'** [12] - 2667:3, 2667:10, 2730:2, 2730:21, 2731:8, 2731:9, 2731:16, 2733:6, 2733:9, 2734:20, 2735:15, 2737:10

**witness's** [2] - 2538:14, 2731:21

**witnessed** [1] - 2616:23

**WITNESSES** [1] - 2760:3

**witnesses** [40] - 2639:17, 2654:5, 2670:4, 2689:16, 2689:21, 2690:4, 2711:7, 2711:23, 2712:7, 2712:8, 2719:3, 2719:10, 2719:24, 2722:21, 2722:23, 2728:5, 2728:24, 2729:8, 2729:11, 2729:12, 2729:15, 2729:22, 2729:24, 2729:25, 2732:7, 2732:18, 2733:22, 2734:22, 2735:3, 2736:5, 2736:7, 2736:21, 2736:23, 2737:13, 2739:7, 2739:10, 2739:12, 2739:14, 2739:23, 2740:6

**wolves** [1] - 2614:8

**woman** [8] - 2562:22, 2586:7, 2586:8, 2586:9, 2586:11, 2591:19, 2613:14, 2613:15

**women** [5] - 2579:24, 2582:23, 2583:16, 2584:23, 2585:21

**wonderful** [1] - 2720:22

**wondering** [3] - 2622:6, 2622:7, 2711:13

**word** [9] - 2576:3, 2646:14, 2646:15, 2652:2, 2714:24, 2725:23, 2756:5, 2756:6, 2757:10

**wording** [1] - 2590:2

**words** [13] - 2533:8, 2546:14, 2610:19, 2612:1, 2614:10, 2622:12, 2630:18, 2743:12, 2743:21, 2744:8, 2744:23, 2746:1, 2746:17

**works** [4] - 2651:6, 2652:1, 2700:21, 2724:12

**World** [57] - 2530:25, 2531:1, 2531:13, 2532:2, 2532:11, 2532:19, 2533:2, 2533:7, 2533:10, 2533:11, 2533:15,

2534:8, 2534:17, 2535:3, 2535:9, 2537:20, 2537:23, 2540:15, 2540:16, 2541:13, 2543:2, 2544:7, 2544:19, 2545:3, 2545:4, 2550:8, 2550:15, 2550:20, 2551:5, 2551:8, 2552:22, 2553:4, 2553:9, 2553:10, 2553:11, 2553:12, 2553:13, 2553:18, 2553:19, 2553:23, 2553:25, 2554:3, 2554:6, 2554:9, 2556:3, 2556:5, 2556:9, 2557:17, 2564:14, 2566:3, 2566:6, 2566:9, 2566:11, 2574:5, 2631:19, 2631:21

**World's** [1] - 2543:9

**worried** [1] - 2604:2

**worry** [2] - 2644:13, 2755:2

**wound** [1] - 2582:14

**wrap** [4] - 2642:15, 2654:21, 2687:6, 2700:23

**write** [1] - 2695:23

**writes** [1] - 2568:19

**writing** [4] - 2673:24, 2674:2, 2674:6, 2746:1

**written** [3] - 2643:22, 2654:11, 2726:24

# Y

**Y'all** [1] - 2541:23

**year** [19] - 2570:14, 2570:15, 2573:17, 2573:25, 2586:18, 2598:21, 2598:22, 2598:25, 2599:21, 2599:24, 2604:11, 2604:12, 2604:20, 2604:24, 2652:22, 2660:21, 2660:24, 2676:8, 2695:22

**years** [29] - 2546:9, 2567:23, 2569:6, 2570:19, 2573:15, 2574:3, 2574:21, 2590:14, 2613:25, 2618:20, 2618:23, 2625:9, 2638:7, 2653:18, 2658:21, 2662:15, 2689:22, 2691:16, 2694:9, 2695:25, 2709:22, 2714:1, 2715:11, 2717:11, 2724:7, 2732:9, 2742:5

**yell** [1] - 2714:2

**yelling** [2] - 2714:1, 2717:17

**yesterday** [13] - 2528:11, 2530:20, 2589:23, 2601:9, 2613:16, 2619:17, 2629:16, 2629:17, 2629:20, 2636:21, 2643:11, 2702:1, 2702:18

**Yo** [8] - 2534:13, 2537:18, 2541:24, 2542:1, 2542:3, 2547:14, 2549:14, 2557:8

**YORK** [1] - 2525:1

**York** [26] - 2525:6, 2525:14, 2525:17, 2525:25, 2526:11, 2598:17, 2599:5, 2609:11, 2612:3, 2612:14, 2614:22, 2685:25, 2686:12, 2686:22, 2690:10, 2691:14, 2693:11, 2693:18, 2749:13, 2749:16, 2749:20, 2750:11, 2751:2, 2751:15

**young** [10] - 2549:24, 2589:19, 2600:20, 2606:23, 2613:14, 2613:15, 2621:23, 2622:1, 2622:8

**younger** [1] - 2566:10

**yourself** [14] - 2565:18, 2569:24, 2575:16, 2581:6, 2589:8, 2589:20,

2592:14, 2592:25, 2605:7, 2611:22, 2651:20, 2727:9, 2731:9, 2758:8

**yourselves** [2] - 2736:22, 2753:5

# Z

**Zareh** [3] - 2560:21, 2562:7, 2566:13

**zero** [1] - 2708:21

**Zetel** [4] - 2683:2, 2683:5, 2683:6, 2683:10